QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000


*Attorneys for OpenAI, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | Case No. 4:23-CV-03918-YGR |
| Plaintiff, | Assigned to the Hon. Yvonne Gonzalez Rogers |
| vs. | **DECLARATION OF DR. SETH JAMES NIELSON SUPPORT OF OPENAI, INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | |
| Defendants. | Date:      November 7, 2023<br>Time:      1:00 p.m.<br>Place:     Courtroom 1 (4th Fl.)<br>              1301 Clay St.<br>              Oakland, CA 94612 |

# DECLARATION OF SETH JAMES NIELSON, PH.D.

I, Seth James Nielson, Ph.D., declare as follows:

1.      My name is Seth James Nielson, Ph.D.  I have been retained by counsel on behalf of Plaintiff OpenAI, Inc. ("OpenAI") in connection with the above-captioned action.  I submit this declaration in response to the evidence that Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Defendants") submitted in opposition to OpenAI's motion for a preliminary injunction.  I make this declaration based on my personal knowledge, education, training, and experience, as well as my review of relevant literature and case-specific materials.  If called and sworn as a witness, I could and would testify competently to my opinions expressed below and the bases and reasons for them.

## I.      ASSIGNMENT AND SUMMARY OF OPINIONS

2.      I have been asked to perform a cyber-forensics investigation and analysis concerning the events and evidence set forth in Mr. Ravine's declaration in opposition to OpenAI's preliminary injunction motion, including as to the existence, accessibility, and functionality of Defendants' purported Wikineering website and related domain names, the so-called "Initial Collaboration Tool," and Defendants' "Open.AI" website and related subdomain names.

3.      It is my opinion, based on my education, training, experience, and investigation and analysis in this matter, that: (i) the Wikineering website was nonfunctioning, under construction, or inaccessible to the public before November 16, 2015, (ii) no "platform" on Wikineering website had been released to the public as of November 16, 2015; (iii) because there was no public Wikineering website or platform before November 16, 2015, there was also no public "Initial Collaboration Tool," (iv) Mr. Ravine's 2023 "reconstruction" of the asserted 2015 "Initial Collaboration Tool" contains text identical to text from a 2017 college textbook, which indicates that the reconstruction is not an accurate representation of a 2015 webpage, (v) the Open.AI domain name either redirected to a landing page, OpenAI's website, or a unrelated website for artworks, between September 2015 and November 2022; and (vi) Mr. Ravine's various "tools" did not appear to have real users.

## II. **QUALIFICATIONS**

4. My qualifications are summarized below and are addressed more fully in my CV attached as **Exhibit A** to this declaration.

5. I am a subject matter expert in cyber security, including the sub-fields of forensics, applied cryptography, and network security. I am the Founder and Chief Scientist of Crimson Vista, a computer security investigations company. I hold appointments at the University of Texas at Austin as an Adjunct Associate Professor in the Department of Computer Science and as a Cybersecurity Fellow in the Robert Strauss Center for International Security and Law.

6. I have been working professionally in the field of computer security since August 2005 and within the field of computer science generally since June 2000. My experience includes graduate-level teaching, academic research, industry employment, and consulting practice.

7. I received my B.S. in Computer Science in April of 2000. During my final undergraduate semester, I worked both as a teaching assistant for a Computer Networking course and as a researcher in the Networked Computing Lab. In these capacities, I assisted students in debugging and designing TCP/IP protocol stacks, Address Resolution Protocol implementations, and Remote Procedure Call projects. I have collaborated on investigations of statistical traffic engineering for bandwidth allocation, including a published paper entitled, "Effective Bandwidth for Traffic Engineering."

8. After graduation (from 2001 through 2003), I worked as a software engineer at Metrowerks (formerly Lineo, Inc.), where I had substantial responsibilities relating to software architecture, computer networking, and technical project management.

9. As part of my technical training and development at Lineo/Metrowerks, I also gained and employed a wide exposure to computer networking and an introduction to network security. I tested and evaluated a prototype firewall product, built a custom VPN solution, and trained in the use of web server and mail server administration. I ran my own personal MTA with an IMAP and POP3 server based on these tools under development.

10. Another major networking project involved porting the Embedix SDK from Linux to Windows. For this project I used a virtual-machine/networked solution. The underlying SDK engine

1 remained running in a Linux VM while the GUI operated in native Windows. I developed all of the
2 code for this remote communication system.

3        11.     Additionally, the SDK provided extensibility through a scripting system based on
4 Python. A critical task was to make the existing Python scripts, built to run in Linux, work
5 unmodified with the new Windows system. I engineered a framework that automatically intercepted
6 certain Python commands and sent them across the network to the other side, similar to RPC
7 technology. From the perspective of the scripts, all of the function calls were local when, in fact,
8 certain operations were executed remotely.

9        12.     While working at Lineo/Metrowerks, I also returned to BYU to pursue my Master's
10 degree in Computer Science. In addition to the graduate level course work in wireless computer
11 networks and compilers, I pursued graduate research in software engineering topics, with a special
12 emphasis on how programmers think while creating and modifying code. My research included a
13 study of computer architectural patterns and how those patterns might need to change as
14 programming languages change and evolve. Based on my research, I proposed a concept called
15 "Design Dysphasia," wherein a programmer or software developer becomes trapped in their
16 approach to solving problems based on the paradigms and design approaches of the programming
17 language. My research was published as "Design dysphasia and the pattern maintenance cycle," in
18 the Journal Information and Software Technology August 2006. This work also was a major
19 component of my Master's thesis.

20        13.     After finishing my Master's degree, I moved to Houston, TX in 2004 to begin a Ph.D.
21 program at Rice University. At this point, my interest in computer security took priority over my
22 interests in programming languages and software engineering, and my classes and research were
23 directed to that topic.

24        14.     During the 2004 fall semester of my Ph.D. program at Rice University, I identified a
25 security vulnerability in the Google Desktop Search that could have allowed hackers to compromise
26 users' computers and obtain private information. After contacting Google and assisting them in
27 closing the vulnerability, we published the details of our investigation.

28

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

15.     In 2005, I completed an internship at Google, where I designed and implemented a solution to privacy loss in Google Web Accelerator. The Google Web Accelerator was designed to increase the speed of browsing the Internet. Once installed on a user's computer, the browser would request all content through a Google Proxy. The proxy performed pre-fetching and extensive caching in order to provide fast and responsive service to the user. At the time of my internship, news reports had identified odd problems in which users of the Accelerator were accessing other individual's private pages. During my internship, I designed and implemented a prototype solution for this issue in C++.

16.     In 2005, I published a paper entitled, "A Taxonomy of Rational Attacks." This paper categorized and described the various types of attacks that one might see in a decentralized, peer-to-peer network. When there is no centralized authority, users have to cooperate to obtain service. The term "rational attacks" refers to the economic incentives to not cooperate while still exploiting the system for service.

17.     My Ph.D. Thesis was entitled "Designing Incentives for Peer-to-Peer Systems," and it built on this concept. Given a network where participants cannot be forced to cooperate, the operation of said network must induce cooperation by design of the outcomes. In other words, it must be in each participant's best interest to contribute to the cooperative operation. I conducted experiments including simulated extensions to the BitTorrent peer-to-peer protocol for long-term identities and mechanisms for cooperative anonymity.

18.     From 2005 through 2008, with the approval of my Ph.D. adviser, I worked as a Security Analyst and for Independent Security Evaluators (ISE). Much of my early work was spent developing a software encryption library, including the necessary tests and procedures for FIPS-certification. The encryption library provided advanced operations such as secure data splitting and recovery.

19.     In 2009, I went to work full time for ISE as a Security Analyst and later as a Senior Security Analyst. I built a number of advanced projects including a parallel-program for massive code coverage analysis, GPU hardware-accelerated AES encryption, and encrypted file-system prototypes.

20.     In addition to the software development, I also performed security evaluation services that included port-scanning analyses, security protocol analysis using formal and exploratory methods, and investigated security breaches.

21.     I also designed and managed the implementation of a secure communication technology that splits trust between multiple SSL Certificate Authorities (CA), so that if one CA is compromised, the communication stream can still be safely authenticated. My work on the secure communications technology project led to the issuance of multiple patents. In total, I wrote hundreds of thousands of lines of code in C, C++, and Python, including projects where I had to implement the same functionality in two separate languages.

22.     In 2011, I began work as a Research Scientist at Harbor Labs and continued with that consulting firm until fall 2015. I worked with a wide range of clients, specializing in network security, network communications, software architecture, and programming languages. I analyzed an extensive collection of commercial software, including software related to secure email, cloud-based multimedia delivery, document signing, anti-virus and anti-intrusion, high- performance routing, networking protocol stacks in mobile devices, PBX telecommunications software, VoIP, and peer-to-peer communications. I also analyzed security considerations for potential technology acquisitions.

23.     Also at Harbor Labs, I reviewed technology and source code for multiple clients related to accusations of theft and/or misappropriation of trade secrets.  These engagements included an analysis of C, C++, Java, Python, and other source code languages in high-frequency trading, e-commerce, and other similar systems.

24.     I also assessed the security and privacy technologies and policies provided by a third-party vendor to the Center for Copyright Infringement (CCI). CCI represents content owners, such as the RIAA and the MPAA, in finding and reducing piracy online.

25.     For other clients, I have "resurrected" or re-created legacy software systems. For example, I assisted one client in making code from the mid 90's operational. I helped them identify the most compatible components from an old CVS repository, obtain the necessary legacy hardware and software to rebuild the source code, and diagnose why the separate components weren't

completely compatible with each other. Using tools from the era (*i.e.,* the mid-90's), I identified and fixed these issues in C++ and Java code, and successfully demonstrated the operational system.

26.     In other similar examples, I re-created basic software in x86 Assembly code that mimicked the behavior of 1990's era viruses, wrote a file transfer system similar to FTP in pre-2.0 Java, and demonstrated the use of a command-line antivirus software adapted for router/gateway scanning.

27.     During my final year at Harbor Labs, I was engaged as the principal consultant with a large biomedical device firm in a twelve-month analysis of the security of their products. Notably, medical devices were for some time not considered significant threats in terms of computer security. However, recent demonstrations by security researchers of the various ways in which a malicious individual might harm a person using a medical device has shifted the thinking in the industry. Accordingly, I was engaged to assist this company in the analysis of their products, their process, and their future roadmap in order to ensure that patients are not harmed. My team and I analyzed design documents, hardware, and a broad range of additional resources in order to expose potential problems. The security of these systems depends, in part, on the architecture and deployment of the networks in which they operate.

28.     In May 2016, I founded Crimson Vista, Inc. as a boutique computer security engineering company. Similar to the work that I did at Harbor Labs, I continue to provide technical expertise to a wide range of clients in areas of programming languages, computer networks, and network security. My expertise in the area of "security engineering" provides comprehensive analysis, design, and insight into cybersecurity concerns before, during, and after development.

29.     For example, I have been retained by a start-up in telecommunications security to provide cryptography expertise and evaluations of their protocols and architectures. My team and I have prototyped new protocols, written up analyses, and presented to potential partners and investors.

30.     Another start-up company retained me for guidance in matters relating to Blockchain and Smart Contracts. This technology is very much dealing with a "fad" phase where there is a lot of misinformation and hype. I guided the start-up company through where these kinds of technologies

would help and where they would not. I have also provided training on Blockchain at the Data Architecture Summit and Enterprise Data World conferences.

31. I have also provided technical guidance to an antitrust team in the United States Department of Justice. Although the technologies and parties are confidential, I can disclose that I provided in-person training on technical topics and analyses of competing security products.

32. More recently, I have been retained by clients, including a Fortune 100 financial institution, to provide them with post-data-breach analyses of what went wrong, the impact of the lost data, and guidance on resolution. In these engagements, I provided reverse engineering of the data to demonstrate how an attacker can or would use the compromised information, analyzed software development to determine when the system became vulnerable, and helped identify impacted customers that had been missed in the investigations.

33. Crimson Vista has also expanded and developed as a forensics investigation company. Our projects include investigations into the provenance of electronics documents and materials, data tracking on Internet websites, and blockchain/cryptocurrency matters. Our team makes use of industry-standard investigation tools as well as our own analysis techniques. I am responsible for developing my team's capabilities and overseeing the investigations.

34. Through Crimson Vista, I also invest in research and development. Recent projects include engaging with a partner to implement prototypes of communications security protocols for next-generation automobiles. I also gave a talk on "Detecting Malicious Sandboxes" at the Workshop on Defensive Deception and Trust in Autonomy, in association with the 2018 Naval Applications of Machine Learning Workshop.

35. I also continue to perform a wide range of code reviews for diverse technologies including CAD software, video game systems, digital mobile radios (DMRs), video streaming, and digital rights management (DRM).

36. I maintain ties to academia. I have held adjunct appointments at Johns Hopkins University from 2014 to 2019. From July 2016 to July 2019 I also held an appointment as the Director of Advanced Research Projects in the Johns Hopkins University Information Security Institute.

37. At Johns Hopkins University I taught Network security and Advanced Network Security. I created a custom curriculum and lab experience wherein students develop their own security protocols as a class and then attempt to break their own creations. Students learn how hard it is to get security right, and how easy it is to find something wrong. I published a paper about the labwork in the Journal of Computer Science Education entitled, "PLAYGROUND: Preparing Students for the Cyber Battleground."

38. The labwork in the advanced course builds on the same framework, but adds in mobile, autonomous vehicles in a game-like simulation. Students program "bots" with computer program "brains" that are used to gather resources, attack, communicate, and so forth. The students explore various opportunities for compromising the brains of the other students as part of the labs.

39. One of the components of the students' lab work is to create a protected "sandbox" for running untrusted code. The sandbox must provide access to the system in a manner that cannot be exploited. Conversely, the other half of their assignment is to design exploitative code that attempts to bypass and/or neutralize the protections of the sandbox environment. This experimental framework enables the students to learn about creating, identifying, and neutralizing malware such as viruses.

40. Beyond course instruction, I also mentored Master's students at Johns Hopkins in their capstone projects. These projects include networking security and privacy concerns across a wide range of technologies including cryptography, drone security, iOS security, BitCoin, SSL vulnerabilities, and Twitter "botnets." My students and I have published multiple papers from these capstone projects.

41. During my tenure as the Director of Advanced Research Projects, I was tasked with developing collaborative research opportunities. Through my efforts, a wide range of student capstones have been executed with partners from the Johns Hopkins Applied Physics Lab or outside corporate partners.

42. For example, we coordinated with the company OnBoard Security to develop better security for anti-collision protocols for air traffic. Students demonstrated the potential issues related

to leaving the protocol unsecured and built a working prototype of a secured variant. OnBoard and Johns Hopkins published press releases which were picked up by aviation-focused news sources.

43. I am now an adjunct professor at the University of Texas at Austin. I previously taught the undergraduate Network Security and Privacy class in the Computer Science department. I now teach the Introduction to Cybersecurity Technology class in the Law School. I continue to advise students in the Computer Science department in independent research projects such as the applications of AI to computer security problems.

44. I am also the co-founder and current director of the Crypto Done Right Foundation, a non-profit. The foundation grew out of a research project initially hosted at Johns Hopkins University and funded by a grant from Cisco. Crypto Done Right is designed to bridge the gap between cryptography SME's and the IT professionals that use it. It provides authoritative guidance on deployment, lifecycle, and management of cryptography in IT systems, software development, and technical management.

45. The attached **Exhibit B** lists the materials I considered in forming my opinions. I am being compensated at my standard rate of $650 per hour for my time, plus reasonable out-of-pocket expenses. I have received no additional compensation for my work in this litigation, and my compensation does not depend upon the contents of this report, any testimony that I may provide, or the ultimate outcome of this litigation.

46. I hold my opinions to a reasonable degree of professional certainty. The information I have relied upon is the type of information that is typically relied upon in my fields of expertise. I reserve the right to revise my opinion if additional information, documents, or testimony provided by the parties becomes available that would cause me to amend or supplement my opinions here.

III. **OPINIONS AND ANALYSIS**

A. **The Wikineering Website**

47. As part of my investigation, I referred to several main sources to begin my analysis, including the Internet Archive's WayBack Machine and advanced searches on Google.

48. Starting with the Internet Archive, I searched for records from the Internet Archive's captures of the Wikineering website, https://wikineering.org, during 2012 when Mr. Ravine has

claimed he started it. But the Internet Archive had no such records. Instead, the first three captures included one capture of a GoDaddy.com parked page in 2011 and two captures of a "502 Bad Gateway" error page in April 2013 and June 2013. Attached as **Exhibit C** is a true and correct copy of screenshots from those three captures on the Internet Archive's website. In my experience, the "502 Bad Gateway" error page indicates that the website server is down or otherwise unavailable. This indicates that the Wikineering website was not operational after the time that Mr. Ravine has said he started it in 2012. Further bolstering this conclusion, a later Internet Archive capture of the Wikineering website on December 18, 2014 showed a basic "Coming soon" page. Attached as **Exhibit D** is a true and correct copy of a screenshot of that capture on the Internet Archive's website.

49.     After the Internet Archive's capture of the December 18, 2014 "Coming soon" page, the next recorded capture is recorded November 16, 2015. The Internet Archive's November 16, 2015 capture of the Wikineering website showed a redesigned website with simple, minimal content and functionality. Attached as **Exhibit E** is a true and correct copy of a screenshot of that capture on the Internet Archive's website.

50.     As shown in Exhibit E, a Wikineering logo is prominently shown in the top left corner, along with the slogan "building the 21st century together." Although the website featured large font, it was short on substance, with only 12 sentences on the entire website. Those sentences provided seemingly generic information about Wikineering. The website did not mention "Open AI," artificial intelligence, or even the so-called "Initial Collaboration Tool." Nor did the website provide any actual platform with collaboration functionality or the ability to access one, such as through a website menu, login button, or signup page. Rather, the website expressly stated: "Wikineering will be released in 2015." This tells me that the Wikineering "platform" had not yet been released to the public as of the date of this website capture—November 16, 2015. Notably, the archived Wikineering webpage is hardly different from the current version of that webpage, despite Mr. Ravine's assertion that the website has changed significantly over time. Attached as **Exhibit F** is a true and correct copy of a screenshot of website taken on October 24, 2023, available at http://wikineering.org/.

51.     In addition, I also searched for and reviewed the Internet Archive's captures of the other domain name that Mr. Ravine mentioned in his declaration, https://ineed.com.  But the captures of that website generally reflected an almost entirely blank space, as shown in the March 25, 2015 screenshot from the Internet Archive attached as **Exhibit G**.  None of those captures that I reviewed reflected a website for Wikineering, much less made any reference to a Wikineering platform, the so-called "Initial Collaboration Tool," or "Open AI."  Further, there was no record whatsoever of the specific URL that Mr. Ravine noted (https://ineed.com/wikineering).  In my opinion, these facts indicate that the ineed.com domain name was not being used to host any consumer-facing platforms in 2015.  It is also not clear why Mr. Ravine would have hosted his Wikineering website on a different domain name (ineed.com), given that he already owned the wikineering.org domain name.  One likely explanation is that platforms that are still being developed and tested before their release to the public are hosted on other domain names.  Thus, to the extent Mr. Ravine had hosted anything related to Wikineering on the ineed.com domain name, it would be consistent with Mr. Ravine not having released that platform to the public.

52.     In addition, I also performed advanced searches on Google for any reference to either "wikineering.org" or "ineed.com/wikineering" (each with quotes).  In my experience as a cyber professional and investigator, I would expect to see at least several pages worth of search results, if not many more, for an online platform that had done business for at least several years.  For example, a Google search for OpenAI's website "openai.com" yields over 2.5 million search results.  Even for a less well-known company or platform, I would still expect to see more than a *de minimis* number of search results, such as press releases, blog posts, news articles, or user generated content about the platform.  I did not see that after performing either search for "wikineering.org" or "ineed.com/wikineering".  In fact, I received *zero* search results for "ineed.com/wikineering."  As for "wikineering.org", Google returned only five search results on a single page, as shown on the true and correct screenshot attached as **Exhibit H**.  In my opinion, the dearth of search results for each of these terms is inconsistent with Mr. Ravine's claim that the website had operated and was used by the public from at least 2012 to early 2016.

**B.** **The "Initial Collaboration Tool"**

53.    Having found no evidence to support the existence of the Wikineering platform that

Mr. Ravine describes, I proceeded to consider the "reconstruction" of the so-called "Initial

Collaboration Tool" that Mr. Ravine provided as Exhibit 2 to his declaration.

54.    In my experience as a cyber professional, I find it unusual and unlikely that

Mr. Ravine has no data sources for this supposed tool.  The supposedly recreated data in Mr. Ravine's

Exhibit 2 has the appearance of a Wiki.  Wiki pages are generated from text files, but Mr. Ravine has

not provided any and suggests none currently exist.  That is unusual because it is easy and straight

forward to store these text files in a repository and maintain them even when there are server and

other changes over time.  The lack of any data that can be dated to the relevant time period other than

what Mr. Ravine *remembers* is unusual.

55.    I also found it curious that Mr. Ravine does not remember *which* domain name

provided access to his Wikineering website (i.e., wikineering.org or ineed.com), yet he could

remember the specific content within the specific portion of that Wikineering website that allegedly

used the words "Open AI."  Given that peculiarity, I began investigating the reconstruction for signs

of copying or plagiarism.

56.    Ultimately, I determined that most of the content (and all of the content with any

technical depth) in Mr. Ravine's reconstruction is virtually identical to content in a 2017 college

textbook entitled, "Mathematics of Autonomy: Mathematical Methods for Cyber-physical-cognitive

Systems," by Darryn J. Reid, Michel J. Pilling, and Vladimir G. Ivancevic (World Scientific,

December 2017), *available at* https://www.worldscientific.com/worldscibooks/10.1142/10716 and

searchable through Google Books.  According to the World Scientific's website linked above, the

authors of that textbook were employed by the Defence Science and Technology Group, a formal

body within the Australian Government's Department of Defence.  *See*

https://www.dst.defence.gov.au/.  Attached as **Exhibit I** is a true and correct copy of an excerpt from

this textbook that reflects the text that Mr. Ravine's Exhibit 2 appears to copy, as retrieved from

Google Books where these excerpts are available, https://books.google.com/books?

id=bp5QDwAAQBAJ.  For the Court's convenience, attached as **Exhibit J** is a side-by-side

summary comparison of each of the passages that are virtually identical in Mr. Ravine's reconstruction and the textbook. It is my opinion that Mr. Ravine's reconstruction copies the content from this textbook—which was not published until two years *after* Mr. Ravine said the content appeared on his "platform."

**C.** **The Open.AI Website**

57.    To investigate Mr. Ravine's uses of the website available at https://open.ai, I first reviewed the Internet Archive's captures of that website. Because Mr. Ravine states that he "[i]mmediately" put up a landing page after March 26, 2015, I began my review at that date. However, there is no record whatsoever on the Internet Archive of Mr. Ravine having put up a landing page at that time. The earliest record I have seen, which is a basic landing page that states an "ANNOUNCEMENT WILL BE MADE SOON," is dated September 5, 2015. In the eight years since, the website has had very infrequent updates, except for those within the past year.

58.    Below is a summary table that reflects captures from the Internet Archive of Defendants' open.ai website between September 5, 2015 and September 18, 2023. As shown in the table: (i) Defendants' website displayed the same landing page in captures between 2015 and 2017, (ii) Defendants had *no* website, instead redirecting their domain name to OpenAI's website, in captures between 2017 and 2022, (iii) Defendants displayed a website for an apparently different company—CryptoArt—without any mention of "Open AI" for a period of time in 2022, and (iv) Defendants began displaying the redesigned website with a text-to-image generator starting in November 2022. As the images shown below reflect, none of these webpages appeared to have any menus or links to subdomains of the open.ai website.

| Description | Thumbnail |
|---|---|
| Date:  September 5, 2015<br><br>Type:  Landing Page<br><br>Description:   The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20150905165533/http:/open.ai/ |  |

| | |
|---|---|
| Date: December 14, 2015<br><br>Type: Landing Page<br><br>Description: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20151214201146/http:/open.ai:80/ |  |
| Date: July 13, 2016<br><br>Type: Landing Page<br><br>Description: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20160713103448/http:/open.ai:80/ |  |
| Date: December 2, 2016<br><br>Type: Landing Page<br><br>Description: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20161202073335/http:/open.ai/ |  |
| Date: June 1, 2017<br><br>Type: Landing Page<br><br>Description: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20170601220909/https:/open.ai/ |  |
| Date: September 26, 2017<br><br>Type: Redirect to Plaintiff's Website<br><br>Description: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20170926220527/http:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | |
|---|---|
| **Date**: December 27, 2018<br><br><u>Type</u>:  Redirect to Plaintiff's Website<br><br>Description:  The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20181227232823/http:/open.ai/ |  |
| **Date**: May 4, 2019<br><br><u>Type</u>:  Redirect to Plaintiff's Website<br><br><u>Description</u>:  The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20190504061836/http:/open.ai/ |  |
| **Date**: October 6, 2020<br><br><u>Type</u>:  Redirect to Plaintiff's Website<br><br><u>Description</u>:  The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20201006113924/https:/open.ai/ |  |
| **Date**: March 16, 2021<br><br><u>Type</u>:  CryptoArt Website<br><br><u>Description</u>:  The open.ai domain name displayed a webpage for "CryptoArt," which did not display the "Open AI" name on the website.<br><br>https://web.archive.org/web/20210316154125/https:/open.ai/ |  |
| **Date**:  August 3, 2021<br><br><u>Type</u>:  Redirect to Plaintiff's Website<br><br><u>Description</u>:  The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20210803032528/https:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | |
|---|---|
| **Date**: January 24, 2022<br><br>**Type**: Redirect to Plaintiff's Website<br><br>**Description**: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20220124001544/https:/open.ai/ |  |
| **Date**: July 1, 2022<br><br>**Type**: CryptoArt Website<br><br>**Description**: The open.ai domain name displayed a webpage for "CryptoArt," which did not display the "Open AI" name on the website.<br><br>https://web.archive.org/web/20220701135945/https:/open.ai/ |  |
| **Date**: November 26, 2022<br><br>**Type**: Redesigned Website<br><br>**Description**: The webpage invited users to generate images by "play[ing] with some StableDiffusion [*sic*]" "[i]n the meantime."<br><br>https://web.archive.org/web/20221126092122/https:/open.ai/ |  |
| **Date**: December 5, 2022<br><br>**Type**: Redesigned Website<br><br>**Description**: The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20221212065045/https:/open.ai/ |  |
| **Date**: August 3, 2023<br><br>**Type**: Redesigned Website<br><br>**Description**: The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230802120247/https:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | |
|---|---|
| Date: September 13, 2023<br><br>Type: Redesigned Website<br><br>Description: The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230913093347/https:/open.ai/ |  |
| Date: September 18, 2023<br><br>Type: Redesigned Website<br><br>Description: The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230918194011/https:/open.ai/ |  |

### D.     "Tools" on Defendants' Website

59.     I also investigated Mr. Ravine's claims of "tools" that he made available at the following addresses:     https://wikineering.org,     https://ineed.com/wikineering,     https://open.ai, https://hub.open.ai, https://beta.open.ai, and https://decentralized.open.ai.   Below is a table of my understanding of those "tools" and their dates "available," as represented by Defendants:

| Defendants' Claimed Uses | | |
|---|---|---|
| **Date** | **Website Address** | **Description** |
| 3/25/2015 to Early 2016 | wikineering.org or ineed.com/wikineering | **Initial Collaboration Tool:** A portion of the Wikineering website dedicated to AI research. Ravine Dec. ¶ 5. |
| 3/25/2015 to Early 2016 | wikineering.org or ineed.com/wikineering | **Initial Discussion Board:** A discussion board allowing users to discuss issues relating to AI development.  Ravine Dec. ¶ 8. |
| 3/26/2015 | open.ai | **Parked Website Landing Page:** A landing page that said:<br>OPEN<br>AI<br>OPEN INDUSTRY WIDE & ACADEMIA WIDE DEEP LEARNING INITIATIVE …<br>ANNOUNCEMENT WILL BE MADE SOON … |

| 09/2016 to Early 2023 | hub.open.ai | **Hub:** An evolved discussion board where users could post research questions or findings about AI related development. Ravine Dec., ¶ 9. |
|---|---|---|
| 1/8/2023 to 10/2023 | beta.open.ai | **Evolved Collaboration Tool:** An evolution of the Initial Collaboration Tool that allowed users to collaborate on AI-related research articles and projects. Ravine Dec., ¶ 10. |
| 10/2017 to 10/2023 | decentralized.open.ai | **Decentralized:** An AI collaboration tool allowing users to create discussion threads for AI companies and to contribute to a particular company's research and development. Ravine Dec. ¶ 11. |

At the top of the table, partially visible:

"Enter your email to be informed of developments or join the initiative." Ravine Dec., ¶ 6.

60.     In professional experience and opinion, Mr. Ravine's descriptions of these "tools" raise multiple concerns. First, I have seen no evidence that Mr. Ravine created or substantially created the underlying platforms on which any of these "tools" ran. For example, Mr. Ravine states that he "developed technology for an improved discussion board in 2016" in discussing his Hub website. Ravine Dec. ¶ 9. However, no source code or other artifacts have been provided that support this assertion. Moreover, the Hub website apparently uses an existing technology called Discourse (https://www.discourse.org/), a free, open-source platform to add a discussion board to any website. Attached hereto as **Exhibit K** is a true and correct copy of a screenshot from Discourse's website reflecting the same platform design as shown in Mr. Ravine's Hub website. Mr. Ravine also appears to use the same software on another website available at subdomain of open.ai, https://guy.open.ai, as reflected in the true and correct copy of a screenshot from that website attached as **Exhibit L**. As shown in that exhibit, Mr. Ravine merely has "test" posts up.

61.     Second, I have seen no evidence supporting Mr. Ravine's claims to have released so many different "tools," including some that are "evolved" versions of "initial" tools, such as the "evolved" versions he states were located at different website addresses. For example, Mr. Ravine states that his "Initial Discussion Board" was available on wikineering.org or ineed.com/wikineering. He also states that his "Hub" was an evolved version of the "Initial Discussion Board" that was available at a different website address. There is no evidence that this is an evolved or improved version.. There also appears to be no evidence that there were active users that had to be transitioned

from one of these websites to the other. When a discussion board or other Internet-based collaboration tool migrates from one web address to another, there is a need to migrate the users as well to not interrupt the community or the social momentum. There is no evidence of any such migration. This suggests to me that Mr. Ravine did not have any users of his initial "tools," including his "Initial Collaboration Tool" or his "Initial Discussion Board."

62. Third, I reviewed the Declaration of Aaron Perahia submitted in connection with OpenAI's motion for a preliminary injunction, including Exhibits C to F thereto. Based on my review of those materials, it is my opinion that the posts on Mr. Ravine's Hub website were copied from prior posts on Github.com, given the nearly identical portions of text that appear. This suggests to me that the Hub website did not have true users, but rather that these posts were copied by Mr. Ravine and/or other administrators to create the appearance of real user dialogue.

63. Last, I performed advanced site searches on Google for the beta.open.ai website, the decentralized.open.ai website, and the hub.open.ai website. In my experience as a cyber professional and investigator, I would expect to see some relevant results if any of those websites had actual users. I did not find any meaningful results. Attached as **Exhibit M** is a true and correct compilation of print outs from Google reflecting those searches. For the beta.open.ai website, the only search result found was for "CryptoArt," which suggests that me that the beta.open.ai was not actually providing the tool described by Mr. Ravine, but rather was displayed a separate cryptocurrency-related website. For the decentralized.open.ai and hub.open.ai website, there were no results at all. These results suggest to me that these "tools" and websites did not have any real users.

## IV. CONCLUSIONS

64. It is my opinion, based on my education, training, experience, and investigation in this matter, that: (i) the Wikineering website was nonfunctioning, under construction, or inaccessible to the public before November 16, 2015, (ii) no "platform" on Wikineering website had been released to the public as of November 16, 2015; (iii) because there was no public Wikineering website or platform before November 16, 2015, there was also no public "Initial Collaboration Tool," (iv) Mr. Ravine's 2023 "reconstruction" of the asserted 2015 "Initial Collaboration Tool" contains text identical to text from a 2017 college textbook, which indicates that the reconstruction is not an

accurate representation, (v) the Open.AI domain name either redirected to a landing page, OpenAI's website, or a unrelated website for artworks, between September 2015 and November 2022; and (vi) Mr. Ravine's various "tools" did not appear to have real users.

///

///

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

      Executed this 24th day of October 2023, in \_\_\_\_\_Austin_____, \_\_\_\_\_Texas_____.

_____
          Seth James Nielson, Ph.D.

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION