Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
OPENAI, INC.,                    )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )     NO. CV 23-03918-YGR
                                 )
OPEN ARTIFICIAL INTELLIGENCE,    )
INC., ET AL.,                    )
                                 )
            Defendants.          )
_____)
```

Oakland, California
Monday, November 20, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
BY: **ROBERT FELDMAN, ESQUIRE**
**MARGRET CARUSO, ESQUIRE**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA  90017
BY: **AARON PERAHIA, ESQUIRE**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
BY: **DYLAN SCHER, ESQUIRE**

Reported By:          Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
Official Reporter

**APPEARANCES CONTINUED:**

For Defendants:

                            BIRD MARELLA BOXER WOLPERT NESSIM
                            DROOKS LINCENBERG & RHOW
                            1875 Century Park East, Suite 2300
                            Los Angeles, CA 90067
                    BY:  **EKWAN RHOW, ESQUIRE**
                            **CAMERON PARTOVI, ESQUIRE**
                            **PAUL S. CHAN, ESQUIRE**

<u>**Monday - November 20, 2023**</u>                          **12:02 p.m.**

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Good afternoon, everyone.

Calling the matter of CV 23-3918, OpenAI, Inc., vs. Open
Artificial Intelligence, Inc., et al.

Parties, please step forward and state your appearances
for the record.

**MS. CARUSO:**  Good afternoon, Your Honor.  Margaret
Caruso for the plaintiff, OpenAI, Inc.  With me are my
colleagues, Robert Feldman; next to him, Aaron Perahia, Dylan
Scher, as well as our paralegal.

**THE COURT:**  Well, I'm sure your paralegal has a name,
too.

**MS. CARUSO:**  Joseph.

**MR. LEROY:**  LeRoy.

**MS. CARUSO:**  LeRoy.

**THE COURT:**  How do you spell his last name?

**MS. CARUSO:**  L-E-R-O-Y.

**THE COURT:**  Okay.  Great.  Thank you.  Good morning or
afternoon.

**MR. RHOW:**  Good afternoon.  Ekwan Rhow on behalf of
the defendants, and I'm here with Cameron Partovi,
P-A-R-T-O-V-I, and Paul Chan, also from my office.

**THE COURT:**  Okay.  Hold on just a minute.  So not

1   Joshua Masur?

2        **MR. RHOW:**  Yeah.  He's not from our firm.  I'm not

3   sure the firm is still in the case, but that --

4        **THE COURT:**  He came up on the list.

5        **MR. RHOW:**  Yes.  I saw that.

6        **THE COURT:**  Just checking.

7      Okay.  Lots to do today.

8      My first question that I always ask when someone asks me

9   for a preliminary injunction or a TRO is when you will be ready

10  to go to trial?

11       **MS. CARUSO:**  Yes, Your Honor.  We believe we will be

12  ready to go to trial next fall.

13       **THE COURT:**  So if I don't give it to you, that's fine

14  with you.  You're ready to go in the fall?

15       **MS. CARUSO:**  That's the -- we would like to have it,

16  but that's the soonest we think we can reasonably get there.

17       **THE COURT:**  Okay.

18     Defendants.

19       **MR. RHOW:**  Your Honor, we do have counterclaims, and

20  we did talk about this, but we'll be prepared to go as soon as

21  necessary.

22       **THE COURT:**  If I decide I need to have an evidentiary

23  hearing, when you will be prepared to go?

24       **MS. CARUSO:**  Your Honor, our company is -- our clients

25  closed for the Thanksgiving week, but I believe after that, we

| | |
|---|---|
| 1 | could do it next week or so.  We would need to check with them |
| 2 | about availability. |
| 3 | **MR. RHOW:**  Likewise, Your Honor.  I do think there are |
| 4 | some conflicts coming up, but if it's a one-day evidentiary |
| 5 | hearing, I'm sure we could schedule sometime in December or |
| 6 | January. |
| 7 | **THE COURT:**  Well, are you going to be ready -- what if |
| 8 | I set it on Monday, will you be ready to go? |
| 9 | **MS. CARUSO:**  Your Honor, I think that would be a |
| 10 | challenge given that -- where our company is right now just in |
| 11 | terms of the holidays. |
| 12 | **THE COURT:**  All right.  Tuesday? |
| 13 | **MS. CARUSO:**  I need to check with them, but we will do |
| 14 | everything we could for Tuesday. |
| 15 | **MR. RHOW:**  If Your Honor sets it for those dates, that |
| 16 | would be fine. |
| 17 | The one issue I would raise -- and this relates to some |
| 18 | very recent news relating to OpenAI, that -- the plaintiff's |
| 19 | version of OpenAI -- |
| 20 | **THE COURT:**  We're going to talk primarily in terms of |
| 21 | plaintiff and defendant. |
| 22 | **MR. RHOW:**  Understood. |
| 23 | In terms of plaintiff, as Your Honor may have heard, two |
| 24 | of the primary percipient witnesses are no longer with |
| 25 | plaintiff as of Friday, Sam Altman and Greg Brockman. |

1        **THE COURT:**  Well, they work for Microsoft now, and

2   Microsoft owns 49 percent.

3        **MR. RHOW:**  Understood.  The only reason I raise that

4   is they would be important percipients as well.

5        **THE COURT:**  Are you sure?

6        **MR. RHOW:**  Yes.  If that -- depending, of course, on

7   what the issue Your Honor is focused on, but if it's focused on

8   the interactions between the parties, those are the only three

9   folks, my client and those two individuals.

10        **THE COURT:**  If I do -- if I need an evidentiary

11   hearing and I do not do it next Monday or Tuesday, it will not

12   happen until January.  That's why I'm asking the question.

13        Okay.  Let's get started.

14        **MS. CARUSO:**  All right, Your Honor.

15        As he referenced in our case management conference,

16   Mr. Feldman is going to begin by addressing some of the

17   defendants' evidence.

18        **THE COURT:**  Mr. Feldman, did you have a role in -- how

19   much of a role did you have in the briefing and how much of a

20   role did you have in the slide deck?

21        **MR. FELDMAN:**  Briefing.  I read both briefs, edited

22   both briefs.

23        Slide deck.  I had a very heavy role in the tabs that I'm

24   going to go through that are the beginning of your book, and

25   not as heavy --

1          **THE COURT:**  Is my -- is my book the same as the slide

2    deck that was emailed to us?

3       No.  It looks like it has more than that.

4          **MR. FELDMAN:**  I'm not sure how to answer your question

5    exactly, but I can tell you that in the book that we handed to

6    the Court this morning and that was circulated, so it must have

7    gone to Your Honor, I'm responsible, principally, actually, for

8    Tabs 1 through 12 and not as responsible for what I think is

9    Tab 13, which is the slide deck about the law.  But as to the

10   statements in the book and the documents in the book from Tabs

11   1 through 12, I'm principally responsible.

12      And as for the briefing, I am responsible -- I'm

13   responsible for all of it.

14         **THE COURT:**  Well, I understand, but there's -- as you

15   and I know, there is heavy involvement and there is reading.

16   The reason I ask is because the primary issues that I have --

17         **MR. FELDMAN:**  Yes.

18         **THE COURT:**  -- are explained in the slide deck but

19   were actually not very well explained in the briefing.

20         **MR. FELDMAN:**  Yes.

21         **THE COURT:**  And so that creates some issues.

22         **MR. FELDMAN:**  Yes.  If you're asking me whether I

23   created the slide deck -- this may be where you're going.  If

24   you're asking me whether I created the slide deck, if you will,

25   in response to what was or wasn't in the brief, I did not.

1          THE COURT:  All right.

2          MR. FELDMAN:  What I am responsible for directly is

3    all of it, and particularly, as I said to you at the CMC, I

4    am -- I am familiar with the quality and the character of the

5    representations made by the defendants to the PTO and to

6    Your Honor.  That's what I have focused my attention on.

7          THE COURT:  All right.

8          MR. FELDMAN:  And I want to be very clear about

9    something.  I affirmatively read both briefs, edited both

10   briefs, but as I was going to begin my -- my remarks by

11   saying -- and I don't mean to be flippant -- trademark law sits

12   squarely in the universe of substantive areas of the law about

13   which I know very little.  So while I aggressively, if you

14   will, edited those briefs, I don't really know very much about

15   the law in this area.  So I won't be of any particular

16   assistance in that respect.

17       And I will say that, as I'm sure you tell people, I made

18   sure -- I tried to make sure that there weren't a lot of

19   adverbs and adjectives in the briefs to describe some conduct

20   which I think is shocking, and I'm responsible for that not

21   being in the brief.

22          THE COURT:  Well, as you know, I appreciate that.

23          MR. FELDMAN:  Yes.  So I hope I'm able to be helpful

24   about the -- what I said I would be at the CMC, the quality and

25   the character of the representations to the PTO and to

1    Your Honor.  I'm not familiar --

2              **THE COURT:**  That's fine.

3         **MR. FELDMAN:**  -- with trademark law.

4         **THE COURT:**  All right.  Who am I going to have on the

5    other side dealing with those issues?  Is that you, Mr. Rhow?

6         **MR. RHOW:**  Your Honor, I'll be dealing with all the

7    issues.

8              **THE COURT:**  All right.  Then you should stay at the

9    mic.

10             **MR. RHOW:**  Understood.

11             **THE COURT:**  All right.

12        **MR. FELDMAN:**  So shall I proceed?

13             **THE COURT:**  You should.

14        **MR. FELDMAN:**  One preliminary observation, before I

15   begin the substance of this, in paragraph 3, the individual

16   defendant says that he is recognized by scholars for his

17   contributions to the field.  The example he gives is at

18   Exhibit 1 of his declaration, page 12, and that is a sentence

19   in which he, among 20 people, is thanked for his contribution

20   to the article or his reading of the article.  That's it.

21       So despite paragraphs 3 and 7 of his declaration, which,

22   on our first reading, would suggest that he is a -- well known

23   in the field and an expert in the field, his entire

24   contribution to scholarship is being thanked as one of 20

25   people who read an article in 2017.

1      Your Honor may wish to consider this, not because it's

2  critical to the motion but because I think it suggests by its

3  lack of detail and corroboration what you're about to hear

4  about.

5      So if I could possibly, Your Honor, direct -- and,

6  Your Honor, you have a book from us, and it's got tabs, and I'm

7  going to refer to tab numbers and exhibit numbers so that the

8  record is complete.

9      **THE COURT:**  And did you give me two books or just one?

10     **MR. FELDMAN:**  I gave you a number of books because I

11  wasn't sure how many staff members you would have here today.

12     **THE COURT:**  Okay.  You have a book?  All right.  Go

13  ahead.

14     **MR. FELDMAN:**  So to make sure we're in the same book

15  and on the same page, I'm going to direct Your Honor's

16  attention, if I might, to Tab 1 in the book, which is Exhibit A

17  to Mr. Perahia's declaration.  Mr. Perahia is an associate at

18  our office.

19     **THE COURT:**  Okay.

20     **MR. FELDMAN:**  This is -- as you can see, this is the

21  application for the trademark.  It's dated 12/11/2015.  And in

22  it, there is a representation on page 4 of 7 of the exhibit

23  that the mark was being used in commerce.  And then Your Honor

24  would join me, please, at page 7 of 7 of this exhibit, and

25  you'll see that what was submitted to establish use in commerce

1  is what I now know to be called a landing page that simply

2  says, quote, announcement will be made soon.  And there's a

3  place for anyone who might have seen this to enter their email.

4      So that is the showing that was made to the patent office,

5  patent and trademark office, when the initial application was

6  made.

7      If I could then, please, direct your attention to Tab 2,

8  which is Exhibit B, as in "boy," to Mr. Perahia's declaration,

9  that is what is known as an "office action" as reflected on

10 page 2 of 20.

11     On page 3 of 20 and the material that is yellow

12 highlighted for the Court's consideration, there is a statement

13 that says, "Registration is refused because the specimen does

14 not show the applied-for mark for use in commerce."

15     And then further down in the further highlighting, Mr.--

16 the individual defendant was told that he could submit a

17 different specimen that was in actual use in commerce, at least

18 as early as the filing date of the application.  And then in

19 language which we did not highlight, it says, "or prior to the

20 filing of an amendment."  That was March-- I believe it was

21 March 29th, 2016.  And the applicant was given six months to

22 respond but wasn't told that he couldn't respond earlier than

23 that.

24     Then if I could invite the Court's attention to Tab --

25 and, by the way, my presentation will take about 10 minutes,

1    not very long, but I hope it's worthwhile walking through this
2    because I think the detail matters here.
3        If I could direct the Court's attention to Tab 3 in the
4    book, which is Exhibit C as in "cat," to Mr. Perahia's
5    declaration, there is something known as a response to office
6    action, and that's on page 2 of 7 of that exhibit.
7        On page 3 of 7, there is a representation which we've
8    highlighted for Your Honor that says, "The substitute specimen
9    was in use in commerce at least as early as the filing date of
10   the application."
11       And then on page 4 of Tab 3, which is Exhibit C,
12   Your Honor will see something with which the Court is familiar.
13   The applicant is told that false statements and the like are
14   punishable by fine or imprisonment or both under 1001.
15       I would then invite your attention to pages 6 and 7, which
16   are the specimens, and the specimens were submitted to the
17   patent and trademark office on September 27th, I believe, in
18   2016.  And there's no reason for the Court to -- nor would
19   you -- memorize the yellow highlighted material on pages 6 and
20   7, but I would ask you to just briefly take a look at them and
21   bear them in mind as we go through the next few exhibits.
22       Tab 4 is the -- so what we have, if I may, is these
23   specimens were submitted to the patent and trademark office in
24   September of 2016, and the patent and trademark office was told
25   in a statement under penalty of 1001 that they were in

commerce, used in commerce, prior to the date of the

application, which was December 2015.

Now I would ask Your Honor to look at Tab 4, which is the

declaration of Mr.-- of the individual defendant, and that

declaration at page -- at page 3 of 9 of the exhibit, which is

paragraph 8 -- excuse me -- yes, paragraph 8 in which the

defendant says that the discussion board that supposedly

existed in 2015 he stopped supporting in or around early 2016.

Then in paragraph 9 -- with no explanation for why.  Then in

paragraph 9, he says that he developed technology for an

improved discussion board in 2016.  Subsequently in

September 2016, not '15, '16, "I launched an evolved version of

the discussion board which bore the Open AI mark."

And then at the end of that paragraph in the last

sentence, he says, "Attached as Exhibit 4 to this declaration

is a true and correct copy of a screenshot of Hub reflecting

the use of Hub in September 2016."

If you would please look at Exhibit 4, which is part of

this tab, it's at the back of this tab, still on Tab 4 in the

page prior to Tab 5, you'll note the highlighted text.

THE COURT:  Keep going.

MR. FELDMAN:  You'll note the highlighted text, which

is the same text, and it's actually the same post that I

brought to Your Honor's attention in the submission to the

patent and trademark office in which it was represented that

1    this thing was in existence prior to the application, that is

2    to say, prior to 2015, December 2015.

3         So here you have a declaration in Your Honor's court

4    saying that it reflects that this thing here -- and I call it

5    "thing" because I actually don't know what it is -- which is

6    Exhibit 4 to the individual defendant's declaration was -- is a

7    true and correct copy of something in September of 2016.

8         The next tab, which is Tab 5, is a demonstrative for which

9    I am responsible a hundred percent, in which we show for

10   Your Honor's convenience what I just said, the relationship

11   between what was submitted to the PTO on the left-hand side and

12   what was submitted to Your Honor under oath in this court in

13   connection with these proceedings, and you can see that they're

14   identical.

15        But -- and, Your Honor, as I said, I told the people to

16   keep adjectives and adverbs out of the brief, and I'm going to

17   try to do that here, but I'm now here to tell you that as Tab 6

18   will show you, both the submission to the PTO and the

19   declaration are wrong.  Let me say that again.  There was a

20   submission to the PTO.  There was a submission in a

21   declaration, and they were both wrong.

22        Tab 6, which is Exhibit E to Mr. Perahia's declaration, at

23   page 2 of 4 of Tab 6 -- are you there, Your Honor? -- you'll

24   see that this is the same text.  That's why I asked you to look

25   at just the first little bit of it.  This is the same -- but

1    we've got the whole thing here.  This is the same text as the

2    two that we just looked at, but Mr. Perahia, who's younger than

3    I am and knows about phones and desktops, looked for this on

4    his mobile browser, which means on his phone.  This is in his

5    declaration.  And this version of this post, which was the

6    subject of two conflicting statements, one to the PTO and one

7    to Your Honor -- this post shows when downloaded, if you will,

8    from Mr. Perahia's phone, its creation date, which is

9    September 26th, 2016.

10        Your Honor will remember that I pointed out the date of

11    the response to the PTO's rejection, and the date of the

12    response was September 27th, six months after the office action

13    by the PTO.  So this post retrieved from Mr. Perahia's phone,

14    which bears a created date of September 26th, was created at

15    6:06 a.m. 2016 by somebody, a day before the submission of the

16    response.

17        If I could now direct Your Honor's attention to Tab 7,

18    which is another demonstrative for which I am a hundred percent

19    responsible, this is to make vivid for the Court what I just

20    said, namely, that the specimen, which was undated, submitted

21    to the PTO and the mobile version downloaded from Mr. Perahia

22    shows that it was -- that the undated thing that was submitted

23    to the PTO on September 27th was created on September 26th,

24    even though the PTO was told that it was in existence prior to

25    December 2015.

1    And, Your Honor, this thing from September 26th wasn't

2    simply created on September 26th.  If I could please ask

3    Your Honor to turn to Tab 8, which is Exhibit F as in "Frank"

4    to the Perahia declaration, on page 2 of 12, you will see the

5    same language that I brought to Your Honor's attention in the

6    box and yellow highlighted, and it's language you've seen

7    before already.  And then if you look above that, you'll see

8    that it's dated August 26th, 2016, so the text that was

9    submitted to the PTO on September 26th is identical to this

10   text which Mr. Perahia found on a different website known as

11   GitHub.  That's Mr. Perahia declaration, paragraph 9.

12   And to make that vivid for the Court, at Tab 9, there's a

13   demonstrative for which I am again responsible, and it shows

14   exactly what I just said, that the GitHub post and the PTO

15   specimen submitted on September 26th are identical.

16   So not only was this post that the PTO was told was in

17   commerce in December created on September 26th, but it was, in

18   fact, copied from something called GitHub that had been

19   published in August of 2016.

20   In case Your Honor has any doubt about this, there are two

21   additional factors with respect to the quality and character of

22   these representations to bear in mind.  The showing that I've

23   just walked through was in our opening papers entirely very

24   clearly.  No adjectives, no adverbs, but it was there.

25       **THE COURT:**  I agree.

1      **MR. FELDMAN:**  And there was no response --

2      **THE COURT:**  I agree.

3      **MR. FELDMAN:**  -- to this, other than to say the PTO

4  has not found there to have been a fraud, and of course the PTO

5  didn't know that there was a fraud.  They weren't told any of

6  these things.  That's number one.

7      Number two, the good Mr. Perahia did not just cherrypick.

8  He looked at this website thing and found two other examples of

9  the exact same pattern, that is to say, creation on

10  September 26th, copied from GitHub earlier posts.  I'm not

11  going to walk Your Honor through them, but with your

12  permission, I will state those cites for the record in case

13  they're of any assistance to the Court at a later point.

14      May I do that?

15      **THE COURT:**  Go ahead.

16      **MR. FELDMAN:**  That would be at Mr. Perahia's

17  declaration at Exhibit C at page -- at 6 at Perahia

18  declaration, paragraph 7, and in paragraph 7, Mr. Perahia said

19  that he found these three posts.  He then said that each of

20  the -- of the posts that he found were dated September 26th

21  between 4:00 and 6:00 a.m.  That's Perahia declaration

22  Exhibit E at 2 through 4.

23      One of those posts is the one you've seen that was in

24  the -- in the individual defendant's submission at Perahia

25  declaration 7.

1    Madame Reporter, am I going too fast?

2       The other two posts were not submitted to the patent and

3    trademark office.  That's at Perahia declaration paragraph 7,

4    Exhibit D as in "David," 4 through 7.

5       The two posts that were not submitted to the patent and

6    trademark office follow the same pattern.  That's at Perahia

7    declaration D, Exhibit D, pages 4 through 5, and Perahia

8    declaration Exhibit 5 at pages 6 through 7, Perahia Exhibit D,

9    6 through 7, with Perahia Exhibit 5 at pages 9 through 12.

10      And I would say one more thing about this.  Mr. Perahia's

11   declaration says that he found three posts.  It does not say

12   that those are the only posts he -- excuse me.  It does not say

13   that those are the only posts that exist.  Those are the only

14   posts that he noted.  None others have been produced by the

15   other side, and they've taken down the website so we can't

16   affirmatively represent to you that those are the only ones,

17   but that's my best belief or prediction or guess or hypothesis.

18      We found three.  Didn't see more.  Can't swear as an

19   officer of the court that there are no more, but I can swear as

20   an officer of the court that none has been submitted to

21   Your Honor, and they took down the website.

22      I think I have one more thing to say.  This relates to

23   Exhibit 2 -- excuse me -- or Tab 10 of the individual

24   defendant's -- sorry.  We're at Tab 10, which is Exhibit 2 to

25   the individual defendant's declaration and paragraph 5 of the

1    same declaration.

2        One of the many things he says he had was something that

3    he called, I think for purposes of the case, quote, an initial

4    collaboration tool.  We've seen no reference in any

5    contemporaneous document to such a tool.  The only reference

6    we've seen to that is in the individual defendant's

7    declaration.  There is nothing in the record from any source

8    that has that title, other than in his declaration.

9        He says that this thing existed from March 2015 until

10   January 2016, and that's at paragraph 5 of his declaration.

11   There is no explanation for why it stopped being available.

12   And if I may say to Your Honor, consistent with his entire

13   declaration, there's no statement that anyone ever saw this or

14   used it.

15       If you look carefully at his declaration, as I know

16   Your Honor will, with respect to all these things that he says

17   existed, there's no statement anywhere that anyone ever saw it

18   or used it.  All he says was either that he developed it or

19   that it was accessible.  But in the papers that have been

20   submitted to you, confusing as they are, the one thing you can

21   be sure of is that there's no evidence that anyone ever saw or

22   used any of the things that the defendant says he had.

23       There's no explanation why this thing wasn't submitted to

24   the patent and trademark office in December of 2015, and

25   there's no explanation why it wasn't submitted to the patent

1  and trademark office after the rejection rather than the phony

2  posts that were submitted.

3      There's no explanation for why there's nothing

4  corroborating the existence of this so-called tool like code or

5  real screenshots or declarations from users or partners or

6  friends or anybody.  And no explanation from even the defendant

7  about what it was used for.  All we have is what he describes

8  in his declaration as a reconstruction.  And, Your Honor,

9  that's at page -- oh, it's in Exhibit 2 of his declaration.

10      And when Your Honor reviews that, you'll see that it

11  actually is nothing.  I mean, it's a page, and it has a lot of

12  technical typing on it, but in terms of actual creation by

13  somebody who purports to have created this thing, there's

14  virtually nothing.

15      And as we've established, the technical material on this

16  page largely comes from an Australian textbook, copied

17  verbatim, which I believe is set forth at Tab 12.  Your Honor

18  can see that there is a textbook that is entitled *Mathematics

19  of Autonomy*, and the text in Exhibit 2 is taken from or

20  identical to, in large part, that textbook.  We have the

21  textbook in court.  We made it available to counsel last week

22  to inspect.  There was no inspection.  If Your Honor has any

23  interest in looking at this book, it's here for your

24  inspection.  There's nothing about that book that suggests that

25  the individual defendant had anything to do with it, and

1    there's certainly nothing on Exhibit 2 to his declaration that

2    suggests that he copied it, other than the fact that we now

3    found the book from which it was copied.

4         So what you have before you, no adjectives and adverbs,

5    is an extraordinary record, and it's one that was made,

6    notwithstanding 1001, to the patent and trademark office and

7    notwithstanding the laws and rules that apply to declarations

8    before Your Honor.

9         I will turn the rest of this over to Ms. Caruso.

10             **THE COURT:**  Not yet.

11             **MR. FELDMAN:**  I thought it was important that I

12   present this to Your Honor personally.

13             **THE COURT:**  I need a response.

14             **MR. RHOW:**  Yes, Your Honor.

15             **THE COURT:**  And I need it as to the specifics.

16             **MR. RHOW:**  Understood.

17             **THE COURT:**  Because it is shocking to me that there

18   was no response in the opposition.

19             **MR. RHOW:**  Understood, Your Honor.  Let me start, if I

20   may, with some background, and then I'll go into sort of a

21   point-by-point response.

22             **THE COURT:**  Well, first point, why didn't you explain

23   this in the opposition?

24             **MR. RHOW:**  Explain --

25             **THE COURT:**  A response.

1      **MR. RHOW:**  Part of -- the last part -- and I'll start

2   with the last part comes in the reply, the textbook argument

3   comes in the reply.  And I'll explain what that textbook

4   article from 2018 is, is actually a copy of a 2015 Wikipedia

5   article.  So the textbook that is being submitted to the Court

6   itself copied from something in 2015, and that is -- that is

7   from our slide show, and we did not get a chance to respond to

8   that.

9      On the first point, candidly, Your Honor, in terms of

10  going through the history of why Mr. Ravine submitted that

11  specimen, which he did incorrectly, he is not -- there are -- a

12  few people in the room are not trademark law experts, and

13  Mr. Ravine clearly is not, and he did not understand what it

14  meant to submit a specimen.  But for our purposes and what we

15  believe are the germane issues, going into that issue, we're

16  not trying to enforce a USPTO trademark registration.  We are

17  simply enforcing common law rights --

18      **THE COURT:**  So you then concede at this point that you

19  have no rights based upon your application or the supplemental

20  registration dating back to either 2015 or 2016?  Is that the

21  concession?

22      **MR. RHOW:**  The concession is this:  We have common law

23  rights.  That's what --

24      **THE COURT:**  I'm asking specifically about the other,

25  because you haven't responded.

1      **MR. RHOW:**  On the supplemental registration, we are

2   not seeking any rights independent of our common law rights.

3   And we are not basing our common law rights on the supplemental

4   registration.

5      The supplemental registration is a data point that is

6   consistent with our timeline narrative, but we are not bringing

7   claim to enforce a trademark ownership based on that

8   supplemental registration.

9      So --

10      **THE COURT:**  Okay.  So I need my record to be clear,

11   and I am not a trademark specialist.

12      So I'd like you to get up, Ms. Caruso, and tell me what

13   admission I need on the record so that I can avoid all of this.

14      **MS. CARUSO:**  I think you're correct to get the

15   admission that they're not seeking to enforce any rights on the

16   registration; however, what this raises a question of on the

17   response is what we're now hearing is they're asserting common

18   law rights.  What are those common law rights based on?

19      **THE COURT:**  Okay.  That's a separate question.

20      **MS. CARUSO:**  Okay.

21      **THE COURT:**  So tell me what the admission would be so

22   I can get an admission from counsel, and we can move on to the

23   common law issues, to the extent that there any.

24      **MS. CARUSO:**  Thank you.

25      First, that the specimen of use was submitted in error.

1    It does not reflect actual use in commerce of what was

2    submitted as a specimen.

3              **THE COURT:**  Are you admitting that?

4              **MR. RHOW:**  Well, it was meant -- if I may -- I feel

5    like I'm being -- it was meant to depict what he believed was

6    2015 use, but he didn't have those records because it was now

7    2016.

8         If the admission is was that actual use as of the first

9    date, that actual document, we admit it wasn't.

10             **THE COURT:**  So as of December 11th, 2015, the

11   submission that I find at Docket 25-1, page 7 of 7, which is

12   the landing page for the website, you admit is not evidence of

13   commerce?

14             **MR. RHOW:**  The landing page that existed in 2015 is

15   evidence of commerce.  The particular document you're referring

16   to we agree as of 2016 when we submitted it, we don't have --

17             **THE COURT:**  Wait.  You submitted this on December 11th

18   of 2015.  He submitted this on December 11th of 2015.

19             **MR. RHOW:**  So I will take no position as to whether

20   that's use or not.  The -- because it's not been litigated.

21   The USPTO came back and said you need more evidence, so we took

22   that at face value, and because we did not have evidence from

23   2015, submitted what a lay person, in this case, Mr. Ravine,

24   thought could suffice.  But we are not submitting to the Court

25   that that was something that existed in December 2015.  He knew

1    the best he could do was a reconstruction because he did not

2    have evidence at that point, which was a year later.

3         THE COURT:  Are you suggest -- are you admitting that

4    your registration should be canceled?

5         MR. RHOW:  No, Your Honor.  It is -- we have a

6    supplemental registration and that means while not as strong as

7    a normal registration, over time, that can mature into a

8    supplemental registration.

9         And, Your Honor, the broader point is none of these points

10   have been litigated because the plaintiff never raised these

11   points until today.  If they need to be litigated, we will do

12   that.

13        THE COURT:  Well, wait.  No, no, no.  I don't know

14   what you mean by that because none of this was new to me, so it

15   was in the briefs, it was in the filings.  I don't know what

16   you mean.

17        MR. RHOW:  What I meant is back in 2017 when plaintiff

18   had notice that their application had been rejected, that the

19   supplemental registration had occurred as to defendants'

20   trademark, that's seven years ago -- that's six years ago.

21   None of this had actually been litigated until now, and so when

22   you ask me am I admitting all these things, I'm not.  I'm not

23   until we litigate them.

24        But in terms of the evidentiary record, I want to make

25   clear that we agree that what is attached to the supplemental

use submission, that as to that particular document, yes, that
was not something that we can show existed as of December 2015.
And that was a mistake by Mr. Ravine that we do not believe is
germane to the issues on this injunction motion.  Maybe
relevant to the ultimate litigation, but on this injunction
motion, which they've brought for relief, we don't think it's
relevant.

    What we believe remains relevant is that they knew of all
these things in 2017.  Their application was expressly rejected
by the USPTO based on all these documents, which at that time
they could have litigated, analyzed --

    **THE COURT:**  So the injunction motion is in part based
on claims of false registration.  So how are these issues not
relevant?

    **MR. RHOW:**  Because we are not -- we -- is there any
evidence --

    **THE COURT:**  You're not conceding -- you're not
conceding that the registration was false.

    **MR. RHOW:**  Correct.

    **THE COURT:**  So if I find that they are likely to
succeed on the merits as to the false registration, how is that
not germane to the proceedings?

    **MR. RHOW:**  Then you would prevent us from enforcing a
USPTO registration, but our common law rights would still
exist.  You'd still have to -- for them to get the injunction

1    they're seeking, they would need to get over a lot of hurdles,

2    in our view, but also prove we have no common law rights.  Even

3    assuming that the supplemental registration is relevant --

4         **THE COURT:**  So let's assume, for purposes of argument,

5    that you have common law rights.  How does Title 15 of the U.S.

6    code at Section 1120 -- what element of that claim relates to

7    common law rights?  It's a statutory right.

8         **MR. RHOW:**  Correct.

9         **THE COURT:**  With statutory requirements.

10        **MR. RHOW:**  Correct.

11        **THE COURT:**  So the common law doesn't get you there

12   with respect to that claim.

13        **MR. RHOW:**  Well, not as to that claim and --

14        **THE COURT:**  Right.  And that's the point.  I have to

15   look at each of these individually.

16        **MR. RHOW:**  Right.

17        **THE COURT:**  So if what you're saying is you have a

18   common law right, that's different than a statutory right.

19        **MR. RHOW:**  Correct.  I'm focused on what -- when you

20   say you will grant an injunction, what would the injunction say

21   then?  If we have common law rights but do not have rights

22   under the statute, what's the injunction?  It's you cannot tell

23   people you have a statutory registration?  That's fine.  We

24   don't.  We're not claiming that.

25        **THE COURT:**  No, but you are.  That's why I'm asking.

1      **MR. RHOW:**  Well, no.  You're asking for an admission,

2  Your Honor, that needs to be litigated for purposes of today's

3  injunction, okay, where they are seeking injunction telling us

4  to stop doing something.  If you tell me what they want us to

5  stop doing, then I can back into it, but it's a broader

6  statement to me you're making, which is if you lose on the

7  statute, they get the injunction.  I don't agree with that at

8  all.  We would still have --

9      **THE COURT:**  It is a multifactor test.  That's what it

10  is.

11      **MR. RHOW:**  Agreed.

12      **THE COURT:**  And you could win on some and lose on

13  others, and then I have to figure out what happens if you lose

14  on some and win on others.

15      **MR. RHOW:**  Fair.

16      **THE COURT:**  But you don't want to engage with your

17  weak evidence or your lack of evidence.

18      **MR. RHOW:**  We are not --

19      **THE COURT:**  And I have to -- I am required to analyze

20  each one of these things, not just the one that you want me to.

21      **MR. RHOW:**  Understood.  And I'm not implying that --

22  that -- I know that on the supplemental registration, just from

23  trademark law, that's a weaker trademark.  I'm not disputing

24  that.

25      And, by the way, this came up in reply brief.  The

1   argument that they cited -- and I have a counter-cite for

2   Your Honor -- is by virtue of us being on the supplemental

3   registration, we've conceded it's a descriptive mark and we

4   lose.

5        The case law, if I may --

6            **THE COURT:**  We are not there yet.

7            **MR. RHOW:**  Okay.

8        -- indicates otherwise.  I'll just say that.

9            **THE COURT:**  What I'm trying to figure out is why it is

10   that you didn't respond to these -- as a first step, why you

11   didn't respond to these -- to the evidentiary points that were

12   made.

13           **MR. RHOW:**  Well, to some of them I can respond now,

14   but in terms of if you're saying in the briefing, some came up

15   in the reply brief --

16           **THE COURT:**  I understand --

17           **MR. RHOW:**  A textbook example and a lot --

18           **THE COURT:**  I understand.  But I would like you to go

19   from the top you, and said that you would.  So can we go back

20   to the top?  Tab 1 --

21           **MR. RHOW:**  Yes.

22           **THE COURT:**  -- he submitted a landing page as evidence

23   of commerce.

24           **MR. RHOW:**  Correct.

25           **THE COURT:**  And you concede that that's -- that

1    doesn't actually show that there's a product.  It's -- it is

2    what it is.

3              MR. RHOW:  It is what it is.

4              THE COURT:  It's a landing page that says "coming

5    soon."

6              MR. RHOW:  Understood, and I concede that.

7              THE COURT:  Okay.  That's fine.  That's all I need.

8              MR. RHOW:  Understood, Your Honor.

9              THE COURT:  But you did not put that in your

10   opposition.

11             MR. RHOW:  Understood.

12             THE COURT:  So I'm giving you an opportunity to

13   respond, and I need to know what your position is.

14             MR. RHOW:  Understood.

15             THE COURT:  Okay.  Then Tab 3 -- well, I guess it's

16   Tab 4 relating to Tab 3.

17             MR. RHOW:  Or Tab 5.  Tab 4 is the declaration.  Tab

18   5, I think, and Tab 6.

19             THE COURT:  Well, Tab 5 is the --

20             MR. RHOW:  Tab 4 I have as his declaration.  5, 6, 7 I

21   think is their progression on this document, which I can

22   explain.

23             THE COURT:  So explain the point relative to his

24   declaration, Exhibit 4, Tab 4.

25             MS. CARUSO:  It's the last page of Tab 4.

1          **THE COURT:**  I'm using the binder that was given to me.

2          **MR. RHOW:**  Understood.

3      So, Your Honor, if I could provide a little context --

4          **THE COURT:**  You can provide context later.  I want a

5  response on this for my notes.

6          **MR. RHOW:**  Okay.  Understood.  And the -- sorry.  The

7  specific question is why is he using GitHub information or --

8  and from that date?

9          **THE COURT:**  He told the office -- correct.

10          **MR. RHOW:**  Correct.  So it is GitHub information which

11  is the nature of the products and tools he has where people put

12  in Wikipedia articles, textbook articles, GitHub articles.

13  They put them onto a forum for the public to review, to think

14  about, to analyze.

15      So the fact that he used GitHub is not of any moment, at

16  least based on the purpose of the product.  This is not

17  ChatGPT.  This is a tool for AI researchers to collaborate on

18  and to think about common issues on, just like Reddit, which

19  copies from thousands of different sources, just like

20  Wikipedia, which cuts and pastes from thousands of different

21  sources.  It is exactly like that.

22      So the reason you're seeing GitHub information or

23  Wikipedia information or textbook information is because that's

24  precisely how the product was designed.

25      As to the date, we are not disputing it's from

1    September 2016, and that was a mistake that Mr. Ravine made.

2    When he was asked to present use from 2015, he didn't have that

3    evidence.  The product has iterated.  These are open forums

4    where things are deleted all the time.  And so what he thought

5    he could do was essentially show the 2015 platform and then

6    show content within the platform.  That content was from 2016,

7    but in his mind he was showing how the 2015 platform worked.

8            **THE COURT:**  And why didn't he put that in his

9    opposition?

10           **MR. RHOW:**  I -- Your Honor, I didn't think it was

11   relevant for what we believe is relevant on the injunction

12   motion.  We're happy to do that if it's -- if it changes

13   anything because we, again -- and that's partly why in the last

14   case management conference we haven't brought counterclaims.

15   We're not asserting claims on these various registrations, and

16   all we're trying to do, frankly, is rebut this PI motion at

17   this time.

18           **THE COURT:**  All right.  Next.

19           **MR. RHOW:**  So then the next one is from the reply --

20   the next -- on the reconstruction, which Guy Ravine's

21   declaration makes very clear that in 2023, he still had an

22   issue with getting 2015 evidence, and so he presented to

23   Your Honor a reconstruction of what existed.  And we admitted

24   that in the declaration.

25           It is true that the reconstruction, because that is how

the product was designed to work, includes materials that are
copied and pasted from somewhere else.  Plaintiff presented --
I guess they had their forensic -- an analyst go through
everything out on the internet, and they found this textbook,
2018 textbook.

Guess what?  If you look at our slide -- sorry.  We
presented this as well, Your Honor -- Slide 8, you will see
that what is in that textbook actually comes from a March 2015
Wikipedia article, which is, again, how this product was meant
to work.  You take existing content, discussion analysis, you
put it on a common forum so that this community, which is very
small at the time -- this community of AI researchers, thought
leaders, could talk about it, think about it, and think about
the best way to deploy AI to the world.

Now, the example that plaintiff just talked about and
mentioned in their reply brief really is not relevant, frankly.
It was just meant to attack his credibility.  But we never had
a chance to respond so I'm responding now.  Because a lot of
what the plaintiff is doing is starting with 15 minutes on his
credibility when you have, Your Honor, a contemporaneous
document, Exhibit 11 to Mr. Ravine's declaration, where he is
talking without lawyers, without lawsuits, directly to
Mr. Altman and Mr. Brockman and laying out exactly what he is
doing at the time and who he is talking to, including Niklas
Boström.  Not as a footnote in some article.  Including Peter

1    Norvig, a professor at Stanford.  And if you look at that

2    Exhibit 11, Your Honor -- I don't mean to get into Margaret's

3    time on this, but --

4         **THE COURT:**  There is no time.  I haven't given anybody

5    a specific amount of time.

6         **MR. RHOW:**  Understood.

7       If you could then, Your Honor -- if you look at Exhibit 11

8    to Mr. Ravine's declaration, forget about reconstructions,

9    about textbooks that -- that Aaron found on the internet.

10   Let's go --

11        **THE COURT:**  That who found?

12        **MR. RHOW:**  Aaron, sorry.  That is -- I forget Aaron's

13   last name.  The associate at Quinn Emanuel.

14        **THE COURT:**  We do not use first names.

15        **MR. RHOW:**  I'm sorry.  I just forgot -- I consider

16   Mr. P a friend and I forgot his last name.

17      Your Honor, if you go to Exhibit 11 of Mr. Ravine's

18   declaration -- and we agree this wasn't submitted to the USPTO.

19   We agree that not everything he is saying in here can be

20   documented with evidence because it's 2015.  And this is a

21   startup founder who does everything by himself, who never hired

22   lawyers to do anything, and thought he could keep all the files

23   organized while keeping security on his websites, and he just

24   couldn't do it.

25      But in 2015, he writes -- Guy Ravine directly to Sam

1   Altman.   Sam Altman knows exactly who Guy Ravine is in

2   December 2015.   And he writes -- this is first sentence.   "We

3   have been working on an initiative called Open AI to build a

4   collective engineering platform to enable researchers from

5   around the world to collectively engineer deep learning

6   algorithms."

7        This was not ChatGPT.   This was Wikipedia.   That's what he

8   was doing so that people could talk about common issues.

9        He writes -- and he, in fact, says -- "to collectively

10  engineer deep learning algorithms together through a fast

11  collective iterative process using a number of new tools."

12            **THE COURT:**   Okay.   But it doesn't say that anything

13  has actually been done --

14        **MR. RHOW:**   Well, he says, "We have been working" --

15  if I could keep going, there is other points.

16            **THE COURT:**   Okay.

17        **MR. RHOW:**   He says, "We have been working on this

18  initiative."   And, again --

19            **THE COURT:**   So to me when I read that -- and I read

20  this -- what it said to me, at least -- you know, we'll see

21  where else you want to point, but it just means nothing is

22  quite there yet.   They're working on it.

23        **MR. RHOW:**   And, look, for purposes of trademark law,

24  you don't have to have the final product.   You have analogous

25  trademark use.   You are taking steps to come up with the final

1    product.  You have a website that says "coming soon."  Those

2    are all steps, that under the case law, you are allowed to take

3    into consideration in determining continuous use.

4        But, if I may, Your Honor, there are other statements --

5        **THE COURT:**  Do you agree with that general

6    proposition?  With the general proposition, yes or no?

7        **MS. CARUSO:**  I disagree with it as framed.

8        I agree that there are steps that can be looked at, steps

9    like press releases that receive widespread attention,

10   solicitation of thousands of people that result in some calls.

11   You don't have to have a million users on day one, that's true,

12   but there's no case law -- I don't agree with this at all --

13   that would support that saying "we're working on it" or "coming

14   soon" --

15       **THE COURT:**  I was not asking you to apply.  I was

16   asking you about the general proposition.

17       **MS. CARUSO:**  The general proposition that there can be

18   trademark rights --

19       **THE COURT:**  He says that you don't have to have the

20   final product.  Do you agree or not?

21       **MS. CARUSO:**  I agree.

22       **THE COURT:**  Okay.  All right.

23      Keep going.

24       **MR. RHOW:**  Your Honor, the second paragraph -- and I

25   know not all of these -- I'm trying to give some context, and,

1   to be honest, this is a credibility issue, too, and this email,

2   again, is realtime, and everything he says in it I think

3   Your Honor should consider when assessing sort of these

4   after-the-fact attacks.

5       Second paragraph says, "The initiative has the same goals

6   as yours, which are the accelerate, the arrival of general AI

7   through open effort."

8       The reason this is important, Your Honor, is because

9   ChatGPT, which is a 2022 product, that's something totally

10  different.  What I'm trying to tell Your Honor is from 2015 to

11  2022, they argue progressive encroachment.  There wasn't

12  encroachment.  There was direct competition on this somewhat

13  discrete goal of creating for this small AI community -- and

14  it's not millions of people.  Back then, maybe it's thousands,

15  maybe it's a handful of these folks who are thinking about

16  this, but that was the goal back then.  That's paragraph 2.

17      Paragraph 3 talks again about the platform.  I won't -- I

18  won't repeat that, but it says, "The goal is a platform for

19  collective engineering designed for AI like the one we have

20  been developing."  So "have been developing" means they've

21  started developing it, and I won't get into a semantics battle.

22  Does it mean it's completely finished?  Probably not.

23      But here's the key.  If you go to the fifth paragraph

24  down, he writes, "I've spent several years thinking about the

25  problem."  Third sentence, "My team has built," has already

built, "a collective engineer platform called Wikineering."

Why is it called "Wikineering," Your Honor?  It's like

Wikipedia.  It takes existing textbooks, content, articles.

You think about them.  How should we deploy AI to better

humanity?  How do we make this thing work?  That's -- that's

what its goal was.  It wasn't ChatGPT, and we acknowledge that,

but it was already built.

And he says what he did -- and this is what Mr. Ravine

says quite clearly in his declaration -- is that "we then

shifted the focus of Wikineering," which no one disputes

existed, "so that it was AI focused."

As of December 2015, whether or not every single one of

these things is true, Mr. Sam Altman, the founder of OpenAI,

should have known there was an existing product, a developing

product, whatever you want to call it, there was an existing

initiative that was using the Open AI name because that's in

the first sentence of this entire email.

Going to the bottom -- and I know plaintiffs think very

little of Mr. Ravine, but, again, contemporaneous email.

December 2015, last paragraph on that first page, he writes, "I

have been working with Peter Norvig, Richard Socher and others

to push a proposal."

Peter Norvig is a professor at Stanford University who

specializes in AI thought.  Alphabet, of course, is Google.  He

was talking with folks within Google about an AI initiative.

And then if you go to the second page, Your Honor, the last

sentence says, "Nick Boström has been advising."

We're not angling for advantage in a litigation,

Your Honor.  We are -- and we're not hiding in the weeds like a

trademark troll.  We are going directly to Sam Altman who takes

the email and actually meets with Guy -- meets with Guy in

December 2015, with Peter Brockman, and we disclose perhaps

a -- a startup who has no legal counsel, only -- only someone

like that would do it, who goes to the competition and

discloses all of their plans.  That's what Guy Ravine does in

December 2015.

And so rather than focus on reconstructions or alleged

copies, focus on this email because this email tells you, for

purposes of use, for purposes of delay, Your Honor, for

purposes of laches -- this email, which no one disputes is

accurate -- Mr. Brockman concedes it's accurate, concedes he

met with him, concedes he offered to purchase the domain name

in December 2015 -- that this evidence is credible, and it's

undisputed.

The back end, Your Honor, to what I just mentioned on the

front end is Exhibit 15, which is after eight years, nine years

of inaction, Mr. Altman and Mr. Brockman, they go back to

Mr. Ravine, on their own, by the way -- instead of filing a

lawsuit in 2017 when their patent application is abandoned,

instead of taking any action to protect their alleged

1   trademark, whether under the USPTO or common law, they go back

2   to him.

3       And this is key, Your Honor.  If you look at the second

4   page, February 19th, 2022, they reach out to him on their own,

5   and they write, "I'm following up on past conversations."  Now,

6   to be clear, Your Honor, we did not put in our declaration

7   anything about conversations other than 2015, but maybe

8   Mr. Brockman or Mr. Altman -- and at this point in 2022, let's

9   be clear, Sam Altman is at the top of the AI game.  Okay?

10  Everyone knows who he is.  But even this email, Your Honor, is

11  eight months before ChatGPT is released.

12      Sam Altman, who is part of this AI community, reaches out

13  to Guy Ravine on his own, and he writes, "I'm following up on

14  past conversations between you and me, regarding your Open AI

15  academic collaboration initiative," because that's what it was,

16  an active --

17          **THE COURT:**  Where are you?

18      **MR. RHOW:**  I'm sorry.  On page 2 of Exhibit 15 to

19  Mr. Ravine's declaration.  It's Document 38-17.  If you look at

20  the emails going bottom to top, February 19th, 2022 -- and

21  let's situate ourselves in time.  At this point in time,

22  plaintiff still has no trademark applications submitted to the

23  USPTO, had their prior application rejected and then abandoned

24  in 2017, has not done anything at all vis-à-vis Mr. Ravine to

25  contest or object to his use of his trademark.

1    And what they do is they reach out to him, and they say,

2    "I'm following up on past conversations between you, me, and

3    Greg Brockman regarding your" -- Mr. Ravine -- "your Open AI

4    academic collaboration initiative."

5        **THE COURT:**  So, wait.  I thought he was asking about

6    the domain name.

7        **MR. RHOW:**  Well, not -- if you read the rest of this,

8    he writes, "Would you be open to us acquiring the open.AI

9    domain name and related IP rights?"

10   What he's trying to buy, Your Honor, in February 2022 --

11   and I'm assuming at this point, because it's a

12   billion-dollar-funded company, their lawyers have looked at

13   this.  Their lawyers are monitoring all of this.  Their lawyers

14   know what we've been doing because that's what billion-dollar

15   companies do.  And Sam writes, with the benefit of those

16   billion-dollar lawyers, Look, you have IP rights, and I'd like

17   to buy them.

18   Mr. Ravine writes back that same day, and he says -- and

19   what's interesting, Your Honor -- talk about credibility

20   because this has been a non-stop focus for them -- in their

21   Complaint they only quote to the public the first line about

22   the $11 million.  They don't quote the whole email.  They don't

23   quote the second sentence of the second paragraph, first line,

24   where he says, "The issue is that if you offered me a sum, I

25   have no use for the money."  He didn't want the money.  He was

```
1    focused on his academic collaboration initiative.  He was

2    hoping that Sam Altman and Greg Brockman would work with him so

3    that Open AI --

4              THE COURT:  That they would fund it.

5              MR. RHOW:  I'm sorry?

6              THE COURT:  That they would fund it.

7              MR. RHOW:  Or just work with him.  Honestly --

8              THE COURT:  That's not what he says.  He says, "Offer

9    me money and put it into the" -- "into my research."

10             MR. RHOW:  Well, he says, You need to -- okay.

11   Understood, you're right.

12             THE COURT:  Let's -- because one day I might have both

13   of them up here.

14             MR. RHOW:  Understood.

15             THE COURT:  Let's not -- let's not stretch.

16   Neither -- none of them are angels.

17             MR. RHOW:  Understood.  And the reason I didn't say

18   "funded," it says, "you donate the money to an academic

19   collaboration."  That's the sixth paragraph.  If that --

20             THE COURT:  He says --

21             MR. RHOW:  "Suppose that instead of giving a rich guy

22   more money that he doesn't need, you donate the money to an

23   academic collaboration."

24             THE COURT:  "That I am gearing to launch."

25             MR. RHOW:  Understood.
```

1          **THE COURT:**  His academic collaboration.

2          **MR. RHOW:**  Right.  It's a far cry, though, from the

3     Complaint where they imply that Mr. Ravine was looking for

4     money, and this is a holdup, when, in fact, it was Sam Altman

5     who reached out to Guy Ravine.  Mr. Ravine's response is, I

6     don't need the money.  Let's make this thing work for the

7     world, which, by the way, is the hubbub over this weekend.

8     That's what's causing all of this.

9          **THE COURT:**  Excuse me?

10          **MR. RHOW:**  That's what's causing a lot of the current

11     turmoil at Open AI, is what is the direction?  Is it profit?

12     Remember, it started as a non-profit 2015.  2019 it suddenly

13     become for profit.  When everyone talks about secondary meaning

14     for Open AI, there is no secondary meaning.  No one even knows

15     what Open AI is doing --

16          **THE COURT:**  Are you now conceding there is no

17     secondary meaning?

18          **MR. RHOW:**  On the plaintiff OpenAI concept.

19          **THE COURT:**  And how is there any secondary meaning

20     if -- if there isn't secondary meaning for plaintiffs, there is

21     no secondary meaning for you --

22          **MR. RHOW:**  Your Honor, that's why I waited on the

23     counterclaim.  We may be willing to concede that.

24          The point is we should be able to use "Open AI" as we've

25     been using it.  If they want to, too, that's fine.  I'm not

1    trying to enjoin them.

2        Your Honor, the point, though, of Exhibit 15, just to be

3    clear, is we are now in February 2022.  They asked to buy our

4    IP rights, which they acknowledge exist, at least based on

5    their wording, and they do nothing after that.  We say no, and

6    they do nothing.

7        That's a year and a half ago, which if irreparable harm

8    existed, you should have seen a lawsuit the next day.  You

9    should have seen a lawsuit, frankly, in 2015, in 2017, and any

10   point between 2017 and 2022, but you certainly one hundred

11   percent should have seen a lawsuit at this time.

12       And because all we're here is to litigate a preliminary

13   injunction motion, not the ultimate merits, this --

14           **THE COURT:**  So you do understand that as part of a

15   preliminary injunction, I have to look at the merits.

16           **MR. RHOW:**  Understood, Your Honor.

17           **THE COURT:**  And whether there is a likelihood of

18   success.  That is one of the core components.

19           **MR. RHOW:**  Understood, Your Honor.  And then a

20   separate component, which this delay issue goes to, is the

21   irreparable harm issue.

22           **THE COURT:**  I understand that, but it's not as if I

23   can't look at --

24           **MR. RHOW:**  I understand.

25           **THE COURT:**  I mean, I have to look at the merits.

1    **MR. RHOW:**  Understood.  And maybe in terms of our

2  focus, you know -- understandably we're focused more on

3  irreparable harm, but I'm not disputing that.

4    **THE COURT:**  These facts are bad for your client.

5  Address them.

6    **MS. CARUSO:**  Yes, Your Honor.  I'm happy to.

7    Looking back at Exhibit 11, which is the December 2015

8  email exchange, as Your Honor noted, the gist of what this

9  email is saying is that nothing is built yet.  The literal

10  quote in the first paragraph of Mr. Ravine's email is it's in

11  development.

12    **THE COURT:**  So if you each have reasonable and

13  differing interpretations of this core evidence, doesn't that

14  mean I have to have an evidentiary hearing and hear from the

15  people who actually wrote them and chatted and resolve factual

16  disputes?

17    **MS. CARUSO:**  Your Honor, I don't believe that I've

18  actually heard factual disputes.  What I've heard are

19  differences about how the law --

20    **THE COURT:**  Do you not believe that they didn't have a

21  product in December of 2015?

22    **MS. CARUSO:**  They don't represent -- the only product

23  they --

24    **THE COURT:**  Answer my question.  My question is do you

25  believe that they had a product in December of 2015?

1      **MS. CARUSO:**  Not under the name "Open AI."

2      **THE COURT:**  And they dispute that, and they've given

3   me some evidence, so doesn't that create a material dispute?

4      **MS. CARUSO:**  Your Honor --

5      **THE COURT:**  Wouldn't that be a material dispute?

6      **MS. CARUSO:**  If Your Honor finds credible their

7   evidence and finds that, in fact, what they say, if you credit

8   it, isn't sufficient on its own under the law to fail, then

9   that would be a material dispute.

10      **THE COURT:**  So why is it that I don't have

11   declarations from this Stanford professor and others who you

12   say knew that all this was happening in 2015?

13      **MR. RHOW:**  Your Honor, I -- that tips the scales.  We

14   can try to get them.  These are third parties, and they may or

15   may not want to be involved in this case, especially when we're

16   talking about 2015 conversations.

17      But the email says what it says, and if Your Honor

18   believes there's relevance, I have no objection to someone

19   trying to bring them to court.  That's the reality of it.

20      If we can get declarations, I can make a good faith effort

21   to do that, but if the question is why, I truly believe

22   Exhibit 11 is not in dispute, and it doesn't say "development."

23   It says, "We have built.  My team has built."

24      **MS. CARUSO:**  It says "we" --

25      **MR. RHOW:**  Hang on.  Let me just finish.

1          **THE COURT:**  It says, "We've built" --

2          **MR. RHOW:**  "My team has built" --

3          **THE COURT:**  Guess what.  I get to decide when I talk.

4          **MR. RHOW:**  Sorry.

5          **THE COURT:**  It says, "My team has built a collective

6    engineering platform called Wikineering," which is not at issue

7    here, "and then I decided that I would make the most" -- "that

8    it would make the most sense to focus on AI, so we started

9    working on the foundations for Open AI."  That doesn't say Open

10   AI is built.

11         **MR. RHOW:**  Well, it -- what his declaration says, he

12   converts Wikineering to the Open AI platform, and he does that

13   as of 2015.  I don't have -- I'm admitting right now, I don't

14   have -- you know, other than the reconstructions, I don't have

15   anything beyond that.  But that email corroborates his timeline

16   narrative.

17       And, by the way, we're talking about 2015.  We're not

18   talking about two months ago where this would be a close call.

19         **THE COURT:**  All right.  Keep going.

20         **MS. CARUSO:**  Your Honor, if I could address that --

21   that larger picture of it being 2015, the issue of whether

22   OpenAI -- the plaintiff should have taken action in 2015 based

23   on a website landing page that said "coming soon," Your Honor,

24   I couldn't, in good faith, sign that Complaint for trademark

25   infringement.  There was no use in commerce of --

1          **THE COURT:**  Does everybody agree that Wikineering was

2     in use as a product?

3          **MS. CARUSO:**  We have no reason to dispute that, but it

4     doesn't use Open AI.  It's a separate product.

5          **THE COURT:**  Did it -- did it transform?  Is it still

6     there?  If I go and Google it right now, is it still there?

7          **MR. RHOW:**  I don't believe so, but I think on the

8     Wayback Machine --

9          **MS. CARUSO:**  Your Honor, we have -- our forensic

10    expert, Dr. Nielson, looked to try and find any evidence of

11    this in a way that you would expect to have existed if you look

12    at the Wayback Machine --

13         **THE COURT:**  Did you talk Dr. Peter Norvig, Richard

14    Socher?

15         **MS. CARUSO:**  I did not, Your Honor.

16         **THE COURT:**  Did your client?

17         **MS. CARUSO:**  I'm unaware of whether my client did or

18    not.

19         **THE COURT:**  Did they tell you he was lying about

20    having all those conversations and about what he was doing in

21    December of 2015?

22         **MS. CARUSO:**  Your Honor, I didn't discuss that with my

23    client because as a matter of law, these kind of conversations

24    are not the kind of things that give rise to a use in commerce

25    that creates trademark rights.

1    **THE COURT:**  The question is whether there was a

2    product, and the problem is, is that this product that is

3    alleged to have existed is a not-for-profit product, so I don't

4    have invoices.  I don't have other kinds of things.

5        Is it -- if it's nonprofit, does it mean that it has no

6    rights?

7        **MS. CARUSO:**  No.  It doesn't mean that.  But if it, in

8    fact -- so this Wikineering product that -- everything about

9    this email suggests we have this Wikineering platform.  We're

10   now turning to something that's in development, doesn't exist

11   as of right now, and therefore as of December 2015, there's no

12   reason for --

13       **THE COURT:**  There is a lot between December of 2015

14   and November of 2022.

15       **MS. CARUSO:**  There is --

16       **THE COURT:**  That is part of my concern.

17       **MS. CARUSO:**  Let's -- let's talk about what there is

18   during that time frame because I agree there is a lot.  And

19   what there is, is the plaintiff coming out with its

20   announcement, very publicly -- it doesn't say "Coming soon.  We

21   don't have anything to tell you yet but stay tuned."  It says,

22   "We're here.  This is what we're doing.  We're hiring."  And

23   that's picked up by the *Wall Street Journal*, *USA Today*, tech

24   press.  It --

25       **THE COURT:**  So why wait so long?

1      **MS. CARUSO:** Because, Your Honor, there was nothing to

2  take action against.  There was nothing that signaled that

3  Mr. Ravine was claiming trademark rights or that he was

4  actually doing anything that would create risk to my client.

5  And that continued to be the case for years.

6      It's not until they launch this November 2022 new product

7  that they claim users.  The very first users that Mr. Ravine

8  claims in his declaration are in December of 2022.

9      And when you have that, you have a clear indication that

10 there have been no trademark rights, no protectable trademark

11 rights that have existed before that time.

12     Yes, it is true that in certain circumstances where

13 plaintiffs take very aggressive, bold measures to make -- you

14 take steps towards use in commerce such as announcing a new

15 video game that's going to come out in three months; iPhone,

16 the day it was announced, you know, big announcement about it.

17 They didn't have to wait until they sold the first one to start

18 getting those trademark rights.

19     But here with this, there's -- there's nothing at all, no

20 case law that says you can put up a web page that has a name on

21 it, and that creates trademark rights.  That is the definition

22 of trying to reserve trademark rights, which the statute tells

23 us you can't do, which the trademark examiners manual tells us

24 you can't do, which the case law tells us you can't do.

25     And there's nothing at all that defendants have put in the

1    record that would support under any precedent cited in their

2    briefs or that we've been able to find that they have done

3    anything that remotely reaches the level of doing use in

4    commerce --

5            **THE COURT:**  What about in September of 2016 when you

6    submitted your application and it was rejected because of

7    others potential rights?

8            **MS. CARUSO:**  Yes, Your Honor.

9            **THE COURT:**  So that was years ago.

10           **MS. CARUSO:**  Yes, that was years ago.

11       So at that time, the plaintiff decided to not pursue the

12   registration route.  It's important to keep in mind that when

13   the USPTO makes a determination of likelihood of confusion,

14   it's not basing it on the actual use in the marketplace.  It's

15   just basing it on the registration.  And you can see that in

16   the documents before Your Honor.  That is also the law.  And

17   that is all that the PTO was saying at that time.

18       Significantly, there also was no registration at that

19   time.  The registration had not yet issued and ultimately

20   issued only on the supplemental register, which does not convey

21   any right -- it doesn't establish any presumption of ownership

22   or any trademark protectability rights.  It's often referred to

23   as not creating any trademark rights at all.

24       So the idea that my client in September of 2017 -- 2016

25   would have said, Oh, if I go onto open.AI and see them

1    redirecting to our website, that is creating irreparable harm

2    to us that we have to take action against.

3        And, Your Honor, we've cited to you a lot of case law on

4    this point of trademark owners don't need to canvas the world,

5    turn over every rock and stone --

6            **THE COURT:**  It's not -- that's not relevant here.  You

7    knew about it.  It's not as if you're -- we're not talking

8    about Disney going after someone on Etsy.

9            **MS. CARUSO:**  Understood.  But it's not even just the

10   actual issue of knowledge.  It's the issue of resource use, and

11   we cited the *AIG* case in which the court so pitifully talked

12   about the horns of a dilemma of waiting to see if there is

13   actually something that is going to significantly impact you

14   and having irreparable harm or going in without irreparable

15   harm and being told there is none.

16       So the fact that my client didn't take any action when

17   there was no competitive product, when there was no significant

18   impact, to use the language of the case law, that shows

19   prudence, not delay.

20           **THE COURT:**  Response.

21           **MR. RHOW:**  Your Honor, if I could respond on several

22   levels.

23       First of all, if I heard opposing counsel correctly, what

24   she said was in December 2022, that is the trigger point.  That

25   is when they knew there was an infringement of their trademark.

1    **MS. CARUSO:**  That's not what I said.

2    **MR. RHOW:**  I think the record will -- she said at that

3    moment, and so that's still a year ago, Your Honor.  If you are

4    a billion-dollar company or, in this case, a

5    hundred-billion-dollar company, if you're Disney and you do see

6    someone on  Etsy --

7    **THE COURT:**  So when did you know?

8    **MR. RHOW:**  -- you sue the next day.

9    **THE COURT:**  Well, not necessarily.  Disney doesn't sue

10   everybody who's using their trademark on Etsy.

11   **MR. RHOW:**  But here they've been using it for eight

12   years, and they know that.  They know that -- they've had

13   communications with him, because you asked the right question.

14   They said how are we supposed to know, and then I was thinking

15   Exhibit 15, they reached out to Guy in February 2015.  Not only

16   did they know, they were concerned about it such that they

17   wanted to buy, and I'm quoting, "your related IP rights."

18   It's not Etsy.  It's the opposite.  They're monitoring.

19   They're figuring out what's going on.  Maybe plaintiff does not

20   realize what is important to them or not.  I don't know if they

21   have a trademark on ChatGPT, frankly.  I don't know if they

22   care about trademarks.

23   My quick review today is they don't even have a trademark

24   on ChatGPT, which is their primary product.  I'm not sure why.

25   I can't speak to that.

1          But your other point, Your Honor, about the registration,

2     let's be clear, when they got rejected in 2017, they would have

3     gotten Guy's supplemental use submission.  And while today

4     they've made a lot of hay about the fact that it's not

5     accurate, the fact of the matter is they had it in 2017.

6     Whether they believed it or not, whether they had folks analyze

7     it or knowledge -- which obviously easily could have been done,

8     easily because someone is able to do it on their phone -- they

9     did nothing.  They did absolutely nothing because it wasn't

10    important to them, because it wasn't causing harm.  I'm not

11    sure of the reason.  But they had full, absolute, unquestioned

12    notice of everything we're talking about here today, and they

13    did nothing.

14         The supplemental registration, Your Honor, is important

15    because whether or not that confers rights -- and I -- if

16    Your Honor wouldn't mind, this shows up in the reply brief.

17    There's one cite I would like you to know.

18         The supplemental registration certainly does not diminish

19    your common law rights.  That's under *California Cooler vs.*

20    *Loretto*, Ninth Circuit case, 774 F.2d, 1451 at 1454.  But the

21    registration, again, is notice that someone out in the world is

22    trying to use your trademark.  If you believe you have a

23    trademark, that supplemental notice plus the direct rejection

24    should tell you for this billion-dollar company you got to sue

25    tomorrow.  You got to take action now to protect it.

1    And then when they reach out to him again, my contention

2  is that when he says "your IP rights," that Altman says, he's

3  talking about all of this that he's known for at least five

4  years, if not longer.

5    So, Your Honor, whether or not we agree on all the points,

6  I think the one thing that's undisputed is the consistent

7  disclosures over eight years made by the USPTO, made by Guy

8  Ravine directly, directly to plaintiff, that tells you it

9  wasn't that important to them.

10    **MS. CARUSO:**  Your Honor, Exhibit 15 to Mr. Ravine's

11  declaration, this email that's being much discussed from

12  February of 2022, in that initial reach-out email, it says, "It

13  looks like open.AI currently redirects to our website."

14    Once again, the idea that acquisition of a domain name

15  that redirects to our website is somehow knowledge that the

16  defendant is doing some competitive product, it -- it defies

17  reason.

18    **THE COURT:**  I don't know that I agree one way or the

19  other.  You're making a lot of assumptions about a very small

20  network of individuals who live in this space, and it is not

21  clear to me what they knew or didn't know.

22    **MS. CARUSO:**  Well --

23    **THE COURT:**  And you've not given me any evidence one

24  way or the other.

25    **MS. CARUSO:**  Well, Your Honor, I think what's most

1   important is if there was evidence of actual use, the kind of

2   use that can create trademark rights, we would have expected

3   defendants to have identified it, and they haven't.

4        What they have identified are a number of things that

5   there's no evidence that anyone actually saw or used.  This is

6   one of the reasons that the PTO specimen is so problematic.

7   We're hearing today well, of course it was copied from GitHub.

8   That's how it's supposed to work.  It was presented to the PTO

9   in support of an application showing that users share documents

10  and information.  Users.  Now we're being told well, of course

11  it wasn't users.  It was just Mr. Ravine, who does everything

12  himself, putting together something to show how it could be

13  used.  That is a mockup of a product.  And the PTO's very

14  clear, a mockup of a product is not a use in commerce, and it

15  does not create trademark rights.  It can't suffice as a

16  specimen, and it constitutes fraud on the trademark office,

17  which is not only relevant to their supplemental registration,

18  it's relevant to the point they're trying to make today.

19  They're trying to use those kinds of random uses on websites

20  without proof of user engagement as priority, and under the

21  law, it's not.

22        **THE COURT:**  Sam Altman offered to buy the IP.  Why

23  isn't money enough?

24        **MS. CARUSO:**  Oh, in terms of irreparable harm?  Is

25  that your question?

1           **THE COURT:**  If damages are enough, you -- you're not

2    entitled to an injunction, a preliminary injunction.

3           **MS. CARUSO:**  Yes, Your Honor.  There is irreparable

4    harm that -- it's beyond just buying it.  If the only issue was

5    it would be more convenient for the plaintiff to own the

6    domain, open.AI, then that would be correct.  But that's not

7    the only harm.  The harm is the actual confusion that's going

8    on right now.

9           **THE COURT:**  Well, if there's no product, why -- why

10   is -- why is an issue of confusion at all creating any harm if

11   there's nothing there?

12          **MS. CARUSO:**  Well, now there is.  Since November, they

13   introduced this text-to-image generator, and we submitted as

14   part of the record some of the images that have been generated

15   using it, images that are watermarked with Open AI, a space

16   between, and that will be confused -- confuse people into

17   thinking that they originate from the plaintiff.

18       We have put in evidence that users who reach the

19   defendants' website think that they are using the website

20   belonging to the plaintiff and the product belonging to the

21   plaintiff.  That --

22          **THE COURT:**  It seems to me that there's no dispute on

23   the general topic of confusion; right?

24          **MR. RHOW:**  On the general topic, I would say yes.  And

25   I -- I have re --

1              **THE COURT:**  You say yes.  That means you agree.

2              **MR. RHOW:**  I would agree on the general topic given

3      that fact one is Open, space, AI and the other is OpenAI.  I

4      agree.  I feel like I don't want to make any implied or

5      inadvertent admissions --

6              **THE COURT:**  That's good because you'll be held to

7      them.

8              **MR. RHOW:**  Yes.

9              **MS. CARUSO:**  And once we have evidence of actual

10     confusion, Your Honor, that is the irreparable harm.  That's

11     why the presumption exists, that's why the trademark law was

12     changed, and that's what we see in the case law over and over.

13     When you have actual confusion, that is irreparable harm

14     because the plaintiff is losing control of its reputation and

15     its ability to control what people think of its goods and

16     services because of this confusion.

17         Once you have this confusion, especially this kind of

18     showing we have here, that is irreparable harm.  And the more

19     people are looking for our OpenAI, the plaintiff's OpenAI and

20     encountering the defendants', that is where you see the harm

21     occurring.  Even journalists are confused and linking to the

22     wrong sites.

23             **THE COURT:**  On page 8 of the slide deck that you

24     provided to me, you had all of these references to OpenAI

25     release products, and yet none of -- virtually, I would say

1   most of it, was not referenced in the brief related to some,

2   you know, 300-page exhibit to which there was no argument, no

3   statements.

4        How is that fair to either the Court or the defendant in

5   terms of your analysis that you now so nice and neatly put in a

6   slide page for which I did not have any of that?

7             MS. CARUSO:  Your Honor, we do cite to --

8             THE COURT:  Yes.  Exhibit Q, which is a 300-page

9   exhibit, and you expect me to discern from the fact that you

10  add that to your filing the arguments that are being made on

11  this slide sheet.  And how is the plaintiff [sic] supposed to

12  discern that as well?  If I can't, how should they be able to

13  be put on notice of that?

14            MS. CARUSO:  Your Honor, we could have been more clear

15  in the brief on that point.  But the important --

16            THE COURT:  You could have stated something.  It's not

17  an issue of clarity.  It's an issue of not saying anything

18  whatsoever.

19            MS. CARUSO:  Well, Your Honor, it's because the

20  2015 -- the real date that we look to is the 2015 date, which

21  we abundantly talked in the briefing and --

22            THE COURT:  So I'll just ignore all the others for

23  purposes of this motion.

24            MS. CARUSO:  Well, Your Honor, we think the 2015 date

25  gets us there, but the --

1          **THE COURT:**  Did you hear what I said?

2          **MS. CARUSO:**  Yes.

3          **THE COURT:**  So shall I just ignore all of those other

4     dates for purposes of this motion?

5          **MS. CARUSO:**  I don't believe so, Your Honor,

6     especially with respect --

7          **THE COURT:**  So should I allow them to have a response,

8     given that you didn't say anything about this in your brief?

9          **MS. CARUSO:**  If they would like a response,

10    Your Honor, we don't object to that.  However, it is in --

11         **THE COURT:**  And how isn't the 2015 just an

12    announcement like the announcements that are in some of these

13    emails?  It's just an announcement.

14         **MS. CARUSO:**  Your Honor, here's how it's different

15    for -- in this case.  And the *Brookfield* case is very

16    illuminating on this point, the Ninth Circuit's decision there.

17    It looked to a press release that was picked up widely, widely

18    disseminated as an initial use in commerce, and that's what we

19    have here.

20         The way that this was rolled out, the way that it was

21    absorbed by the public so saturated in the media makes it

22    qualitatively different from what the -- what the defendants

23    did.

24         And so the purpose of these additional products is

25    reinforcing that, in fact, there were products released to

1    consumers.  And the evidence for the Gym product from

2    April 2016, that code --

3         **THE COURT:**  You understand that that word wasn't

4    mentioned once in the brief.  Do you understand that?

5         **MS. CARUSO:**  Yes, Your Honor.  That was identified in

6    the defendants' submission, and so I think they knew about it

7    because they put it into the record, that specimen and that use

8    date of April 2016.

9         So even if, in fact, the defendants had made some prior

10   use -- and I'd like to call up one of our slides.  I think it

11   makes this clear, the timeline of their use.  It shows by

12   Mr. Ravine's own declaration -- this is slide 27 -- whatever

13   they were doing with the Wikineering and the original

14   collaboration tool, by Mr. Ravine's own admission, that stopped

15   in early 2016.  And then there wasn't anything else --

16        **THE COURT:**  Where does it say that?  I don't see that

17   on that slide.

18        Well, I was looking at the wrong one.

19        Where does it say that?

20        **MS. CARUSO:**  It's slide 27.  And we have a quote in

21   the pink bar, is what's showing the time -- the duration of

22   these various things.  And this goes to Mr. Ravine's

23   declaration, Exhibit 10 -- sorry -- paragraph 10.  And I

24   haven't -- and this is actually consistent with defendants'

25   timeline slides as well, that this use was made, they claim,

1   approximately March 2015 through early 2016.  And then there's

2   a gap.  There's nothing else that defendants even claim until

3   September of 2016.

4        And so, Your Honor, whatever preceded September 2016

5   doesn't provide priority because priority for trademark rights

6   has to be continuous use.  This wasn't continuous.

7        And this record yields no -- no ambiguity, no

8   contradiction that plaintiff was using OpenAI before

9   September 2016 with consumers, with actual users.

10            **THE COURT:**  Do you want to respond on *Brookfield*?

11        **MR. RHOW:**  On this point, Your Honor, and some of the

12   prior points as well, if I may.

13            **THE COURT:**  *Brookfield* first.

14        **MR. RHOW:**  *Brookfield*, on the case -- sorry.  I missed

15   that.  On this point right here?

16            **THE COURT:**  She cited *Brookfield* as the core case

17   that -- with respect to the announcement and how it identifies

18   a date for purposes of use in commerce.

19        **MR. RHOW:**  Understood, Your Honor.  I -- I -- the

20   broader point on -- that I have --

21            **THE COURT:**  Do you want to respond --

22        **MR. RHOW:**  I am trying to respond on that.  Sorry,

23   Your Honor.

24        There is no question -- and I'm admitting that it had a

25   lot of widespread publicity, but it wasn't associated with use.

It wasn't associated with a product.

In December 2015 --

THE COURT:  But is the legal principle correct as articulated by Ms. Caruso?

MR. RHOW:  I don't believe so unless it's attached to a use.  The publicity can't just be Elon Musk is investing into plaintiff version of OpenAI, which is what generated a lot of that publicity.  There was a supposed billion-dollar investment.  Didn't materialize.  Elon Musk was associated.  If you put Elon Musk on any press release, I guarantee a ton of people are going to pick it up.

Sam Altman himself, by the way, who was the founder of Y Combinator, who was not in the AI community, was associated, so, yes, there was publicity.  I don't believe that is what is contemplated by secondary meaning vis-à-vis an actual commercial use.

And, Your Honor, your point on slide 8 is well-taken, which is none of these are what we view as commercial use.  These are beta programs.  These are programs presenting literal algorithms.  There is no product until 2022 by their own admission.

In terms of some of what she's mentioned about our timeline, we had an iterative startup process, and what that means is Guy Ravine, who is -- doesn't have the resources of a thousand engineers, is iterating, improving, sometimes taking

1  off the market certain products and then replacing them as he

2  develops them, and so there is a clear continuous pathway of

3  use that leads to, frankly, the present.

4       The last small point, Your Honor, I want to make is we

5  focus a lot on the USPTO and what it did.  One thing I forgot

6  to mention -- and this is in our slide show on slide 4 -- is as

7  late as 2023, plaintiff, submitting all the evidence that

8  you've seen, Your Honor, on secondary meaning, on press

9  releases, submitting all of that evidence, was rejected again

10 by the USPTO, both in February and April of 2023.

11      And so here again, we have a third party, in this case the

12 USPTO, looking at this evidence and saying, Wait a minute, for

13 whatever reason -- and I'm not saying I know what's going

14 through their minds -- all the evidence you're hearing today is

15 not enough to get a trademark.

16      **THE COURT:**  So the question -- it's an important

17 question, which is why do either of you -- why do either of you

18 have any claim?  That is, the -- the PTO has said multiple

19 times that this is a descriptive mark, that there hasn't been

20 secondary meaning.  Why -- frankly, I don't know why anybody

21 would pick this kind of mark for this kind of thing.  That's

22 why we're not even using it, given that I don't want to

23 constantly be saying Open AI with a space, OpenAI without the

24 space.

25      So why is any of this protectable, period?

1        **MS. CARUSO:**  Your Honor, the plaintiff believes it

2   certainly has rights in this.  It -- OpenAI is associated with

3   the plaintiff at this point in time without question.  We've

4   cited to the kind of evidence that most dilution plaintiffs

5   dream of having.  You have press saying everyone knows the name

6   OpenAI.  It's a household name.  Yes, it is, and it's not a

7   household name in the -- like crypto as some generic thing.

8   People know what OpenAI is and that it originates from a single

9   source.  That's what it takes to have common law trademark

10  rights.

11       We also --

12       **THE COURT:**  Well, it certainly didn't have that before

13  November of 2022.

14       **MS. CARUSO:**  Your Honor, we believe it did.  It was

15  quite -- there's a lot of press that we cite to from before

16  2022.

17       **THE COURT:**  Then you're living in a bubble.

18       **MS. CARUSO:**  It's not just tech press that's from this

19  area.  It's worldwide press, global press.

20       **THE COURT:**  When did it become a household name?

21       **MS. CARUSO:**  Well --

22       **THE COURT:**  Not in 2015.

23       **MS. CARUSO:**  Not in 2015.

24       **THE COURT:**  Not in 2016.

25       **MS. CARUSO:**  Your Honor, what is --

1          **THE COURT:**  When?  When did it become a household

2    name?

3          **MS. CARUSO:**  We aren't asserting a dilution claim, and

4    we haven't -- household name is not the standard for secondary

5    meaning.  We believe secondary meaning was acquired certainly

6    by the time ChatGPT was released, and that was released before

7    the defendants had a product, any product, for which they claim

8    a single consumer, a single person engaged in using it.

9          **THE COURT:**  So 2020?  2018?  What are you saying?

10         **MS. CARUSO:**  We believe the press in 2015 was

11   sufficient, but if not by then, then in early 2022 for certain.

12         **THE COURT:**  How does that timing play into any of the

13   analysis?

14         **MS. CARUSO:**  The way it plays in because the

15   defendants are claiming that they have a senior trademark

16   right.  In order to have a senior trademark right, they have

17   to --

18         **THE COURT:**  Let me -- let me back up a little bit.

19         What if -- what -- theoretically speaking, what if I

20   thought, based upon what's in front of me -- because there's a

21   lot that's not -- that really there was no -- that neither --

22   because it's descriptive and the PTO said it was descriptive

23   multiple times, there really are no rights that attach until

24   either one had secondary meaning.

25         There doesn't seem to be much evidence that the defendant

has -- that its mark has secondary meaning, but perhaps plaintiff acquired secondary meaning in early 2022.

So injunction can issue and damages, to the extent any would exist, are pretty limited because you haven't had that secondary meaning for that long.

How does it play in that kind of hypothetical circumstance?

MS. CARUSO:  It could play that way, Your Honor.  That makes sense logically.

THE COURT:  How does that play?

MR. RHOW:  First, one of the earlier questions you asked, what happens if neither side has the rights.  I mean, we are not the moving party.  We are not the plaintiff.  We are simply the defendant who has this record before them --

THE COURT:  I understand.

MR. RHOW:  And so I certainly believe that is a potential outcome and that could explain perhaps why we haven't done counterclaims yet.

On the issue that you indicated, I think it depends on use in part.  I mean, if Your Honor believes that as of early 2022 it's a protectable trademark, then they should sue in early 2022.  They still have a massive delay issue.

But second, it depends on -- and I go back to use because it seems like somehow in early 2022, because ChatGPT is coming out, that there is secondary meaning, and my argument would be,

1    Your Honor, that yes, we are not contesting that ChatGPT may

2    ascend to that level of meaning, but what we don't see is any

3    association between OpenAI and that secondary meaning.  We're

4    not here contesting ChatGPT.  We are here talking about OpenAI

5    and OpenAI alone.

6         And so if secondary meaning exists, perhaps it's to the

7    product that we all know and use but not to OpenAI.

8         And so OpenAI, if -- playing out your initial

9    hypothetical -- could just exist in the ether, and certainly as

10   to us -- maybe not to others in the world -- but as to us, it

11   cannot be enforced.

12        **THE COURT:**  But if I found, as the PTO has found, that

13   there was no secondary meaning ever that attached to your

14   rights, whatever rights you think you might have had, then how

15   can it not be enforced as against your client if I find or if

16   there is, you know -- that the secondary meaning attached?  I

17   understand that you dispute that the secondary meaning --

18        **MR. RHOW:**  Understood.

19        **THE COURT:**  -- attaches in 2022.

20        **MR. RHOW:**  Right.

21        **THE COURT:**  But if I found that it attached in 2022 as

22   opposed to anything earlier and that because it was otherwise

23   descriptive, your client has no enforceable rights, then

24   doesn't that mean the injunction should issue?

25        **MR. RHOW:**  I don't think so because -- this is

1    thinking off the top of my head, Your Honor, but the -- the --

2    the tools that exist as of 2022, before secondary meaning

3    attaches, has meaning among the folks who are using it.  And so

4    the injunction should not attach to those folks because we've

5    had these products in play for seven years.

6         Again --

7              THE COURT:  Well --

8              MR. RHOW:  I am contesting the secondary meaning, but

9    if Your Honor were to find secondary meaning as of that moment

10   and if all the other obstacles to an injunction are met,

11   irreparable harm, etc., etc., then I suppose on a go-forward,

12   it could.  I just -- I would have to think that through some

13   more and look at the case law in terms of kind of graduating

14   into secondary meaning at some point while you're fully aware

15   that someone else has been using the trademark all along.

16             THE COURT:  Yeah.  Except that -- it's been using a

17   mark.

18             MR. RHOW:  A mark.

19             THE COURT:  Which had no protection.

20             MR. RHOW:  Correct.  I'm not disagreeing with that.

21   So I -- I suppose that could exist.  I would have to research

22   this.

23             THE COURT:  What damage, if any, exists to your client

24   with this -- if the injunction issues?  I mean, it's -- there

25   is certainly no monetary damage.

1          **MR. RHOW:**  Are you talking about to us, Your Honor.

2          **THE COURT:**  Yeah.

3          **MR. RHOW:**  Well, I mean, they have a lawsuit against

4     us.  And one of the big issues that I should raise is, you

5     know, in terms of evidence-based prejudice, this is a classic

6     case where in 2015, we do have evidence back then.  Mr. Ravine

7     has declared to that.  But in 2023, that evidence doesn't

8     exist.  Not just in terms of documentary evidence.  There could

9     be witness memory issues, there could be other means which we

10    could have proven our case if a timely claim had been brought.

11         This is that classic case where I'm constrained to prove

12    certain things because while I believe them to be true, for

13    Your Honor's purposes, evidence is necessary, and I may not

14    have that.  That's the ultimate prejudice that will exist if

15    you find a reasonable probability of success, if you enforce

16    the injunction.

17         But in terms of the harm to us, we're getting hit with a

18    lawsuit right now.  We are being asked, if you look at the

19    Complaint, for a whole host of things beyond simply an

20    injunction, and then we will lose what Mr. Ravine has built for

21    those nine years.  He's built this Open AI academic

22    collaborative concept where people know him for that, where

23    that's his life goal.  And he's built that systematically,

24    perhaps without the benefit of expert trademark counsel prior

25    to 2017, but he has built that.  So the loss is dramatic to him

1   as well from a prejudice perspective.

2          **THE COURT:**  Are attorneys' fees recoverable in this

3   kind of case?

4          **MS. CARUSO:**  For willful infringement in exceptional

5   cases, they are.

6          **THE COURT:**  All right.

7       What else do you want to say?

8          **MS. CARUSO:**  Your Honor, I would like to make just a

9   few points in response to what we just heard so that the record

10  is clear.

11      There was a suggestion that all the press related to

12  ChatGPT, and there was no evidence that, in fact, there was

13  association with OpenAI.  All of the evidence that we submitted

14  for that time period, voluminous exhibits to be sure, but part

15  of the reason it was voluminous is to show there was, in fact,

16  a lot of recognition of OpenAI, not just ChatGPT.

17      The PTO's finding is not a final determination of --

18          **THE COURT:**  No, but it's evidence.

19          **MS. CARUSO:**  Right.  But it hasn't yet been settled.

20  Those trademarks are on pause right now, essentially pending

21  this resolution and us presenting additional evidence.  And the

22  PTO doesn't have all of the evidence that we have presented

23  here today necessarily.

24      And on the issue of harm, again, the fact that defendants'

25  open.AI website has grown in the wake of plaintiff's

1   development of ChatGPT and DALL-E, that is -- so what has been

2   built is a confusion-based ecosystem.

3           **THE COURT:** I understand.

4           **MR. RHOW:** Your Honor, one final --

5           **THE COURT:** Go ahead.  I'm listening.

6           **MS. CARUSO:**  I was going to turn it over to

7   Mr. Feldman.

8           **THE COURT:** Hold on, Mr. Feldman.

9     Go ahead.

10          **MR. RHOW:** Your Honor, one final point, and this is

11  kind of a broader point in terms of prejudice and harm.  Maybe

12  it doesn't fit cleanly into a category.

13      But as you, Your Honor, noted, the AI community is rather

14  discrete, and the plaintiffs, in their Complaint, take many

15  shots at Mr. Ravine, and obviously it is what it is.  But the

16  reputational issues here are dramatic as well, especially as an

17  advocate of AI open to the community for the benefit of

18  humanity.  Guy Ravine views that as quite important, views that

19  as an important part of his initiative.  And by virtue of this

20  lawsuit already, he is facing the obstacle of overcoming those

21  perceptions.

22      So there is a lot of downside to an injunction and to this

23  lawsuit, which is why we're defending it, understanding some of

24  the issues Your Honor has raised.  And we say -- that's really

25  from the client.

1          **THE COURT:**  One of the factors in determining

2     secondary meaning is whether the use of the trademark has been

3     exclusive.  Can you address that, given plaintiff's knowledge

4     of Mr. Ravine's use and vice versa?

5          **MS. CARUSO:**  Yes, Your Honor.

6          Exclusive -- that is one of the factors.  Usually what the

7     courts look at is substantially exclusive use, but here, again,

8     if we break down every bit of use that the defendants are

9     claiming, there's -- the use has to be -- the use that matters

10    is use that consumers engage in.  And so until consumers are

11    engaging in the use, then if they're not, then it's still

12    exclusive use.  If they don't see the defendants' mark

13    anywhere, from the consumer perspective, the plaintiff's use is

14    exclusive.

15         **MR. RHOW:**  I have a harder argument in reverse,

16    obviously, since OpenAI is more well-known, but I don't view

17    this as a popularity contest.

18         The reality is Mr. Altman and Mr. Brockman, on at least

19    two occasions, were well aware of the use and as late as

20    February 2022 asked to purchase, not just the domain, but the

21    related IP rights.  That is an acknowledgment of use.  It's an

22    acknowledgment of the trademark ownership and rights.  And

23    that's in plain English in a direct communication between the

24    parties to this lawsuit.

25         **THE COURT:**  And then what about the fact that the

1　plaintiff never petitioned the PTO to cancel defendants'

2　secondary registration within five years?  Why not?  Why didn't

3　you do that when you knew it was there?

4　　　　　**MS. CARUSO:**  Your Honor, again, it didn't seem like

5　anything that was a genuine commercial threat, much like Disney

6　in the *VidAngel* case didn't take action, even when there were

7　hundreds of thousands of beta users.  It wasn't until it became

8　a substantial threat that there was a need to do anything.

9　　　　And, again, here that PTO registration pointed to that

10　tool that had, you know, these posts on it.  Looking at that

11　was not any kind of commercial threat that was significant,

12　plus it was on the supplemental register which, again, it's not

13　an impediment to the plaintiff creating rights.

14　　　　　**MR. RHOW:**  Your Honor, if I could briefly respond.

15　　　　Your Honor, if you look at their trademark application,

16　the plaintiffs, it's not just about downloadable software like

17　ChatGPT.  It's about research and development services as well,

18　which I believe is Class 42.

19　　　　So when they say it's not a threat because the use looked

20　different, that doesn't answer the question.  ChatGPT is a

21　different product.  It's a red herring for this discussion.

22　　　　During the time period at issue, we are directly in the

23　class that they are alleging in their trademark application,

24　and I'm quoting:  "Research and development services in the

25　field of AI."  That's not ChatGPT.  That's something totally

1   different.

2        The other thing in the case law, Your Honor -- and this

3   is, I think, in our Footnote 8 to our opposition -- is under

4   this *Internet Specialties West* case, Ninth Circuit case, a

5   plaintiff is, and I'm quoting, "not entitled to wait until a

6   competitor's business grows large enough to constitute a real

7   threat."

8        The whole goal, even in the Etsy example you gave, is to

9   the extent you see it, you got to sue on it.  You got to stop

10  it before it grows bigger, and this is the classic case of the

11  opposite where they knew directly that we're in the field and

12  they waited.  They waited.

13       And, by the way, even when that product launches that they

14  now say they're concerned about, they still waited.  They

15  waited another eight months, which under the case law you see,

16  delays as late as, I think it's three months, six months, etc.,

17  are -- are too long when you know.  A lot of those cases are

18  where you don't really know, but they know for sure --

19            **THE COURT:**  It's not your strongest argument.

20            **MR. RHOW:**  Okay.  Understood.

21            **THE COURT:**  Okay.

22       Mr. Feldman, you wanted to say something?

23            **MR. FELDMAN:**  I will be very brief.  I'm not going to

24  argue.  I just have two things to bring to your attention.

25       First, I'm sorry about that April entry on that slide.  I

1   didn't -- I didn't focus on that.  It's my fault.

2       You were favored with Exhibit 11 to I think it's

3   Mr. Ravine's declaration dated December 15th, and I would

4   invite the Court's attention to the first paragraph which

5   refers to a collective engineering platform that is described

6   by the defendant as "it's in development."  So that's

7   December 15th, right after the application.  So that's one

8   thing.

9       With respect to that topic, I would bring two items to

10  Your Honor's attention.  Number one is Mr. Ravine's

11  declaration, the individual defendant's declaration, and

12  paragraph 6 thereof, and Exhibit 3.  Exhibit 3 is something

13  you're probably tired of seeing.  It's one of these.  It's a

14  landing page.  And at paragraph 6 of his declaration, he says

15  that that's what he had in September of 2015.

16      With respect to the same topic, I would bring to

17  Your Honor's attention Mr.-- Exhibit E to Mr. Nielson's

18  declaration, which is another website associated with the

19  defendant.  That's Exhibit E to Mr. Nielson's declaration.

20  That is a screen capture that Mr. Nielson obtained in

21  November 2015, one month before the exhibit that said the

22  engineering platform was in development.  That capture does not

23  mention AI.  There is no functionality on that capture.  All

24  that it permits is entering email on the -- an email address on

25  the last page, and it actually says Wikineering will be

1    released in 2015.  So this is November 2015.  The last page

2    says Wikineering will be released in 2015.  And there's no

3    reference to AI.  And then a month later, there was an email

4    that said it was in development.

5        So when you're considering what the state of -- I think

6    Your Honor may have asked about a product.  That's what the

7    state was in December 2015.

8            THE COURT:  Okay.  Anything else?

9            MS. CARUSO:  Just very briefly, I wanted to point out

10   that we have in our submissions some summaries of all of the

11   landing pages that defendants' website looked like, as well

12   as -- as Exhibit C to Mr. Scher's declaration.  It goes -- for

13   everything where the defendant said "you should have known here

14   and taken action," it shows what was available then and why it

15   wouldn't have made sense to take action at that time.

16       And in terms of prejudice, we really haven't heard

17   anything specific about what apparently existed at some time

18   that was lost.  We heard that even in 2016, Mr. Ravine didn't

19   have records from 2015.

20       So with that, Your Honor, unless you have additional

21   questions.

22           MR. RHOW:  Your Honor, my brief response to what --

23   some of what Mr. Feldman said is if you look at not just that

24   paragraph from Mr. Ravine's declaration, I think -- as I've

25   tried to give, I think the remainder of it tries to give

1   context.  But beyond that, I have nothing further.

2            THE COURT:  Okay.  Happy Thanksgiving.  I'll take it

3   under submission.

4            MR. RHOW:  Thank you, Your Honor.

5            MR. FELDMAN:  Happy Anniversary.

6            THE COURT:  Mr. Feldman, you're right.  Tomorrow.

7            MR. RHOW:  Anniversary of?

8            THE COURT:  My commission.

9            MR. RHOW:  Congratulations, Your Honor.

10           THE COURT:  So it has been 12 years.

11           MS. CARUSO:  You've learned something about trademark

12   law.

13           THE COURT:  Patent and ERISA and securities and all

14   sorts of things that state court judges --

15           MR. FELDMAN:  Can we go off the record?

16           THE COURT:  Yes.  Let's go off the record.

17               (Proceedings adjourned at 2:09 p.m.)

18

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Monday, November 27, 2023

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25