**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **OPENAI, INC.,**<br><br>      Plaintiff,<br><br>     v.<br><br>**OPEN ARTIFICIAL INTELLIGENCE, INC., AND GUY RAVINE,**<br><br>      Defendants. | **Case No.:** 4:23-cv-3918-YGR<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 21, 58, and 59 |

Plaintiff OpenAI, Inc., the founder of ChatGPT among other artificial intelligence tools and services, brings this trademark dispute against defendants Guy Ravine and his company Open Artificial Intelligence. The two parties use virtually identical trademarks—plaintiff's OpenAI (no space) versus defendants' Open AI (with a space). Each contests who is the senior user. Pending before the Court is plaintiff's Motion for a Preliminary Injunction. (Dkt. No. 21.)[1] In it, plaintiff asks the Court to restrain defendants' use of the Open AI trademark.

Having carefully considered the papers submitted, along with the argument presented at the November 20, 2023, hearing, the Court **GRANTS** plaintiff's motion for a preliminary injunction. Plaintiff's trademark is associated with perhaps the most renowned artificial intelligence tools currently in use and, quite quickly, became ubiquitous. Defendants' trademark, by contrast, is associated with a website that, until shortly before this litigation commenced, was inoperable at best. Only plaintiff, therefore, has shown that it has a protectible interest in its trademark.

## I.    BACKGROUND

Plaintiff brought this case on August 4, 2023, against defendants for: (1) federal trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (2) common law

---

[1] Plaintiff also filed a motion for leave to supplement the record along with a motion to seal the supplemental material. (Dkt. Nos. 58 and 59.) Defendants object to plaintiff's attempt to supplement the record under Local Rule 7-3(d). The Court agrees with defendants' objection. Nonetheless, the sealing request is **GRANTED** given the nature of the information and the request to supplement the record is **DENIED** for the purposes of this motion.

trademark infringement; (3) fraudulent registration, 15 U.S.C. § 1120; (4) cancellation—no *bona fide* use, 15 U.S.C. § 1119; and (5) cancellation—misrepresenting source (15 U.S.C. § 1119). To determine whether plaintiff is likely to succeed on the merits of its trademark infringement claim, the Court first describes the history of both parties' use of the disputed mark.

### A.   PLAINTIFF'S USE OF THE DISPUTED MARK

#### 1.   Development of the OpenAI Mark

On December 11, 2015, plaintiff announced its foundation as an artificial intelligence research company. (Dkt. No. 22-1.) The announcement was widely covered in the media. Plaintiff has introduced several artificial intelligence products that have become immensely popular, including ChatGPT and Dall-E. Since its foundation, plaintiff has used the OpenAI mark in association with its goods and services. It uses the mark on its website, social media, and marketing. Every time consumers open ChatGPT, for example, they see the OpenAI mark.

Plaintiff's use of that mark has significant reach. Its website, which displays the OpenAI mark prominently, ranked in September 2023 as one of the most visited websites in the world. (Dkt. No. 22-13.) In the month preceding the filing the complaint, the website had 185 million U.S. visitors. (*Id.*) Anytime plaintiff communicates with its millions of followers on social media platforms, it communicates with that mark. Plaintiff's products and services have received extensive coverage. Statements in the media reflect the widespread association of the OpenAI mark with plaintiff—Forbes stated, for example, that "[i]n 2023, everyone knows OpenAI's name" while the Washington Post reported that the company was "rocketing into the mainstream." (Dkt. No. 22-17 at 197 and 231.)

#### 2.   Plaintiff's Attempts to Register the Disputed Mark with the USPTO

Plaintiff first attempted to register its OpenAI mark with the United States Patent and Trademark Office ("USPTO") on September 21, 2016. (Dkt. No. 23-1 at 67.) After reviewing the application, the USPTO identified several issues. (*Id.*) Though the USPTO acknowledged that there were no similar "registered" marks, it warned plaintiff that defendant Ravine's prior-filed application, *see infra*, "may present a bar to registration" because "of a likelihood of confusion." (*Id.*) Second, the USPTO noted that the applied-for mark, OpenAI, was "merely descriptive." (*Id.*)

Though such a mark could not be registered on the Primary Register, the USPTO advised plaintiff that it could apply for the Supplemental Register instead. (*Id.*) Plaintiff never responded; the USPTO then closed the application as abandoned effective August 4, 2017. (*Id.* at 94.)

Years later, on January 26, 2022, plaintiff once again tried to register its OpenAI mark. Once again, the UPSTO rejected it as "merely descriptive." (Dkt. No. 38-24.) Plaintiff submitted evidence that the mark should still be registered because it had "acquired distinctiveness." (*Id.*) The USPTO rejected this claim: It noted that, though plaintiff had used the mark for five years, this use was "insufficient to show acquired distinctiveness because the applied-for mark is highly descriptive of applicant's goods and/or services." (*Id.*) After the USPTO received a Letter of Protest from defendant Ravine, *see infra*, where he argued that the applied for mark was confusingly similar to his own, the USPTO provisionally rejected plaintiff's application. (Dkt. No. 38-12.)

**B.** **DEFENDANTS' USE OF THE DISPUTED MARK**

**1.** **Development of Open AI Mark**

Defendant Guy Ravine is the chief executive officer ("CEO") and founder of defendant Open Artificial Intelligence, Inc., aka 'Open AI'. He has worked in the technology industry for the past several decades, including in the field of artificial intelligence. (Dkt. No. 38-2 ¶ 2.)

In 2012, defendant Ravine developed Wikineering.org, a website that he states offered user-created online articles related to engineering topics, including artificial intelligence. Around March 25, 2015, defendant Ravine submits that he branded a portion of Wikineering.org with the Open AI mark on a page called the "Initial Collaboration Tool." (Dkt. No. 38-2 ¶ 5.) He attests that branded page was available until early 2016. (*Id.*) No record of this website currently exists—the only evidence proffered is a composite sketch he made in preparation for litigation:

3



Other than submitting this sketch from recollection, defendant Ravine does not corroborate the existence of this webpage with the Open AI mark.

To respond, plaintiff hired a cyberforensics expert, Dr. Seth James Nielson, to analyze defendant Ravine's proffer that he had branded the Wikineering page with the Open AI mark as far back as March 2015.[2] (Dkt. No. 47.) Dr. Nielsen notes that there is no archived record of the Wikineering website in 2012, when defendant Ravine states he published it. As of December 18, 2014, Dr. Nielsen found that all Wikineering showed was a basic "Coming Soon" page. Only on November 16, 2015, did the Wikineering page finally materialize:



---

[2] Plaintiff presented Dr. Nielsen's report on reply. Because the evidence was before the Court, and defendants did not object to it, the Court considers it at this preliminary stage.

United States District Court
Northern District of California

As seen above, it did not include the Open AI mark; instead, it prominently displayed a Wikineering logo. (Dkt. No. 47-5.) The website has not changed much since then, Dr. Nielsen states. Attaching as exhibits screenshots of the website taken on October 25, 2023, Dr. Nielsen notes that the website still includes the same basic functionality and stock images, including the exact same landing page. (Dkt. No. 47-6.) Nowhere is Open AI mentioned. (*Id.*)

Dr. Nielsen also performed an advanced search on Google for any reference to Wikineering. Given defendant Ravine's declaration that the website had been actively used for years, Dr. Nielson expected to see several pages worth of search results. Instead, he received a single page, none of which demonstrated the consumer engagement that defendant Ravine testifies existed. (Dkt. No. 47-8.)

Because he found no evidence of the Wikineering platform as described, Dr. Nielsen proceeded to analyze the "reconstruction" of the "Initial Collaboration Tool" defendant Ravine submitted. Dr. Nielsen notes that it is "curious" that no archival record of the website exists, yet defendant Ravine was able to remember "the specific content within the specific portion of that Wikineering website that allegedly used the words 'Open AI.'" (Dkt. No. 47.) What Dr. Nielsen discovered is that defendant Ravine's reconstruction is "virtually identical to content in a 2017 college textbook entitled, "Mathematics of Autonomy: Mathematical Methods for Cyber-physical-cognitive Systems," by Darryn J. Reid, Michel J. Piling, and Vladimir G. Invancevic. (*See* Dkt. No. 47-10.) Dr. Nielsen concludes that defendant Ravine's reconstruction copies the content from this textbook, which was not published until two years *after* defendant Ravine said the content appeared on his platform. (Dkt. No. 47.)

///
///
///
///
///
///
///

5

On March 26, 2015, defendant Ravine purchased the domain Open.ai. The website was made up only of a landing page, which included a mark with the term 'Open AI,' a statement that 'Open AI' was an "Open Industry Wide & Academia Wide Deep Learning Initiative," and a fillable box for visitors to enter their email addresses:



Later, in September of 2016, defendant Ravine states that he launched a discussion board on Hub.open.ai, which he states was an evolution of the Wikineering Open AI page. (*Id.* ¶ 9.) Hub.open.ai, defendant Ravine submits, was available from September 2016 until early 2023. (*Id.*) Defendant Ravine also says that he launched a new tool, the Evolved Collaboration Tool, which was available to the public at Beta.open.ai. (*Id.* ¶ 10.) Lastly, defendant Ravine submits he created a third tool—Decentralized—for discussing AI companies. (*Id.* ¶ 11.) This tool also included the Open AI mark, according to defendant Ravine. (Dkt. No. 38-8.) None of these is currently available online—defendant Ravine states that he restricted access to them to "prevent users from continuing to edit the page[s] in order to preserve the status quo during this litigation." (*Id.*)

///
///
///
///
///
///

United States District Court
Northern District of California

The only evidence defendant Ravine presents of the existence of these Open AI tools is the following screenshot:



Defendant Ravine also submitted screenshots of these tools when filing his trademark application with the USPTO. These screenshots demonstrate that the site was only set up with nonsensical references like "this is a test," "lll," and "testing":



Until January 24, 2022, defendant Ravine's Open.ai was inoperative. From 2015–2017, the homepage only reflected the 'coming soon' message shown above. After 2017, it redirected users to *plaintiff's* website. (Dkt. Nos. 25-9, 25-10, and 47.) On November 26, 2022, defendant Ravine finally updated Open.ai. (Dkt. No. 25-11.) He added a third-party plugin for a text-to-image generator called Stable Diffusion. That generator, created by Stability AI, competes with plaintiff's Dall-E 2 text-to-image generator, which had only been publicly released two months prior. Defendant Ravine represents that he created and publicly launched his own text-to-image generator

on November 16, 2022. (Dkt. No 38-12 at ¶ 12.) As shown below, however, Open.ai was *only* hosting the third-party Stable Diffusion in November of 2022:



Shortly before the start of this litigation, defendants redesigned Open.ai. The new website looks remarkably like plaintiff's, as seen below:

 

Defendants' Website                           Plaintiff's Website

### 2.    Application for Registration with the USPTO

On December 11, 2015, at 10:32 p.m. eastern, the night after plaintiff's founding was widely reported in the press, defendant Ravine filed an application with the USPTO to register the Open AI mark on the Principal Register. (Dkt. No. 25-1.) In it, defendant Ravine stated that he had

used the proposed trademark in commerce since at least March 25, 2015. He attached only the following specimen in support:



On March 29, 2016, the USPTO rejected defendant Ravine's application. It found that the specimen submitted did not actually show that defendant Ravine had used the mark in commerce. (Dkt. No. 25-2.) In response, defendant Ravine submitted substitute specimens on September 27, 2016. (Dkt. No. 25-3.) Defendant Ravine attested that the specimens demonstrated his mark had been in commercial use since March of 2015. The mobile version of defendant Ravine's website, however, shows that the proposed specimens were uploaded on September 26, 2016, the day before defendant Ravine submitted his revised application:



(Dkt. No. 25-5 at 2.) Based on this post, the USPTO determined that defendant Ravine's mark was "merely descriptive" and therefore ineligible for the Principal Register. (Dkt. No. 23-1 at 44.) The USPTO advised defendant Ravine, however, that even though it had refused him registration on the Principal Register, he could apply instead for the Supplemental Register. (*Id.*)

Four months later, on August 1, 2017, the USPTO registered defendant Ravine's mark on the Supplemental Register, 15 U.S.C. § 1091. On June 30, 2023, defendant Ravine assigned the trademark to defendant Open Artificial Intelligence, Inc. (Dkt. No. 25-8.)

In December 2022, almost a year after plaintiff had filed its various trademark applications, defendant Ravine submitted various Letters of Protest with the USPTO. (Dkt. No. 23-1.) He argued that plaintiff's proposed mark was "confusingly similar" to his and should therefore be rejected under 15 U.S.C § 1052(d). (*Id.*) The USPTO subsequently rejected plaintiff's applications.

### 3. Defendant Ravine's Interactions with Plaintiff

On the day that plaintiff announced its formation, December 11, 2015, defendant Ravine sent an email to plaintiff's CEO and co-founder, Sam Altman, and notified him that he had also been working on an AI initiative. (Dkt. No. 38-13.) In response, Mr. Altman copied plaintiff's president and co-founder, Greg Brockman, who met with defendant Ravine on December 16, 2015. At the meeting, defendant Ravine described his initiative and suggested that the parties collaborate on AI development. Brockman rejected the proposal. (Dkt. No. 38-2 ¶ 19.) Instead, Brockman offered to purchase the Open.ai domain on the condition that defendant Ravine also change the name of his upcoming project. (*Id.*) Defendant Ravine declined.

Six years later, on February 9, 2022, Altman reached out to defendant Ravine to ask, once again, about purchasing the Open.ai domain and related intellectual property. (Dkt. No. 38-17.) Defendant Ravine responded that "Elon Musk paid $11 million for the Tesla domain and trademark in 2017. As we both know, OpenAI holds the potential to become larger than Tesla, and in either event, will become one of the largest companies in the world in a relatively short period of time." (*Id.*) The problem, defendant Ravine continued, is that he had "no use for the money. As an individual, I'm already well off." (*Id.*) Instead of "giving a rich guy more money that he doesn't need," defendant Ravine proposed that plaintiff "donate the money to an academic collaboration"

which would "of course" result in plaintiff getting defendants' Open.ai domain. (*Id.*) Plaintiff never did so.

### C. CUSTOMER CONFUSION

The overlap between the marks has misled customers. Users visiting defendant Ravine's website have typed terms relating to plaintiff's products, such as 'chatgpt' and 'chatgpt 4.0.' (*See* Dkt. No. 25-16.) People on social media have mixed up the two, attributing plaintiff's products to defendants' website. (Dkt. No. 25-22.) Even sophisticated publishers, like Reuters, have talked about plaintiff while linking to defendants' Open.ai website. (Dkt. No. 25-21.)  In addition, plaintiff conducted a customer confusion survey.  When questioned about both parties' websites, more than half of the respondents were confused as to the difference. (Dkt. No. 24-8.)

## II.    LEGAL FRAMEWORK

Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor" if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. This is the Ninth Circuit's "sliding scale" approach, in which "the elements of a preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131. In all cases, at an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimental v. Dreyfus*, 670 F.3d 1096, 1105–06 (9th Cir. 2012). In applying the sliding scale, a district court must consider that, under the Lanham Act as amended, there exists a presumption of irreparable injury for a party seeking a preliminary injunction "upon a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a).

Plaintiff argues that it is likely to succeed on its Lanham Act claim because it has the priority mark. Without an injunction, plaintiff contends that it will suffer irreparable harm. Defendants disagree as to both. First, they the claim they have the senior right to the disputed mark. Second, they submit that plaintiff waited too long to bring its trademark infringement claim and therefore cannot show irreparable harm. The Court considers each argument in turn.[3]

### A.    LIKELIHOOD OF SUCCESS

To prevail on its trademark infringement claim, plaintiff "must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (cleaned up). Here, parties do not dispute that their respective trademarks—OpenAI versus Open AI—are likely to cause consumer confusion. The crux of this motion, therefore, is who has the senior right to the disputed mark.

The parties agree that (i) defendants have a registered mark on the USPTO's Supplemental Register and (ii) both parties' trademark applications on the Principal Registry were denied. Regardless, plaintiff argues that it is the senior user because it was the first one to actually use the mark in the provision of goods or services. Defendants response that they have used the mark in commerce since March 2015. Moreover, defendants argue that plaintiff had ample notice of their use because, among other things, the USPTO rejected plaintiff's trademark application as confusingly similar to defendants' mark after the USPTO published defendants' trademark on the Supplemental Register. Defendants assert that this prior use is dispositive.

To address these arguments, the Court first looks at the impact of defendants' registration on the Supplemental Register, then considers each party's history of using the disputed marks to determine who has the senior claim.

Under the Lanham Act, the USPTO administers a federal registration system for trademarks. 15 U.S.C. §§ 1051, 1052. Registration of a mark is not mandatory. The owner of an

---

[3] The parties' arguments on the balance of equities and public interest factors largely mirror their other arguments. For that reason, the Court does not separately consider those two factors.

unregistered mark may still use it in commerce and enforce it against infringers. *Iancu v. Brunetti*, 139 S.Ct. 2294, 2297 (2019). That said, registration confers valuable benefits.

The Principal Register "is the primary register of trademarks in the United States." *CreAgri, Inc. v. USANA Health Services, Inc.*, 474 F.3d 626, 628 n.5. Registration on the Primary Register constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, the owner's ownership of the mark, and the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services" described in the owner's certificate. 15 U.S.C. § 1057(a). Generally, the Act directs the USPTO to register marks "used in commerce." 15 U.S.C. § 1051(a)(1).

Certain marks are not eligible for registration on the Primary Register. *Id.* § 1052. The USPTO cannot register a mark that is "merely descriptive" of the goods on which it is used. *Id.* § 1052(e). A merely descriptive mark can become protectable under the Primary Register only if it "has become distinctive of the applicant's goods in commerce," in other words, if it has acquired a secondary meaning. 15 U.S.C. § 1052(f). Secondary meaning "occurs when, in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Real Foods Pty. Ltd. v. Frito-Lay North America, Inc.*, 906 F.3d 965, 972 (Fed. Cir. 2018). Prima facie proof of distinctiveness is a mark's substantially exclusive and continuous use for five years. *Id.*

A descriptive mark that is "capable of distinguishing an applicant's goods or services" can be registered instead under the Supplemental Register. 15 U.S.C. § 1091(a). The Supplemental Register "confers considerably fewer advantages than principal registration." *In re Am. Fertility Society*, 188 F.3d 1341, 1343 (Fed. Cir. 1999). None of the evidentiary benefits apply. A mark on the Supplemental Register is not presumed to be valid or exclusive. Registration on the Supplemental Register does, however, give the USPTO the authority to later reject confusingly similar marks.

Neither mark here is registered on the Principal Register. Nor is defendants' registration of their mark on the Supplemental Register prima facie evidence that it is valid. And the USPTO's rejection of plaintiff's trademark application is not dispositive because it merely shows that the two

marks are confusingly similar (which the parties do not contest). The core issue, then, is whether either entity had a common law right to the trademark.

"It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. Therefore, a party pursuing a trademark claim must meet a threshold 'use in commerce' requirement." *Rearden LLC v. Rearden Commerce, Inc.*, 638 F.3d 1190, 1203 (9th Cir. 2012). The Lanham Act defines "use in commerce" to mean "the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark." 15 U.S.C. § 1127. "The text of the definition expressly distinguishes between use that is 'merely to reserve a right in a mark' and a 'bona fide use of a mark in the ordinary course of trade.'" *Lodestar Anstalt v. Baardi & Company Limited*, 31 F.4th 1228, 1255 (9th Cir. 2022). This means two things. "First, by specifying that the use must be 'in the ordinary course of trade,' the statue requires 'commercial use of the type common to the particular industry in question.'" *Id.* Second, the requirement that the use be "bona fide" "means that it is done for *genuine* commercial reasons and not *merely* to reserve its right for a lawsuit." *Id.*

The Ninth Circuit follows a "totality of the circumstances approach" to determine whether a party has shown priority of use. *Rearden*, 683 F.3d at 1205. Under this approach, the Ninth Circuit does not require proof of actual sales. Instead, it "turns on evidence showing, first, adoption, and second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind" "as belonging to the owner." *Id.* at 1205–06.

Further, courts must decide what degree of protection to afford a mark. "The strength of a mark is determined by its placement on a continuum of marks." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). "The strongest marks—that is, those which receive the maximum trademark protections—are 'arbitrary' or 'fanciful.' The weakest marks, entitled to no trademark protection, are 'generic.' In between lie 'suggestive' and 'descriptive' marks; suggestive marks have the greater strength of the two." *Id.* "A descriptive mark is entitled to trademark protection only if 'it has acquired secondary meaning, *i.e.*, it has become distinctive of the

applicant's goods in commerce." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985)).

### 1.     Plaintiff's Use of the Disputed Mark

Plaintiff first publicly used its mark in 2015, when it was founded. (Dkt. No. 22-1.) That said, the current record indicates that plaintiff did not use its mark on an actual artificial intelligence tool or service until December 5, 2016, when it announced its new software platform, Universe, a "school for artificial intelligence."[4] (Dkt. No. 22-17 at 3.) In 2020 and 2021, plaintiff announced its first iterations of Dall-E and ChatGPT. (*Id.* at 45, 48.) On September 28 and November 30, 2022, it released Dall-E 2 and ChatGPT to the public for the first time, the latter of which reached 100 million monthly active users shortly after its launch. By some measures, ChatGPT was the fastest growing consumer software in history. (Dkt. No. 22-17 at 345.) Given that, the Court has no trouble finding that plaintiff will prove that it used its mark in commerce since at least 2022 and perhaps as early as 2016.

On the strength of that mark, plaintiff argues that the "OpenAI Mark is at least suggestive because it requires some imagination to associate it with OpenAI's products and services, such as DALL E and ChatGPT." Whether a particular trademark has come to have a secondary meaning is a question of fact. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005). The factors that courts must considered are: "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive." *Id.*

As recently as January 3, 2022, the USPTO rejected plaintiff's application to register its OpenAI mark on the Principal Register because it was "merely descriptive" and had not acquired distinctiveness, or secondary meaning. Though defendants raised this point in their opposition,

---

[4] Plaintiff did not cite Universe (or even earlier artificial intelligence tools it had developed) in either its opening or reply briefs. It did, however, identify these earlier artificial intelligence tools at the November 20, 2023, hearing and noted that articles about Universe were included in an exhibit submitted with its preliminary injunction motion. The Court therefore considers this evidence here.

plaintiff did not reply. At least for purposes of this motion, then, the Court assumes that as of January of 2022 plaintiff's mark was not distinct enough to guarantee plaintiff its exclusive use. Since then, however, the landscape has changed. In September and November of 2022, as stated above, plaintiff publicly launched two products, ChatGPT and DALL E 2, which have made it a household name. Its website, which hosts these two tools, is one of the most visited on the planet.

With this background in mind, plaintiff is likely to satisfy the first three *Yellow Cab* factors. It has demonstrated that: its users associate its trademark with its products; its extensive use of the trademark in advertising its products; and use of the trademark since December 2015, which in the past year has made its trademark one of the most recognized in the artificial intelligence industry, if not the world. Though the fourth factor is a closer question, the Court ultimately concludes that plaintiff is likely to prove that its use of the claimed trademark was exclusive. Exclusive use does not mean only use but rather "whether the trademark owner's use of the mark was substantially exclusive." *Converse, Inc. v. International Trade Commission Skechers USA, Inc.*, 909 F.3d 1110, 1121 (Fed. Cir. 2018). Though plaintiff knew defendants were using essentially the same mark, plaintiff's use of the mark was likely substantially exclusive given the significant and unrebutted evidence, *see infra*, that defendants' mark was not in commercial use.

For those reasons, the Court finds that plaintiff is likely to prove that it was a *bona fide* user of the disputed mark since at least September of 2022, if not earlier, and that its mark by that point was at least suggestive.

### 2. Defendants' Use of the Disputed Mark

Defendants respond that they, in fact, are the senior users because they first used the Open AI mark in commerce in March 2015 and the strength of that mark is at least suggestive.

The Court finds that plaintiff has presented credible evidence that defendants did not use their mark in commerce, if at all, until recently. *See, supra,* I. Background. It demonstrated that defendants' Wikineering page was either inoperative or lacking in users and that their Open.ai domain was nothing but a landing page until November 16, 2022, when defendants simply uploaded another company's AI tool onto their website. Much of this evidence, presented in plaintiff's opening brief, simply went unanswered in defendants' opposition. At the hearing,

defendants supported their history of use with a pair of emails between defendant Ravine and Sam Altman, one in 2015 and the other in 2022. The emails do not establish, as defendants argue, that they had been using the mark in commerce since 2015. At most, the back-and-forth messages are circumstantial evidence that defendant Ravine was considering creating an open-sourced AI platform. In them, defendant Ravine states that he was "working on" an AI initiative; that this AI nonprofit was "in development"; and, in fact, that the Open AI project he was thinking about was separate from his Wikineering platform. (Dkt. No. 38-13, "Dec. 15, 2015, email.") That plaintiff offered to purchase defendants' domain does not mean, *ipso facto*, that defendants had a valid trademark. (*See* Dkt. No. 38-17, "February 9, 2022, email.")

Further, the current record paints a troubling picture of defendant Ravine's representations to the USPTO and this Court about the true extent of his use of the disputed mark. Defendant Ravine applied for the disputed trademark the night that plaintiff announced its founding; he submitted specimens to the USPTO of a website that was either inoperative, created the day before he submitted his application, or contained only copies of information from other sources. As it stands, the evidence strongly suggests that defendants registered their mark merely to reserve a right to it rather than for a genuine, commercial purpose.

Even if the Court were to credit defendants' testimony about when and why they used their mark, it still does not establish that they have the senior claim. Defendants state, for example, that they first used their mark in commerce when defendant Ravine labeled a page on his Wikineering site as Open AI. The rest of the website, however, including the home page, was branded as Wikineering. This suggests that Open AI was the topic of a particular page rather than the trademark of a whole site. *See Am. Auto. Ass'n v. Gen. Motors LLC*, 367 F.Supp.3d 1072, 1094 (N.D. Cal. 2019) ("The prominent use of [a different] mark instead of the [asserted mark]" on the website "diminish[es] the public's ability to associate a single mark with the service as it is unclear which mark to attach to the [service].") Defendants' use of the disputed mark on the Open.ai domain fares no better; the USPTO rejected that very specimen as inadequate because it did not show that the Open AI mark was tied to any commercial good or service. Instead, it was linked to a splash page that for seven years merely stated that an announcement was "coming soon."

Finally, first use does not automatically entail exclusive use; defendants must demonstrate that the mark has become associated with them. 2 McCarthy on Trademarks and Unfair Competition § 16:35 (5th ed.). Defendants have not done so. The USPTO registered their mark under the Supplemental Register because it was merely descriptive. Nothing in defendants' opposition persuades the Court otherwise. This is especially true because a party whose trademark was registered under the Supplemental Register as descriptive can more readily apply to upgrade their mark to the Principal Register after five years. *See* 15 U.S.C. § 1052(f). That defendants have not attempted to do so after eight years is itself telling.

For those reasons, the Court concludes that plaintiff is likely to demonstrate that it has the priority claim over the disputed mark. It is therefore likely to succeed on the merits of its trademark infringement claim.

## B.     IRREPARABLE HARM

Where a plaintiff is likely to succeed on the merits of its trademark infringement claim, it is "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). Defendants argue that the Court should reject this presumption because of plaintiff's eight-year delay in bringing this suit.

The federal Lanham Act has no statute of limitations. *Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1023 (9th Cir. 2018). Instead, the Ninth Circuit applies the equitable doctrine of laches. "Laches is an equitable time limitation on a party's right to bring suit and is a valid defense to trademark infringement claims." *DC Comics v. Towle*, 802 F.3d 1012, 1026 (9th Cir. 2015). The doctrine is guided with a two-step process. *Pinkette*, 894 F.3d at 1025. First, courts assess the delay by looking to whether the most analogous state statute of limitations has expired. *Id*. Second, courts must consider the "*E-Systems*" factors: "(1) strength and value of trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by junior user because of senior user's delay." *Id*.

The most analogous state statute of limitations is California's four-year statute of limitations for trademark infringement actions. *Pinkette*, 895 F.3d at 1025. Here, the evidence shows that

plaintiff knew about defendant Ravine's competing trademark as far back as 2015. It is undisputed that plaintiff filed a trademark application in 2015, and that application, along with a more recent one, were preliminarily rejected by the USPTO because it found that plaintiff's OpenAI mark was confusingly similar to defendant Ravine's Open AI mark. The Court therefore treats as uncontested the fact that plaintiff knew about defendant Ravine's competing trademark as far back as 2015.

Plaintiff asserts four reasons that its delay in bringing a trademark infringement suit should not control. First, plaintiff argues that laches do not apply when a competitor's actions are willfully calculated to exploit the advantage of an established mark. *See DC Comics v. Towle*, 802 F.3d 1012, 1027 (9th Cir. 2015) (defendant "barred from asserting a laches defense to [plaintiff's] trademark infringement claim because he willfully infringed on [plaintiff's] trademarks"). Plaintiff contends that it has pled willful infringement and shown that defendants acted in bad faith.

On this record, however, the Court cannot say defendants willfully infringed plaintiff's mark. *See DC Comics*, 802 F.3d at 1027. Defendant Ravine applied to register his mark when plaintiff's founding had just been announced. At that point, plaintiff's mark was not "established." *Id.* That is, in fact, why the USPTO initially rejected its application.

Second, plaintiff claims it did not actually delay eight years in bringing suit. Prior to November of 2022, defendants had not launched a competing product which might infringe on plaintiff's mark or goodwill, it argues. "Laches is not measured from a defendant's first use of the contested mark, but from the date that defendant began significantly impacting plaintiff's goodwill and business reputation." *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp*., 1991 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997). The Court agrees that, given the strength of the evidence that defendants' use of the disputed mark only began to impact plaintiff in late 2022, the analogous four-year statute of limitationd would not have run.

Third, even if a presumption of laches did exist, plaintiff argues, defendants' progressive encroachment rebuts it. Under the "doctrine of progressive encroachment" a "trademark owner need not sue in the face of *de minimis* infringement by the junior user." *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir. 2006). Instead, a trademark owner can wait until the junior users "moves into direct competition . . . causing actual

market confusion." *Id.* The Court agrees.  The evidence shows that until November of 2022, when defendants uploaded a product that directly competed with plaintiff's AI tools, defendants' use of the disputed mark had not caused actual market confusion.

Finally, plaintiff argues defendants' actions caused it escalating harm. The Ninth Circuit has noted that "courts are loath to withhold relief solely because of delay, which is not particularly probative in the context of ongoing, worsening injuries." *Disney Enters. Inc. v. Vid Angel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017). In *Disney*, the Ninth Circuit upheld a district court's preliminary injunction, even though plaintiff sued only after defendant expanded from "beta-testing into a real threat," because it found that the alleged harms were ongoing and only likely to increase. *Id.*

Again, given the substantial evidence of defendant only launched a competing product in November of 2022, plaintiff's delay was not unreasonable. Like in *Disney*, plaintiff was permitted to wait until defendants actually posed a threat to its business reputation. This is especially true here, where defendants have provided no evidence of any prejudice resulting from the delay because they have no protectible interest in their mark.

For those reasons, the Court finds that laches overcomes the presumption, under the Lanham Act, that plaintiff has been irreparably harmed.

## IV.    CONCLUSION

For the reasons stated above, the Court concludes that plaintiff is likely to succeed on the merits and be irreparably harmed without a preliminary injunction. Given those findings, the Court similarly finds that the balance of equities and public interest favor a preliminary injunction. Plaintiff's motion for a preliminary injunction is therefore **GRANTED.**

**THE COURT HEREBY ORDERS AS FOLLOWS:**

1.    Defendants, and each of their officers, directors, employees, agents, servants, representatives, and affiliates are preliminary enjoined and restrained from:

      a.    Using defendants' "Open AI" mark, or any other logo, design, or word mark that is a colorable imitation of, or similar to, it, including without limitation "Open AI" and "open.ai," in connection with the display, advertising, development marketing, production, promotion, sale, and/or distribution of

any artificial intelligence products or services, including the results generated
by such products or services;

    b.    Using any "Open AI" mark in connection with any website, app, or social media account, including as a domain name or social medial handle; and

    c.    Representing in any manner or by any method whatsoever that goods, services, or other products branded with the "Open AI" mark are sponsored, approved, or authorized by, or originate from, OpenAI, or otherwise taking any action likely to cause confusion, mistake or deception as to the origin, approval, sponsorship, or certification of such goods, products, or services.

2.    All those acting in active concert or participation at the direction of, or in contractual privity with the above-enjoined parties, including domain name registrars, web hosting services, and social media platforms, are preliminary enjoined and restrained from facilitating, permitting, or otherwise enabling defendants to engage in any of the actions restrained by this Order, including allowing anything to be displayed on https://open.ai other than a notice of suspension.

3.    Defendants, within 30 days after service of this Order, are required to file with the Court and serve upon OpenAI's attorneys a written report under oath setting forth in detail the manner in which defendants have complied with the above-mentioned orders, including contacting the domain name registrar and web hosting service of https://open.ai to request suspension of that website. Defendants must also provide contact information regarding all those acting in active concert or participation at the direction of, or in contractual privity with the above-enjoined parties, including domain name registrars, web hosting services, and social media platforms through which it makes any use of any "Open AI" trademark.

This terminates Docket Nos. 21, 58, and 59.

**IT IS SO ORDERED**.

Date: **February 28, 2024**

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**