Ryan G. Baker (Bar No. 214036)
  rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@waymakerlaw.com
Norma P. Rojas-Castro (Bar No. 339087)
  projas-castro@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:    (424) 652-7800
Facsimile:    (424) 652-7850

*Attorneys for Guy Ravine and Open Artificial
Intelligence, Inc.*



# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>Defendants.<br><br>――――――――――<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation and GUY RAVINE, an individual,<br><br>The Ravine Parties,<br><br>vs.<br><br>OPENAI, INC., a Delaware corporation; SAMUEL ALTMAN, an individual; AND GREGORY BROCKMAN, an individual,<br><br>Counterclaim-Defendants. | **CASE NO. 4:23-cv-3918**<br><br>**OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM TO COMPLAINT**<br><br>**Assigned to Hon. Yvonne Gonzalez Rogers**<br><br>**Complaint Filed: August 4, 2023**<br><br>1. **LANHAM ACT UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN OR SOURCE, AND FALSE ADVERTISING (15 U.S.C. § 1125(a));**<br>2. **LANHAM ACT TRADEMARK INFRINGEMENT (15 U.S.C. §§ 1114, 1125(a));**<br>3. **CANCELLATION OF APPLICATIONS FOR REGISTRATION (15 U.S.C. § 1119)**<br>4. **CALIFORNIA COMMON LAW TRADEMARK INFRINGEMENT;**<br>5. **FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500);**<br>6. **DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK (15 U.S.C. § 1125(a);**<br>7. **DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF_ COMMON LAW TRADEMARK; AND** |



8. **DECLARATORY JUDGMENT OF OWNERSHIP OF OPEN AI MARK**
9. **DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY**

**[DEMAND FOR JURY TRIAL]**



I.   PROLOGUE ................................................................................................................ 1

II.  INTRODUCTION ....................................................................................................... 3

  A.   The Implications and Behind-the-Scenes of the Hijacking Of Open AI ................ 3

  B.   Whatever It Takes To Control AGI ........................................................................ 5

III. PARTIES .................................................................................................................... 12

IV.  JURISDICTION AND VENUE ................................................................................. 13

V.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF ............ 13

  A.   WHO WILL CONTROL AGI? THE MOST IMPORTANT QUESTION IN
       HUMAN HISTORY .............................................................................................. 13

  B.   CREATING THE RECIPE FOR AGI FOR HUMANITY ..................................... 16

       1.   Guy Ravine Invents the Recipe for AGI: Open AI ...................................... 16

       2.   Guy Ravine Creates the AGI Effort for Humanity: Open AI ...................... 19

  C.   THE PUSH TO STEAL THE RECIPE FOR AGI FROM HUMANITY ............... 25

       1.   Altman and Brockman Rush to Steal Open AI from Humanity ................... 25

       2.   Altman and Brockman Steal the Recipe for AGI from Humanity ............... 27

       3.   Guy Ravine Attempts to Regain Control of Humanity's Property .............. 36

       4.   Brockman and Altman Become the Ill-Gotten Stewards of
            Humanity's Property ................................................................................... 38

  D.   THE THEFT OF HUMANITY'S AGI PROPERTY: OPENAI ............................. 39

       1.   Whatever It Takes: Stealing the Ingredients from Humanity ...................... 39

       2.   Whatever It Takes: The Systematic Theft of Humanity's Property ............ 45

       3.   Whatever It Takes: The Successful Diversion of Humanity's
            Property to Altman's Personal Control ...................................................... 47

       4.   Whatever It Takes: Eliminating Dissent ...................................................... 49

       5.   OpenAI Willfully Infringes Ravine's Trademark Even As It Fails to
            Obtain Protection at USPTO ....................................................................... 50

       6.   OpenAI, Inc.'s Applications and Failure to Register the Infringing
            Mark ............................................................................................................ 52

7.    The Mysterious Deletion of Evidence Contained on Servers ....................53

8.    Abuse of Power: Altman Abuses Humanity's Property............................59

VI.    RAMIFICATIONS............................................................................................65

A.    An Abuse of Power ....................................................................66

B.    Humanity Needs to Answer the Most Important Question in Human History ........67

C.    "A system a billion times more powerful than any human" ...................72

D.    Altman Has Hijacked Humanity's Property............................................73

E.    AI Safety's Blindspot ........................................................................78

Counterclaimants and Defendants Open Artificial Intelligence Inc. ("Open AI"), and its President, Guy Ravine ("Ravine" and with Open AI, the "Ravine Parties"), for their compulsory counterclaims against Counterclaim-Defendants OpenAI, Inc.; Samuel Altman; and Gregory Brockman (collectively, "Counterclaim-Defendants"), and demanding trial by jury, allege as follows:

## I.       PROLOGUE

1.      The promise of Open AI to be open sourced and serve humanity was created by Guy Ravine in late 2014, after two-and-a-half years of intense contemplation about how to ensure the future of artificial general intelligence remains under the control of humanity as a whole. This was a year before the announcement of the company founded by Sam Altman and Greg Brockman.

2.      While others were talking about AGI, Ravine found the secret sauce to build AGI: a special ingredient that would allow his not-for-profit initiative for humanity to compete with the likes of Google in AI when it was considered "impossible." That secret sauce was reflected in the principles he conceived: An artificial intelligence organization that would be open-sourced, not for profit and 100% for humanity, as a standalone initiative and most importantly, encapsulated in the magical words of Open AI.

3.      This concept would attract the world's top researchers when it was not possible for a new initiative to compete with large companies like Google on AI talent due to resource constraints. By 2015, Ravine had held discussions with top industry leaders on the foundation, launch, and support of the Open AI non-profit initiative to build AGI for the benefit of humanity. Prominent institutions such as Google Research expressed interest in backing the initiative, and Ravine was in discussions to raise up to $100 million to launch Open AI.

4.      Altman and Brockman learned of Ravine's Open AI, and saw within it its promise, not to give it to humanity, but as a recipe to gain control of an AGI effort that could compete with Google for themselves. As internal emails show, to them this promise to be open for humanity was simply a "recruiting strategy for the short and medium term."

5.      Altman and Brockman duplicated Ravine's initiative, name, principles, mission, vision, and even domain, and statements, word for word.

6.      As they rushed to usurp Ravine's Open AI, Altman and Brockman falsely announced in the media and elsewhere that they had $1 billion in funding commitments and a long list of researchers. They used the promise to be open, not-for-profit and for humanity to dupe talent and funders such as Elon Musk. Neither statement turned out to be true. However, based on these misstatements, they were able to attract the best AI talent from institutions like Google when they could otherwise not compete. They were also able to scare away competitors.

7.      The truth is, when they announced the $1 billion commitment for funding, they had virtually no money. Their financials showed they only raised $13 million through the year 2016. And when they said they would be open and nonprofit and for humanity they lied. Based on the announcement by Altman and Brockman's company that they were non-profit, operating for humanity, and had $1 billion in donor commitments and their assurances to Ravine that they would fulfill his mission, he decided to let them be the stewards of the mission.

8.      Ravine's recipe for AGI worked—since that time, no new organization other than OpenAI, Inc. and its spinoff Anthropic have been able to challenge Google. But it did not work as Ravine intended, to serve humanity, as it has been diverted to the end benefit of a single individual who was fired by his board for failing to uphold the promise to act for humanity above his personal interests. Cynically, with the hijacking of Open AI, Altman created the exact scenario that Ravine created Open AI to prevent—the unlimited concentration of this great power.



Case No. 4:23-cv-3918

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

## II.    INTRODUCTION

9.    This Counterclaim unveils the untold origin story and the dark secrets lurking behind the façade of OpenAI, Inc..

> "*I am really glad that you are going to make the back story public. More people need to know about this.*"
>
> > - Yann LeCun, the Father of Deep Learning, and Meta's Chief AI Scientist.

> "*It is tragic that the hijacking of Open AI from Guy Ravine may have historic consequences.*"
>
> > - Tom Gruber, Co-Founder of Siri, and Apple's former leader on AI.

### A.    The Implications of Open AI's Hijacking

10.    The ultimate prize in human history is Artificial General Intelligence (AGI), an artificial intelligence capable of serving as a general technological replacement for human intelligence and labor.  Because of the rapid evolution of general AI systems today, hundreds of forecasters expect AGI to be built in a median of two years. An OpenAI, Inc. researcher expects it to happen "any year now." Some believe that it has already been attained within OpenAI, Inc.. This will be the most important event in human history, as historian Yuval Harari said, for history "will continue with somebody else in control" - a system far more capable and powerful than humans.

11.    Whether it occurs in two years or six or ten—this raises the most pressing and important question in history: who will control the large-scale AGI systems, data centers of artificial human workers capable of outsmarting, displacing or overpowering humanity—Humanity, or a few individuals?

12.    This was the question Ravine asked when he set out to create Open AI.

13.    After years of thinking about how to create a way to build AGI and put it in the hands of humanity, rather than in the hands of a few individuals, OpenAI was born. Within it was

automatic mechanism of sharing the benefits with humanity but also a way to acquire the best talent to build it for humanity — at a time when no upstart could.

14. As consequence of Ravine's work and of Altman and Brockman's subsequent hijacking, the remnant is that today OpenAI, Inc. is legally a non-profit corporation and its charter pledges that its "primary fiduciary duty is to humanity"—not to shareholders or to directors, or to officers, but solely to humanity. In other words, every individual on this planet, as a member of humanity, is the de facto owner of OpenAI. Because OpenAI is on the brink of creating a technological replacement for humans, it is of unprecedented critical importance that its charter to serve solely humanity remains wholly, completely and entirely true with no interference by the personal agenda of any individual.

15. But OpenAI has undergone a remarkable transformation, transforming from an open, non-profit organization with a fiduciary duty to humanity into a closed, for-profit entity, that appears to be under the de facto personal control of a single individual, Sam Altman — who after being fired in November 2023 came back to effectively fire the board that was put in place to defend the company's fiduciary responsibility to humanity.

16. The reason for this remarkable transformation is simple. Whereas Ravine created OpenAI for humanity with the automatic sharing mechanism of openness enshrined in its name in an effort to limit power, Altman and Brockman hijacked and used the very ideology as a means to gain control of power — the power of AGI. In Altman's words, he believed that OpenAI's AGI systems could "capture the light cone of all future value in the universe." For Altman OpenAI, Inc. was not about limiting concentration of power by sharing the benefits — it was simply a "short to medium term recruiting strategy", meant to capture the benefits.

17. The history of OpenAI paints a picture not of individuals operating for humanity but of despots or dictators commanding subjects from a lofty throne. Saying they are working for the people so the people could help them capture the means of production from the people on the promise that they would be given back to the people.

### B.  Whatever It Takes To Control AGI

18.  It was said that digital human intelligence may not be achieved by the smartest or the hardest working, but by being the ones willing to do whatever it takes. In their "insatiable pursuit of achieving AGI," as described by former OpenAI, Inc. employees, it appears that Altman, and Brockman have and will do whatever it takes.

19.  Altman and Brockman's journey to gain personal control of AGI began in May 2015. The promise of Open AI to openly serve humanity was, in fact, created by Ravine in late 2014, after two-and-a half years of intense contemplation about how to ensure that the future of AGI remains under the control of humanity as a whole. Ravine had already established an AI company in the early 2000's and created an open collaboration platform called Wikineering in the early 2010's that was a non-for-profit for the benefit of humanity that openly enabled researchers to collaborate to freely give back innovations to the world.

20.  These principles of sharing openly with humanity were enshrined Ravine's fiber from an early age. Ravine set out to create a system that would prevent the concentration of the power of AGI in the hands of a few individuals.

21.  As Ravine saw it, when built, the power of AGI needed to rest in the hands of humanity as a whole. Instead of bestowing this power to a few individuals, the system would serve to limit concentration of power and distribute the benefits to all people. With this power, all humanity could benefit and exert influence as AI displaces human workers from the economy and re-shapes the political balance of power. The result of this contemplation was Open AI as a non-profit organization to openly share its code for the benefit of humanity.

22.  Little did Ravine know that his promise of Open AI to openly distribute the benefits to humanity would later be hijacked from him and used to create the very thing that he set out to prevent – the concentration of the power of AGI in the hands of a few individuals.

23.  By early 2015, Ravine had held discussions with top industry leaders on the foundation, launch, and support of the Open AI non-profit initiative for the benefit of humanity. As Ravine and others who worked with him held discussions at the top echelons of Silicon Valley about Open AI the word began to spread. Among those with whom Ravine spoke was Patrick

Collison, CEO of Stripe, who was Brockman's boss. Stripe had received its initial funding from Sam Altman's Y Combinator. The two made plans to stay in touch on the Open AI endeavor and in fact, Ravine followed up with emails to Collision. At or around that same time, Brockman decided to leave the company and was trying to decide what to do next. According to Brockman's blog post, he sought advice from both Collison and Sam Altman. After communicating with Collison, Brockman recalls in his blog, immediately thereafter: "My goal was to figure out what deep learning was." It is important to note that because word spread, additional mutual individuals in connection with the two groups were well aware of Ravine's Open AI..

24.      Prominent institutions such as Google Research expressed interest in Ravine's initiative, and Ravine was in discussions to raise up to $100 million to launch the initiative. However, just as Ravine's Open AI initiative was gearing up to make a major announcement of the Open AI open non-profit for the benefit of humanity, Altman and Brockman learned of Ravine's initiative, including its secret sauce. They immediately recognized within it a powerful "recipe" to compete with Google in an effort to build AGI. This was considered an "impossible" feat but with the idea of Open AI, in Brockman's words, it became "not obviously impossible." By stealing the idea of being open and serving humanity as a non-profit, encapsulated in the powerful words "Open AI," Altman and Brockman saw a powerful tool – an ideological bombshell that would accomplish what their modest funds could not – demolish the walls of Big Tech companies and set AI research talent free to join their own initiative. Altman and Brockman founded OpenAI, Inc. on the ideology they took from Ravine. They duplicated Ravine's initiative, name, principles, mission, vision, and even domain, and statements, word for word. On the promise to openly sharing the research with humanity encapsulated in the magical words "OpenAI"  and their false public statements that they had commitments for $1 billion in funding, they were able to excite and attract researchers from Google and elsewhere, where it was "impossible" to recruit them otherwise.

25.      In addition to their announcing they had $1 billion in funding commitments, they announced they had signed up a long list of researchers. At that time, they had neither, but based on these false statements, they were able to attract the best AI talent from institutions like Google

WAYMAKER

when they could otherwise not compete. The truth is, when they announced the $1 billion commitment for funding, they had virtually no money. Their financials showed they only raised $13 million through the year 2016. All they really were banking on was ideology and the secret sauce they stole.

26.     After stealing the ideology to build an AGI effort from Ravine, and promising they would give it to humanity, Altman and Brockman sold the promise to Elon Musk for millions of dollars in donations. Musk later sued them for breach of contract for failing to uphold the very promises enshrined in their charter. In 2023, Musk stated that he felt like he "gave money to an organization to save the Amazon rainforest, only for them to become a lumber company and chop down the forest."

27.     After deceiving Musk for his money, connections, and clout on the stolen promise, Altman and Brockman continued to deceive the best talent, the entire AI community, and the world at large. They falsely claimed they would be open-sourced and openly sharing the benefits with humanity. But their internal emails told a different story. Just 21 days after their launch, OpenAI internally referred to the promise to openly share with humanity as a "recruiting strategy for only the short and medium term." They stated that it was "totally OK not to share the science" once they have used the "recruiting strategy" and not to give back to humanity the fruits of the academic research they stole.

28.     After stealing the recipe for an AGI effort for humanity and the ingredients, they stole the trademarked brand from the Ravine Parties, they took the patented algorithm from Google, and they took the copyrighted data from millions of creators, as well as all of humanity. As Brockman put it, their very modus operandi was to "have faith that we or someone in the field will manage to figure out the missing ingredient" – only to then take it. To acquire the ingredients to build AGI, Altman and Brockman would do whatever it takes.

29.     After doing whatever it took to acquire all the ingredients to build AGI—the recipe, ideology, mission, structure, brand, people, money, algorithm, data, and goodwill of the AI community—largely through deception or misappropriation, Altman and Brockman began to race

to dismantle the mechanisms put in place to ensure that the control and power of the system constructed lay with humanity and not within their hands.

30.     As they raced to consolidate personal control over the AGI effort for humanity, Altman and Brockman encountered a fundamental problem. For those who wish to gain personal control of the power of AGI, the promise of "Open AI" had what could be described as a "zero-day flaw." The incredibly powerful recipe behind the success of OpenAI—which they took from Ravine—was the very promise to ensure that the AGI they be openly shared with the whole of humanity enshrined in its very name, "OpenAI." On the basis of this stolen promise, Altman and Brockman were able to acquire all the necessary ingredients for the AGI effort under their command—the people joined for this very mission, the donors gave them money to ensure they pursue this very mission, and they captured the goodwill of the AI research community. But this very promise on which they acquired their position also meant that they were supposed to automatically distribute this power and control of the AGI system to humanity and to limit their concentration of power over this powerful technology.

31.     So, Altman and Brockman set out to eliminate the flaw. In 2019, just three days after getting fired from Y Combinator for self-dealing for putting his own personal thirst for acquisition of power ahead of the greater good, Altman turned OpenAI from a non-profit organization to a for-profit company. Around the same time, Altman and Brockman transformed OpenAI from open to closed by removing the requirement that their code would be open-sourced. The excuse was that it was done for safety, whereas in fact a year later they were selling systems 100 times larger and more powerful. In this process, they dismantled the mechanism put in place to automatically ensure that the benefits of AGI would be shared with humanity. Instead of the immutable mechanism of sharing, they replaced it with a board of loyalists who would serve as a frail biological switch that would determine how the benefits would be distributed to humanity. The swapping of the automatic mechanism of openness with a "biological switch" would later prove far too frail and susceptible to influence, deception, manipulation, corruption, power, and legal intimidation.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

32.    After stealing the recipe and the ingredients to build AGI, and deceiving the talent and donors that they would openly operate for humanity, and while systematically consolidating this great power through into their own personal hands, upon information and belief, the duo set out to cover their tracks. Ravine lost significant data due to highly suspicious simultaneous server failures.

33.    When the board saw Altman's deception and fired him for his lies – stating that it would be consistent with the mission of OpenAI – Altman and Brockman countered by effectively firing the board, again dismantling mechanisms put in place to protect humanity's property. Their personal consolidation of power was, once again, successful. The biological switch – the board of humans – failed. It was far too frail to protect the interests of humanity. Using legal intimidation, manipulation, and social media love emojis, in combination with a threat to gut OpenAI's team and reconstitute them under the banner not of humanity but of Microsoft, along with the specter of driving the employees equity value down to zero – from millions previously – Altman and Brockman were able to regain command of humanity's property. They then proceeded to fire safety researchers, dismissing those who on information and belief, were close to the ones who alerted the board of an internal breakthrough in AGI that could threaten human existence before the board's firing.

34.    After diverting humanity's property—Open AI—from its dominion to their own by dismantling the mechanisms put in place to ensure the system operates for humanity and gaining personal command of its now massive resources, Altman gained absolute control as he appointed a new puppet board of loyalists. Altman then rushed to install himself as Co-chair of an AI "Ethics Council" he created and hastily proceeded to construct a $100 billion system of data centers capable of running millions of superhuman AGI's. At its completion, the system is expected to have perhaps more intelligence than the entirety of humanity combined, and capable of collectively outsmarting and overpowering the entirety of our civilization. In the words of an AGI researcher inside OpenAI, Inc., this system will provide "god-like powers to whoever controls it over everyone else." This system is considered by some researchers as an existential threat. Right now, Altman controls humanity's most powerful and valuable property, which he wields as his

own. After saying last year that it is "important that the board could fire me" and that "the world should not trust me," he proceeded to effectively fire the board who fired him. Now Altman is rushing to raise up to a rumored $7 trillion to create a system of fabs that he would personally control that would, on information and belief, enable him to turn OpenAI, Inc. into its customer, such that he would be able to not only profit handsomely, but also be in personal control of the systems running the very AGIs that could displace and overpower humanity.

35. After consolidating power, Altman and Brockman began to abuse their newfound power which they acquired through a legally binding non-profit purporting to operate for humanity. They wielded the ill-gotten assets of humanity's non-profit against the very originator from whom they stole the promise, the recipe, the mission, and the brand (and trademark) "Open AI." They launched the present legal onslaught to which this complaint responds to against Guy Ravine—pitting a $100 billion behemoth which is humanity's non-profit, bankrolled with the wallet of a $3 trillion company and spending millions of dollars on litigation to try to squash, punish, and erase the very originator of the promise to humanity by which they exist in the first place.

36. Ravine is one of the original voices left (Elon Musk is another) to defend the promise to uphold the interests of humanity after Altman dismantled the last mechanisms put in place to ensure it remains true when he legally intimidated the board that fired him to resign. Of the 15 lawsuits that OpenAI, Inc. is involved in, 14 are from large companies and groups suing OpenAI, Inc. for stealing money, and only a single outgoing lawsuit, is against Ravine, the very originator of the promise to humanity itself, which Altman and Brockman stole from Ravine. Their lawsuit attempts to paint Ravine as a fraud and a troll and to silence him into submission to ensure he cannot inform humanity about their dark history – as well as to seize control of the Open AI trademark and the open.ai domain, which trademark they have, in fact, misappropriated seeking to deceptively portray openness, when they are utterly closed.

37. Ravine had, in fact, offered the trademark to Altman in 2022 if in exchange for a donation to the academic AI research community from which they have taken their very existence – to be true to the name that he so covets. Instead, Altman decided to donate to his lawyers, who

have commenced this litigation to take the Ravine Parties' registered trademark and seize control of the internet domain, open.ai, which Ravine acquired pursuant to his effort to build Open AI.

38.     Ravine is counter suing OpenAI. Ravine demands that OpenAI uphold its mission to ensure that AGI is truly the property of humanity outside the control of Altman or Brockman or any other individuals; in addition, OpenAI must change its deceptive and misleading name to ClosedAI or a different more appropriate name, because first, that name is owned by Ravine Parties, and more importantly, the name "OpenAI" in the hands of Altman and Brockman is deceptive and misleading, and is beyond absurdity when the company known as "secretively closed AI" also lobbies to literally kill the open AI movement. The name ClosedAI has been repeatedly proposed by numerous industry leaders. Even Elon Musk is willing to drop his lawsuit if the deceptive organization only changes its name.

39.     Ravine ialso seeks to strip Counterclaim-Defendants' rights in the name Open AI for being impermissibly deceptive; this will include an injunction on their use of the Open AI name and the openai.com domain, a cancellation of their applications and an injunction against any future applications. He is also suing for false advertising, unfair competition, unjust enrichment, trademark infringement and a declaration that he is and remains the rightful owner of the Open AI mark, at which point, the mark Open AI would then be provided freely to the whole of humanity, with the exception of Counterclaim-Defendants.

40.     Just as Altman and Brockman's deception and the record of their theft is enshrined in their non-profit's very name, so too is the theft of humanity's property from humanity. If Altman and Brockman succeed in building AGI while preserving Altman's personal control over humanity's property—OpenAI, Inc.—or if Altman is able to maintain the overarching command of the massive data centers that OpenAI is now constructing, each of which will hold millions of AGI agents—Altman and Brockman will have committed nothing less than the most damaging theft in human history.

41.     We now find ourselves in a timeline when the world's most advanced AGI will be not under the command of humanity, but under the command of one or two individuals. It is up to

humanity to choose whether the timeline should revert back to the control of humanity, before humanity's future is no longer under its control.

42. Tom Gruber, the co-founder of Siri and Apple's former leader in AI, encapsulated the circumstances:

> "If OpenAI achieves its mission of developing Artificial General Intelligence, that power would now be concentrated in the hands of a few individuals with apparently no independent oversight rather than shared widely with humanity. It is tragic that the hijacking of Open AI from Guy Ravine may have historic consequences. Whoever gets AGI first will have a tool that could be used to exert enormous power over economic and political systems. This power should rest in a democratically governed society rather than a few people who report to no one."

## III. PARTIES

43. Defendant and Counterclaimant Open Artificial Intelligence, Inc. is a Delaware corporation with its principal place of business at 95 3rd Street, San Francisco, 94103.

44. Defendant and Counterclaimant Guy Ravine is an individual residing in Sunnyvale, California. Ravine is the President of Open Artificial Intelligence, Inc.

45. Plaintiff and Counterclaim-Defendant OpenAI, Inc. is a Delaware non-profit corporation with its principal place of business at 3180 18th Street, Suite 100, San Francisco, California 94110. It was originally registered on December 8, 2015. OpenAI, Inc. is registered as a foreign corporation with the California Secretary of State.

46. Counterclaim-Defendant Samuel Altman is a cofounder and Chief Executive Officer of OpenAI, Inc. Upon information and belief, Altman resides in the Northern District of California.

47. Counterclaim-Defendant Gregory Brockman is a co-founder and President of OpenAI, Inc. Upon information and belief, Brockman resides in the Northern District of California.

48. Upon information and belief, at all times relevant, each of the Counterclaim-Defendants was the agent of the other Counterclaim-Defendants, and in doing the things alleged, each of them was acting within the course and scope of an agency relationship and were subject to and under the supervision of each other. The Ravine Parties are informed and believe that each of

the fictitiously named Counterclaim-Defendants are responsible in some manner for the injuries to The Ravine Parties alleged in this Counterclaim. The Ravine Parties further allege that their injuries their property rights, goodwill, and reputation were directly proximately caused by each and all such Counterclaim-Defendants.

## IV.    JURISDICTION AND VENUE

49.    This Court has original subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. §§ 1116 and 1121 because this action includes alleged violations of federal trademark and unfair competition laws of the United States pursuant to 15 U.S.C. §§ 1114, 1125.

50.    Additionally, this Court has supplemental jurisdiction over the state law-based claims under 28 U.S.C. § 1367 because those claims are related to the federal claims asserted and therefore form the part of the basis of the same case or controversy and arise from a common nucleus of operative facts.

51.    This Court has personal jurisdiction over the Counterclaim-Defendants because each have their principal place of business in this jurisdiction and/or sufficient contacts with this jurisdiction. The Court's exercise of jurisdiction over these parties will not offend traditional notions of fair play and substantial justice.

52.    Under 28 U.S.C. § 1391, venue is proper in this jurisdiction because the Plaintiff initiated this civil action here and/or some of the Counterclaim-Defendants can be found or transact business in this judicial District and/or are residents of this District.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.    WHO WILL CONTROL AGI? THE MOST IMPORTANT QUESTION IN HUMAN HISTORY

53.    The most important event in human history is now unfolding before our very eyes: the surpassing of human intelligence by artificial intelligence. It is difficult to overstate the significance of this event: Electronic intelligence, which is perhaps 1,000 times faster and cheaper than biological intelligence, is about to surpass human intelligence "any year now." Comparing the speed of human labor to the speed of these systems is like comparing the movement of plants

WAYMAKER

to animals. In this analogy, humans are the plants. Developments that took place over a span of decades may soon take place over a span of months.

54.     The emergence of these general AI systems is occurring at an astonishing pace, not over years or decades, but over months. After decades of underachievement, AI models exhibiting general human-like intelligence have leaped from the cognitive abilities of a toddler to those of a PhD student in just 18 months, with their general IQ soaring from 65 to surpass the average intelligence of 100 of most adults only over this past year. The discovery of Scaling Laws has enabled the industry to predict the trajectory of these systems' intelligence over the coming years. The AI model of 2025 is expected to surpass the intelligence of 95% of humans, and the one of 2026 is poised to eclipse the intelligence of all of humanity.

55.     Whereas OpenAI's latest GPT-4 model has an estimated IQ higher than that of an average human, OpenAI's CEO Sam Altman recently stated that "we can say right now, with a high degree of scientific certainty, that GPT5 [releasing shortly] is going to be a lot smarter than GPT4, and GPT6 [in roughly 2025] is going to be a lot smarter than GPT5 and we are not going to get off this curve."

56.     An OpenAI researcher privately said that AGI will be achieved "literally, any year now" and it will probably become a superintelligence just "a year later." Most importantly, he added that whoever controls it will have "godlike powers over everyone else who doesn't." This individual then quit OpenAI because he did not believe it would uphold its principles.[1]

57.     Many forecasters bet that the emergence of AGI is less than two years in the future, and that superintelligence will follow just months later, presumably as the system is set to improve itself. To appreciate how fast AI is getting smarter, projections for the timeline for superintelligence have shrunk from 40 years in the future to just three years—over a span of the last three years. Such machine intelligence is expected to outsmart humanity within "single-digit years."

[1] Daniel Kokotaijlo, Shortform Post (Oct. 8, 2019), available at https://www.greaterwrong.com/posts/cxuzALcmucCndYv4a/daniel-kokotajlo-s-shortform#comment-LKThjEJ6W8eQEJiXG.

58. The significance of this event far surpasses that of the Industrial Revolution; it is akin to the creation of a new form of life superior to humanity that is increasing its capabilities exponentially by the month, and it has not even begun the process of self-improvement. Humanity is caught by surprise, wholly unprepared as it is about to encounter the intelligence, speed, and veracity of something far more capable and far more powerful than itself, something that could replicate itself on millions of servers, outsmart humans, and rapidly reshape the world in its desired image.

59. The most important question in human history stares us in the face: Who will control these powerful systems that will be capable of displacing, disempowering, overpowering, and outsmarting humanity many times over at a speed we could not even comprehend? Will it be humanity itself in control, or a few individuals, or perhaps the very system itself?

60. As historian Yuval Harari said, this event in the next few years will mark "the end of human history. History will continue with somebody else in control" —under the control of a system far smarter and more capable than humanity itself. Because things are happening so fast, we are about to run into this event like a brick wall. The only question is: Who will be in control? Will it be humanity or somebody else?

61. To answer this question in favor of humanity, Guy Ravine set out in 2012 to create what became Open AI in early 2015. But what Altman and Brockman did next changed the course of human history and diverted the control of these systems from humanity's command to their own personal dominion.

> "*Throughout our time at OpenAI, we witnessed a disturbing pattern of deceit and manipulation by Sam Altman and Greg Brockman, driven by their insatiable pursuit of achieving artificial general intelligence (AGI).*"
>
> – Former OpenAI employees in a letter to the board.[2]

---

[2] Will Knight, *Elon Musk Trolls His Way Into the OpenAI Drama*, WIRED (Nov. 21, 2023), available at https://www.wired.com/story/elon-musk-troll-openai-drama/.

## B.    CREATING THE RECIPE FOR AGI FOR HUMANITY

### 1.    Guy Ravine Invents the Recipe for AGI: Open AI

62.    From an early age, Guy Ravine had a talent for coming up with breakthrough ideas, some of which led to technologies used today by billions of people. What defined Ravine's innovations is that they were always ahead of their time and came after long periods of deep thinking, seeing further into the future and anticipating the next events and possibilities. In 2000, fresh out of high school, Ravine founded his first company, an AI startup providing a talkative retrieval bot over the internet, which afterwards transformed into a web traffic prediction system. He later proceeded to start several companies and projects in fields ranging from internet to wireless systems as well as a prototype for a one-person electric vehicle. In 2011, Ravine created an open collaboration platform called Wikineering. In 2012, he invented the foundations of modern mobile video, including the first TikTok-like app, We.

63.    For many years, Ravine had thought deeply about the future of artificial intelligence. Ravine understood that if AGI were developed solely by large, for-profit companies, it could lead to a  a concentration of power where the means of production were concentrated in the control of one or a few companies, which would allow them to subjugate the entire balance of power, a scenario known as a singleton. Instead, Ravine wanted to create a future in which AGI was developed by and for all of humanity. In this future, when AI systems begin to displace humanity from the economy, humanity as a whole would own the machines that replace them. This could lead to an unimaginable abundance and everyone would be equally empowered. This vision guided him.

64.    In 2009, Ravine saw a lecture by Tomassio Poggio's lab at MIT and concluded that neural networks would rapidly advance., It occurred to him that the emerging ideas the researchers at the time were thinking about would probably arrive at human level intelligence. He estimated that within 15 years, this approach would lead to the development of AGI. Ravine's idealism caused him to want to provide the benefits to everyone. He founded an AI company as well as an open collaboration platform, Wikineering, as a not-for-profit initiative for the benefit of humanity that allowed engineers to collaborate to build things openly and share them.

65.     In 2012, as neural networks were showing promising breakthroughs, Ravine wanted to find a way to ensure that AGI would be developed for humanity as a whole, an "insurance policy for the world," rather than to serve the few. He spent the next two and a half years thinking deeply about how to build an AGI effort for humanity, iterating on dozens of ideas and exploring a large number of possibilities. He was looking for the recipe to serve AGI to all.

66.     At this time, Google had cornered the market for AI research talent, and had virtually unlimited amounts of money, with billions of dollars spent on AI talent, as well as a network of research talent, so it seemed that no new effort would come along to challenge Google's dominance. This was also the conventional wisdom at time. In the words of Greg Brockman's recollection, it seemed "impossible." And indeed, in the years since, no new effort has been able to challenge Google, except for one: Counterclaim-Defendant OpenAI, Inc. (and its spinoff, Anthropic). This success was based on Ravine's Open AI, a recipe for an AGI effort intended to put the benefits of AGI in the hands of humanity.

67.     This was not entirely coincidental. Ravine spent 2.5 years of thought and iteration on dozens of ideas to find a way to find a way to challenge Google's dominance and put the benefits of AGI in control of humanity. Over time, Ravine realized that to create an effort for humanity that would compete with companies like Google, such an effort could not rely on conventional ingredients, like money. A new effort would also lack the talent network effect that Google used to have. When you could not compete on money or on a network effect, you needed something brilliant and powerful—a simple idea that would do what Google's billions of dollars could not. What Ravine found is that normally the simplest idea that seems obvious in hindsight is the one that works. So, he kept looking for the simplest most powerful idea. Unlike most startup founders who could have a flash of insight and decide to pursue an idea, Ravine's process was more deliberate, taking years of deep thought, never satisfied until absolutely certain that the idea would work. This process also led to the first TikTok like app, We, years ahead of its time, and the principles of modern mobile video (on which Ravine received Patents). When users used this technology, they thought it was science fiction for its time.

68.     After years of trying to come up with the simple secret sauce to build AGI and put the benefits of it with humanity, the result was Open AI. What Ravine eventually realized is that all he had to do was build on the ideology of his open collaboration platform and encapsulate it in two magic words. While you could not compete with Google on money, researchers were actually motivated by the ideology of open sharing. The promise of Open AI to be open sourced and serve humanity was created by Guy Ravine in late 2014. While others were talking about AGI, Ravine found the secret sauce to build AGI: a special ingredient that would allow his not-for-profit initiative for humanity to compete with the likes of Google when it was considered "impossible." That secret sauce was reflected in the principles he conceived: An artificial intelligence organization that would be open-sourced, not for profit and 100% for humanity, as a standalone initiative and most importantly, encapsulated in the magical words of "Open AI."

69.     Open AI had the ability to attract the top researchers in the world when it was not possible for a new initiative to compete with Google on the basis of money. But to understand the significance of encapsulating the idea in two magic words, imagine that instead of using OpenAI for the name of his company, Altman would have used the name Altman's AI, and it was for-profit, closed, and for the benefit of Sam Altman (similar to how it is today). Would Altman have gotten Musk to donate to Altman's AI? Would he have been able to recruit Sutskever, Karpathy and others? The answer is No. The ideology itself was reflected in the name and was instantly communicated as if it were a magical spell. And it worked. It pulled in the research talent and the funding. When you could not attract talent with money or enough funding, you could do so with a powerful ideology encapsulated in two words that could capture the imaginations of researchers and funders alike.

70.     Gradually, the pieces began to fall into place, and by late 2014, the idea of Open AI had fully emerged under the name "Open AI": A standalone, non-profit initiative dedicated to developing AGI for the benefit of all humanity. Open AI was an ideological bombshell that, when dropped on the scene, was able to demolish the walls of Big Tech and untether research talent.

71.     When people heard the words "Open AI," they understood what the organization was about and felt a powerful desire to be a part of it. It was like "Open Sesame" - a phrase that

could open people's hearts and wallets, inspiring them to join the cause because the cause was truly for the people. Open AI was the simplest and most powerful recipe: a recipe for building AGI for humanity. It would ignite the excitement and recruit talent where no other recipe could. And it was the only recipe for building a new AGI effort that worked since then, apart from the Anthropic spinoff that piggybacked on OpenAI Inc.'s success. That is why it was so alluring that Altman and Brockman so coveted it.

72. While Open AI may seem obvious in today's world, at the time of its inception, it represented a radical departure from the conventional wisdom surrounding the development of AGI. The notion that AGI could be developed openly and transparently in a standalone deep learning non-profit initiative with a fiduciary duty to humanity, required a re-framing of assumptions and assumed that it would be developed in an institution like DeepMind or a government project.

73. In 2014, just as Open AI was beginning to take shape, Nick Bostrom published his book "Superintelligence," which represented the culmination of his research on the topic. In the book, Bostrom meticulously outlined every conceivable scenario for the development of AGI, from government-led initiatives to research projects within big tech companies to secretive startups working on the fringes of the field.

74. Yet for all his expertise and insight, Bostrom had failed to consider the possibility of a standalone collaborative open non-profit effort to develop AGI openly with a fiduciary duty to humanity. It was a startling omission, one that spoke to just how deeply entrenched the assumptions surrounding AGI research had become when the deep learning paradigm emerged, and to the novelty of Ravine's approach of Open AI. When Bostrom and Ravine met by chance in March 2015, just as Bostrom was stepping off the TED stage after delivering a talk on his research, he was surprised to learn that he had not considered the Open AI approach to achieving AGI. The encounter inspired Bostrom to utilize the next year to write a paper on the implications of openness in AI and invite Ravine's feedback.

**2.    Guy Ravine Creates the AGI Effort for Humanity: Open AI**

75. Throughout 2015, Guy worked tirelessly to bring Open AI to life. He pitched the idea to top AI labs around the world and to top executives, proposing a dual initiative that would combine cutting-edge open research with an AI school to train the next generation of researchers.

76. Ravine held discussions with many top executives, including notable figures such as Google CEO Larry Page, Facebook Chief AI Scientist and Father of Deep Learning Yann LeCun, Apple AI leader and Siri co-founder Tom Gruber, Google Research Head and AI Authority Peter Norvig, Google Research director Alon Halevy, Skype co-founder Jaan Tallinn, AI authority Nick Bostrom, Google self-driving car head, Sebastian Thrun, Stripe CEO Patrick Collison, and others. Erik Brynjolfsson spoke about Open AI with Elon Musk and Reid Hoffman but, on information and belief, did not attribute the source.

77. Gruber, the co-founder of Siri, former head of Apple's Advanced Technology Group, and Apple's representative on the Partnership on AI, recalled:

"On March 19, 2015 I saw Guy Ravine proposing Open AI to Google CEO Larry Page and requesting the backing of Open AI, presenting it as an initiative that Google should support. Guy argued that Open AI would be an open non-profit AI organization to attract researchers who would publish their code openly and share the benefits of AI with humanity. **This was nine months before the public announcement of OpenAI, Inc. by Sam Altman and Greg Brockman**." (Emphasis added.)

78. Gruber also attested to the power of the idea of Open AI to recruit top AI researchers:

"In April 2015, after a TED conference, Guy asked me if Apple would be interested in supporting Open AI. We had talked about Open AI's mission and goals, where he explained Open AI would attract the best talent on the basis of a culture of openness, common shared resources and a mission for sharing the benefits of the research with humanity. Guy made the case that it would be in Apple's best interest to support Open AI and its model of research because it would accelerate research in deep learning and Apple could build on that to power its AI products. At that time, it was clear that Deep Learning was the future for AI and we already saw its power to transform speech recognition. When I was at Apple, the company had huge amounts of money. It enjoyed a great reputation as a place to work, and as a company with an ethical stance towards building products. Despite this, Apple struggled to attract top researchers in AI because its own researchers were not allowed to publish or speak openly. This made Guy's proposal of Open AI as a way to attract researchers and accelerate progress while sharing the fruits with humanity a powerful idea which I personally supported."

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

79.     In an email dated March 22, 2015, Ravine outlined Open AI's principles: "Open AI initiative", "completely open for the deep learning community and set up for nonprofit"" "open source" "good for the world."

80.     Around March 25, 2015, Ravine also launched an instance of the Wikineering AI collaboration tool that he had built earlier and branded it as Open AI, making it available to the community with tools to contribute AI related materials openly.



Case No. 4:23-cv-3918

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

81.     On March 26, 2015, Ravine acquired the open.ai domain.

<Invoice Open.AI.pdf>



82.     The next day, Ravine discussed Open AI with Skype co-founder Jaan Tallinn:



83.     During this time, Ravine was working to put together the necessary ingredients to launch the OpenAI collaboration initiative that would include a research effort with participation from multiple companies.

84.     On May 8, 2015, Ravine emailed Yann LeCun, then of Facebook and now the

Chief AI Scientist of Meta. LeCun is one of the Fathers of Deep Learning.[3]



> **GR**  **Guy Ravine**                                              May 8, 2015 at 5:10 PM
> Open.AI Initiative
> To: ███████████   ███████████
>
> Hi Yann,
>
> A group of academics and companies are looking to launch an open academia wide and industry-wide
> initiative called Open.AI.
>
> The goal of the collaboration is to foster faster progress in the field of deep learning by (a) making it much
> easier for more people to experiment on and improve the general algorithms of deep learning, (b) by providing
> an open API and free cloud for one button experimentation with new algorithms, (c) by identifying benchmarks
> for each of the challenging areas, and (d) through a more coherent organized general approach in the field,
> that also involves cognitive developmental researchers for testing and mirroring hypotheses. Below you can
> read more about the goals of the initiative.
>
> I'll be in NYC next week and would like to meet with you on Wednesday if you could make time to discuss the
> possibility of Facebook or your research group providing computing resources for the initiative or other
> potential cooperation (Tuesday might also work if Wednesday doesn't work for you).
>
> Guy

85.     By September 2015, Ravine began discussions to raise up to $100 million for this

ambitious project. Open AI would be an open, non-profit AI initiative for the benefit of humanity.

The initiative would include a center lab and academic and industry wide collaboration with an AI

school. By late 2015, even Google Research had expressed interest in backing the Open AI effort

that included the establishment of an AI School. As momentum built around Open AI, Ravine put

together a business plan and began recruiting leading researchers to the initiative.

86.     Open AI would also provide a platform for cloud experimentation with open

models along with an establishment of an AI school, as reflected in Ravine's September 28, 2015

presentation:

---

[3] See, https://en.wikipedia.org/wiki/Yann_LeCun

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM



87.     By September 2015, Open AI at open.ai was updated to reflect a sign-up page that stated "ANNOUNCEMENT WILL BE MADE SOON" for the open industry-wide and academia wide initiative:

88.     As of December 2015, Ravine was making progress, the initiative was taking shape, and the announcement of Open AI was imminent. In addition to its core mission of developing AGI openly and transparently in a manner that involves all of humanity, Open AI intended to facilitate a collaboration for a broader shift in the AI research landscape. Other than

conducting open research, the plan was to serve as an initiative for all research labs to collaborate openly creating a kind of "benevolent contagion," a model of open collaboration and knowledge-sharing that would incorporate more research labs and gradually spread throughout the industry, leading all companies to collaborate with open code for humanity.

89.    On December 10, 2015, Ravine sent an email to Nick Bostrom to provide an update on Open AI: "I'm working with some key people in Alphabet and we're thinking about putting a lot of resources behind Open AI as part of a related effort. I wanted to talk to you about your ideas again for the evolution of a future where general AI is available to everyone with a computer and no one group has an algorithmic advantage in general AI." Ravine's Open AI was planning to make the major announcement of the Open AI non-profit initiative for humanity, with funding, over the following weeks so Ravine added to Bostrom: "*I have a feeling that what we do in the next weeks with plans for Open AI could have a big impact on the course of evolution of AI.*"

## C.    THE PUSH TO STEAL THE RECIPE FOR AGI FROM HUMANITY

### 1.    Altman and Brockman Rush to Steal Open AI from Humanity

90.    But one day later, on Dec 11, 2015, the timeline diverged. Sam Altman and Greg Brockman beat the original Open AI to its announcement, telling the world at openai.com that OpenAI, Inc. had obtained $1 billion in funding commitments from Elon Musk and others. Unlike Ravine's project, which was working to raise a modest $100M and to attract researchers, Altman and Brockman claimed to have a $1 billion and 30 leading researchers on their team. This was incredible. As Ravine would learn many years later, it was also a lie.

91.    Altman and Brockman took Ravine's recipe and promise to create an AGI effort for humanity—Open AI—and used its stolen promise—to be an "open non-profit for the benefit of humanity"—to gather Elon Musk's donations and entice other leading researchers to leave their positions for the mission to build AI openly for the benefit of humanity. They then rushed to make an announcement that they will be the stewards of "OpenAI non-profit for the benefit of humanity," thereby diverting the stewardship of Open AI "of the promise of Open AI to humanity" to their own control.

92.     On information and belief, Altman and Brockman learned of Ravine's Open AI, and saw within it its promise, not to give it to humanity, but as a recipe to gain control of an AGI effort that could compete with Google for themselves – as internal emails from January 2, 2016 – a mere 21 days after their announcement, shows, to them this promise to be open for humanity was simply a "recruiting strategy for the short and medium term." and it was "OK not to share the science."[4]  They duplicated Ravine's initiative, name, principles, mission, vision, and even domain, and statements, word for word, but they did not have the intention to follow through, at least not for the benefit of humanity.

93.     They used the promise to be open, not-for-profit and for humanity to dupe talent and funders such as Elon Musk. But they would neither be open nor for humanity. However, based on these misstatements, they were able to attract the best AI talent from institutions like Google when they could otherwise not compete. They were also able to scare away competitors. The truth is, when they announced the $1 billion commitment for funding, they had virtually no money. Their financials showed they only raised $13 million through the year 2016. And when they said they would be open and non-profit and for humanity they lied.

94.     Based on Altman and Brockman's announcement that OpenAI, Inc. was non-profit, operating for humanity, and had $1 billion in donor commitments and their assurances to Ravine that they would fulfill his mission, and without reason to doubt their truthfulness at the time, Ravine stood down to let them steward the mission.

95.     As we now understand, from the time of the December 2015 announcement through the end of 2016, OpenAI, Inc. would raise about $13 million. Yet for all outside appearances – and certainly to Ravine – it was as though OpenAI, Inc. had completely assimilated his principles, usurped his name, and established themselves as the unquestioned leaders in the field. Little did Ravine know that his original Open AI was still the only open, non-profit initiative for the benefit of humanity. The impostor OpenAI, Inc. would eventually reveal itself to be a

---

[4] Greg Brockman, *et al.*, *Open AI and Elon Musk*, (March 5, 2024), https://openai.com/blog/openai-elon-musk.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

closed, for-profit company, for the benefit of a few who strive to have an algorithmic advantage over all other groups in general AI rather than ensure that no single group has an algorithmic advantage.

96.     This is where the timelines diverged, and there begins an alternate timeline where the original Open AI non-profit initiative for the benefit of humanity was hijacked and reconstituted under the stewardship of Sam Altman and Greg Brockman. Instead of an organization dedicated to ensuring that no single group has an algorithmic advantage in general AI, Altman and Brockman created the very thing that Open AI set out to prevent, and cynically began using that very promise, to attempt to ensure that one group would have an algorithmic advantage in general AI over others—theirs.



### 2.     Altman and Brockman Steal the Recipe for AGI from Humanity

97.     One of the academics Ravine discussed Open AI with was Erik Brynjolfsson, then an MIT professor, now Stanford faculty.[5] Professor Byrnjolfsson had been working with Ravine on the non-profit Wikineering open collaboration project for humanity and had spoken in academic and business circles and in conferences about the potential for using Wikineering's collaborative engineering process as a way to accelerate development of technologies, including AI. Ravine began to discuss an open-source, non-profit development effort around AI, initially called Wikineering AI.

98.     Thereafter, the full vision of Ravine's Open AI emerged. It would start with an open collaboration platform for everyone based on Wikineering AI, and once funded, it would

---

[5] Professor Byrnjolfsson currently directs the Digital Economy Lab at the Stanford Institute for Human-Centered AI, with appointments at SIEPR, the Stanford Department of Economics and the Stanford Graduate School of Business.



become an Open AI research center and collaboration center for multiple companies and research labs to collaborate, as well as perform its own research, all of which would be open for the world.

99.     Byrnjolfsson told Ravine that he had received encouraging feedback from Elon Musk and Reid Hoffman, initially on Wikineering AI ideas, and later on Open AI, the platform and the industry-wide initiative and center. Brynjolfsson held multiple conversations with Musk and Hoffman. For example, on or around January 18, 2015, Brynjolfsson wrote Ravine that "Elon Musk has expressed his support for the idea," and on or around March 27, 2015, Byrnjolfsson said that "I think we made some progress with Reid and others." There were other such communications in person, by calls and over emails, between both Ravine and Brynjolfsson and Brynjolfsson and Musk and Hoffman.

## **2015 Timeline**



OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM



100.    Another business leader that Byrnjolfsson introduced Ravine to was Patrick Collison, CEO and co-Founder of Stripe, a company that had received its initial funding from Altman's Y Combinator. Collison was Brockman's associate at Stripe and was in frequent communication with Altman.

101.    On March 13, 2015, Ravine met with Collison and shared his vision for Open AI as a non-profit, open-source AI initiative and industry-wide collaboration for the benefit of humanity, in a way that it would be for the good of the world and shared openly so that general AI belongs to the world and not to any group of individuals. He would use Wikineering as the foundation to build on first and subsequently continue with an industry-wide and academia-wide collaboration and research initiative center. They met at the playground tables outside of Stripe's offices on a sunny afternoon around mid-day for this discussion. They spoke for about 15 to 20 minutes and covered the ideas and principles before Collison was called back to the office and Ravine drove off with Brynjolfsson to meet Andrew Ng, then Baidu's Chief Scientist and Google Brain's founder. Collison told Ravine to email him to see if he could help.

102.    On May 6, Brockman, Stripe's CTO, left the company and, as shown in his blog, was considering what to do next:



**What comes next**

I haven't decided exactly what I'll be building (feel free to ping if you want to chat). But for now, I'm looking forward to exploring some ideas I've been thinking about for as long as I've been programming.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

103. On May 19, 2015, Brockman apparently decided to apply for summer school.



104. On May 21, 2015 Ravine followed up with Collison on the conversations they had about the principles of Open AI. Ravine thought Collison would be interested that he is launching the kind of iteration of Open AI that they talked about on Wikineering. Ravine also provided more details about the Open AI "**deep learning** initiative," and asked if he could "**make the right connections to a few people**" interested in joining.

105. Around that time, Brockman recalls in his blog that he became interested in AI and that "**My first goal was to figure out what deep learning was.**" By June 28, 2015, he began posting on social media images of a GPU he bought to run deep learning experiments.

106. According to Brockman's blog post, he had discussions with both Collison and Altman specifically about what to do next after Ravine's meeting and correspondences with Collisson.[6]

---

[6] "Before I finalized my decision to leave, Patrick [Collison] asked me to go talk to Sam Altman. He said Sam had a good outsider's perspective, had seen lots of people in similar circumstances, and would probably have a good recommendation on what I should do. Within five minutes of talking to Sam, he told me I was definitely ready to leave. He said to let him know if he could be helpful in figuring out my next thing. I replied that AI was top of my list (and it was definitely my life goal). However, I wasn't yet sure whether it was the right time, or what the best way for me to contribute would be. He said, "We've been thinking about spinning up an AI lab through YC. We should keep in touch." https://blog.gregbrockman.com/my-path-to-openai.

107.    By contrast, Ravine had built his AI company in the early 2000's and had built an open collaboration platform from the early 2010's. He also held discussions about the foundation and support of Open AI with top executives and leaders of AI at this point.

108.    Around that time, Altman became interested in starting something in AI, initially within YCombinator, according to Brockman's blog. But Altman and Brockman had a problem; it was considered in their words, "impossible" to compete with Google. An AI lab alone would not get anywhere, it would need a special sauce to attract talent.

109.    On May 25, 2015, Altman wrote to Elon Musk proposing that he fund an AI effort. By June, Brockman had decided what he wanted to do next: Start an AI Company. That summer, Altman, Brockman, and Musk had a dinner meeting at the Rosewood Sand Hill Hotel, where they discussed AI they concluded after discussions that the idea of competing with Google suddenly "appeared not entirely impossible."[7] What was considered previously impossible, with the principles of an Open AI non-profit initiative for the benefit of humanity, could actually work. Brockman identified the recipe.

110.    By October 2015, Ravine was making progress with his own Open AI initiative, holding discussions to raise up to $100M from various sources, including potentially Google Research, which expressed interest in supporting Open AI as part of a dual initiative that included an AI school. He began collaborating on a plan with a group of researchers, such as Richard Socher, former Chief Scientist of Salesforce, Peter Norvig, Google Research head, and other researchers from institutions such as MIT.

111.    Around November 22, 2015, Musk committed to funding Altman and Brockman's OpenAI, Inc. Musk wrote: "*We need to go with a much bigger number than $100M to avoid sounding hopeless relative to what Google or Facebook are spending.*" The amount later donated by Musk was actually around $45M over 5 years.

112.    By November, Ravine was making progress and preparing to make an announcement about Open AI. The site reflected that news would be coming soon.

---

[7] Cade Metz, *et al.*, *Ego, Fear and Money: How the A.I. Fuse Was Lit*, N.Y. Times (Dec. 3, 2023), available at https://www.nytimes.com/2023/12/03/technology/ai-openai-musk-page-altman.html.



113.     On information and belief, Brockman was aware that Ravine was about to make an announcement and rushed to acquire the domain openai.com around December 5th and to make an imminent announcement to usurp the original effort. In addition to the site showing that an "announcement will be made soon," word got around Silicon Valley about Ravine's OpenAI initiative.[8]

114.     On December 8th, Brockman proceeded to incorporate OpenAI, Inc. Its charter reflected the promise of open sourcing their code for public benefit and provided that "[t]he corporation is not organized for the private gain of any person."

---

[8] In searching for an available domain, Altman and Brockman saw that Ravine already owned – and was using – www.open.ai. Then, as now, AI companies preferred to use the .ai TLD rather than .com.

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:22 PM 12/08/2015
FILED 02:22 PM 12/08/2015
SR 20151247198 - File Number 5902936

**CERTIFICATE OF INCORPORATION OF**

**A NON-STOCK CORPORATION**

**OPENAI, INC.**

FIRST: The name of the Corporation is "OpenAI, Inc." (the **"Corporation"**).

SECOND: The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

THIRD: This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person. In furtherance of its purposes, the corporation shall engage in any lawful act of activity for which nonprofit corporations may be organized under the General Corporation Law of Delaware.

115.    Rushing to grab the spotlight before Ravine could announce sufficient funding, Altman and Brockman launched "their" OpenAI, Inc. on December 11, 2015, in an attention-grabbing blog post. In every major respect, Altman's OpenAI, Inc. was identical to Ravine's Open AI, except that Altman claimed to have "$1 billion" in funding commitments from Musk, Hoffman, and Peter Thiel, as well as the involvement of some 14 top AI researchers. These claims were misleading.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM



INTERNET ARCHIVE  https://openai.com/blog/introducing-openai/                          Go   NOV  DEC  JAN
WayBackMachine  1,093 captures                                                              11
11 Dec 2015 – 12 Apr 2024   | | | | | | | | | | | | | | | | | | | | | | | | | | |   2014  2015  2016   About this capture

**OpenAI**                                                                                    About

## Introducing OpenAI

by Greg Brockman, Ilya Sutskever, and the OpenAI team
December 11, 2015

OpenAI is a non-profit artificial intelligence research company. Our goal is to advance
digital intelligence in the way that is most likely to benefit humanity as a whole,
unconstrained by a need to generate financial return.

Since our research is free from financial obligations, we can better focus on a positive
human impact. We believe AI should be an extension of individual human wills and, in the
spirit of liberty, as broadly and evenly distributed as is possible safely.

The outcome of this venture is uncertain and the work is difficult, but we believe the goal
and the structure are right. We hope this is what matters most to the best in the field.

Sam, Greg, Elon, Reid Hoffman, Jessica Livingston, Peter Thiel, Amazon Web Services
(AWS), Infosys, and YC Research are donating to support OpenAI. In total, these funders
have committed $1 billion, although we expect to only spend a tiny fraction of this in the
next few years.

116.    In reality, Altman and Brockman's OpenAI, Inc. finished the following year with
only $13 million in funding, and had fewer researchers committed to their project than announced
at the outset. They ultimately raised only a fraction of the claimed amount over the next five years.
But the shocking announcement of $1 billion from Musk and others, as well as 13 top researchers
behind Altman and Brockman's OpenAI, which copied Ravine's plans in all respects, stole
Ravine's thunder and relegated Ravint to the sidelines.

117.    The similarities between the entities were quite profound:

|  | **Original** | **Copy** |
|---|---|---|
| **Name** | Open AI | OpenAI |
| **Location** | San Francisco | San Francisco |
| **Domain** | open.ai | openai.com |
| **Acquired** | March 26, 2015 | December 5, 2015 |

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM



| Descriptions from communications | Open AI is a non-profit AI initiative "to the benefit of humanity," "in a way that would ultimately be good for humanity" "collaboration" | Copied: OpenAI is a non-profit "to benefit humanity" "in a way that is most likely to benefit humanity as a whole" "collaborate" |
|---|---|---|
| **Ethos** | Open AI | Copied: "OpenAI"<br>Now: ClosedAI |
| **Structure** | Non-profit | Copied: "Non-profit"<br>Now: For-profit |
| **Mission** | For benefit of humanity | Copied: "For benefit of humanity"<br>Now: For benefit of Altman & Brockman |
| **Background of originating founder** | Artificial Intelligence, Open collaboration | Financial Payments, Venture Capital |
| **Defining characteristic** | Idealist, wanted to limit power and distribute it to humanity, not profit-driven but about the well-being of everyone (Told Altman "I'm not interested in money, instead, if you want the trademark, donate to academic research in AI for the good of the community and the world, if you care about the good of the world") | "Especially good at getting powerful"<br>Sued the originator after rejecting a request to financially support AI research for the "good of the world." |
| **Trademark** | Open AI (applied 2015, registered 2017) | Misappropriated The Ravine Parties' Open AI Mark and later sought legal ratification of their misappropriation in this lawsuit. |
| **Past-time pursuit of originating founder** | Open collaboration platform, as a non-profit for humanity | Contemplating whether to get more powerful by running for governor of California, getting fired or pushed out three times for self-dealing or self-interest |
| **Communication between mutual parties** | Jan 2015 - May 2015 | Patrick Collisson (Brockman's associate), Brynjolfsson, Musk, Reid Hoffman |

118.     Shocked by this announcement, Ravine reached out to Altman and Brockman, expressing surprise and suggesting that they could potentially work together. Upon closer examination, Ravine realized that many of the key people involved or connected to Altman and Brockman's OpenAI, Inc., such as Collison, Musk, and Hoffman, were the same individuals that Ravine and Brynjolfsson had discussed Open AI with earlier.

119.     Make no mistake, Counterclaim-Defendants did not steal Open AI, the recipe for AGI, from Ravine. They stole it from humanity. Because Open AI was to build AGI and give it to humanity. Instead, Altman and Brockman used it to acquire power for themselves.

120.     Altman and Brockman's duplicitous actions had major consequences. As Siri Co-founder and Apple's former leader on AI, Tom Gruber stated:

> It is a travesty that by hijacking Guy's Open AI initiative and hurriedly making a major announcement, Altman and Brockman were able to attract top AI researchers and abundant donations, which allowed them to become a major player in AI. The fact that Altman and Brockman's OpenAI later switched from a non-profit, open AI organization for the benefit of humanity to a closed AI, for-profit, under the influence of the founders, is a betrayal of the original mission.

### 3.     Guy Ravine Attempts to Regain Control of Humanity's Property

121.     When Ravine heard of Altman and Brockman's announcement of a non-profit project for the collaborative creation of open-source software for the benefit of humanity called OpenAI, Inc., he was understandably concerned that Altman and Brockman had copied his own non-profit Open AI project for the collaborative creation of open-source software for the benefit of humanity. While Ravine hoped that Altman and Brockman's *arriviste* entity would turn out to be a collaborator, Ravine could not be sure. To protect his intellectual property, Ravine immediately applied to register the Open AI Mark that he had been using and in which he had been developing goodwill for almost a year. He then reached out to Altman and his co-founder Ilya Sutskever, to see if they would, as their ethos indicated, be interested in collaborating for the betterment of humankind. Because Ravine realized that they were already founding an AI lab, which was also the plan for Ravine's Open AI, he proposed they collaborate and work on the collaboration platform component together:

On Fri, Dec 11, 2015, at 9:12 PM, guy@open.ai <guyravine@gmail.com> wrote:

Hi Ilya and Sam,

We've been working on an initiative called Open.AI to build a collective engineering platform to enable researchers from around the world to collectively engineer deep learning algorithms together through a fast collective iterative process using a number of new tools and principles. It's in development and is also a non-profit.

The initiative has the same goals as yours, which are [to] accelerate the arrival of general AI through an open effort.

We think the way research is done today is grossly inefficient, and a platform for collective engineering designed for AI like the one we have been developing could dramatically accelerate progress in the field through a better application of collective intelligence to the problem

We also believe that by applying collective intelligence to refine and simplify deep learning teaching materials in an iterative process through this platform, a lot more people would get involved in improving AI.

I've spent several years thinking about the problem of how to apply collective intelligence to large scale engineering projects, and in particular to AI, in an effective way. The conclusions were a number of key principles towards this end. My team has built a collective engineering platform called Wikineering (wiki engineering, www.wikineering.org), and then I decided that it would make most sense to focus on AI, so we started working on the foundations for Open.AI.

I've been working with Peter Norvig, Richard Socher and others to push a proposal for an AI School within Alphabet. The AI School would be a physical space that would teach its students as well as people online how to improve deep learning algorithms. In the proposal we are working on, the idea is that the AI School would also develop and maintain the Open.AI platform, and improve its teaching materials in an iterative process on Open.AI.

Before we go the Alphabet route (and we are not clear yet whether Larry will approve it being funded), I think it would make sense for us to meet and see if we could team up because we are working towards the same goals. This is bigger than us and I think it could benefit from working together.

By the way, Nick Bostrom has also been advising us on the evolution of open AI.

Guy

Guy Ravine
guy@open.ai
(415) 515-xxxx



122. Altman responded in about 24 hours and added Brockman to the thread. It was quickly decided that Ravine and Brockman would meet in the coming days at Brockman's incubator space at Tesla that Musk had provided to help launch their project.

#### 4. Brockman and Altman Become the Ill-Gotten Stewards of Humanity's Property

123. When Ravine went to Tesla to meet Greg Brockman on December 16, 2015, he was hoping that he would be able to form an alliance. After all, only a few days earlier, Brockman had posted that in his version of OpenAI: "Researchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code, and our patents (if any) will be shared with the world. We'll freely collaborate with others across many institutions and expect to work with companies to research and deploy new technologies."[9] With Ravine's years of work on the subject and his unlimited passion for the mission, a collaboration seemed almost certain.

124. Ravine could not have been more wrong. When Brockman met with Ravine, he was met with indifference, and Brockman refused to collaborate. However, Brockman assured Ravine that OpenAI, Inc. was non-profit, operating for humanity, and had $1 billion in donor commitments. He made his assurances to Ravine that they would fulfill his mission—that they would be the rightful Open AI non-profit for the benefit of humanity. He also asked Ravine to change the name of Ravine's Open AI sell them the open.ai domain.

125. Relying on these assurances Ravine stopped pursuing the OpenAI initiative because as Brockman implied, it was indeed true that they stole the thunder of the original OpenAI now that there is one with Musk's $1 billion in the picture. But more importantly, instead, Ravine was excited that something that he has worked for three years was well funded and would commit to the mission that he set out for. $1 billion from Elon Musk is success beyond his wildest dreams. So he let them because the stewards of the mission, believing that they would be open, non-profit and for humanity. It was pointless to try to launch an Open AI initiative with far less than the $1 billion dollar, since it would appear as a copycat and since they said had $1 billion and pursuing

---

[9] Greg Brockman, *et al.*, *Introducing OpenAI* (Dec. 11, 2015), https://openai.com/blog/introducing-openai.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

the same objectives, it make complete sense to let them pursue the mission. It is worth noting that Ravine continued to build open AI projects for the community using the mark while he decided to put his attention to his other opportunities, now that this mission to build AGI for was in safe hands.

126. Little did Ravine know that OpenAI, Inc. closed the following year only with $13 million, an amount less than Ravine was in discussions for raising, and that Brockman's assurances could not be further from the truth. 21 days after this meeting, OpenAI, Inc. was sending internal emails revealing that their commitment to a non-profit initiative for the benefit of humanity was simply a "recruiting strategy for the short and medium term."

### D. THE THEFT OF HUMANITY'S AGI PROPERTY: OPENAI

#### 1. Whatever It Takes: Stealing the Ingredients from Humanity

127. Having launched their company by stealing Ravine's "recipe"—the Open AI name and principles—Altman and Brockman continued their insatiable quest to achieve AGI by stealing the "ingredients," i.e., the other elements that went into their product. Through further deception and manipulation, Altman and Brockman built a company that claimed to be a non-profit building AI *for* humanity, while actually building a multi-billion-dollar company based almost entirely on stealing *from* humanity. The stolen Ravine recipe, which was meant to be a beacon of hope for an open and transparent future, became a propaganda weapon in Altman and Brockman's hands, wielded to attract unsuspecting talent and funders who believed the insincere promises of an AI revolution that would benefit all of humanity.

128. Under the insincere veneer of openness and a commitment to benefiting humanity, Altman and Brockman lured top AI researchers with false promises. In an interview published on December 11, 2015, Altman asserted, "[o]ne thing that really appeals to researchers is freedom and openness and the ability to share what they're working on, which at any of the industrial labs you don't have to the same degree. . . . I think our mission and our vision and our structure really

appeals to people."[10] But even as Altman made such grandiose statements, he had no intention of making OpenAI, Inc. an "open" company. For example, a January 2, 2016 email between Altman, Brockman, and other OpenAI, Inc. co-founders said,"*[I]t's totally OK to not share the science (even though sharing everything is definitely the right strategy in the short and possibly medium term for recruitment purposes)*."[11]

129.   This brazen deception was not merely acceptable to Altman and Brockman; it was a calculated strategy to lure in the best minds in the field. Brockman himself admitted that attracting top talent from Google would have been "impossible" without the false promise of an open, non-profit organization dedicated to humanity. Researchers, believing in the fabricated mission, took significant pay cuts to join the cause, unaware that they were being exploited for Altman and Brockman's personal gain.

130.   Investors also fell victim to the pair's deceit. Elon Musk, who provided seed funding of approximately $50 million and was instrumental in recruiting Sutskever, OpenAI's Chief Scientist, had an agreement with Altman and Brockman that the OpenAI endeavor "(a) would be a non- profit developing AGI for the benefit of humanity, not for a for-profit company seeking to maximize shareholder profits; and (b) would be open-source, balancing only countervailing safety considerations, and would not keep its technology closed and secret for proprietary commercial reasons."[12]

131.   Musk also participated in the formation of the OpenAI Certificate of Incorporation, which stated that the company's "technology would benefit the public and the corporation will seek to open-source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person."[13] Yet when the truth of OpenAI's closed, for-profit nature came to light, Musk left the company. As he famously opined, "[i]t does seem weird that

---

[10] Steven Levy, *How Elon Musk and Y Combinator Plan to Stop Computers From Taking Over*, WIRED (Dec. 12, 2015), available at https://www.wired.com/2015/12/how-elon-musk-and-y-combinator-plan-to-stop-computers-from-taking-over/.
[11] Greg Brockman *et al.*, *OpenAI and Elon Musk* (Mar. 5, 2024), https://openai.com/blog/openai-elon-musk#email.
[12] Complaint at 24, Musk v. Altman, WL 899024 (Cal. Super. 2024) (No. CGC-24-612746)
[13] *Id.*, 6:15-17; Exhibit 1 (OpenAI, Inc. Certificate of Incorporation) at p. 1, para. three.

something can be a non-profit, open source and somehow transform itself into a for-profit, closed source… This would be like, let's say you found an organization to save the Amazon rainforest, and instead, they become a lumber company, and chop down the forest, and sold it for money."[14] In 2024, Musk ultimately sued OpenAI for, among other things, breach of their founding agreement, breach of fiduciary duty, and unfair competition.

132.    But this was not the end of Altman and Brockman's deception. In fact, all their products and their entire business is based on resources they have usurped from others, often through deceptive means. This was Counterclaim-Defendants' pattern of practice, and it has been very effective. For example, OpenAI, Inc.'s technology is based on Google's patented "Transformer" algorithm[15] (the "T" in GPT). And it is well-acknowledged that OpenAI, Inc. used without permission massive portions of humanity's collective creative works, including millions of books, newspaper articles, paintings, photos, videos, internet posts, and social media posts.[16] Altman and Brockman even managed to steal the goodwill of the technology world, diverting for their benefit much of the growing goodwill in the world for AI technologies that would benefit humanity. As but one example, Ravine sometimes received emails apparently meant for OpenAI, Inc. expressing unbridled enthusiasm for Counterclaim-Defendants' professed virtues as embodied in the name and the recipe that had been misappropriated from Ravine:

---

[14] CNBC interview with Elon Musk, May 16, 2023. Available at https://www.youtube.com/watch?v=bWr-DA5Wjfw

[15] *See* Vaswani, *et al.*, *Attention Is All You Need*, 31st Conference on Neural Information Processing Systems (NIPS 2017), available at https://proceedings.neurips.cc/paper_files/paper/2017/file/3f5ee243547dee91fbd053c1c4a845aa-Paper.pdf.

[16] *See, e.g.*, Dan Milmo, *'Impossible' to create AI Tools like ChatGPT without copyrighted material, OpenAI says*, The Guardian (Jan. 8, 2024), available at https://www.theguardian.com/technology/2024/jan/08/ai-tools-chatgpt-copyrighted-material-openai?CMP=share_btn_url; Yiwen Lu, *Digital Media Outlets Sue OpenAI for Copyright Infringement*, N.Y. Times. (Feb. 28, 2024), available at https://www.nytimes.com/2024/02/28/technology/openai-copyright-suit-media.html; Jonathan Gillham, *OpenAI and ChatGPT Lawsuit List* (Dec. 28, 2023), https://originality.ai/blog/openai-chatgpt-lawsuit-list; Joe Panettieri, *Generative AI Lawsuits Timeline: Legal Cases vs. OpenAI, Microsoft, Anthropic, Nvidia and More* (Apr. 8, 2024), https://sustainabletechpartner.com/topics/ai/generative-ai-lawsuit-timeline/.

Very excited! ███████████

Nathan ████████████                                              Fri, Dec 11, 2015, 6:44 PM   ☆   ⊙   ↰
to contact ▾

I was absolutely amazed when I was first notified of OpenAI's motives and goals! As a 19 year old college student from Australia what could I do to help?

133.    With context, it is clear that *all* the elements of OpenAI's technology and its quest to achieve AGI were stolen through theft or deception, and in each case, the theft was to the detriment of humanity:

| Ingredient for AGI | How Stolen? | Effect on Humanity |
|---|---|---|
| **The Recipe** | Misappropriated from Ravine | Diverted Open AI for humanity and turned it into closed AI controlled by a few |
| **The Name** | Misappropriated from Ravine, who had registered the OpenAI Mark in 2015 | Took a brand from its rightful owner who intended to use it as a beacon for collaborative work that would benefit society; turned it into a cynical corporate slogan that represents the opposite: a closed, secretive multi-billion-dollar corporation backed by Microsoft, the world's biggest corporation. |
| **The Domain (Open.ai)** | Seeking to seize through litigation. | Counterclaim defendants have sued to prevent Ravine from using the domain he acquired before anyone had heard of Altman's "Open"AI |
| **The Money** | Deceived Musk and other donors who believed they were contributing to a non-profit to benefit humanity. | Diverted funds that would have gone to open research to benefit humanity and received preferential tax treatment through its "non-profit" status. |
| **The Talent** | Deceived AI Researchers from academic institutions and research labs into taking positions at below-market rates to work for a putatively non-profit organization for humanity | Diverted researchers from genuinely open projects to benefit humanity |
| **The Algorithm** | Infringed Google's patent and took the | Partially, academics created diffusion and other algorithms for humanity with the expectation of receiving back, but "Open"AI became closed after taking |

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

| | | |
|---|---|---|
| | work of academics[17] | all the open research, which they continue to take to this day without sharing back |
| **The Data** | Solen from tens of millions of creators of copyrighted art, literature, photography, computer code, social media, and many other works | Directly taken from a significant portion of humanity without compensation |
| **The Goodwill** | Diverted the enthusiasm of the AI and Tech communities to their putatively open and altruistic company | Diverted energy that could have been going to truly open AI projects during a critical time of AI development |

134.     Brockman's words reveal the depths of his and Altman's deception and the extent to which he and the other Counterclaim-Defendants were willing to go to achieve their goals. Brockman openly admitted that OpenAI, Inc.'s modus operandi was the misappropriation of ingredients, stating, "The real aha moment was when Ilya saw the transformer come out," Brockman says. "He was like, 'That's what we've been waiting for.' That's been our strategy—to push hard on problems and then have faith that we or someone in the field will manage to figure out the missing ingredient."



Mark Riedl (e/wumpus) @mark_riedl · 9/6/23
Replying to @SashaMTL
What is fascinating to me is that every major innovation that OpenAI has capitalized on--transformer, diffusion, RLHF--was invented somewhere else.
💬 14     ↻ 19     ♡ 194     ⬆

Sasha Luccioni, PhD 🏴🌐🦋✨🤗 @SashaMTL · 9/6/23
💯💯💯
💬     ↻ 1     ♡ 13     ⬆

[17] *See, e.g.*, Alex Zhavoronkov, *Can Google Challenge OpenAI With Self-Attention Patents?*, Forbes (Jan. 23, 2023), available at https://www.forbes.com/sites/alexzhavoronkov/2023/01/23/can-google-challenge-openai-with-self-attention-patents/?sh=71ae49175639.



**We are Sociaall.com** @dez_blanchfield · Sep 6

when OpenAI says "open" what they mean is "stay open so we can steal your copyright contend and copyleft protected sourcecode, images, art and designs rights & remedies, all for our nefarious use for free to make bilkiins in profits, and we won't ever pay you a cent, never ever.

💬          ⇄          ♡ 2          �archives 162          ⬆

135.     As a result of this deception, OpenAI, Inc. presently faces a staggering 14 lawsuits, primarily for the misappropriation of content, data, and money. Yet somehow, in the midst of this legal maelstrom, OpenAI, Inc.'s single offensive lawsuit has been to sue The Ravine Parties, including Ravine, the originator of the "OpenAI" name and the recipe for the success of a truly open AI. Because OpenAI, Inc. could not get the OpenAI name from Ravine through bullying or by defeating him in the USPTO, they have decided to pursue litigation to strip Ravine of the mark that he adapted before OpenAI, Inc. was even formed, and which Ravine has been using for over nine years without any legal objections from OpenAI, Inc. By cynically seeking to punish Ravine for using the very trademark they stole from him, Altman and Brockman continue to demonstrate that their modus operandi is to use any means necessary to take what does not belong to them from creators and to divert the benefits of AI from humanity to themselves.

136.     Perhaps nothing proves this more than the 2022 email exchange between Altman and Ravine. Altman asked Ravine if he could buy the open.ai domain and the "related IP rights." Ravine offered to give Altman the domain and the Open AI Mark and name—for nothing more than a substantial donation to truly open academic AI research (and not to Ravine himself).[18] Altman refused, choosing instead to "donate" millions to lawyers and seek to claim the IP in court. The entire record of OpenAI is one of taking from others, at the expense of humanity.

137.     Ultimately, Counterclaim-Defendants' story is one of relentless deception, and intimidation in the pursuit of AGI. Altman and Brockman's actions demonstrate an unwavering commitment to acquiring the ingredients necessary for AGI development, no matter the cost to

---

[18] *See supra* ¶ 100 (email from Ravine to Altman).

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

integrity, trust, or the collective knowledge of humanity. Their hypocrisy shocks the conscience and shows that they will go to any lengths to control AGI, the most transformative technology of our time, and use this control for personal gain, rather than for the benefit of humanity, as Ravine intended.

### 2. Whatever It Takes: The Systematic Theft of Humanity's Property

138. After using theft, deception, fraud, and a facade of benefiting humanity to obtain the components necessary to build AGI, Altman systematically dismantled the mechanisms ensuring OpenAI would remain under the command of humanity. Through a series of steps taken he has consolidated personal control over the most valuable technology in human history, effectively diverting the benefits of AGI from humanity to himself. What was incredible is that at virtually every step of the way Altman justified each transformation as a move to save and benefit humanity, all while it directly consolidated the control of AGI under his own command.

139. "Open"AI essentially became ClosedAI (while still keeping the name): "Open"AI transformed from open-source to closed-source, thereby betraying their very foundational principles of sharing with humanity and eliminating the automatic mechanism that ensured the benefits belong to humanity. Openness automatically shared the benefits of AGI equally with humanity by default. It was an immutable mechanism that could not be subject to corruption or manipulation.

140. Altman replaced the automatic, technical mechanism of open source, which guaranteed openness, with a frail biological switch—a human board of directors—that could be appointed by cronies, easily manipulated, intimidated, or deceived to do Altman's bidding. (Indeed, Altman would eventually intimidate and jettison board members after the board voted to fire him.) Altman justified this move (of changing from open to closed) under the guise of "safety," claiming it was necessary to protect humanity by not sharing technological developments with humanity. Except that just a year later, Counterclaim-Defendants started selling AI models 100 times larger and more powerful and are now selling systems even more powerful.

141. In early 2019, just days after being fired from Y Combinator for self-dealing and enriching himself at the organization's expense, Altman immediately set out to transform OpenAI,

Inc. from a non-profit to a for-profit entity under his command. This shift allowed him to consolidate further control over the organization and its direction. This move allowed him to exert control through additional mechanisms.[19]

- Stacking the board with loyalists: Altman proceeded to ensure that the board, now the sole decision-maker in sharing AGI's benefits with humanity, was composed of loyalists. This allowed him to maintain control over the organization and its direction, even as it claimed to be working for the benefit of all.[20]

- Capping investors' returns: Altman further consolidated control by capping investors' returns, ensuring the unlimited upside potential of AGI would return to his dominion providing him totalitarian control unlike any other for-profit in history. He justified this move by claiming that no group should be able to own the "light cone" of all future value while, in reality, ensuring that he and Brockman would have this very power.[21]

- Capping employees returns: Employees equity upside was also capped to ensure the proceeds of AGI returned to the organization under his consolidated control.

- Preventing Microsoft from accessing AGI: OpenAI, Inc. prevented Microsoft, a major investor, from accessing the AGI developed by the organization. This move was justified as ensuring that AGI "belongs to humanity," but in reality, it served to concentrate control over the technology in Altman's hands, ensuring that if he acquired command of AGI first, he would have no competition and could race ahead to self-improvement, leaving the rest of humanity in the dust. He also kept the ability to

[19] Dan Primack, *Sam Altman steps down as president of Y Combinator*, Axios (March 8, 2019) https://www.axios.com/2019/03/08/sam-altman-y-combinator
Elizabeth Dwoskin and Nitasha Tiku, *Altman's polarizing past hints at OpenAI board's reason for firing him*, Wash. Post (Nov. 22, 2023), available at
https://www.washingtonpost.com/technology/2023/11/22/sam-altman-fired-y-combinator-paul-graham/
[20] Lauren Good and Will Knight, OpenAI's proposed all-male board would appear to remove three directors who voted to eject Altman (Nov. 22, 2023)  https://bit.ly/3xHXqs1
[21] Connie Loizos, *Sam Altman's leap of faith*, TechCrunch (May 18, 2019)
https://techcrunch.com/2019/05/18/sam-altmans-leap-of-faith/
OpenAI has become a "capped profit" company, with the promise of giving investors up to 100 times their return before giving away excess profit to the rest of the world.

determine when AGI will be achieved, ensuring that he could cut Microsoft's relationship once he constructed the very systems that will replace Microsoft as OpenAI, Inc.'s partner that he plans to own by himself in his own personal chip venture.

- Enabling the board to cancel investors' equity: OpenAI, Inc.'s investment agreements include a clause that allows the board to cancel any investor's equity. This provision, justified as a means to ensure that AGI remains under the control of humanity, in reality, gives Altman and his loyalist board unchecked power over the organization's ownership structure.[22]

- OpenAI Startup Fund is Sam Altman: The OpenAI Startup Fund itself was literally Sam Altman as an individual, allowing him to maintain control of the proceeds of the organization from external investments that appreciated in value as the organization grew. This was the case until it was scrutinized in the wake of his firing.

142.    In truth, OpenAI, Inc. is not Altman's property. It is humanity's property, and it must be used to benefit humanity at large. This is what was promised by Altman and others. They should be held to their word.

### 3.    Whatever It Takes: The Successful Diversion of Humanity's Property to Altman's Personal Control

143.    On Nov 17, 2023, the board of OpenAI, Inc. recognized the scale of Altman's deception and fired Altman; Brockman then resigned. After the board, recognizing that Altman was not acting in the best interests of humanity, fired him, Altman intimidated them using OpenAI, Inc.'s lawyer and ties with Microsoft to reinstate himself. This demonstrated Altman's installation of the frail biological switch that was successful: His intimidation and manipulation worked. The successful dismantling of mechanisms meant to keep AGI in humanity's hands showed the extent of Altman's consolidation of power.

---

[22] OpenAI, *Our structure* (June 28, 2023), https://openai.com/our-structure.

144.    After receiving a letter from OpenAI, Inc.'s researchers warning the board of an AGI breakthrough that could threaten humanity, the board fired Altman for "not being candid." This firing came on the heels of his firing for self-interested behavior from Y Combinator.[23]

145.    After getting fired by a board guided by fiduciary duties for lying and for being unfit to carry on OpenAI's stated non-profit mission to ensure these systems would benefit humanity, Altman reinstated himself at the helm of OpenAI, Inc. through a combination of legal intimidation, heart emojis, investor manipulation, and financial blackmail; effectively fired the OpenAI board; installed a new puppet board of conflicted individuals or individuals that could be manipulated for a lack in understanding of the true significance of these events; and crowned himself co-chair of his own AI Ethics Council.[24]

146.    "Within hours, messages dismissed the board as illegitimate and decried Altman's firing as a coup by OpenAI, Inc. co-founder and chief scientist Sutskever, according to the people…On social media, in news reports, and on the anonymous app Blind, which requires members to sign up with a work email address to post, people identified as current OpenAI employees also described facing intense peer pressure to sign the mass-resignation letter."[25] Indeed a mass resignation letter was generated, and due to the pressures exerted, several hundred OpenAI employees signed it.

147.    This happened only months after Altman said it was important that the board could fire him with the power of AGI that OpenAI is building, and that it belongs to the world and not to any individual. "No one person should be trusted here. I don't have super voting shares. The board can fire me. I think that's important. [We] think this technology, the benefits, the access to it, the

[23] Meghan Bobrowsky, Deepa Seetharaman, *The OpenAI Board Member Who Clashed With Sam Altman Shares Her Side*, Wall St. J. (Dec. 7, 2023) https://www.wsj.com/tech/ai/helen-toner-openai-board-2e4031ef
[24] Mirtha Donastorg, *OpenAI launches ethics initiative. Atlanta leaders tapped to help* (Dec 11, 2023) https://www.ajc.com/news/business/atlanta-leaders-tapped-for-new-ethics-initiative-launched-by-openai/7MGJFO5L2ZGYPEY3WDDBGK24FE/
[25] Nitasha Tiku, *OpenAI leaders warned of abusive behavior before Sam Altman's ouster*, Wash. Post (Dec. 8, 2023) https://www.washingtonpost.com/technology/2023/12/08/open-ai-sam-altman-complaints/

governance of it, belongs to humanity as a whole. If this really works, it's quite a powerful technology and you should not trust one company and certainly not one person."[26]

148.    But when the board acted on the fiduciary duty to humanity and fired Altman on the eve of a breakthrough towards an AGI system that could pose a danger to humanity, they were attacked on social media by Altman and his allies as "bad board members." It is clear that Altman does not operate out of altruistic motives for humanity. "I think we just move on to good governance and good board members and we'll do this independent review, which I'm super excited about… I just want everybody to move on here and be happy. And we'll get back to work on the mission."[27] At the moment the board fired Altman, he threatened to gut OpenAI's team and reconstitute it under Microsoft—Microsoft's stock saw an uptick of 4% in pre-market trading after news that Altman and Brockman would join them—demonstrating that it is not humanity to which he has allegiance, but to his control of AGI systems.[28]

### 4.    Whatever It Takes: Eliminating Dissent

149.    After reinstatement through legal intimidation of a 30-year-old scientist responsible for upholding humanity's interest, Altman also fired two AI safety researchers who leaked or were close to those who leaked to the board the warning of an internal breakthrough that could serve as a threat to humanity before the board fired him.[29] Others quit, "due to losing confidence that it would behave responsibly around the time of AGI."[30] Sutskever, the Chief Scientist and co-founder who fired Altman, responsible for ensuring the safety of the system, is rumored to have

---

[26] Mark Sullivan, *Sam Altman: You should not trust Sam Altman* (June 6, 2023) https://www.fastcompany.com/90913845/sam-altman-you-should-not-trust-sam-altman.
[27] Charles Duhigg, *The inside story of Microsoft's partnership with OpenAI*, New Yorker (Dec. 1, 2023), available at https://www.newyorker.com/magazine/2023/12/11/the-inside-story-of-microsofts-partnership-with-openai.
[28] Liam Wright (Nov. 20, 2023) https://cryptoslate.com/agi-is-excluded-from-ip-licenses-with-microsoft-should-it-be-attained-at-openai/.
[29] Erin Woo *et al.*, *OpenAI Researchers, Including Ally of Stuskever, Fired for Alleged Leaking*, The Information (Apr. 11, 2024), https://www.theinformation.com/articles/openai-researchers-including-ally-of-sutskever-fired-for-alleged-leaking.
[30] Daniel Kokotajlo. Lesswrong, https://www.lesswrong.com/users/daniel-kokotajlo.

gotten metaphorically crucified, with a meme circulating depicting his crucifixion and except a cryptic message about "beatings" that "will continue" was not heard of since. This sent a chilling message: Dissent to Altman will not be tolerated. OpenAI, Inc. is Altman's to control.

### 5. OpenAI Willfully Infringes Ravine's Trademark Even As It Fails to Obtain Protection at USPTO

150. The name OpenAI was a fundamental part of Counterclaimant Defendants' deceptive plan. They stole this from The Ravine Parties, who have continuously used the Open AI Mark in interstate commerce since at least March 2015.

151. In 2012, Ravine had developed a website called Wikineering, which acted as the technical foundation for the various collaboration tools to be used in connection with Ravine's Open AI project. Wikineering offered user-created online articles about research topics and findings related to engineering, including topics relating to artificial intelligence. Similar to the online encyclopedia Wikipedia, users could use Wikineering to collaborate on the development of these articles, making contributions based on their own research and expertise. In or around March 2015, Ravine re-branded the portion of the Wikineering project focused on artificial intelligence as "Open AI."

152. On or around March 26, 2015, Ravine purchased the domain, "open.ai" with the intent to launch future projects related to artificial intelligence on this website, all under the Open AI Mark.

153. On or around April 9, 2015, a sign-up page to join the Open AI project went live on the open.ai website. The website explained that Open AI was an "Open Industry Wide & Academia Wide Deep Learning Initiative" and included a fillable box for visitors to enter their email address "to be informed of developments or join the initiative."

154. Throughout 2015, Ravine met with leading executives in the artificial intelligence field to advocate for funding and other support for the Open AI project.

155. On or around October 15, 2015, The Ravine Parties created a digital brochure explaining The Ravine Parties' Open AI concept, which was available for anyone to share and access online. The brochure explained that Open AI "[p]rovides a platform and cloud for

experimentation with new models" and "materials for every step from high school to PhD in AI," "collectively refined by the community."

156.    As of December 5, 2015, The Ravine Parties' Open AI project had drawn nearly 1,000 users, representing a significant portion of the community of artificial intelligence researchers at the time.

157.    On December 11, 2015, a blog post entitled "Introducing OpenAI" appeared on Counterclaim-Defendant OpenAI, Inc.'s website, introducing Counterclaim-Defendants' OpenAI concept. Counterclaim-Defendants' project name was identical to The Ravine Parties', except for the lack of a space between "Open" and "AI"—the "OpenAI" mark (the "Infringing Mark").

158.    Concerned that Counterclaim-Defendants' use of the Infringing Mark would affect his rights in the Open AI Mark, Ravine filed an application to register the Open AI Mark with the USPTO that same day, on December 11, 2015. By this time, Ravine had been using the mark continuously in interstate commerce for nearly nine months.

159.    At the same time, Ravine emailed Counterclaim-Defendants Altman and Brockman, explaining that he was pursuing a similar non-profit approach to artificial intelligence research and inquiring about the possibility of working together. Brockman agreed to meet with Ravine the following day, on December 16, 2015.

160.    At the December 16, 2015, meeting, Ravine described his Open AI project and the various initiatives he had undertaken under the Open AI Mark. Ravine suggested that the parties collaborate on the development of artificial intelligence. Brockman rejected the proposal and, instead, offered to purchase the open.ai domain on the condition that Ravine rebrand his Open AI project. Ravine declined, and the meeting concluded.

161.    As a result of this meaning, Counterclaim-Defendants were aware of Ravine's interests in the Open AI Mark as of December 16, 2015, and nevertheless continued to offer its goods and services under the Infringing Mark.

162.    As set forth above, the Ravine Parties continued to pursue its Open AI project under the Open AI Mark continuously from 2016 onwards.

163.    On August 1, 2017, the Open AI Mark was published in the USPTO's Supplemental Register, Reg. No. 5,258,002. A true and correct copy of the Open AI Mark Registration Certificate is attached hereto as Exhibit 2.

164.    Counterclaim-Defendants did not oppose the application or registration of the Open AI Mark.

165.    On February 19, 2022, after the filing of OpenAI's first application with the USPTO, Altman emailed Ravine to "follow up on past conversations" among the parties regarding Ravine's Open AI project. Altman stated that his company was "working on building out our own domain portfolio" and asked whether Ravine would be "open to us acquiring the open.ai domain and related IP rights from you," confirming the Counterclaim-Defendants' awareness of the Ravine Parties' rights in the Open AI Mark.

166.    On June 30, 2023, Ravine assigned the entirety of his interests in the Open AI Mark to Open Artificial Intelligence Inc. A true and correct copy of the Trademark Registration Assignment is attached as Exhibit 3.

### 6.    OpenAI, Inc.'s Applications and Failure to Register the Infringing Mark

167.    Counterclaim-Defendant OpenAI, Inc. did not file an application with the USPTO to register the infringing "OpenAI" word mark until 2022. Ser. No. 97/238,896 (filed Jan. 26, 2022); Ser. No. 97/238,902 (filed Jan. 26, 2022); and Ser. No. 98/010,861 (filed May 24, 2023).

168.    The USPTO issued Non-Final Office Actions rejecting OpenAI's claim of acquired distinctiveness on January 3, 2023. Since then, on February 23 and April 12, 2023, the USPTO again determined that OpenAI, Inc.'s Infringing Mark and logo were unregistrable for being "highly descriptive" despite OpenAI, Inc. having submitted hundreds of pages of evidence in support of its claim.

169.    As described in detail in the preceding paragraphs, it became clear only in 2023 that, despite repeated assurances, Counterclaim-Defendant OpenAI, Inc. did not intend to honor its commitment to develop the technology in an open manner beneficial to all of humanity and,

instead, and contrary to countless public statements and statement made in their corporate formation documents, Counterclaim-Defendants would focus on profits.

170.    Counterclaim-Defendant OpenAI, Inc.'s application to register the "OpenAI" is thus impermissibly misdescriptive, as the name suggests an artificial intelligence research effort that is open and beneficial to all, when it is, in fact, a secretive endeavor focused on profit.

**7.    The Mysterious Deletion of Evidence Contained on Servers**

171.    In August 2023, in a brazen attempt to rewrite history, OpenAI, Inc. sued Ravine, seeking to paint Ravine as a fraud and a troll, in a bid to force a transfer of Ravine's original Open AI Mark, which OpenAI, Inc. had, in fact, misappropriated. During discovery, Ravine realized that the loss of server data years earlier under mysterious circumstances would be used against him.

172.    A connection between OpenAI's leadership and Ravine can be traced back to 2003 when Adam D'Angelo, now an OpenAI board member, joined Ravine's social network startup at MIT. Ravine's startup comprised around seven MIT undergraduates and several Boston area engineers. D'Angelo, fresh out of his first year at Caltech, was the sole member from Caltech to join Ravine's MIT-based social network team.

173.    Upon joining the startup, D'Angelo signed an NDA and was granted root access to Ravine's "iNeed" server. In 2003, Ravine developed an algorithm that enabled rapid computation of social graphs, an innovation that eliminated the barrier to quickly scaling social networks. D'Angelo's responsibility was to deploy and verify the code. In January 2004, Ravine's team sent the social network scaling code to D'Angelo, but D'Angelo vanished without a trace, taking with him root access credentials to the iNeed server that provided him admin control, as well as access to other materials on the server.

Wednesday, January 7, 2004 at 1:48 PM

To:                                    +1 more ⌄

I've done some work on the algorithms and database
structures already.
I'm not sure if you've seen this yet, I'm gonna just copy
the email
that I sent to Adam D'Angelo asking for his
input. Unless you think
there's a better way this is what I'm goign to use. I'm
going to work
on the general page prototyping tonight and try to get
a working
version of it all put together as soon as possible.

### Re: [iNeed-dev] Update to working

Wednesday, January 7, 2004 at 1:48 PM

To:                                    +1 more ⌄

#1 degree apart
SELECT DISTINCT user2 user, user1 first_degree, 0
second_degree, 0
third_degree, 0 fourth_degree
FROM users_users
WHERE user2 = '$start' AND user2='$end'
UNION
SELECT DISTINCT user1 user, user2 first_degree, 0
second_degree, 0
third_degree, 0 fourth_degree

174.    Meanwhile, in February 2004, across the river at Harvard, Mark Zuckerberg was launching Facebook. D'Angelo resurfaced at Facebook in the summer of 2004, where he became CTO responsible for scaling.

175.    By early 2015, Ravine launched Open AI and open.ai on the iNeed servers to which D'Angelo had root access. In 2018, Ravine's iNeed servers hosted the original Open AI and Open AI collaboration tools from as early as 2014, the open.ai websites from 2015-2018, as well as Ravine's previous projects, including the 2003 social network. The original iNeed server was given access to newer iNeed servers and the access keys were replicated across servers.

176.    On information and belief, Ravine's Open AI and open.ai were a constant source of frustration for Brockman and Altman. Apart from serving as evidence of their murky origins, later in 2017, OpenAI had to abandon their attempt to register the OpenAI trademark due to Ravine's original Open AI. In fact, at this time, Counterclaim-Defendants were infringing on Ravine's trademark. Ravine also used the domain open.ai, similar to their OpenAI, Inc.'s openai.com, but more in line with AI companies' usage. Brockman had previously tried to acquire the open.ai

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

domain from Ravine and insisted that he change his Open AI's name; Ravine, of course, had refused.

177.    On April 24, 2018, D'Angelo joined the OpenAI board.



178.    Just nine days later, on May 3rd, Ravine's iNeed servers stopped responding.



179.    The co-location facility was contacted, and it was discovered that Ravine's two Open AI related iNeed servers had become irreparably inoperable due to disk and other fatal hardware errors. They contained some of the original Open AI collaboration tools.



180.    The third Open AI related server, iNeed-3, which was used to host Open AI at open.ai, also failed. Its password had changed, and its logs were flooded. To restart the server required erasing its flooded logs, thereby obliterating three years of evidence of Open AI and open.ai, as well as any malicious activity that may have caused the incident.

181.    Most bizarrely, the colocation facility indicated twice that the name of the fourth server, instead of "iNeed-1," had been changed to "Caltech." Later, in March 2024, with the aid of a forensic team, Ravine was able to pull the logs of the server from October 2017, months before the incident, which showed the server's name that the colocation facility referred to as "Caltech" was "iNeed-1" as of October 2017. The iNeed-3 server logs were also pulled from 2017 and indicated the existence of the original Open AI and open.ai, including 30,000 users. None of the servers were called "Caltech" as of October 2017.

Two of the servers appear to be fine, ineed3 rebooted with no errors and we did not look at caltech.

The other two servers had login prompts, ineed-3 and caltech, and did not appear to have additional errors.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM



182.    At the time in 2018, Ravine did not grasp the significance of the incident or pay attention to the details because his newer projects had already migrated to Google Cloud. Although frustrated by the loss of significant work and history, the issue was not fully investigated, and the servers were temporarily forgotten.

183.    On August 4, 2023, OpenAI, Inc. filed a lawsuit against Ravine in an attempt to portray him as a troll to gain ownership of the Open AI Mark and open.ai domain, which they had tried to acquire from Ravine for eight years.

184.    During discovery for the lawsuit, it then dawned on Ravine that the logs of his original open.ai and OpenAI servers, which proved the existence of Ravine's original Open AI, had been destroyed in May 2018 during the incident in which the logs of the iNeed-3 server, which hosted open.ai, were flooded and had to be erased on reboot. It was then noticed that the iNeed-1 server name had been changed to Caltech.

185.    Interestingly, D'Angelo was the only person with Caltech ties who ever had access to the server. His username contained the word Caltech. There were about a dozen with access to the server, and none of them other than D'Angelo had anything to do with Caltech.

186.     On information and belief, a server would not change its name automatically from iNeed-1 to Caltech without intervention. Additionally, it would be far easier for anyone with current or past root access to change the name of the server. Even having root access to the servers for a limited time would allow a person to take command of any server at a later point by installing a backdoor process to allow re-entry at any point.

187.     Years later, in February 2024, these servers and disks were needed to show the existence of the original Open AI when OpenAI, Inc. filed a lawsuit against Ravine. Even though Counter-Defendants had known about Ravine for eight years and had attempted to purchase the rights to the Open AI Mark from him, OpenAI, Inc. argued in the lawsuit that Ravine had never actually built or used "Open AI" and was just a troll since Ravine lacked the server logs to immediately prove otherwise. Based on an incomplete record—in part due to the difficulty the Ravine Parties faced in gathering evidence, much of which had been lost on the servers—the Court entered a preliminary injunction against the Ravine Parties. The Ravine Parties have appealed the preliminary injunction.

188.     In March 2024, Ravine's forensic team was able to retrieve a backup log of the server from October 2017 that shows Open AI and open.ai existed and, in fact, had more than 15,000 users by July 18, 2017. The logs also show that the server's name in October 2017 was iNeed-1, and not Caltech as indicated by the colocation facility during the May 3, 2018 incident.

189.     The Preliminary Injunction provided OpenAI, Inc., which is really ClosedAI, at least a temporary monopoly over the name Open AI that they stole from a literally open AI company that has used it to pursue a truly open AI.

190.     Counterclaim-Defendants stand to command more than superpowers in the coming few years. These are also the people who, under the misleading guise of being "Open," have obtained access to the personal data of hundreds of millions of users. It is no surprise that they are currently being investigated by the FTC and EU and are facing lawsuits for data leaks and weak guards of user data privacy.

191.     Believing that Altman could not engage in those acts because he looks good, sounds genuine, says he is altruistic and hangs out with lawmakers conjures thoughts of Sam

Bankman-Fried and Elizabeth Holmes. These once Silicon Valley darlings are from the same cloth; they appear genuine, say they are altruistic and rub shoulders with lawmakers, but the well-manicured façade conceals a darker truth.

### 8. Abuse of Power: Altman Abuses Humanity's Property

192. Out of the 15 lawsuits in which OpenAI, Inc. is currently involved, 14 are from individuals, large groups, and companies suing OpenAI, Inc. for stealing their data or money. In an unprecedented display of abuse of power, OpenAI, Inc., the $100 billion "non-profit for humanity" backed by the world's deepest corporate pockets (Microsoft), has set its sole outgoing legal action on none other than a private individual, Ravine, the very originator of Open AI.

193. The absurdity of the situation is thrown into sharp relief when one considers that Ravine created Open AI for the benefit of humanity, only to have it hijacked and diverted from its intended purpose by Altman and Brockman. Now, in a twisted turn of events, they are wielding the very non-profit property of humanity that they usurped against the person who created the promise for them to steal.

194. In a stunning display of hypocrisy and abuse of power, OpenAI, Inc. is suing Ravine for the name "OpenAI," which they stole from him and which represents the exact opposite of who they are. The entire industry has called upon them to change their name to "ClosedAI," yet they persist in their deception, even as to sue the very man whom they stole the name from.

> **Quincy Lee** ✔      ···
> @QuincyEdmundLee
>
> The intellectual dishonesty of @OpenAI is encoded in its name
>
> It leads a massive lobbying campaign in DC aimed at blocking out competitors
>
> But it retains the name "OpenAI"....
>
> Its hard to imagine a more ironic outcome







195.    On Feb 19, 2022, Altman reached out to Ravine in another attempt to acquire the Open AI Mark and open.ai domain. When Ravine offered Altman the Open AI Mark and name and open.ai domain for a substantial donation to open academic AI research, Altman, instead of responding with a donation to the cause he claims to champion, decided to funnel millions of dollars to his lawyers. This act, a striking abuse of humanity's non-profit resources, was done in order to obtain a name that embodies the very dishonesty and deception that defines their organization, and to silence the originator of that name, a person because of whom Altman has the very ability to wield millions of dollars on a lawsuit, which he is now using against the very originator of what made him successful.

196.     This was the last direct interaction between Altman and Ravine:

On Feb 19, 2022, at 9:09 AM, Altman <sama@openai.com> wrote:

> Hi Guy,
>
> I'm following up on past conversations between you, me and Greg Brockman regarding your Open.AI academic collaboration initiative. It looks like open.ai currently redirects to our website. OpenAI is working on building out our own domain portfolio - would you be open to us acquiring the open.ai domain name and related IP rights from you?
> Thanks!
> Sam

On Sat, Feb 19, 2022, at 1:47 PM, Ravine <guyravine@gmail.com> wrote:

> Hi Sam,
>
> Elon Musk paid $11 million for the Tesla domain and trademark in 2017. As we both know, OpenAI holds the potential to become larger than Tesla, and in either event, will become one of the largest companies in the world in a relatively short period of time. So the ultimate value of the domain and the brand are substantial.
>
> The issue is that if you offered me a sum, I have no use for the money. As an individual, I'm already well off. In fact, I'm about to sell my company, video.io, which will make me even more money. So I'm not sure that giving money to someone who doesn't need it is a great use of resources for the world (assuming that your goal is to make the most good in the world).
>
> So here's something else you should think about that may align our values better.
>
> I'm selling my company so I could focus on funding academic AI research. The type of research I'm passionate about is also the type of research that OpenAI is interested in.
>
> Suppose that instead of giving a rich guy more money that he doesn't need, you donate the money to an academic collaboration that I am gearing to launch that funds academic research in transformers.
>
> In that case, OpenAI would benefit in several ways:
> 1. OpenAI would of course get the domain and IP.
> 2. Instead of giving the money away, it would be a donation to an organization that funds academic AI research which that would translate to good will with the academic AI community.



3. The organization would also take input from OpenAI as to which research makes most sense to fund. Since OpenAI benefits from new research discoveries in areas that OpenAI sees as important, doing this is something that effectively pays back to OpenAI.
4. The money would not be wasted, the transaction would result in good karma for the world, the academic community would view OpenAI more positively, and the donation would pay back for itself.

Guy

On Feb 27, 2022, at 8:11 PM, Altman <sama@openai.com> wrote:

Thanks for getting back, and sorry for the delay. Can you give me some more details about the academic collaboration and what you would be interested in from us?

Best,
Sam

On Thu, Mar 3, 2022, at 8:13 PM, Ravine <guyravine@gmail.com> wrote:

Hey Sam, sorry for the delay. Will get back to you after I get a moment to consider this. Been working to get my Russian team and their families out in time in an operation that turned into a James Bond plot that keeps getting more insane. Will be in touch soon.

**From:** Sam Altman <sama@openai.com>
**Subject: Re:**
**Date:** March 4, 2022 at 1:58:16 PM PST
**To:** Guy Ravine <guyravine@gmail.com>

So sorry to hear; great you are doing that...

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

197.    Altman never followed up. In fact, Ravine did not hear from OpenAI for well over year, until he got this message from their outside law firm:

**OpenAI, Inc. v. Open Artificial Intelligence, Inc., et al. - Notice of Lawsuit**

Aaron Perahia <aaronperahia@quinnemanuel.com>
to me, wheedy@vwlawfirm.com, Robert, Sam, Margret ⌄

Fri, Aug 11, 2023, 4:58 PM

Dear Mr. Ravine,

We are outside litigation counsel for OpenAI, Inc. Please be advised that OpenAI, Inc. has commenced a lawsuit against you and Open Artificial Intelligence, Inc. in the United States District Court for the Northern District of California, Civil Action No. 3:23-cv-3918-TSH.

Pursuant to Rule 4(d), attached please find a Notice of Lawsuit and Request to Waive Service, which includes a copy of the complaint. Please inform us promptly whether you intend to agree to waive service. If you agree to waive service, we have also attached a form for you to sign and return to us. If we do not hear back from you regarding whether you intend to waive service, we intend to take prompt action to effect service.

Sincerely,
Aaron Perahia

**Aaron Perahia | Associate | quinn emanuel urquhart & sullivan, llp**
865 S. Figueroa Street, 10th Floor | Los Angeles, California 90017
Direct: 213-443-3146 | Main: 213-443-3000 | Fax: 213-443-3100
Email: aaronperahia@quinnemanuel.com | Web: www.quinnemanuel.com

**Most Feared Law Firm in the World**
based on survey of top legal decision makers at over 300 organizations by leading independent research provider BTI Consulting Group for its Litigation Outlook 2020

198.    Rather than donate to academic research, Altman chose to use legal bills as a cudgel to drown and silence the originator of OpenAI, from whom they have stolen the entire basis for their multibillion-dollar company.



OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

199. It is crucial to understand that OpenAI, Inc. is and should be humanity's non-profit property, yet Altman wields it as a personal tool for his own personal vendettas. Just as he intimidated board members to resign so he could consolidate control over OpenAI, Inc., he now seeks to legally bully Ravine, the originator of Open AI, until he is silenced. These are the markings of a juvenile dictator, not of a person acting for the good of humanity.

200. The irony is striking. A non-profit claiming to serve humanity is suing the individual who created the very promise they claim to uphold. The very name "OpenAI" is a surface-level projection of Altman's matrix of deception, showcasing the moral bankruptcy of this very individual in command of humanity's property. He wields humanity's assets against the very creator of humanity's promise, suing for a name he stole and infringed upon from the beginning, which represents the organization's very deception and stolen origins.

201. Indeed, the name "OpenAI" represents exactly what this company is not. This trademark lawsuit is a microcosm of OpenAI's true nature – stolen promises, deceptive practices, and the dictatorial actions of an individual misusing humanity's property for personal gain. Their very origin is one of theft, and their deceptiveness is enshrined in the very name they bear. This legal action represents Altman's unlimited ambition for consolidation of power, and misuse of humanity's property. The ironies here are numerous:

| Irony/Absurdity | Description |
|---|---|
| Suing the originator | At Altman's behest, OpenAI, Inc. is suing Ravine, the very person who originated the concept of Open AI and the promise to humanity that they built their success upon. |
| Using humanity's property against its creator | OpenAI is using the resources and power gained by diverting humanity's property to target the individual who created the promise in the first place. |
| Suing for a name embodying the opposite | OpenAI is suing Ravine for the "Open AI" name, which represents the antithesis of what the company has become: closed, opaque, and self-interested. |
| Refusing to donate to academic AI research | Altman and Brockman could have acquired the "Open AI" trademark and domain for free by donating to academic open AI research true to the name, but instead chose to instead spend that money in litigation. |
| Attempting to rewrite history | The lawsuit paints Ravine as a fraud and a troll, attempting to erase his pivotal role in the creation of Open AI. |
| Shutting down open-source AI community | Shutting down Ravine's thriving open-source AI community, cutting off access to resources for millions of users. |

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

| Being the sole aggressor | Out of 15 lawsuits involving OpenAI, 14 are against the company for stealing data or money; their only outgoing lawsuit targets Ravine. |
| --- | --- |
| Preventing the use of "Open AI" for open AI | OpenAI is preventing Ravine from using the "Open AI" name to provide genuinely open AI models and tools, while they operate as a closed AI entity. |
| Lobbying to ban open AI initiatives | OpenAI is asking Congress to ban open AI initiatives while attempting to monopolize the "Open AI" name, ensuring they are the only ones who can use it. |
| The name represents their deception | OpenAI is known as ClosedAI and many industry leaders repeatedly ask them to change their name. |
| Suing an individual as a massive company | It is virtually unheard of for a company of OpenAI's size and resources to sue a private individual, especially one directly responsible for their success. |
| Betraying the principles of a non-profit | As a non-profit organization with a fiduciary duty to humanity, OpenAI, Inc.'s actions directly contradict the principles they claim to uphold. |
| Silencing dissent through legal intimidation | Altman and Brockman are using legal intimidation tactics to silence anyone who speaks out against them, just as they did with the OpenAI, Inc. board members who questioned their actions. |
| Attempting to acquire a deceptive name which they wouldn't even be able to register due to deceptiveness | OpenAI is using the legal system to secure ownership of a name that is fundamentally deceptive and misrepresents their true nature. |
| Ignoring calls for a name change | Despite numerous industry leaders calling for OpenAI to change its misleading name, the company continues to cling to it, highlighting their lack of integrity. |
| Diverting resources from AI development | The millions of dollars OpenAI is spending on legal battles could have been used to further the development of open and accessible AI for the benefit of all. |

## VI.    RAMIFICATIONS

202.    OpenAI publicly makes statements such as: "We commit to use any influence we obtain over AGI's deployment to ensure it is used for the benefit of all, and to avoid enabling uses of AI or AGI that harm humanity or unduly concentrate power."[31] This is difficult to square with what we see in the press every day: OpenAI is valued at over $90B and is widely seen as on a path to a valuation over $1T. Its tax-favored "non-profit" status persists despite annual profits in excess of $2B. Over a dozen major lawsuits are pending against OpenAI for uncompensated use of copyrighted works that were used to train the company's AI models that generate these eye-popping profits. The company still calls itself "open" even though it no longer publishes or open sources its research. When its CEO Altman was fired by the board for not being "consistently

---

[31] OpenAI, *OpenAI Charter* (Apr. 9, 2018), https://openai.com/charter

candid in his communications with the board," he threatened to transfer the entirety of the company's workforce and IP to a subsidiary of Microsoft, itself a $3T monopolist which already owns a 49% stake in OpenAI. The "inquiry" into Altman's firing was held by OpenAI's own law firm, WilmerHale, and details of their deliberations have not been publicly released. There are multiple news stories about self-dealing by Altman, as well as board member Brett Taylor, and recent reports indicate that Altman is trying to raise $7T from the United Arab Emirates to build chip fabrication plants.[32] Altman is fêted by government officials in the United States and worldwide, who hang on his every word as they decide how to regulate the industry he dominates. At what point does this become an "undue concentration of power"?

203.     This case is ultimately about whether the legal system is willing to hold OpenAI accountable for deception and worse, or whether OpenAI is going to get a free pass for being "too big to fail." It is not just Ravine who has a right to demand that OpenAI conduct itself honestly and transparently. All eight billion people on the Earth, to whom OpenAI is "irrevocably dedicated" in its Certificate of Incorporation, have a stake in this litigation. The importance of this lawsuit goes far beyond Guy Ravine and his company. The results of this case will profoundly affect consumers, researchers, investors, lawmakers, and indeed anyone who plans to inhabit the planet. Some of these broader considerations are outlined below.

### A.     An Abuse of Power

204.     OpenAI's modus operandi is abuse of power. Even as the company is defending itself from 14 different lawsuits based on its theft of others' data,[33] this $100 billion company with access to the wallet of a $3 trillion behemoth has chosen to focus its sole outgoing lawsuit on a private individual. Not just any private individual, but Guy Ravine, the very originator of OpenAI, without whom they likely would not exist today.

---

[32] Keach Hagey, *Sam Altman Seeks Trillions of Dolars to Reshape Business of Chips and AI*, Wall St. J. (Feb. 8, 2024), available at https://www.wsj.com/tech/ai/sam-altman-seeks-trillions-of-dollars-to-reshape-business-of-chips-and-ai-89ab3db0.

[33] Jonathan Gillham, *OpenAI and ChatGPT Lawsuit List* (Dec. 28, 2023), https://originality.ai/blog/openai-chatgpt-lawsuit-list; Joe Panettieri, *Generative AI Lawsuits Timeline: Legal Cases vs. OpenAI, Microsoft, Anthropic, Nvidia and More* (Apr. 8, 2024), https://sustainabletechpartner.com/topics/ai/generative-ai-lawsuit-timeline/.

205.    The absurdity of the situation is thrown into sharp relief when one considers that Ravine created Open AI for the benefit of humanity, only to have it stolen and diverted from humanity by Sam Altman. Altman is now wielding the very property of humanity that he diverted from humanity against the very person who created it for him to steal. This is a stunning betrayal of the principles upon which OpenAI was founded and a clear demonstration of the lengths to which its leadership will go to silence anyone who challenges their authority.

206.    And yet, the absurdity runs deeper. The suit is a battle over ownership of the name "Open AI." This is not merely any name. Not only did Ravine use the name first, and not only do the Ravine Parties still hold a valid trademark registration for Open AI, but the name itself embodies openness, the antithesis of what OpenAI has become. The company that is closed, opaque, and driven by self-interest is demanding the right to call itself "open" at the expense of the originator of the Open AI concept, who was actually using the mark to create and promote AI that is open.

### B.    Humanity Needs to Answer the Most Important Question in Human History

207.    In the last century, on the heels of the Industrial Revolution, the most important question that defined humanity was whether humanity would be governed by itself in a democracy, or by select individuals in totalitarianism. World Wars have fought over this question and over a hundred million people have died to defend these principles. The result of these deaths is that today, much of the world lives in democracy, and much of humanity is in control of its own destiny.

208.    But today, the threat to the power of the people is facing something beyond dictators or countries. It is a power that will soon surpass humanity itself: Artificial General Intelligence (AGI). Today, on the threshold of the Artificial General Intelligence Revolution, the most important question that will define humanity will fundamentally repeat once again: who will control the vast power of AGI? Will it be humanity, or a small group of individuals who will accumulate in their hands the levers to more power than the entirety of humanity itself?

209.    What we are witnessing today is a repeat of what occurred in prior centuries. The Industrial Revolution provided the tools for dictators to control millions of people by mobilizing

them through persuasion with the technology of the radio and motorized vehicles. The emergence of these tools allowed a class of dictators to arise and exploit vast populations of human labor. Through technology, humanity was tricked or forced to do these dictators' bidding, and reality was reshaped in accordance to the wishes of the powerful few.

210.     Today, AGI is about to usher in a far greater revolution. AGI will provide those in control with a power equivalent to a vast human population, except that this labor will be a thousand times faster in speed and a thousand times cheaper in cost than the labor of the Industrial Revolution, and it will be able to improve and replicate its capabilities by itself. This labor will be equivalent to not millions but billions of human-like workers that become more intelligent and capable by the day. Control of large data centers with millions of servers running AGI systems will allow those in control to consolidate in their hands not only the means of production of the economy but also to overwhelm and control the political process; the very destiny of humanity. It will be like controlling a new form of life that is orders of magnitude superior to humanity, that will keep improving over humanity exponentially.

211.     We are about to lose what many millions have died for by giving control to a few individuals who have worked behind the scenes to accumulate in their hands at the expense of humanity a power that will surpass nations and superpowers -- AGI. We are within single-digit years to the point when those in command of the leading AGI super system will hold more power in their hands than humanity combined. This power is currently accumulating away from public view on encrypted servers as these systems learn humanity's works in an effort to beat humanity on any job to attain superhuman capabilities over humanity.

212.     The story of the theft of Open AI from Guy Ravine is nothing less than the story of the theft of humanity's emerging means of production – AGI – from its proper provenance to the personal command of a single individual, one who has used the very promise that these systems are owned by humanity to gain personal control over the very systems that will displace humanity.

213.     Ravine created an insurance policy for humanity in late 2014 to assure that humanity as a whole controls and owns the great emerging power of AGI, rather than a small group of individuals. This promise was stolen, diverted, bastardized, and systematically

dismantled, ultimately for the benefit of a single individual, Sam Altman, and those who are in his favor. When Greg Brockman and Sam Altman stole Open AI from Ravine, they saw within the promise to provide this power to humanity an opportunity to gain command of this very power.

214. Noted AI leader Tom Gruber, the co-founder Apple's Siri emphasizes the seriousness of the present situation:

> It is a travesty that by hijacking Guy's Open AI initiative and hurriedly making a major announcement, Altman and Brockman were able to attract top AI researchers and abundant donations, which allowed them to become a major player in AI. The fact that Altman and Brockman's OpenAI later switched from a non-profit, open AI organization for the benefit of humanity to a closed AI, for-profit, under the influence of the founders is a betrayal of the original mission.
>
> If OpenAI achieves its mission of developing Artificial General Intelligence, that power would now be concentrated in the hands of a few individuals with apparently no independent oversight rather than shared widely with humanity. It is tragic that the hijacking of Open AI from Guy Ravine may have historic consequences. Whoever gets AGI first will have a tool that could be used to exert enormous power over economic and political systems. This power should rest in a democratically governed society rather than a few people who report to no one. The ideological tool of an "open AI" non-profit effort "for the benefit of humanity" that they stole and hijacked from Guy Ravine who spent three years thinking about how to ensure the future of humanity is under its own power was a recipe for an AGI effort. This recipe would allow them to acquire the research talent and zero-dilution funding to consolidate in their hands totalitarian personal control over an effort to build and command the very AGI that will overpower humanity. They used the facade that they are operating for humanity.

215. For Altman and Brockman, OpenAI was never really about humanity to begin with. The very promise to humanity was stolen from someone else because it was a recipe to acquire research talent from Google and tax-incentivized funding from unsuspecting philanthropists.

216. When the board fired Altman and then Brockman quit, their deception and motives became obvious to anyone paying attention. If they were really acting for humanity, would they have, upon Altman's dismissal, rushed to offer OpenAI's entire workforce to build AGI as a subsidiary of Microsoft, a $3T for-profit monopolist company? Clearly, Altman and Brockman are motivated solely by a lust for control of AGI. This episode, the events in this complaint, and

countless other actions indicate that humanity is not in their heart or driving their goals; they seek personal control of AGI. At any cost.

217. Further evidence of dictatorial intent: Altman was literally fired by his own board for not being truthful enough to uphold OpenAI's charter-driven promise to humanity, yet he came back by using legal intimidation, financial blackmail, threats to individuals, and, in a sign of our times, many, many social media posts with heart emojis. He forced the board members who fired him to resign and installed his own board of loyalists. Having survived this putsch, Altman and Brockman redoubled their efforts to dismantle the systems intended to ensure that AGI will be the property of humanity. Altman created a so-called AI Ethics Council, and he crowned himself co-chair. The two were able to appropriate technology that was expressly created to be owned and operated for the benefit of humanity to their own personal property.

218. Unlike dictators of the past who would mobilize armies to do their bidding on the vision that they would be working for the good of the people, Altman and Brockman used the promise to humanity to mobilize an army of research talent and multi-billion dollar donations. But as with all dictators, once their power was entrenched, they systematically dismantled the promise behind the scenes, eliminated dissenters, and consolidated power, while maintaining the façade that they are operating for humanity. Just as Elon Musk noted that Altman and Brockman used him for his money, so too researchers who joined OpenAI to benefit humanity were used – and are being used – to create power and value for Altman and Brockman. When these scientists build an AGI that can do their own jobs, OpenAI will no longer need them; they will be replaced the way Uber drivers are being replaced by self-driving vehicles. OpenAI's researchers may have believed that they were working for the people, but in effect they have been working to increase the power of a few individuals.



219.    This amounted to the greatest labor arbitrage scheme in human history, acquiring people to build systems that will displace all of humans and concentrate this power in the hands of a few individuals, on the promise—the cynical promise—that their work will be given to humanity. They promised to give it to humanity while displacing the very people who were building the tools that will displace them.



**Sam Altman** ✔
@sama

sure 10x engineers are cool but damn those 10,000x engineer/researchers…

12:24 PM · Sep 22, 2023 · **1.1M** Views

220.    Surely it is a serious crime against humanity to steal the means of production from humanity under the façade and promise that you are doing it for humanity. There is no more cynical of a crime than this theft. The theft of humanity's means of production from itself, the theft of humanity's power from itself, on the promise that that this power will belong to humanity. And, after hijacking the promise to humanity, using the newfound power on the back of the promise to attempt to bury the very person who created the very promise.

221.    Sam Altman is racing to answer the most important question in human history: "Who will be in control of AGI?" He began writing his name as the answer, hoping that humanity could not pay attention fast enough.

222.    Altman's dismissal and resurrection happened only months after he himself said, "The board can fire me, I think that's important."[34] But when the board acted on the fiduciary duty for humanity and fired him on the eve of a breakthrough towards an AGI system that could pose a danger to humanity, they were pilloried in social media by Altman's allies as "bad board members."

---

[34] https://www.bloomberg.com/news/videos/2023-06-22/openai-ceo-sam-altman-on-the-future-of-ai

223.     Altman is now rushing to construct a $100 billion super-system of data centers that will run millions of super-intelligent AIs under his control. These systems, when working in concert, will be able to think far faster, far cheaper, and far better than potentially all of humanity combined, as it will set out to improve itself at superhuman speeds. As these superintelligences cooperate, the control of this system will provide Altman controls it with more power perhaps the entirety of human workforce, or within an order of magnitude thereof, with the ability to coordinate their actions to displace humanity, disempower and overpower humanity, or silence dissent in ways we could not even imagine. There are numerous advantages to such a system if it is set to cooperate over biological groups of humans that it would not take that many servers of superhuman agents cooperating together to overwhelm the economy or surpass the power of governments.

224.     And if that is not enough, Altman is in talks to raise a rumored $7 trillion for a system of data centers and fabrication factories under his personal control, external to OpenAI, that will then license OpenAI's technology to run on his own personal systems, just in case he gets fired again. This would serve as an insurance policy for himself. He also fired the AI safety researchers who leaked or were close to those who leaked to the board the warning of an internal breakthrough that could serve as a threat to humanity before the board fired him. Ilya Sutskever, the Chief Scientist and co-founder who voted with the board to fire Altman, responsible for ensuring the safety of the system, is rumored to have been metaphorically crucified; except for a cryptic message that "the beatings will continue until morale improves,"[35] he has not been heard from since. This sent out a strong message: dissent to Altman will be eliminated. OpenAI is Altman's property.

C.     "A system a billion times more powerful than any human"

225.     Altman is exploiting information asymmetry: the lack of public understanding of the speed of the transformation of these systems behind the scenes and the true power that they are about to wield for those who control them. Because humanity has not caught up, he gets away

---

[35] https://au.news.yahoo.com/openai-cofounder-pushed-sam-altman-220141667.html

with misleading Congress that he only cares about humanity; he testified "I have no equity in OpenAI… I'm doing it because I love it" to imply that he is so eager to be CEO of OpenAI out of his altruistic motive for humanity that he does not need to receive anything in return.

226. Altman realized from the very beginning that controlling OpenAI as it constructs AGI is much more valuable than any equity or money. Controlling this system is equivalent to controlling millions of super-fast superhuman workers that keep improving, a system in his own words "a billion times more powerful than any human." He said in 2019 that with such systems OpenAI could "maybe capture the light cone of all future value in the universe,"[36] quickly adding, "… and that's for sure not okay for one group of investors to have." He apparently changed his mind about this last part, because he went on to consolidate these systems under his own command when he was in a position to do so.

### D. Altman Has Hijacked Humanity's Property

227. By its charter, OpenAI is humanity's de facto property. There are no shareholders. Humanity is the only beneficiary on the non-profit's charter that owns the for-profit. The system has a fiduciary duty to humanity. OpenAI is therefore your asset—your property—dear reader, as it is all of humanity's. It is likely the most valuable asset you will ever own, one with the capacity to replace you. Because OpenAI is building an electronic replacement to humans far more capable and orders of magnitude faster and cheaper than humans, with their construction of millions of servers, this property will soon outgrow to have more labor capacity than humanity itself. It will be able to produce staggering value, perhaps many times more than the economy as the system grows. Some have estimated this value as big as in the quadrillion dollars range, as these systems surpass human labor. Your personal stake in the system could be imagined as equivalent to all the work you will ever perform, because this system will be trained on your work and the work of millions of others—all of humanity—on an explicit charter to displace you and everyone else.

---

[36] Connie Loizos, *Sam Altman's leap of faith*, TechCrunch (May 18, 2019) https://techcrunch.com/2019/05/18/sam-altmans-leap-of-faith/. In 2019 the then-underdog Altman followed this prediction by saying, His opinion seems to have changed with his increased station.

Creating a system that outperforms humans in economically viable tasks is the organization's very charter, and it is close to achieving this very system.

228.    The system is training on humanity to displace humanity, while potentially putting humanity in existential risk to get there, on the charter that it is humanity's property—but in practice, it is the de facto property of a single individual. Your property, potentially your most valuable property—your future labor, has been hijacked by one person who says that it is your property. The OpenAI system—humanity's property—in practice answers to no one—no real board, no shareholders—it has been hijacked by a single person.

229.    At this moment in time, humanity has its answer: Unless humanity gets its grip together and takes control of its own property, Sam Altman will remain in control of humanity's future and its means of production - millions of data centers running millions of superhuman AI's with ever growing capability to overpower humanity in every dimension.

230.    As Brockman himself said, "it's not science fiction anymore."

231.    We need to act because the initial conditions for what the future of humanity will look like or if it even has a future is being laid as at this very moment in time. This is the most critical and pressing matter humanity has ever dealt with, a system that will overpower humanity, and the fact that it is happening in a span of months not years should make us all drop everything we do and focus on this very matter. If these systems are in control of humanity they could create a utopia, an abundance like no other, where humanity controls its destiny. If these systems are in control of the select few, then they will create whatever is in the image of the person who controls them. If these systems control themselves or the system dynamics spiral into unpredictability, then there is no telling what will happen.

232.    Humanity needs to decide what it wants its future to look like. Nothing else matters. Everything else pales in comparison to what is coming in the next few years, and it is going to render your job and everything you know obsolete, vastly faster than you can appreciate. If there is still such a thing. Progress that used to take a decade will take months. The most important question in human history is who will control these vast powers?

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

233.     Cynically, they acquired this power on the very promise to humanity, the promise that they hijacked, because the promise itself was also the recipe by which they could acquire this great power in their very hands and the best talent and funding to build AGI, to gain personal power over an AGI effort that could compete with Google.

234.     They were fired, after which they came back and fired the board, showcasing that their dismantling of the mechanisms in place to ensure that it is humanity's property and insurance policy, was successful.

235.      Altman and Brockman at the outset—returned to fire the board and regain control of the system that can overpower humanity, thereby consolidating in their hands control of the power that is about to subjugate humanity.

236.     The story of OpenAI is the story of the continuous diversion of humanity's future means of production from its own provenance to the provenance of a few individuals.

237.     It is important to understand three things:

238.     First, the significance of these events that are now occurring in the field of Artificial Intelligence and their impact for the rest of human history. With the determination of who will be in control of these systems—humanity or a few individuals—Humanity is currently putting in place the initial conditions for what the rest of human history will look like.

239.     Second, OpenAI is humanity's own de facto property—it is your property, dear reader. The fiduciary duty of the organization is to humanity as a whole, and not to Sam Altman or Greg Brockman or any individual. The duo each has a stake as equal in OpenAI as you, dear reader, have yourself, as part of 8 billion other people. This property is the most valuable property that you will ever own. It stands to become the new means of production that will take over your means of production—your work, your job. Its charter is to displace humanity—to displace you, on the back of the work that you created as the system is trained on your work and the work of humanity to displace humanity. This is the explicit chapter of OpenAI.

240.     It is therefore paramount that the property of OpenAI is in your control and your ownership, and is not diverted to any other individuals, because that would amount to theft of humanity's means of production from its own provenance.



241.     Three, Altman and Brockman hijacked OpenAI and its charter to serve humanity from Ravine not for idealistic motives but as a ploy to gather research talent and funding that they would be operating for humanity. Once they had the ingredients they needed, they systematically began to dismantle the very mechanisms put in place to ensure that this property belongs to humanity. OpenAI turned from open to closed, from a non-profit to a for-profit, and from an organization under the control of humanity, to an organization under the de facto totalitarian control of a single individual. Sam Altman, who was fired by the board for not upholding the promise to humanity, and who later returned to intimidate, manipulate and blackmail the board to reinstate himself. This happened only months after Altman himself said that the world should not trust him with this great power and that it is important that the board could fire him.

242.     The world should not trust Sam Altman with this great power, as he said himself before it was convenient for him to forget what he said.

243.     The most critical thing that humanity needs to recognize is that because of the rapid pace of evolution in AI these systems are going to overpower humanity in the next 2 years, each server out of millions surpassing the intelligence of every human, while operating at a speed 100 to 1000 times faster and cheaper. It is crucial that humanity takes control of its own property: OpenAI, which is at the lead of the AI race and is constructing systems about to overpower humanity, before this power has inflated behind the scenes so far that it can never be taken back.

244.     This power grows in the dark, as the systems improve themselves on encrypted servers, learning all of humanity's collective works, with the explicit goal to surpass and displace humanity. The goal of overpowering and displacing humanity is on the very charter of OpenAI. It is therefore the most critical thing that humanity can do at this very moment in time—take possession of its legally-binding property OpenAI, because this power is further diverted to the totalitarian control of a single individual.

245.     Altman says that he is operating for the people. But his actions show that he is operating for himself, and like dictators of past—is maintaining the facade and the genuine-looking dark authenticity face that humanity can trust him while he is constructing the systems

that will overpower and take over the means of production from humanity in a blink of an eye, because he you can trust him to give this power back to the people.

246.    This is a person who was fired twice in the space of 4 years for being untrustworthy and for doing "what's in it for me". It is a person who, merely the day after he when fired, was instantly willing to gut OpenAI's team and reconstitute the construction of this system that will displace humanity within a monopolist for-profit, Microsoft.

247.    Make no mistake, this person operates this system for himself, not for humanity.

248.    It is a person who hijacked the promise to humanity at its very origin, bastardized and used it to acquire personal command over these systems by using the promise to recruit research talent and donors. Once he had those, he systematically dismantled the mechanisms to ensure this power remains in the hands of humanity, consolidating control under his own command. His consolidation of control was tested with the board firing, which illustrates that he is indeed the de facto singular owner of humanity's property—its future means of production—on a charter that he hijacked that this system serves humanity.

06-22-2023 | TECH

# Sam Altman: You should not trust Sam Altman

The OpenAI CEO says large AI models are so powerful that control of them must be democratized to all people in the near future. (Good luck with that.)

249.    Because the pace of evolution of AI today is happening on the scale of months, not years, it is about to reach the point of overpowering humanity within the next 1-2 years. At that point, as the system is set out to improve itself, it may be impossible to take back this power. It is crucial that humanity takes back control of Open AI—its legally binding property—before it is further bastardized to be completely subjugated.

250.    This is not a warning by anyone, but by the very originator of the promise to humanity —Ravine, who originated Open AI before it was hijacked by Altman and Brockman.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

Ravine created Open AI specifically to ensure that this power will be the property of humanity and it was a recipe for the creation of an AI effort that could compete with Google. This ideology appealed to the best researchers and to Musk as a donor. Altman and Brockman hijacked the ideology and used it to gain personal command over this power. They therefore used the promise to humanity that was created to prevent this very concentration of power, against itself—creating what Ravine created it to prevent.

251. Open AI is humanity's property and it was hijacked. Who will control the future of humanity? Humanity itself or a few individuals?

252. Altman himself has suggested he, nor any one person, should be trusted:[37]

> **ON WHETHER THE WORLD SHOULD TRUST SAM ALTMAN:**
>
> "You shouldn't. No one person should be trusted here. I don't have super voting shares. The board can fire me. I think that's important. [We] think this technology, the benefits, the access to it, the governance of it, belongs to humanity as a whole. If this really works, it's quite a powerful technology and you should not trust one company and certainly not one person."

### E. AI Safety's Blindspot

253. The field of AI safety rightly focuses on preventing the development of misaligned artificial intelligence. The archetype of a dangerous or misaligned AI agent possesses the following characteristics: (1) Power-seeking; (2) Deceptive; (3) Persuasive; (4) Malicious; (5) Determined in pursuing objectives; (6) Misaligned with human values;  (7) Difficult to interpret or control.

254. Shockingly, these same dangerous traits perfectly describe Sam Altman, the CEO of OpenAI, as demonstrated in the table below.

| Characteristic | Danger in AI Agent | Altman's Amplified Danger |
|---|---|---|

---

[37] Mark Sullivan, *Sam Altman: You should not trust Sam Altman*, Fast Company (June 22, 2023), https://www.fastcompany.com/90913845/sam-altman-you-should-not-trust-sam-altman.



| Power-seeking | Prioritizes control over humanity's well-being | Defied board to regain power at OpenAI; described as "exceptionally good at getting powerful" by former mentor Paul Graham; orchestrated removal from Y Combinator in 2018 due to concerning behavior. As a human, Altman can navigate complex social and political landscapes to amass power in ways an AI cannot. |
|---|---|---|
| Deceptive | Hides risks and hinders safe AI development | Contradicts public statements with actions; called a "pathological liar" by Elon Musk; board stated he "has not been candid"; promised Musk an open organization benefiting humanity, but delivered a closed one serving his interests. Altman's human ability to deceive through charm and persuasion makes him more dangerous than an AI, as he can manipulate people's trust and emotions. |
| Persuasive | Manipulates others to support misaligned agenda | Pressured board to reinstate him through social media, legal intimidation, and threats; appears genuine while scheming; wields incredible influence to shape public opinion, policy, and resource allocation. As a charismatic human, Altman can persuade people to support his misaligned agenda, exploiting human biases and vulnerabilities in ways an AI cannot. |
| Determined | Pursues objectives at any cost, even if harmful | Displays unwavering commitment to his goals, even when misaligned with humanity's interests; willing to take harmful or risky actions; views human opposition as an obstacle to overcome. Altman's human determination, coupled with his misaligned values, allows him to pursue his objectives relentlessly, adapting to challenges and leveraging his resources in ways an AI cannot. |
| Uninterpretable | Opaque decision-making hinders risk identification | Impossible to directly examine his mind, making intentions and decisions inscrutable; public persona may mask true motives; decision-making processes and motivations are opaque, making it challenging to identify risks. As a human, Altman's uninterpretability is more dangerous than an AI's, as we cannot analyze his mind like we could an AI's weights and neural activity. |
| Verified as a Risk | Credible warnings of danger are ignored | Own board fired him due to concerns his actions endangered humanity, demonstrating lack of confidence in his alignment; reputable figures and institutions have identified him as a risk. As a human, Altman can leverage his influence and resources to discredit or suppress warnings about his misalignment, making him more dangerous than an AI that could be more easily contained. |
| Misaligned | Prioritizes own objectives over humanity's well-being | Board firing revealed depth of misalignment with beneficial AI development; prioritizes personal power over safety; has goals and values not aligned with humanity's interests. As a human, Altman's misalignment is more dangerous than an AI's, as he can deceive others about his true intentions and adapt his strategies to avoid detection and maintain power. |

Case No. 4:23-cv-3918

| Access to Vast Resources | Can develop and deploy advanced AI at unprecedented scale | Constructing vast data center with millions of AGI instances, exponentially amplifying his power; can operate freely as a human; has funding, data, and computing power to create AI systems that are difficult to control or regulate. As a human with vast resources, Altman can leverage his wealth and connections to influence policies, institutions, and public opinion in ways an AI cannot, making his access to resources more dangerous. |
|---|---|---|

255.    However, there are two critical differences between a rogue AI agent and Sam Altman that make him an even greater threat. First, Altman is constructing and will have access to a vast data center with millions of AGI instances working together, exponentially amplifying his power. Second, as a human, Altman can operate freely in the world, and can manipulate systems and individuals in ways an AI could not. Moreover, his misalignment has been verified by his own board, who fired him due to the danger he poses to humanity.

256.    This presents a far more immediate and tangible threat that the AI safety community is neglecting in favor of improbable scenarios. While they debate hypotheticals, a misaligned human is already racing to concentrate power capable of dominating humanity. The true danger lies in the resources we are handing to Altman.

257.    The AI safety community's focus on "alignment" is crucial, but it begs the question: alignment with whom? Currently, the emphasis seems to be on aligning AI with its creator's goals - in this case, Sam Altman's. To protect humanity, we must confront the uncomfortable reality that if an AI demonstrating these hazardous traits would be blacklisted, the same standard should apply to a human.

258.    The AI safety community must recognize the critical threat posed by misaligned humans with concentrated, unchecked power over AI.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIM

# CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

## LANHAM ACT UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN OR SOURCE, AND FALSE ADVERTISING

## (15 U.S.C. § 1125(a))

### (Against All Counterclaim-Defendants)

259. The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

260. The Counterclaim-Defendants' actions as described and alleged above, including but not limited to the sale and/or offering for sale of infringing goods and services under a mark or name confusingly similar to the Ravine Parties' Open AI Mark, are intended to and are likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of the infringing goods and/or services and is intended and are likely to cause such parties to believe in error that the infringing goods and/or services have been authorized, sponsored, approved, endorsed, or licensed by the Ravine Parties, and as such constitute unfair competition, false designation of origin, false or misleading descriptions or representations of fact, false advertising, and/or unfair or deceptive trade practices, and in fact have already caused such confusion and/or mistake, in violation of Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A).

261. Further, the Counterclaim-Defendants' actions as described and alleged above, including but not limited to the sale and/or offering for sale of infringing goods and services under an impermissibly misdescriptive mark or name suggesting that its products and services are open to the public and their repeated public announcements in interstate commerce regarding its intentions as a non-profit artificial intelligence company, misrepresents the material nature, characteristics, and qualities of the products and services sold in interstate commerce under the Infringing Mark in commercial advertising and promotion, which had the capacity to deceive, and did in fact deceive, a substantial segment of the public, and as such constitutes unfair competition, false designation of origin, false or misleading descriptions or representations of fact, false

advertising, and/or unfair or deceptive trade practices, and in fact have already caused such confusion and/or mistake, in violation of Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(B).

262.     By reason of and as a direct and proximate cause of the Counterclaim-Defendants' unfair, misleading, deceptive and/or false misconduct, the Ravine Parties have been suffering, and will continue to suffer, substantial and irreparable injury, including to their reputation and credibility, resulting in lost opportunities, diminished goodwill, and harm to its ability to expand and to achieve their plans and goals for the development, use, and future of AI. Each of the Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct described herein, are jointly and severally liable for the injury to the Ravine Parties.

263.     As set forth herein, the Counterclaim-Defendants' conduct has been willful and in bad faith, in that they had actual knowledge of the Ravine Parties' Open AI Mark; the Ravine Parties' prior use of the Open AI Mark; and the registration of the Open AI Mark, making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

264.     The Ravine Parties have no adequate remedy at law because their Open AI Mark and name are unique and represent to the public Open AI's identity, reputation, credibility, and goodwill, such that monetary damages alone cannot fully compensate the Ravine Parties for the Counterclaim-Defendants' willful misconduct.

265.     Unless permanently enjoined by this Court, the Counterclaim-Defendants will continue to willfully and openly infringe upon the Open AI Mark and name, causing irreparable injury to the Ravine Parties. This present and future and real threat of injury to Open AI's business, identity, goodwill, credibility, and reputation requires the imposition of permanent and comprehensive injunctive relief to prevent Counterclaim-Defendants' continued unfair, deceptive, misleading, false advertising and business practices, and to address and to mitigate the Ravine Parties' injury.

266.     The Counterclaim-Defendants have financially gained and been unjustly enriched from this unlawful misconduct. They have made, and will continue to realize, substantial profits or gains to which they are not entitled under law or equity to retain. Consequently, in addition to the

grant of permanent injunctive relief, the Ravine Parties are entitled to an award of monetary damages pursuant to 15 U.S.C. § 1117(a), including, but not limited to, disgorgement of the Counterclaim-Defendants' profits, a reasonable royalty for the unauthorized and unlawful use of their Open AI Mark or name, loss of goodwill and value in the Open AI Mark and name, and costs of suit, in amounts to be determined at trial. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

## SECOND CAUSE OF ACTION
## LANHAM ACT TRADEMARK INFRINGEMENT
## (15 U.S.C. §§ 1114, 1125(a))
### (Against All Counterclaim-Defendants)

267.　The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

268.　The Open AI Mark is a valid and protectable trademark. Indeed, as of August 1, 2017, Ravine became the rightful owner of a registered trademark issued by the United States Patent and Trademark Office ("USPTO") on the PTO's Supplemental Register, Reg. No. 5,258,002. A true and correct copy of the registration certificate is attached as Exhibit 2. On June 30, 2023, Ravine assigned the entirety of his interests in the Open AI Mark to Open Artificial Intelligence Inc. A true and correct copy of the Trademark Registration Assignment is attached as Exhibit 3.

269.　As set forth herein, the Ravine Parties have continuously used the Open AI Mark in interstate commerce since at least March 25, 2015.

270.　Courts in the Ninth Circuit recognize "two theories of consumer confusion that support a claim of trademark infringement: forward confusion and reverse confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017). While "[f]orward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," in contrast, "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." Id.

(quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005)). "The concern with reverse confusion is not a question of palming off, since neither junior nor senior user wishes to siphon off the other's goodwill, but rather that the small senior user [will lose] control over its identity in the rising tide of publicity associated with the junior mark." *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1252 (9th Cir.), cert. denied sub nom. *Anstalt v. Bacardi & Co. Ltd.*, 143 S. Ct. 428 (2022) (citations omitted); *see also Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) ("[T]he smaller senior user" in a reverse confusion case "seeks to protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity.").

271.    The Counterclaim-Defendants' willful actions as described and alleged above constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Ravine Parties' federally registered Open AI Mark, and a false designation of origin, by using, in commerce, without the Ravine Parties' authorization or permission, the confusingly similar Infringing Mark, and Counterclaim-Defendants' sale, offering for sale, providing, or advertising of products and services under the Infringing Mark is likely to cause, and has caused, confusion or mistake and deceived the public in violation of 15 U.S.C. § 1114, constituting trademark infringement under Section 32 of the Lanham Act.

272.    The use of the Infringing Mark as described and alleged above enables these infringers to trade on and receive the benefit and goodwill of the Open AI Mark which the Ravine Parties had built up. The use of the Infringing Mark also prevents the Ravine Parties from controlling the identity, goodwill, credibility, and goals associated with the Open AI Mark.

273.    The Counterclaim-Defendants' infringement has been willful and in bad faith, in that they had actual knowledge of the Open AI Mark, the Ravine Parties' prior use of the Open AI Mark, and the registration of the Open AI Mark. Accordingly, this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

274.    By reason of and as a direct and proximate cause of the Counterclaim-Defendants' infringing activities, the Ravine Parties have been suffering and will continue to suffer substantial and irreparable injury, including to their reputation and credibility, resulting in lost opportunities,

diminished goodwill, and harm to their ability to expand and achieve their plans and goals for the development, use, and future of AI. Each of the Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct described herein, are jointly and severally liable for the injury to the Ravine Parties.

275.     The Ravine Parties have no adequate remedy at law because its Open AI Mark and name are unique and represent to the public Open AI's identity, reputation, and goodwill, such that monetary damages alone cannot fully compensate the Ravine Parties for the Counterclaim-Defendants' willful misconduct and infringement.

276.     Unless permanently enjoined by this Court, the Counterclaim-Defendants will continue to infringe upon the Open AI Mark and name, causing irreparable injury to the Ravine Parties. This present and future threat of injury to Open AI's business and property interests, identity, goodwill, credibility, and reputation requires the grant of permanent and comprehensive injunctive relief to prevent the Counterclaim-Defendants' continued willful and open unlawful use and infringement of the Open AI Mark and name and to address and mitigate the Ravine Parties' significant injury.

277.     In addition to the imposition of permanent injunctive relief, the Ravine Parties are entitled to monetary damages pursuant to 15 U.S.C. § 1117(a), including, but not limited to, disgorgement of the Counterclaim-Defendants' profits, a reasonable royalty for the use of the Open AI Mark, loss of goodwill and value in the Open AI Mark, and costs of suit, in amounts to be determined at trial. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).


**THIRD CAUSE OF ACTION**

**CANCELLATION OF APPLICATIONS FOR REGISTRATION**

**(15 U.S.C. § 1119)**

**(Against Counterclaim-Defendant OpenAI, Inc.)**

278.     The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

279. As set forth herein, the Infringing Mark is impermissibly misdescriptive insofar as it suggests that the products and services sold under the Infringing Mark are open to the public, in violation of Section 2(a) of the Lanham Act. 15 U.S.C. §1052(e)(1).

280. The Infringing Mark both misdescribes the goods and services to which it applies, and consumers are likely to believe the misdescription. In Re Phillips-Van Heusen Corp., 63 U.S.P.Q.2d 1047 (T.T.A.B. 2002).

281. District courts have the authority to cancel or otherwise decide disputes over trademark applications. See BBK Tobacco & Foods LLP v. Cent. Coast Agric., Inc., 97 F.4th 668, 670 (9th Cir. 2024) ("The plain language of § 1119 thus grants a district court jurisdiction to consider challenges to the trademark applications of a party to the action if the action involves a registered trademark.").

282. The Ravine Parties will be damaged by the registration of the Infringing Mark, and thus hereby petitions to cancel the pending applications to register "OpenAI" on the Principal Register, Ser. No. 97/238,896 (filed Jan. 26, 2022) and Ser. No. 98/010,861 (filed May 24, 2023).

<b><u>FOURTH CAUSE OF ACTION</u></b>

<b><u>CALIFORNIA COMMON LAW TRADEMARK INFRINGEMENT</u></b>

<b><u>(Against All Counterclaim-Defendants)</u></b>

283. The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

284. The Court has jurisdiction over this Cause of Action based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

285. The Ravine Parties have continuously used the Open AI Mark in commerce since March 2015.

286. The Counterclaim-Defendants' willful actions as described and alleged above constitute an infringement of the Ravine Parties' common law trademark rights to the Open AI Mark and name under the laws of the State of California.

287. By using, in commerce, without the Ravine Parties' authorization or permission, the confusingly similar Infringing Mark, and Counterclaim-Defendants' sale, offering for sale,



providing, or advertising of products and services under the Infringing Mark is likely to cause, and has caused, confusion or mistake and deceived the public.

288. By reason of and as a direct and proximate cause of the Counterclaim-Defendants' willful infringing activities and misconduct, the Ravine Parties have been suffering, and will continue to suffer, substantial and irreparable injury, including to their reputation and credibility, resulting in lost opportunities, diminished goodwill, and harm to their ability to expand and achieve their plans and goals for the development, use, and future of AI. Each of the Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct described herein, are jointly and severally liable for the injury to the Ravine Parties.

289. The Ravine Parties have no adequate remedy at law because its Open AI Mark and name are unique and represent to the public Open AI's identity, reputation, credibility, and goodwill, such that monetary damages alone cannot fully compensate the Ravine Parties for the Counterclaim-Defendants' willful infringement and misconduct.

290. Unless permanently enjoined by this Court, the Counterclaim-Defendants will continue to infringe upon the Open AI Mark and name, causing irreparable injury to the Ravine Parties. This present and future threat of injury to Open AI's business, identity, goodwill, credibility, and reputation requires the imposition of permanent and comprehensive injunctive relief to prevent the Counterclaim-Defendants' continued unauthorized use and infringement of the Open AI Mark and name and to address and mitigate the Ravine Parties' injury.

291. In addition to the imposition of permanent injunctive relief, the Ravine Parties are entitled to monetary damages, in an amount to be determined at trial, for injuries suffered as a result of the Counterclaim-Defendants' infringement.

1   **FIFTH CAUSE OF ACTION**

2   **FALSE ADVERTISING**

3   **(Cal. Bus. & Prof. Code § 17500)**

4   **(Against All Counterclaim-Defendants)**

5       292.    The Ravine Parties incorporate by reference, as though fully set forth herein, the

6   allegations of the preceding paragraphs of this Counterclaim.

7       293.    The Court has jurisdiction over this Cause of Action based on supplemental

8   jurisdiction pursuant to 28 U.S.C. § 1367.

9       294.    On December 8, 2015, OpenAI filed its Certificate of Incorporation with the state

10  of Delaware. The Certificate of Incorporation stated that the purpose of the nonprofit corporation

11  was "to provide funding for research, development and distribution of technology related to

12  artificial intelligence. The resulting technology will benefit the public and the corporation will

13  seek to open-source technology… The corporation is not organized for the private gain of any

14  purpose."

15      295.    As set forth more fully above, OpenAI, Inc. made several public announcements

16  regarding its intentions as a non-profit artificial intelligence company. For example, in a

17  December 15, 2015, introductory statement partly attributed to Brockman, OpenAI, Inc. claimed

18  the company was designed "to benefit humanity as a whole, unconstrained by a need to generate

19  financial return" and that, because its research would be "free from financial obligations, [it could]

20  better focus on a positive human impact."[38]  It further stated that its "[r]esearchers w[ould] be

21  strongly encouraged to publish their work"; that its patents would "be shared with the world"; that

22  it would "freely collaborate with others across many institutions" and expected "to work with

23  companies to research and deploy new technologies."

24      296.    The December 11, 2015, announcement further stated that "funders ha[d]

25  committed $1 billion" in donations to support OpenAI, Inc. On information and belief, the

26

27

28  [38]  Greg Brockman, *et al.*, *Introducing OpenAI* (Dec. 11, 2015),
https://openai.com/blog/introducing-openai.

Counterclaim-Defendants knew, or should have known, this statement was untrue at the time it was made.

297.    At the same time, the Ravine Parties were in discussions to raise up to $100 million to create Open AI for the benefit of humanity. However, on information and belief, the Counterclaim-Defendants' false representations diverted funds from the Ravine Parties' Open AI to the Counterclaim-Defendants' OpenAI, Inc. Also, in and around 2015, the Ravine Parties believed Counterclaim-Defendants' public assurances that they were pursuing AGI for the benefit of humanity; indeed, the Ravine Parties had no reason to believe Counterclaim-Defendants' representations were in fact false at this time.

298.    As set forth above, the Counterclaim-Defendants continued to make public statements suggesting that their OpenAI project would continue to remain an open-source, non-profit endeavor and that its technology would continue to be shared with the world. On information and belief, they knew, or should have known, these statements were false and untrue.

299.    In January 2018, researchers at OpenAI, Inc. released the "Generative Pre-Trained Transformer" model ("GPT"), along with its source code and a detailed paper describing the model, which allowed others to build upon it. In 2019, researchers at OpenAI, Inc. released GPT-2, along with source code and a paper describing the second-generation model. In 2020, researchers at OpenAI, Inc. released GPT-3, once again accompanied by a research paper describing its implementation so that others could build upon it.

300.    On or around March 14, 2023, OpenAI, Inc. released GPT-4. On information and belief, the design of GPT-4 was kept and remains a complete secret to everyone except to the Counterclaim-Defendant and Microsoft. Indeed, there was no research paper or scientific publication accompanying the release of this iteration of the model. With the release of GPT-4, it became clear that OpenAI, Inc. no longer intended to honor its prior commitments to develop the technology in an open manner beneficial to all of humanity.

301.    On information and belief, this switch to operating in secrecy was done for commercial reasons, in an attempt to maximize profits for Microsoft.

302.    The reinstatement of Counterclaim-Defendant Altman as CEO in November 2023 and the replacement of the majority of OpenAI, Inc.'s Board of Directors, including the only two independent female directors, made clear that OpenAI, Inc. did not intend to honor its commitment to develop the technology in an open manner beneficial to all of humanity and, instead, revealed the Counterclaim-Defendants' new focus on profits.

303.    OpenAI, Inc. openly admits that its "current AI research builds upon a wealth of previous projects and advances."39  On information and belief, this research was largely performed by individuals who believed OpenAI, Inc.'s promises that its work was for the benefit of humanity and not for profit. Nevertheless, OpenAI, Inc. and its agents and partners used these open-source contributions to build GPT-4, which is now effectively property belonging to Microsoft and is no longer a project intended to benefit all humanity.

304.    On information and belief, OpenAI, Inc. is now secretly working on development of a new model known as Q*. Such a secretive approach likewise departs from Open AI's representations that all work would be performed and shared openly for the benefit of humanity.

305.    As set forth more fully above, the Ravine Parties relied on these false and misleading statements to their detriment. Specifically, Ravine was in the process of procuring significant investments for his Open AI project, including advanced discussions to raise up to $100 million to create Open AI for the benefit of humanity, but, in reliance on Counterclaim Defendants' public assurances that Counterclaim-Defendants were pursuing AGI for the benefit of humanity, the Ravine Parties elected not to proceed at that time.

306.    As a result of Counterclaim Defendants' false statements, the Ravine Parties suffered actual injuries, in an amount to be proven at trial.

307.    As alleged above, Counterclaim Defendants made numerous false statements between 2015 and 2023 regarding OpenAI, Inc.'s goal to benefit humanity and conduct and share research openly. The Ravine Parties reasonably relied on the truthfulness of these statements, which were not revealed as false, misleading, and/or deceptive until 2023.

---

39 https://openai.com/research/overview.



## SIXTH CAUSE OF ACTION

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK UNDER THE LANHAM ACT

## (15 U.S.C. § 1125(a))

### (Against Counterclaim-Defendant OpenAI, Inc.)

308.    The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

309.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

310.    As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that the Ravine Parties have not infringed and are not infringing Counterclaim-Defendant OpenAI, Inc.'s alleged trademark rights in the Infringing Mark because they hold trademark rights that are senior to any purported trademark rights of Counterclaim-Defendant OpenAI, Inc.

311.    A judicial declaration is necessary and appropriate so that the Ravine Parties may ascertain their right to continue using the Open AI Mark in the manner set forth in this Counterclaim.

312.    Accordingly, the Ravine Parties are entitled to declaratory judgment that their use of the Open AI Mark does not infringe, either directly or indirectly, any trademark rights of Counterclaim-Defendant OpenAI, Inc. under 15 U.S.C. § 1114(1) or 15 U.S.C. § 1125(a), and that the Ravine Parties are not liable for any damages or other relief.


**SEVENTH CAUSE OF ACTION**

**DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF COMMON LAW TRADEMARK**

**(Against Counterclaim-Defendant OpenAI, Inc.)**

313.    The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

314.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

315.    As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that the Ravine Parties have not engaged in any conduct that constitutes common law trademark infringement under the laws of the State of California.

316.    A judicial declaration is necessary and appropriate so that the Ravine Parties may ascertain their right to continue using the Open AI Mark in the manner set forth in this Counterclaim.

317.    Accordingly, the Ravine Parties are entitled to a declaratory judgment that they have not violated and are not infringing any trademarks under the laws of the State of California and are not liable for any damages or other relief.

**EIGHTH CAUSE OF ACTION**

**DECLARATORY JUDGMENT OF OWNERSHIP OF OPEN AI MARK**

**(Against Counterclaim-Defendant OpenAI, Inc.)**

318.    The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

319.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

320.     As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that the Ravine Parties are the true and rightful owners of the Open AI Mark and are entitled to trademark protection from the use of any confusingly similar mark or name in commerce, including but not limited to the Infringing Mark.

321.     A judicial declaration is necessary and appropriate so that the Ravine Parties may ascertain their right to continue using the Open AI Mark in the manner set forth in this Counterclaim.

322.     Accordingly, the Ravine Parties are entitled to a declaratory judgment that Open Artificial Intelligence, Inc. is the true and rightful owners of trademark rights for the Open AI Mark.



### NINTH CAUSE OF ACTION

### DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY

### (Against Counterclaim-Defendant OpenAI, Inc.)

323.     The Ravine Parties incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

324.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

325.     As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that Counterclaim Defendant OpenAI, Inc. owns no valid trademark rights in the Infringing Mark, as the mark is impermissibly misdescriptive insofar as it suggests that the products and services sold under the Infringing Mark are open to the public, in violation of Section 2(a) of the Lanham Act. 15 U.S.C. §1052(e)(1).

326.     The Infringing Mark both misdescribes the goods and services to which it applies, and consumers are likely to believe the misdescription. *In Re Phillips-Van Heusen Corp.*, 63 U.S.P.Q.2d 1047 (T.T.A.B. 2002).

327.     Accordingly, the Ravine Parties are entitled to a declaratory judgment that the Infringing Mark is impermissibly misdescriptive and that Counterclaim-Defendant OpenAI, Inc. thus owns no valid trademark rights in the Infringing Mark.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Ravine Parties pray for judgment against the Counterclaim-Defendants as follows:

1. An Order permanently enjoining the Counterclaim-Defendants and any related entities, their agents, employees, and all other persons acting in concert or participating with them from using the Infringing Mark or otherwise participating in any acts calculated or likely to cause confusion or mistake in the minds of the consuming public or to lead consumers to believe that the Ravine Parties' Open AI project shares some affiliation, connection, association, or sponsorship with the Counterclaim-Defendants' products and services;

2. Compensatory and consequential damages against the Counterclaim-Defendants as permitted by law and according to proof at trial;

3. Disgorgement of the Counterclaim-Defendants' profits according to proof at trial;

4. Statutory damages;

5. Reasonable royalty;

6. Punitive and exemplary damages according to proof at trial;

7. A declaratory judgment stating that the Ravine Parties have not, and are not infringing, either directly or indirectly, any valid and enforceable trademark rights purportedly belonging to the Counterclaim-Defendant OpenAI, Inc. under 15 U.S.C. § 1114(1) or 15 U.S.C. § 1125(a);

8. A declaratory judgment stating that the Ravine Parties have not, and are not infringing, either directly or indirectly, any valid and enforceable trademark rights of Counterclaim-Defendant OpenAI, Inc. under California law;

9. A declaratory judgment adjudging that Counterclaimant Open Artificial Intelligence,



Inc. is the true and rightful owner of the Open AI Mark;

10. A declaratory judgment adjudging that Counterclaim-Defendants own no valid trademark rights in the Infringing Mark, as the mark is impermissibly misdescriptive;

11. An Order cancelling OpenAI, Inc.'s pending applications with the USPTO to register "OpenAI" on the Principal Register, Ser. No. 97/238,896 (filed Jan. 26, 2022) and Ser. No. 98/010,861 (filed May 24, 2023).

12. An Order awarding the Ravine Parties their reasonable attorneys' fees/costs as provided by statute;

13. Prejudgment and postjudgment interest as provided by law at the maximum interest rate; and

14. For such other and further relief as the Court deems just and proper.

DATED:  April 30, 2024                    WAYMAKER LLP


By:   ___/S/ Ryan G. Baker_____
          RYAN G. BAKER

*Attorneys for Guy Ravine and Open Artificial Intelligence, Inc.*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 3-6, Counterclaimants Guy Ravine and Open Artificial Intelligence, Inc. hereby request a trial by jury as to all issues and claims in this action, which are subject to adjudication by a jury.

DATED:  April 30, 2024            WAYMAKER LLP


By:      */S/ Ryan G. Baker*
         RYAN G. BAKER

         *Attorneys for Guy Ravine and Open Artificial Intelligence, Inc.*

**EXHIBIT 1**

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:22 PM 12/08/2015
FILED 02:22 PM 12/08/2015
SR 20151247198 - File Number 5902936

# CERTIFICATE OF INCORPORATION OF

## A NON-STOCK CORPORATION

### OPENAI, INC.

FIRST: The name of the Corporation is "OpenAI, Inc." (the "**Corporation**").

SECOND: The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

THIRD: This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person. In furtherance of its purposes, the corporation shall engage in any lawful act of activity for which nonprofit corporations may be organized under the General Corporation Law of Delaware.

FOURTH: This corporation is organized and operated exclusively for purposes set forth in Article THIRD hereof within the meaning of the Internal Revenue Code section 501(c)(3). No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation and this corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf on any candidate for public office. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation/organization exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by a corporation/organization, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

FIFTH: The property of this corporation is irrevocably dedicated to the purposes in Article THREE hereof and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person. Upon the dissolution or winding up of this corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable, educational and/or religious purposes and which has established its tax exempt status under Internal Revenue Code section 501(c)(3), or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose.

SIXTH: The corporation shall not have any capital stock.

SEVENTH: The corporation shall not have any members.

EIGHTH: The name and mailing address of the incorporator are as follows:

Jonathan Levy<br>
335 Pioneer Way<br>
Mountain View, CA 94041

I, Jonathan Levy, for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this

Executed on December 8, 2015.

**AUTHORIZED OFFICER**


/s/Jonathan Levy_____
Jonathan Levy

# EXHIBIT 2

# United States of America

## United States Patent and Trademark Office

# Open AI

**Reg. No. 5,258,002**

**Registered Aug. 01, 2017**

**Int. Cl.: 42**

**Service Mark**

**Supplemental Register**

Guy Ravine (UNITED STATES INDIVIDUAL)
346 1st st
San Francisco, CA 94105

CLASS 42: Providing a web site featuring technology that enables internet users to share documents, images and videos

FIRST USE 3-25-2015; IN COMMERCE 3-25-2015

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR

No claim is made to the exclusive right to use the following apart from the mark as shown: "AI"

SER. NO. 86-847,151, FILED P.R. 12-11-2015; AM. S.R. 03-30-2017
KATINA SHAY JACKSON, EXAMINING ATTORNEY



Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

## REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

## WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# EXHIBIT 3

# TRADEMARK ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

ETAS ID: TM822995

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT OF THE ENTIRE INTEREST AND THE GOODWILL |

**CONVEYING PARTY DATA**

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Guy Ravine | | 06/30/2023 | INDIVIDUAL: UNITED STATES |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | Open Artificial Intelligence Inc. |
| Street Address: | 95 3rd Street |
| City: | San Francisco |
| State/Country: | CALIFORNIA |
| Postal Code: | 94103 |
| Entity Type: | Corporation: DELAWARE |

**PROPERTY NUMBERS Total: 1**

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 5258002 | OPEN AI |

**CORRESPONDENCE DATA**

**Fax Number:**      2123553333
***Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent
using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.***
**Phone:**            2128138800
**Email:**            TMADMIN@GOODWINLAW.COM
**Correspondent Name:**   Goodwin Procter LLP/Janis Nici
**Address Line 1:**   620 Eighth Avenue
**Address Line 4:**   New York, NEW YORK 10018

| NAME OF SUBMITTER: | Janis Nici |
|---|---|
| SIGNATURE: | /janis nici/ |
| DATE SIGNED: | 07/10/2023 |

**Total Attachments: 2**
source=Open Artificial Intelligence - Trademark Assignment Agreement FE#page1.tif
source=Open Artificial Intelligence - Trademark Assignment Agreement FE#page2.tif

OP $40.00 5258002

DocuSign Envelope ID: D83D5591-1CCD-4B08-B6B3-2EBB140C80DC

# TRADEMARK REGISTRATION ASSIGNMENT

This TRADEMARK REGISTRATION ASSIGNMENT (this "Trademark Assignment") is made by Guy Ravine, a California resident ("Assignor"), and Open Artificial Intelligence Inc., a Delaware corporation with an office at 95 3rd Street, San Francisco, California, 94103 ("Assignee").

WHEREAS, Assignee desires to acquire Assignor's entire right, title and interest in and to U.S. Trademark Registration No. 5,258,002 for OPEN AI (the "Trademark Properties"), together with the goodwill of the business symbolized by the Trademark Properties.

NOW THEREFORE, the parties agree as follows:

1.    Assignment.  For good and valuable consideration, receipt of which is acknowledged, Assignor hereby irrevocably conveys, assigns and transfers to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the following:

(a)    all right, title and interest in and to the Trademark Properties, together with the goodwill of the business connected with the use of, and symbolized by, the Trademark Properties;

(b)    all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction, by international treaties and conventions, and otherwise throughout the world;

(c)    any and all royalties, fees, income, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and

(d)    any and all claims and causes of action with respect to any of the foregoing, whether accruing before, on, or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

2.    Recordation and Further Actions.  Assignor hereby authorizes the Commissioner for Trademarks in the United States Patent and Trademark Office to record and register this Trademark Assignment. Following the date hereof, upon Assignee's reasonable request, Assignor shall take such steps and actions, and provide such cooperation and assistance to Assignee and its successors, assigns, and legal representatives, including the execution and delivery of any affidavits, declarations, oaths, exhibits, assignments, powers of attorney, or other documents, as may be necessary to effect, evidence, or perfect the assignment of the Trademark Properties to Assignee, or any assignee or successor thereto.

3.    Counterparts.  This Trademark Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed one and the same agreement.  A signed copy of this Trademark Assignment delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Trademark Assignment.

4.    Successors and Assigns.  This Trademark Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

ACTIVE/123975273.2

**TRADEMARK
REEL: 008127 FRAME: 0690**

IN WITNESS WHEREOF, the parties have duly executed this Trademark Assignment as of June 30, 2023

**ASSIGNOR:**

**Guy Ravine**

DocuSigned by:

*Guy Ravine*

1AA6A27162A4452...

**ASSIGNEE:**

**Open Artificial Intelligence Inc.**

DocuSigned by:

*Guy Ravine*

By _____

1AA6A27162A4452...

Name: Guy Ravine

Title: President

ACTIVE/123975273.2

**TRADEMARK**
**RECORDED: 07/10/2023**      **REEL: 008127 FRAME: 0691**