1   Ryan G. Baker (Bar No. 214036)
      rbaker@waymakerlaw.com
2   Scott M. Malzahn (Bar No. 229204)
      smalzahn@waymakerlaw.com
3   Jose R. Nuño (Bar No. 312832)
      jnuno@waymakerlaw.com
4   Norma P. Rojas-Castro (Bar No. 339087)
      projas-castro@waymakerlaw.com
5   WAYMAKER LLP
    515 S. Flower Street, Suite 3500
6   Los Angeles, California 90071
    Telephone:   (424) 652-7800
7   Facsimile:   (424) 652-7850

8   *Attorneys for Guy Ravine and Open Artificial*
    *Intelligence, Inc.*

9

10                    **UNITED STATES DISTRICT COURT**

11                   **NORTHERN DISTRICT OF CALIFORNIA**

12                          **OAKLAND DIVISION**

| | |
|---|---|
| 13 OPENAI, INC., a Delaware corporation, | **CASE NO. 4:23-cv-3918** |
| 14            Plaintiff, | **DEFENDANTS' OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS TO COMPLAINT** |
| 15       vs. | |
| 16 OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | **Assigned to: Hon. Yvonne Gonzalez Rogers** |
| 17 | **Complaint Filed: August 4, 2023** |
| 18            Defendants. | |

19   OPEN ARTIFICIAL INTELLIGENCE, INC.,
     a Delaware corporation and GUY RAVINE,
20   an individual,

21            Counterclaimants,

22        vs.

23   OPENAI, INC., a Delaware corporation;
     SAMUEL ALTMAN, an individual; AND
24   GREGORY BROCKMAN, an individual,

25            Counterclaim-Defendants.

26

27

28

1. **LANHAM ACT UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN OR SOURCE, AND FALSE ADVERTISING (15 U.S.C. § 1125(a));**
2. **LANHAM ACT TRADEMARK INFRINGEMENT (15 U.S.C. §§ 1114, 1125(a));**
3. **CANCELLATION OF APPLICATIONS FOR REGISTRATION (15 U.S.C. § 1119)**
4. **CALIFORNIA COMMON LAW TRADEMARK INFRINGEMENT;**
5. **FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500);**
6. **DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK  (15 U.S.C. § 1125(a);**



7. **DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF_ COMMON LAW TRADEMARK;**
8. **DECLARATORY JUDGMENT OF OWNERSHIP OF OPEN AI MARK; AND**
9. **DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY**

**[DEMAND FOR JURY TRIAL]**

Counterclaimants and Defendants Open Artificial Intelligence Inc. ("Open AI"), and its President, Guy Ravine ("Ravine" and with Open AI, the "Counterclaimants"), for their compulsory counterclaims against Counterclaim-Defendants OpenAI, Inc.; Samuel Altman; and Gregory Brockman (collectively, "Counterclaim-Defendants"), and demanding trial by jury, allege as follows:

## I.    INTRODUCTION

1.      Over the past five years, Counterclaim-Defendant OpenAI, Inc. has undergone a shocking transformation. When the company was created, its formative documents said it was a "nonprofit corporation" developing artificial intelligence technology as "open source technology for the public benefit," with a "primary fiduciary duty to humanity." The "open" in "OpenAI" promised not only open-source code, but also sharing, transparency, and AI safety. Yet somewhere in the course of becoming a company with a $90 billion valuation, OpenAI, Inc. became a secretive, for-profit company that closed down its research, fired board members who exercised their fiduciary duty to represent humanity, disbanded its safety team, pushed out co-founders who served as its moral compass, and punished employees who showed anything less than absolute loyalty to their CEO, Counterclaim-Defendant Altman. Many in the AI community have publicly questioned why the company is even called "OpenAI," frequently accompanied by derisive suggestions that the company should be called "Closed AI."

2.      The dark secret behind this incongruity is that Open AI—the promise to be an open-sourced, non-profit AI organization for the benefit of humanity and the Open AI name itself—was created by Guy Ravine in San Francisco in late 2014, a year before Altman and Brockman announced their so-called "Open" AI. Altman and Brockman stole the foundational principles of Open AI from Ravine—the structure, the mission, the vision, the dedication to humanity, and even the name—because while Ravine's Open AI was a "recipe" or "secret sauce" to create AI that benefitted all of humanity, it also was a unique way for Altman and Brockman's cynically-named imitator OpenAI, Inc. to become the world's most powerful AI company. While Ravine created the promise of "Open AI" as a sacred obligation to humanity, Altman and Brockman deployed the Open AI name and ethos as convenient, expendable tools; their own

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

emails reveal that from their earliest days, Altman and Brockman saw the "open" part of Open AI as a "recruiting strategy" for "the short and medium term" that would allow them to compete with behemoths like Google and to attract non-profit funding from Elon Musk and others who believed that Altman and Brockman were sincere about the Open AI mission.

3.      On two separate occasions, Altman and Brockman personally asked Ravine to sell them the rights to the Open AI name and the open.ai domain that Ravine was using. When Ravine refused to sell, Altman and Brockman used the Open AI name anyway. Adapting the copycat domain openai.com, their company tried and failed to register OpenAI as a trademark, only to be refused due to Ravine's prior use and registration of the Open AI mark. As a last desperate move, they are now suing Ravine for trademark infringement, claiming that he somehow was infringing the very Open AI mark that he created. The reality is that Altman, Brockman, and OpenAI, Inc. willfully infringed Ravine's Open AI mark, and now are trying to own and register this name themselves, even though their insincere use of the name "Open" AI is unlawfully deceptive.

4.      The success of Open AI was no accident. Ravine—an entrepreneur with a background in both AI and collaborative development—created Open AI after two-and-a-half years of intense contemplation. He dedicated his personal time and money to ensure that AI, and in particular artificial general intelligence ("AGI")—highly autonomous AI systems that can outperform humans in a wide range of tasks—remained under the control of humanity as a whole. Ravine saw that AGI would have the power to replace millions of human jobs and reshape the global economy. Therefore, it was critical to Ravine that AGI remain under the control of all of humanity and not be consolidated under one or a few companies. While it had been widely believed that only Google had the resources to bring forth the incredible power of AGI, Ravine's Open AI was the secret sauce to build AGI collaboratively and in a manner that benefitted humanity, not individual companies. That secret sauce was reflected in the principles Ravine articulated—an artificial intelligence organization that would be open-sourced, not for profit and 100% for humanity—eloquently encapsulated in the almost magical words "Open AI."

5.      As someone who knew the AI community, Ravine foresaw that "Open AI" would attract the world's top AI researchers, who were motivated more by the mission than by money.

While others thought it was impossible for a new initiative to compete with the resources of large companies for AI talent, Ravine's Open AI was doing just that. By 2015, Ravine had held discussions with top industry leaders on the foundation, launch, and support of Open AI as a non-profit initiative to build AGI for the benefit of humanity. Prominent institutions such as Google Research expressed interest in backing the initiative, and Ravine was in discussions to raise $100 million to launch Open AI.

6.     On information and belief, Altman and Brockman learned of Ravine's Open AI, and unlawfully duplicated the initiative, copying Ravine's initiative, principles, mission, vision, words, domain, and even the Open AI name. Rushing to usurp Ravine's Open AI, Altman and Brockman falsely announced that they had $1 billion in funding commitments and a long list of researchers. Neither statement turned out to be true. However, based on these false statements, they were able to attract the best AI talent away from institutions like Google when they could otherwise not compete. The truth is, when they announced the $1 billion commitment for funding, they had virtually no money. They only raised $13 million in their first year of operation. And when they said they would be open, nonprofit, and for humanity, they lied.

7.     Ravine's recipe for AGI worked: since that time, no new organization other than OpenAI, Inc., and its spinoff Anthropic, have been able to successfully challenge Google. But it did not work to serve humanity as Ravine intended. Instead, Open AI was diverted to benefit a single company, and at times it seems a single individual, Sam Altman, who somehow survived being fired by his own board for failing to uphold the promise to act for humanity above his personal interests. Cynically, with the hijacking of Open AI, Altman created the exact scenario that Ravine created Open AI to prevent: the unlimited concentration of this great power.

## II.     PARTIES

8.     Defendant and Counterclaimant Open Artificial Intelligence, Inc. is a Delaware corporation with its principal place of business at 95 3rd Street, San Francisco, 94103.

9.      Defendant and Counterclaimant Guy Ravine is an individual residing in Sunnyvale, California. Ravine is the President of Open Artificial Intelligence, Inc.

10.      Plaintiff and Counterclaim-Defendant OpenAI, Inc. is a Delaware non-profit corporation with its principal place of business at 3180 18th Street, Suite 100, San Francisco, California 94110. It was originally registered on December 8, 2015. OpenAI, Inc. is registered as a foreign corporation with the California Secretary of State.

11.      Counterclaim-Defendant Samuel Altman is a cofounder and Chief Executive Officer of OpenAI, Inc. Upon information and belief, Altman resides in the Northern District of California.

12.      Counterclaim-Defendant Gregory Brockman is a co-founder and President of OpenAI, Inc. Upon information and belief, Brockman resides in the Northern District of California.

13.      Upon information and belief, at relevant times, each of the Counterclaim-Defendants was the agent of the other Counterclaim-Defendants, and in doing the things alleged, each of them was acting within the course and scope of an agency relationship and were subject to and under the supervision of each other. Counterclaimant are informed and believed that each of the fictitiously named Counterclaim-Defendants are responsible in some manner for the injuries to the Counterclaimants. The Counterclaimants further allege that their injuries to their property rights, goodwill, and reputation were directly proximately caused by each and all such Counterclaim-Defendants.

**III.      JURISDICTION AND VENUE**

14.      This Court has original subject matter jurisdiction over this civil action under 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. §§ 1116 and 1121 because this action includes alleged violations of federal trademark and unfair competition laws of the United States pursuant to 15 U.S.C. §§ 1114, 1125.

15.      Additionally, this Court has supplemental jurisdiction over the state law-based claims under 28 U.S.C. § 1367 because those claims are related to the federal claims asserted and

therefore form the part of the basis of the same case or controversy and arise from a common nucleus of operative facts.

16.     This Court has personal jurisdiction over the Counterclaim-Defendants because each have their principal place of business in this jurisdiction and/or sufficient contacts with this jurisdiction. The Court's exercise of jurisdiction over these parties will not offend traditional notions of fair play and substantial justice.

17.     Under 28 U.S.C. § 1391, venue is proper in this jurisdiction because the Plaintiff initiated this civil action here and/or some of the Counterclaim-Defendants can be found, reside, or transact business in this judicial District.

## IV.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.     WHO WILL CONTROL AGI? ONE OF THE MOST IMPORTANT QUESTIONS IN HUMAN HISTORY

18.     Perhaps the most important event in human history is now unfolding before our very eyes: the surpassing of human intelligence by artificial intelligence. It is difficult to overstate the significance of this event: Electronic intelligence, which is perhaps 1,000 times faster and cheaper than biological intelligence, is about to surpass human intelligence "any year now." Comparing the speed of human labor to the speed of these systems is like comparing the movement of plants to animals. In this analogy, humans are the plants. Developments that took place over a span of decades may soon take place over a span of months.

19.     The emergence of these general AI systems is occurring at an astonishing pace, not over years or decades, but over months. After decades of underachievement, AI models exhibiting general human-like intelligence have leaped from the cognitive abilities of a toddler to those of a PhD student in just 18 months, with their general IQ soaring from 65 to surpass the average intelligence of 100 of most adults only over this past year. The discovery of scaling saws has enabled the industry to predict the trajectory of these systems' intelligence over the coming years. The AI model of 2025 is expected to surpass the intelligence of 95% of humans, and the one of 2026 is poised to eclipse the intelligence of all of humanity.

20.     Whereas OpenAI's latest GPT-4 model has an estimated IQ higher than that of an average human, OpenAI's CEO Altman recently stated that "we can say right now, with a high degree of scientific certainty, that GPT5 [releasing shortly] is going to be a lot smarter than GPT4, and GPT6 [in roughly 2025] is going to be a lot smarter than GPT5 and we are not going to get off this curve."

21.     An OpenAI researcher privately said that AGI will be achieved "literally, any year now" and it will probably become a superintelligence just "a year later." Most importantly, he added that whoever controls it will have "godlike powers over everyone else who doesn't." This individual then quit OpenAI because he did not believe it would uphold its principles.[1]

22.     Many forecasters bet that the emergence of AGI is less than two years in the future, and that superintelligence will follow just months later, presumably as the system is set to improve itself. To appreciate how fast AI is getting smarter, projections for the timeline for superintelligence have shrunk from 40 years in the future to just three years—over a span of the last three years. Such machine intelligence is expected to outsmart humanity within "single-digit years."

23.     The significance of this event far surpasses that of the Industrial Revolution; it is akin to the creation of a new form of life superior to humanity that is increasing its capabilities exponentially by the month, and it has not even begun the process of self-improvement. Humanity is caught by surprise, wholly unprepared as it is about to encounter the intelligence, speed, and veracity of something far more capable and far more powerful than itself, something that could replicate itself on millions of servers, outsmart humans, and rapidly reshape the world in its desired image.

24.     The most important question in human history stares us in the face: Who will control these powerful systems that will be capable of displacing, disempowering, overpowering, and outsmarting humanity many times over at a speed we could not even comprehend?

---

[1] Daniel Kokotajlo, Shortform Post (Oct. 8, 2019), available at https://www.greaterwrong.com/posts/cxuzALcmucCndYv4a/daniel-kokotajlo-s-shortform#comment-LKThjEJ6W8eQEJiXG.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

25.     As historian Yuval Harari said, this event in the next few years will mark "the end of human history. History will continue with somebody else in control"—under the control of a system far smarter and more capable than humanity itself. Because things are happening so fast, we are about to run into this event like a brick wall. The only question is: Who will be in control? Will it be humanity or somebody else?

26.     To resolve this question in favor of humanity, Guy Ravine set out in 2012 to create what became Open AI in early 2015. But what Altman and Brockman did next changed the course of human history and diverted the control of these systems from humanity's command to their own personal dominion.

> *"Throughout our time at OpenAI, we witnessed a disturbing pattern of deceit and manipulation by Sam Altman and Greg Brockman, driven by their insatiable pursuit of achieving artificial general intelligence (AGI)."*
>
> – Former OpenAI employees in a letter to the board.[2]

## B.     CREATING THE RECIPE FOR AGI FOR HUMANITY

### 1.     Guy Ravine Invents the Recipe for AGI: Open AI

27.     From an early age, Guy Ravine had a talent for coming up with breakthrough ideas, some of which led to technologies used today by billions of people. What defined Ravine's innovations is that they were always ahead of their time and came after long periods of deep thinking, seeing further into the future and anticipating the next events and possibilities. In 2000, fresh out of high school, Ravine founded his first company, an AI startup providing a talkative retrieval bot over the internet, which afterwards transformed into a web traffic prediction system. He later proceeded to start several companies and projects in fields ranging from internet to wireless systems as well as a prototype for a one-person electric vehicle. In 2011, Ravine created

/ / /

/ / /

/ / /

/ / /

---

[2] Will Knight, *Elon Musk Trolls His Way into the OpenAI Drama*, WIRED (Nov. 21, 2023), available at https://www.wired.com/story/elon-musk-troll-openai-drama/.

WAYMAKER

an open collaboration platform called Wikineering.[3] In 2012, he invented the foundations of modern mobile video feed, an app called We, which was emulated by TikTok.

28.     For many years, Ravine had thought deeply about the future of artificial intelligence. Ravine understood that if AGI were developed solely by large, for-profit companies, it could lead to a concentration of power where the means of production were concentrated in the control of one or a few companies, which would allow them to subjugate the entire balance of power. Instead, Ravine wanted to create a future in which AGI was developed by and for all of humanity. In this future, when AI systems begin to displace humanity from the economy, humanity as a whole would own the machines that replace them. This could lead to an unimaginable abundance, and everyone would be equally empowered. This vision guided him.

29.     In 2009, Ravine saw a lecture by Tomassio Poggio's lab at MIT and concluded that neural networks would rapidly advance. It occurred to him that the emerging ideas the researchers at the time were thinking about would probably arrive at human level intelligence. He estimated that within 15 years, this approach would lead to the development of AGI. Ravine's idealism caused him to want to provide the benefits to everyone. He founded an AI company as well as an open collaboration platform, Wikineering, as a not-for-profit initiative for the benefit of humanity that allowed engineers to collaborate to build things openly and share them.

30.     In 2012, as neural networks were showing promising breakthroughs, Ravine wanted to find a way to ensure that AGI would be developed for humanity as a whole, an "insurance policy for the world," rather than to serve the few. He spent the next two and a half years thinking deeply about how to build an AGI effort for humanity, iterating on dozens of ideas and exploring a large number of possibilities. He was looking for the recipe to serve AGI to all.

31.     At this time, Google had effectively cornered the market for AI research talent by spending huge sums of money to recruit and retain a vast network of scientists. The conventional

---

[3] In 2012, Ravine had developed a website called Wikineering, which acted as the technical foundation for the various collaboration tools to be used in connection with Ravine's Open AI project. Wikineering offered user-created online articles about research topics and findings related to engineering, including topics relating to artificial intelligence. Similar to the online encyclopedia Wikipedia, users could use Wikineering to collaborate on the development of these articles, making contributions based on their own research and expertise."

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

wisdom was that no new effort could challenge Google's dominance. In the words of Brockman's recollection, it seemed "impossible" to challenge Google at this time. And indeed, in the years since, no new effort has been able to challenge Google, except for one: Counterclaim-Defendant OpenAI, Inc. (and its spinoff, Anthropic). This success was based on Ravine's Open AI, a recipe for an AGI effort intended to put the benefits of AGI in the hands of humanity.

32.    This was not coincidental. Ravine had worked to find a way to find a way to challenge Google's dominance and put the benefits of AGI in control of humanity. Over time, Ravine realized that to create an effort for humanity that would compete with companies like Google, such an effort could not rely on conventional ingredients, like money. A new effort would also lack the talent network effect that Google used to have. When you could not compete on money or on a network effect, you needed something brilliant and powerful—a simple idea that would do what Google's billions of dollars could not. What Ravine found is that normally the simplest idea that seems obvious in hindsight is the one that works. So, he kept looking for the simplest most powerful idea. Unlike most startup founders who could have a flash of insight and decide to pursue an idea, Ravine's process was slower and more deliberate, never satisfied until absolutely certain that the idea would work. This process also led to the first TikTok like app, We, years ahead of its time, and the principles of modern mobile video (on which Ravine received Patents). When users first encountered this technology, they remarked that it seemed like science fiction.

33.    After years of trying to come up with the simple secret sauce to build AGI and put the benefits of it with humanity, the result was Open AI. What Ravine eventually realized is that he could build on the ideology of his open collaboration platform. While you could not compete with Google on money, researchers were actually motivated by the ideology of open sharing. The promise of Open AI to be open sourced and serve humanity would allow his not-for-profit initiative to compete with the likes of Google when it was considered "impossible." And that secret sauce was encapsulated in the magical words "Open AI."

34.    Gradually, the pieces began to fall into place, and by late 2014, the idea of Open AI had fully emerged under the name "Open AI": A standalone, non-profit initiative dedicated to

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

developing AGI for the benefit of all humanity. Open AI was an ideological bombshell that, when dropped on the scene, was able to demolish the walls of Big Tech and untether research talent.

35.     When people heard the words "Open AI," they understood what the organization was about and felt a powerful desire to be a part of it. Open AI was the simplest and most powerful recipe for building AGI for humanity. It would ignite the excitement and recruit talent where no other recipe could. Ultimately that was why it was so alluring to Altman and Brockman, and why they so aggressively pursued and coveted it.

36.     Open AI had the ability to attract the top researchers in the world based on their mission, not money. But to understand the significance of encapsulating the idea in two magic words, imagine that instead of using OpenAI for the name of his company, Altman would have used the name Altman's AI, and it was for-profit, closed, and for the benefit of Sam Altman (similar to how it is today). Would Altman have gotten Musk to donate to Altman's AI? Would he have been able to recruit Sutskever, Karpathy and others? The answer is no. The ideology itself was reflected in the name and was instantly communicated as if it were a magical spell. And it worked. It pulled in the research talent and the funding because of its powerful ideology encapsulated in two words that could capture the imaginations of researchers and funders alike.

37.     While the concept of Open AI may seem obvious in today's world, at the time of its inception, it represented a radical departure from the conventional wisdom surrounding the development of AGI. The notion that AGI could be developed openly and transparently in a standalone deep learning non-profit initiative with a fiduciary duty to humanity, required a re-framing of assumptions and assumed that it would be developed in an institution like DeepMind or a government project.

38.     In 2014, just as Open AI was beginning to take shape, Oxford philosopher Nick Bostrom published his book "Superintelligence," which represented the culmination of his research on the topic. In the book, Bostrom meticulously outlined every conceivable scenario for the development of AGI, from government-led initiatives to research projects within big tech companies to secretive startups working on the fringes of the field.

39.     Yet for all his expertise and insight, Bostrom had failed to consider the possibility of a standalone collaborative non-profit effort to develop AGI openly with a fiduciary duty to humanity. It was a startling omission, one that spoke to just how deeply entrenched the assumptions surrounding AGI research had become when the deep learning paradigm emerged, and to the novelty of Ravine's approach of Open AI. When Bostrom and Ravine met in March 2015, just as Bostrom was stepping off the TED stage after delivering a talk on his research, he was surprised to realize that he had not considered the Open AI approach to achieving AGI. The encounter inspired Bostrom to utilize the next year to write a paper on the implications of openness in AI, and he invited Ravine's feedback.

### 2.     Guy Ravine Creates the AGI Effort for Humanity: Open AI

40.     Throughout 2015, Guy worked tirelessly to bring Open AI to life. He pitched the idea to top AI labs around the world and to top executives, proposing a dual initiative that would combine cutting-edge open research with an AI school to train the next generation of researchers.

41.     Ravine held discussions with many top executives, including notable figures such as Google CEO Larry Page, Facebook Chief AI Scientist and Father of Deep Learning Yann LeCun, Apple AI leader and Siri co-founder Tom Gruber, Google Research Head and AI authority Peter Norvig, Google Research director Alon Halevy, Skype co-founder Jaan Tallinn, AI authority Nick Bostrom, Google self-driving car head Sebastian Thrun, Stripe CEO Patrick Collison, and others. Erik Brynjolfsson, then MIT professor (now at Stanford), evangelized the potential benefits of Wikineering and Open AI with Elon Musk and Reid Hoffman but, on information and belief, did not attribute the source.

42.     Gruber, the co-founder of Siri, former head of Apple's Advanced Technology Group, and Apple's representative on the Partnership on AI, recalled:

> "On March 19, 2015 I saw Guy Ravine proposing Open AI to Google CEO Larry Page and requesting the backing of Open AI, presenting it as an initiative that Google should support. Guy argued that Open AI would be an open non-profit AI organization to attract researchers who would publish their code openly and share the benefits of AI with humanity. **This was nine months before the public announcement of OpenAI, Inc. by Sam Altman and Greg Brockman**." (Emphasis added.)

43. Gruber also attested to the power of the idea of Open AI to recruit top AI researchers:

> "In April 2015, after a TED conference, Guy asked me if Apple would be interested in supporting Open AI. We had talked about Open AI's mission and goals, where he explained Open AI would attract the best talent on the basis of a culture of openness, common shared resources and a mission for sharing the benefits of the research with humanity. Guy made the case that it would be in Apple's best interest to support Open AI and its model of research because it would accelerate research in deep learning and Apple could build on that to power its AI products. At that time, it was clear that Deep Learning was the future for AI and we already saw its power to transform speech recognition. When I was at Apple, the company had huge amounts of money. It enjoyed a great reputation as a place to work, and as a company with an ethical stance towards building products. Despite this, Apple struggled to attract top researchers in AI because its own researchers were not allowed to publish or speak openly. This made Guy's proposal of Open AI as a way to attract researchers and accelerate progress while sharing the fruits with humanity a powerful idea which I personally supported."

44. Around March 25, 2015, Ravine also launched an instance of the Wikineering AI collaboration tool that he had built earlier and branded it as Open AI, making it available to the community with tools to contribute AI related materials openly. An October 2023 reconstruction of the Initial Collaboration Tool.





OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

45. On or around March 26, 2015, Ravine purchased the domain, "open.ai" with the intent to launch future projects related to artificial intelligence on this website, all under the Open AI Mark.

46. The next day, Ravine discussed Open AI with Skype co-founder Jaan Tallinn:



47. On or around April 9, 2015, a sign-up page to join the Open AI project went live on the open.ai website. The website explained that Open AI was an "Open Industry Wide & Academia Wide Deep Learning Initiative" and included a fillable box for visitors to enter their email address "to be informed of developments or join the initiative." During this time, Ravine was working to put together the necessary ingredients to launch the OpenAI collaboration initiative that would include a research effort with participation from multiple companies.

48. On May 8, 2015, Ravine emailed Yann LeCun, then Chief AI Scientist of Facebook and now Meta. LeCun is one of the Fathers of Deep Learning.[4]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] See, https://en.wikipedia.org/wiki/Yann_LeCun

**GR** **Guy Ravine**
Open.AI Initiative

May 8, 2015 at 5:10 PM

To: ████████████   ████████████

Hi Yann,

A group of academics and companies are looking to launch an open academia wide and industry-wide initiative called Open.AI.

The goal of the collaboration is to foster faster progress in the field of deep learning by (a) making it much easier for more people to experiment on and improve the general algorithms of deep learning, (b) by providing an open API and free cloud for one button experimentation with new algorithms, (c) by identifying benchmarks for each of the challenging areas, and (d) through a more coherent organized general approach in the field, that also involves cognitive developmental researchers for testing and mirroring hypotheses. Below you can read more about the goals of the initiative.

I'll be in NYC next week and would like to meet with you on Wednesday if you could make time to discuss the possibility of Facebook or your research group providing computing resources for the initiative or other potential cooperation (Tuesday might also work if Wednesday doesn't work for you).

Guy

49.     By September 2015, Ravine began discussions to raise $100 million for this ambitious project. Open AI would include a lab and an academic and industry-wide collaboration with an AI school. By late 2015, even Google Research had expressed interest in backing the Open AI effort. As momentum built around Open AI, Ravine put together a business plan and began recruiting leading researchers to the initiative.

50.     Open AI would also provide a platform for cloud experimentation with open models along with an establishment of an AI school, as reflected in Ravine's September 28, 2015 presentation:



OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

51.     Because Ravine was close to a public launch, in September 2015, he changed the Open AI signup page at open.ai to say "ANNOUNCEMENT WILL BE MADE SOON" for the open industry-wide and academia wide initiative.

52.     On or around October 15, 2015, Counterclaimant Ravine created a digital brochure explaining his Open AI concept, which was available for anyone to share and access online. The brochure explained that Open AI "[p]rovides a platform and cloud for experimentation with new models" and "materials for every step from high school to PhD in AI," "collectively refined by the community."

53.     As of September 2015, Ravine's Open AI project had drawn the attention of a significant portion of the community of artificial intelligence researchers at the time.  The below chart tracks interactions with Open.AI between April 6, 2015, and September 2015.  The total number of interactions is over 1,000— a significant number in relation to the size of the then-nascent artificial intelligence industry.[5]



---

[5] For example, the largest national AI  conference, the Conference and Workshop on Neural Information Processing Systems (NIPS) had 2,400 attendees in its December 2014 meeting.

54.     As of December 2015, Ravine was making progress, the initiative was taking shape, and the announcement of Open AI was imminent. In addition to its core mission of developing AGI openly and transparently in a manner that involves all of humanity, Open AI intended to facilitate a collaboration for a broader shift in the AI research landscape. Other than conducting open research, the plan was to serve as an initiative for all research labs to collaborate openly creating a kind of "benevolent contagion," a model of open collaboration and knowledge-sharing that would incorporate more research labs and gradually spread throughout the industry, leading all companies to collaborate with open code for humanity.

55.     On December 10, 2015, Ravine sent an email to Nick Bostrom to provide an update on Open AI: "I'm working with some key people in Alphabet and we're thinking about putting a lot of resources behind Open AI as part of a related effort. I wanted to talk to you about your ideas again for the evolution of a future where general AI is available to everyone with a computer and no one group has an algorithmic advantage in general AI."  Ravine's Open AI was planning to make the major announcement of the Open AI non-profit initiative for humanity, with funding, over the following weeks so Ravine added to Bostrom: "*I have a feeling that what we do in the next weeks with plans for Open AI could have a big impact on the course of evolution of AI.*"

56.     Ravine continued to pursue his Open AI project under the Open AI Mark continuously from 2016 onwards. He used the "Open AI" mark in connection with a variety of on-line tools to foster research and collaboration among AI engineers and scholars. These tools included:

- Initial Collaboration Tool: A website and tool offering user-created online articles about artificial intelligence ("AI") research topics, offered at either wikineering.org or ineed.com/wikineering from on or about March 25, 2015, through in or around early 2016. The functionality of this tool was similar to Wikipedia. Visitors to the Initial Collaboration Tool could review articles and edit them. Visitors did not need to create an account to review or edit articles.

- AI Research Discussion Board No. 1: An online discussion board for users to discuss issues relating to AI development, offered at either wikineering.org or ineed.com/wikineering from in or around March 25, 2015, through in or around early 2016.

- Hub: An evolved version of the previous online discussion board, offered at hub.open.ai from on or about September 2016 through in or around early 2023. Hub Users could press a "sign up" button on the Hub webpage to create an account.

After doing so, the Hub User could author "posts" regarding AI research topics. The User would select a "Topic" for this post, and published posts were organized by topic. Other Hub Users could then reply to individual posts to add commentary or propose solutions to a research question. Hub Users could also "upvote" or "downvote" replies and proposed solutions. A higher number of "upvotes" on a particular reply served as guidance for future Hub Users who visited the site to find answers to a similar issue.

- Evolved Collaboration Tool: A website and tool offering user-created online articles about AI research topics (with advanced technology compared to the Initial Collaboration Tool), offered at beta.open.ai from January 18, 2017, through October 2023. The functionality of this tool was similar to Wikipedia. While users could create an account to use the Evolved Collaboration Tool, they could also create and edit articles anonymously.

- Decentralized v1: Tool designed to allow users to construct AI research projects together and edit topics relating to these projects in real time, offered at decentralized.open.ai from October 2017 through October 2023. Users could click on the "Start a New Company" button to create a new collaborative AI project. Several such "companies" were created titled "General Purpose Face ID," "Automated Store," and "AI Super Renderer."

- Open AI Image Generator: In late 2020 or early 2021, Ravine—like many in the AI field at that time—began to develop an AI text-to-image generator, completing it in March 2022. This generator creates images in response to user text prompts, offered at open.ai from November 16, 2022, through the present. Users do not need an account to create content through the Open AI Image Generator. Users can also click a "feed" button that displays images generated by other users. Users can share generated images through social media or through direct links. Users can also flag any images that the user believes contain inappropriate content.

57. Although data relating to older tools has been lost over the past decade, a forensics analysis of existing server data demonstrates that the Open AI family of websites were functional and had users. Between April 6, 2015, and December 10, 2015, before Altman announced the founding of OpenAI, Inc., Ravine's open.ai domain had attracted at least 393 unique, legitimate users. Between May 22, 2015, and December 11, 2015, about 133 users signed up with their email addresses on the open.ai domain. Over the next two-plus years, from May 22, 2015, through July 18, 2017, the open.ai family of websites had about 16,334 unique, legitimate users; and about 6,202 users signed up with their email addresses between May 22, 2015, and July 18, 2017. As of

/ / /

/ / /

/ / /

/ / /

October 2023, the Open AI Image Generator had about 3.1 million users, as reflected in the chart below.



### C.   THE COUNTERCLAIM-DEFENDANTS' EFFORTS TO MISAPPROPRIATE THE RECIPE FOR AGI FROM HUMANITY

#### 1.   Altman and Brockman Rush to Snatch Open AI from Humanity

58.   On December 11, 2015, after Ravine already had begun using the Open AI mark and the open.ai domain, Sam Altman and Greg Brockman announced to the world that they had formed OpenAI, Inc. and had obtained $1 billion in funding commitments from Elon Musk and others. Unlike Ravine's project, which was working to raise a more modest $100 million and to attract researchers, Altman and Brockman claimed to have a $1 billion in funding and over a dozen leading researchers on their team. This was incredible. As Ravine would learn many years later, it was also false.

59.   Altman and Brockman took Ravine's recipe and promise to create an AGI effort for humanity—Open AI—and used its stolen promise and mission—to be an "open non-profit for the benefit of humanity" —to gather Elon Musk's donations and entice other leading researchers to leave their positions for the mission. They then rushed to make an announcement that they would be the stewards of "OpenAI non-profit for the benefit of humanity," thereby diverting the stewardship of Open AI to their own control.

60.     On information and belief, Altman and Brockman learned of Ravine's Open AI from mutual business contacts and saw within it a recipe to gain control of an AGI effort that could compete with Google for themselves. As internal emails from January 2, 2016—a mere 21 days after their announcement—show, to them, this promise to be open for humanity was simply a "recruiting strategy for the short and medium term" and it was "OK not to share the science."[6] They misappropriated and duplicated Ravine's initiative, name, principles, mission, vision, domain, and statements, word for word, but they did not have the intention to follow through, at least not for the benefit of humanity.

61.     Altman and Brockman used their false promise to be open, not-for-profit, and for humanity to attract funders and the best AI talent from large institutions when they could not otherwise compete. They were also able to scare away competitors. The truth is, when they announced the $1 billion commitment for funding, they had virtually no money.

62.     As Ravine now understands, from the time of the December 2015 announcement through the end of 2016, OpenAI, Inc. would raise about $13 million. Yet for all outside appearances – and certainly to Ravine – it was as though OpenAI, Inc. had completely assimilated his principles, usurped his name, and established themselves as the unquestioned leaders in the field. Little did Ravine know that his original Open AI was still the only open, non-profit initiative for the benefit of humanity. The impostor Counterclaim-Defendant OpenAI, Inc. would eventually reveal itself to be a closed, for-profit company, for the benefit of a few who strive to have an algorithmic advantage over all other groups in general AI rather than ensure that no single group has an algorithmic advantage.

### 2.     Altman and Brockman Misappropriate the Recipe for AGI from Humanity

63.     One of the academics Ravine discussed Open AI with was Erik Brynjolfsson, then an MIT professor, now Stanford faculty.[7] Professor Byrnjolfsson had been working with Ravine

---

[6] Greg Brockman, *et al.*, *Open AI and Elon Musk*, (March 5, 2024), https://openai.com/blog/openai-elon-musk.

[7] Professor Byrnjolfsson currently directs the Digital Economy Lab at the Stanford Institute for Human-Centered AI, with appointments at SIEPR, the Stanford Department of Economics and the Stanford Graduate School of Business.

on the non-profit Wikineering open collaboration project and had spoken in academic and business circles and in conferences about the potential for using Wikineering's collaborative engineering process as a way to accelerate development of technologies, including AI. Ravine began to discuss an open-source, non-profit development effort around AI, initially called Wikineering AI.

64.     Thereafter, the full vision of Ravine's Open AI emerged. It would start with an open collaboration platform for everyone based on Wikineering AI, and once funded, it would become an Open AI research center and collaboration center for multiple companies and research labs to collaborate, as well as perform its own research, all of which would be open for the world.

65.     Byrnjolfsson told Ravine that he had received encouraging feedback from Elon Musk and Reid Hoffman, initially on Wikineering AI ideas, and later on Open AI, the platform and the industry-wide initiative and center. Brynjolfsson held multiple conversations with Musk and Hoffman. For example, on or around January 18, 2015, Brynjolfsson wrote Ravine that "Elon Musk has expressed his support for the idea," and on or around March 27, 2015, Byrnjolfsson said that "I think we made some progress with Reid and others." There were other such communications in person, by calls and over emails, between both Ravine and Brynjolfsson and Brynjolfsson and Musk and Hoffman.

66.     Another business leader that Byrnjolfsson introduced Ravine to was Patrick Collison, CEO and co-Founder of Stripe, a company that had received its initial funding from Altman's Y Combinator. Collison was Brockman's associate at Stripe and was in frequent communication with Altman.

67.     On March 13, 2015, Ravine met with Collison and shared his vision for Open AI as a non-profit, open-source AI initiative and industry-wide collaboration for the benefit of humanity, in a way that it would be for the good of the world and shared openly so that general AI belongs to the world and not to any group of individuals. He would use Wikineering as the foundation to build on first and subsequently continue with an industry-wide and academia-wide collaboration and research initiative center. They met at the playground tables outside of Stripe's offices on a sunny afternoon around mid-day for this discussion. They spoke for about 15 to 20 minutes and

covered the ideas and principles before Collison was called back to the office and Ravine drove off with Brynjolfsson to meet Andrew Ng, then Baidu's Chief Scientist and Google Brain's founder. Collison told Ravine to email him to see if he could help.

68.     On May 6, Brockman, Stripe's CTO, left the company and was considering what to do next.

69.     On May 19, 2015, Brockman apparently decided to apply for summer school.

70.     On May 21, 2015, Ravine followed up with Collison on the conversations they had about the principles of Open AI. Ravine thought Collison would be interested that he is launching the kind of iteration of Open AI that they talked about on Wikineering. Ravine also provided more details about the Open AI "deep learning initiative," and asked if he could "make the right connections to a few people" interested in joining.

71.     Around that time, Brockman recalls in his blog that he became interested in AI and that "My first goal was to figure out what deep learning was." By June 28, 2015, he began posting on social media images of a GPU he bought to run deep learning experiments.

72.     According to Brockman's blog post, he had discussions with both Collison and Altman specifically about what to do next after Ravine's meeting and correspondences with Collison.[8]

73.     By contrast, Ravine had built his AI company in the early 2000's and had built an open collaboration platform from the early 2010's. He also held discussions about the foundation and support of Open AI with top executives and leaders of AI at this point.

74.     Around that time, Altman became interested in starting something in AI, initially within YCombinator, according to Brockman's blog. But Altman and Brockman had a problem; it

---

[8] "Before I finalized my decision to leave, Patrick [Collison] asked me to go talk to Sam Altman. He said Sam had a good outsider's perspective, had seen lots of people in similar circumstances, and would probably have a good recommendation on what I should do. Within five minutes of talking to Sam, he told me I was definitely ready to leave. He said to let him know if he could be helpful in figuring out my next thing. I replied that AI was top of my list (and it was definitely my life goal). However, I wasn't yet sure whether it was the right time, or what the best way for me to contribute would be. He said, "We've been thinking about spinning up an AI lab through YC. We should keep in touch." https://blog.gregbrockman.com/my-path-to-openai.

1  was considered in their words, "impossible" to compete with Google. An AI lab alone would not

2  get anywhere, it would need a special sauce to attract talent.

3      75.    On May 25, 2015, Altman wrote to Elon Musk proposing that he fund an AI effort.

4  By June, Brockman had decided what he wanted to do next: Start an AI Company. That summer,

5  Altman, Brockman, and Musk had a dinner meeting at the Rosewood Sand Hill Hotel, where they

6  discussed AI. They concluded after discussions that the idea of competing with Google suddenly

7  "appeared not entirely impossible."[9] What was considered previously impossible, with the

8  principles of an Open AI non-profit initiative for the benefit of humanity, could work.

9      76.    By October 2015, Ravine was making progress with his own Open AI initiative,

10 holding discussions to raise up to $100M from various sources, including potentially Google

11 Research, which expressed interest in supporting Open AI as part of a dual initiative that included

12 an AI school. He began collaborating on a plan with a group of researchers, such as Richard

13 Socher, former Chief Scientist of Salesforce, Peter Norvig, Google Research head, and other

14 researchers from institutions such as MIT.

15     77.    Around November 22, 2015, Musk committed to funding Altman and Brockman's

16 OpenAI, Inc. Musk wrote: "We need to go with a much bigger number than $100M to avoid

17 sounding hopeless relative to what Google or Facebook are spending." The amount later donated

18 by Musk was actually around $45M over 5 years.

19     78.    As discussed above, by November 2015, Ravine was making progress on his Open

20 AI initiative, and he had posted on his open.ai domain that an "announcement will be made soon."

21 Word was getting around Silicon Valley about Ravine's Open AI initiative.  On information and

22 belief, Brockman would have been aware that Ravine was about to make an announcement and

23 rushed to acquire the similar domain openai.com around December 5.

24     79.    On December 8, Brockman proceeded to incorporate OpenAI, Inc. Its charter

25 reflected the promise of open sourcing their code for public benefit and provided that "[t]he

26 corporation is not organized for the private gain of any person."

27 _____

28 [9] Cade Metz, *et al.*, *Ego, Fear and Money: How the A.I. Fuse Was Lit*, N.Y. Times (Dec. 3, 2023), available at https://www.nytimes.com/2023/12/03/technology/ai-openai-musk-page-altman.html.

1

2

3

4

5

6

7

8

9

10

11

12

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:22 PM 12/08/2015
FILED 02:22 PM 12/08/2015
SR 20151247198 - File Number 5902936

**CERTIFICATE OF INCORPORATION OF**

**A NON-STOCK CORPORATION**

**OPENAI, INC.**

FIRST: The name of the Corporation is "OpenAI, Inc." (the "**Corporation**").

SECOND: The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

THIRD: This Corporation shall be a nonprofit corporation organized exclusively for charitable and/or educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States Internal Revenue law. The specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open source technology for the public benefit when applicable. The corporation is not organized for the private gain of any person. In furtherance of its purposes, the corporation shall engage in any lawful act of activity for which nonprofit corporations may be organized under the General Corporation Law of Delaware.

13    80.    Rushing to grab the spotlight before Ravine could announce sufficient funding,

14  Altman and Brockman launched "their" OpenAI, Inc. on December 11, 2015, in an attention-

15  grabbing blog post. In every major respect, Altman's OpenAI, Inc. was identical to Ravine's Open

16  AI, except that Altman claimed to have "$1 billion" in funding commitments from Musk,

17  Hoffman, and Peter Theil, as well as the involvement of some 14 top AI researchers. These claims

18  were misleading, but they made a huge difference.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /



> ### Introducing OpenAI
>
> by Greg Brockman, Ilya Sutskever, and the OpenAI team
> December 11, 2015
>
> OpenAI is a non-profit artificial intelligence research company. Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return.
>
> Since our research is free from financial obligations, we can better focus on a positive human impact. We believe AI should be an extension of individual human wills and, in the spirit of liberty, as broadly and evenly distributed as is possible safely.
>
> The outcome of this venture is uncertain and the work is difficult, but we believe the goal and the structure are right. We hope this is what matters most to the best in the field.

> Sam, Greg, Elon, Reid Hoffman, Jessica Livingston, Peter Thiel, Amazon Web Services (AWS), Infosys, and YC Research are donating to support OpenAI. In total, these funders have committed $1 billion, although we expect to only spend a tiny fraction of this in the next few years.

81.     In reality, Altman and Brockman's OpenAI, Inc. finished the following year with only $13 million in funding, and had fewer researchers committed to their project than announced at the outset. They ultimately raised only a fraction of the claimed amount over the next five years. But the shocking announcement of $1 billion from Musk and others, as well as 13 top researchers behind Altman and Brockman's OpenAI, which copied Ravine's plans in all respects, stole Ravine's thunder and relegated Ravine to the sidelines.

82.     The similarities between the entities were quite profound:

|  | **Original** | **Copy** |
|---|---|---|
| **Name** | Open AI | OpenAI |
| **Location** | San Francisco | San Francisco |
| **Domain** | open.ai | openai.com |

| Acquired | March 26, 2015 | December 5, 2015 |
|---|---|---|
| **Descriptions from communications** | Open AI is a non-profit AI initiative "to the benefit of humanity," "in a way that would ultimately be good for humanity" "collaboration" | Copied: OpenAI is a non-profit "to benefit humanity" "in a way that is most likely to benefit humanity as a whole" "collaborate" |
| **Ethos** | Open AI | Copied: "OpenAI" Now: ClosedAI |
| **Structure** | Non-profit | Copied: "Non-profit" Now: For-profit |
| **Mission** | For benefit of humanity | Copied: "For benefit of humanity" Now: For benefit of Altman & Brockman |
| **Background of originating founder** | Artificial Intelligence, Open collaboration | Financial Payments, Venture Capital |
| **Trademark** | Open AI (applied 2015, registered 2017) | Misappropriated The Ravine Parties' Open AI Mark and later sought legal ratification of their misappropriation in this lawsuit. |

83.     Shocked by this announcement, Ravine reached out to Altman and Brockman, expressing surprise and suggesting that they could potentially work together. Upon closer examination, Ravine realized that many of the key people involved or connected to Altman and Brockman's OpenAI, Inc., such as Collison, Musk, and Hoffman, were the same individuals that Ravine and Brynjolfsson had discussed Open AI with earlier.

84.     Open AI was to build AGI and give it to humanity. Instead, Altman and Brockman used it to acquire power for themselves.

85.     Altman and Brockman's actions had major consequences. As Siri Co-founder and Apple's former leader on AI, Tom Gruber stated:

> It is a travesty that by hijacking Guy's Open AI initiative and hurriedly making a major announcement, Altman and Brockman were able to attract top AI researchers and abundant donations, which allowed them to become a major player in AI. The fact that Altman and Brockman's OpenAI later switched from a non-profit, open AI

organization for the benefit of humanity to a closed AI, for-profit, under the influence of the founders, is a betrayal of the original mission.

### 3.      Guy Ravine Attempts to Regain Control of Humanity's AGI Property

86.     When Ravine heard of Altman and Brockman's December 11, 2015 announcement of a non-profit project for the collaborative creation of open-source software for the benefit of humanity called OpenAI, Inc., he was understandably concerned that Altman and Brockman had copied his own non-profit Open AI project for the collaborative creation of open-source software for the benefit of humanity. While Ravine hoped that Altman and Brockman's *arriviste* entity would turn out to be a collaborator, Ravine could not be sure.

87.     To protect his intellectual property, Ravine immediately filed an application to register the Open AI Mark with the USPTO on December 11, 2015. By this time, Ravine had been using the mark continuously in interstate commerce for nearly nine months.

88.     Ravine then reached out to Altman and his co-founder Ilya Sutskever, to see if they would, as their ethos indicated, be interested in collaborating for the betterment of humankind. Because Ravine realized that they were already founding an AI lab, which was also the plan for Ravine's Open AI, he proposed they collaborate and work on the collaboration platform component together:

On Fri, Dec 11, 2015, at 9:12 PM, guy@open.ai <guyravine@gmail.com> wrote:

Hi Ilya and Sam,

We've been working on an initiative called Open.AI to build a collective engineering platform to enable researchers from around the world to collectively engineer deep learning algorithms together through a fast collective iterative process using a number of new tools and principles. It's in development and is also a non-profit.

The initiative has the same goals as yours, which are [to] accelerate the arrival of general AI through an open effort.

We think the way research is done today is grossly inefficient, and a platform for collective engineering designed for AI like the one we have been developing could dramatically accelerate progress in the field through a better application of collective intelligence to the problem

We also believe that by applying collective intelligence to refine and simplify deep learning teaching materials in an iterative process through this platform, a lot more people would get involved in improving AI.

I've spent several years thinking about the problem of how to apply collective intelligence to large scale engineering projects, and in particular to AI, in an effective way. The conclusions were a number of key principles towards this end. My team has built a collective engineering platform called Wikineering (wiki engineering, www.wikineering.org), and then I decided that it would make most sense to focus on AI, so we started working on the foundations for Open.AI.

I've been working with Peter Norvig, Richard Socher and others to push a proposal for an AI School within Alphabet. The AI School would be a physical space that would teach its students as well as people online how to improve deep learning algorithms. In the proposal we are working on, the idea is that the AI School would also develop and maintain the Open.AI platform, and improve its teaching materials in an iterative process on Open.AI.

Before we go the Alphabet route (and we are not clear yet whether Larry will approve it being funded), I think it would make sense for us to meet and see if we could team up because we are working towards the same goals. This is bigger than us and I think it could benefit from working together.

By the way, Nick Bostrom has also been advising us on the evolution of open AI.

Guy

Guy Ravine
guy@open.ai
(415) 515-xxxx

89.     Altman responded in about 24 hours and added Brockman to the thread. It was quickly decided that Ravine and Brockman would meet in the coming days at Brockman's incubator space at Tesla that Musk had provided to help launch their project.

### 4.     Brockman and Altman Become the Ill-Gotten Guardians of Humanity's Property

90.     When Ravine went to Tesla to meet Greg Brockman on December 16, 2015, he was hoping that he would be able to form an alliance. After all, only a few days earlier, Brockman had posted that in his version of OpenAI: "Researchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code, and our patents (if any) will be shared with the

1 world. We'll freely collaborate with others across many institutions and expect to work with

2 companies to research and deploy new technologies."[10]

3    91.    When Ravine met with Brockman, he was met with indifference. Brockman was

4 dismissive of Ravine's work to date and refused to collaborate. However, Brockman assured

5 Ravine that OpenAI, Inc. was non-profit, operating for humanity, and had $1 billion in donor

6 commitments. He made his assurances to Ravine that they would fulfill his mission—that they

7 would in fact be the righteous Open AI non-profit for the benefit of humanity that Ravine had

8 envisioned. Despite these assurances, Brockman wanted the Open AI name–and all that it

9 conveyed–for himself. Brockman asked Ravine to change the name of Ravine's Open AI and to

10 sell the open.ai domain to his and Altman's new company. Ravine declined to sell the Open AI

11 name and domain to Brockman, and the meeting concluded.

12    92.    As a result of this meaning, Counterclaim-Defendants were unquestionably aware

13 of Ravine's interests in the Open AI Mark as of December 16, 2015, and nevertheless continued to

14 offer its goods and services under the Infringing Mark.

15    93.    Little did Ravine know that OpenAI, Inc. closed the following year only with $13

16 million, an amount less than Ravine was in discussions for raising, and that Brockman's

17 assurances could not be further from the truth. Within 21 days after this meeting, OpenAI, Inc.

18 was sending internal emails revealing that their commitment to a non-profit initiative for the

19 benefit of humanity was simply a "recruiting strategy for the short and medium term."

20    **D.    THE MISAPPROPRIATION OF HUMANITY'S AGI PROPERTY: OPENAI**

21    **1.    Misappropriation of the AGI Ingredients from Humanity**

22    94.    Having launched their company by looting Ravine's "recipe"—the Open AI name

23 and principles—Altman and Brockman continued their insatiable quest to achieve AGI by

24 purloining the "ingredients," *i.e.*, the other elements that went into their product. Through further

25 deception and manipulation, Altman and Brockman built a company that claimed to be a non-

26 profit building AI *for* humanity, while actually building a multi-billion-dollar company based

27 _____

28 [10] Greg Brockman, *et al.*, *Introducing OpenAI* (Dec. 11, 2015), **Error! Hyperlink reference not valid.**https://openai.com/blog/introducing-openai.

OPEN ARTIFICIAL INTELLIGENCE, INC. AND GUY RAVINE'S COUNTERCLAIMS

almost entirely on absconding *from* humanity. The stolen Ravine recipe, which was meant to be a beacon of hope for an open and transparent future, became a propaganda weapon in Altman and Brockman's hands, wielded to attract unsuspecting talent and funders who believed the insincere promises of an AI revolution that would benefit all of humanity.

95.     Under the insincere veneer of openness and a commitment to benefiting humanity, Altman and Brockman lured top AI researchers with false promises. In an interview published on December 11, 2015, Altman asserted, "[o]ne thing that really appeals to researchers is freedom and openness and the ability to share what they're working on, which at any of the industrial labs you don't have to the same degree. . . . I think our mission and our vision and our structure really appeals to people."[11] But even as Altman made such grandiose statements, he had no intention of making OpenAI, Inc. an "open" company. For example, a January 2, 2016 email between Altman, Brockman, and other OpenAI, Inc. co-founders said,"[I]t's totally OK to not share the science (even though sharing everything is definitely the right strategy in the short and possibly medium term for recruitment purposes)."[12]

96.     This brazen deception was not merely acceptable to Altman and Brockman; it was a calculated strategy to lure in the best minds in the field. Brockman himself admitted that attracting top talent from Google would have been "impossible" without the false promise of an open, non-profit organization dedicated to humanity. Researchers, believing in the fabricated mission, took significant pay cuts to join the cause, unaware that they were being exploited for Altman and Brockman's personal gain.

97.     Investors also fell victim to the pair's deceit. Elon Musk, who provided seed funding of approximately $50 million and was instrumental in recruiting Sutskever, OpenAI's Chief Scientist, had an agreement with Altman and Brockman that the OpenAI endeavor "(a) would be a non-profit developing AGI for the benefit of humanity, not for a for-profit company

---

[11] Steven Levy, *How Elon Musk and Y Combinator Plan to Stop Computers From Taking Over*, WIRED (Dec. 12, 2015), available at https://www.wired.com/2015/12/how-elon-musk-and-y-combinator-plan-to-stop-computers-from-taking-over/.

[12] Greg Brockman *et al.*, *OpenAI and Elon Musk* (Mar. 5, 2024), https://openai.com/blog/openai-elon-musk#email.

1  seeking to maximize shareholder profits; and (b) would be open-source, balancing only

2  countervailing safety considerations, and would not keep its technology closed and secret for

3  proprietary commercial reasons."[13]

4      98.     Musk also participated in the formation of the OpenAI Certificate of Incorporation,

5  which stated that the company's "technology would benefit the public and the corporation will

6  seek to open-source technology for the public benefit when applicable. The corporation is not

7  organized for the private gain of any person."[14] Yet when the truth of OpenAI's closed, for-profit

8  nature came to light, Musk left the company. As he famously quipped, "[i]t does seem weird that

9  something can be a non-profit, open source and somehow transform itself into a for-profit, closed

10  source . . . . This would be like, let's say you found an organization to save the Amazon rainforest,

11  and instead, they become a lumber company, and chop down the forest, and sold it for money."[15]

12  In 2024, echoing this sentiment, Musk ultimately sued OpenAI for, among other things, breach of

13  their founding agreement, breach of fiduciary duty, and unfair competition.

14      99.     On March 5, 2024, Musk offered to drop the lawsuit if OpenAI changed its

15  misleading name.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26

27  [13] Complaint at 24, Musk v. Altman, WL 899024 (Cal. Super. 2024) (No. CGC-24-612746)
    [14] *Id.*, 6:15-17; Exhibit 1 (OpenAI, Inc. Certificate of Incorporation) at p. 1, para. three.

28  [15] CNBC interview with Elon Musk, May 16, 2023. Available at
    https://www.youtube.com/watch?v=bWr-DA5Wjfw



100.    Others in the community have similarly complained that OpenAI's name is misleading and misdescriptive.



101.    On February 19, 2022, Altman emailed Ravine in an exchange shown below. Although there had been more than six years of silence between the two men, Altman offhandedly said he was "following up on past conversations between you, me and Greg Brockman," and asked if OpenAI, Inc. could purchase "the open.ai domain and related IP rights" from Ravine. Ravine wrote that if Altman wanted to do good for the world it would be better if Altman offered the money not to Ravine himself, but rather donate to academic research in AI. In exchange, Ravine would give Altman the Open AI trademark and domain for free. Instead of donating to

academic research, Altman chose to initiate litigation, trying to paint Ravine as a trademark troll,

claiming that Ravine was infringing the very IP that Altman had been offering to purchase.

> On Feb 19, 2022, at 9:09 AM, Sam Altman <█████████████> wrote:
>
> Hi Guy,
>
> I'm following up on past conversations between you, me and Greg Brockman regarding your Open.AI academic collaboration initiative. It looks like open.ai currently redirects to our website. OpenAI is working on building out our own domain portfolio - would you be open to us acquiring the open.ai domain name and related IP rights from you?
>
> Thanks!
> Sam

> On Sat, Feb 19, 2022 at 1:47 PM Guy Ravine <█████████████> wrote:
> Hi Sam,
>
> Elon Musk paid $11 million for the Tesla domain and trademark in 2017. As we both know, OpenAI holds the potential to become larger than Tesla, and in either event, will become one of the largest companies in the world in a relatively short period of time. So the ultimate value of the domain and the brand are substantial.
>
> The issue is that if you offered me a sum, I have no use for the money. As an individual, I'm already well off. In fact, I'm about to sell my company, video.io, which will make me even more money. So I'm not sure that giving money to someone who doesn't need it is a great use of resources for the world (assuming that your goal is to make the most good in the world).
>
> So here's something else you should think about that may align our values better.
>
> I'm selling my company so I could focus on funding academic AI research. The type of research I'm passionate about is also the type of research that OpenAI is interested in.
>
> Suppose that instead of giving a rich guy more money that he doesn't need, you donate the money to an academic collaboration that I am gearing to launch that funds academic research in transformers.
>
> In that case, OpenAI would benefit in several ways:
> 1. OpenAI would of course get the domain and IP.
> 2. Instead of giving the money away, it would be a donation to an organization that funds academic AI research which that would translate to good will with the academic AI community.
> 3. The organization would also take input from OpenAI as to which research makes most sense to fund. Since OpenAI benefits from new research discoveries in areas that OpenAI sees as important, doing this is something that effectively pays back to OpenAI.
> 4. The money would not be wasted, the transaction would result in good karma for the world, the academic community would view OpenAI more positively, and the donation would pay back for itself.
>
> Guy

## 2.  The Diversion of Humanity's Property to Altman's Personal Control

102.  On November 17, 2023, the then-Board of OpenAI, Inc.—guided by its fiduciary

duties and non-profit mission—recognized Altman was not acting in the best interests of

humanity. Following a letter from OpenAI, Inc.'s researchers warning of an AGI breakthrough

/ / /

/ / /

/ / /

1   that could threaten humanity, the Board fired Altman for "not being candid." This firing came on

2   the heels of his firing for self-interested behavior from Y Combinator.[16]

3        103.    Altman used a combination of legal intimidation, heart emojis, investor

4   manipulation, and financial brinksmanship to get himself reinstated. Board members were

5   attacked on social media as bad board members. "Within hours, messages dismissed the board as

6   illegitimate and decried Altman's firing as a coup[.]"[17]  "[P]eople identified as current OpenAI

7   employees also described facing intense peer pressure to sign [a] mass-resignation letter

8   [protesting Altman's ouster]."[18] Altman threatened to gut OpenAI's team[19] and reconstitute it

9   under Microsoft—demonstrating that it is not humanity to which he has allegiance, but to his

10  control of AGI systems.[20] In the end, on information and belief, Altman effectively fired the

11  Board; installed a new puppet board of conflicted individuals or individuals that could be

12  manipulated for a lack in understanding of the true significance of these events; and crowned

13  himself co-chair of his own AI Ethics Council.[21]

14       104.    This happened only months after Altman said it was important that the Board could

15  fire him with the power of AGI that OpenAI is building, and that it belongs to the world and not to

16

17  [16] Meghan Bobrowsky, Deepa Seetharaman, *The OpenAI Board Member Who Clashed With Sam Altman Shares Her Side*, Wall St. J. (Dec. 7, 2023) https://www.wsj.com/tech/ai/helen-toner-openai-board-2e4031ef

18  [17] Nitasha Tiku, *OpenAI leaders warned of abusive behavior before Sam Altman's ouster*, Wash. Post (Dec. 8, 2023) https://www.washingtonpost.com/technology/2023/12/08/open-ai-sam-altman-complaints/

20  [18] *Id.*

21  [19] "Within hours, messages dismissed the board as illegitimate and decried Altman's firing as a coup by OpenAI, Inc. co-founder and chief scientist Sutskever, according to the people…On social media, in news reports, and on the anonymous app Blind, which requires members to sign up with a work email address to post, people identified as current OpenAI employees also described facing intense peer pressure to sign the mass-resignation letter." Indeed, a mass resignation letter was generated, and due to the pressures exerted, several hundred OpenAI employees signed it. Nitasha Tiku, *OpenAI leaders warned of abusive behavior before Sam Altman's ouster*, Wash. Post (Dec. 8, 2023).https://www.washingtonpost.com/technology/2023/12/08/open-ai-sam-altman-complaints/

26  [20] Liam Wright (Nov. 20, 2023) https://cryptoslate.com/agi-is-excluded-from-ip-licenses-with-microsoft-should-it-be-attained-at-openai/.

27  [21] Mirtha Donastorg, *OpenAI launches ethics initiative. Atlanta leaders tapped to help* (Dec 11, 2023) https://www.ajc.com/news/business/atlanta-leaders-tapped-for-new-ethics-initiative-launched-by-openai/7MGJFO5L2ZGYPEY3WDDBGK24FE/

1  any individual. "No one person should be trusted here. I don't have super voting shares. The board
2  can fire me. I think that's important. [We] think this technology, the benefits, the access to it, the
3  governance of it, belongs to humanity as a whole. If this really works, it's quite a powerful
4  technology and you should not trust one company and certainly not one person."[22]

### 3.  OpenAI Willfully Infringes Ravine's Trademark Even as It Fails to Obtain Protection at the USPTO

105.  The name OpenAI was a fundamental part of Counterclaim-Defendants' deceptive
plan. They infringed and misappropriated this from the Counterclaimant Ravine, who has
continuously used the Open AI Mark in interstate commerce since at least March 2015.

106.  On August 1, 2017, Ravine's Open AI Mark was published in the United States
Patent and Trademark Office's ("USPTO's") Supplemental Register, Reg. No. 5,258,002. A true
and correct copy of the Open AI Mark Registration Certificate is attached hereto as Exhibit 2.

107.  Counterclaim-Defendants did not oppose the application or registration of the Open
AI Mark.

108.  On June 30, 2023, Ravine assigned the entirety of his interests in the Open AI Mark
to Open Artificial Intelligence Inc. A true and correct copy of the Trademark Registration
Assignment is attached as Exhibit 3.

### 4.  OpenAI, Inc.'s Registration Applications and Failure to Register the Infringing Mark

109.  Counterclaim-Defendant OpenAI, Inc. did not file an application with the USPTO
to register its infringing "OpenAI" word mark until 2022.[23] Ser. No. 97/238,896 (filed Jan. 26,
2022); Ser. No. 97/238,902 (filed Jan. 26, 2022); and Ser. No. 98/010,861 (filed May 24, 2023).

110.  The USPTO issued Non-Final Office Actions rejecting OpenAI's claim of acquired
distinctiveness on January 3, 2023. Since then, on February 23 and April 12, 2023, the USPTO
again determined that OpenAI, Inc.'s Infringing Mark and logo were unregistrable for being

---

[22] Mark Sullivan, *Sam Altman: You should not trust Sam Altman* (June 6, 2023)
https://www.fastcompany.com/90913845/sam-altman-you-should-not-trust-sam-altman.

[23] While there was a 2016 trademark application, Counterclaim-Defendants
chose to abandon their application after learning of Ravine's pending application for the same
mark. Ser. No. 87/178,985 (filed September 24, 2016; abandoned July 6, 2017).

"highly descriptive" despite OpenAI, Inc. having submitted hundreds of pages of evidence in support of its claim.

111.    As described in detail in the preceding paragraphs, it became clear only in 2023 that, despite repeated assurances, Counterclaim-Defendant OpenAI, Inc. did not intend to honor its commitment to develop the technology in an open manner beneficial to all of humanity and, instead, and contrary to countless public statements and statement made in their corporate formation documents, Counterclaim-Defendants would focus on profits.

112.    Counterclaim-Defendant OpenAI, Inc.'s application to register the "OpenAI" is thus impermissibly misdescriptive, as the name suggests an artificial intelligence research effort that is open and beneficial to all, when it is, in fact, a secretive endeavor focused on profit.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### LANHAM ACT UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN OR SOURCE, AND FALSE ADVERTISING

### (15 U.S.C. § 1125(a))

### (Against All Counterclaim-Defendants)

113.    Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

114.    The Counterclaim-Defendants' actions as described and alleged above, including but not limited to the sale and/or offering for sale of infringing goods and services under a mark or name confusingly similar to the Counterclaimants' Open AI Mark, are intended to and are likely to confuse, mislead, or deceive consumers, the public, and the trade as to the origin, source, sponsorship, or affiliation of the infringing goods and/or services and is intended and are likely to cause such parties to believe in error that the infringing goods and/or services have been authorized, sponsored, approved, endorsed, or licensed by the Counterclaimants', and as such constitute unfair competition, false designation of origin, false or misleading descriptions or representations of fact, false advertising, and/or unfair or deceptive trade practices, and in fact

1  have already caused such confusion and/or mistake, in violation of Section 43(a) of the Lanham

2  Act. 15 U.S.C. § 1125(a)(1)(A).

3      115.    As here, reverse confusion occurs when a large junior user saturates the market

4  with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user

5  does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the

6  senior user is injured because the public comes to assume that the senior user's products are really

7  the junior user's or that the former has become somehow connected to the latter. The result is that

8  the senior user loses the value of the trademark—its product identity, corporate identity, control

9  over its goodwill and reputation, and ability to move into new markets.[24]

10     116.    Further, the Counterclaim-Defendants' actions as described and alleged above,

11  including but not limited to the sale and/or offering for sale of infringing goods and services under

12  an impermissibly misdescriptive mark or name suggesting that its products and services are open

13  to the public and their repeated public announcements in interstate commerce regarding its

14  intentions as a non-profit artificial intelligence company, misrepresents the material nature,

15  characteristics, and qualities of the products and services sold in interstate commerce under the

16  Infringing Mark in commercial advertising and promotion, which had the capacity to deceive, and

17  did in fact deceive, a substantial segment of the public, and as such constitutes unfair competition,

18  false designation of origin, false or misleading descriptions or representations of fact, false

19  advertising, and/or unfair or deceptive trade practices, and in fact have already caused such

20  confusion and/or mistake, in violation of Section 43(a) of the Lanham Act. 15 U.S.C. §

21  1125(a)(1)(B).

22     117.    By reason of and as a direct and proximate cause of the Counterclaim-Defendants'

23  unfair, misleading, deceptive and/or false misconduct, the Counterclaimants have been suffering,

24  and will continue to suffer, substantial and irreparable injury, including to their reputation and

25  credibility, resulting in lost opportunities, diminished goodwill, and harm to its ability to expand

26  and to achieve their plans and goals for the development, use, and future of AI. Each of the

27

28  [24] *See, e.g., Edge Games, Inc. v. Electronic Arts, Inc.*, 745 F. Supp. 2d 1101, 116 n.8 (N.D. Cal. 2010).

1    Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct

2    described herein, are jointly and severally liable for the injury to the Counterclaimants.

3    118.    As set forth herein, the Counterclaim-Defendants' conduct has been willful and in

4    bad faith, in that they had actual knowledge of the Counterclaimants' Open AI Mark; the

5    Counterclaimants' prior use of the Open AI Mark; and the registration of the Open AI Mark,

6    making this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

7    119.    The Counterclaimants have no adequate remedy at law because their Open AI Mark

8    and name are unique and represent to the public Open AI's identity, reputation, credibility, and

9    goodwill, such that monetary damages alone cannot fully compensate the Counterclaimants for the

10   Counterclaim-Defendants' willful misconduct.

11   120.    Unless permanently enjoined by this Court, the Counterclaim-Defendants will

12   continue to willfully and openly infringe upon the Open AI Mark and name, causing irreparable

13   injury to the Counterclaimants. This present and future and real threat of injury to Open AI's

14   business, identity, goodwill, credibility, and reputation requires the imposition of permanent and

15   comprehensive injunctive relief to prevent Counterclaim-Defendants' continued unfair, deceptive,

16   misleading, false advertising and business practices, and to address and to mitigate the

17   Counterclaimants' injury.

18   121.    The Counterclaim-Defendants have financially gained and been unjustly enriched

19   from this unlawful misconduct. They have made, and will continue to realize, substantial profits or

20   gains to which they are not entitled under law or equity to retain. Consequently, in addition to the

21   grant of permanent injunctive relief, the Counterclaimants are entitled to an award of monetary

22   damages pursuant to 15 U.S.C. § 1117(a), including, but not limited to, disgorgement of the

23   Counterclaim-Defendants' profits, a reasonable royalty for the unauthorized and unlawful use of

24   their Open AI Mark or name, loss of goodwill and value in the Open AI Mark and name, and costs

25   of suit, in amounts to be determined at trial. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct.

26   1492, 1497 (2020).

27

28

WAYMAKER

**SECOND CAUSE OF ACTION**

**LANHAM ACT TRADEMARK INFRINGEMENT**

**(15 U.S.C. §§ 1114, 1125(a))**

**(Against All Counterclaim-Defendants)**

122.    The Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

123.    The Open AI Mark is a valid and protectable trademark. Indeed, as of August 1, 2017, Ravine became the rightful owner of a registered trademark issued by the USPTO on its Supplemental Register, Reg. No. 5,258,002. A true and correct copy of the registration certificate is attached as Exhibit 2. On June 30, 2023, Ravine assigned the entirety of his interests in the Open AI Mark to Open Artificial Intelligence Inc. A true and correct copy of the Trademark Registration Assignment is attached as Exhibit 3.

124.    As set forth herein, the Counterclaimants have continuously used the Open AI Mark in interstate commerce since at least March 25, 2015.

125.    Courts in the Ninth Circuit recognize "two theories of consumer confusion that support a claim of trademark infringement: forward confusion and reverse confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017). While "[f]orward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," in contrast, "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." Id. (quoting *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005)). "The concern with reverse confusion is not a question of palming off, since neither junior nor senior user wishes to siphon off the other's goodwill, but rather that the small senior user [will lose] control over its identity in the rising tide of publicity associated with the junior mark." *Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1252 (9th Cir.), *cert. denied sub nom. Anstalt v. Bacardi & Co. Ltd.*, 143 S. Ct. 428 (2022) (citations omitted); *see also Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002) ("[T]he smaller senior user" in a reverse confusion case "seeks to

protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity.").

126.    The Counterclaim-Defendants' willful actions as described and alleged above constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Counterclaimants' federally registered Open AI Mark, and a false designation of origin, by using, in commerce, without the Ravine Parties' authorization or permission, the confusingly similar Infringing Mark, and Counterclaim-Defendants' sale, offering for sale, providing, or advertising of products and services under the Infringing Mark is likely to cause, and has caused, confusion or mistake and deceived the public in violation of 15 U.S.C. § 1114, constituting trademark infringement under Section 32 of the Lanham Act.

127.    The use of the Infringing Mark as described and alleged above enables these infringers to trade on and receive the benefit and goodwill of the Open AI Mark which the Counterclaimants had built up. The use of the Infringing Mark also prevents the Counterclaimants from controlling the identity, goodwill, credibility, and goals associated with the Open AI Mark.

128.    The Counterclaim-Defendants' infringement has been willful and in bad faith, in that they had actual knowledge of the Open AI Mark, the Counterclaimants' prior use of the Open AI Mark, and the registration of the Open AI Mark. Accordingly, this an exceptional case within the meaning of 15 U.S.C. § 1117(a).

129.    By reason of and as a direct and proximate cause of the Counterclaim-Defendants' infringing activities, the Counterclaimants have been suffering and will continue to suffer substantial and irreparable injury, including to their reputation and credibility, resulting in lost opportunities, diminished goodwill, and harm to their ability to expand and achieve their plans and goals for the development, use, and future of AI. Each of the Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct described herein, are jointly and severally liable for the injury to the Counterclaimants.

130.    The Counterclaimants have no adequate remedy at law because its Open AI Mark and name are unique and represent to the public Open AI's identity, reputation, and goodwill, such

that monetary damages alone cannot fully compensate the Counterclaimants for the Counterclaim-Defendants' willful misconduct and infringement.

131.    Unless permanently enjoined by this Court, the Counterclaim-Defendants will continue to infringe upon the Open AI Mark and name, causing irreparable injury to the Counterclaimants. This present and future threat of injury to Open AI's business and property interests, identity, goodwill, credibility, and reputation requires the grant of permanent and comprehensive injunctive relief to prevent the Counterclaim-Defendants' continued willful and open unlawful use and infringement of the Open AI Mark and name and to address and mitigate the Counterclaimants significant injury.

132.    In addition to the imposition of permanent injunctive relief, the Counterclaimants are entitled to monetary damages pursuant to 15 U.S.C. § 1117(a), including, but not limited to, disgorgement of the Counterclaim-Defendants' profits, a reasonable royalty for the use of the Open AI Mark, loss of goodwill and value in the Open AI Mark, and costs of suit, in amounts to be determined at trial. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

### THIRD CAUSE OF ACTION

### CANCELLATION OF APPLICATIONS FOR REGISTRATION

### (15 U.S.C. § 1119)

### (Against Counterclaim-Defendant OpenAI, Inc.)

133.    The Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

134.    As set forth herein, the Infringing Mark is impermissibly misdescriptive insofar as it suggests that the products and services sold under the Infringing Mark are open to the public, in violation of Section 2(a) of the Lanham Act. 15 U.S.C. §1052(e)(1).

135.    The Infringing Mark both misdescribes the goods and services to which it applies, and consumers are likely to believe the misdescription. *In Re Phillips-Van Heusen Corp.*, 63 U.S.P.Q.2d 1047 (T.T.A.B. 2002).

136.     District courts have the authority to cancel or otherwise decide disputes over trademark applications. *See BBK Tobacco & Foods LLP v. Cent. Coast Agric., Inc.*, 97 F.4th 668, 670 (9th Cir. 2024) (Pursuant to the plain language of Section 1119, "[t]he district court's authority to 'determine the right to registration' and 'rectify the register' includes the power to decide disputes over trademark applications.").

137.     The Counterclaimants will be damaged by the registration of the Infringing Mark, and thus hereby petitions to cancel the pending applications to register "OpenAI" on the Principal Register, Ser. No. 97/238,896 (filed Jan. 26, 2022) and Ser. No. 98/010,861 (filed May 24, 2023).

### FOURTH CAUSE OF ACTION

### CALIFORNIA COMMON LAW TRADEMARK INFRINGEMENT

### (Against All Counterclaim-Defendants)

138.     The Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

139.     The Court has jurisdiction over this Cause of Action based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

140.     The Counterclaimants have continuously used the Open AI Mark in commerce since March 2015.

141.     The Counterclaim-Defendants' willful actions as described and alleged above constitute an infringement of the Counterclaimants' common law trademark rights to the Open AI Mark and name under the laws of the State of California.

142.     By using, in commerce, without the Counterclaimants' authorization or permission, the confusingly similar Infringing Mark, and Counterclaim-Defendants' sale, offering for sale, providing, or advertising of products and services under the Infringing Mark is likely to cause, and has caused, confusion or mistake and deceived the public.

143.     By reason of and as a direct and proximate cause of the Counterclaim-Defendants' willful infringing activities and misconduct, the Counterclaimants have been suffering, and will continue to suffer, substantial and irreparable injury, including to their reputation and credibility,

1  resulting in lost opportunities, diminished goodwill, and harm to their ability to expand and

2  achieve their plans and goals for the development, use, and future of AI. Each of the

3  Counterclaim-Defendants, by virtue of their knowing and active participation in the conduct

4  described herein, are jointly and severally liable for the injury to the Counterclaimants.

5      144.    The Counterclaimants have no adequate remedy at law because its Open AI Mark

6  and name are unique and represent to the public Open AI's identity, reputation, credibility, and

7  goodwill, such that monetary damages alone cannot fully compensate the Counterclaimants for the

8  Counterclaim-Defendants' willful infringement and misconduct.

9      145.    Unless permanently enjoined by this Court, the Counterclaim-Defendants will

10  continue to infringe upon the Open AI Mark and name, causing irreparable injury to the

11  Counterclaimants. This present and future threat of injury to Open AI's business, identity,

12  goodwill, credibility, and reputation requires the imposition of permanent and comprehensive

13  injunctive relief to prevent the Counterclaim-Defendants' continued unauthorized use and

14  infringement of the Open AI Mark and name and to address and mitigate the Counterclaimants'

15  injury.

16      146.    In addition to the imposition of permanent injunctive relief, the Counterclaimants

17  are entitled to monetary damages, in an amount to be determined at trial, for injuries suffered as a

18  result of the Counterclaim-Defendants' infringement.

19

20              **FIFTH CAUSE OF ACTION**

21              **FALSE ADVERTISING**

22          **(Cal. Bus. & Prof. Code § 17500)**

23          **(Against All Counterclaim-Defendants)**

24      147.    The Counterclaimants incorporate by reference, as though fully set forth herein, the

25  allegations of the preceding paragraphs of this Counterclaim.

26      148.    The Court has jurisdiction over this Cause of Action based on supplemental

27  jurisdiction pursuant to 28 U.S.C. § 1367.

28

149.     On December 8, 2015, OpenAI filed its Certificate of Incorporation with the state of Delaware. The Certificate of Incorporation stated that the purpose of the nonprofit corporation was "to provide funding for research, development and distribution of technology related to artificial intelligence. The resulting technology will benefit the public and the corporation will seek to open-source technology… The corporation is not organized for the private gain of any purpose."

150.     As set forth more fully above, OpenAI, Inc. made several public announcements regarding its intentions as a non-profit artificial intelligence company. For example, in a December 15, 2015, introductory statement partly attributed to Brockman, OpenAI, Inc. claimed the company was designed "to benefit humanity as a whole, unconstrained by a need to generate financial return" and that, because its research would be "free from financial obligations, [it could] better focus on a positive human impact."[25]  It further stated that its "[r]esearchers w[ould] be strongly encouraged to publish their work"; that its patents would "be shared with the world"; that it would "freely collaborate with others across many institutions" and expected "to work with companies to research and deploy new technologies."

151.     The December 11, 2015, announcement further stated that "funders ha[d] committed $1 billion" in donations to support OpenAI, Inc. On information and belief, the Counterclaim-Defendants knew, or should have known, this statement was untrue at the time it was made.

152.     At the same time, the Counterclaimants were in discussions to raise up to $100 million to create Open AI for the benefit of humanity. However, on information and belief, the Counterclaim-Defendants' false representations diverted funds from the Counterclaimants' Open AI to the Counterclaim-Defendants' OpenAI, Inc. Also, in and around 2015, the Counterclaimants believed Counterclaim-Defendants' public assurances that they were pursuing AGI for the benefit of humanity; indeed, the Counterclaimants had no reason to believe Counterclaim-Defendants' representations were in fact false at this time.

---

[25] Greg Brockman, *et al.*, *Introducing OpenAI* (Dec. 11, 2015), **Error! Hyperlink reference not valid.**https://openai.com/blog/introducing-openai.

153.    As set forth above, the Counterclaim-Defendants continued to make public statements suggesting that their OpenAI project would continue to remain an open-source, non-profit endeavor and that its technology would continue to be shared with the world. On information and belief, they knew, or should have known, these statements were false and untrue.

154.    In January 2018, researchers at OpenAI, Inc. released the "Generative Pre-Trained Transformer" model ("GPT"), along with its source code and a detailed paper describing the model, which allowed others to build upon it. In 2019, researchers at OpenAI, Inc. released GPT-2, along with source code and a paper describing the second-generation model. In 2020, researchers at OpenAI, Inc. released GPT-3, once again accompanied by a research paper describing its implementation so that others could build upon it.

155.    On or around March 14, 2023, OpenAI, Inc. released GPT-4. On information and belief, the design of GPT-4 was kept and remains a complete secret to everyone except to the Counterclaim-Defendant and Microsoft. Indeed, there was no research paper or scientific publication accompanying the release of this iteration of the model. With the release of GPT-4, it became clear that OpenAI, Inc. no longer intended to honor its prior commitments to develop the technology in an open manner beneficial to all of humanity.

156.    On information and belief, this switch to operating in secrecy was done for commercial reasons, in an attempt to maximize profits for Microsoft.

157.    The reinstatement of Counterclaim-Defendant Altman as CEO in November 2023 and the replacement of the majority of OpenAI, Inc.'s Board of Directors, including the only two independent female directors, made clear that OpenAI, Inc. did not intend to honor its commitment to develop the technology in an open manner beneficial to all of humanity and, instead, revealed the Counterclaim-Defendants' new focus on profits.

158.    OpenAI, Inc. openly admits that its "current AI research builds upon a wealth of previous projects and advances."[26]  On information and belief, this research was largely performed by individuals who believed OpenAI, Inc.'s promises that its work was for the benefit of humanity

---

[26] https://openai.com/research/overview.

1   and not for profit. Nevertheless, OpenAI, Inc. and its agents and partners used these open-source

2   contributions to build GPT-4, which is now effectively property belonging to Microsoft and is no

3   longer a project intended to benefit all humanity.

4         159.    On information and belief, OpenAI, Inc. is now secretly working on development

5   of a new model known as Q*. Such a secretive approach likewise departs from Open AI's

6   representations that all work would be performed and shared openly for the benefit of humanity.

7         160.    As set forth more fully above, the Counterclaimants relied on these false and

8   misleading statements to their detriment. Specifically, Ravine was in the process of procuring

9   significant investments for his Open AI project, including advanced discussions to raise up to

10   $100 million to create Open AI for the benefit of humanity, but, in reliance on Counterclaim

11   Defendants' public assurances that Counterclaim-Defendants were pursuing AGI for the benefit of

12   humanity, the Counterclaimants elected not to proceed at that time.

13         161.    As a result of Counterclaim Defendants' false statements, the Counterclaimants

14   suffered actual injuries, in an amount to be proven at trial.

15         162.    As alleged above, Counterclaim-Defendants made numerous false statements

16   between 2015 and 2023 regarding OpenAI, Inc.'s goal to benefit humanity and conduct and share

17   research openly. The Counterclaimants reasonably relied on the truthfulness of these statements,

18   which were not revealed as false, misleading, and/or deceptive until 2023.

19

20                       **SIXTH CAUSE OF ACTION**

21   **DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF TRADEMARK**
                      **UNDER THE LANHAM ACT**

22

23                       **(15 U.S.C. § 1125(a))**

24            **(Against Counterclaim-Defendant OpenAI, Inc.)**

25         163.    The Counterclaimants incorporate by reference, as though fully set forth herein, the

26   allegations of the preceding paragraphs of this Counterclaim.

27

28

WAYMAKER

164.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

165.    As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that the Counterclaimants have not infringed and are not infringing Counterclaim-Defendant OpenAI, Inc.'s alleged trademark rights in the Infringing Mark because they hold trademark rights that are senior to any purported trademark rights of Counterclaim-Defendant OpenAI, Inc.

166.    A judicial declaration is necessary and appropriate so that the Counterclaimants may ascertain their right to continue using the Open AI Mark in the manner set forth in this Counterclaim.

167.    Accordingly, the Counterclaimants are entitled to declaratory judgment that their use of the Open AI Mark does not infringe, either directly or indirectly, any trademark rights of Counterclaim-Defendant OpenAI, Inc. under 15 U.S.C. § 1114(1) or 15 U.S.C. § 1125(a), and that the Counterclaimants are not liable for any damages or other relief.

### SEVENTH CAUSE OF ACTION

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF COMMON LAW TRADEMARK

### (Against Counterclaim-Defendant OpenAI, Inc.)

168.    The Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

169.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

170.    As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that the Counterclaimants

1  have not engaged in any conduct that constitutes common law trademark infringement under the

2  laws of the State of California.

3       171.   A judicial declaration is necessary and appropriate so that the Counterclaimants

4  may ascertain their right to continue using the Open AI Mark in the manner set forth in this

5  Counterclaim.

6       172.   Accordingly, the Counterclaimants are entitled to a declaratory judgment that they

7  have not violated and are not infringing any trademarks under the laws of the State of California

8  and are not liable for any damages or other relief.

9

10                          **EIGHTH CAUSE OF ACTION**

11       **DECLARATORY JUDGMENT OF OWNERSHIP OF OPEN AI MARK**

12                **(Against Counterclaim-Defendant OpenAI, Inc.)**

13       173.   The Counterclaimants incorporate by reference, as though fully set forth herein, the

14  allegations of the preceding paragraphs of this Counterclaim.

15       174.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is

16  authorized to "declare the rights and other legal relations of any interested party seeking such

17  declaration, whether or not further relief is or could be sought."

18       175.   As a result of the acts described herein, there exists a controversy of sufficient

19  immediacy and reality to warrant the entry of a declaratory judgment that the Counterclaimants are

20  the true and rightful owners of the Open AI Mark and are entitled to trademark protection from the

21  use of any confusingly similar mark or name in commerce, including but not limited to the

22  Infringing Mark.

23       176.   A judicial declaration is necessary and appropriate so that the Counterclaimants

24  may ascertain their right to continue using the Open AI Mark in the manner set forth in this

25  Counterclaim.

26       177.   Accordingly, the Counterclaimants are entitled to a declaratory judgment that Open

27  Artificial Intelligence, Inc. is the true and rightful owners of trademark rights for the Open AI

28  Mark.

## NINTH CAUSE OF ACTION

## DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY

## (Against Counterclaim-Defendant OpenAI, Inc.)

179.    The Counterclaimants incorporate by reference, as though fully set forth herein, the allegations of the preceding paragraphs of this Counterclaim.

180.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court is authorized to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

181.    As a result of the acts described herein, there exists a controversy of sufficient immediacy and reality to warrant the entry of a declaratory judgment that Counterclaim Defendant OpenAI, Inc. owns no valid trademark rights in the Infringing Mark, as the mark is impermissibly misdescriptive insofar as it suggests that the products and services sold under the Infringing Mark are open to the public, in violation of Section 2(a) of the Lanham Act. 15 U.S.C. §1052(e)(1).

182.    The Infringing Mark both misdescribes the goods and services to which it applies, and consumers are likely to believe the misdescription. *In Re Phillips-Van Heusen Corp.*, 63 U.S.P.Q.2d 1047 (T.T.A.B. 2002).

183.    Accordingly, the Counterclaimants are entitled to a declaratory judgment that the Infringing Mark is impermissibly misdescriptive and that Counterclaim-Defendant OpenAI, Inc. thus owns no valid trademark rights in the Infringing Mark.

## PRAYER FOR RELIEF

**WHEREFORE**, the Counterclaimants pray for judgment against the Counterclaim-Defendants as follows:

1. An Order permanently enjoining the Counterclaim-Defendants and any related entities, their agents, employees, and all other persons acting in concert or participating with them from using the Infringing Mark, including, but not limited to Counterclaim-Defendants' use of the openai.com website domain, or otherwise participating in any acts calculated or likely to cause confusion or mistake in the minds of the consuming

public or to lead consumers to believe that the Counterclaimants' Open AI project shares some affiliation, connection, association, or sponsorship with the Counterclaim-Defendants' products and services;

2. Compensatory and consequential damages against the Counterclaim-Defendants as permitted by law and according to proof at trial;

3. Disgorgement of the Counterclaim-Defendants' profits according to proof at trial;

4. Statutory damages;

5. Reasonable royalty;

6. Punitive and exemplary damages according to proof at trial;

7. A declaratory judgment stating that the Counterclaimants have not, and are not infringing, either directly or indirectly, any valid and enforceable trademark rights purportedly belonging to the Counterclaim-Defendant OpenAI, Inc. under 15 U.S.C. § 1114(1) or 15 U.S.C. § 1125(a);

8. A declaratory judgment stating that the Counterclaimants have not, and are not infringing, either directly or indirectly, any valid and enforceable trademark rights of Counterclaim-Defendant OpenAI, Inc. under California law;

9. A declaratory judgment adjudging that Counterclaimant Open Artificial Intelligence, Inc. is the true and rightful owner of the Open AI Mark;

10. A declaratory judgment adjudging that Counterclaim-Defendants own no valid trademark rights in the Infringing Mark, as the mark is impermissibly misdescriptive;

11. An Order cancelling OpenAI, Inc.'s pending applications with the USPTO to register "OpenAI" on the Principal Register, Ser. No. 97/238,896 (filed Jan. 26, 2022) and Ser. No. 98/010,861 (filed May 24, 2023).

12. An Order awarding the Counterclaimants their reasonable attorneys' fees/costs as provided by statute;

13. Prejudgment and post-judgment interest as provided by law at the maximum interest rate; and

14. For such other and further relief as the Court deems just and proper.

1    DATED:  May 24, 2024                    WAYMAKER LLP

2

3                                             By:    _____/S/ Ryan G. Baker_____

4                                                    RYAN G. BAKER

5                                             *Attorneys for Guy Ravine and Open Artificial*
                                              *Intelligence, Inc.*
6

7

8

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 3-6, Counterclaimants Guy Ravine and Open Artificial Intelligence, Inc. hereby request a trial by jury as to all issues and claims in this action, which are subject to adjudication by a jury.

DATED:  May 24, 2024                                  WAYMAKER LLP


By:  _____
                 */S/ Ryan G. Baker*
                 RYAN G. BAKER

                 *Attorneys for Guy Ravine and Open Artificial*
                 *Intelligence, Inc.*