UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>OPEN ARTIFICIAL INTELLIGENCE,<br>INC., et al.,<br><br>        Defendants. | Case No. 23-cv-03918-YGR (AGT)<br><br>**DISCOVERY ORDER**<br>Re: Dkt. Nos. 165, 169 |

This order resolves the parties' dispute over OpenAI's RFP responses and the related motion to seal portions of the parties' joint letter brief and the exhibits thereto.

\* \* \*

1. **RFPs 79–81**. OpenAI must produce any nonprivileged communications, memoranda, or reports it has that address the results of the two brand-awareness surveys it previously produced. *See* Dkts. 169-4, 169-5. The surveys appear relevant to secondary meaning, *see Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002) ("A descriptive mark is entitled to trademark protection only if it has acquired secondary meaning, *i.e.*, it has become distinctive of the applicant's goods in commerce.") (simplified), and OpenAI's communications, memoranda, and reports about the surveys may further illuminate the

results. For the same reason, OpenAI must produce the marketing surveys alluded to by James Dyett, one of OpenAI's 30(b)(6) witnesses. *See* Dkts. 169-1 at 2, 169-6 at 14–15.

OpenAI argues that its brand-awareness surveys are irrelevant because they reflect the perceptions of the "general population," not "relevant consumers." Dkt. 174-1 at 6 (citing *Castaline v. Aaron Mueller* Arts, No. C 09-02543-CRB, 2010 WL 583944, at *3 (N.D. Cal. Feb. 16, 2010) (explaining that secondary meaning requires "a strong association between the mark and its owner . . . in the mind of the *relevant consumer population*") (emphasis added)). This is a fine distinction, which OpenAI can draw on summary judgment or at trial. But on the current record, OpenAI hasn't convinced the Court that the surveys do not tend to prove or disprove secondary meaning. Nor has OpenAI demonstrated that the "burden or expense of [this] discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). OpenAI must complete the above-ordered production by February 7, 2025.

2. **RFP 52**. Defendants seek all documents "relating to any association between [OpenAI's marks] [and] inappropriate content, including but not limited to racist or pornographic content." Dkt. 165-2 at 13–14. These documents are relevant if they exist. In moving for a preliminary injunction, OpenAI asserted that defendants' "image generator [was] unsafe, while [OpenAI's] image generator . . . [could not] be used to generate images depicting sexual, violent, or hate content." Dkt. 169-1 at 3 (simplified). Documents responsive to RFP 52, i.e., documents showing an association between OpenAI and inappropriate content, could discredit the distinction drawn by OpenAI.

To date, in response to RFP 52, OpenAI has agreed to produce only documents "sufficient to show . . . OpenAI's efforts to combat association between its marks and inappropriate content." Dkt. 174-1 at 7 (quoting another source). This response is too narrow.

Defendants want to know whether inappropriate content has been generated *despite* OpenAI's efforts to combat it. OpenAI's response sidesteps defendants' actual request.

To fully comply with RFP 52, OpenAI says it would need to conduct "a massive, human review of all emails sent to customer support." *Id.* To the contrary, OpenAI should be able to craft search terms to find customer emails referencing racist or pornographic content, obviating the need to review "all emails sent to customer support." *Id.* OpenAI complains that defendants haven't identified such search terms, *see id.*, but OpenAI, as the responding party, "must take the initiative." *Emerson v. Iron Mountain Info. Mgmt. Servs., Inc.*, No. 20-CV-08607-YGR-AGT, 2021 WL 8085488, at *1 (N.D. Cal. Sept. 2, 2021) ("Iron Mountain is in a better position than Emerson to know which of its employees are likely to have responsive ESI and to determine how that ESI can best be located, reviewed, and produced."). OpenAI must comply with RFP 52 by February 7, 2025.

3. **RFPs 4–6, 10, 21, 67–73**. Defendants seek documents from OpenAI relating to defendants' mark, defendants' websites (such as open.ai), and defendants themselves. Generally, such records are relevant because they may reveal when and what OpenAI knew about defendants and their mark. *See Commerce Nat., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3rd Cir. 2000) (stating that, in a reverse confusion case, "the intent inquiry must . . . be altered to focus on whether the [junior user (purportedly OpenAI)] was aware of the senior user's use of the mark in question"). OpenAI doesn't disagree.

OpenAI produced responsive documents, but defendants posit that OpenAI is withholding more. The Court isn't convinced of this. OpenAI searched for responsive documents from 22 custodians and "later disclosed its custodians, along with certain searches, . . . during meet and confer." Dkt. 168, Perahia Decl. ¶ 6. OpenAI then gave defendants the chance to

3

propose more search terms, but defendants didn't do so. *See id.* ¶ 8. Only now, after the discovery cutoff, have defendants asked the Court to "order the parties to negotiate custodians, search terms, and targeted searches." Dkt. 174-1 at 5.

If defendants weren't satisfied with OpenAI's production, they should have proposed additional custodians and search terms. *See Emerson*, 2021 WL 8085488, at *1 ("Iron Mountain must . . . tell Emerson which custodians and search terms it used. . . . [I]f warranted, Emerson may [then] ask Iron Mountain to add additional custodians or search terms."). Instead, defendants now only speculate that OpenAI's production is incomplete.

With one exception, OpenAI need not respond further to RFPs 4–6, 10, 21, and 67–73. The exception is this: By February 7, 2025, OpenAI must produce the cover emails to the Coresearch reports it previously produced. *See* Dkt. 174-1 at 7. Even though the reports are dated, *see, e.g.*, dkt. 168-5 at 2, the cover emails will show when OpenAI received them. OpenAI can redact "confidential information relating to other watched marks and non-U.S. reports" from the cover emails. Dkt. 174-1 at 7. On the current record, the Court isn't convinced that these redactions will be "disproportionately burdensome." *Id.*

4. **Motion to Seal**. OpenAI seeks to redact portions of the joint letter brief and to seal many of the exhibits thereto. *See* Dkts. 169, 172. Except for the two brand-awareness surveys (dkts. 169-4, 169-5), which reveal extensive market-research results, the Court isn't convinced that "specific prejudice or harm will result" if the materials in question are publicly disclosed. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003). Only some survey results are disclosed in the letter brief and the other exhibits, and OpenAI hasn't articulated how public disclosure of these limited results will harm the company.

By January 31, 2025, defendants, as the parties who filed the joint letter brief, must

4

file a public unredacted version of the brief and the exhibits except for the brand-awareness surveys.

**IT IS SO ORDERED.**

Dated: January 24, 2025

_____
Alex G. Tse
United States Magistrate Judge