QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone:    (212) 849-7000

*Attorneys for OpenAI, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 4:23-cv-03918-YGR<br><br>Assigned to the Hon. Yvonne Gonzalez Rogers<br><br>**PLAINTIFF OPENAI, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      June 17, 2025<br>Time:      2:00 p.m.<br>Place:     Courtroom 1 (4th Fl.)<br>             1301 Clay St.<br>             Oakland, CA 94612 |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 17, 2025, at 2:00 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers at the United States District Court for the Northern District of California, Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 1 (4th Floor), 1301 Clay Street, Oakland, California 94612, Plaintiff/Counterclaim-Defendant OpenAI, Inc. ("Plaintiff" or "OpenAI") will, and hereby does, move the Court for an order entering summary judgment in favor of OpenAI on each of Plaintiff's claims and each of Defendants/Counterclaimants Open Artificial Intelligence, Inc. and Guy Ravine's (collectively, "Defendants") counterclaims, pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rules 7-2 and 56.

As detailed in the Proposed Order submitted with this Motion, Plaintiff OpenAI seeks an order granting summary judgment in its favor on its five causes of action on the grounds that it holds senior, protectable trademark rights; that Defendants infringed those rights; and that Defendants made a material misrepresentation to the U.S. Patent and Trademark Office. Plaintiff further seeks summary judgment on Defendants' seven counterclaims, as no reasonable jury could find that Defendants possess senior trademark rights. Additionally, Plaintiff seeks an order in its favor finding that Defendants' counterclaims are barred by the doctrine of laches and that their damages claim fails for lack of any non-speculative evidence. Because there are no genuine issues of material fact regarding the bases for Plaintiff's motion, Plaintiff is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

This motion is based upon this Notice of Motion and Motion, the incorporated memorandum of points and authorities, Plaintiff's 56.1 Separate Statement of Undisputed Material Facts ("SUF"); the Declaration of Gregory Brockman ("Brockman Decl."), Declaration of James Dyett ("Dyett Decl."), Declaration of Janine Korovesis ("Korovesis Decl."), Declaration of Rebecca McCurry ("McCurry Decl."), Declaration of Todd Price ("Price Decl."), Declaration of Hod Lipson ('Lipson Decl."), Declaration of Scott D. Swain ("Swain Decl."), and Declaration of Aaron Perahia ("Perahia Decl."); the accompanying request for judicial notice; other documents on file in this action; and other evidence and argument presented to the Court.

1   DATED: April 9, 2025                    QUINN EMANUEL URQUHART &
2                                           SULLIVAN, LLP

3
                                        By _____/s/ Margret M. Caruso_____
4                                               Margret M. Caruso
                                            Attorneys for OpenAI, Inc.
5

**ISSUE TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), OpenAI identifies the following issue to be decided:

1.     Whether summary judgment should be granted in favor of Plaintiff on the parties' infringement claims—*i.e.*, Plaintiff's claims for (1) federal trademark infringement and unfair competition (15 U.S.C. § 1125(a)); (2) common law trademark infringement, and Defendants' counterclaims for (1) Lanham Act unfair competition (15 U.S.C. § 1125(a)); (2) Lanham Act trademark infringement (15 U.S.C. § 1114); (3) common law trademark infringement; (4) declaratory judgment of non-infringement of trademark under the Lanham Act (15 U.S.C. § 1125(a)); (5) declaratory judgment of non-infringement of common law trademark; (6) declaratory judgment of ownership of Open AI mark; and (7) declaratory judgment of trademark invalidity.

2.     Whether summary judgment should be granted in favor of Plaintiff on its claims for cancellation of Defendants' registration on the Supplemental Register—*i.e.*, (3) cancellation – fraudulent registration (15 U.S.C. § 1120); (4) cancellation – no bona fide use (15 U.S.C. § 1119); and (5) cancellation – misrepresenting source (15 U.S.C. § 1119).

3.     Whether summary judgment should be granted in favor of Plaintiff on Defendants' counterclaims, even if triable issues of fact remain as to the validity of either side's trademark rights, because Defendants' counterclaims are barred due to (a) OpenAI's role as an intervening junior user in a different market segment, and/or (b) laches.

4.     Whether summary judgment should be granted in Plaintiff's favor on Defendants' claimed damages—regardless of whether triable issues of fact remain as to Plaintiff's liability— because no genuine issue of material fact exists as to the existence of any non-speculative damages suffered by Defendants due to Plaintiff's alleged infringement.

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 10

INTRODUCTION ....................................................................................................................... 10

SUMMARY OF FACTUAL BACKGROUND ........................................................................... 11

     A.     OpenAI's Founding And Growth ....................................................... 11

     B.     Defendants' 2015 "Use" And Fraud On The PTO .................................... 12

     C.     After OpenAI Suggested Buying Ravine's Domain Name, Defendants Created Consumer Confusion ...................................................................... 13

LEGAL STANDARD .................................................................................................................. 14

ARGUMENT ............................................................................................................................... 15

I.     THERE IS NO TRIABLE ISSUE ON TRADEMARK INFRINGEMENT ........................ 15

     A.     Plaintiff OpenAI Has Senior Protectable Trademark Rights ...................................... 15

     B.     Defendants Did Not Acquire An Ownership Interest In A Valid Trademark Before November 2022 ........................................................................ 20

           1.     Defendants' Paucity of Evidence of Third-Party Bona Fide Use Dooms Their Trademark Claims. ............................................................... 20

           2.     Defendants' Lack of Distinctiveness Dooms Their Trademark Claims. ...... 23

     C.     Plaintiff Is Entitled To Summary Judgment On Trademark Infringement ............. 25

II.     THE UNDISPUTED FACTS CONFIRM THAT DEFENDANTS' REGISTRATION ON THE SUPPLEMENTAL REGISTRATION SHOULD BE CANCELLED ........................ 25

III.     EVEN IF DEFENDANTS HAD VALID RIGHTS, THEIR COUNTERCLAIMS FAIL .. 28

IV.     PLAINTIFF IS ENTITLED TO SUMMARY ADJUDICATION ON DEFENDANTS' DAMAGES CLAIM ........................................................................ 33

CONCLUSION ........................................................................................................................... 35

1

# TABLE OF AUTHORITIES

2

## Cases

3

*Accentra Inc. v. Staples, Inc.*,
    2012 WL 12877868 (C.D. Cal. Jan. 3, 2012) ...................................................................... 24

*Airs Aromatics, LLC v. Hakim*,
    556 F. App'x 622 (9th Cir. 2014) ....................................................................................... 21

*ATM Express, Inc., v. ATM Express., Inc.*,
    2009 WL 2973034 (S.D. Cal. Sept. 11, 2009) ............................................................... 30, 32

*Automated Pet Care Prod., LLC v. PurLife Brands, Inc.*,
    670 F. Supp. 3d 946 (N.D. Cal. Apr. 21, 2023) .................................................................. 24

*Belmora LLC v. Bayer Consumer Care AG*,
    987 F.3d 284 (4th Cir. 2021) .............................................................................................. 28

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ........................................................... 16, 20, 21, 22, 29

*Brunat v. OneWest Bank FSB*,
    473 F. App'x 649 (9th Cir. 2012) ....................................................................................... 15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................................... 14, 25

*Chance v. Pac-Tel Teletrac Inc.*,
    242 F.3d 1151 (9th Cir. 2001) ............................................................................................ 22

*Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*,
    909 F.3d 1110 (Fed. Cir. 2018) .......................................................................................... 25

*Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*,
    457 F. Supp. 1090 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979) .............................. 28

*Dimas v. Matilde*,
    2015 WL 5768341 (C.D. Cal. Sept. 30, 2015) ................................................................... 26

*E-Systems, Inc. v. Monitek, Inc.*,
    720 F.2d 604 (9th Cir. 1983) .............................................................................................. 30

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
    2021 WL 3630225 (9th Cir. Aug. 17, 2021) ...................................................................... 24

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) ............................................................................................ 24

*Fitbug Ltd. v. Fitbit, Inc.*,
    78 F. Supp. 3d 1180 (N.D. Cal. 2015) ...................................................................32, 33

*Glow Indus., Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ........................................................................22

*Golden Door, Inc. v. Odisho*,
    646 F.2d 347 (9th Cir. 1980) ....................................................................................18

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*,
    391 F.3d 1088 (9th Cir. 2004) .............................................................................30, 32

*H.I.S.C., Inc. v. Rajanayagam*,
    810 F. App'x 560 (9th Cir. 2020) ..............................................................................19

*Hanginout, Inc. v. Google, Inc.*,
    54 F. Supp. 3d 1109 (S.D. Cal. 2014) .............................................. 15, 22, 23, 31

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
    2024 WL 4750497 (9th Cir. Nov. 12, 2024) ............................................. 30, 31, 32

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
    668 F. Supp. 3d 1025 (C.D. Cal. 2023), *aff'd*, 2024 WL 4750497 (9th Cir. Nov.
    12, 2024) .......................................................................................................31, 32

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
    287 F.3d 866 (9th Cir. 2002) ....................................................................................24

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002) ....................................................................................32

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
    68 F.4th 1203 (9th Cir. 2023) ...................................................................................19

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) ....................................................................................14

*Kopets v. Kajajian*,
    2023 WL 4145433 (9th Cir. June 23, 2023) .............................................................21

*Lisa Frank, Inc. v. Impact Int'l, Inc.*,
    799 F. Supp. 980 (D. Ariz. 1992) ..............................................................................19

*Lodestar Anstalt v. Bacardi & Co.*,
    2019 WL 8105378 (C.D. Cal. July 3, 2019), *aff'd*, 31 F.4th 1228 (9th Cir.
    2022) ......................................................................................................................34

*Look Cycle Int'l v. Kunshan Qiyue Outdoor Sports Goods Co.*,
    2024 WL 3739358 (T.T.A.B. Aug. 9, 2024) ................................................ 26, 27, 28

*Machine Head v. Dewey Global Holdings Inc.*,
  2001 WL 1747180 (N.D. Cal. 2001)...................................................................29

*Midwest Rsch. Inst. v. S & B Promotions, Inc.*,
  677 F. Supp. 1007 (W.D. Mo. 1988)...................................................................17

*Mike's Novelties, Inc. v. PIV Enters., Inc.*,
  2024 WL 457120 (E.D. Cal. Feb. 6, 2024).........................................................22

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006) ...............................................................29, 30, 32

*Neurovision Med. Prods., Inc. v. NuVasive, Inc.*,
  2014 WL 12544830 (C.D. Cal. Aug. 5, 2014) ....................................................17

*NewRez v LLC v. Brosnan*,
  2023 WL 2347441 (C.D. Cal. Jan. 30, 2023) ......................................................18

*Off. Airline Guides, Inc. v. Gross*,
  6 F.3d 1385 (9th Cir. 1993) ................................................................................16

*Olivier v. Baca*,
  913 F.3d 852 (9th Cir. 2019) ..............................................................................14

*OpenAI, Inc. v. Open Artificial Intelligence, Inc.*,
  2024 WL 4763687 (9th Cir. Nov. 13, 2024) ................................................19, 23

*Optimal Pets, Inc. v. Nutri-Vet, LLC*,
  877 F. Supp. 2d 953 (C.D. Cal. 2012)................................................................22

*Pac. Packaging Concepts, Inc. v. Nutrisystem, Inc*,
  2021 WL 3130041 (C.D. Cal. July 23, 2021)......................................................34

*Parts.com, LLC v. Google Inc.*,
  2014 WL 12461256 (S.D. Cal. Jun. 25, 2014) ..............................................30, 32

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018) ............................................................................31

*Plumrose Holding Ltd. v. USA Ham LLC*,
  2025 WL 248763 (T.T.A.B. Jan. 17, 2025).........................................................28

*Quia Corp. v. Mattel, Inc.*,
  2011 WL 2749576 (N.D. Cal. July 14, 2011) .....................................................34

*Robi v. Five Platters, Inc.*,
  918 F.2d 1439 (9th Cir. 1990) ............................................................................26

*RSI Corp. v. Int'l Bus. Machines Corp.*,
  2012 WL 3277136 (N.D. Cal. Aug. 9, 2012) ................................................32, 33

*RXD Media, LLC v. IP Application Dev. LLC*,
    986 F.3d 361 (4th Cir. 2021) ...................................................29

*In Re Sheet Pile, LLC*,
    2024 WL 1175785 (T.T.A.B. Mar. 19, 2024) ..................................................24

*SmileDirectClub, LLC v. Berkely*,
    2018 WL 8131096 (C.D. Cal. Oct. 26, 2018)..................................................28

*Soc. Techs. LLC v. Apple Inc.*,
    4 F.4th 811 (9th Cir. 2021) ..................................................21

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,
    735 F.2d 346 (9th Cir. 1984) ..................................................28

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
    2013 WL 4528539 (N.D. Cal. Aug. 23, 2013), *amended in part*, 2013 WL
    6157208 (N.D. Cal. Nov. 22, 2013), *aff'd*, 650 F. App'x 473 (9th Cir. 2016) .......................18

*Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*,
    2021 WL 4813257 (C.D. Cal. Oct. 6, 2021)..................................................34

*TIBCO Software Inc. v. GatherSmart LLC*,
    2021 WL 4477902 (N.D. Cal. Mar. 5, 2021) ..................................................20

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006) ..................................................30

*W. Coast Corvettes, Inc. v. MV Mktg., Inc.*,
    2012 WL 12882014 (C.D. Cal. Dec. 13, 2012) ..................................................19

*Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*,
    2010 WL 11520159 (C.D. Cal. Sept. 20, 2010) ..................................................16, 18

*Worx4u2, Inc. v. Earthwhile Endeavors, Inc.*,
    2022 WL 1601399 (C.D. Cal. Apr. 5, 2022) ..................................................31

### Rules

Fed. R. Civ. P. 56(a) ..................................................14

### Additional Authorities

Trademark Manual of Examining Procedure, 904.04(a)(i)..................................................26

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff seeks summary judgment that Defendant's use of "Open AI" infringes Plaintiff's "OpenAI" trademark, that Defendants fraudulently obtained the Supplemental Registration they rushed to apply for after learning of OpenAI, and that even if Defendants had valid trademark rights, their counterclaims are barred by laches, and they have no damages.  There is no genuine dispute of material fact on any issues necessary for the Court to grant Plaintiff's motion.

For nearly a decade, Plaintiff OpenAI has been at the forefront of the artificial intelligence revolution, developing and releasing some of the best known and most used AI products in the world.  Meanwhile, Defendants, Guy Ravine and his company, Open Artificial Intelligence, Inc., sporadically used the name "Open AI" in discussing the concept of a nonprofit they never founded and in displaying webpages of limited utility with scant consumer engagement.  Defendants did not make available any artificial intelligence goods or services on their open.ai webpage until November 2022, and, for years before that, Defendants' open.ai webpage redirected traffic to Plaintiff's website.  Ravine's LinkedIn profile described himself as "OpenAI Originator" from "2014-2015."

But that changed in 2022, after OpenAI's CEO reached out to Ravine to see if Ravine would sell his domain that was redirecting to OpenAI's website.  After OpenAI did not eagerly jump at Ravine's suggestion that his domain name was worth $11 million, Ravine updated his LinkedIn profile to say he never stopped working at "OpenAI," and Defendants began offering access to a third-party, open-source AI image generator to compete with OpenAI's DALL·E image generator.  Defendants filed secret letters of protest against OpenAI's trademark applications, sought and received litigation funding after OpenAI launched ChatGPT, and tried unsuccessfully to lure Meta, Google, and Amazon into an alliance to "get OpenAI scrambling," and "force[] [OpenAI] to change their name."

The evidence leaves no doubt that Plaintiff OpenAI has valid and protectable trademark rights senior to Defendants, and it is entitled to summary judgment.  To the extent Defendants have any trademark claims, they are entirely barred by laches.  Defendants knew of Plaintiff OpenAI from the outset, but they sat by and watched, never once raising any concern to OpenAI about its

use of its mark, as OpenAI invested billions in research and development and introduced transformative products that have captivated the imagination of millions. OpenAI's motion for summary judgment should be granted in full and Defendants' fraudulent registration cancelled.

## SUMMARY OF FACTUAL BACKGROUND

### A.    OpenAI's Founding And Growth

Plaintiff announced its founding as an artificial intelligence research lab in December 2015 and immediately garnered significant, national media coverage. SUF 1-2. Within five months, it released OpenAI Gym, a toolkit to develop artificial intelligence algorithms, on its website and on GitHub, attracting thousands of artificial intelligence researchers. *Id*. 3. By January 2017, following additional releases, research publications, conference presentations, AI community events, policy advocacy, and further promotion of and publicity for its research and software, OpenAI had established a reputation among artificial intelligence researchers and developers, nationally, who understood the "OpenAI" mark to identify the source of Plaintiff's products and services. *Id*. 9; *see also id.* 4-8.

OpenAI has since developed and released more than twenty AI products using its "OpenAI" mark, including its GPT language model in 2018, GPT-2 in 2019, a GPT-3 application programming interface ("API") in 2020, the DALL·E image generation tool in 2021, and Whisper, an automatic speech recognition system in 2022. SUF 4. These products had millions of users by November 15, 2022. *Id*. 15. By November 15, 2022, OpenAI had published over 100 research papers, which have collectively been cited more than 200,000 times. *Id*. 5.

OpenAI's products have been remarkably successful. By 2019, OpenAI's website was attracting over 1 million monthly visitors, climbing to over 1 billion monthly visitors by 2023. SUF 11, 20. By April 2021, over tens of thousands developer were using OpenAI's API, with OpenAI's GPT-3 generating 4.5 billion words per day. *Id*. 12. By March 2022, search engines like Google and Bing exclusively associated the term "OpenAI" with Plaintiff, and *Time* named OpenAI to its Top 100 Most Influential Companies. *Id*. 13-14. OpenAI's API reached over 1 million signups in July 2022. *Id*. 15; Dyett Decl., Ex. E. By September 2022, its DALL·E 2 program had 1.5 million users generating over 2 million images *per day*. Dyett Decl., Ex. J at '3215. OpenAI released

1   ChatGPT in November 2022, and it created an immediate sensation, gaining 1 million users within

2   five days and becoming "the fastest-growing consumer internet app of all time." Perahia Decl., Ex.

3   57 at '21167. By August 2023, OpenAI had over

4                . SUF 15. That year, CNBC ranked OpenAI #1 on its annual Disruptor 50 list,

5   recognizing that "OpenAI has quickly become a household name." Perahia Decl., Ex. 57 at '21335.

6       **B.**    **Defendants' 2015 "Use" And Fraud On The PTO**

7         In 2015, Ravine purported to have the idea of trying to launch a collaboration between

8   industry and academia to promote "open AI," and acquired the Anguilla country code domain name

9   open.ai. SUF 23. After seeing coverage of OpenAI's founding, Ravine rushed to apply to register

10  "Open AI" with the U.S. Patent and Trademark Office ("PTO"); he claimed to have used the mark

11  in commerce—even though at the time Ravine's open.ai webpage said simply "Announcement Will

12  Be Made Soon," and it offered no goods or services. *Id.* 24-25, 57-59. That same day, after filing

13  his application, Ravine emailed one of OpenAI's founders to propose they collaborate to work

14  towards "accelerat[ing] the arrival of general AI through an open effort," noting that "a platform for

15  collective engineering … could dramatically accelerate progress in the field." *Id.* 69. OpenAI's

16  President met with him shortly thereafter, and unmistakably declined to work with Ravine. *Id.* 70.

17        Ravine abandoned his idea for the industry-academia collaboration. SUF 25-26. Consistent

18  with that abandonment, Ravine's open.ai webpage began redirecting traffic to Plaintiff's openai.com

19  webpage. *Id.* And even years later, as of February 22, 2022, Ravine's LinkedIn profile, described

20  his work with "OpenAI" as from "2014-2015." SUF 48.

21        In March 2016, the PTO rejected Ravine's "Announcement Will Be Made Soon" webpage

22  specimen as not showing use of "Open AI" in commerce. SUF 59-60. In September 2016, shortly

23  before his deadline to submit a new specimen, Ravine had a worker copy content from an unrelated

24  website onto "hub.open.ai." *Id.* 61. He concealed the posting dates and misrepresented the

25  screenshot to the PTO as showing use in commerce from December 2015. *Id.* 62. With no reason

26  to suspect Ravine's substitute specimen, submitted under penalty of perjury, was fraudulent, the

27  PTO did not reject the specimen. But the PTO refused to register Ravine's "Open AI" mark on the

28  Principal Register because it was descriptive. *Id.* 46. Ravine requested the mark be registered

instead on the Supplemental Register, and on August 1, 2017, it was.  *Id.*   To this date, Defendants have made no attempt to move the mark from the Supplemental Register to the Principal Register.

### C.    After OpenAI Suggested Buying Ravine's Domain Name, Defendants Created Consumer Confusion

In January 2022, Plaintiff applied to the PTO to register its "OpenAI" mark.  SUF 49.  In connection with that application, OpenAI's trademark lawyer investigated Ravine's registration on the Supplemental Register, only to discover the open.ai webpage was directing traffic to Plaintiff's website, and that all of the content on the "hub" webpage specimen had been copied from a third-party site—more than five years earlier.  *Id.* 24-26, 33-35.  That investigation revealed no evidence Ravine was actually making an effort to use "Open AI" in commerce—or had done anything to offer goods or services through open.ai.  *See* McCurry Decl. ¶¶ 3-5, Ex. A-E.  Following the investigation, on February 19 2022, OpenAI's CEO emailed Ravine to see if he would be interested in selling his "domain name and related IP" to OpenAI.  SUF 27.  In responding, Ravine did not deny that his website had been redirecting traffic to Plaintiff's website, nor did he claim to be engaging in any commercial activity in connection with "Open AI," and he did not claim that OpenAI was infringing any trademark rights he owned.  *Id.*  Instead, he wrote that OpenAI "will become one of the largest companies in the world in a relatively short period of time," that "the ultimate value of the domain and the brand are substantial," that the "Tesla domain and trademark in 2017" had been sold for $11 million, and that "OpenAI holds the potential to become larger than Tesla."  *Id.*  Ravine suggested he would agree to a transfer if OpenAI made a "donation" to an "academic collaboration" that he was supposedly "gearing to launch."  *Id.*   OpenAI's CEO asked Ravine to provide more details about the "academic collaboration."  *Id.*  Ravine never responded to him.  *Id.*

Two months later in April 2022, OpenAI released DALL·E 2 to widespread publicity.  *See* SUF 10.  Later, Ravine adapted an open-source image generator, which he made available on open.ai in November 2022.  *Id.* 50.  The next month, after OpenAI launched ChatGPT, Ravine secretly sent a letter of protest to the PTO, trying to prevent OpenAI's registration of the OPENAI mark.  *Id.* 65.  And the month after that, Ravine began seeking litigation funding.  Perahia Decl. ¶ 87.  He also began an email campaign aimed at third parties, including Google, Meta, and Amazon,

unsuccessfully trying to convince them to form an alliance that could "get OpenAI scrambling" and "force[] [them] to change their name."  *Id*.

Meanwhile, Defendants' November 2022 introduction of a competing image generator using the name "Open AI" on the open.ai webpage caused actual consumer confusion.  SUF 51-57. Visitors searched for Plaintiff's products, such as ChatGPT, on Defendants' website, social media users posted about their confusion, and media outlets mistakenly linked to Defendants' website when discussing Plaintiff's products.  *Id*. 52-54.  Numerous third parties—including customers and business associates—contacted Defendants believing they were reaching Plaintiff, sharing confidential information and business opportunities.  *Id*. 51.  And an unrebutted confusion survey confirmed this widespread confusion.  *Id.* 57.

After becoming aware of Defendants' competing use, Plaintiff filed suit and successfully sought a preliminary injunction, which the Ninth Circuit affirmed.  *See* Dkt. Nos. 1, 21, 63, 144. Eight months after Plaintiff initiated this lawsuit, Defendants filed counterclaims.  *See* Dkt. No. 100.

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329 (9th Cir. 2017) (quotations and brackets omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 329-330 (quotations omitted).

"Where … the opposing party will have the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case."  *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (quotations omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment." *Brunat v. OneWest Bank FSB*, 473 F. App'x 649, 650 (9th Cir. 2012) (quotations omitted).

## ARGUMENT

## I.    THERE IS NO TRIABLE ISSUE ON TRADEMARK INFRINGEMENT

OpenAI is entitled to summary judgment that Defendants' use of "Open AI" is infringing (Claims 1-2, and all of Defendants' counterclaims). *See* Dkt. 219. No reasonable juror could find otherwise.

### A.    Plaintiff OpenAI Has Senior Protectable Trademark Rights

The undisputed evidence establishes that Plaintiff has protectable rights in its OPENAI trademark: (i) it continuously used the mark in commerce, (ii) it developed secondary meaning, and (iii) it achieved sufficient market penetration and established a national reputation. *See, e.g.*, *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1118 (S.D. Cal. 2014) ("To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. … To establish common law trademark rights in the absence of federal registration, a plaintiff must plead and prove that it is the senior user of the mark with sufficient market penetration to preclude the defendant from using the mark in a specific geographic market.") (quotations omitted); Model Jury Instruction 15.9 (Infringement—Elements—Validity—Unregistered Marks); *see also* Dkt. 224 (detailing elements). Because Plaintiff did all of those things by January 2017, before Defendants used "Open AI" in continuous commerce, and well before Defendants began using it in connection with generative AI products in November 2022, Plaintiff's rights are senior.

OpenAI announced its founding as an AI research lab on December 11, 2015, in a blog post on its website and social media. SUF 1. Starting that very day, OpenAI received considerable unsolicited media coverage, with features in national publications like *The New York Times*, *The Wall Street Journal*, and *USA Today*, among others. *Id.* 2. Within five months, in April 2016, OpenAI used its mark in releasing OpenAI Gym on GitHub, a third-party marketplace, and OpenAI's own website. *Id.* 3. OpenAI Gym was an open-source toolkit for AI researchers and developers to use to develop and compare the performance of artificial intelligence algorithms. *Id.*

1    OpenAI promoted OpenAI Gym on its own website, including through a blog post, and on social

2    media, along with an academic research paper published on ArXiv.org.  *Id*.  OpenAI Gym had

3    thousands of users within months of launch, quickly spawning third-party articles, scholarship, and

4    even multiple third-party instructional guides.  *Id*. 3-4, 9.  OpenAI thus made use in commerce of

5    its mark "sufficiently public to identify or distinguish the marked goods in an appropriate segment

6    of the public mind."  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1052 (9th

7    Cir. 1999) (quotations omitted).

8         Later in 2016, OpenAI used its mark in connection with another offering, OpenAI Universe,

9    also released on GitHub and OpenAI's own website.  SUF 4, 9.  OpenAI Universe is a software

10   platform for measuring and training an AI's general intelligence.  *Id*. 4.  OpenAI announced

11   Universe on its website and social media and released a research paper about it.  *Id*.  Traditional

12   advertising was not necessary for nearly 3,000 users to "star" OpenAI Universe on GitHub (akin to

13   bookmarking it) within *three days* of its launch.  *Id*.; *see also* Lipson Decl., Ex. A ¶ 28 (explaining

14   "stars").  As with OpenAI Gym, promotion of OpenAI Universe to AI researchers included mentions

15   in research papers, presentations at conferences, and social media posts and videos on YouTube,

16   Twitter, and Reddit.  SUF 4, 9.  OpenAI's recognition continued to grow, and by the end of 2016,

17   its then-target market of AI researchers associated the "OpenAI" mark as a source of goods and

18   services, not merely a description of the kinds of goods and services OpenAI was offering.  *Id*. 9.

19        Because the relevant "segment of the public associate[d] the [OpenAI] Name with Plaintiff,"

20   the "OpenAI" mark had acquired secondary meaning.  *Westside Shepherd Rescue of Los Angeles,*

21   *Inc. v. Pollock*, 2010 WL 11520159, at *5 (C.D. Cal. Sept. 20, 2010) (secondary meaning for non-

22   profit amongst "members of the community involved in animal rescue, control, shelters, adoption

23   and healthcare, in addition to those members of the community who either use animals in their work

24   or who have personally adopted animals"); *see also Off. Airline Guides, Inc. v. Gross*, 6 F.3d 1385,

25   1391 (9th Cir. 1993) (secondary meaning established when "customers associate the mark with a

26   particular source")).  The national recognition of the "OpenAI" mark among users and researchers

27   of OpenAI Gym and OpenAI Universe (which have remained continuously available since their

28   2016 introduction) establishes sufficient market penetration through a national reputation among

the relevant consumers. *See, e.g.*, *Neurovision Med. Prods., Inc. v. NuVasive, Inc.*, 2014 WL 12544830, at *5 (C.D. Cal. Aug. 5, 2014) (plaintiff established "nationwide rights" through evidence including sales "in multiple states," exhibitions "at trade shows and conferences throughout the country," display of products on website, and product mentions in "several medical journals distributed nationwide"); *Midwest Rsch. Inst. v. S & B Promotions, Inc.*, 677 F. Supp. 1007, 1012-13 (W.D. Mo. 1988) (secondary meaning established in mark regarding research services based on testimony of those who recognized plaintiff's name as a distinct source of research services).

OpenAI has continued to use its OPENAI mark in connection with a wide range of offerings including software code, the OpenAI API, other generative AI products and services, and published research. *Id.* 4, 9. For example, OpenAI's Roboschool, Baselines, Gym Retro, and Spinning Up code releases in 2017 and 2018 collectively received over 23,100 stars, as well as 6,511 forks (reflecting the number of personal copies of OpenAI's repositories saved by other users, permitting them to freely experiment or iterate on the code) on GitHub. *Id.* 9. In 2018, OpenAI Five, a team of five AI "agents" that OpenAI developed to play the game Dota 2, participated in multiple high-profile demonstrations against human opponents, generating over 1 million livestream views, 1.1 million YouTube views, thousands of upvotes and comment engagement on Reddit, and extensive media coverage in national publications, including *The New York Times*. *Id.* 4, 10. The extensive unsolicited media coverage of OpenAI, including in national publications like *The New York Times*, *The Wall Street Journal*, and *USA Today*, which have regularly referred to "OpenAI" in headlines, further evidences the source-identifying function of the mark. *Id.* 4-21. And OpenAI continued to use and promote its mark in association with its products and services on its website, social media, and marketing. *Id.* 4.

Beginning in 2018, OpenAI expanded its offerings to include generative AI products and services. In June 2018, OpenAI released its original generative AI GPT model, along with a research paper and source code, followed by the GPT-2 source code on GitHub in February 2019, with updated versions in May and November 2019. SUF 4. These advancements were a "significant step forward in the field." Perahia Decl., Ex. 56 at '4315. In April 2019 alone, OpenAI's website had 3.39 million views. SUF 11. OpenAI received extensive media coverage in 2019 related to its

research, its GPT-2 model, and its partnership with Microsoft.  *Id*. 4.  Following GPT-2's success, OpenAI included GPT-3 functionality in the OpenAI API, the first product it charged for, which it released in June 2020.  *Id*. 4.  In March 2022, *Time* named OpenAI one of the "Top 100 Most Influential Companies of 2022."  *Id*. 14.

OpenAI's consumer acclaim accelerated just days later with its introduction of its DALL·E 2 image generator in April 2022.  SUF 4.  *The New York Times* referred to the spring 2022 unveiling of DALL·E 2 as the first generative AI technology to "capture[] the public attention" and as "a hit with consumers" by the summer 2022.  *Id*. 4, 10; *see also* Perahia Decl., Ex. 58 at '2163 (January 2023 *Fortune* article referring to DALL·E 2 as a "hype generator").  Within the six months following DALL·E 2's release, more than 1.5 million customers used it to create over 2 million images per day.  *Id*.; *see also* Perahia Decl., Ex. 58 at '4642.  By November 1, 2022, the success of OpenAI's offerings among consumers of generative AI products was undeniable, with over 1.8 million U.S. account sign-ups for non-API products, and over 275,000 U.S. companies and organizations using the OpenAI API.  *Id*. 15-18.  This was all before Defendants began making available a competing generative AI product in November 2022.  *Id*. 50.

The levels of media attention, promotion, and users OpenAI achieved by November 1, 2022, establish both secondary meaning and sufficient market penetration through a national reputation. *See, e.g.*, Dkt. 63 (PI Order) at 13, 15 (for secondary meaning, courts consider "(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive").[1]

---

[1]    *NewRez v LLC v. Brosnan*, 2023 WL 2347441, *4 (C.D. Cal. Jan. 30, 2023) (evidence that the plaintiff had "served more than 1.7 million loans" using its mark supported secondary meaning); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350-51 (9th Cir. 1980) ("the district court's finding that a secondary meaning has attached is supported by evidence of the extensive media coverage plaintiff's spa has received"); *Westside Shepherd Rescue*, 2010 WL 11520159, at *5 (evidence of name appearing in "magazine articles" and "on websites," and being "well-known in the [relevant] community]" weighed in favor of secondary meaning); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 2013 WL 4528539, at *3, 11 (N.D. Cal. Aug. 23, 2013) ("legally sufficient national market penetration" was "established" through testimony concerning sales and "approximately $66,000 per year in advertising and marketing" spending, as well as "corroborating evidence … including news articles"), *amended in part*, 2013 WL 6157208 (N.D. Cal. Nov. 22, 2013), *aff'd*, 650 F. App'x 473

Evidence on other secondary meaning factors further demonstrates that any reasonable juror would conclude the OpenAI mark had secondary meaning. "[S]ubstantial and continuous use of a mark in commerce for five years is *prima facie* evidence of secondary meaning." *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1216 (9th Cir. 2023). As of November 1, 2022, OpenAI had continuously used its mark for nearly *seven* years. SUF 4, 10, 15. Plaintiff's use was substantially exclusive. *See W. Coast Corvettes, Inc. v. MV Mktg., Inc.*, 2012 WL 12882014, at *8 (C.D. Cal. Dec. 13, 2012) ("Plaintiff has … shown substantial exclusivity sufficient to establish a secondary meaning" where "other alleged uses of the disputed mark did not compete and did not predate Plaintiff's use"). No third party used "OpenAI" for generative artificial intelligence products or services—or for AI research services. SUF 22. And, as discussed in Section I.B.1, Defendants had made little, if any, use in commerce of "Open AI" as of November 1, 2022.

Defendants' attempt to capitalize on consumer association of the OpenAI mark with Plaintiff's goods and services further establishes secondary meaning. *See Jason Scott Collection*, 68 F.4th at 1214 ("proof of copying strongly supports an inference of secondary meaning") (quotations and brackets omitted). Defendants did so by introducing competing products using the "Open AI" name on open.ai and redesigning their website to "look[] remarkably like plaintiff's" website. Dkt. 63 (PI Order) at 8. The resulting confusion (SUF 51-57) further proves that consumers associate the OpenAI mark with a single source, not as a description of products that multiple companies offer. *See, e.g.*, *H.I.S.C., Inc. v. Rajanayagam*, 810 F. App'x 560, 561 (9th Cir. 2020) ("Secondary meaning can also be established by evidence of likelihood of confusion."). This evidence of secondary meaning exceeds what was in the record that supported the preliminary injunction the Ninth Circuit affirmed. *See OpenAI, Inc. v. Open Artificial Intelligence, Inc.*, 2024 WL 4763687 (9th Cir. Nov. 13, 2024).

---

(9th Cir. 2016), *on reh'g en banc*, 839 F.3d 1179 (9th Cir. 2016); *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F. Supp. 980, 993 (D. Ariz. 1992) ("extensive promotional activities, including the sponsorship of national and local [] events," "attendance at industry trade shows" and "[e]vidence of extensive unsolicited media coverage supports a finding of secondary meaning").

**B.      Defendants Did Not Acquire An Ownership Interest In A Valid Trademark Before November 2022**

**1.      Defendants' Paucity of Evidence of Third-Party Bona Fide Use Dooms Their Trademark Claims.**

Defendants had no meaningful third-party users of any "Open AI" branded goods or services before November 2022.  As such, they are unable to establish valid trademark rights in "Open AI" before Plaintiff began offering AI-related research and other products and services in 2016, before Plaintiff began offering generative AI products in 2018, or before Plaintiff OpenAI released DALL·E-2 in 2022.

Defendants alleged that they have continuously used "Open AI" in commerce since 2015.  Dkt. 138 (SACC) ¶ 105.  Discovery proved this to be indisputably false.  Defendants have pointed to two ostensible offerings in 2015.  SUF 25, 29.  One is the "Open AI Initiative" Ravine claims to have pitched and promoted through the open.ai "Announcement Will Be Made Soon" webpage.  *Id.* 25.  As the PTO Trademark Examiner concluded, this webpage did not reflect use in commerce.  *Id.* 61.  *See also, e.g.*, *TIBCO Software Inc. v. GatherSmart LLC*, 2021 WL 4477902, at *3 (N.D. Cal. Mar. 5, 2021) ("GatherSmart's website standing alone, without advertising, marketing, or selling trademarked goods or services in connection with its website does not constitute use of the mark in commerce."); *Brookfield*, 174 F.3d at 1052 (rejecting purported use as "akin to putting one's mark on a business office door sign, letterheads, architectural drawings, etc. or on a prototype displayed to a potential buyer, both of which have been held to be insufficient to establish trademark rights").  Ravine has now admitted that his efforts regarding that initiative failed, and he abandoned it.  SUF 25-26.  And remarkably, starting by at least September 2017, it is undisputed that Defendants' own open.ai webpage redirected visitors to *Plaintiff's* website until February 2022.  *Id.* 26, 32.

Defendants' second claimed 2015 offering was what they called an "Initial Collaboration Tool."  SUF 29-30.  Because Defendants lack any documentation that such a tool existed, they rest solely on "reconstructions" made for this litigation and mock-ups pasting the "Open AI" image from the "Announcement Will Be Made Soon" webpage over text from Wikipedia.  *Id.* 31.  They lack any evidence the tool was ever used in commerce.  *Id.* 29-32, 40-44.  But even if it were, Defendants admit that they discontinued this tool by February 2016, and "probably" "sometime before that."

*Id.* 31.  Accordingly, the tool cannot be used to establish continuous use in commerce that began in 2015.  *Kopets v. Kajajian*, 2023 WL 4145433, at *1 (9th Cir. June 23, 2023) ("One requirement for a mark to be valid and protectable is that the plaintiff's use of the mark was continuous and not interrupted.") (quotations omitted); *Airs Aromatics, LLC v. Hakim*, 556 F. App'x 622, 623 (9th Cir. 2014) ("To establish a protectable ownership interest in a common law trademark, the owner must establish not only that he or she used the mark before the mark was registered, but also that such use has continued to the present.") (quotations omitted).

The next "Open AI" offering Defendants claim was in September 2016, on the hub.open.ai webpage—five months after OpenAI released OpenAI Gym on the GitHub marketplace.  SUF 33. Defendants lack any evidence that this use was "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Brookfield*, 174 F.3d at 1052.  They engaged in no traditional or social media advertising of the hub webpage, and they have no evidence of any third-party user of the "service."  SUF 34-35, 40-44. As such, Defendants' hub webpage fares no better than its "Announcement Will Be Made Soon" webpage.  *See supra*.  This is because "a mark cannot serve a source-identifying function if the public has never seen the mark and thus is not meritorious of trademark protection until it is used in public in a manner that creates an association among consumers between the mark and the mark's owner."  *Brookfield,* 174 F.3d at 1051; *see also Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 819 (9th Cir. 2021) (plaintiff's pre-launch activities, including maintaining a website for two years, early-stage business planning, a $100,000 internal investment, and soliciting outside investors, did not constitute a bona fide use in commerce).

Defendants' remaining pre-November 2022 offerings, the "Evolved Collaboration Tool" (or "Beta") on the beta.open.ai webpage, and "Decentralized," on the decentralized.open.ai webpage, both displayed starting in 2017, suffer from the same defects.  SUF 36-39.  Not only are these purported uses nearly a year or more *after* the introduction of OpenAI Gym—and after OpenAI's release of OpenAI Universe—but Defendants engaged in no marketing or promotion of them.  *Id.* 40-44.  Discovery revealed zero third-party user registrations for Beta until June 2020—days after Plaintiff announced its OpenAI API on beta.openai.com.  *Id.* 37.  (Thereafter, Defendants received

emails demanding that Defendants delete registration data after the senders realized they inadvertently registered for Defendants' website.  *Id.*)  Decentralized contained only test content and had six accounts before November 2022, none of which represented bona fide use in commerce: two belonged to administrators, two were explicitly labeled as test accounts, and two were created within an hour of each other from the same non-U.S. IP address associated with someone on Defendants' developer team.  *Id.* 39.  *Cf. Brookfield*, 174 F.3d at 1052 ("trademark rights are not conveyed … through mere preparation to use a term as a trademark"); *accord Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1160 (9th Cir. 2001) ("mailing of the 35,000 post cards, which generated 128 responses to its 800 number and no sales, cannot be considered a first use").

Defendants' pre-November 2022 "uses" are thus insufficient to create trademark rights. Even if Defendants could somehow satisfy the bona fide use in commerce threshold at some point, they cannot establish the requisite market penetration to create trademark rights at any time before November 16, 2022.  *See, e.g.*, *Mike's Novelties, Inc. v. PIV Enters., Inc.*, 2024 WL 457120, at *9 (E.D. Cal. Feb. 6, 2024) ("A senior user of a distinctive unregistered trademark is entitled to assert its trademark rights only in geographical areas in which it has legally sufficient market penetration.") (citing *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 959 (C.D. Cal. 2012) and *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002)).  Defendants have no evidence of sales, no evidence of the number of registered users for the product in relation to the total number of potential customers, no evidence of the volume of users in any U.S. state, no advertising, and no evidence from which to argue "Open AI" had a national reputation before November 15, 2022.  SUF 25-44.  *See, e.g.*, *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d at 1122 (identifying market penetration factors and finding plaintiff's "failure to present any evidence as to the actual location of its registered users dispositive").

Far more substantial evidence of market penetration than Defendants' has been rejected as insufficient.  *See Optimal Pets*, 877 F. Supp. 2d at 961-64 ("no reasonable jury could properly find that [plaintiff] had legally sufficient market penetration … in any geographic area" where over a 4-year period, it had made less than $35,000 in sales across 16 states while "passively maintaining a website" and spent $100,000 in advertising); *Glow Indus.*, 252 F. Supp. 2d at 984-85 (no market

penetration regionally or nationally notwithstanding features in *InStyle* and *Los Angeles* magazines, and sales in a Los Angeles retail store, Bergdorf Goodman, Nordstrom stores, Ritz Carleton Hotels, retail stores in 11 states, and through the company's website).  The discussion of market penetration in *Hanginout* is particularly instructive.  There:

> (1) [the plaintiff] had a Facebook profile by March 2011 [three months before the defendant launched its product]; (2) by May 2011, over 200 consumers had registered for and used Version 1.0 of the HANGINOUT web-based platform; (3) from September 15, 2012 through December 23, 2013 the HANGINOUT smart phone application had 30,000 visits from California consumers, 7,000 visits from New York consumers, 3,500 visits from Florida consumers, 2,700 visits from Michigan consumers, 2,600 visits from Texas consumers, and a ranging number of visits from consumers in the remaining states; (4) nearly 8,000 individuals had registered for the HANGINOUT iTunes application by the filing of the preliminary injunction; and (5) various celebrities and politicians have created HANGINOUT accounts and published content utilizing the HANGINOUT platform.

54 F. Supp. 3d at 1122.  Notwithstanding this evidence, and marketing and advertising efforts that included partnerships with professional athletes (one of whose use was mentioned in an ESPN article) and a San Diego mayoral candidate who use plaintiff's platform to conduct a town hall, the court held "none of the evidence is sufficient to support a finding of market penetration in a specific geographic market," including Southern California.  *Id.* at 1124.  It is undisputed that Defendants' evidence of market penetration as of November 15, 2022 does not exceed the inadequate evidence in *Hanginout*.  It does not even approach it.  Accordingly, Defendants' priority of ownership claims fail—irrespective of whether its mark is descriptive.

### 2.    Defendants' Lack of Distinctiveness Dooms Their Trademark Claims.

Defendants' inability to prove "OpenAI" is a distinctive mark is an independent reason their infringement counterclaims (counterclaims 1-3) fail.

As multiple examiners from the PTO have determined, Defendants' "Open AI" mark is descriptive.  SUF 47.  Defendants never challenged any of these decisions, made in 2017 and 2024.  Rather, with respect to the 2017 decision, Ravine requested that his mark be registered on the Supplemental Register, and Defendants never attempted to move the registration to the Principal Register.  *Id.* 47.  "Deference to the PTO's classification decision is sensible."  *OpenAI, Inc.*, 2024 WL 4763687, at *2 (quotations omitted).  Further, registration on the Supplemental Register

1  "constitutes an 'admission against interest' that the registered mark is [descriptive and] not yet a

2  protectable trademark."  *Automated Pet Care Prod., LLC v. PurLife Brands, Inc.*, 670 F. Supp. 3d

3  946, 951 (N.D. Cal. Apr. 21, 2023).

4      Further, Ravine's own statements confirm that Defendants used the phrase "Open AI" to

5  describe the qualities and characteristics of their products and services.  SUF 45; *see, e.g.*, *Accentra*

6  *Inc. v. Staples, Inc.*, 2012 WL 12877868, at *3 (C.D. Cal. Jan. 3, 2012) ("descriptive mark may

7  describe only one feature of a product, and not the full product.") (collecting cases).  For example,

8  Ravine represented to this Court that Defendants used "the open.ai domain … to offer[] ***open***

9  ***(source)*** AI generative tools and ***open (source)*** AI collaboration tools" and  "developed ***open***

10 collaboration tools, educational collaboration tools, generative AI tools, voice chat bots, mobile

11 apps, and more, primarily using ***open (source) AI models*** to support the ***open (source) AI***

12 movement."  Perahia Decl., Ex. 22 (Dkt. 80 (Ravine Decl.) ¶¶ 25, 26 (emphasis added)); SUF 45.

13 Defendants *alleged* that they were "a ***literally open AI company***" (Dkt. 100 (Counterclaims) ¶ 189),

14 and that "Open AI" would be understood by consumers to describe their activities: "When people

15 heard the words 'Open AI,' they understood what the organization was about and felt a powerful

16 desire to be a part of it" (Dkt. 138 (SACC) ¶ 35).  Thus, according to Defendants' own words,

17 consumers did not need to "use imagination or any type of multistage reasoning to understand the

18 mark's significance."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 (9th Cir. 2002).

19     Given Defendants' numerous admissions, there is no reasonable dispute "whether someone

20 who knows what the goods and services are will understand the mark to convey information about

21 them."  *In Re Sheet Pile, LLC*, 2024 WL 1175785, at *3 (T.T.A.B. Mar. 19, 2024) (quotations

22 omitted).  As such, "Open AI" is descriptive (*see id.*), and Defendants must establish secondary

23 meaning to prove the validity of their mark.  *See Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,

24 287 F.3d 866, 873 (9th Cir. 2002) ("Because Japan Telecom's trade name is descriptive, it is not

25 protectable unless Japan Telecom shows that the name has acquired secondary meaning.").

26     It is undisputed that Defendants have no evidence that would support their asserted "Open

27 AI" mark "attained secondary meaning prior to the alleged infringement"—as they must to succeed.

28 *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 2021 WL 3630225, at *1 (9th Cir. Aug.

17, 2021) (citing *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116 (Fed. Cir. 2018) ("In any infringement action, the party asserting trade-dress protection must establish that its mark had acquired secondary meaning before the first infringing use by each alleged infringer.")).

Defendants have no evidence that could support a finding of secondary meaning, especially given Defendants' lack of sales, lack of advertising, and at best, non-exclusive and sporadic use. SUF 32, 40-44.  *See* Dkt. 63 (PI Order) at 13, 15 (identifying secondary meaning factors). Accordingly, Defendants cannot establish their ownership of a valid trademark, and Plaintiff is entitled to summary judgment on their counterclaims, including trademark infringement and declaratory judgment of non-infringement.  *E.g.*, *Celotex*, 477 U.S. at 325 ("burden on the moving party may be discharged by 'showing' … there is an absence of evidence to support the nonmoving party's case").  No reasonable juror could conclude that there was consumer association with Defendants' asserted mark at the necessary time to establish valid trademark rights.

### C.    Plaintiff Is Entitled To Summary Judgment On Trademark Infringement

As discussed in Sections A and B above, because OpenAI used its mark continuously in commerce since at least April 2016 and established secondary meaning and sufficient market penetration before Defendants had any valid trademark rights or used "Open AI" to offer directly competing goods, Plaintiff is entitled to summary judgment on the issue of seniority of rights.  It is also undisputed that Defendants' use of "Open AI" is likely to cause confusion—and, in connection with generative AI products actually caused confusion.  SUF 50-57.  Accordingly, OpenAI is entitled to summary judgment on all trademark infringement claims (Claims 1-2) and counterclaims (Counterclaims 1-7).  *See* Dkt. 219.

## II.    THE UNDISPUTED FACTS CONFIRM THAT DEFENDANTS' REGISTRATION ON THE SUPPLEMENTAL REGISTRATION SHOULD BE CANCELLED

Plaintiff is entitled to summary judgment on its claim for cancellation of Defendants' registration on the Supplemental Register (Claims 3-5).

"A party may seek cancellation of a registered trademark on the basis of fraud" by showing:

[1] a false representation regarding a material fact, [2] the registrant's knowledge or belief that the representation is false, [3] the intent to induce reliance upon the

misrepresentation and reasonable reliance thereon, and [4] damages proximately resulting from the reliance.

*Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990).  The undisputed facts establish each of these elements.

**First**, Ravine made a false representation of a material fact to the PTO.  Representations that a mark has been used in commerce as reflected in a specimen are material as a matter of law to obtaining any kind of trademark registration.  *E.g.*, *Look Cycle Int'l v. Kunshan Qiyue Outdoor Sports Goods Co.*, 2024 WL 3739358, at *16 (T.T.A.B. Aug. 9, 2024) ("The falsity of the specimens is a material misrepresentation, as they must be accepted by the Examining Attorney to demonstrate use in commerce for a Section 1(a) use-based application before being passed to publication and eventual registration.").  "Averments and evidence of use of a mark for the goods or services identified in a use-based application are critical to the approval of a use-based application, and if it had been disclosed to the examining attorney that the mark was not in use for the identified services (or that the specimen of use was fabricated), registration would have been refused."  *Id.*

Defendants' specimen and associated declaration of use as of March 2015 are false because Defendants' specimen did not show bona fide third-party use of the hub.open.ai webpage in commerce; rather, the sole "evidence of use" reflected on the webpage specimen consisted of content copied from GitHub and pasted onto that page—as Ravine's agent whom he paid to work on that product testified.  SUF 24-26, 33-35.  This type of manufactured, mock-up "evidence" of use cannot support a registration.  *See Dimas v. Matilde*, 2015 WL 5768341, at *4, *1 (C.D. Cal. Sept. 30, 2015) (summary judgment of cancellation where defendant did not rebut that specimens were "fakes" that were "created solely to present to the USPTO"); *see also* Perahia Decl., Ex. 32 (Trademark Manual of Examining Procedure, 904.04(a)(i): "A digitally created/altered or mockup specimen … do[es] not evidence actual use of the mark on goods sold or transported in commerce"); *id.* Ex. 33 at 20 ("Merely advertising your services, without ever having provided them, is not use in commerce.").  As in *Look Cycle*, which involved specimens with false U.S. addresses on invoices, 2024 WL 3739358 at *14, Ravine's specimen was intended to falsely convey that U.S. consumers had engaged with the product, when in fact, there was no evidence that they had.

As of September 27, 2016 (the date he submitted the fraudulent specimen), Ravine had no alternate specimens showing genuine use in commerce he could have submitted. SUF 33-35, 62-64. The PTO had already rejected the open.ai webpage showing the "Announcement Will Be Made Soon" placeholder language as inadequate to show use, and the "Initial Collaboration Tool," if it ever existed, had been disabled since February. *Id.* 31. Thus, as discussed above in Section I.B.1, Defendants had no continuous use in commerce as of September 27, 2016, and the declaration that the specimen was "in use in commerce at least as early as the filing date of the application" (December 11, 2015) was false.

***Second,*** Ravine knew that the representation is false. No reasonable factfinder could conclude that Ravine was unaware that the specimen did not show bona fide third-party use—it was manufactured by Ravine's "core engineer," who copied content from GitHub, and posted the day before the specimen was submitted to the PTO. SUF 24-26, 33-35. Had Ravine taken and submitted a screenshot to the PTO of the same URL two days earlier, no use content would have appeared.

***Third,*** Ravine intended to induce reliance upon the misrepresentation. "[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." *Look Cycle Int'l*, 2024 WL 3739358, at *14 (quotations omitted). Defendants' fabrication of a specimen and the attestation that it represented use from a year earlier —even though the hub webpage was not created until September 2016 —represent deceptive intent. *Id.* at *16. In addition, "intent to deceive can be inferred from recklessness, in particular a reckless disregard for the truth." *Id.* At a minimum, Ravine acted with reckless disregard for the truth by filing a false statement. *Id.* at *17 ("An applicant is charged with knowing the specimen submitted to support its averment of use… and by submitting a specimen of use displaying goods shown to have not been sold in the United States, as demonstrated by the false addresses and the lack of testimony or evidence to show such use, Respondent acted with a reckless disregard for the truth.").

***Fourth***, damages proximately resulted from Defendants' fraudulent registration because the USPTO refused to grant OpenAI's registration of its mark due in part to a likelihood of confusion with Defendants' previously registered mark. SUF 66. *See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 735 F.2d 346, 349 (9th Cir. 1984) (sufficient damages to permit fraudulent registration claim

where "continued registration of [defendant's] trademark impeded [plaintiff's trademark] application because of a potential likelihood of confusion."); *SmileDirectClub, LLC v. Berkely*, 2018 WL 8131096, at *7 (C.D. Cal. Oct. 26, 2018) (plaintiff sufficiently pled damages caused by defendant's fraudulent registration where plaintiff's trademark registration was rejected because of defendant's registration).

In addition, cancellation is warranted for misrepresentation of source (Claim 5) if the registrant engaged in a "blatant misuse of the mark … in a manner calculated to trade on the goodwill and reputation of [plaintiff]." *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 298 (4th Cir. 2021) (quotations omitted). Defendants did just that when they redirected open.ai to Plaintiff OpenAI's webpage for five years, and Ravine held himself out as "the original guy behind OpenAI." SUF 25-27. Consequently, Defendants' mark on the Supplemental Register ought to be cancelled. *See Plumrose Holding Ltd. v. USA Ham LLC*, 2025 WL 248763, at *13 (T.T.A.B. Jan. 17, 2025) (party "deliberately aimed at passing off goods," including where it altered typeface and "mimick[ed]" packaging label); *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1101 (S.D.N.Y. 1978), *aff'd*, 607 F.2d 995 (2d Cir. 1979) (party "blatantly misused these marks … to blur whatever distinctions exist between the parties' products, and trade upon the renown and reputation of plaintiff").

In all events, Defendants' registration is "void ab initio" since it was not based on any bona fide use in commerce, as described in Section I.B.1; *see also* SUF 40-44. *Look Cycle*, 2024 WL 3739358 at *11 ("An application based on use of the mark in commerce under Section 1(a), as in this case, is void ab initio if the mark was not in use in commerce in connection with the goods identified in the application at the time the application was filed."). Consequently, Plaintiff is entitled to summary judgment on its claim for cancellation based on no bona fide (Claim 4).

## III.  EVEN IF DEFENDANTS HAD VALID RIGHTS, THEIR COUNTERCLAIMS FAIL

Although Plaintiff is entitled to summary judgment on all of Defendants' counterclaims for the reasons discussed above, it is alternatively entitled to summary judgment on Defendants' infringement counterclaims (1-3) for two additional reasons.

**First**, even if Defendants had valid trademark rights before June 2018 for "[p]roviding a web site featuring technology that enables internet users to share documents, images and videos" (per their supplemental registration, SUF 59, 62), liability does not lie when a junior user adopts a similar mark in a distinct market segment before the senior user's entry into that segment; rather, the "intervening [junior] user" obtains superior rights within that market. *See, e.g.*, *Brookfield*, 174 F.3d at 1051.

Generative AI products are a distinct market segment from "[p]roviding a web site featuring technology that enables internet users to share documents, images and videos." SUF 59. *See RXD Media, LLC v. IP Application Dev. LLC*, 986 F.3d 361, 371 (4th Cir. 2021) ("even if RXD were assumed to be the 'first user' of the 'ipad' mark, by January 2010, Apple had begun using the mark as an 'intervening user' of a product much different and much more sophisticated than the internet notepad marketed unsuccessfully by RXD"); *Machine Head v. Dewey Global Holdings Inc.*, 2001 WL 1747180, *4 (N.D. Cal. 2001) (retail release of heavy metal CD compilation "was not natural [expansion]" for company that had previously marketed sound design only to advertising agencies). It is undisputed that Defendants did not release generative AI products using the "Open AI" name before November 2022—years *after* OpenAI introduced generative AI products, including GPT (June 2018), GPT-2 (February 2019), the OpenAI API (June 2020), and DALL·E 2 (April 2022). SUF 4, 9-10, 15. Accordingly, Plaintiff OpenAI is, at a minimum, the "intervening junior user" in the generative AI market and therefore the senior rights holder as to the use of OPENAI in connection with generative AI products and services—the only type of use Defendants contend has caused reverse confusion. *See* Dkt. 138 (SACC) ¶¶ 118-121.

**Second**, Defendants' claims are barred by laches. "If any part of the alleged wrongful conduct occurred outside of the limitations period, courts presume that the plaintiff's claims are barred by laches." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). Because the Lanham Act does not have its own statute of limitations, courts look to "[t]he most analogous state statute of limitations," which is California's four-year statute of limitations for trademark infringement actions." Dkt. 63 (PI Order) at 18; *see also Miller*, 454 F.3d at 997 & n.11. Because Plaintiff began using its "OpenAI" mark before April 2020 (*supra* Section I.A), laches is presumed.

Independent of the presumption, laches applies because Defendants' delay was unreasonable and prejudicial. *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). To assess whether delay was unreasonable and prejudicial in trademark cases, courts must analyze the six *E-Systems* factors: "(1) strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing mark; (3) harm to senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of senior user's delay." *Tillamook Country Smoker*, 465 F.3d at 1108 (quoting *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983)). These factors compel a finding that laches applies.

**Factor 1: Defendants' Trademark Is Weak.** The first factor is the relative strength of the mark, with a weak mark favoring laches. *See, e.g.*, *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1102 (9th Cir. 2004). As discussed in Section I.B, Defendants' descriptive "Open AI" mark is conceptually and commercially weak. *See also id.* ("descriptive or suggestive marks are relatively weak."). Accordingly, this factor favors laches. *See, e.g.*, *Parts.com, LLC v. Google Inc.*, 2014 WL 12461256, at *6 (S.D. Cal. Jun. 25, 2014) (granting motion to dismiss on laches; first factor favors laches where mark was "descriptive, and thus inherently weak"); *ATM Express, Inc., v. ATM Express., Inc.*, 2009 WL 2973034 at *4 (S.D. Cal. Sept. 11, 2009) (granting summary adjudication; factor favors laches where mark was descriptive); *see also Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 2024 WL 4750497, at *2 (9th Cir. Nov. 12, 2024) (affirming laches on summary judgment; "mark was 'weak' because it was 'suggestive' and not rebutted by any evidence of commercial strength or significant consumer recognition of Jem's brand").

**Factor 2: Defendants Have Not Been Diligent In Enforcing Their Mark.** Despite actually knowing of Plaintiff's adoption of the "OpenAI" mark in December 2015 and being in contact with Plaintiff, Altman, and Brockman that very month (as well as in 2016 and 2022), Ravine never told them (or Plaintiff) that he thought Plaintiff was infringing his rights. SUF 27, 47, 67-71. He never even claimed to them that he had trademark rights. *Id.* 69-70. Defendants did not engage in any trademark enforcement efforts whatsoever, other than secretly submitting letters of protest to the PTO in December 2022 and January 2023. *Id.* 47, 65. Defendants' lack of diligence for over eight

years, including for more than two years after the introduction of ChatGPT, favors the application of laches. *See Harman,* 2024 WL 4750497, at *2 (applying laches at summary judgment where plaintiff did not file its counterclaim until more than four years after learning of the alleged infringement); *Worx4u2, Inc. v. Earthwhile Endeavors, Inc.*, 2022 WL 1601399, at *8 (C.D. Cal. Apr. 5, 2022) (granting summary judgment on laches where 4 year delay reflects lack of diligence) (collecting cases); *see also Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1043 (C.D. Cal. 2023) (granting summary judgment; "fail[ure] to contact [plaintiff] about the alleged infringement … falls short of the 'effective policing effort' the Ninth Circuit requires"), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) (quotations omitted).

**Factor 3: Defendants Will Not Suffer Harm If Relief Is Denied**.  Plaintiff's continued use of the name OpenAI will not harm Defendants.  Defendants have no revenue.  SUF 40-43.  They have no sales.  *Id.*  They have made no marketing or promotion efforts.  *Id.*  They have no actual damages.  *See* Section IV, below.  After the injunction, they did not rebrand their alleged goods and services or offer them on any of the many other websites Ravine owns.  *Id.* 44.  In fact, Defendants' delay even within this lawsuit—including delay in filing their counterclaims for more than eight months after the complaint was filed, their decision not to accept an earlier trial date, and their failure to seek a preliminary injunction—reflects the lack of harm they will suffer from OpenAI's continued use.  *See* Dkt. 95 at 4; *cf. Hanginout*, 54 F. Supp. 3d at 1132 (delay of less than 7 months "on its own, sufficient to weigh against a finding of irreparable harm") (collecting cases).  Indeed, the primary source of Defendants' historic traffic appears to be users seeking Plaintiff's goods and services.  SUF 50-57.

**Factor 4: OpenAI's Use Of Its Trademark Is In Good Faith.**  OpenAI made "open and notorious" use of its mark since December 2015, reflecting Plaintiff's good faith.  *See, e.g.*, *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1028 (9th Cir. 2018) (affirming finding of good faith where "[t]here was no indication that Pinkette was ever trying to hide its use of the mark; it was open and notorious"); *see also Harman Int'l*, 668 F. Supp. 3d at 1043-44 ("voluminous sales" that were "open and notorious" favors laches because it "supports … operating in good faith") (quotations omitted).  Moreover, at no point since December 11, 2015, when Ravine first reached

1  out to OpenAI, through Defendants' filing of counterclaims last year did Defendants ever tell

2  OpenAI not to use its mark. SUF 27, 69-70. Nor did Plaintiff have any reason to believe Defendants

3  asserted trademark rights in "Open AI." *Id.* Accordingly, this factor favors laches.

4      **Factor 5: Competition Does Not Preclude Laches.** Even if the parties actually offered

5  competing goods and services, that does not overcome the other factors weighing in favor of laches,

6  particularly where there is a presumption of laches. *See, e.g., Harman Int'l Indus.*, 668 F. Supp. 3d

7  at 1043 (applying laches despite competition); *RSI Corp. v. Int'l Bus. Machines Corp.*, 2012 WL

8  3277136, at *18 (N.D. Cal. Aug. 9, 2012) (similar); *Grupo*, 391 F.3d at 1104 (affirming application

9  of laches despite competition); *see also Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1194 (N.D.

10  Cal. 2015) (competition factor is "insufficient to sway the overall weight of the factors" even

11  assuming it "weighs strongly" against applying laches).

12      **Factor 6: OpenAI Will Be Prejudiced.** Defendants' delay has lasted more than eight years.

13  SUF 4, 9-10, 15 Such a lengthy delay makes prejudice "more likely to have occurred and less proof

14  of prejudice will be required." *Miller*, 454 F.3d at 1000 (quotations omitted); *see, e.g., Parts.com*,

15  2014 WL 12461256, at *4 (5.5 years); *ATM Exp.*, 2009 WL 2973034, at *3 (6 years); *Jarrow*

16  *Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 832 (9th Cir. 2002) (7 years). During

17  Defendants' delay, OpenAI invested _____ in research, development, and promotion, and its user

18  base and acclaim exploded. SUF 72-73. For example, by September 2023, OpenAI had

19  _____ and its website was the 28th most visited site in the

20  world, with more than 1.4 billion monthly visitors, including 180 million U.S. visitors. *Id.* 19-20.

21  Those numbers continued to grow by the time Defendants finally filed their counterclaims in 2024.

22      OpenAI's extraordinary business growth and product distribution using the name OpenAI

23  easily establishes harmful prejudice caused by Defendants' delay in taking any action against the

24  Plaintiff. *See Harman Int'l*, 2024 WL 4750497, at *2 (prejudice demonstrated "from Jem's delay

25  in asserting its claim as Harman continued to invest in its JBL-and XTREME-brand speakers");

26  *Fitbug*, 78 F. Supp. 3d at 1194 (prejudice demonstrated by party's "efforts through [delay period]

27  to build its business, generating substantial sales, hiring large numbers of employees, and

28

1  developing products"); *RSI Corp.*, 2012 WL 3277136, at *16 (prejudice demonstrated "as a result

2  of … delay" based on "licensing revenues" from "seven different versions of" product).

3       The prejudice to OpenAI is indisputable—even if Defendants had any viable argument that

4  the alleged infringement began with the introduction of ChatGPT in 2022, more than two years

5  before Defendants filed their counterclaims. ChatGPT, which had more than 1 million users within

6  the first five days of its launch, was described as "almost certainly the most rapidly adopted product

7  in the history of technology," and as the "fastest-growing consumer internet app ever," resulting in

8  significant investments. Perahia Decl., Ex. 57 at '4642. It is beyond dispute that Ravine was aware

9  of this; he was looking for litigation funding as early as January 2023. *E.g.*, *id.* ¶ 87. Yet he never

10 even sent a cease-and-desist letter to OpenAI or raised any trademark infringement concerns;

11 instead, he allowed OpenAI to keep developing goodwill with an exploding number of users without

12 saying a word. *Id.* 27, 47, 67-71. This kind of delay—where litigants sit back and wait to let others

13 build up goodwill and make investments—is exactly the kind of activity laches does not permit.

14 *E.g.*, *Fitbug*, 78 F. Supp. 3d at 1188 ("inequitable" to allow a party to "wait and watch … only to

15 intervene once those investments panned out").

16 **IV.    PLAINTIFF IS ENTITLED TO SUMMARY TO AJUDICATION ON DEFENDANTS' DAMAGES CLAIM**

17       Aside from the evidence compelling judgment in OpenAI's favor on the merits of

18 Defendants' infringement claims (Counterclaims 1-3), Plaintiff is also entitled to summary

19 judgment with respect to Defendants' damages claims because they have no non-speculative

20 evidence of damages resulting from the alleged reverse confusion. Defendants' sole damages

21 evidence is expert testimony set forth in Dr. Goedde's six-page report that seeks

22 _____ based on a reasonable royalty theory.[2] This theory is nothing more than speculative

23 guesswork because the parties have no licensing history—not between each other and not with any

24 unrelated parties. *Id.* 74-76. Accordingly, as a matter of law, this theory fails.

25

26

---

27 [2]  Dr. Goedde original report opined this was _____, but his (untimely) April 1, 2025 "supplemental" report reduced that to _____ limiting the royalty base to U.S. only-revenues

28 of Plaintiff's subsidiary, after Plaintiff's damages expert challenged Dr. Goedde's use of global revenue. Perahia Decl., Ex. 54 at 1-2 (Goedde Rep.); Ex. 55 at 1-2 (Goedde Supp. Rep.).

A reasonable royalty rate may not be awarded in trademark cases if neither party has ever licensed or negotiated a license to their marks. *See, e.g.*, *Lodestar Anstalt v. Bacardi & Co.*, 2019 WL 8105378, at *13-14 (C.D. Cal. July 3, 2019) (granting summary judgment that party was not entitled to a reasonable royalty "[i]n the absence of any evidence of a prior license" or "negotiations with a third party to license"), *aff'd*, 31 F.4th 1228 (9th Cir. 2022); *Thrive Nat. Care, Inc. v. Thrive Causemetics, Inc.*, 2021 WL 4813257, at *6 (C.D. Cal. Oct. 6, 2021) ("Plaintiff fails to present a genuine dispute of material fact supporting its request for a reasonable royalty as a measure of damages" where "there is no evidence of a prior licensing agreement or prior licensing negotiations"); *Pac. Packaging Concepts, Inc. v. Nutrisystem, Inc*, 2021 WL 3130041, at *3 (C.D. Cal. July 23, 2021) (granting summary judgment that party is not entitled to royalty where "[t]he record contains no evidence of a prior licensing agreement or any business negotiations with respect to [the] mark"); *Quia Corp. v. Mattel, Inc.*, 2011 WL 2749576, at *7 (N.D. Cal. July 14, 2011) (granting summary judgment that party was not entitled to a reasonable royalty where "the record contains no evidence of a prior license or licensing negotiations between the parties, a prior license or negotiations with respect to Plaintiff's mark with a third party, or of a plan or timeline for licensing the mark"). The absence of any licensing history is thus fatal to Defendants' damages claim.

No expert analysis can cure the factual deficiency of licensing history to establish a reasonable royalty—especially not Dr. Goedde's "calculation" of a royalty rate by taking the median rate from among a table of 25 utterly unrelated licenses prepared by a third party. *See* Perahia Decl., Exs. 54-55. Although Dr. Goedde's report refers to these as "comparable" licenses, he admitted that the word "comparable" did "not really" have any meaning to him. *Id.*, Ex. 16 at 144:15-24. Nor could it. Not only did those licenses concern unrelated industries, a variety of geographic scopes and uses, and negotiation dates spanning four decades, but as Dr. Goedde admitted "[f]rom an economic standpoint, there was not much value built up in the [Defendants'] mark." *Id.* 16 at 62:4-6; *e.g.*, Perahia Decl., Ex. 54 at 29-32 (Schedule 2). Defendants' theory of damages is not cognizable. Lacking any other evidence of damages aside from Dr. Goedde's opinion, Defendants have failed to establish any damages.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in Plaintiff's favor on all claims and counterclaims in this action.


DATED: April 9, 2025                    QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                        By          /s/ Margret M. Caruso
                                                  Margret M. Caruso
                                                Attorneys for OpenAI, Inc.