# EXHIBIT A

## Nielson Declaration ISO Plaintiff's Motion for Summary Judgment

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | Case No. 4:23-CV-03918-YGR |
| Plaintiff, | Assigned to the Hon. Yvonne Gonzalez Rogers |
| vs. | **REBUTTAL REPORT OF DR. SETH JAMES NIELSON [CORRECTED]** |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | |
| Defendants. | **HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

1

<u>TABLE OF CONTENTS</u>

I.     SUMMARY OF OPINIONS ................................................................5

II.    QUALIFICATIONS ......................................................................10

III.   ASSESSMENT OF MR. TENERY'S DATA COLLECTION ...........................11

     A.    Data Identification Failures ...............................................11

     B.    Data Integrity and Validation Issues ....................................13

     C.    Website Architecture Documentation Failures ......................13

     D.    User Activity Analysis Deficiencies ....................................14

     E.    Data Query and Analysis Issues .........................................15

IV.   ASSESSMENT OF MR. TENERY'S DATA ANALYSIS................................15

     A.    Flaws in Server Log Analysis ...........................................15

          1.    Error-Prone Custom Script...........................................16

          2.    Flaws in Bot Traffic Analysis .........................................17

          3.    Flaws in Administrator Traffic Analysis .............................18

          4.    Flaws in IP Address Analysis..........................................19

          5.    Flaws in Referrer Field Analysis .....................................19

          6.    Alternative Methodology of Server Logs ...........................20

     B.    Flaws in Mr. Tenery's Production Log Analysis.........................23

     C.    Flaws in Mr. Tenery's Etherpad Log Analysis .......................26

     D.    Flaws in Mr. Tenery's Database Analysis..............................28

     E.    Failure to Exclude Employees and Administrators ..................29

V.    ANALYSIS OF MR. TENERY'S CLAIMS REGARDING USE OF DEFENDANTS' ASSERTED PRODUCTS ........................................30

     A.    Initial Collaboration Tool..................................................30

          1.    Overview...............................................................30

          2.    Assessment of Existence and Use ....................................31

          3.    Assessment of the Relevant Server Logs ...........................33

          4.    Assessment of the AI School Presentations ........................34

          5.    Conclusions ...........................................................36

B.    open.ai before November 2022 (the 'Coming Soon' webpage) .............. 37

    1.    Overview ............................................................... 37

    2.    Assessment of Existence and Use .................... 37

    3.    Assessment of Server Logs ............................. 39

    4.    Assessment of Email Logs ............................. 40

    5.    Conclusions ......................................................... 42

C.    hub.open.ai ....................................................................... 42

    1.    Overview ............................................................... 42

    2.    Assessment of Existence and Use .................... 42

    3.    Conclusions ......................................................... 44

D.    decentralized.open.ai ...................................................... 44

    1.    Overview ............................................................... 44

    2.    Database Analysis ............................................. 45

        (a)    Registered Accounts ........................ 45

        (b)    IP Address Clustering and Lack of Genuine U.S. Engagement .................................................. 47

        (c)    Project Companies ........................... 49

        (d)    Discussions and Comments ............ 52

    3.    Conclusions ......................................................... 54

E.    beta.open.ai ...................................................................... 56

    1.    Overview ............................................................... 56

    2.    Assessment of Server Logs and Database ................ 56

    3.    Conclusions ......................................................... 59

F.    open.ai since November 2022 (the Image Generator website) .............. 59

    1.    Overview ............................................................... 59

    2.    Assessment of Use ............................................. 60

    3.    Assessment of Google Analytics Data .......................... 60

G.    ava.open.ai ....................................................................... 64

VI.    MR. TENERY'S CLAIMS REGARDING USE OF DEFENDANTS' WEBSITES UNRELATED TO THIS ACTION ................................................. 64

A.    Wikineering.org / Sunglass.io .................................................. 64

    1.    Overview ............................................................... 64

2.      Assessment of Existence and Use ................................................ 65

3.      Conclusions ................................................................................... 67

B.      Boom ................................................................................................. 68

1.      Overview ...................................................................................... 68

2.      Assessment of Existence and Use ................................................ 68

3.      Assessment of the Boom Database ............................................. 69

4.      Conclusion ................................................................................... 70

VII.    SERVER CRASHES DO NOT EXPLAIN DEFENDANTS' LACK OF USER DATA ................................................................................................................ 70

A.      Overview ........................................................................................... 70

B.      The Record Shows Routine Maintenance and Billing Issues ............... 71

C.      Standards for Investigating Data Loss Claims ..................................... 72

D.      Mr. Tenery's Investigation Falls Short of Professional Standards ....... 73

E.      Selective Pattern of Alleged Data Loss Lacks Credibility .................... 74

F.      Additional Technical Issues Undermining Data Loss Claims .............. 74

G.      Conclusion ........................................................................................ 75

VIII.   MR. TENERY'S GOOGLE TRENDS ANALYSIS IS FLAWED. ...................... 76

APPENDIX TO REPORT ................................................................................. 83

Exhibit A ................................................................................................... 84

Exhibit B ................................................................................................... 85

Exhibit C ................................................................................................... 99

Exhibit D ................................................................................................. 101

Exhibit E ................................................................................................. 107

Exhibit F ................................................................................................. 109

Exhibit G ................................................................................................. 111

Exhibit H ................................................................................................. 115

Exhibit I ................................................................................................. 117

## REBUTTAL EXPERT REPORT OF SETH JAMES NIELSON, Ph.D.

I, Seth James Nielson, Ph.D., state as follows:

1.    I have been retained by counsel on behalf of Plaintiff OpenAI, Inc. ("OpenAI") in the lawsuit captioned *OpenAI, Inc. v. Open Artificial Intelligence, Inc.*, Case No. 23-cv-03918-YGR, which is currently pending before the Honorable Yvonne Gonzalez Rogers in the United States District Court for the Northern District of California, Oakland Division.

2.    I submit this rebuttal expert report on behalf of OpenAI based on my personal knowledge, education, training, and experience, as well as my review of relevant literature and case-specific materials.  If called and sworn as a witness, I could and would testify competently to my opinions expressed below and the bases and reasons for them.

## I.    SUMMARY OF OPINIONS

3.    Based on my education, training, experience, and investigation and analysis in this matter, I conclude to a reasonable degree of professional certainty that:

a.    **Opinion 1:** Mr. Tenery's digital forensic investigation exhibits significant methodological deficiencies that fundamentally undermine the reliability of his conclusions regarding website usage patterns.  His investigation deviates from established professional standards by failing to independently verify data sources, instead relying uncritically on Defendants' representations about their systems. Omissions include failure to map complete network topology, document system states prior to data collection, investigate backup systems, or properly preserve log file integrity.  His database collection procedures lack essential pre-collection documentation, and his web architecture analysis omits crucial details about subdomain configurations and user tracking mechanisms.  Furthermore, his bot detection methodology is insufficient, relying on simplistic tools without proper

5

validation, and his geolocation analysis lacks verification of accuracy. These systematic failures to follow standard forensic practices suggest that apparent gaps in website activity could be attributable to incomplete data collection and methodological shortcomings rather than actual periods of inactivity.

b. **Opinion 2:** Mr. Tenery's data analysis methodology contains critical flaws that fundamentally undermine his conclusions about website usage and user activity. His analysis relies on unvalidated custom scripts lacking essential error handling and audit capabilities, while employing a simplistic bot detection approach that fails to account for sophisticated automated traffic. The investigation demonstrates serious technical deficiencies in analyzing server logs, with his exclusive reliance on HTTP Referrer fields and IP addresses failing to properly identify unique users or account for dynamic IP allocation and mobile device usage. His examination of production logs consists of overly simplistic status code matching without considering crucial system context or architectural elements, while his database analysis shows concerning departures from accepted forensic practices through undocumented modifications of dump files and ignoring critical metadata. Furthermore, the methodology fails to properly exclude employee and administrator traffic, lacks proper validation controls, and shows fundamental misunderstandings of modern web application architecture, particularly in areas of session handling and cross-domain traffic analysis. These systematic failures, combined with his inability to properly filter automated traffic and validate geolocation data, render his conclusions about user activity and website usage patterns technically unreliable.

c. **Opinion 3:** None of Defendants' claimed websites generated meaningful third-party user engagement before November 2022. Technical analysis (Ex. I) reveals these websites either never launched, existed only as internal test environments, or attracted negligible activity primarily from non-U.S. users. After OpenAI released ChatGPT in November 2022, traffic to Defendants' websites

increased dramatically, but this traffic appears driven by user confusion rather than genuine interest in Defendants' services.

(i)    The Initial Collaboration Tool shows no credible evidence of ever existing as a functioning website with third-party users.  Despite extensive searches across the Internet Archive, Google, Bing, and public forums, no traces or references to the tool were found.  The testimony of Defendants' own developer confirms it remained "an internal project" that was "never publicly tested or released."  Server logs cited by Mr. Tenery predate the claimed "Open AI" branding, and marketing materials appear to be screenshots of Wikipedia content rather than evidence of an operational platform.

(ii)    The open.ai domain before November 2022 consisted only of a static landing page that collected email addresses between March 2015 and September 2017, with no actual services or interactive features.  By September 2017, Defendants began redirecting all traffic to Plaintiff's openai.com domain, a redirect that remained in effect for nearly five years.  Analysis of server logs reveals only 66 valid U.S. IP addresses before November 2022.

(iii)    The Hub website was demonstrably an internal test environment rather than a public website.  The evidence shows only a basic installation of Discourse software with default settings, and all posts were copied from earlier GitHub discussions.  The only identifiable users were internal team members, and the sole other account ("Rick") was likely created by the development team, according to testimony.

(iv)    The decentralized.open.ai database reveals coordinated test account creation rather than organic user adoption.  Of only six registered accounts before September 2022, two belonged to administrators, two were explicitly labeled as test accounts, and two were created from the same foreign IP address within an hour.  Analysis of IP addresses shows clustering within two

7

network ranges, suggesting internal testing rather than independent users. Every "project company" in the database links to either a test account or contains explicit test markers.

(v)     The beta.open.ai website shows zero genuine third-party registrations from 2017 to June 2020, with the first non-developer registration coinciding precisely with Plaintiff OpenAI's launch of their API at beta.openai.com. The extremely low engagement rates (averaging 12.5 "interactions" per user over three years) suggest users quickly realized they had reached the wrong website. After June 2020, traffic patterns indicate user confusion with OpenAI's newly launched services rather than intentional engagement with Defendants' platform.

(vi)     The open.ai image generator launched in November 2022 shows clear patterns of user confusion rather than genuine adoption. Google Analytics data reveals that most users landed on the homepage and quickly navigated away, with sessions averaging less than one minute. Over 80% of traffic came from direct URL entry, far exceeding industry standards and suggesting automated traffic or user confusion. Users attempted to access well-known OpenAI services like ChatGPT and DALL-E, indicating they believed they were visiting OpenAI's website.

(vii)     Finally, the ava.open.ai chatbot shows no evidence of public release or genuine user engagement. The Firestore database entries cited by Mr. Tenery could represent internal testing rather than public use, and no evidence demonstrates that the May 2023 entries reflect anything beyond development activity.

d.     **Opinion 4:** Analysis of additional websites that Mr. Tenery opines shows use of "Open AI" reveals significant deficiencies in both Wikineering.org and Boom. Mr. Tenery's analysis of Wikineering traffic is irrelevant because Defendants claim "Open AI" branding appeared only on a specific section (the "Initial

Collaboration Tool") starting in March 2015, yet Internet Archive snapshots show the site was largely non-functional from 2012 to 2014 and subsequently promoted unrelated projects with no mention of artificial intelligence or "Open AI." Mr. Tenery's analysis of Wikineering server logs contains significant technical flaws, including counting multiple automated requests as separate events and failing to account for dynamic IP addressing, with proper filtering revealing only 4 valid U.S. IP addresses across the entire period. Similarly, the Boom website shows no connection to the "Open AI" mark, as Defendants did not identify it in discovery responses or court declarations, and the interface screenshot contains no "Open AI" branding. The Boom database reveals minimal activity of just 51 entries from 11 purported users, with four users directly associated with Defendants and three entries being browser identification strings rather than actual users, indicating internal testing rather than genuine public use in commerce.

e.    **Opinion 5:** Mr. Tenery, failed to follow basic professional standards for investigating data loss claims. The absence of contemporaneous communications about data recovery efforts, combined with the delayed timing of discovering the alleged loss, suggests these claims may have been constructed after the fact to explain the lack of evidence supporting Defendants' position.

f.    **Opinion 6:** Mr. Tenery's Google Trends analysis of search terms 'OpenAI,' 'ChatGPT,' and 'DALL-E' between August 2022 and March 2024 contains significant methodological flaws that undermine its reliability. His analysis suffers from selection bias by focusing on a period immediately following ChatGPT's viral success, which artificially suppressed the relative scores of other terms due to Google Trends' normalization methodology. Historical data from 2015-2022 shows a markedly different picture, with OpenAI achieving sustained high search interest levels (ranging from 53 to 89) and often outperforming competitors like DeepMind and Meta AI. Additionally, Mr. Tenery failed to include appropriate competitive

benchmarks, comparing a company (OpenAI) against its product (ChatGPT) rather than other AI companies, and ignored OpenAI's strong pre-ChatGPT market presence. When viewed through a broader timeframe and compared against appropriate industry benchmarks, the data demonstrates that OpenAI has maintained substantial and growing market presence, contrary to Mr. Tenery's conclusions of consistently low search interest.

g.    In sum, Defendants' claims of substantial U.S. user engagement before November 2022 are not supported by reliable evidence. The traffic and interaction metrics cited by Mr. Tenery are inflated due to methodological errors, including improper filtering of automated traffic and flawed geolocation analysis. Adjusted data reveals negligible user activity, with no evidence of sustained or meaningful engagement by third-party users.

## II.    **QUALIFICATIONS**

4.    I am a subject matter expert in cyber security, including digital forensics, network security, and web application analysis. I am the Founder and Chief Scientist of Crimson Vista, a computer security investigations company, and hold appointments at the University of Texas at Austin. My qualifications are detailed in my opening expert report dated January 30, 2025, which is incorporated by reference as if set forth fully herein. My qualifications and testimony in the last four years are also set out in full in my *curriculum vitae*, which is attached as **Exhibit A**.

5.    The attached **Exhibit B** lists the materials that I considered forming my opinions. I am being compensated at my standard rate of $650.00 per hour for my time, plus reasonable out-of-pocket expenses. I have received no other compensation for my work in this case. My compensation does not depend on the contents of this report, any testimony that I may provide, or the ultimate outcome of this lawsuit.

6.      I hold my opinions to a reasonable degree of professional certainty.  The information that I have relied upon is the type of information that is typically relied upon in my field of expertise.  I reserve the right to revise my opinion if additional information, documents, or testimony provided by the parties becomes available that would cause me to amend or supplement my opinions here.

## III.    ASSESSMENT OF MR. TENERY'S DATA COLLECTION

7.      Digital forensic examination requires adherence to established professional standards to ensure evidence reliability.  These standards, established by organizations such as National Institute of Standards and Technology (NIST), Scientific Working Group on Digital Evidence (SWGDE), and the International Organization for Standardization (ISO), outline the steps necessary for collecting and preserving digital evidence.  Mr. Tenery's analysis, which purports to demonstrate continuous website usage over nearly a decade, fails to document many of the key steps required by these standards, undermining the reliability of his conclusions.

### A.    Data Identification Failures

8.      Mr. Tenery's failure to independently identify relevant data sources critically compromises his analysis.  Rather than conducting his own investigation, he relied extensively on Defendants' representations about the existence and location of data.  This approach violates core principles of forensic investigation, which require investigators to independently discover and validate data sources to ensure all relevant evidence is captured.

9.      A major shortcoming is Mr. Tenery's unquestioning reliance on Defendants' descriptions of their systems.  For instance, while he acknowledges accessing "three (3) servers" (Tenery Report ¶ 19), he provides no evidence of attempting to independently map the complete technical environment.  Professional standards, such as NIST SP 800-86, require investigators to conduct independent

network topology mapping to identify all potential evidence sources. *See* NIST SP 800-86, *available at* https://csrc.nist.gov/pubs/sp/800/86/final#pubs-documentation. Modern web applications typically involve interconnected systems such as development servers, testing environments, load balancers, and backup infrastructure. Without documenting an independent effort to map these components, Mr. Tenery cannot confirm whether his analysis captured all relevant data.

10.    Mr. Tenery also neglected critical steps for collecting virtual machine data. While he claims his VMDK (Virtual Machine Disk) exports preserved "all metadata associated with the container's file system" (Tenery Report ¶ 20), he failed to document the system state prior to data collection. Professional standards require documenting running processes, active network connections, mounted filesystems, and open file handles before collection begins. *See* ISO/IEC 27037, available at https://www.iso27001security.com/html/27037.html. Additionally, Mr. Tenery does not indicate whether write-blocking was implemented during data export or whether cryptographic hashes were calculated to verify data integrity. These omissions make it impossible to confirm that the exported data accurately represents the original system state.

11.    Mr. Tenery's failure to investigate backup systems deviates from best practices. Despite acknowledging server crashes in 2016 and 2018, he provides no indication of efforts to locate or recover data from backup systems. Tenery Report ¶¶ 54–58. In enterprise environments, multiple types of backups—such as system images, database dumps, and incremental file backups—are typically maintained. Industry standard practices include analyzing backup retention policies, reviewing backup logs, and attempting to restore historical data. Without any documentation of backup analysis, Mr. Tenery cannot determine whether gaps in his data reflect actual website inactivity or merely a failure to collect available backup data.

12.    Additionally, Mr. Tenery's log collection methodology conflicts with forensic standards for system log preservation.  From my analysis of Mr. Tenery's analysis tools, it appears that Mr. Tenery made modifications to the log files. At the very least, he aggregated files together and renamed them. His own tool does not correctly operate on the log files produced. Such modifications are not forensically sound in any case. Best practices would have any derivations of the originally imaged log files be performed as part of the analysis and documentation of any aggregation or filtering. Without this documentation, apparent gaps in the logs may reflect incomplete collection rather than platform inactivity.

**B.    Data Integrity and Validation Issues**

13.    Mr. Tenery's database collection procedures deviate from standard practice.  While he claims to have collected "complete backup cop[ies]" of PostgreSQL databases using pg_dumpall (Tenery Report ¶ 28), his report omits critical pre-collection steps.  Investigators are supposed to document the database state before collection, including active transactions, replication status, and consistency checks. Mr. Tenery provides no evidence of capturing database schemas, verifying referential integrity, or preserving transaction logs.  His failure to examine replication configurations or collect data from replica servers raises further concerns about whether his collection captured all relevant user activity data.

14.    Mr. Tenery's treatment of Google Analytics data also fails to meet forensic standards for validating web analytics.  While he claims to have analyzed Google Analytics data (Tenery Report ¶¶ 29–30), his report does not document any verification of tracking code implementation across domains.

**C.    Website Architecture Documentation Failures**

15.    Mr. Tenery's analysis of web application architecture omits important details.  Although he analyzed traffic across multiple subdomains of open.ai (Tenery

Report ¶¶ 31–40), his report does not document how these subdomains were configured or interconnected.  Investigators are expected to preserve web server configurations, routing rules, and load balancing settings, as these factors determine how user traffic is distributed and logged.  Without documenting these details or their historical changes, Mr. Tenery cannot establish whether his traffic analysis captures all relevant user interactions or whether apparent gaps reflect configuration changes rather than website inactivity.

16.    Mr. Tenery also fails to document how Defendants' websites tracked users across different devices or browsers.  Investigations should account for how systems track unique users accessing websites through various methods, as this directly affects the accuracy of user counts.  The report provides no evidence that Mr. Tenery considered users accessing websites via multiple devices, even though mobile access patterns evolved significantly during the 2015–2024 period under analysis.  Mr. Tenery does not even know basic information about the organization of the web servers such as which server hosted which website (domain name), and which web log files correspond to which website.  This basic lack of architectural knowledge is at least partially why Mr. Tenery resorts to such poor means for analyzing the user activity as I will explain in more detail below.

17.    Mr. Tenery relies heavily on IP geolocation to determine U.S.-based users but does not validate the accuracy of this geographic data.  Tenery Report ¶¶ 39-40.  Users accessing websites through VPNs, proxy servers, or forwarding techniques could obscure their true locations.  Mr. Tenery does not document how he handled such cases or verified the reliability of IP-based geolocation, undermining his conclusions about U.S. market presence.

D.    **User Activity Analysis Deficiencies**

18.    Mr. Tenery's bot detection methodology is insufficient.  Despite claiming to have filtered bot traffic using the "is-bot" library and User Agent strings (Tenery

14

Report ¶¶ 32–33), he does not validate this approach quantitatively. The "is-bot" library works by analyzing user-agent strings, which already excludes any behavioral analysis or request patterns. Instead, *it relies on the self identification of the scanner or bot.* Thus, it is definitely a problematic approach to identifying malicious (dishonest) bots or scanners. Mr. Tenery makes no attempt to validate the use of is_bot or determine how effective the library is identifying bots.

### E.    Data Query and Analysis Issues

19.    Mr. Tenery's database query methodology lacks sufficient documentation. While he describes running queries against various databases (Tenery Report ¶¶ 45–46), he does not preserve the exact SQL code or document how query results were validated. This omission makes it impossible to confirm whether the queries captured all relevant records or whether the results accurately reflect the original data.

20.    Similarly, Mr. Tenery's server log analysis omits key details. While he analyzes logs spanning multiple years, his report does not document the server configurations that generated these logs. Logging settings—such as levels, retention policies, and configuration changes—directly affect which user activities are recorded. Without this documentation, gaps in user activity may reflect logging configuration changes rather than actual website inactivity.

## IV.    ASSESSMENT OF MR. TENERY'S DATA ANALYSIS

### A.    Flaws in Server Log Analysis

21.    Mr. Tenery's analysis of server logs, user activity, and website traffic contains methodological flaws that undermine his conclusions regarding Defendants' claimed use of "Open AI" branded products in U.S. commerce. His analysis relies on unvalidated custom scripts, employs flawed filtering methodologies, and relies on incorrect assumptions. Most significantly, his

conclusions about U.S. user activity are based on incomplete data, unreliable geolocation methods, and flawed user identification techniques. Tenery Report ¶¶ 31–40.

### 1. Error-Prone Custom Script

22. The most fundamental flaw in Mr. Tenery's analysis stems from his reliance on an unvalidated "custom-built script" to process server logs, without producing the underlying data necessary to verify results. The script, as described in his report, uses basic Python libraries such as Pandas and is-bot but lacks critical features like robust error handling, data validation, and audit capabilities required for reliable log analysis. Tenery Report ¶ 31. Without these safeguards, the accuracy of his data processing and conclusions about user activity cannot be verified.

23. Effective log analysis requires multiple layers of validation and verification, none of which is documented in Mr. Tenery's report. For example, there is no evidence that he verified the integrity or completeness of the log files. He also offers no methodology for handling corrupt or malformed log entries. His script provides no audit trail of processing decisions or error handling. Additionally, he does not validate timestamp consistency across different server configurations, nor does he address or account for gaps in log data. Tenery Report ¶¶ 31–32.

24. Additional defects in Mr. Tenery's script further undermine his findings. Mr. Tenery's scripts were incomplete and inoperable upon delivery. Tenery Report ¶¶ 31–35. Even making a few additions to get something working resulted in errors when processing the produced log files. Most critically, Mr. Tenery has not produced the original log outputs he claims to have generated, making it impossible to validate whether the data matches the methodologies described in his report.

25. Valid and reliable log analysis needs to be reproducible on forensically collected data. The processing must be transparent in its operations and calculations

so that the methodology can be validated and assessed. By contrast, Mr. Tenery's reliance on a custom script lacking these capabilities renders his conclusions about user activity unreliable. Tenery Report ¶¶ 31–32.

### 2.     Flaws in Bot Traffic Analysis

26.     Mr. Tenery's methodology for filtering bot traffic is technically deficient and invalidates his conclusions about legitimate user activity. His approach relies exclusively on matching User Agent strings using the "is-bot" library, ignoring other essential indicators of automated traffic. Tenery Report ¶ 33. This simplistic approach fails to account for modern, sophisticated bot behavior and web traffic patterns.

27.     Modern bot detection requires analyzing multiple technical indicators. *See, e.g.*, J. Kadel, BOTracle: A framework for Discriminating Bots and Humans (arXiv:2412.02266v1 [cs.LG]) (Dec. 3, 2024), https://arxiv.org/html/2412.02266v1 ("Modern bot detection requires analyzing multiple technical indicators."). Mr. Tenery's methodology fails to address this. For example, he does not examine IP reputation data, which could identify traffic from bot networks or proxy services. He also ignores request timing patterns that could reveal automated behavior and fails to analyze geographic anomalies, such as single users appearing to access the site from multiple continents within short timeframes. Furthermore, he performs no behavioral analysis to distinguish legitimate human activity from automated traffic. Tenery Report ¶¶ 33–35.

28.     Mr. Tenery's exclusive reliance on User Agent strings for bot detection demonstrates a lack of technical sophistication. Modern bots frequently spoof User Agent strings to mimic legitimate browsers, making his approach ineffective. *See* Kaminari Click, Sophisticated Invalid Traffic: Detecting Spoofing and Automated Bots, https://kaminari.click/blog/post/sophisticated-invalid-traffic-detecting-

spoofing-and-automated-bots.    Consequently, his methodology likely misclassifies sophisticated bots as legitimate users, inflating his user counts.  Tenery Report ¶ 33.

29.    The deficiencies in Mr. Tenery's bot detection methodology are further evident in his handling of session data.  For example, his analysis does not examine session indicators, such as request frequency or navigation patterns, that could identify automated behavior.  He also fails to address instances where malformed data suggests a malicious bot scanning for potential weaknesses and vulnerabilities. These technical oversights result in a significant overcount of legitimate users. Tenery Report ¶¶ 33–35.

**3.    Flaws in Administrator Traffic Analysis**

30.    Mr. Tenery's approach to identifying administrator traffic reflects a fundamental misunderstanding of web application architecture.  His methodology relies solely on examining URL paths in server logs to identify administrative access, ignoring other key indicators of administrative activity.    Even Mr. Tenery's implementation is suspect as he looks for the administrative URL paths only in the path requests ***and not in the referrer fields*** that are indicative of the domain names relevant to his analysis.  Tenery Report ¶ 34.  This simplistic approach likely led to both missed administrative traffic and misclassified user traffic.

31.    Realistic analysis of administrator traffic requires identifying the administrative pages of the website(s) under test. Given that Mr. Tenery had supposedly complete access to the servers, it should have been straightforward to identify the administrative pages of the websites of the Defendants. Moreover, complete logs would have revealed direct administrator access to the webpage.  Mr. Tenery provides no evidence that he analyzed these elements or validated his administrative URL list against system documentation.  Tenery Report ¶ 34.

32.    Modern web applications often exhibit complex administrative access patterns that Mr. Tenery's methodology fails to account for.  For instance, he does

not analyze traffic from development environments, testing systems, or internal networks commonly used for administrative tasks. Tenery Report ¶ 34.

33. Mr. Tenery's reliance on a static list of administrative URLs he picked without any reference to the actual construction of the alleged Defendants websites highlights the limitations of his approach. Administrative paths often change due to updates or configuration changes, yet he provides no methodology for identifying new paths or handling administrative actions performed through API endpoints rather than web interfaces. Tenery Report ¶ 34.

### 4. Flaws in IP Address Analysis

34. Mr. Tenery's use of IP addresses to count unique users demonstrates a lack of understanding of modern internet infrastructure. His analysis assumes each unique IP address represents a distinct user after applying his flawed bot and administrator filters. Tenery Report ¶ 35. This assumption ignores critical realities of IP address allocation and usage patterns.

35. Dynamic IP address assignment by internet service providers undermines his methodology. IP addresses are frequently reassigned, meaning a single address may represent different users over time. Mr. Tenery provides no evidence of attempts to correlate sessions across different IP addresses or account for IP address rotation. Tenery Report ¶ 35.

36. Mobile device usage further highlights the flaws in his approach. Mobile devices frequently switch between cellular networks and WiFi, changing their IP address multiple times in a single session. Mr. Tenery's methodology would incorrectly count these transitions as separate users, inflating his user counts. Tenery Report ¶ 35.

### 5. Flaws in Referrer Field Analysis

37. Mr. Tenery's use of HTTP Referrer fields to identify product usage represents a completely unreliable methodology that should simply not be necessary.

19

As stated above, this part of the analysis should be conducted on log files known to be used for a particular website (domain). The logs for a given domain would indicate all use of the website as every request is a known request to that website. His reliance on Referrer fields to determine "what product the user had accessed" (Tenery Report ¶ 37) is flawed by nature because the request is fundamentally **to a different website**. Mr. Tenery is basically relying on tangential information to other websites to identify traffic to the website he is evaluating. It is akin to trying to track the movements of someone by listening in on their friends' conversations to see if they mention him.

38.    It is concerning that Mr. Tenery did not attempt to forensically account for the log files and identify which domain traffic they represent. *See* Tenery Report ¶ 37. The log files should have been used to directly identify traffic to a domain rather than trying to infer the traffic at another domain. does not account for the complexities of cross-domain traffic, where Referrer patterns can vary significantly.

### 6.    Alternative Methodology of Server Logs

39.    As noted, there are multiple fundamental problems with Mr. Tenery's analysis of what he identifies as the "Server Logs" and specifically his analysis of "unique users." Mr. Tenery's analysis of identifying unique users for a specific website (i.e., web domain) can be summarized as follows. First, a unique IP address is a proxy for a user. Second, an IP address is determined to have visited a website if the website's domain name shows up in an HTTP request in which the referrer field. Third, IP addresses are removed if they ever are identified as being bots or if they ever are identified as accessing an administrative webpage. Fourth, and finally, the unique IP appeared within a specified date range.

40.    This analysis of Mr. Tenery has problems ranging from fundamental to poor implementation. On the implementation side, Mr. Tenery does not even fulfill his own methodology effectively. One of these implementation issues is his bot

detection. Mr. Tenery uses the "is-bot" library to detect bots which analyzes the "user agent" string in each web request. However, Mr. Tenery **excludes** user agent strings that are empty, meaning that no user agent was specified. The problem is that an unreported user agent string is indicative of bots. Even the is-bot library will report an empty user agent string as a bot, but Mr. Tenery prevented these empty strings from being evaluated by the library.

41.     Another implementation detail is in the check for the domain name in the referrer field. All Mr. Tenery does is check if the domain name shows up **anywhere** in the referrer field. But that means he is including referrer fields that simply reference the domain name. For example, if he is searching for referrer fields that reference open.ai, his code would count "http://google.com?search=open.ai". That is clearly a Google page but Mr. Tenery's system would count this as someone visiting open.ai.

42.     A third implementation issue is searching for administrative pages. Mr. Tenery searches for them in the path but not in the referrer field. Accessing an administrative page in the target domain name should also mark an IP address as an administrator. Mr. Tenery also picks a very narrow name of administrative pages as I discussed elsewhere in this report.

43.     Beyond these implementation issues, Mr. Tenery's approach is fundamentally incorrect because identifying IP addresses alone does not identify a "user." To identify a user, a more appropriate methodology is to validate that the interaction represents some kind of legitimate and desired interaction. It is well known in the industry that real "users" interact with the website over time and space (i.e., various pages of the website). As one research paper put it, "Typically researchers evaluate Website usage in terms of the number of hits made or the number of pages viewed but there is, in fact, a much more meaningful use metric, and that is the number of sessions conducted. A session delineates a number of

related information actions, like searching and displaying. In general parlance a session is a 'visit'." *See* Huntington, Paul, David Nicholas, and Hamid R. Jamali. "Website usage metrics: A re-assessment of session data." Information Processing & Management 44.1 (2008): 358-372, *available at* https://scholar.google.com/scholar?cluster=6660175640551532925.

44.    Accordingly, I evaluated the log data provided by Defendants to evaluate a more accurate count of "visits". And more particularly, to represent a user that is actually interested in the website (as opposed to an accidental or incidental visit), I also identified "frequent" users as those that visited the webpage more than 2 calendar days.

45.    My overall methodology starts out similar to Mr. Tenery to create an apples-to-apples comparison. Accordingly, I started by looking at the referrer field to identify website hits. As I have explained elsewhere, this is a poor methodology. However, Mr. Tenery did not provide information about which log files belonged to which website (domain name). Also following Mr. Tenery's approach, I remove bots and administrative users using the same libraries and key strings. Nevertheless, I also corrected the implementation details I described above.

46.    Using this data as a starting point, I then identified the following characteristics: interactions that had no valid transactions, suspicious IPs, bounces, and infrequent visits.

47.    In terms of valid transactions, I look at the HTTP status code. Unless the status code is either 2XX (which indicates a successful page response) or 304 (which indicates the page is not updated and a cached response is fine), it is not a valid interaction. I note that these status code refers to the pages requested and not the referrer field from whence the IP address presumably came. However, this goes to illustrate how poor of a methodology it is to use the referrer field at all. The log data is meant to be useful for the requested page and using it to infer visit via the

referrer field is unreliable.  In my opinion, if an IP address has no valid page loads that the referrer field is also suspect.

48.    Suspicious IPs are IP addresses that do more suspicious requests than non-suspicious requests.  A suspicious request includes unusual HTTP request methods (such as CONNECT, which should not be used with a web server, especially to 3rd party services such as Yahoo), requests that produce unusual HTTP responses and errors, or that request unusual paths.

49.    For my purposes, I count a "bounce" as an IP address that shows up within a 60-second window and then is never seen again.  In other words, I look at all requests associated with the IP address.  Then I calculate the earliest time the IP address appears in the log and the last time the IP address appears in the log.  If the difference between the two numbers is 60 seconds or less, that means that the IP address was seen only within that 60 second window and never again.

50.    Finally, an "infrequent" visitor is one that had 2 calendar days of interactions or less within a given time period.  A website that has a visitor for less than two calendar days would generally to categorize them as a "user".

**B.    Flaws in Mr. Tenery's Production Log Analysis**

51.    Mr. Tenery's analysis of the Production Log contains fundamental methodological flaws that render his conclusions about server errors and system availability unreliable.  His report examines the "Production Log" without supporting contextual evidence.  Tenery Report ¶ 41.  This approach fails to meet the technical requirements necessary for a proper analysis of complex production systems.

52.    First, Mr. Tenery oversimplifies the complexity of modern production logging systems.  Web applications typically generate multiple types of logs, including application logs, error logs, debug logs, and performance logs.  His report does not explain why he examined only one log file or how he determined that it

contained all relevant error data.  Without analyzing the full range of logs produced by the system, his conclusions about server errors are unsupported and incomplete.

53.    Second, Mr. Tenery's analysis of the log file, consisting of simple text searches, does not represent a fulsome analysis.

54.    Third, Mr. Tenery's focus solely on status codes ignores critical context captured in production logs.  A proper log analysis would examine error stack traces, which provide detailed information about system failures.  Additionally, the system state at the time of the error must be reviewed to understand the conditions that caused the failure.  Related warning messages often provide essential context for identifying patterns in errors.  Metrics such as server resource usage during error periods can reveal capacity issues, while network connectivity logs might identify infrastructure problems.   The status of database connections, application components, and concurrent user activity must also be analyzed to fully understand error causes.  None of these essential contextual elements are addressed in Mr. Tenery's analysis.

55.    Fourth, Mr. Tenery fails to validate the integrity or completeness of the log file he analyzed.  His report does not address several critical factors that cast doubt on the reliability of his conclusions.  He does not establish whether the log file was corrupted or modified during collection or analysis.  He fails to determine whether log rotation policies were properly configured during the relevant period. There is no evidence that the logging system operated continuously throughout the timeframe under review.   He does not verify whether all logging components functioned as expected or whether the system captured all error conditions that occurred.  Additionally, he fails to confirm that logging levels were appropriately set or whether log buffering affected the recording of errors.  Given that Mr. Tenery cannot identify with any certainty which web log files are associated with a given website (domain), it seems unlikely that he can properly attribute the Production

Log to a specific website. Certainly he provided no corroborating evidence from the web log files to support his analysis of the Production Log. Without these validations, his conclusions lack reliability.

56. Fifth, Mr. Tenery's conclusion that "the same type of error occurred" based solely on matching status codes reflects a misunderstanding of web application error handling. Identical status codes can result from vastly different error conditions that require deeper investigation to understand. For example, an HTTP 500 error code could indicate a database connection failure, an application logic error, a memory allocation issue, or a network timeout. *See* MDN Web Docs, 500 Internal Server Error, *available at* https://developer.mozilla.org/en-US/docs/Web/HTTP/Status/500. Without examining detailed error messages, stack traces, and system state information, it is impossible to determine the root cause of errors. Mr. Tenery's simplistic status code matching provides no meaningful insight into the actual issues affecting the system.

57. Sixth, Mr. Tenery's analysis fails to identify, much less consider, the architecture of the system, which represents the broader system context in which the production errors occurred. A proper analysis of production errors must account for the nature and architecture of the system under test. For example, if the system makes use of a database, database performance metrics might reveal the cause of application errors, network infrastructure logs could explain connection failures, and load balancer statistics might point to capacity issues. Alternatively, if the systems uses a cache server, cache server status, authentication service logs, and other system components can also be critical to understanding error conditions. By failing to analyze this broader context, Mr. Tenery cannot reliably determine the cause or impact of the errors he identified.

C.    **Flaws in Mr. Tenery's Etherpad Log Analysis**

58.    Mr. Tenery's analysis of the Etherpad logs contains fundamental methodological flaws that render his conclusions about product usage unreliable. A review of his script in Exhibit G reveals significant technical deficiencies that undermine the validity of his findings. Tenery Report ¶ 42.

59.    First, Mr. Tenery acknowledges that he was unable to filter bot or administrator traffic from the Etherpad logs, yet he still relies on this unfiltered data to draw conclusions about legitimate user activity. This is a critical methodological failure. Collaborative editing platforms like Etherpad are frequently targeted by bot traffic, and without filtering this automated activity, his user counts likely include significant bot-generated events. Mr. Tenery's own analysis of the Server Logs demonstrates the importance of bot filtering, yet he entirely omits this step for the Etherpad analysis. Furthermore, he makes no attempt to use alternative methods to identify bot activity, such as analyzing request patterns, session behaviors, or resource access timing. He does not cross reference his findings from his Etherpad analysis with the server log analysis. Presumably, IP addresses identified by his Etherpad analysis should be present in his web log analysis. His failure to implement any bot detection methodology renders his conclusions about user activity fundamentally unreliable.

60.    Second, an examination of Mr. Tenery's script in his report's Exhibit G reveals serious technical flaws in its implementation. The script fails to handle malformed log entries properly, silently dropping them without notification or documentation. The error-handling mechanism for the IP geolocation function is particularly inadequate, as it makes only three retry attempts before abandoning geolocation entirely, potentially misclassifying significant amounts of traffic. Additionally, the script's timestamp parsing lacks proper timezone handling, introducing potential errors in temporal analysis. Most critically, the script's

memory management appears ill-equipped to handle large log files, increasing the risk of data corruption during processing.

61.    Third, Mr. Tenery's reliance on IP addresses alone to count unique users fundamentally misrepresents actual usage patterns.  His script does not attempt to correlate related sessions from different IP addresses that might belong to the same user, nor does it account for users accessing the website from multiple networks or devices.  Without proper session correlation, his unique user counts lack technical validity and fail to accurately reflect actual user activity.

62.    Fifth, the script's geolocation implementation makes no effort to validate geolocation results against other indicators or to account for VPN or proxy usage that could mask users' true locations.

63.    Sixth, the script lacks proper audit trails and validation controls.  It does not log processing decisions, transformations, or intermediate results, making it impossible to verify how data was handled or whether critical steps were missed. The script offers no mechanism to ensure the completeness of processed data, nor does it validate input data formats or output results.  These omissions make it impossible to confirm the accuracy or reliability of the script's output.

64.    Seventh, the script fails to properly analyze concurrent user sessions. Etherpad logs typically contain multiple events from the same user during active editing sessions.  However, Mr. Tenery's script does not attempt to correlate these events or analyze session patterns, ignoring critical insights into user engagement and activity.  This failure further undermines his conclusions about user behavior and website usage.

65.    These technical deficiencies render Mr. Tenery's analysis of the Etherpad logs fundamentally unreliable.  His inability to filter automated traffic, improper handling of log rotation, flawed unique user counting, problematic geolocation implementation, and lack of validation controls all compromise the

integrity of his conclusions. As a result, his findings about product usage cannot be supported by sound technical analysis.

### D.    Flaws in Mr. Tenery's Database Analysis

66.    Mr. Tenery's analysis of the PostgreSQL databases exhibits fundamental methodological flaws that render his conclusions about user activity unreliable.    His approach to database restoration and analysis demonstrates technical deficiencies that undermine the validity of his findings.

67.    Mr. Tenery's modification of the database dump file represents a serious departure from accepted forensic practices. He acknowledges removing "certain lines of code and commands" from the dump file, yet provides no documentation of exactly what was removed.   This selective editing of forensic evidence violates basic chain-of-custody principles. Without a complete record of the modifications made to the dump file, the reliability of the restored database cannot be verified.   Mr. Tenery's claim that these modifications allowed him to "fully restore the database structure" cannot be replicated or independently validated when he altered the source data, which is why his methods are antithetical to industry standards.

68.    Mr. Tenery's handling of console commands in the dump file further compromises his analysis. His removal of commands that "attempted to switch between databases" indicates the original system likely contained multiple related databases.   By eliminating these database relationships, Mr. Tenery potentially destroyed critical context about user interactions and data relationships.   His methodology provides no way to verify whether important data resided in these related databases.

69.    Mr. Tenery's definition of "active editors" as "any user that had created or revised a page" demonstrates concerning technical oversimplification. PostgreSQL databases typically maintain detailed metadata about user interactions.   His analysis ignores critically relevant data points such as session

duration, interaction frequency, edit size, and content persistence.  The methodology fails to distinguish between substantive edits and minor changes.  It provides no analysis of edit patterns that might indicate automated or fraudulent activity.

70.    Mr. Tenery's apparent failure to analyze database logs and transaction history undermines his conclusions about user activity.  His methodology ignores Write-Ahead Logs (WAL) that could validate transaction timing.  The analysis disregards system catalogs that track database changes. Without examining these critical data sources, his conclusions about user activity lack technical foundation. Fundamentally, Mr. Tenery does not cross reference this analysis with his server log analysis.

71.    In conclusion, while Mr. Tenery's analysis purports to show legitimate user activity and engagement across multiple products and domains, his methodology is not sufficiently robust to support these claims.  His reliance on unverified internal scripts, imprecise metrics, and incomplete log data undermines the reliability of his findings.

### E.    Failure to Exclude Employees and Administrators

72.    Mr. Tenery's methodology is further compromised because he failed to adequately exclude IP addresses associated with people who were directly connected to Defendants, including many of Defendants' own employees and business associates whose names appeared in various iterations across the relevant databases.

73.    For example, Mr. Ravine hired Nikita Gaer in 2014 as a "core" software engineer and paid Gaer to work on his projects.  Gaer Tr. 139:25-140:26, 144:16-23. Mr. Gaer's name appears frequently in Defendants' data, including in test and public-facing environments.  Mr. Ravine hired and paid several software developers whose names are present in Defendants' data, including Mattia Ivarone and Peter Zolova.  Gaer Tr. 62:19-65:19; Ivarone Tr. 16-69:18.  Mr. Ravine also engaged his

friends and associates to help with his projects, including Rachel Kim (Park Tr. 28:8-19) and Deborah Reynolds (Reynolds Tr. 15:9-16:2).

74.    Mr. Tenery's data analysis fails to isolate or exclude each IP address associated with these and other individuals associated with Defendants' business, which artificially inflated his findings as to unique users.

## V.    ANALYSIS OF MR. TENERY'S CLAIMS REGARDING USE OF DEFENDANTS' ASSERTED PRODUCTS

75.    My investigation reveals that none of Defendants' claimed websites generated meaningful third-party user engagement before November 2022. Defendants claim to have launched several webpages between March 2015 and November 2022 that they say relate to "Open AI," but the technical evidence shows these websites either never launched, existed only as internal test environments, or attracted negligible activity from primarily non-U.S. users.

76.    This lack of genuine user engagement appears consistently across all of Defendants' claimed offerings—from their earliest "Initial Collaboration Tool" through later products like Hub and Decentralized. After OpenAI released ChatGPT in November 2022, traffic to Defendants' websites increased dramatically, but this traffic appears driven by user confusion rather than genuine interest in Defendants' services.

### A.    Initial Collaboration Tool

#### 1.    Overview

77.    Mr. Tenery opines that server logs and marketing materials confirm the existence and use of the so "Initial Collaboration Tool." Tenery Report ¶¶ 80-84. He relies on three pieces of evidence: (1) server logs showing five "interactions" with a *different* website without "Open AI" branding in 2014, (2) presentations on Google Drive from October 2015, and (3) Defendants' recent "reconstruction" of the tool. *Id*. Based on these materials, Mr. Tenery concludes that the Initial Collaboration Tool

existed on the Internet from September 13, 2014, initially branded as Wikineering, and later operated as an "Open AI"-branded website. Tenery Report ¶ 82.

78.     I disagree with Mr. Tenery's opinions. First, the server logs that Mr. Tenery cites pre-date Defendants' claimed "Open AI" branding by months, making them irrelevant to proving the existence of an "Open AI"-branded tool. Second, even accepting Mr. Tenery's interpretation of these logs, they show negligible activity inconsistent with a functioning website. Third, Mr. Tenery's reliance on October 2015 presentations to prove the existence of the tool only serve to weaken his opinions. Fourth, my investigation reveals the "tool" was nothing more than a basic MediaWiki installation that was never developed into a functional product or meaningfully used by third parties.

### 2.     Assessment of Existence and Use

79.     The "Initial Collaboration Tool" was a wiki-based website branded with "Open AI" that offered "user-created online articles about artificial intelligence ('AI') research topics." 12/20/23 Def. Ravine's Suppl. Resp. to Interrog. No. 1. Defendants claim they offered this tool at either wikineering.org or ineed.com/wikineering from "March 25, 2015" to "early 2016." Dkt. 38-2 ¶ 5.[1]

80.     My investigation found no credible evidence that the Initial Collaboration Tool ever existed as a functioning website with third-party users. I conducted research of public Internet sources to identify any artifacts or evidence of the Initial Collaboration Tool's existence. Despite searches across the Internet

---

[1] *See* Dkt. 38-2 (Ravine Decl.) ¶ 5 ("On or about March 25, 2015, I rebranded the portion of the Wikineering website devoted to artificial intelligence research as 'Open AI.' The brand 'Open AI' appeared prominently in the top left corner of Wikineering pages containing this research. These Wikineering pages displaying the Open AI name ('Initial Collaboration Tool') were immediately accessible to the public, and were continuously available for users to review and contribute to until in or around early 2016 at either wikineering.org or ineed.com/wikineering.").

Archive, Google, Bing, and public forums, I found no references to or traces of the Initial Collaboration Tool. The complete absence of any digital footprint is particularly significant, as a public collaboration website would typically be indexed by search engines and leave discoverable traces across the Internet.

81.    The case-specific materials I reviewed also reflect no contemporaneous evidence supporting claims about the Initial Collaboration Tool. If anything, the testimony regarding the Initial Collaboration Tool undermines Defendants' claims. Defendants' developer, Mr. Gaer, testified that it remained "an internal project" that was "never publicly tested or released." Gaer Tr. 27:8-17; 169:20-170:1. Similarly problematic is Ravine's testimony, where he admitted he "cannot recall whether anyone shared any kind of content" (Ravine Tr. 69:8-17; 131:12-134:3) and acknowledged having no records of messages allegedly posted by third parties to the Initial Collaboration Tool (Ravine Tr. 237:18-238:4). These admissions contradict any notion of public use.

82.    In addition, when asked for records documenting existence of the Initial Collaboration Tool, Ravine claimed that any such records were destroyed in 2018. Ravine Tr. 69:19-20; *see also* Dkt. 80 (Ravine Decl.) ¶ 7 (asserting that "the original code for the Initial Collaboration Tool was on a co-located server that around May 3, 2018, was rendered inoperable, and ultimately discarded without my knowledge"). Mr. Tenery appears to have accepted this assertion without meaningful scrutiny. *See* Tenery Report ¶ 83 ("Our understanding is that the servers storing the initial collaboration tool crashed, and are no longer available for our forensic analysis.").

83.    I disagree with Mr. Tenery's uncritical acceptance of the server crash explanation. A Media Wiki installation would generate multiple types of technical artifacts that would likely survive a server failure, including server logs, database tables, user accounts, editing histories, cached content, configuration settings, and automated backups. Data centers like ByteGrid, where Ravine's servers were

located, often implement multiple redundancy and backup systems specifically to prevent total data loss. Yet Mr. Tenery's analysis shows no indication that he investigated whether such standard backup systems existed or were utilized.

84.    Instead of contemporaneous evidence, Mr. Tenery appears to rely on Defendants' "reconstruction" (Tenery Report ¶ 81)—a single webpage created during litigation containing only copied Wikipedia content (Dkt. 80 (Ravine Decl.) ¶¶ 7-10). *See also* RAVINE '2092. There is no professional basis to accept this explanation, which relies on Mr. Ravine's credibility.

### 3.    Assessment of the Relevant Server Logs

85.    Mr. Tenery claims to have "found evidence that the 'Initial Collaboration Tool' existed on the internet at least as early as September 13, 2014, branded as Wikineering on the Wikineering.org domain." Tenery Report ¶ 82. His conclusion rests primarily on server logs showing five "interactions" with the Wikineering website between September 13, 2014, and December 17, 2014, from two unique users accessing a page with "Main_Page" in its path. *Id.*

86.    Mr. Tenery's analysis is erroneous and reflects a fundamental misunderstanding of the facts. Critically, Mr. Tenery misunderstands what constitutes the "Initial Collaboration Tool." According to Defendants' own timeline, Wikineering existed in 2014 as a general collaboration website based on MediaWiki, and they did not brand anything as "Open AI" until March 25, 2015. Dkt. 38-2 (Ravine Decl.) ¶¶ 4-5; Dkt. 80 (Ravine Decl.) ¶¶ 7-10. Defendants invented the term "Initial Collaboration Tool," which they used to specifically refer to their MediaWiki installation after it was branded as "Open AI" in March 2015. *See id.* Therefore, logs from 2014 cannot demonstrate the existence of the Initial Collaboration Tool.

87.    The technical evidence further undermines Mr. Tenery's conclusions. While the logs show access to a "Main_Page," this carries no probative value because "Main_Page" is the default landing page automatically created for every MediaWiki

installation.      *See*      MediaWiki,      Manual:Main      Page, https://www.mediawiki.org/wiki/Manual:Main_Page ("The Main Page is the page that the wiki goes to if no page is specified in parameters to index.php."). The logs merely show access to a basic MediaWiki instance—not what website or page that instance relates to, or what branding appeared on the page. It is likely the page related to the Wikineering brand or the Sunglass.io brand, as described in Mr. Ravine in his declarations. Dkt. 38-2 ¶ 4 (stating he created Wikineering, which was "[s]imilar to the online encyclopedia Wikipedia," in 2012); Dkt. 80 ¶ 6 (stating that "sunglass.io was rebranded as Wikineering and continued to reside on sunglass.io"). In either event, given Mr. Ravine's admission that he did not create the Initial Collaboration Tool branded as "Open AI" until 2015 (Dkt. 38-2 ¶¶ 4-5; Dkt. 80 ¶¶ 7-10), the 2014 logs definitively do not show use of "Open AI."[2]

### 4.    Assessment of the AI School Presentations

88.    Mr. Tenery bases his conclusions about the Initial Collaboration Tool on two versions of a presentation found in Defendants' Google Drive, which are titled "AI School Keynote Presentation 006c.pdf" and "AI School Keynote Presentation 006d.pdf." Tenery Report ¶ 84. Mr. Tenery makes three key points about these materials: (1) they contain three slides showing "Open AI" branding, (2) one of the slides contains what he claims is "an excerpt of the article hosted on the Initial Collaboration Tool as recreated in Exhibit 2 of Defendant's declaration," and (3) Google Drive metadata shows an October 15, 2015 creation date. *Id.* & Ex. M. Mr. Tenery contends these materials prove the Initial Collaboration Tool existed because they contain screenshots purportedly matching Defendants' later reconstruction of the Initial Collaboration Tool. *Id.*

---

[2] In any event, the two IP addresses associated with these 2014 logs were located in Canada and Greece. *See* Dkt. 80-8 (listing 91.236.74.170 and 70.72.68.22).

89.    I disagree with Mr. Tenery's conclusions for several reasons.  First, these presentations facially relate to a different venture—Defendants' "AI School" project.  *See* RAVINE '17, '117422.    The brochures are titled "AI School Keynote Presentation," indicating they were created to promote an educational venture.  *See id.* & Tenery Report ¶ 84.  Consistent with these AI School presentations, server logs from this period show regular website traffic to aischool.com, a domain owned which I understand Ravine owns.    *See* ViewDNS, Reverse Whois, "Guy Ravine", https://viewdns.info/reversewhois/?q=guy+ravine    (identifying    "aischool.com" registration).    Archived versions of aischool.com from the Internet Archive show identical visual elements, branding, and content to what appears in these brochures.  *See* Exhibit C (comparison).  Mr. Tenery's analysis fails to address this evidence showing the materials documented a different project entirely.

90.    Second, the content of these presentations conflicts with Defendants' purported timeline.  The presentations contain the phrase "See Backpropagation for more"—language that did not appear in Wikipedia they claimed to have used.  *See* Dkt. 80 n.3 (citing Convolutional Neural Network, Wikipedia (revision Mar. 8, 2015), https://en.wikipedia.org/w/index.php?title=Convolutional_neural_network&oldid=650474279).    The presentations shared other unique characteristics with later versions of the Wikipedia article, including the rich formatting of mathematical symbols and formulas under the "ReLU Layer" subheading, which were presented on Wikipedia with only simple text in March 2015.  This timing suggests Defendants did not launch their "Initial Collaboration Tool" in March 2015 as they have claimed.

91.    Third, although Defendants have claimed the screenshot in the presentation reflects the "Initial Collaboration Tool," a closer examination reveals it is merely a screenshot of the underlying Wikipedia article in September 2015.  *See* Convolutional    Neural    Network,    Wikipedia    (revision    Sept.    10,    2015), https://en.wikipedia.org/w/index.php?title=Convolutional_neural_network&oldid=6

80328967.  In particular, the "Details" heading uses Wikipedia's exact interface font from that period, the margin spacing matches Wikipedia's layout precisely, and even the hyperlink styling is identical to Wikipedia's then-current design.

92.    Last, these October 2015 presentations do not reflect any actual collaboration.  Despite claiming they operated the Initial Collaboration Tool for more than six months before these presentations were created (Dkt. 38-2 ¶ 8), the presentations show no user-generated content on Defendants' purported website. Instead, they contain only Wikipedia content that did not exist in March 2015.  The absence of any user contributions in these presentations created after months of claimed operation strongly suggests no such website actually existed.

### 5.    Conclusions

93.    Contrary to Mr. Tenery's opinions, the evidence demonstrates that Defendants never deployed a functional collaboration website with third-party users. First, no technical evidence supports Mr. Tenery's opinion as to the existence of a functioning Initial Collaboration Tool, such as user accounts, edit histories, or backups.  Second, the server logs Mr. Tenery relies on predate Defendants' claimed "Open AI" branding and show minimal activity consistent with internal testing rather than public use.  Third, key witness testimony contradicts Mr. Tenery's claims of public availability, with the website's developer testifying it was "never publicly tested or released."  Fourth, the "AI School" presentations contain content that could not have existed until months after the claimed launch date and appear to depict Wikipedia rather than Defendants' own website.  Fifth, Defendants' explanation that server crashes destroyed all evidence of the platform is contradicted by common data center practices and the lack of any independent corroboration.

36

**B.**    **open.ai before November 2022 (the 'Coming Soon' webpage)[3]**

      **1.**    **Overview**

94.    Defendants' open.ai webpage before November 2022 consisted of a basic landing page with minimal functionality.  Mr. Tenery opines that server logs demonstrate substantial traffic and user interactions with open.ai before November 2022, citing metrics such as "17,384 interactions" before April 2016 and "105,578 interactions" between April 2016 and June 2022.  Tenery Report ¶¶ 63–64.

95.    I disagree with Mr. Tenery's conclusions.  The evidence shows that open.ai was a static webpage that merely collected email addresses from users between March 2015 and September 2017, with no actual services, content, or interactive features.  By September 2017, Defendants began redirecting all traffic from open.ai to Plaintiff's openai.com domain, and this redirect remained in effect for nearly five years.  The site offered no substantive functionality, and Mr. Tenery's claims regarding substantial usage are based on flawed assumptions and incomplete analysis.

      **2.**    **Assessment of Existence and Use**

96.    Defendants claim that Ravine created the landing page for open.ai shortly after purchasing the domain on March 25, 2015.  Dkt. 138; 12/20/23 Def. Ravine's Suppl. Resp. to Interrog. No. 1.  However, Internet Archive captures reveal no trace of any content on open.ai until September 5, 2015.  When content did appear, it consisted of a basic landing page with three elements: (1) a statement that read "Open Industry Wide & Academia Wide Deep Learning Initiative," (2) a message stating "Announcement will be made soon," and (3) an email sign-up form.

---

[3] In November 2022, Defendants released the "Image Generator" version of open.ai. Because that Image Generator website is different from the version of open.ai before November 2022, I analyze the pre-November 2022 version here and the post-November 2022 version below.

Defendants' developer, Nikita Gaer, admitted in testimony that no announcement was ever made in 2015 or 2016. Gaer Tr. 165:1–166:2. Gaer also confirmed that there was no mechanism to verify whether the email addresses submitted were valid or functional. Gaer Tr. 162:10–163:23.

97.    Between September 2015 and June 2017, Internet Archive captures show that this 'Coming Soon' page remained unchanged. During this period, the site had no menus, subpages, user accounts, or content beyond the email sign-up form. By September 2017, Defendants implemented a redirect that sent all traffic from open.ai to Plaintiff's website at openai.com. This redirect remained active until early 2022, except for brief interruptions where the domain displayed unrelated "CryptoArt" content. *See* Ex. D.

98.    Mr. Tenery's characterization of the redirect implemented in 2017 as a technical "error" is both unsupported and misleading. Mr. Tenery provides no support for his assertion that the redirection was an "error," rather than a deliberate decision. In reality, the redirect appears to be an intentional decision by Defendants, as evidenced by five years of uninterrupted Internet Archive captures showing open.ai traffic consistently redirected to openai.com.

99.    Further, Mr. Tenery claims that "around 790 users attempted to access an unsecure version of the homepage ... but were redirected" while secured HTTPS traffic supposedly continued to reach open.ai. Tenery Report ¶ 67. For starters, this is inaccurate, as confirmed by the Wayback Machine's archives of numerous instances in which secured HTTPS traffic was redirected from Defendants' open.ai to Plaintiff's openai.com. *See, e.g.*, 10/6/2020 HTTPS Redirect, https://web.archive.org/web/20201006113924/https://open.ai/; 1/24/2022 HTTPS Redirect, https://web.archive.org/web/20220124001544/https://open.ai/. The Internet Archive data illustrates that the Wayback Machine in fact made no functional distinction between secured and non-secured HTTP traffic—the open.ai

domain indiscriminately redirected all traffic to Plaintiff's website.  *See, e.g.*,
9/26/2017                              HTTP                              Redirect,
https://web.archive.org/web/20170926220527/http://open.ai/;    8/3/2021    HTTP
Redirect, https://web.archive.org/web/20210803032528/http://open.ai.

100.  Additionally, Mr. Tenery's analysis ignores critical contextual evidence,
such as the email sign-up list.  The last modification date for the list, July 18, 2017,
aligns precisely with the implementation of the redirect, providing further evidence
that all traffic—both HTTP and HTTPS—was redirected after this date.  If HTTPS
traffic had bypassed the redirect as Mr. Tenery suggests, the email list would have
been expected to show *some* increase beyond this date.  Instead, all activity ceased
when the redirect was implemented.

### 3.    Assessment of Server Logs

101.  Mr. Tenery's analysis of server logs contradicts the historical record of
open.ai's usage.  He claims significant user activity before November 2022, citing
"17,384 interactions" and "2,629 unique, legitimate users" before April 2016, as well
as "105,578 interactions" and "14,763 unique, legitimate users" between April 2016
and June 2022.  Tenery Report ¶¶ 63–64.  However, these claims are inconsistent
with the documented lack of functionality on open.ai during this period.  As noted
above, the Internet Archive captures show that open.ai was nothing more than a
static landing page from September 2015 to June 2017.  The page contained no
interactive features beyond an email submission box, making it unclear how Mr.
Tenery's claimed user activity aligns with the site's limited capabilities.

102.  Moreover, Mr. Tenery's analysis of server logs before November 2022
contains fundamental methodological flaws.  First, Mr. Tenery inflates interaction
numbers by treating each server request as a distinct interaction.  A single visit to
the landing page typically generated multiple requests for HTML, CSS, JavaScript,
and image files.  Mr. Tenery also fails to adequately filter out bot, suspicious, invalid,

and non-U.S. traffic. He also fails to analyze one-time visits (which I categorize as a bounce). Second, Mr. Tenery's classification of U.S. traffic relies solely on basic IP geolocation, failing to account for VPNs, proxy servers, and cloud provider IP ranges.

103. After accounting for these discrepancies and applying my alternative methodology above, U.S. interactions is reduced to 66 IPs before November 2022, as shown below (*see also* Ex. I):

| open.ai – All IPs | | | | | | | |
|---|---|---|---|---|---|---|---|
| Start | End | Valid IPs | Invalid IPs | | | | |
| | | U.S. | Non-U.S. | No Valid Request | Suspicious | Infrequent | Bounced |
| | 12/11/15 | 2 | 351 | 10 | 0 | 387 | 368 |
| 12/11/15 | 12/31/15 | 6 | 512 | 4 | 0 | 674 | 574 |
| 12/31/15 | 4/27/16 | 4 | 1,320 | 24 | 0 | 1,596 | 1,353 |
| 4/27/16 | 12/31/16 | 29 | 6,075 | 50 | 0 | 7,723 | 6,743 |
| 12/31/16 | 9/26/17 | 25 | 5,134 | 49 | 0 | 6,728 | 5,956 |
| 9/26/17 | 12/31/17 | 0 | 23 | 27 | 0 | 24 | 21 |
| 12/31/17 | 12/31/18 | 0 | 76 | 93 | 0 | 97 | 84 |
| 12/31/18 | 12/31/19 | 0 | 246 | 334 | 5 | 332 | 283 |
| 12/31/19 | 12/31/20 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12/31/20 | 12/31/21 | 0 | 0 | 0 | 0 | 0 | 0 |
| 12/31/21 | 11/15/22 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total IPs | 66 | 13,737 | 591 | 5 | 17,561 | 15,382 |

### 4. Assessment of Email Logs

104. Mr. Tenery claims 8,439 email address submissions to open.ai before November 2022. Tenery Report ¶¶ 43-44, 63. From this, Mr. Tenery extrapolates that 6,202 unique users provided their email addresses to and signed up with open.ai. *Id.* ¶ 53. But Mr. Tenery's analysis is predicated on a series of flawed assumptions that undermine his conclusions.

105. It is customary for email logs to be maintained in a format that preserves the content of the logs, including accurate dates, times, and locations of origin recorded in real-time. Here, however, Mr. Tenery discovered that the open.ai webpage "stores users' email addresses in a text file without timestamps." Tenery

Report ¶ 43. The open.ai webpage's failure to capture basic timestamp information for its email logs is a substantial deviation from the industry standard. Without timestamp data, Mr. Tenery is simply unable to determine with an acceptable degree of confidence the date any email submissions were recorded.

106. Mr. Tenery references secondary sources, such as the Linux file timestamps in the open.ai source code directory, to suggest that the email logs were modified on July 18, 2017, and therefore the timing of the email logs roughly corresponds to that date. Tenery Report ¶ 43. But that is not a scientific conclusion informed by the evidence. For one, the July 18, 2017 modification date is explained more readily by other factors, such as the site-wide policy redirecting traffic on that date, as explained in detail above. The Linux files are ancillary at best, and not a substitute for accurate timestamp information within the email logs themselves. Even Mr. Tenery recognizes "Linux timestamps can be modified," further exacerbating the credibility concerns with the data. *Id.* ¶ 43. Mr. Tenery's failure to independently verify the contents and timing of the email logs severely undermines his conclusions about the significance of those logs.

107. I analyzed the email logs with reliable methods appropriate for the inquiry. In particular, my analysis starts with the original list that Defendants produced of 8,439 emails. *See* RAVINE '114572. I then culled that list to (1) remove exact duplicates of email addresses (2,191 email addresses), (2) remove near duplicates of misspellings of emails (29 email addresses), (3) remove incorrect entries that are not email addresses (23 entries), and (4) remove email addresses associated with non-U.S., country-specific top-level domain names or domain names with non-U.S. MX records. I then processed the list through ZeroBounce, a leading email verification service, which removed another 467 email addresses that could not be validated. There are 2,297 email addresses that remain.

### 5.    Conclusions

108.    The historical record and technical evidence contradict Mr. Tenery's claims regarding open.ai's usage before November 2022.    The site was a static landing page that offered no content or services until November 2022.    The majority of Mr. Tenery's claimed interactions were either automated traffic or inflated due to flawed methodology.    Additionally, the intentional redirect from open.ai to openai.com from 2017 to 2022 further undermines his conclusions.

### C.    hub.open.ai

#### 1.    Overview

109.    Mr. Tenery asserts that Hub was a website for posting and reading problems and solutions related to artificial intelligence, hosted on the subdomain hub.open.ai and branded with the OpenAI trademark by at least September 27, 2016.    He further references an image of Hub (RAVINE '2088) and claims that Defendants made it publicly available.    Dkt. 38-2 ¶ 9.

110.    Mr. Tenery's analysis fails to provide credible evidence that Hub was ever operational as a website with genuine third-party users.    The evidence instead demonstrates that Hub was an internal project with no external user engagement and was likely created to manufacture evidence that "Open AI" was being used by the public.

#### 2.    Assessment of Existence and Use

111.    Mr. Tenery opines that Hub was hosted on a Docker container called "data_ai" and relies on a file modification timestamp of June 6, 2016, to suggest that the website was active as early as that date.    Tenery Report ¶ 86.    While he acknowledges that file modification timestamps can be altered, he relies on this timestamp as proof without verifying its authenticity or corroborating it with other evidence.    *Id*.    A timestamp alone indicates only that a file was created or modified, not that a website was deployed, accessible, or used.    Mr. Tenery does not examine

whether the timestamp reflects routine testing or actual operation. Without supporting evidence, such as server logs or network traffic data, this timestamp cannot establish that Hub was operational by June 2016.

112. The Docker container Mr. Tenery references contains no evidence of a functional or customized website. It includes a basic installation of Discourse, an open-source discussion board software, with default logos and settings. This suggests the website was in a development or testing phase, not operational. Mr. Tenery does not explain how this standard Discourse installation demonstrates that Hub was functioning as an AI-related website. A fully operational website would typically include unique branding or features tailored to its purpose, none of which appear in the Docker container. Tenery Report ¶ 86.

113. Further, Mr. Tenery's analysis fails to demonstrate that Hub was publicly accessible or used by third-party users. He does not investigate server logs or network traffic data, which would have shown whether the website was accessible to external users. Nor does he examine user registration records to confirm whether accounts existed beyond Defendants' team. Without these data points, there is no basis for concluding that Hub was publicly available or actively used.

114. The content on Hub further undermines Mr. Tenery's claims. All posts appear to have been copied from earlier GitHub discussions initiated by Nikita Gaer. Exhibits show that identical posts were first published on GitHub before being transferred to Hub. Gaer Exs. 31–33, 35–39, 43. Gaer confirmed this in his testimony, making it clear that the content was not created by independent users. Gaer Tr. 225:1–3, 225:19–226:10. Additionally, the only identifiable users of Hub were internal team members. Mr. Gaer admitted that the account "Rick," the sole other user identified, was likely created by someone on the development team. Gaer Tr. 215:20–216:7. Ravine could also not confirm that Rick was an actual third party, further casting doubt on the existence of external users. Ravine Tr. 232:15–233:3.

115. Last, Mr. Tenery's analysis of Hub is inconsistent with the methodology he applies to Defendants' other websites. Regarding Defendants' other websites, Mr. Tenery examines server logs, network traffic data, and user activity to verify website use. Uniquely for Hub, however, he relies solely on an unverified file modification timestamp without investigating other sources of evidence. This selective approach undermines the reliability of his conclusions. Tenery Report ¶¶ 85–86.

### 3. Conclusions

116. The evidence demonstrates that Hub was not a functional website accessible to third-party users. Mr. Tenery's reliance on a single file modification timestamp is insufficient to establish that Hub was used by actual third parties. The evidence supports the conclusion that Hub was an internal project designed to create the appearance of third-party commercial use rather than a genuine website accessible to third-party users—much less used by any. Mr. Tenery's selective methodology and reliance on insufficient evidence further weaken his conclusions. There is no credible basis for asserting that Hub functioned as a public-facing website with third-party users.

### D. decentralized.open.ai

### 1. Overview

117. Mr. Tenery asserts that Defendants' operated a website called "Decentralized" at decentralized.openai.com that enabled users to read, code, and run algorithms from October 2017 onward. Tenery Report ¶ 95. According to Mr. Tenery, Decentralized had 28 registered users and 453 revisions made by 10 unique editors. *Id.* ¶ 96. He bases his analysis on a database for Decentralized, which purportedly shows user and edit histories spanning from October 25, 2017, through November 16, 2022. *Id.*

118. I disagree with Mr. Tenery's conclusions about the Decentralized product for several fundamental reasons. First, the database records reveal

coordinated account creation rather than organic user adoption. Second, supposedly independent user accounts show suspicious clustering of IP addresses suggesting internal testing. Third, the revision history demonstrates minimal activity inconsistent with a functioning website. Fourth, the purported user-generated content appears to be test data rather than genuine contributions. Fifth, Mr. Tenery's geographic analysis fails to establish meaningful U.S. user engagement.

### 2.    Database Analysis

119. Mr. Tenery relies on his analysis of the "Decentralized Database" to conclude the product had users and contributors from October 2017 through November 2022. Tenery Report ¶¶ 95-99; *see* RAVINE '6007 (Decentralized database). According to Mr. Tenery, the database shows 453 revisions by 10 unique editors, 28 total users before September 2022, and 11 "project companies." *Id.* ¶¶ 96-99. While noting that data after December 2022 appears "defaced," Mr. Tenery claims the database proves user engagement during this period. Mr. Tenery acknowledges he "cannot determine whether the first users were test accounts" and has "not validated the authenticity of the user sign-ups." *Id.* ¶¶ 97-98.

120. The database records show this was a test environment, not a website with real users. First, the registered accounts reveal coordinated creation by a small group of testers. Second, the IP addresses cluster within two network ranges belonging to the same organizations. Third, the "project companies" consist of test entries created in rapid succession by single users. Fourth, the discussions and comments contain explicit statements identifying them as tests. *See* RAVINE '6007.

### (a)    Registered Accounts

121. Only six accounts were registered on decentralized.open.ai before September 28, 2022. *See* RAVINE '6007. Two of these accounts were associated with the site's administrators (Defendant Ravine and developer Gaer). Two more accounts were registered under "Tester" and "Tester 2" within a two-day span from

the same IP address. The remaining two—"Mike Thomson" and "Julia"—were registered within one hour of each other from the same foreign IP address on the day the site purportedly launched. These accounts are shown below:

| decentralized.open.ai – Registered Accounts | | | |
|---|---|---|---|
| **Email Address** | **Name** | **Date** | **IP Address** |
| mike@mike.com | Mike Thomson | 10/25/17 2:12 PM | 46.0.222.154 |
| gaer.nikita@gmail.com | Nikita Gaer | 10/25/17 2:43 PM | 149.3.37.207 |
| julia@julia.com | Julia | 10/25/17 2:51 PM | 46.0.222.154 |
| guyravine@gmail.com | Guy Ravine | 3/8/20 6:54 AM | 73.93.154.216 |
| tester@test.com | Tester | 3/19/20 2:38 AM | 114.149.54.247 |
| tester2@test.com | Tester 2 | 3/20/20 6:04 AM | 114.149.54.247 |

122. According to Mr. Tenery, the "first user to make a recorded change in the Decentralized database was created on October 25, 2017," but he "cannot determine whether the first users were test accounts." Tenery Report ¶ 97. I disagree. The database records show that these initial registrations were, in fact, test accounts. On October 25, 2017, three users—"Mike Thomson," "Nikita Gaer," and "Julia"—all registered within a 39-minute window, employing foreign IP addresses (46.0.222.154 and 149.3.37.207).

123. Specifically, "Mike Thomson" at "mike@mike.com" was registered at 2:12 p.m. from 46.0.222.154 in Russia. Thirty-one minutes later, "Nikita Gaer" registered from 149.3.37.207 in Georgia. Nine minutes afterward, "Julia" registered under "julia@julia.com" from 46.0.222.154 again. The same IP hosting multiple accounts with apparently fabricated emails is indicative of deliberate testing, rather than genuine user engagement.

124. The use of fabricated email addresses (e.g., "mike@mike.com" and "julia@julia.com"), the clustering of registration timestamps, and the involvement of Gaer (Defendants' developer) collectively confirm that these accounts were created solely for testing. This conflicts with Mr. Tenery's expressed uncertainty as to whether the first accounts were test-based. Even if genuine, these accounts were

non-U.S. based, leave no U.S.-based IP addresses who registered for an account before September 28, 2022—other than Defendant Guy Ravine.

(b)    IP Address Clustering and Lack of Genuine U.S. Engagement

125.  The database records show 30 unique IP addresses accessing decentralized.open.ai before September 28, 2022.  Two IP addresses connect to accounts registered under Defendant Ravine and his developer Gaer.  Of the remaining 28 accounts, 13 originated from outside the United States:

| decentralized.open.ai – IP addresses | | | |
|---|---|---|---|
| Email Address | Name | Date | IP Address |
| mike@mike.com | Mike Thomson | 10/25/17 2:12 PM | 46.0.222.154 |
| gaer.nikita@gmail.com | Nikita Gaer | 10/25/17 2:43 PM | 149.3.37.207 |
| N/A | Anonymous | 12/12/17 3:12 PM | 46.0.165.127 |
| N/A | Anonymous | 9/9/18 7:55 PM | 31.210.177.127 |
| N/A | Anonymous | 9/19/19 7:54 AM | 5.165.45.3 |
| N/A | Anonymous | 11/9/19 9:39 AM | 5.164.154.23 |
| N/A | Anonymous | 3/17/20 6:39 AM | 114.149.54.247 |
| N/A | Anonymous | 8/15/20 2:04 PM | 192.176.50.84 |
| N/A | Anonymous | 8/31/20 10:08 PM | 94.191.136.155 |
| N/A | Anonymous | 9/2/20 7:23 AM | 194.132.70.218 |
| N/A | Anonymous | 9/8/20 7:43 PM | 189.177.72.236 |
| N/A | Anonymous | 1/13/21 7:48 AM | 46.0.220.2 |
| N/A | Anonymous | 2/21/22 6:09 AM | 188.169.155.237 |

126.  Among the remaining 17 U.S. IP addresses, eight fall into two distinct network clusters that indicate common network ownership and management.  In Internet Protocol (IP) addressing, the four sets of numbers in an IP address (e.g., 174.194.199.205) are called octets.  Network administrators typically allocate IP addresses in contiguous blocks to maintain efficient routing and network management.  The size of these blocks is denoted using Classless Inter-Domain Routing (CIDR) notation, where a "/16" block indicates that the first two octets are fixed for all addresses in that block.

127. The first cluster ("Cluster A") contains three IP addresses sharing the prefix "174.194":

| decentralized.open.ai – IP addresses (Cluster A) | | | |
|---|---|---|---|
| Email Address | Name | Date | IP Address |
| N/A | Anonymous | 9/19/19 3:50 PM | **174.194**.199.205 |
| N/A | Anonymous | 11/9/19 7:06 PM | **174.194**.204.147 |
| N/A | Anonymous | 3/14/20 10:30 PM | **174.194**.208.43 |

128. These addresses share identical first two octets (174.194), indicating they belong to the same /16 network block. In standard network architecture, a /16 block contains 65,536 consecutive IP addresses (2^16) managed as a single unit. Large organizations typically receive and manage /16 blocks as single administrative units. The identical "174.194" prefix therefore indicates these three IP addresses belong to the same organization's network.

129. The second cluster ("Cluster B") contains five IP addresses sharing the prefix "73.93":

| decentralized.open.ai – IP addresses (Cluster B) | | | |
|---|---|---|---|
| Email Address | Name | Date | IP Address |
| N/A | Anonymous | 1/31/20 4:31 AM | **73.93**.155.92 |
| **guyravine@gmail.com** | Guy Ravine | 3/8/20 6:54 AM | **73.93**.154.216 |
| N/A | Anonymous | 3/16/20 8:41 PM | **73.93**.152.190 |
| N/A | Anonymous | 3/28/20 10:43 PM | **73.93**.154.203 |
| N/A | Anonymous | 3/28/20 10:43 PM | **73.93**.154.203 |
| N/A | Anonymous | 8/1/20 10:37 PM | **73.93**.155.109 |

130. These addresses share the "73.93" prefix and show only minor variations in the third octet (152-155), indicating they likely belong to a series of adjacent /24 networks within a larger /16 block. In typical network deployments, organizations subdivide their /16 blocks into smaller /24 networks for internal routing efficiency, but maintain administrative control over the entire /16 range. The presence of Ravine's authenticated account (73.93.154.216) within this IP range indicates these addresses likely originated from the same organization's network.

131.   Two other IP addresses are notable.  The first IP address (107.3.140.185) is linked to an account that later registered for the Decentralized website on March 18, 2023 under the name "John Wiseman."  *See* RAVINE '6007.  It appears "John Wiseman" is an alias of Guy Ravine, as indicated by a video posted to an account under the name "Guy Ravine" by someone claiming to be "John Wiseman."[4]  The second IP address (72.134.193.245) is linked to edits by Rachel Park, who testified she created a test "company" called "Rachel EST."  *See* Park Tr. at 226:4-16.  The database confirms this IP's association with owner ID "69de7abc-51ae-4779-9bf7-d1603a582b31", which created the "Rachel est" company.

132.   After considering the network relationships—specifically the eight clustered addresses (three in Cluster A and five in Cluster B), Ravine's alias, and Park's test account—the total number of potentially independent U.S. IP addresses is reduced to just eight anonymous U.S. IP addresses.  The clustering of these IP addresses within network blocks controlled by single organizations directly undermines Mr. Tenery's assumption that each IP address corresponds to a distinct user—much less third-party users.

(c)    <u>Project Companies</u>

133.   I understand the Decentralized website was structured to allow for the creation of "Companies."  *See* RAVINE '2075.  In Mr. Tenery's report, he includes part of a screenshot of a page purportedly from Decentralized reflecting some of the companies.  *See* Tenery Report ¶ 95.  But the screenshot he provides is cut in a way

---

[4]  *See* https://boom.me/threads/d8f5597f-466c-497d-bb65-97b730f6e801/0d151aac-1c28-4c81-84fe-659d62ce4f7c.

that omits certain relevant content, including test companies. *See id.* Below is a full screenshot of the page that Mr. Tenery only partially provided (*see* RAVINE '2075):



134.   I understand the companies reflected in the screenshot above are stored in the Decentralized database under a table called "project_companies."  *See* RAVINE '6007.  Contrary to Mr. Tenery's opinions (*see* Tenery Report ¶ 96), the "project_companies" table in that database further corroborates the test-oriented nature of the database.  *See* RAVINE '6007.  Below is a table of each of the 11 "companies" from that database table:

| No. | Name | Description | Owner ID | Date |
|---|---|---|---|---|
| 1 | General Purpose Face ID | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/17 2:12 PM |
| 2 | Automated Store | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/17 2:12 PM |
| 3 | AI Super Renderer | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/17 2:12 PM |
| 4 | Task: Masks | This is a test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/12/20 1:53 AM |
| 5 | The Network | Defining the Network | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/17/20 3:48 AM |
| 6 | Rachel est | Testing | 69de7abc-51ae-4779-9bf7-d1603a582b31 | 8/23/20 3:53 AM |
| 7 | lll | lll | b67b245f-65e7-47e0-92c2-7083eddad062 | 6/28/22 9:33 PM |
| 8 | test | Data analytics for publishers | 0952238c-5fbd-4df0-9ffe-7cf65fc95ad6 | 4/14/23 2:59 PM |
| 9 | <aaa> | <b>hello</b>world | 44b7552b-54ea-441e-8b87-fa8a0dc4d7a9 | 4/14/23 3:06 PM |
| 10 | PandaServer | Reliable | 4fd3a5a1-05a5-46bf-bc1e-07101b8f94ef | 5/3/23 8:37 AM |
| 11 | TEST | dumpster company | 3e2fb4c8-6b5e-4ff2-b7b1-1b2ca452e765 | 10/6/23 9:59 PM |

(decentralized.open.ai – Project Companies Table)

135. Mr. Tenery acknowledges that, aside from the first three projects created on October 25, 2017, the last eight projects "appear to be mostly test projects or vandalism."  Tenery Report ¶ 99.  To be clear, however, the database table confirms that ***all*** of the last eight projects were not created by real users, but instead by testers or vandals.  Four of these eight projects expressly include the word "test" or "testing" in their title or description.  *See supra*, ¶ 134, Table Nos. 4, 6, 8, & 11.

51

The "Rachel est" project (*see supra*, Table No. 6) belongs to Rachel Park, who testified she created it as a test.  *See* Park Tr. 226:4-16.  The remaining two projects from March 2020 share the same owner ID (2c9862f4-9d58-4321-a728-c7b7bb86e5c5) as Ravine's registered account.

136.  The three remaining projects, all created on October 25, 2017, share a single owner ID (0f557d59-74fc-4ebf-bd6a-4108e946caab).  This owner ID matches the "Mike Thomson" account—the test account created with the email "mike@mike.com" from a Russian IP address.  These three projects were created within 26 seconds of each other (between 14:12:20 and 14:12:46) during the initial test session when the "Mike Thomson" account was first registered.

137.  The project companies' creation patterns match the test account patterns identified in the user registration data.  Every project links to either an identified test account or contains explicit test markers in its title or description.

(d)    Discussions and Comments

138.  Examination of the "discussions" and "discussion_comments" tables in the Decentralized database further confirms that the website's activity was entirely test-oriented.

139.  The discussions table comprises only seven total entries:

| No. | Title | Text | Creator ID | Date |
|---|---|---|---|---|
|  | **decentralized.open.ai – Discussions Table** (Ravine '6007) | | | |
| 1 | General discussion | You can put any thought about vision, implementation and possible approaches here. | bd5df84b-f7c7-4423-acf9-dedaf1eca439 | 10/25/17 3:39 PM |
| 2 | Discussion on this test | This is a discussion on xyz | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/8/20 6:56 AM |
| 3 | discuss this | discuss | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 7:48 AM |
| 4 | Roadmap discussion | Put you thoughts about further features here | bd5df84b-f7c7-4423-acf9-dedaf1eca439 | 10/25/17 2:46 PM |

| 5 | Discuss this | | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 11:40 PM |
| 6 | Test discussion | | 69de7abc-51ae-4779-9bf7-d1603a582b31 | 8/23/20 5:16 AM |
| 7 | This is a discussion | About a test | 55971c44-9607-4928-b815-68672ca92286 | 3/20/23 4:29 AM |

140. The discussion titles and content indicate test activity. Three discussions explicitly contain the word "test." *See* Discussions Nos. 2, 6, & 7. Two discussions contain no content. *Id.*, Nos. 5 & 6. The remaining three contain template-style instructions ("Put you [sic] thoughts about further features here") rather than actual discussion content. *Id.*, Nos. 1, 3, & 4.

141. The discussion_comments table contains 18 comments:

| decentralized.open.ai – Discussion Comments Table (Ravine '6007) | | | |
|---|---|---|---|
| No. | Discussion Text | Owner ID | Date |
| 1 | This is a test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/8/20 6:56 AM |
| 2 | This is another test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/8/20 6:57 AM |
| 3 | test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/15/20 9:21 AM |
| 4 | tjis is a | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:03 AM |
| 5 | discuss | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:03 AM |
| 6 | what do you wantt | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:03 AM |
| 7 | tl discuss | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:03 AM |
| 8 | discyss | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:04 AM |
| 9 | This is a test right now | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |
| 10 | this is a test right now | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |
| 11 | another one | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |
| 12 | another comment | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |
| 13 | this is another test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |

| 14 | this is another test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/20 8:40 PM |
| 15 | This is a discussion about a test of this. | 55971c44-9607-4928-b815-68672ca92286 | 3/20/23 4:29 AM |
| 16 | This is another comment | 55971c44-9607-4928-b815-68672ca92286 | 3/20/23 4:30 AM |
| 17 | This is a comment on a comment | 55971c44-9607-4928-b815-68672ca92286 | 3/20/23 4:30 AM |
| 18 | wer | 44b7552b-54ea-441e-8b87-fa8a0dc4d7a9 | 4/14/23 3:09 PM |

142.   The comments show three distinct patterns of test activity.   First, on March 16, 2020, a single user (2c9862f4-9d58-4321-a728-c7b7bb86e5c5) posted four comments within 1 minute.   *See* Comment Nos. 5, 6, 7, & 8.   Second, the same user posted six more comments within 39 seconds later that day.   *See id.*, Nos. 9, 10, 11, 12, 13, & 14.   Third, all comments from this user either express test language ("This is a test") or incomplete test content with typographical errors ("tjis is a", "what do you wantt").   *See id.*, Nos. 1-14.

143.   A single user ID (2c9862f4-9d58-4321-a728-c7b7bb86e5c5) created 14 of the 18 total comments.   The rapid succession of comments, combined with their test content and concentration from a single user, indicates coordinated testing rather than natural user discussions.

### 3.   Conclusions

144.   Contrary to Mr. Tenery's opinions, the database records, particularly when examined as a whole, confirm that decentralized.open.ai operated as a test environment rather than a website with real users.   The evidence appears in five distinct categories of data, all pointing to the same conclusion.

145.   First, the six registered accounts show coordinated test creation rather than organic user registration.   Three accounts created on October 25, 2017, link to two IP addresses - with "Mike Thomson" and "Julia" sharing the same Russian IP address, and Defendants' developer Gaer registering from Georgia.   The remaining

accounts include two explicitly labeled as "Tester" and "Tester 2" plus Defendant Ravine's account.

146. Second, the IP address data contradicts Mr. Tenery's assumption that each address represents a different user. Of 30 total IP addresses, 13 originated outside the United States. Of the remaining 17 U.S. addresses, eight belong to two network blocks: three addresses sharing the "174.194" prefix and five sharing the "73.93" prefix with Defendant Ravine's registered account. After accounting for these network relationships and Rachel Park's test account, no more than eight independent U.S. IP addresses remain.

147. Third, every project company in the database links to either a test account or contains explicit test markers. The three earliest projects share the same owner ID as the "Mike Thomson" test account and were created within 26 seconds during that account's initial registration. The remaining eight projects include four with clear test labels, one created by Rachel Park as a test, two sharing Defendant Ravine's owner ID, and one marked as vandalism.

148. Fourth, the discussions and comments contain clear test content and show usage patterns matching systematic feature testing. A single user created 14 of 18 total comments, posting them in rapid bursts of 4-6 comments within seconds of each other. The comment text repeatedly states "this is a test" or contains incomplete test content with typographical errors.

149. Fifth, the total activity level contradicts Mr. Tenery's claim of a functioning website. Over nearly five years, the database shows only 453 revisions—less than eight revisions per month. This minimal activity, combined with its concentration among a few test accounts, indicates a test environment rather than a website supporting real users.

### E.    beta.open.ai

#### 1.    Overview

150.    Mr. Tenery opines that Defendants offered a so-called "Evolved Collaboration Tool" at beta.open.ai from March 2017 through December 2024. Tenery Report ¶¶ 87-89.    Defendants claim this website "offer[ed] user-created online articles about AI research topics."    12/20/23 Def.'s Suppl. Resp. to Interrog. No. 1.    According to Mr. Tenery, the website attracted substantial user engagement, with 77,075 interactions from 15,753 unique users over its lifetime.    *Id.* ¶ 90.

151.    I disagree with Mr. Tenery's opinions.    The core flaw in Mr. Tenery's analysis is that he ignores the traffic pattern of when these users began visiting the website, which coincided with Plaintiff OpenAI's release of its first product, the OpenAI API, at beta.openai.com.

#### 2.    Assessment of Server Logs and Database

152.    Mr. Tenery bases his conclusions on two primary categories of evidence. First, he analyzes sever logs that purportedly document user interactions with the website between March 2017 and December 2024.    Tenery Report ¶¶ 89-93.    Second, Mr. Tenery relies on user registration data from what he calls the "Evolved Database."    *Id.* ¶ 94.    This database purportedly contains records of 1,097 registered users with valid email addresses between June 2020 and October 2023, along with 14,391 "anonymous users" who allegedly visited the site.    *Id.*

153.    The user registration data reveals a complete absence of genuine third-party adoption before June 2020.    During the website's first three and a half years of claimed operation (January 2017 to June 2020), only one user—Mr. Gaer—registered for an account.    Tenery Report ¶ 94.    Gaer was not an independent user but rather a developer of the website.    Gaer Tr. 175:24-176:6.    The complete absence of third-party registrations during this extended period demonstrates that Defendants' website generated no meaningful market interest.

154. The sudden appearance of new users on beta.open.ai in June 2020 corresponds with Plaintiff OpenAI's launch of its API service at beta.openai.com. In particular, I understand that OpenAI released its API product on June 11, 2020. *See* OPENAI_RAV-00003529 (Page Vault capture of OpenAI's announcement). I also understand that by June 15, 2020, OpenAI promoted its API product via its website at the URL beta.openai.com. *See* OPENAI_RAV-00003544 (Wayback Machine capture of beta.openai.com on June 15, 2020). Below is a screenshot from a Wayback Machine capture of Plaintiff OpenAI's website available at the URL beta.openai.com on June 15, 2020:



155. The first non-developer registration on Defendants' website occurred in June 2020, the same month OpenAI began offering its API to developers. Tenery Report ¶ 94. This timing strongly suggests that any subsequent traffic to

Defendants' similarly-named domain resulted from user confusion, as developers seeking to access OpenAI's widely-publicized API services inadvertently landed on Defendants' website.

156. The reliability of Mr. Tenery's interaction data is undermined by his failure to filter out non-genuine activity. The Etherpad Logs he relies on make no distinction between meaningful collaborative editing and superficial page loads, automated processes, or internal testing. *See* Tenery Report ¶¶ 42-43. By September 2022, Mr. Tenery acknowledges that Defendants' websites were experiencing vandalism and "defaced" content. *Id.* ¶ 96. His failure to exclude such non-genuine activity from his analysis renders the raw interaction counts meaningless as a measure of actual website usage.

157. I also disagree with Mr. Tenery's analysis of unique users. I calculated my own analysis per my methodology above, which is below (*see also* Ex. I):

| beta.open.ai – All IPs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Valid IPs | Invalid IPs | | | | |
| Start | End | U.S. | Non-U.S. | No Valid Request | Suspicious | Infrequent | Bounced |
| | 3/1/17 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3/6/17 | 6/1/20 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6/1/20 | 4/1/22 | 0 | 1 | 0 | 0 | 2 | 0 |
| 4/1/22 | 11/15/22 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11/15/22 | 03/23/24 | 0 | 71 | 85 | 80 | 85 | 81 |
| | Total IPs | 0 | 72 | 85 | 80 | 87 | 81 |

158. Even accepting Mr. Tenery's interaction data at face value, it shows remarkably low engagement levels. For the period from March 2017 to June 2020, he identifies only 966 total interactions from 77 purported users, averaging just 12.5 interactions per user over more than three years. Tenery Report ¶ 91. Between June 2020 and September 2022, after OpenAI launched its API, Mr. Tenery reports 15,012 interactions from 2,315 users—still only 6.5 interactions per user over 27

months.  *Id.* ¶ 92.  These minimal interaction rates are inconsistent with genuine collaborative use of a document editing website.  Instead, they are more consistent with confused users who navigated to beta.open.ai rather than beta.openai.com.

159.  Mr. Tenery's reliance on "anonymous users" further weakens his conclusions.  While he cites 14,391 anonymous users who allegedly visited the site, he provides no analysis of whether these represent actual human visitors versus bots, crawlers, or other automated traffic.  *See* Tenery Report ¶ 94.  Without such analysis, this figure provides no insight into genuine website adoption.

### 3.    Conclusions

160.  The evidence Mr. Tenery presents fails to demonstrate any meaningful third-party usage of Defendants' Evolved Collaboration Tool for three reasons.  First, the website attracted only one registered user (affiliated with Defendants) during its first three years of operation.  Second, the sudden increase in registrations beginning in June 2020 coincides precisely with OpenAI's launch of beta.openai.com, strongly suggesting these users were actually seeking OpenAI's services.  Third, the extremely low per-user interaction averages throughout the website's existence indicate that users who found their way to beta.open.ai quickly realized it was not the OpenAI website they were seeking and did not return to make meaningful use of Defendants' collaborative editing tools.

### F.    open.ai since November 2022 (the Image Generator website)

### 1.    Overview

161.  I understand Defendants launched their image generator on open.ai in November 2022.  Mr. Tenery claims that the open.ai image generator experienced significant traffic after November 2022, with approximately 1,750,000 additional "interactions," approximately 110,000 new "users" worldwide, and approximately 24,000 new U.S. "users."  *See* Tenery Report ¶ 53.

162. Mr. Tenery's analysis of the traffic data after November 2022 is fundamentally flawed. Not only do his calculations suffer from the same methodological flaws discussed above, but he fails to account for the context of the traffic surge, which occurred in the months following the public release of DALL E 2 on April 6, 2022, and immediately following release of ChatGPT on November 30, 2022. The data strongly suggests user confusion rather than intentional visits to Defendants' website.

### 2. Assessment of Use

163. Mr. Tenery's analysis of the Server Logs and Google Analytics data for this period is incomplete and potentially misleading. He acknowledges that the data shows a "surge in visits to the domain Open.ai after the release of ChatGPT on November 30, 2022" but fails to analyze whether this surge represents genuine interest in Defendants' services or mere user confusion.

164. I conducted my own analysis of use since November 2022 per my methodology above, which is below (*see also* Ex. I):

| open.ai (Image Generator) – All IPs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Valid IPs | Invalid IPs | | | | |
| Start | End | U.S. | Non-U.S. | No Valid Request | Suspicious | Infrequent | Bounced |
| 11/15/22 | 3/23/24 | 828 | 68,602 | 114 | 0 | 86,283 | 67,511 |

### 3. Assessment of Google Analytics Data

165. Defendants' Google Analytics data strongly suggests that most users of Defendants' image generator arrived at the site by mistake, likely due to confusion with Plaintiff OpenAI's offerings. Mr. Tenery highlights user activity on the Open.ai domain based on Google Analytics data collected between November 18, 2022, and April 12, 2023, reporting approximately 1.1 million unique users, 2.9 million page views, and 9.3 million events during this period. However, his analysis fails to

establish that this activity reflects genuine user engagement with Defendants' offerings, as the data strongly suggests that most traffic to the open.ai domain was the result of confusion with Plaintiff OpenAI's widely-publicized tools.

166. The timing of this activity is critical. Google Analytics logging for open.ai began on November 18, 2022, shortly before OpenAI's release of ChatGPT on November 30, 2022. *See* RAVINE '117420. The release of ChatGPT triggered a surge in online interest, with users searching for OpenAI's services. This context is essential because the domain name "open.ai" closely resembles OpenAI's branding, and the sudden increase in traffic to Defendants' website is consistent with user confusion rather than intentional engagement with Defendants' offerings.

167. Between November 18, 2022, and April 12, 2023, Mr. Tenery reports 1.1 million unique users and 2.9 million page views. Tenery Report ¶ 70. However, these metrics alone do not demonstrate meaningful engagement with Defendants' offerings. Analysis of the "Landing Page" Google Analytics report for the open.ai webpage (RAVINE '752-880) reveals that most users landed on the open.ai homepage and quickly navigated away. On average, users recorded only 1.25 sessions, lasting less than one minute. This minimal engagement indicates that most users left the site immediately after realizing it was not affiliated with Plaintiff OpenAI. Below are Defendants' most visited landing pages on the open.ai domain besides their homepage:

| open.ai (Image Generator) – Top 15 Landing Pages within open.ai domain November 2022 to December 2023 | | |
|---|---|---|
| No. | URL | Impressions |
| 1 | https://open.ai/images | 214,518 |
| 2 | https://open.ai/chat | 12,434 |
| 3 | **https://open.ai/chatgpt** | 4,353 |
| 4 | **https://open.ai/playground** | 2,967 |
| 5 | https://open.ai/terms | 1,664 |
| 6 | https://open.ai/chats/new | 1,109 |
| 7 | https://open.ai/supersecretstats | 636 |
| 8 | **https://open.ai/api** | 572 |

| 9 | https://open.ai/login | 408 |
|---|---|---|
| **10** | **https://open.ai/blog/chatgpt** | 376 |
| **11** | **https://open.ai/dall-e-2** | 310 |
| 12 | https://open.ai/image | 305 |
| **13** | **https://open.ai/gpt** | 167 |
| **14** | **https://open.ai/chatGPT** | 160 |
| 15 | https://open.ai/blog | 157 |

168. This pattern of attempted access to specific webpages associated with Plaintiff (e.g., ChatGPT) strongly suggests user confusion with Plaintiff's website. Many of these webpages mirror the structure and naming of Plaintiff OpenAI's well-known services and pages.

169. Mr. Tenery fails to account for the abnormal direct access rate recorded in the Google Analytics data. Over 80% of the traffic to the Open.ai domain during this period was classified as "direct," meaning users entered the domain name directly into their browsers. Industry standards place the expected direct access rate for a domain like open.ai at less than 5%, with exceptional cases exceeding 20%. The implausibly high direct access rate strongly suggests that much of the recorded traffic was nonhuman (e.g., bots) or the result of user confusion rather than deliberate engagement with Defendants' offerings.

170. While Mr. Tenery reports high numbers of page views and events, these metrics are inflated and do not accurately reflect active user engagement. Many of the reported "events" are likely automated processes, bots, or superficial interactions, such as loading a page without meaningful engagement. This interpretation is supported by the fact that only a small fraction of users (approximately 1–15%) achieved "active" status during any given 30-day period, as defined by Google Analytics reports (RAVINE '1297-1326).

171.  The data also reveals a significant mismatch between Defendants' user base and their purported market.  From November 18, 2022, to April 12, 2023, the majority of traffic to the open.ai domain originated from foreign countries (approximately 2.4 million users), with only a small fraction (approximately 651,000 users) coming from the United States.  This geographic distribution further supports the conclusion that the traffic was not composed of genuine users seeking Defendants' image generator or other offerings but was instead the result of user confusion or automated activity.



172.  In conclusion, Mr. Tenery's analysis of Google Analytics data fails to demonstrate meaningful usage of the Open.ai domain.  The evidence instead supports the conclusion that the majority of traffic to the domain resulted from user confusion following the release of ChatGPT and was inflated by automated processes and nonhuman activity.  Metrics such as page views and events do not reflect genuine user engagement, and the high direct access rate, minimal session times, and geographic distribution of users further undermine Mr. Tenery's conclusions.

G.    **ava.open.ai**

173.  Mr. Tenery claims that Ava was the first voice chatbot associated with Defendants' trademark "Open AI," hosted at the subdomain ava.open.ai, and that development began as early as May 24, 2023.  Tenery Report ¶¶ 100-101.  Mr. Tenery supports this claim by referencing a Firestore database query that shows chat messages sorted by creation timestamps.

174.  Mr. Tenery's reliance on the Firestore database as the sole basis for his conclusions is flawed.  The presence of a database entry does not necessarily provide a complete or accurate timeline of Ava's development or operation.  The entries in the Firestore database could represent internal testing rather than public use.  It is common in software development to utilize a testing environment to ensure functionality prior to public release.  Mr. Tenery has not provided any evidence to demonstrate that the May 24, 2023, entry reflects anything beyond internal activity.

VI.   **MR. TENERY'S CLAIMS REGARDING USE OF DEFENDANTS' WEBSITES UNRELATED TO THIS ACTION**

175.  Mr. Tenery analyzes certain websites that he claims show Defendants' use of the "Open AI" mark in U.S. commerce, including Wikineering and Boom. Tenery Report ¶¶ 72-79 (Wikineering), Tenery Report ¶¶ 102-103 (Boom).  For each website, he purports to examine technical evidence to argue that these websites had genuine users.

176.  I disagree with Mr. Tenery's analysis of these websites as being relevant to this lawsuit.  I further conclude that his evidence fails to establish any connection to "Open AI" or relevant use in U.S. commerce.

A.    **Wikineering.org / Sunglass.io**

1.    **Overview**

177.  Mr. Tenery claims to demonstrate Defendants' use of "Open AI" through his analysis of the Wikineering website.  Tenery Report ¶¶ 72-79.  According to

Mr. Tenery, "the Open AI mark was originally used on a webpage the Defendants refer to as Wikineering." *Id.* ¶ 72. Defendants assert that a portion of the Wikineering website dedicated to artificial intelligence research was "rebranded" as "Open AI" in March 2015, creating what they call the "Initial Collaboration Tool." Dkt. 38-2 ¶¶ 4-5. Despite this, Mr. Tenery analyzes traffic to the *entire* Wikineering website to support his conclusions. Based on server logs, Mr. Tenery claims that Wikineering "was regularly used for over two years" with "16,681 events and 1,414 unique, legitimate users." Tenery Report ¶ 74.

178. Mr. Tenery's analysis is flawed for several reasons. First, his focus on general Wikineering traffic is irrelevant, as only the "Initial Collaboration Tool" allegedly displayed "Open AI"-branding. Dkt. 38-2 ¶¶ 3-5. As discussed above, the evidence does not show that Defendants ever released the "Initial Collaboration Tool" to actual third-party users. Second, even if general Wikineering traffic were relevant, the evidence shows that Wikineering was non-functional or unrelated to artificial intelligence for most of its existence. Third, Mr. Tenery's analysis of server logs suffers from serious methodological issues that undermine the accuracy of his conclusions. Finally, his reliance on Defendants' inconsistent statements about domain names and server operations cannot substitute for actual evidence of use in commerce by independent third parties.

### 2. Assessment of Existence and Use

179. According to Defendants, Wikineering began in 2012 as a website for collaboration on shared research and engineering projects. Dkt. 38-2 ¶ 4. Defendants claim that in March 2015, they "rebranded" a portion of the site as "Open AI," creating the "Initial Collaboration Tool." Dkt. 38-2 ¶ 5. Mr. Tenery separately analyzes this "Initial Collaboration Tool" and general traffic to the entire Wikineering domain. Tenery Report ¶¶ 80–84.

180. Mr. Tenery's analysis of general Wikineering traffic is irrelevant to trademark use because it examines the wrong data. Defendants themselves claim that "Open AI" appeared only on the specific "Initial Collaboration Tool" section of the website beginning in March 2015. Yet Mr. Tenery's analysis includes all traffic to the Wikineering domain, including traffic from 2014—before the "Open AI" name existed. He does not distinguish between requests directed at the Initial Collaboration Tool and other parts of the website, such as sections about unrelated projects like "Airnet" and "The Network." By analyzing all Wikineering traffic as evidence of "Open AI" usage, Mr. Tenery relies on irrelevant data that cannot establish trademark use.

181. There is no evidence outside of the Initial Collaboration Tool (which itself is unsupported) to suggest that Wikineering ever displayed "Open AI." Historical snapshots from the Internet Archive show that Wikineering.org was largely non-functional from 2012 to 2014, displaying only a parked GoDaddy page, "502 Bad Gateway" errors, and a "Coming soon" message as late as December 2014. Dkt. 80 ¶ 6. Even after Defendants claim to have rebranded part of the site as "Open AI" in March 2015, Internet Archive captures from September and November 2015 show the website promoting unrelated projects, such as "Airnet" and "The Network," with no mention of artificial intelligence or "Open AI." The site's tagline— "The world's platform for making everything in the world better"—further confirms its lack of association with the "Open AI" mark. Google searches reveal no historical references linking Wikineering.org to artificial intelligence or "Open AI." Mr. Tenery's inclusion of all general traffic to Wikineering ignores critical distinctions. This approach renders his analysis irrelevant to trademark use, as it includes traffic to parts of the website that never allegedly displayed "Open AI."

182. Even setting aside the relevance issues, Mr. Tenery's server log methodology contains significant technical flaws that render his conclusions

unreliable. He claims to have identified "16,681 events and 1,414 unique, legitimate users," but his counting methods dramatically inflate actual usage. Web servers generate multiple log entries for a single page visit—for example, requests for images, stylesheets, and scripts. By treating each of these automated requests as a separate "event," Mr. Tenery misleadingly inflates activity levels.

183. Similarly, Mr. Tenery's method for identifying "unique users" based on IP addresses is flawed. Modern internet service providers use dynamic IP addressing, meaning a single user's IP address can change multiple times per day. Without accounting for this, Mr. Tenery likely counted the same user accessing the site from different IP addresses as multiple unique visitors. His bot detection methods, which rely solely on User Agent strings, are also inadequate. These strings can easily be spoofed by automated programs, and Mr. Tenery fails to analyze patterns in the log entries—such as timing or access sequences—that could identify automated traffic.

184. I performed my own analysis of traffic to Wikineering per my methodology above, which is below (*see also* Ex. I):

| wikineering.org – All IPs | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Valid IPs | Invalid IPs | | | | |
| Start | End | U.S. | Non-U.S. | No Valid Request | Suspicious | Infrequent | Bounced |
| | 3/25/15 | 1 | 243 | 41 | 13 | 332 | 306 |
| 3/25/15 | 12/11/15 | 2 | 578 | 18 | 0 | 704 | 667 |
| 12/11/15 | 4/27/16 | 0 | 46 | 1 | 0 | 86 | 74 |
| 4/27/16 | 12/31/16 | 0 | 64 | 5 | 0 | 141 | 131 |
| 12/31/16 | 11/15/22 | 1 | 22 | 5 | 0 | 68 | 63 |
| 11/15/22 | 3/23/24 | 1 | 26 | 0 | 0 | 51 | 47 |
| | Total IPs | 5 | 979 | 70 | 13 | 1,382 | 1,288 |

### 3.    Conclusions

185. Mr. Tenery's analysis fails to establish any connection between general Wikineering traffic and use of the "Open AI" mark for several reasons. First, his

analysis includes irrelevant traffic to the entire Wikineering domain rather than focusing on the Initial Collaboration Tool, where the "Open AI" mark allegedly appeared. Second, Internet Archive snapshots definitively show that Wikineering was either non-functional or promoted unrelated projects, with no evidence of "Open AI" branding. Third, Mr. Tenery includes traffic from before March 2015, when Defendants admit the "Open AI" name did not exist.

### B.   Boom

#### 1.   Overview

186. Mr. Tenery opines that a website called "Boom" supports Defendants' use of "Open AI" in commerce. *See* Tenery Report ¶¶ 102-103. I disagree. The evidence Mr. Tenery cites—including a screenshot of Boom—lacks any "Open AI" branding. *See id.*; RAVINE '50532. At most, Mr. Tenery's evidence shows Mr. Ravine was developing a different website unrelated to "Open AI." Beyond this core defect, Mr. Tenery's analysis fails for two other reasons. First, Mr. Tenery provides no evidence that any U.S. consumers ever saw or associated Boom with "Open AI." Second, the Boom database shows only minimal activity from a handful of users connected to Defendants, rather than genuine third-party use.

#### 2.   Assessment of Existence and Use

187. Contrary to Mr. Tenery's opinions, the lack of any connection between Boom and the "Open AI" mark is evident from multiple sources. First, when asked in discovery to identify all products and services offered in connection with "Open AI," Defendants did not identify Boom. *See* 12/20/23 Def. Ravine's Suppl. Resp. to Interrog. No. 1. Nor did Mr. Ravine identify Boom in the declarations he filed with the Court setting forth Defendants' purported websites and products. Dkt. 38-2; Dkt. 80. Second, the screenshot relied upon by Mr. Tenery shows an interface with no "Open AI" branding or any connection to it. *See* Tenery Report ¶ 102 (citing RAVINE '50532).

188. This evidence suggests that Boom was an entirely separate project, unrelated to Defendants' claimed "Open AI." Neither the database entries nor any other evidence shows that users would have associated Boom with "Open AI" or understood it to be one of Defendants' branded services.

189. Mr. Tenery's reliance on Mr. Ravine's recent deposition testimony does not show that Boom ever used or displayed "Open AI" or that Boom was ever displayed on open.ai. *See* Tenery Report ¶ 102 & n.65. Mr. Ravine testified that he "released an image generator initially on Boom" and "then we released another image generator on Open AI at -- the open.ai -- Open.ai in November 2022." 12/14/24 Ravine Tr. 121:8-24. Mr. Ravine admitted that Boom was not available on open.ai. 1/15/25 Ravine Tr. at 56:21-24.

### 3.    Assessment of the Boom Database

190. Even if there was any evidence that Boom used "Open AI" branding (which there is not), the database records Mr. Tenery analyzed show only internal testing rather than public use. The database contains 51 entries created by 11 purported users, and most of these users connect directly to Defendants or appear to be browser identifiers rather than actual people. *See* RAVINE '114493.

191. Four of the eleven users were directly associated with Defendants: (i) Guy Ravine (Defendant himself), (ii) Nikita Gaer (Defendants' developer), (iii) Mattia Iavarone (appearing as "Mattia 🌼"), and (iv) Rachel Kim (appearing as "Rachel Yedam Kim"). Three other entries in the user list are not users at all, but rather browser identification strings: (i) "Chromemac" (Chrome browser on Mac OS), (ii) "firefoxmac" (Firefox browser on Mac OS), and (iii) "safari" (Safari browser). This leaves only four other usernames in the database: (i) "electronWin 17nov", (ii) "Faith Harley", (iii) "Mircea Video", and (iv) "Roman_yahoo". Mr. Tenery provides no analysis of these remaining four usernames. He does not establish whether they

represent real users, whether those users were located in the United States, or whether they ever saw any "Open AI" branding.

192.  In my professional opinion, a proper forensic examination of the Boom database should have considered several key factors that Mr. Tenery's analysis overlooks.  Mr. Tenery should have analyzed user location data to determine whether any users accessed Boom from the United States, examined user registration information and access patterns to determine whether users were independent of Defendants, and consider usage patterns to distinguish between testing activities and genuine consumer engagement.  Mr. Tenery did none of those. Instead, he simply identifies "the earliest row in the Boom Database by a user that was not identified as an administrator."  Tenery Report ¶ 103.

### 4.  Conclusion

193.  The evidence shows Boom was a separate project unrelated to the trademark dispute in this case.  The minimal database activity, concentrated among Defendants' personnel and browser identifiers, indicates internal testing rather than public use.  More importantly, nothing in the database or other evidence suggests any consumer would have associated Boom with "Open AI."

## VII.  SERVER CRASHES DO NOT EXPLAIN DEFENDANTS' LACK OF USER DATA

### A.  Overview

194.  Defendants claim they operated various websites using "Open AI" between 2015 and 2022, but they have produced little evidence showing websites and any actual users.  To explain this lack of evidence, Defendants assert that server crashes destroyed critical data about their websites' usage.  Dkt. 138 ¶ 57.  Mr. Tenery's report attempts to validate these claims, but his investigation fails to meet basic professional standards for verifying data loss.  Tenery Report ¶ 54, 58, 83.  The

technical evidence instead shows only routine maintenance incidents that would not result in permanent data loss.

195. Mr. Tenery claims "several server crashes potentially limited the data available for review" and made him "unable to confirm exact usage dates for Defendants' products or the exact number of users." Tenery Report ¶ 54. He specifically references four servers that allegedly crashed—INEED-2, INEED-3, Caltech, and "an unlabeled server." *Id.* According to Mr. Tenery, these crashes occurred on four specific dates: February 16, June 3, and June 8, 2016, and May 3, 2018. *Id.* ¶¶ 54-55. Defendants assert these crashes destroyed evidence of their websites' usage, particularly data about their Initial Collaboration Tool. *Id.* ¶ 54.

196. Modern data centers implement multiple safeguards to prevent data loss during server incidents. These include maintaining redundant storage systems, creating regular backups, and storing copies of data across multiple locations. Professional data centers also document all system failures through detailed incident reports, error logs, and recovery records. When true data loss occurs, extensive technical documentation shows what data was lost and what recovery attempts were made.

197. In this case, Mr. Tenery's entire analysis of the alleged crashes rests on twelve customer support emails between Defendants and their data center provider, ByteGrid. These emails document four occasions when Defendants reported connection problems to ByteGrid's technical support team. Tenery Report ¶¶ 54-55. Beyond these support tickets, Mr. Tenery cites no other evidence supporting claims of data loss. His report contains no analysis of backup systems, no examination of server logs, and no documentation of recovery attempts.

B. **The Record Shows Routine Maintenance and Billing Issues**

198. The ByteGrid support emails document standard technical support interactions rather than catastrophic server failures. On February 16, 2016,

Defendants reported they could not connect to their INEED-3 server. Tenery Report ¶ 57. ByteGrid's response involved basic troubleshooting—plugging in a keyboard and monitor, checking system status, and performing a routine reboot. *Id.* The data center noted the server "had not been rebooted for 781 days," indicating the system had been running continuously for over two years before requiring standard maintenance. RAVINE0020964.

199. The June 2016 communications similarly describe routine issues. ByteGrid reported an "alarm going off from the INEED-2 server" but noted that "other servers appeared to be running under normal conditions." Tenery Report ¶ 58; RAVINE '22058. Their technicians confirmed the servers "were running and have the status lights described," indicating functioning hardware rather than system failure. *Id.* These descriptions match standard monitoring alerts that occur during normal data center operations.

200. The May 2018 incident appears connected to account issues rather than technical failures. While Defendants reported they "can't access the IP's for our servers," ByteGrid's response noted the servers were "still running" with "up and connected interface[s]." Tenery Report ¶ 56; RAVINE '4537. The data center directed Defendants to "contact the billing department," suggesting the access problems stemmed from account suspension rather than system failure. RAVINE '4534. This interpretation aligns with standard data center practices of restricting access when accounts become delinquent.

### C.    Standards for Investigating Data Loss Claims

201. Proper forensic investigation of claimed server crashes requires adherence to established professional standards. Investigators must document the complete system architecture to identify what data existed and where it was stored. This includes mapping all servers, understanding their relationships, and locating associated backup systems. Investigators must also analyze system logs to identify

error conditions, review monitoring data to identify failure patterns, and document recovery attempts.

202.  Modern web platforms typically distribute data across multiple systems, including production servers, development environments, backup storage, and disaster recovery sites.  Forensic investigations must examine all potential sources of data and attempt recovery from each.  Investigators are also required to preserve technical evidence of data loss, such as drive diagnostics showing physical failures, filesystem metadata indicating corruption, or logs documenting unrecoverable errors.

**D.    Mr. Tenery's Investigation Falls Short of Professional Standards**

203.  Mr. Tenery acknowledges that he never examined the servers that allegedly crashed.  His report documents no attempt to map Defendants' system architecture or determine what data each server contained.  He provides no analysis of where user data was stored, how it was backed up, or why it could not be recovered. These omissions represent a failure to perform essential investigative steps for verifying claims of data loss.  Tenery Report at 19 n.21.

204.  Mr. Tenery's investigation fails to address multiple potential sources for the allegedly lost data.  Web applications typically maintain development servers with copies of production code, staging environments for testing, and backup systems for preserving historical data.  Mr. Tenery provides no evidence that he searched for website data in any of these locations.  His report contains no analysis of backup systems, archive storage, or data center recovery procedures that could have preserved the allegedly lost information.

205.  Mr. Tenery provides no technical evidence proving that data loss occurred.  His report includes no analysis of drive diagnostics that would indicate hardware failures, no filesystem metadata showing corruption, and no system logs

documenting unrecoverable errors. Instead, his conclusions are based solely on Defendants' assertions and customer support emails that describe temporary access issues. Professional forensic standards require concrete technical evidence to substantiate claims of data loss, not unverified assertions.

### E.    Selective Pattern of Alleged Data Loss Lacks Credibility

206.  Tenery's opinions about data loss show a suspiciously selective pattern that undermines their credibility. According to Defendants, the crashes destroyed only the specific evidence needed to prove their websites had users, while leaving other data intact. For example, they claim the crashes erased evidence of their Initial Collaboration Tool's usage but preserved unrelated data from the same period. Tenery Report ¶ 54. This selective pattern of loss is highly unusual and concerning.

207.  Server crashes do not selectively destroy specific types of data. Drive failures and data corruption typically affect entire volumes, databases, or systems, rather than targeting particular historical records. Defendants' claim that the crashes destroyed only evidence supporting their trademark claims while sparing other data defies technical plausibility. Mr. Tenery offers no explanation for this improbable pattern of data loss.

### F.    Additional Technical Issues Undermining Data Loss Claims

208.  The absence of contemporaneous communications about data loss raises further questions. When critical business data is lost due to server crashes, organizations typically generate extensive internal communications about recovery efforts. However, Mr. Tenery cites no emails between Defendants and their developers discussing lost data, no internal recovery plans, and no contemporaneous documentation of what data was allegedly lost. Instead, he relies solely on routine customer support tickets that do not mention data loss.

209. The timing of Defendants' claims about data loss is also unsupported by evidence. Defendants assert that they discovered the loss of evidence for their Initial Collaboration Tool years after the alleged crashes. However, professional data centers maintain detailed logs of system failures and recovery attempts. If critical data had been lost, it would have been documented and addressed immediately. Mr. Tenery provides no explanation for why this alleged data loss went unnoticed until Defendants needed evidence to support their claims.

210. Mr. Tenery fails to account for standard enterprise backup procedures that prevent permanent data loss. Professional hosting environments typically implement daily incremental backups, weekly full backups, monthly archives, transaction logs enabling point-in-time recovery, and offsite backups to protect against local failures. Mr. Tenery does not examine these safeguards or explain why they allegedly failed in this case.

### G.   Conclusion

211. The technical evidence does not support Defendants' claims that server crashes destroyed proof of website usage. Mr. Tenery's investigation relies solely on customer support emails describing routine maintenance issues and ignores professional standards for verifying data loss. He fails to analyze backup systems, system logs, or recovery efforts, and provides no technical evidence of actual data loss.

212. When properly analyzed, the evidence shows only temporary connection issues rather than permanent data loss. The ByteGrid communications describe functioning servers requiring routine maintenance, not catastrophic failures. The alleged crashes represent brief interruptions over an eight-year period, and Mr. Tenery's lack of adherence to forensic protocols, combined with the implausible selective data loss, renders his investigation unreliable.

## VIII. **MR. TENERY'S GOOGLE TRENDS ANALYSIS IS FLAWED.**

213.  Mr. Tenery claims to have "conducted analysis on the Google Trends for the search terms 'OpenAI,' 'ChatGPT,' and 'DALL-E' between August 2022 and March 2024." Tenery Report ¶ 105.  He concludes that search interest in "OpenAI" and "DALL-E" during this period was consistently low, with average scores below 1 and 5.9 respectively, while "ChatGPT" averaged 60 and peaked between April 16 and April 22, 2023.  Mr. Tenery relies on these figures to argue that public engagement with OpenAI and DALL-E is minimal compared to the overwhelming attention given to ChatGPT.  However, his interpretation is heavily dependent on the selected timeframe and the inherent limitations of the Google Trends tool.  His analysis fails to consider critical contextual factors and provides a narrow, distorted view of market dynamics.

214.  Google Trends normalizes search interest on a scale from 0 to 100, where 100 represents the peak popularity of a term within a specific timeframe and region, 50 indicates half that peak, and 0 signifies insufficient data for reliable measurement.  These figures are *relative* metrics, not absolute values, and are highly influenced by the most popular search term within the selected timeframe.  When one term experiences explosive growth, the normalized scores of other terms can appear disproportionately low, even if those terms maintain substantial absolute search volumes.  Mr. Tenery's failure to account for this normalization effect leads to misinterpretation of low relative scores as indicators of low public interest—a critical methodological flaw.

215.  The timeframe Mr. Tenery selected, from August 2022 to March 2024, is particularly problematic as it primarily consists of the period immediately following the viral success of ChatGPT.  During this time, ChatGPT experienced an unprecedented surge in search volume, which skewed the normalized data.  For example, as Reuters noted in a February 1, 2023 article, ChatGPT became was

76

estimated to have reached 100 million monthly active users in January 2023, "just two months after launch, making it the fastest-growing consumer application in history." *See* Reuters, *ChatGPT sets record for fastest-growing user base – analyst note* (Feb. 2, 2023), available at https://www.reuters.com/technology/chatgpt-sets-record-fastest-growing-user-base-analyst-note-2023-02-01/.  The article, citing data from analytics firm Similarweb, said an average of about 13 million unique visitors had used ChatGPT per day in January, more than double the levels of December. *Id.*  By contrast, the article noted, it took TikTok about nine months after its global launch to reach 100 million users and Instagram 2-1/2 years, as shown below:



216.  As a result, even if "OpenAI" and "DALL-E" had significant absolute search volumes, their relative scores were artificially suppressed.  This creates a selection bias in his analysis, as the chosen period is not representative of broader

trends in public interest.   Rather than providing an accurate picture of market dynamics, his conclusions are based on a distorted snapshot of search interest.

217.   A more robust analysis requires examining a broader historical perspective.   Google Analytics data from January 2015 to November 2022 paints a vastly different picture than Mr. Tenery's analysis.   In 2022, OpenAI peaked at an interest level of 100, and achieved sustained search interest levels ranging from 53 to 89, indicating strong and steady public interest in the brand.   By comparison, competitors like DeepMind and Meta AI registered much lower levels, with scores of 0 to 2 during the same period, as shown below:



218.   This historical context demonstrates OpenAI's significant market presence over time, directly contradicting Mr. Tenery's claim of consistently low search interest ratings.

219.   Historical data from 2018 to 2021 further reinforces OpenAI's consistent market engagement.   During this period, OpenAI maintained search interest levels

between 14 and 100, with notable peaks of 87 in August 2018, 85 in April 2019, 100 in July 2019, and 84 in July 2020, as shown below:



220.  These figures demonstrate that OpenAI generated substantial public interest well before the viral success of ChatGPT.  By focusing exclusively on the post-viral period, Mr. Tenery ignores these historical trends, which highlight OpenAI's long-term market strength.  This selective analysis undermines his conclusions and fails to capture the brand's broader search interest dynamics.

221. Mr. Tenery's analysis also suffers from a lack of competitive benchmarks.  Instead of comparing OpenAI (a company) against ChatGPT (a product), a more accurate approach would include comparisons with other major AI companies, such as DeepMind, Meta AI, and Google AI.  When these benchmarks are incorporated, it becomes clear that OpenAI not only holds its own but often surpasses its competitors in search interest.  For example, in 2022, OpenAI's search

interest peaked at 100 and ranged between 53 and 89, while competitors showed consistently lower and flatter trends, as shown below:



222. This competitive context is crucial for accurately assessing OpenAI's market position, yet Mr. Tenery fails to include it in his analysis. When viewed through a broader timeframe and compared against appropriate industry benchmarks, the data clearly demonstrates that OpenAI has maintained substantial and growing market presence. The sustained search interest levels, which remained high even before ChatGPT's viral surge, indicate strong brand recognition and significant consumer engagement. This evidence directly contradicts Mr. Tenery's assertion of "consistently low search interest ratings" for OpenAI and DALL-E. A proper analysis must account for historical trends, fluctuations caused by viral events, and industry comparisons to provide an accurate picture of OpenAI's market performance.

223. In sum, Mr. Tenery's Google Trends analysis suffers from substantial methodological shortcomings, including a biased timeframe, failure to incorporate competitive benchmarks, and misinterpretation of normalized data. By focusing exclusively on a period dominated by ChatGPT's viral success, his analysis neglects the broader context of OpenAI's sustained performance. Mr. Tenery's exclusion of competitive benchmarks also prevents an accurate assessment of OpenAI's relative position in the industry. These flaws render his conclusions unreliable and misleading.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this February 20, 2025, in _____, Austin, Texas.

_____

Seth James Nielson, Ph.D.