Jason H. Wilson (Bar No. 140269)
jwilson@willenken.com
Ashley L. Kirk (Bar No. 291012)
akirk@willenken.com
David S. Harris (Bar No. 255557)
dharris@willenken.com
Breeanna N. Brewer (Bar No. 312269)
bbrewer@willenken.com
Michelle K. Millard (Bar No. 298245)
mmillard@willenken.com
WILLENKEN LLP
707 Wilshire Blvd., Suite 4100
Los Angeles, California 90017
Telephone: (213) 955-9240

Joshua M. Masur (Bar No. 203510)
joshua.masur@hglaw.com
HALEY GUILIANO LLP
111 North Market Street, Suite 900
San Jose, California 95113
Telephone: (669) 213-1056

Attorneys for Defendants and Counterclaimants
OPEN ARTIFICIAL INTELLIGENCE, INC.
and GUY RAVINE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>　　　　　Defendants.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>　　　　　Counterclaimants,<br><br>v.<br><br>OPENAI, INC., a Delaware corporation; SAMUEL ALTMAN, an individual; and GREGORY BROCKMAN, an individual,<br><br>　　　　　Counterclaim-Defendants. | Case No.: 4:23-cv-03918-YGR<br><br>Assigned to the Hon. Yvonne Gonzalez Rogers<br><br>**DECLARATION OF GUY RAVINE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:　　　June 17, 2025<br>Time:　　　2:00 p.m.<br>Ctrm:　　　1 – 4th Floor |

# DECLARATION OF GUY RAVINE

I, Guy Ravine, declare as follows:

1. I am a party in the above-entitled action, and the President and Founder of Defendant Open Artificial Intelligence, Inc. ("Open AI"). I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

## My Background in Creating Technology Startup Companies and Collaborative Engineering Projects

2. I am a frequent innovator and inventor in the technology industry who has founded several technology companies: Entity Inc., iNeed Inc., Video Inc., and Open AI. I built over a dozen technologies over the past two and a half decades in fields that include artificial intelligence ("AI"), research collaboration, Internet, electric vehicles, internet video, and wireless technology, among others. I established my first AI company, Entity, in 2000, which built an early AI chatbot system and an AI prediction system for the web.

3. Much of my work was on collaborative types of engineering projects. For example, while living in Boston, I started an unofficial MIT incubator called the MIT Playground. I recruited students to the incubator by posting flyers around campus stating "Who wants to work for free?" Several students were interested and began working on startup projects affiliated with the incubator, and many of those students went on to found successful companies. Notably, a similar solicitation at CalTech led Adam D'Angelo to work with me on algorithms for scaling social media networks. Mr. D'Angelo left my company to become join Facebook in 2004, where later he became CTO. Correspondence discussing Mr. D'Angelo's work on scaling solutions for social media applications for my company iNeed is attached as **Exhibit 1.**

4. Since entering the AI field over two decades ago, I have been one of the earliest proponents of the concept of freely-accessible, collectively-developed AI technology. In contrast to a proprietary software model, where code is developed in secret, under my vision, AI models would be developed collaboratively so they could be used by all entrepreneurs in their projects.

5. Initially, when this suit was brought against me, I believed that most of the historical data related to my entrepreneurial projects before 2018, including my initial work on my Open AI projects and tools were lost in a catastrophic crash of my servers in 2018.[1] However, it appears that an employee backed up two of my four servers in late 2017, so we were able to uncover some evidence of use for some of my various products after the issuance of the injunction against me. While this evidence is based upon partial historical records, the forensic evidence affirms my recollection of the creation of my Open AI business and supports third-party testimony regarding my use of the Open AI mark on my various software products.

6. Some of the tools I discuss below were migrated to a cloud-based server hosted by Google in 2017. These various products and tools remained available on those cloud-based servers, and were hosted on the open.ai, ava.open.ai, staging.open.ai, hub.open.ai; beta.open.ai, decentralized.open.ai domains until some of the tools became password protected in October 2023 (hub, Evolved, and Decentralized). In fact, despite my inability to use my website due to the Court's order, I maintain my registrations for the domain open.ai.

**The Creation of the Collaborative Engineering Platform Wikineering**

7. In 2012, I developed Wikineering, a website and collaboration tool that allowed users to make contributions toward the development of a shared research or engineering project, including topics relating to artificial intelligence. Similar to the online encyclopedia Wikipedia, users were able to use Wikineering to make contributions with their own research and expertise, with the goal of collaborating on a shared research project. A true and correct copy of the Wikineering launch page, submitted with a trademark application I filed, is attached as **Exhibit 2**.

8. My Wikineering tool was re-launched in 2013 with additional features to further enable users to collaborate on engineering problems, like the Hyperloop problem presented by Elon Musk. A true copy of a WikiCommons chat discussing the Wikineering relaunch can be

---

[1] This server crash occurred two weeks after my former employee, Adam D'Angelo, became a board member of Plaintiff.

DECLARATION OF GUY RAVINE ISO DEFENDANTS' OPP. TO PLAINTIFF'S MSJ

1036884.1

found at Tenery Decl., Ex. 2 at ¶111, Exhibit L, filed herewith. Stanford professor Erik Brynjolfsson further reported that Elon Musk believed Wikineering would be a "great platform" for his Hyperloop project. **Exhibit 3.**

9. In 2014, I purchased the company Design Play Technologies, Inc. ("Design Play"), which produced collaborative computer aided drafting and design ("CAD") tools and offered those tools on its website sunglass.io. Dkt. 80 (Decl. of Guy Ravine ISO Mot. To Alter or Amend Judgment) at ¶6, Ex. A. I rebranded the Design Play company on the sunglass.io site as Wikineering and branded the project as part of my 'Open Engineering' venture. Tenery Decl., Ex. 2 at ¶76, Ex. D. I further integrated some of the tools associated with Design Play on my Wikineering website. Dkt. 79 (Decl. Kaustuv Debiswas ISO Mot. To Alter or Amend Judgment) at ¶¶6-7. My idea was that the Wikineering page would include various collaborative tools for different technologies with the 'Open' brand like it appeared on the sunglass.io webpage, for example Open Engineering, Open Companies, Open.xyz, and Open AI.

10. Sometime in 2014, I also launched an artificial intelligence ("AI") discussion section on my Wikineering webpage. This AI discussion section included various sources on AI technology and allowed users to post and share research in the AI field with the goal of creating collaborative AI projects.

11. While I initially thought that data related to the Wikineering website was lost in the server crash mentioned above, the forensic expert I hired in March 2024, after the preliminary injunction was issued in this case, was able to confirm the existence of my Wikineering webpage. This examination was intensive and cost me over $100,000. The analysis of my servers showed that the Wikineering webpage had users from 2014-2016. Tenery Decl., Ex. 2 at ¶76.

**Rebranding the Wikineering Platform as Open AI and Launch of the Open AI Initative**

12. On or around March 25, 2015, I rebranded my Wikineering site with the mark 'Open AI'. The Open AI trademark appeared in the upper left-hand corner of the Wikineering

DECLARATION OF GUY RAVINE ISO DEFENDANTS' OPP. TO PLAINTIFF'S MSJ

1  page, where the Wikineering mark had previously appeared, and this became my initial
2  collaboration tool (the 'Initial Collaboration Tool').

3      13.     On March 26, 2015, I acquired the domain name open.ai for $2500. **Exhibit 4**.
4  On March 28, 2015, I told my employee Victor Madlangbayan, to redirect the open.ai domain to
5  the wikineering site hosting my Initial Collaboration Tool having the Open AI brand. **Exhibit 5**.

6      14.     Furthermore, at around the same time that I developed the Initial Collaboration
7  Tool in 2015, I deployed a publicly available discussion board bearing the Open AI Mark, which
8  was designed for users to freely discuss issues relating to the development of AI. While this
9  discussion board no longer exists (I stopped supporting it in or around early 2016), I hosted it at
10 either Wikineering.org or ineed.com/wikineering.

11     15.     Immediately after re-branding my Wikineering site with the Open AI mark, and
12 launching the discussion board, I invested more resources into my Open AI business. I hired
13 Nikita Gaer to develop a home page for open.ai, and to add a sign-up box for interested users to
14 signup to receive updates from my company. Sergey Belkin provided the work on the graphics
15 for this launch page. By 2017, we had over 6000 users provide their email addresses in this sign-
16 up prompt.

17     16.     In 2015, I estimate I spent $50,000 on activities related to the development and
18 marketing of my Open AI business. Due to the passage of time, I am unable to locate all of the
19 invoices for these activities; however, I found expenses related to me speaking at the Deep
20 Learning Summit Boston in May 2015, where I spoke about my company Open AI. **Exhibits 6-**
21 **9**.

22     17.     While evidence of the re-branded Wikineering website hosting the Initial
23 Collaboration Tool was lost in the server crash in 2018, my forensics expert located evidence of
24 the Initial Collaboration Tool in a brochure I produced and disseminated in October 2015.
25 Specifically, another potential idea associated with my company Open AI was the formation of a
26 school called AI School where people could learn about AI code and development. I conceived
27 AI school to be a part of my overall Open AI business. As such, I created a brochure to advertise
28

the AI school, leveraging my work on Open AI as a part of the Wikineering tool. The brochure for the AI School shows what I refer to as the Initial Collaboration Tool, namely the Wikineering site, rebranded with the Open AI mark. Tenery Decl., Ex. 2 at ¶¶82-84, Exhibit F.

**Discovery of the Plaintiff's Use of OpenAI for their Initiative**

18. On December 7, 2015, I emailed a friend and colleague Charles Cadieu, an AI researcher and entrepreneur, about my vision for the future of Artificial Intelligence. At that time, I believed the creation of a product like my Ava product (discussed below) was inevitable, part of my vision, and I wanted to be part of the process of creating generative AI products. Specifically, in my correspondence I laid out my vision the future of AI product development:

> I feel that because of the rapid iteration in this space we will have the algorithms for General AI in 10 years, much sooner than most people believe. The implementation will be simple. It will run itself and do whatever the user wants it, through a simple semantic interface. You won't even have to provide it files, just access, and it will figure things out on its own . . . . I used to think it's years in the future but given the rapid iteration in the field and large investments being made my money is on it happening in the next decade. I think it makes sense to think about doing something relevant to that evolutionary path which will stick around. **Exhibit 10**.

Consistent with this vision, I hoped my Open AI initiative would create products and tools that would be relevant in a future AI marketplace.

19. On December 11, 2015, I was informed by Charles Cadieu that the Plaintiff had announced the formation of an OpenAI initiative that would focus on AI research. *Id.* Because I had spent significant time and money promoting my Open AI project and had big plans for my business, I filed an application to register the Open AI mark with the USPTO that same day. I filed the application without the assistance of an attorney and used what I now know was an improper specimen of my use of the Open AI mark with my initial filing. Namely, I filed my application with the initial sign-up page for my Open AI venture. Moreover, when I was told in an Office Action from the USPTO that I would not be listed on the Primary Register, I registered my mark on the Supplemental Register. I did so without understanding that I could contest the

rejection of my mark. At the time of registration of my mark, I did not understand the difference in rights I would obtain with a supplemental registration, and I did not believe I was making any admission as to the validity or nature of my Open AI trademark by seeking such a registration.

20. Around the same time, I also reached out to the Plaintiff to see if they were interested in collaborating on my Open AI business. Brewer Decl., Ex. 29. Mr. Brockman, President of Open AI, declined and stated that Plaintiff would be focused on "internal research", and not commercial products. Brewer Decl. Ex. 20. My understanding from our conversation and correspondence, was that both parties would use their respective marks for their respective goods and services. Namely, Plaintiff would use their OpenAI mark for internal research, and not commercial products, while I would use my Open AI mark with other AI tools, such as my computer programs that enabled collaboration on AI projects and online applications running AI algorithms like chat bots and image generators. Because the goals of both companies were similar at the time – to make AI technology accessible to developers and entrepreneurs – concurrent usage of the Open AI mark was acceptable to me.

21. Because I understood both parties to be concurrently using the mark for different respective goods and services, I continued to develop projects for my Open AI business that would allow users to collaborate on AI tools, and ultimately share AI products with each other as set forth in my initial registration.

**Creation of Various Tools and Projects for Open AI from 2015-2024**

22. From 2015 to 2024, I created a number of AI tools, including collaborative tools and generative AI tools. In total, I employed over 10 people during this period and spent approximately $2,000,000 on developing and marketing my products.

23. I began to think about the development of a more advanced collaboration tool in the fall of 2015 that I called Open xyz. In January 2016, I began working with my developer Nikita Gaer to develop this tool. That tool was written in javascript, and to my recollection was made publicly available in February 2016.

24. Immediately after discontinuing our work on the first upgraded collaboration tool, Open xyz, I began development of a new upgraded collaboration tool called Hub.

### Hub

25. We took the lessons we learned in developing the first upgraded collaboration tool, and began to develop a second upgraded collaboration tool, ultimately called Hub (branded as Open AI), in June 2016. Hub was a discourse-based project written in javascript, and included features such as a message board where users could post problems and solutions related to AI. A true and correct copy of an image of the Hub application is attached as **Exhibit 11**, and shows the Open AI mark in the upper right-hand corner. *See also* Tenery Decl., Ex. 2 at ¶85.

26. Nikita Gaer was employed to assist in the development of Hub. I paid him approximately $45,000 for development work related to Open AI collaboration tools in 2016.

27. While most of the data related to Hub was lost in the server crash in 2018, my forensic expert was able to find some evidence that this product existed. Specifically, forensics was able to see a creation date for the docker container that featured Hub's code. This docker container was created in June 2016, which aligns with my prior testimony as to when we began to develop the program. *Id.*

28. I released Hub to the public in September 2016 on the subdomain hub.open.ai., almost four months after we began developing the program. After the release of the Hub program, my programmer Mr. Gaer started a discussion on the platform using a conversation on GitHub. This is like other software tools that initiate prompts to kick-start use. This is a similar process to other websites, like the social media site MySpace, who connected everyone initially to the co-founder Tom Anderson as their default first friend. Like the connection with MySpace Tom, this conversation was meant merely to entice the use of the program by other users. In other words, the Hub tool was available to the public and in use.

29. In 2016, I received a rejection of my trademark application from the USPTO. The USPTO rejected my initial specimen of use for the Open AI mark and requested that I submit a new specimen. Because Hub was available to the public, I used the home screen from Hub as

my specimen, which at the time included the initial discussion board.  This specimen was not manufactured by me for the purpose of deceiving the USPTO.  In fact, I spent approximately four months, and $15,000 on developing Hub.  I find the allegation that I manufactured this specimen to be absurd.  I spent four months, and thousands of dollars, to create a commercial product for public use, not a specimen for a trademark application.

**Evolved Collaboration Tool**

30. Hub proved to be a short-lived, exclusive release for my company.  Immediately after the release of Hub, I began to think of additional features I wanted to include in this collaboration tool.  In late 2016, we began to develop the third upgraded collaboration tool, which would be called the Evolved Collaboration Tool.  The Evolved Collaboration Tool included features that allowed users to collaborate on projects in real-time, create a hierarchy of contributions from various users to a project, and a chat function.

31. The Evolved Collaboration Tool (branded as Open AI) was available at beta.open.ai beginning in January 2017.  I have used a beta subdomain with my companies since at least 2003, and it was part of my practice to have a beta subdomain for my companies.  For example, both iNeed and Wikineering had beta subdomains.

32. I worked on the Evolved Collaboration Tool with Nikita Gaer and another developer whose name I cannot recall.  I spent approximately $15,000 developing the first version Evolved Collaboration Tool.

33. Initially, I believed that the Evolved Collaboration Tool had no evidence of users because my servers are set up to delete web logs every 52 days for data storage reasons, and because I lost server data in the 2018 server crash.  However, the forensics expert I hired was able to prove that the Evolved Collaboration Tool existed, was publicly available at least as early as March 2017, and had a first instance of a timestamp for the tool was January 8, 2017.  Tenery Decl., Ex. 2 at ¶90.

34. Moreover, it's my understanding that the forensics expert I hired was able to

locate a significant number of users for the Evolved Collaboration Tool from the date it was available online until it was put under password protection with this lawsuit in 2023. Likewise, this data shows that even with the web log deletion, the few logs that were recovered after 2017 showed continuing use on the site and the Evolved Collaboration Tool. Tenery Decl., Ex. 2 at ¶¶ 89-91.

**Decentralized**

35. My next collaboration tool was called Decentralized (branded as Open AI), which I released in the fall of 2017. Decentralized was available at decentralized.open.ai and provided additional functionality to my prior collaboration tools. It enabled groups of people to build AI projects together and run them on the platform. For example, Decentralized was faster than the Evolved Collaboration Tool and had a nicer design. It also had new features not in the Evolved Collaboration Tool, such as the ability write AI code collaboratively, run AI algorithms on the platform, assign tasks, and conduct discussions about their AI projects. We programmed Decentralized using node.js, javascript, and etherpad components. A true and correct copy of the Decentralized home page can be found at Tenery Decl., Ex. 1 at ¶ 95.

36. I employed Nikita Gaer, Piotr Zalewa, and another developer whose name I cannot recall. I estimate I spent over $100,000 on the development of the Decentralized tool.

37. On or around December 2022, Decentralized experienced defacing. Again, users were going onto Decentralized and leaving disparaging comments about our work or creating fake test programs. At the time the Decentralized domain began experiencing vandalism, we had created and released other AI applications, including image generators on open.ai, and a video application with AI features, including image generation, called Boom.

38. Up until Decentralized was defaced, we had users and projects on the decentralized website. As mentioned above with the other tools, because weblogs associated with user interactions were routinely deleted to manage storage space on our servers, much of the user data for Decentralized was lost. However, it is my understanding our forensics expert was

Decentralized was available to the public on least as early as October 2017, and had users from that date until it was password protected in October 2023. *Id.*

### Woahhh! and Boom

39. In 2020, I began conducting research into the development of generative AI products for use by everyday people, rather than researchers or engineers. Generative AI is a subset of AI algorithms, the development of which was always the purpose of my company and my collaborative tools.

40. I created two initial generative AI products, which I named woahhh! and Boom. I planned to integrate both products into my Open AI business so that I could offer my users generative AI products.

41. I began work on the "woahhh" product in 2021, which was an AI image generator. In January 2022, I engaged Rachel Kim to assist with the design of woahhh!. While the woahhh! application was never released, the design of this tool was the foundation for the image generator I developed and ultimately released in a different application called Boom. I spent approximately $20,000. A screenshot of version of woahhh! from April 2022 is attached hereto as **Exhibit 14**.

42. Boom was a desktop, web and mobile video communication application that allowed users to instantly record and send videos to others, and ultimately was integrated with AI features such as image generation, transcription, and user recognition. Boom was released to the public as a desktop application and a mobile device application in 2021.

43. Development of the video communication aspects of Boom began in 2020. The development and design team for Boom was large for my company, and included Mattia Iavarone, Nikita Gaer, Rachel Kim, Gui Rambo, Roman Lebedenko, Liam Nichols, Deniz Adalar, Dennis Stricken, and Mircea Birleanu. I estimate that I spent $1,000,000 developing Boom.

44. In early 2022, we added features to Boom that included AI generative technology. By summer 2022, we added novel AI image generation features to Boom.

45. Ultimately the image generation tool my company developed for use in Boom was launched on the open.ai domain in November 2022 and branded as Open AI.

46. Once the image generator was transferred from Boom to my open.ai website, we continued the development of the image generator and added additional features such as, social media features (sharing, liking, etc.), made improvements to image generation (higher quality images, filtering, high resolution, etc.), and added a mobile application. I estimate I spent $150,000 on these improvements.

**Ava**

47. I first developed an internet chat bot in 2000 called AskJay as part of Entity, Inc., one of my former start-up companies. AskJay allowed users to retrieve internet information, schedule reminders and answered questions. At the time I developed this chatbot, I hoped that one day I could create a similar chatbot that was powered by more sophisticated artificial intelligence. In 2022, I decided to develop an AI voice chat application as AI technology was maturing and I thought such an application was achievable.

48. In early 2023, I developed Ava, an AI voice chatbot that converses, generates images, creates presentations, and enables voice conversations with a group of experts. In use, a user would ask Ava a question, and Ava would respond with an image, video, or discussion. For example, if a user asked Ava "was Darth Vadar a good father", Ava would respond with a conversation between AI generated experts discussing the deficiencies of Darth Vadar's parenting style. This AI generated conversation would be similar user experience to listening to a podcast on the requested topic.

49. Nikita Gaer, Mattia Iavarone, Rachel Kim and Mircea Birleanu worked to develop and design Ava, and I estimate that I spent $100,000 on the development of this application.

50. A version of Ava (branded as Open AI) was released to the public on my Open AI domain in May 2023, and a voice bot was released in June 2023 and later added the ability to

1036884.1

talk to experts. A true and correct copy of a screenshot of the Ava application is attached as **Exhibit 12**. *See also* Tenery Decl., Ex. 2 at ¶100.

51. Ava was available to the public until the date of the Court's injunction order.

**My Redirect to the Plaintiff's Website**

52. As mentioned above, I became aware of Plaintiff in 2015, when they announced the formation of a research company called OpenAI. At that time I informed Plaintiff that I would be open to collaboration. Plaintiff declined. My understanding is that both parties would continue the use of their respective marks for their respective goods and services. I began to create the tools discussed above and launched those tools on open.ai and its various subdomains.

53. The decision to launch our tools on various subdomains was caused by the concurrent use of the marks. My company would occasionally receive resumes from people seeing an AI research position at Plaintiff. I was empathetic to people searching for jobs, and believed Plaintiff and my company had a shared vision. Initially, I would respond to these applicants and tell them to contact Plaintiff, and sometimes give Mr. Brockman's name and email address.

54. While solicitations were bothersome, we also began experiencing vandalism on our homepage and our tools. On or around January 2017, we launched the Evolved Tool on the beta.open.ai subdomain. In 2017, we moved the Evolved Collaboration Tool to our home page open.ai. Immediately after we moved the Evolved Tool to our home page, the Evolved Tool began to experience defacing or vandalism. I met with my developers, including Mr. Gaer, to come up with solutions to prevent the vandalism of our various tools, and to prevent people from sending us resumes looking for research positions. Without my knowledge or consent, Mr. Gaer placed a temporary redirect on the open.ai home page, while keeping the subdomains active.

55. When I became aware of the redirect, Mr. Gaer was instructed to stop the open.ai homepage from redirecting to the Plaintiff's openai.com website. Unfortunately, there was a misconfiguration of my servers, and when the redirect was changed, the unsecured traffic

DECLARATION OF GUY RAVINE ISO DEFENDANTS' OPP. TO PLAINTIFF'S MSJ

1036884.1

continued to re-direct to Plaintiff's website. This glitch went unnoticed by me because it was limited to unsecured traffic, and neither I, nor my developers, likely ever accessed the open.ai webpage with an unsecured internet connection and our products were on our various subdomains.

56. Moreover, Plaintiff had not informed us the redirect was occurring for unsecured traffic. In my experience, it is typical for a redirect to include the referring website in a field called the referrer field. In other words, every instance of a redirect would have informed Plaintiff that there was traffic coming from my site, open.ai. It is common for companies to monitor these redirects for networks security purposes. My understanding is that Plaintiff was receiving redirects from my site limited to unsecured traffic for five years, which necessarily would have clearly identified my open.ai website. Until 2022, Plaintiff did not alert me or my company to the redirect or asked us to stop redirecting traffic to their webpage.

**My Efforts to Prevent Confusion for the Parties' Agreed Concurrent Use**

57. As mentioned above, I became aware of Plaintiff in 2015, when they announced the formation of a research company. At that time, I believed that there might be an opportunity to collaborate on AI tools and products. Instead, I learned that Plaintiff was going to pursue "internal research" and was not interested in collaboration. My understanding from this meeting was that both parties were going to concurrently use the Open AI mark for their respective goods and services.

58. In or around 2017, it became increasingly difficult to avoid users and researchers affiliated with Plaintiff from reaching out to my company looking for work opportunities, or vandalism on tools posted to my home page. My team began discussions as to possible solutions to prevent confusion between our company and Plaintiff for our respective goods and services.

59. As mentioned above, also in 2017, after these discussions with my team, one of my employees temporarily redirected unsecured traffic to the home page, and only the home page, to Plaintiff's website without my knowledge. After we removed the redirect, we elected to

1  keep the initial launch page active on the home page at open.ai.  All our various tools and
2  products that had launched (other than the Initial Collaboration Tool) remained publicly
3  available on our various subdomains.  This solution had the benefit of alerting casual users that
4  they were not visiting Plaintiff, a research company, but our company that developed AI tools.

60.     During the entire time the initial launch page appeared on the open.ai domain, our site had user traffic to our various subdomains at beta.open.ai, decentralized.open.ai, and hub.open.ai. For example, in 2020 the Wayback machine has evidence of the Evolved Collaboration Tool at beta.open.ai.  Tenery Decl., Ex. 2 ¶87, Ex. G.

61.     In 2017, I created another project called CryptoArt.  CryptoArt was a site that allowed users to create NFTs.  No later than 2020, at the same time I was developing generative AI tools, I directed the secure traffic to the open.ai domain to CryptoArt.  The CryptoArt page server the same purpose as the initial launch page – its goal was to prevent confusion between my company and the Plaintiff.

**Confusion Between My Open AI Mark and Plaintiff's OpenAI Mark**

62.     In November 2022, I signed up for Google Analytics and began monitoring usage of my open.ai domain name for the first time.  Based on the data I received from Google Analytics, I had user traffic to my domain name, which at that time had various tools and products posted thereon.  Tenery Decl., Ex. 2 ¶ 69, Ex. C.

63.     The use and traffic on my domain name was consistent with the trace usage that the forensics expert was able to uncover in his analysis.  *See generally*, *id.* at ¶69-70.

64.     When ChatGPT was released, however, the traffic to my domain name exploded.  There was no longer any effort that I could take to prevent confusion between my company and the Plaintiff.  From that point, concurrent use became impossible, and I lost all value and goodwill I had created amongst my users in my Open AI mark.  As a result, I began to enforce my trademark rights by filing my protest to Plaintiff's trademark application on December 6, 2022.  **Exhibit 13.**

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct, and that this declaration is executed on April 30, 2025, at
3  _____Sunnyvale_____, California.

_____
GUY RAVINE