# EXHIBIT 3

**Brewer Declaration ISO Defendants' Opposition to Plaintiff's Motion for Summary Judgment**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     OAKLAND DIVISION
 4
 5   OPENAI, INC., a Delaware corporation,  )
                                            )
 6           Plaintiff,                     )
                                            )
 7       v.                                 ) Case No.
                                            ) 4:23-cv-03918-YGR
 8   OPEN ARTIFICIAL INTELLIGENCE,  INC., a )
     Delaware corporation; and GUY RAVINE,  )
 9   an individual,                         )
                                            )
10           Defendants.                    )
                                            )
11                                          )
     OPEN ARTIFICIAL INTELLIGENCE, INC., a  )
12   Delaware corporation; and GUY RAVINE,  )
     an individual,                         )
13                                          )
             Counterclaimants,             )
14       v.                                 )
                                            )
15   OPENAI, INC., a Delaware corporation;  )
     SAMUEL ALTMAN, an individual; and      )
16   GREGORY BROCKMAN, an individual,       )
                                            )
17           Counterclaim-Defendants.       )
                                            )
18                                          )
     AND RELATED COUNTERCLAIMS.             )
19                                          )
20
                     *** HIGHLY CONFIDENTIAL***
21
                     *** ATTORNEYS' EYES ONLY ***
22
                  DEPOSITION OF HOD LIPSON, Ph.D.
23
                        MARCH 12, 2025
24
25   REPORTED BY:  RENEE HARRIS, CSR 14168, CCR, RPR
     JOB NO. 7235109 | PAGES:  1 - 187
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5   OPENAI, INC., a Delaware corporation,  )
                                            )
 6            Plaintiff,                     )
                                            )
 7      v.                                   ) Case No.
                                            ) 4:23-cv-03918-YGR
 8   OPEN ARTIFICIAL INTELLIGENCE,  INC., a )
     Delaware corporation; and GUY RAVINE,  )
 9   an individual,                          )
                                            )
10            Defendants.                    )
                                            )
11                                           )
     OPEN ARTIFICIAL INTELLIGENCE, INC., a  )
12   Delaware corporation; and GUY RAVINE,  )
     an individual,                          )
13                                           )
              Counterclaimants,              )
14      v.                                   )
                                            )
15   OPENAI, INC., a Delaware corporation;  )
     SAMUEL ALTMAN, an individual; and      )
16   GREGORY BROCKMAN, an individual,       )
                                            )
17            Counterclaim-Defendants.       )
                                            )
18                                           )
     AND RELATED COUNTERCLAIMS.              )
19                                           )
20
                       *** HIGHLY CONFIDENTIAL***
21
                       *** ATTORNEYS' EYES ONLY ***
22
      Video Deposition of HOD LIPSON, Ph.D., appearing
23   from New York, New York on Wednesday, MARCH 12,
     2025 at 2:39 P.M., Eastern Daylight Time, before
24   Renee Harris, California Certified Shorthand
     Reporter No. 14168, New Jersey Certified Court
25   Reporter No. 30XI00241200, and Registered
     Professional Reporter.
```

Page 2

1    APPEARANCES OF COUNSEL:

2    On behalf of OPENAI, INC., A DELAWARE CORPORATION;

3    SAMUEL ALTMAN, AN INDIVIDUAL; AND GREGORY

4    BROCKMAN, AN INDIVIDUAL:

5              QUINN EMANUEL URQUHART & SULLIVAN, LLP

6                   BY:  DYLAN SCHER, ESQ.

7                        MICHAEL CARDEN, ESQ.

8              295 Fifth Avenue

9              New York, New York 10016

10             (212) 849-7000

11             dylanscher@quinnemanuel.com

12             (Present with Witness)

13

14   On Behalf of DEFENDANTS DEFENDANTS AND

15   COUNTERCLAIMANTS OPEN ARTIFICIAL INTELLIGENCE,

16   INC. AND GUY RAVINE:

17             WILLENKEN LLP

18                   BY:  BREEANA BREWER, ESQ.

19             707 Wilshire Boulevard, Suite 4100

20             Los Angeles, California 90017

21             (213) 955-9250

22             bbrewer@willenken.com

23

24   Also Present:   Terrence Weiss, Videographer

25                       Jodi Van De Hay, Technician

                                              Page  3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                          INDEX
 2    EXAMINATION BY:                          PAGE
 3    MS. BREWER                                  7
 4
 5
 6
 7
 8
 9                        EXHIBITS
10    EXHIBIT NO.        DESCRIPTION            PAGE
11    Exhibit 450        Expert Report, Hod Lipson    22
12                       January 30, 2025
13    Exhibit 451        Google Scholar search   101
14                       "openai gym"
15    Exhibit 452        Google Scholar search   110
16                       "openai gym" 2016
17    Exhibit 453        GitHub Stars            120
18    Exhibit 454        E-mail, December 4, 2024   137
19                       List of URLs - Ravine
20    Exhibit 455        Rebuttal Expert Report,   176
21                       Hod Lipson
22                       February 20, 2025
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    federal.  That's all I -- I know.

2            I'm not sure what other kinds of cases

3    there are.  But...

4        Q.  Oh, where were the parties located?

5        A.  I just don't -- so the -- I don't know to    02:47:37

6    what degree I can talk about that case.

7            But it was -- I was asked to look at a

8    particular software and provide input.

9            And then the parties were two private

10   companies with some software dispute.             02:47:59

11           They were -- where they were -- the

12   parties were located, I don't remember.  This was

13   an international case.  It involved international

14   parties.

15       Q.  Understood.                                02:48:12

16           And did that case that you provided

17   expert services for involve any trademark

18   disputes?

19       A.  No.

20       Q.  And have you provided expert services in   02:48:20

21   any other lawsuits?

22       A.  No.  That was the only one.

23       Q.  So is it fair to say that you have never

24   provided expert testimony in a trademark lawsuit?

25       A.  That's correct.                            02:48:41
```

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  And is it fair to say that you have never

2  provided expert testimony regarding secondary

3  meaning in a trademark matter?

4      A.  That is correct.

5      Q.  And is it fair to say that you have never   02:48:52

6  provided expert testimony about whether an online

7  platform brand has acquired secondary meaning?

8      A.  That is correct.

9      Q.  Have you ever conducted a secondary

10  meaning survey?                             02:49:15

11      A.  I have not.

12      Q.  Did you conduct a secondary meaning

13  survey in this case?

14      A.  An official survey, no.

15      Q.  Did you review any secondary meaning   02:49:33

16  surveys that were provided to you in this case?

17      MR. SCHER:  Objection.  Vague.

18  BY MS. BREWER:

19      Q.  You can answer.

20      A.  So I -- we can -- I analyzed many things.  02:49:49

21      I'm not sure what survey you're referring

22  to and if you're referring to anything specific.

23      Q.  Do you recall specifically reviewing

24  anything called a "secondary meaning survey" for

25  this case?                                   02:50:09

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.  And what school did you attend?

2      A.  I attended Technion, Israel Institute of

3   Technology, for my bachelor and my Ph.D.

4      Q.  And what bachelor degree did you obtain?

5      A.  My Bachelor's degree is in mechanical        02:51:36

6   engineering and my Ph.D as well.

7      Q.  And when you were in college and graduate

8   school, did you ever take any marketing and

9   branding classes?

10     A.  I did not take any branding classes.        02:51:53

11     Q.  Did you ever take any classes about

12  trademark?

13     A.  No.

14     Q.  Have you ever had a senior management

15  role at a Fortune 500 company?                     02:52:08

16     A.  I have not.

17     Q.  Have you ever worked in a -- in the

18  marketing or branding department at a Fortune 500

19  company?

20     A.  I have not worked at a branding company.    02:52:22

21     Q.  Have you ever published anything about

22  marketing and branding?

23     A.  No.

24     Q.  Have you ever published anything about

25  trademarks?                                        02:52:37

                                                   Page 15

1          A.  No.

2          Q.  Have you ever published anything about a

3     trademark acquiring secondary meaning?

4          A.  I have not.

5          Q.  Have you ever commissioned a secondary        02:52:51

6     meaning survey?

7          A.  No.

8          Q.  What factors do you believe are important

9     to analyze when determining whether a trademark

10    has become well-known?                                 02:53:05

11             MR. SCHER:  Objection.  Vague.  Legal

12        conclusion.

13             THE WITNESS:  Yeah.  So I'm -- I'm not an

14        expert in trademarks or trademark law.

15             So -- so if you can rephrase that in a         02:53:19

16        way that -- that I can perhaps answer without

17        a legal background.

18    BY MS. BREWER:

19         Q.  What factors do you believe are important

20    to analyze when opining on whether a company's         02:53:34

21    name has become well-known?

22             MR. SCHER:  Objection.  Vague.  Legal

23        conclusion.

24             THE WITNESS:  You know, in general, I

25        think it's important to understand who -- you       02:53:49

                                                          Page 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          know, who the consumers are and then how

2          they -- how they sort of interact with the

3          company, how they recognize it.

4     BY MS. BREWER:

5          Q.   And how would you determine who the          02:54:02

6     consumers are or --

7               MR. SCHER:  Objection.  Vague --

8     BY MS. BREWER:

9          Q.   -- for a company?

10         A.   Sorry.                                        02:54:11

11              Could you repeat that?

12         Q.   How would you determine who the consumers

13    of a company are?

14              MR. SCHER:  Objection.  Vague.

15              THE WITNESS:  Again, I can't answer that      02:54:31

16         in general.

17              But in -- in the area of the soft -- the

18         AI software business, my experience has been

19         that the consumers are the people likely to

20         pay for the software services and products.        02:54:47

21              So these are usually technical people,

22         business people that make decisions about

23         acquiring these API services that a company

24         like OpenAI produces.

25    ///

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. BREWER:

2        Q.  So you said that in the AI software

3    business, "consumers are the people likely to pay

4    for the software services and products"; correct?

5        A.  It's mostly -- you know, I want to            02:55:23

6    distinguish here between sort of end consumers

7    that might be using a software, you know, and sort

8    of pay -- using it at a superficial level versus

9    software developers that decide which API services

10   to integrate in a software product.                  02:55:44

11           This is sort of a little bit more

12   technical than a consumer that just uses something

13   on an app without the technical skills.

14           So I'm focusing on more of the technical

15   side.                                                02:55:59

16       Q.  And how would you determine on the

17   technical side who the software developer

18   consumers are for an artificial intelligence

19   company?

20           MR. SCHER:  Objection.  Incomplete           02:56:17

21       hypothetical.  And vague.

22           THE WITNESS:  Well, I just described it.

23       These are -- these are the people who

24       make those decisions.  And, you know,

25       finding -- you know, finding -- I know they      02:56:32

Page 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    recall correctly.

2        Q.  And did you speak with anyone other than

3    counsel about this lawsuit?

4        A.  No.

5        Q.  Have you spoken with Plaintiff's other        02:58:03

6    experts about this lawsuit?

7        A.  No.

8        Q.  And have you received compensation in

9    connection with your work on this case?

10       A.  I have filed invoices by the hour.          02:58:16

11       Q.  Okay.  And how many hours have you spent

12   in connection with this lawsuit?

13       A.  Let me see.  So in January, I think --

14   oh, I don't remember, something like -- around 30.

15   I don't remember the exact number.                  02:58:41

16           And probably in February, something

17   similar.  Don't remember the exact numbers, on

18   that order.

19       Q.  And do you remember approximately when

20   you were first contacted in January?  Was it the    02:58:55

21   beginning?  The middle?

22       A.  It must have been in -- earlier in

23   January, earlier half.

24       Q.  And how much do you charge for your

25   services in this case?                              02:59:17

Page 20

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  I charge $800 per hour for writing and --

2   writing reports and reviewing material, 1,200 for

3   depositions, and 400 for travel.

4      Q.  And do you know approximately how much

5   you have invoiced Plaintiff for in connection with    02:59:37

6   your work on this matter?

7      A.  I think -- so, so far, I have only

8   invoiced for January.

9          And if it's about 30 hours, it would be

10  something like $20,000, 25-, something like that.    02:59:50

11     Q.  And do you have any financial interest in

12  the outcome of this case?

13     A.  No.

14     Q.  And based on our earlier conversation, it

15  sounds like you don't typically perform a lot of     03:00:08

16  expert work; correct?

17     A.  That's correct.

18     Q.  So a large percentage of your annual

19  income is not earned from performing expert

20  services?                                             03:00:19

21     A.  That's correct.

22     Q.  Okay.  So now I'd like to show you the

23  first exhibit, which is Tab 1.

24          MS. BREWER:  So, Ms. Court Reporter, can

25      you please mark that exhibit and present it.     03:00:36

                                                  Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Okay.  Now let's turn to page 45.

2             This is Appendix B to the expert report

3    that you submitted in this matter; correct?

4             Mr. Lipson, is page 45, Appendix B to

5    Exhibit 450, the appendix that you submitted in        03:03:01

6    connection with your report in this matter?

7        A.   Page 45, yeah.

8        Q.   Okay.  And is this a complete list of the

9    documents that you relied upon in forming your

10   opinion in this matter?                                 03:03:16

11       A.   That, and also the -- all the end notes

12   and footnotes throughout the -- throughout the

13   document.

14       Q.   Okay.  Are there any other documents,

15   other than documents listed in your footnotes and       03:03:35

16   end notes and in this list of documents, that you

17   relied upon in forming your opinions in this

18   matter?

19       A.   No.  This -- everything that I relied on

20   is here.                                                03:03:48

21       Q.   Did you review any other expert reports

22   that were submitted in this case?

23       A.   I reviewed the defendant rebuttal -- two

24   of the rebuttals.

25             And I reviewed the summary -- the initial     03:04:19

                                                            Page 23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    summary by the judge.

 2        Q.  And do you remember which Defendants'

 3    rebuttal experts reports you reviewed?

 4        A.  Yes, Chiagouris -- I may be

 5    mispronouncing.                                  03:04:40

 6        Q.  Larry Chiagouris?

 7        A.  Yes, and I also reviewed another one.

 8    And I forget the name.  I can look it up.

 9        Q.  I think I can help you out by listing it.

10        A.  Yeah, if you give me the names.          03:05:06

11            There's someone else on the defendant's

12    side that had commentated on my original report,

13    and I reviewed their comments.

14        Q.  Was it Sam Malek?

15        A.  Yes, that's right.  So these are -- yeah.  03:05:19

16    So these are the two reports I reviewed.

17        Q.  You didn't review any other expert

18    reports in this case?

19        A.  That's right.

20        Q.  Did you review the expert report         03:05:32

21    submitted by Plaintiff in this case?

22        A.  I did not.

23        Q.  And is there anything in your expert

24    report that you submitted that needs to be

25    corrected?                                       03:05:45
```

Page 24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           A.   No.

2           Q.   Have you published any papers about how a

3      trademark acquires secondary meaning?

4           A.   No.

5           Q.   So now I want to talk to you about your          03:07:19

6      actual expert report submitted in this case.

7           A.   Right.

8           Q.   So what was your assignment in this case?

9           A.   My assignment was to describe how the AI

10     community understood OpenAI -- the term "OpenAI,"        03:07:49

11     the contribution of the company, and how they

12     interacted with the company as a community prior

13     to 2022.

14          Q.   Did you analyze how the AI community

15     understood the term "OpenAI" and contributions of        03:08:16

16     the company after 2022?

17               MR. SCHER:   Objection.   Vague.

18               THE WITNESS:   I didn't, no.   I didn't

19          analyze -- I didn't analyze -- I did not

20          analyze that period.                                03:08:37

21          I was asked to focus on the earlier

22          period since the founding of OpenAI up until

23          around 2022.

24     BY MS. BREWER:

25          Q.   Okay.   And after you received your            03:08:48

                                                          Page 26

1    assignment, did you request any specific types of

2    documents?

3         A.  No.  I did -- these -- these three

4    documents were given to me, and that's it.

5              I did not actually request anything else,      03:09:06

6    no.

7         Q.  Okay.  So you did not request any

8    information that you thought was important to

9    review?

10        A.  Oh, the other thing --                          03:09:18

11             MR. SCHER:  Objection.  Mischaracterizes

12        testimony.

13             THE WITNESS:  The other thing I did

14        review is a list of URLs.  I received a list

15        of URLs with login information for Open AI --       03:09:31

16        for Ravine's Open AI's web pages.

17             And then I proceeded to log in and

18        examine those web pages.

19    BY MS. BREWER:

20        Q.  So to be clear, you didn't specifically         03:09:50

21    request any other information in order to complete

22    your assignment; correct?

23        A.  Correct.

24             MR. SCHER:  Objection.  Mischaracterizes

25        testimony.                                          03:09:59

Page 27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          But more specifically, they published a

2     paper that was -- and created a software platform

3     that became very important at the time.

4          And so they had an impact and become --

5     became known within the AI community.          03:13:01

6          Q.  And when you talk about the "AI

7     community," can you define what you mean by that?

8          A.  Yeah.  So I --

9          MR. SCHER:  Objection.  Vague.

10    BY MS. BREWER:                                03:13:18

11         Q.  Let me rephrase.

12         A.  Yeah.  Okay.

13         Q.  How do you define the phrase that you use

14    in your report, "AI community"?

15         A.  So when I use the term "AI community,"  03:13:31

16    I'm referring to the AI community that I'm

17    familiar with, which is -- comprises researchers

18    and software developers that use AI tools, use the

19    AI software, develop new AI techniques, and

20    integrate those tools into products.          03:13:49

21         And this involves students, colleagues,

22    technical software developers that I interact

23    with.

24         And, you know, a lot of people that I

25    never met personally, but I read their work     03:14:09

                                               Page 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    online, read their papers, use their software,

2    download their software or their open source code.

3          That's the community -- people that opine

4    on AI in user groups.  There are many ways in

5    which the AI community interacts.                    03:14:33

6      Q.  Okay.  So I'm going to break your answer

7    down a little bit just so that we're very clear on

8    who you're including in the AI community in your

9    expert report.

10     A.  Okay.                                           03:14:49

11     Q.  And before I do that, sometimes your

12   expert refers to the "AI community," and sometimes

13   it refers to the "technical AI community."

14         Are those two different terms, or do they

15   encompass the same people?                            03:15:04

16         MR. SCHER:  Objection.  Vague.

17         THE WITNESS:  You know, I have to see

18      exactly the context of when I make this

19      reference.

20         But in general, my report is -- is          03:15:18

21      focused on the technical AI community, as I

22      describe, the people who write code and the

23      people who use code.

24   BY MS. BREWER:

25     Q.  Does your definition of the AI community   03:15:32

                                                     Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          more technically integrated into sort of --

 2          in the back end.

 3              So if somebody is just a user of a tool

 4          without understanding how it works and

 5          without making any decisions about that --      03:18:30

 6          about that tool, that's not what I'm talking

 7          about whenever I say "AI community."

 8      BY MS. BREWER:

 9          Q.  And why are you not including users of a

10      tool who are not actually developing AI            03:18:45

11      software --

12              MR. SCHER:  Objection --

13      BY MS. BREWER:

14          Q.  -- as members of the AI community?

15              MR. SCHER:  Objection.  Mischaracterizes    03:18:51

16          testimony.  Vague.

17              THE WITNESS:  I would say -- so again,

18          what I was asked to comment about is how the

19          AI community that I'm familiar with, which is

20          the technical AI community, interacted with     03:19:05

21          OpenAI company before the period they became

22          very famous, where they started with ChatGPT.

23              So in that period, it was -- before they

24          had consumer products, then only technical

25          people interacted with OpenAI, in the period    03:19:26
```

Page 34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              of interest.

2    BY MS. BREWER:

3        Q.  So is it fair to say that you are not

4    familiar with users that simply use artificial

5    intelligence tools who are not software          03:19:54

6    developers?

7            MR. SCHER:  Objection.  Mischaracterizes

8            testimony.

9            THE WITNESS:  There's -- again,

10           there's -- so I am focusing on people who  03:20:04

11           understand the back end, the technical parts.

12           They might write code, or they might make

13           decisions about it.  For example, should they

14           integrate it into a product or not.

15           So that's -- that's -- that's the AI     03:20:18

16           community that interact with OpenAI during

17           that period.

18           And that's what I'm focusing on.

19   BY MS. BREWER:

20       Q.  So I understand what you're focusing on.  03:20:35

21           I'm asking a different question.

22       A.  Okay.

23       Q.  Are you qualified to opine on the use by

24   people outside of the back end or technical part

25   and their awareness of OpenAI?                   03:20:52

                                            Page 35

1        MR. SCHER:  Objection.  Beyond the scope.

2    Mischaracterizes testimony.  And vague.

3        THE WITNESS:  Am I qual- -- so the -- I

4    can opine about it.

5        But I am -- I'm not an expert in          03:21:06

6    consumer -- consumer products.

7    BY MS. BREWER:

8    Q.  Okay.  Going back to your definition of

9    the AI community, how big is that AI community?

10       MR. SCHER:  Objection.  Vague.          03:21:40

11       THE WITNESS:  Hard to estimate exactly,

12    but it is in the hundreds of thousands.

13    BY MS. BREWER:

14    Q.  And how big was the AI community prior to

15    2022?                                        03:21:59

16       MR. SCHER:  Objection.  Vague.

17       THE WITNESS:  It was tens to hundreds of

18    thousands, I believe.

19    BY MS. BREWER:

20    Q.  Do you know what products and services    03:22:21

21    Plaintiff OpenAI, Inc., offered before 2022?

22    A.  I am familiar with several of them, yes.

23    Q.  And can you tell me the products and

24    services that Plaintiff offers that you are

25    familiar with?                               03:22:40

Page 36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          MR. SCHER:  Objection.  Compound.  Vague.

2          THE WITNESS:  Well, I'd say the first one

3      was the OpenAI Gym.  That's what they

4      launched in 2016 or -- or thereabout.

5          And that was -- that was probably the          03:23:01

6      first -- that's how I got to know about

7      OpenAI.

8          That was a software -- it's a combination

9      of an API and a set of benchmarks for

10     reinforcement learning.                            03:23:18

11         And we can go into details of what that

12     means and why that was important.

13         But that was my first interaction with

14     them.  And then there are more after that,

15     but -- but that was -- that was the first          03:23:32

16     one.

17         Would you like me to move on to other

18     ones?

19  BY MS. BREWER:

20     Q.  Yes.  We don't need any detailed              03:23:39

21  explanation right now.

22     A.  Yeah.

23     Q.  But if you know --

24     A.  So probably -- okay.  So that was -- that

25  was one.                                             03:23:48

                                                    Page 37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      I would say probably the most impactful

2   after that was 2018, where they introduced the

3   notion of -- of a pre-trained transformer -- a

4   generative pre-trained transformer, GPT, which has

5   since then become a common notion but back then          03:24:12

6   was a new idea.

7          And it wasn't necessarily a product.  It

8   was a paper.  It was an idea that turned out to be

9   extraordinarily powerful, literally changed the AI

10  community.                                                03:24:33

11         But it originated in a 2018 paper by

12  OpenAI.  And that's when they really sort of

13  changed the field, possibly, you know, seeding

14  many other products later on.

15         After that, there was many other things         03:24:53

16  that started coming at higher and higher

17  frequency.

18         There was CLIP, which shows how you

19  combine text with images in a -- because if you

20  think about this AI, it's all about speaking           03:25:06

21  different languages.  And images and text are a

22  completely different type of language.

23         So OpenAI discovered a way to combine

24  these two things together.  And that -- that led

25  to things like DALL-E later on and other things.        03:25:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    So -- so these are examples of three

2    major milestones in -- in -- in things that OpenAI

3    offered.   I don't know if I would call it

4    "product," necessarily.

5    But it was a concept, an API, a software        03:25:42

6    platform that people could use and expand on.

7    Q.  So let's go back to your report and look

8    at paragraph 3.b.

9    A.  Mm-hmm.

10    Q.  So in paragraph 3.b, you opine that:        03:26:10

11    "OpenAI established itself as a

12    powerhouse of technical AI innovation by 2021

13    (before the launch of ChatGPT) and has been

14    well-known within the AI community since

15    within a year of its founding"; correct?        03:26:26

16    A.  That's correct.

17    Q.  Now, when you opine that OpenAI "has been

18    well-known within the AI community since within a

19    year of its founding," do you mean that people

20    within the AI community were aware that a company   03:26:44

21    called "OpenAI" existed?

22    MR. SCHER:  Objection.  Mischaracterizes

23    testimony.

24    THE WITNESS:  It means that, when you

25    said -- when one would say "OpenAI paper"        03:26:55

Page 39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. BREWER:

2        Q.  And was the AI community aware that

3    OpenAI was the company offering Gym?

4        A.  Yeah.  Yes.

5        Q.  And within a year of the founding of          03:28:29

6    OpenAI, did a significant number of the consuming

7    public know that OpenAI was the source of Gym?

8            MR. SCHER:  Objection.  Vague.

9        Mischaracterizes testimony.

10           THE WITNESS:  Yes.  I think this is a          03:28:53

11       really important question.  And I'm going to

12       use it to make a very important distinction.

13           Because you say the "consuming public,"

14       and this is -- this is really an important --

15       important distinction I was referring to        03:29:05

16       earlier.

17           So when -- until OpenAI had a

18       public facing product like ChatGPT, the

19       consuming public, meaning, let's say, people

20       who are not AI experts, didn't even know       03:29:20

21       about OpenAI.

22           But the entire AI community -- the tens

23       or hundreds of thousand who write, who are

24       interested in AI, who write code using AI or

25       use AI to solve problems -- that community     03:29:35

Page 41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          was well aware of -- of OpenAI.

 2              So when you say "consuming public," it's

 3          a little bit -- could be misinterpreted.

 4              So I want to make sure that I'm focusing

 5          on the community of AI researchers, and that    03:29:54

 6          community was well aware of OpenAI.

 7     BY MS. BREWER:

 8          Q.  So to be clear, you are not providing an

 9     opinion that OpenAI had become well-known within

10     the general consuming public within a year of its    03:30:07

11     founding; correct?

12              MR. SCHER:  Same objections.

13              THE WITNESS:  The general consuming --

14          could you explain what you mean, "general

15          consuming public"?                               03:30:19

16              Because that -- because in the AI

17          community, the consumers are frequently

18          considered to be the software developers.

19              Do you see the ambiguity of the word

20          "consumer"?                                      03:30:36

21              So for me -- so in the AI community, we

22          also see ourselves as consumers, but we

23          consume software.  And that's what AI --

24          that's what OpenAI provided.

25              So the general public, meaning people who    03:30:48
```

Page 42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        are not AI software developers, I think they

2        were not aware of OpenAI back in -- during

3        its first year.

4            But again, as I said earlier, I'm not an

5        expert in public consumer marketing.  So I        03:31:05

6        don't know what ordinary people, how they

7        interact with AI.

8    BY MS. BREWER:

9        Q.  So looking back at your language in

10   Opinion 3.b, when you say that "OpenAI has been        03:31:19

11   well-known within the AI community," how do you

12   define the term "well-known"?

13           MR. SCHER:  Objection.  Vague.

14           THE WITNESS:  I define -- "well-known,"

15       meaning that -- well, there's, I would say,        03:31:41

16       sort of two ways to look at it.

17           One is anecdotally.

18           If you talk about OpenAI, do people know

19       what you're talking about?  If you say

20       "OpenAI Gym," people sort of nod.  And you        03:31:57

21       can go ahead and -- or -- and I understand

22       what you're talking about anecdotally.

23           Or if you say, "Hey, let's use the OpenAI

24       Gym to test our robot."  And people, like,

25       say that to a student.  And the student said,        03:32:11

                                                    Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    report, which is marked as Exhibit 450.  That's on

2    page 32.

3            I'm going to give you a minute to reread

4    paragraph 51 of your expert report.

5            Let me know when you're done.            03:36:40

6        A.  Okay.  Okay.

7        Q.  Okay.  Does paragraph 51 of your report

8    accurately reflect the factors that you considered

9    in forming the opinion that OpenAI "has been

10   well-known within the AI community since within a    03:37:15

11   year of its founding"?

12       A.  Yes.

13       Q.  So one of the factors that you analyzed

14   was OpenAI's leading role at conferences; correct?

15       A.  Yeah.                                        03:37:30

16       Q.  You also analyzed the volume and quality

17   of cutting-edge research by OpenAI; correct?

18       A.  That's -- that's correct.

19       Q.  And you analyzed the widespread citation

20   of OpenAI's papers and building off of its          03:37:48

21   open-source products; is that correct?

22       A.  That's right.

23       Q.  And what led you to consider these

24   factors specifically in order to test whether

25   OpenAI had become well-known within the AI          03:38:02

                                                    Page 47

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    community?

2          MR. SCHER:  Objection to form, including

3      vague.  Mischaracterizes report.

4          THE WITNESS:  You know, as -- as somebody

5      who does research in AI -- and my career is      03:38:17

6      all about producing research in AI, teaching

7      students, developing software -- I -- when I

8      was asked to opine about this topic, I

9      thought, Okay, how -- how -- what does it

10     mean to have impact in the world of AI?      03:38:36

11         And again, in the back end, in the

12     actual, technical software development, what

13     does it mean to have impact?  How does one

14     know whether impact has been achieved?

15         And frankly, as an academic, academia is      03:38:49

16     all about having impact.  That's -- day and

17     night, that's what we try to do.  We try to

18     do research that has impact.  We don't try to

19     do just stuff to kill time.  We try to have

20     impact.      03:39:05

21         So this is what I do.  So how do we

22     measure impact in academia?  How do we know

23     if a technical contribution moved the needle

24     in the world?

25         We look at, do you get excepted into      03:39:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    conferences?  Do people download your papers;

2    do the people use your software?  Do they

3    build upon your software to make the next

4    generation of software?

5        These are all factors that we use in            03:39:34

6    academia.  This is how we evaluate tenure

7    cases.  This how we evaluate whether somebody

8    earns a Ph.D.; this is how we evaluate

9    whether, you know, some of these academic

10   contribution deserves a prize.                       03:39:49

11       I mean, this is -- this is sort of common

12   in the world of academia.  And these are sort

13   of the criteria that I used in this case

14   because they reflect sort of how the AI

15   community engages and how it values impact.          03:40:02

16       And some of this, as I mentioned earlier,

17   is anecdotal:  Are you familiar with this

18   topic or not?

19       And someone who -- that is very

20   quantitative:  How many citations?  Is the           03:40:12

21   number of citations growing; is the number of

22   downloads growing?

23       You know, these are more quantitative

24   metrics that we also use.

25   ///

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BY MS. BREWER:

2        Q.  To be clear, are your opinions limited to

3    whether OpenAI has had a measured impact in the

4    world of academia?

5            MR. SCHER:  Objection.  Mischaracterizes      03:40:49

6        testimony.  Vague.

7            THE WITNESS:  I am -- no.  So I am not

8        limited to academia.  I'm talking about

9        software developer community, which includes

10       academia.                                          03:41:00

11           Frequently, software developers start as

12       students.  And so I get a window into that

13       period but also later on.

14   BY MS. BREWER:

15       Q.  Do any publications set forth the factors     03:41:23

16   that you analyzed as important factors to analyze

17   when determining whether a trademark has become

18   well-known?

19           MR. SCHER:  Same objections.  And legal

20       conclusion.                                        03:41:42

21           THE WITNESS:  I don't know.  So -- so are

22       there any papers?  I don't know if there are

23       any papers around this.  That's an

24       interesting question.

25           But definitely, it's not -- that's not my     03:41:51

Page 50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        expertise, about trademarks.

2    BY MS. BREWER:

3        Q.  So when you were creating the methodology

4    to test your opinions, did you consult any

5    publications to determine what factors you needed    03:42:07

6    to analyze?

7            MR. SCHER:  Objection.  Vague.

8            Mischaracterizes testimony.  Legal

9            conclusion.

10           THE WITNESS:  I did not -- I did not       03:42:18

11           consult any -- did you say -- technical -- so

12           no.

13               So I did this based on how we normally

14           evaluate impact in the technical AI

15           community, which is, again, something I do on  03:42:40

16           a regular basis as part of my job as -- as an

17           academic researcher.

18   BY MS. BREWER:

19       Q.  Is it fair to say that the methodology

20   you used to test your opinions was based on your    03:42:54

21   personal experience and how you evaluate impact in

22   the technical AI community?

23           MR. SCHER:  Same objections.

24           THE WITNESS:  It is based on my

25           experience and how also my colleagues -- how  03:43:10

Page 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          like "likes" but for software, for AI
 2          software.
 3              So these are different windows into
 4          different impact.  And these are all things
 5          that I considered in this report; these are        03:50:15
 6          things that are commonly considered in the
 7          field when people evaluate.
 8              And none of these are exclusive in
 9          determining, but they all give you a window
10          into -- into impact.                               03:50:25
11              And usually, the more impact -- the more
12          impactful one is or one company is, that
13          would be reflected in all of these different
14          metrics.
15   BY MS. BREWER:                                            03:50:40
16      Q.  Do you know what factors courts in the
17   Ninth Circuit usually consider when determining
18   whether a trademark has become well-known?
19          MR. SCHER:  Objection.  Legal conclusion.
20          Beyond the scope.                                  03:50:56
21          THE WITNESS:  I don't know.  I didn't
22          even know the Ninth Circuit exists until a
23          month ago.
24   BY MS. BREWER:
25      Q.  Did you analyze whether Plaintiff had             03:51:14
```

Page 57

1    meaningful levels of advertising expenditures?

2          MR. SCHER:  Objection.  Beyond the scope.

3       Legal conclusion.

4          THE WITNESS:  No, I did not analyze that

5       at all.                                      03:51:28

6          I read a comment about that in -- in

7       Chiagouris's report.  But apart from that, I

8       have no information.

9    BY MS. BREWER:

10       Q.  Did you review any material related to    03:51:42

11   Plaintiff's advertising expenditures in this case?

12       A.  No.

13       Q.  Did you analyze Plaintiff's sales in this

14   case?

15       A.  No.                                       03:51:55

16       Q.  Did you review any of Plaintiff's

17   financial documents?

18          MR. SCHER:  Objection.  Vague.

19          THE WITNESS:  I did not.

20   BY MS. BREWER:                                    03:52:03

21       Q.  Did you --

22          MR. SCHER:  We've been going for more

23       than an hour.  And if we are changing topics,

24       I think this is a good time for a break.

25          MS. BREWER:  Sure.  We could take a break   03:52:21

                                              Page 58

```
 1          now.

 2               Let's go off the record.

 3               THE VIDEOGRAPHER:  This ends Media 1.  We

 4          are now going off the record.  The time is

 5          3:52.                                        03:52:34

 6               (Short break taken.)

 7               THE VIDEOGRAPHER:  This begins Media 2.

 8          We are now back on the record.  The time is

 9          4:10.

10     BY MS. BREWER:                                    04:10:18

11          Q.  Welcome back, Mr. Lipson.

12          A.  Pleasure to be here.

13          Q.  Before the break, we were covering what

14     you analyzed to form your opinions.

15               Do you remember that?                   04:10:28

16          A.  Yes.

17          Q.  I'm just going to continue on with that

18     line of questioning.

19          A.  Okay.

20          Q.  Did you review any internal brand         04:10:34

21     awareness and perception surveys conducted by

22     Plaintiff?

23               MR. SCHER:  Objection.  Vague.

24               THE WITNESS:  No.  I did not review

25     any -- any such documents.                         04:10:51
```

Page 59

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     BY MS. BREWER:

 2         Q.  Did you visit any of Plaintiff's

 3     websites?

 4         A.  In the course -- in the course of my

 5     work, I've visited OpenAI's websites many times.    04:11:09

 6             Is that what you're referring to?

 7         Q.  In forming your opinions in this case,

 8     did you analyze Plaintiff's websites?

 9         A.  A little bit, yeah, but I can't say I

10     thoroughly analyzed all of their websites.          04:11:33

11             But I have visited them.

12         Q.  What websites did you analyze?

13         A.  I looked at the OpenAI API websites.

14     That's one area that I looked at.

15             I also looked at several of -- revisited    04:11:56

16     because I've been there many times before.  But I

17     looked at their -- their blogs and papers.

18         Q.  Okay.  So I'm going to break that down.

19             First you said that you visited OpenAI's

20     API websites?                                        04:12:21

21         A.  Document- -- yeah, documentation.  Yeah.

22         Q.  And do you know what the URL was for any

23     of those API websites?

24         A.  I cite it in my report.  And I don't

25     remember which citation exactly, but it's cited      04:12:37
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    there.

2          If you look for "OpenAI API," you'll

3    probably find that --

4        Q.  Okay.

5        A.  -- in my report.                        04:12:49

6        Q.  And next you said you reviewed OpenAI's

7    blog?

8        A.  Yeah.  Several -- several of their blog

9    posts, yeah.

10       Q.  And did you cite to the blog post that   04:13:02

11   you --

12       A.  Yes, I did.  Yes.

13       Q.  Did you review any API websites or blog

14   posts that are not referenced in your expert

15   report?                                          04:13:24

16       A.  No, only those I referenced.

17       Q.  And when you reviewed OpenAI's API

18   websites and blog posts, did you analyze whether

19   OpenAI appeared prominently?

20          MR. SCHER:  Objection.  Vague.  Beyond    04:13:40

21       the scope.

22          THE WITNESS:  I did not analyze it,

23       although it was pretty clear that it was

24       OpenAI.  It was in the URL, and it -- in the

25       author list.                                 04:13:54

Page 61

1          And as I show in my report, the OpenAI

2      API, when you use it, you have to type "Open

3      API" -- "OpenAI" frequently.

4          So it's in the code; it's embedded in the

5      code.  So it appears in many, many ways and        04:14:12

6      many forms.

7  BY MS. BREWER:

8      Q.  Okay.  Now I want to go through each of

9  the factors that you analyzed.

10         So going back to paragraph 51 of            04:14:22

11  Exhibit 450.

12     A.  Share the screen or -- it makes it a

13  little easier.  Okay.  Yeah.

14     Q.  Okay.  Going to the last sentence, you

15  start with:                                        04:14:46

16         "Within a few months of its founding,

17     OpenAI was well-known within the AI

18     community, as reflected by its leading role

19     at conferences"; correct?

20     A.  Yeah.                                       04:15:00

21     Q.  What did you mean by "leading role"?

22     A.  Publishing papers at conferences and

23  being at the conference.

24         And I have to emphasize that also

25  OpenAI -- the people who were there who found the  04:15:19

Page 62

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          want to know what's the latest technique in
 2          AI because you're interested in -- in using
 3          it, the software, you go to NeurIPS.
 4              If you are a company and you want to
 5          show, "Hey, I have a software algorithm that      04:20:39
 6          is, you know, really good and outperforms
 7          everything else," you can claim it all day.
 8              But the real way to have impact is to go
 9          to publish a paper in NeurIPS demonstrating
10          that you've actually accomplished that.          04:20:57
11              So you'll have big companies like Google
12          and Apple who try really hard to get a
13          publication into NeurIPS, for example.
14     BY MS. BREWER:
15          Q.  Understood.                                  04:21:14
16              So there's academics that attend these
17     conferences, professionals in the AI industry, and
18     companies in the AI industry; is that accurate?
19          A.  That's accurate.
20          Q.  And do you have to register to attend         04:21:25
21     these conferences?
22          A.  Yes, you have to register, and there is a
23     limited number of spots.
24              So you have to register early, or you
25     have to publish a paper.                              04:21:37
```

Page 67

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.  So there are -- yeah.  So NeurIPS, for

2   example, publishes exact numbers or number of

3   submissions, number of attendees, acceptance

4   rates.

5         All of these stats are publicly available     04:24:47

6   for -- for most of the conferences.

7     Q.  Okay.  I want you to listen carefully to

8   my question.

9         Mr. Lipson, do you personally have any

10  data about the number of people who attend these     04:25:04

11  types of conferences?

12        MR. SCHER:  Objection.  Asked and

13        answered.

14        THE WITNESS:  I have seen that data.  So

15  what do you mean do I have it "personally."     04:25:21

16  Like, I'm not sure what you're asking.

17        I have seen -- I've gone to the website.

18  I've seen -- I've seen the numbers, but I

19  don't recall them.

20        But they are in the ten -- you know,     04:25:29

21  they're more than 10,000, somewhere between

22  10- and 20,000 for each of these conferences.

23        And the reason why I'm familiar with

24  these numbers is because, again, we really

25  want to publish papers in these conferences     04:25:44

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           MS. BREWER:  It's on page 12.

2      BY MS. BREWER:

3           Q.  Did you produce the backup data for the

4      numbers in Figure 2?

5           A.  No.  This is -- the source of the data is      04:29:16

6      cited.

7           Q.  Did you produce the backup data?

8           A.  No.  The source is cited there.

9           Q.  I understand that the source is cited.

10          But did you --                                      04:29:31

11          A.  I'm not sure what you're asking me.

12          Q.  Did you produce the backup data for this

13      figure?

14          A.  No.  I got the data from the source.

15          Q.  And to be clear, you got Figure 2 from          04:29:46

16      the source that you cited?

17          A.  Correct.

18          Q.  But you don't have any backup data to

19      confirm that Figure 2 is accurate?

20          MR. SCHER:  Objection.  Asked and                   04:30:00

21          answered.

22          THE WITNESS:  So this chart is -- like I

23          said, the data for this is online.

24      BY MS. BREWER:

25          Q.  Okay.  We can put this back down.               04:30:18

                                                                Page 73

1    Q.  Now, in this list that you've presented

2    in Exhibit A to your expert report, do you

3    distinguish between papers that were presented

4    versus spotlighted versus put on posters?

5    A.  Between those three, no.  Let me see.    04:41:05

6         So let's say the paper -- no.  So I just

7    see a paper, InfoGAN, and I don't know if it was

8    spotlighted or not.

9    Q.  Okay.  So I want to start with NeurIPS.

10        I pronounced that right?                  04:41:30

11   A.  Yeah.

12   Q.  Okay.  I'm learning.  You're teaching me

13   things.

14        So NeurIPS, do you know if all of the

15   conferences between -- sorry.  Scratch that.  Let  04:41:43

16   me rephrase.

17        Do you know if all of the NeurIPS

18   conferences between 2015 and 2022 were physically

19   held in the United States?

20   A.  I don't know that.  I know -- I mean,    04:42:03

21   some of them were held in Canada for sure.

22        So no -- so I know that they were not all

23   held in the United States.

24   Q.  Are you aware that between 2015 and 2021,

25   only the 2016 NeurIPS conference was physically   04:42:22

Page 82

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    held in the United States?

2           MR. SCHER:  Objection.  Beyond the scope.

3           THE WITNESS:  I -- no, I don't know

4       either way.

5    BY MS. BREWER:                                    04:42:40

6       Q.  When you make opinions about the AI

7    community, is the AI community limited to the AI

8    community in the United States?

9           MR. SCHER:  Objection.  Vague.

10          THE WITNESS:  No, absolutely not.  I'm    04:42:56

11       talking about the global AI community, as I

12       can access through publications, which cover

13       most of the -- most of the world, at least

14       those who speak -- publish in English.

15   BY MS. BREWER:                                    04:43:17

16       Q.  Did you specifically analyze whether

17   OpenAI is well-known within the AI community in

18   the United States?

19       A.  No.

20          MR. SCHER:  Objection.  Vague.           04:43:37

21          THE WITNESS:  I analyzed -- so I

22       analyzed, for example, citations.

23          And citations are not limited to United

24       States at all.

25   ///

                                               Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    presentations at all of the conferences listed in

2    exhibit --

3        A.  You mean an oral presentation?

4        Q.  Yes.  Let me rephrase.

5            Do you know if OpenAI gave oral                04:49:59

6    presentations at all of the conferences listed in

7    Exhibit A to your report?

8            MR. SCHER:  Objection.  Asked and

9        answered.

10           THE WITNESS:  I do not know if they gave       04:50:09

11       a presentation, like an oral presentation, in

12       all of them.

13           But just by -- if you look at the list,

14       for example, there is a tutorial by -- on

15       GANs.  That was one of them.                        04:50:29

16           So that is -- a tutorial is a

17       presentation.  But -- so -- and if there's a

18       paper, it was at least -- it was at least a

19       poster.

20           So, again, it depends what you mean by          04:50:47

21       "presentation."

22    BY MS. BREWER:

23       Q.  Do you have any quantitative data showing

24    how many people saw OpenAI give oral presentations

25    at the conferences you listed in Exhibit A?            04:51:03

                                                    Page 88

 1          MR. SCHER:  Objection.  Vague.  Beyond

 2     the scope.

 3          THE WITNESS:  I don't have data on that,

 4     except that if it was an oral presentation

 5     and plenary, then it was an entire            04:51:19

 6     conference.  It was -- if it was a plenary.

 7          But apart from that, I don't have,

 8     myself, data on that.

 9   BY MS. BREWER:

10     Q.  Earlier we discussed Figures 2 and 3 on    04:51:47

11   pages -- on page 12 to your expert report.

12          MS. BREWER:  Can we go to that page for

13     the expert?

14   BY MS. BREWER:

15     Q.  Do you remember discussing these figures    04:52:05

16   earlier, Mr. Lipson?

17     A.  I do.

18     Q.  Do these figures break down how many

19   people from the United States attended these

20   conferences?                                    04:52:28

21     A.  I'd have to look --

22          MR. SCHER:  Objection.  Vague.

23          THE WITNESS:  I think it is general

24     attendees, not just United States.  But I am

25     not sure.                                     04:52:37

                                            Page 89

1          I might have to -- can you zoom in there

2      on the vertical axis?

3          I think this is number of attendees, not

4      limited to the U.S.

5  BY MS. BREWER:                                    04:53:08

6      Q.  And if we go down to Figure 3.

7      A.  Yeah.

8      Q.  Is this figure listing the number of

9  attendees, not limited to the U.S.?

10     A.  Correct.                                   04:53:21

11     Q.  Do you have any data about the number of

12 attendees from the United States who attended

13 these conferences?

14     A.  I don't have data, although I could

15 estimate it.                                       04:53:43

16         MS. BREWER:  You can take down Exhibit

17     450.

18 BY MS. BREWER:

19     Q.  So we've been talking a lot about

20 different conferences that OpenAI attended; right?  04:53:53

21 And you've told me that OpenAI gave some

22 presentations; right?

23     A.  Yeah.

24     Q.  And OpenAI presented some papers; right?

25     A.  Yeah.                                      04:54:07

                                            Page 90

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.  So can you tell me how the name "OpenAI"

2   would have been exposed to individuals attending

3   these technical conferences?

4            MR. SCHER:  Objection.  Vague.

5            THE WITNESS:  The main way in which the        04:54:23

6        name is presented is the affiliation of the

7        author or the presenter.

8            So whenever a presenter presents a paper,

9        after the title, there is always a name and

10       affiliation.  And the affiliation will say,        04:54:40

11       "OpenAI, Inc.," or it will say "Columbia

12       University," or it will say whatever the

13       affiliation is.  And that's a prominent part

14       of a presentation.

15           It's also important for assessing the          04:54:57

16       source of the contribution.

17           So when -- when -- when people look at a

18       paper, they want to know, not just the name

19       of the person, but where they are from and --

20       because that helps people understand what          04:55:20

21       other papers are coming from that place.  And

22       it begins to build the reputation of that

23       place.

24           So it's an important factor that people

25       look at.                                            04:55:31

Page 91

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.  And do you know the number of downloads

2  there were in 2016 specifically?

3       MR. SCHER:  Objection.  Asked and

4      answered.

5       THE WITNESS:  In 2016, which is right    04:59:20

6      after -- so I have to emphasize, it takes a

7      little bit of time between when a software is

8      published until you get citations.

9       Because it means somebody has to download

10     it, run it, do stuff with it, get some good    04:59:32

11     results, write that paper, and get that

12     published.  So there's a -- let's say a

13     two-year delay.

14       So -- so I do show the number of

15     citations in OpenAI Gym.  And you can see    04:59:46

16     that it reaches a few hundred within two

17     years.

18       The number of downloads, I don't have the

19     numbers for 2016.

20  BY MS. BREWER:                         05:00:07

21       Q.  And do you have the number of downloads

22  of OpenAI's Gym for 2017?

23       MR. SCHER:  Same objection.

24       THE WITNESS:  I don't.  I only have it in

25     the last couple of months.            05:00:19

Page 94

1           And I have the number of citations over

2       the years.

3   BY MS. BREWER:

4       Q.  So you don't have the number of downloads

5   for OpenAI's Gym for 2018; correct?                05:00:32

6       A.  That's correct.

7       Q.  And you don't have the number of

8   downloads for OpenAI's Gym for 2019; correct?

9           MR. SCHER:  Objection.  Asked and

10      answered.                                      05:00:44

11          THE WITNESS:  Correct.

12  BY MS. BREWER:

13      Q.  You don't have the number of downloads

14  for OpenAI's Gym for 2020; correct?

15          MR. SCHER:  Same objections.               05:00:51

16          THE WITNESS:  Correct.

17  BY MS. BREWER:

18      Q.  You don't have the number of downloads

19  for OpenAI's Gym for 2021; correct?

20          MR. SCHER:  Same objections.               05:01:00

21          THE WITNESS:  Correct.

22  BY MS. BREWER:

23      Q.  You don't have the number of downloads

24  for OpenAI's Gym for 2022; correct?

25          MR. SCHER:  Same objections.               05:01:08

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1                THE WITNESS:  Correct.

2        BY MS. BREWER:

3            Q.  You don't have the number of downloads

4        for OpenAI's Gym for 2023; correct?

5                MR. SCHER:  Same objections.          05:01:15

6                THE WITNESS:  Correct.

7        BY MS. BREWER:

8            Q.  You don't have the number of downloads

9        for OpenAI's Gym for 2024; correct?

10               MR. SCHER:  Same objections.          05:01:28

11               THE WITNESS:  Correct.

12       BY MS. BREWER:

13           Q.  Now I want to turn to paragraph 26.

14               Do you see paragraph 26?

15           A.  Yeah.                                 05:02:11

16           Q.  You state that, [as read]:  "hundreds of

17       papers mention OpenAI Gym that were published";

18       correct?

19           A.  Correct.

20           Q.  And then you cite to Figure 9?        05:02:22

21           A.  Mm-hmm.

22           Q.  And then you say:

23               "These articles reflect that OpenAI was

24               well-known in the artificial intelligence

25               community as early as 2016"; correct?   05:02:33

                                                     Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       A.  Yeah.  Mm-hmm.

2       Q.  Okay.  Let's look at Figure 9, which is

3   on the next page.  Now, Figure 9 states that it

4   shows the:

5           "Number of papers published per year          05:02:54

6       mentioning 'OpenAI' and 'OpenAI Gym' on

7       Google Scholar, 2014 to 2022"; correct?

8       A.  Correct.

9       Q.  Just to be clear, if we look at Figure 9,

10  it doesn't include the number of papers for 2014       05:03:09

11  or 2015; right?

12      A.  That's correct.

13      Q.  Okay.  Now, did you produce any backup

14  data for Figure 9?

15      A.  Yeah.  I produced -- I produced this        05:03:23

16  figure.  Like, I actually measured it.

17      Q.  So I know that you produced the figure.

18          But did you produce any backup data, like

19  a list of the papers and authors that mentioned

20  "OpenAI" or "OpenAI Gym"?                              05:03:38

21          MR. SCHER:  Objection.  Asked and

22      answered.

23          THE WITNESS:  I tallied it, and these are

24      the numbers.

25  ///

                                                    Page 97

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MS. BREWER:
 2        Q.  You didn't produce a list of the actual
 3    papers?
 4        A.  I did.  On the -- on the screen, yeah.  I
 5    don't have it in the report.                           05:03:58
 6            But, yes, the whole list, all 11,000.
 7        Q.  You produced a list of all 11,000?
 8        A.  Yes.  It's very easy to do.
 9        Q.  And you produced that in the materials
10    with your expert report?                               05:04:18
11        A.  No.  I didn't include it in the report,
12    but I produced it as I was creating the report.
13            So when you go to -- I don't know if
14    you've had a chance to do this.
15            But if you go to Google Scholar and you    05:04:27
16    type in a term like "OpenAI Gym," you will get the
17    list.  That's it.  It's not -- this doesn't take
18    a -- you know, expertise to do this.
19            And it's a very -- in fact, as I
20    mentioned earlier, when we assess impact of          05:04:44
21    people's work, both industrial, you know, student
22    applicants, you know, what -- if I want to know if
23    I want to use this software or that software,
24    which one is more established, this is one of the
25    established ways to do it.                             05:05:03
```

Page 98

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1           You go to Google Scholar.  You type in

2     the terms of the software that you're interested

3     in or the company or the lab or the whatever it is

4     that you care about.  And you get the list of all

5     the papers that cite it.                          05:05:16

6           And not only do you get the list, you

7     also get how many people cited those papers.

8           So in other words, it's a little bit

9     like -- sort of like a Google search, where you

10    can -- you get the most influential paper that    05:05:31

11    cited that paper.  You know, so it's a -- and you

12    get the whole list.  You get the numbers;

13    derivative citations, everything you want.  And

14    it's very easy to produce.

15       Q.  But you did not produce the list of all    05:05:48

16    of the papers --

17           MR. SCHER:  Objection.

18           THE WITNESS:  I did.  I produced it.

19           And if you mean "produce" as included it

20       in this report, no.                            05:05:57

21           But did I have the list as I calculated

22       the numbers?  Yes.

23    BY MS. BREWER:

24       Q.  Okay.  To be clear with my question, you

25    did not include a list of the results from your    05:06:07

Page 99

1    Google Scholarship [sic] with your report;

2    correct?

3          A.   That's correct.

4          MS. BREWER:  Okay.  We're close to an

5    hour.                                        05:06:22

6          I think now would be a good time to take

7    a short break.

8          MR. SCHER:  That sounds good to me.

9          Bree, not to put you on the spot --

10         MS. BREWER:  Let's go off the record      05:06:35

11    first.

12         THE VIDEOGRAPHER:  This ends Media 2.  We

13    are now going off the record.  The time is

14    5:06.

15         (Short break taken.)                      05:23:06

16         THE VIDEOGRAPHER:  This begins Media 3.

17    We are now back on the record.  The time is

18    5:23.

19         MR. SCHER:  Just for the record, my

20    colleague, Michael Carden, also from Quinn     05:23:40

21    Emanuel, is going to be joining me in a few

22    moments.

23    BY MS. BREWER:

24         Q.  Welcome back, Mr. Lipson.

25         A.  Thank you.                            05:23:51

                                                 Page 100

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            for identification on this date and is
 2            attached hereto.)
 3    BY MS. BREWER:
 4        Q.  Okay.  So Exhibit 452 is a screenshot
 5    showing the citations to the OpenAI Gym paper;        05:40:35
 6    correct?
 7        A.  Mm-hmm.
 8        Q.  And if you look on the left side, it
 9    shows that this is limited to citations to the
10    OpenAI Gym paper that were done in 2016; correct?     05:40:51
11        A.  Mm-hmm.
12        Q.  And if you look at the results, how many
13    papers cited to the OpenAI Gym paper?
14            MR. SCHER:  Objection.  Vague.
15            THE WITNESS:  So here you have 28; right?     05:41:12
16    BY MS. BREWER:
17        Q.  Yes.
18            And Figure 9 of your opening report lists
19    121 references, the cite to OpenAI Gym; correct?
20        A.  Correct.                                      05:41:28
21        Q.  So Figure 9 in your report is inaccurate;
22    correct?
23        A.  Or this is inaccurate.
24            MR. SCHER:  Objection.  Mischaracterizes
25    testimony.                                            05:41:43
```

Page 110

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        because it's a proportion.  So by the first

2        year, they didn't have a dozen paper -- so

3        no.

4             It wouldn't make a difference because

5        they could have had maybe one or two or three      05:49:47

6        papers in that one year.  And they wouldn't

7        have had time, even, to cite themselves

8        within the same year.

9             So there's no -- it wouldn't make a

10       difference.  It would -- we're talking about,      05:50:00

11       you know, 1 percent, 2 percent at most.

12            So we are at the point now, when we

13       consider promotions -- which are largely

14       based on citations in academia, for

15       example -- we do not even discuss               05:50:18

16       self-citations.

17            It's a nonissue in determining impact.

18       It's just statistically insignificant.

19  BY MS. BREWER:

20       Q.  Do you have any data showing the number        05:50:41

21  of people who actually read the papers that you

22  reference in Figure 9?

23            MR. SCHER:  Objection.  Vague.

24            THE WITNESS:  I don't have the number of

25       people -- number of people who actually read      05:50:49

                                                Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1          it, no.

 2     BY MS. BREWER:

 3          Q.  Let's go --

 4          A.  I would assume -- my assumption is that

 5     if someone cites the paper, they at least read it      05:51:06

 6     or care about the software or ran the software, or

 7     it's relevant to what they are doing.

 8               And that's a conservative number --

 9     estimate because there are many people who read --

10     read the paper or install the software or download     05:51:23

11     it but do not cite the paper.

12               So it's a conservative estimate.

13          Q.  Okay.  Let's go to paragraph 28.

14               So in paragraph 28, you opine that, [as

15     read]:                                                 05:51:45

16               "Another way to measure the wide-adoption

17          of Gym is by the high number of GitHub Stars

18          it has earned over the years"; correct?

19          A.  Correct.

20          Q.  Okay.  If we scroll down so you can see       05:52:01

21     the rest of the paragraph.

22               You opined that as of the date of your

23     report, Gym had 35,000 Stars; correct?

24          A.  Correct.

25          Q.  How many Stars did Gym have in 2016?          05:52:20
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MS. BREWER:  Okay.  Can you take down

 2         this exhibit?

 3     BY MS. BREWER:

 4         Q.  So you didn't do any analysis to

 5     determine the number of accounts that had starred      05:59:39

 6     Gym on GitHub that were users from the United

 7     States?

 8              MR. SCHER:  Objection.  Mischaracterizes

 9         testimony.

10              THE WITNESS:  Right, but -- nor did I        05:59:50

11         claim that they are all from the U.S.

12     BY MS. BREWER:

13         Q.  Going back to your opening report, you

14     claim that OpenAI Gym is the "No. 391 ranked

15     repository on GitHub"?                                 06:00:22

16         A.  Correct.

17         Q.  Do you know what OpenAI Gym was ranked in

18     2016?

19         A.  I don't.

20         Q.  How about 2017?                                06:00:34

21         A.  I do not know the ranking and, as I

22     mentioned earlier, in any particular year.

23         Q.  So now I want to talk about OpenAI's 2018

24     paper on generative pre-training.

25              Is that GPT for short?                        06:01:12
```

Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              *** ERRATA SHEET ***
2    NAME OF CASE:  OPENAI, INC VS. OPEN ARTIFICIAL
3    INTELLIGENCE, INC
4    DATE OF DEPOSITION:  MARCH 12, 2025
5    NAME OF WITNESS:  HOD LIPSON, Ph.D.
6    Reason Codes:
7              1.  To clarify the record.
8              2.  To conform to the facts.
9              3.  To correct transcription errors.
10
11   PAGE  LINE      FROM           TO          REASON
12   ____|_____|_____|_____|_____
13   ____|_____|_____|_____|_____
14   ____|_____|_____|_____|_____
15   ____|_____|_____|_____|_____
16   ____|_____|_____|_____|_____
17   ____|_____|_____|_____|_____
18   ____|_____|_____|_____|_____
19   ____|_____|_____|_____|_____
20                         _____
21   Subscribed and sworn before me
22   This____day of_____,20__.
23
24   _____    _____
25   (Notary Public)         My Commission Expires:

                                    Page 185
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1              DECLARATION UNDER PENALTY OF PERJURY

2

3          I, HOD LIPSON, Ph.D., do hereby certify

4      under penalty of perjury that I have read the

5      foregoing transcript of my deposition taken

6      on MARCH 12, 2025; that I have made such

7      corrections as appear noted herein; that my

8      testimony as contained herein, as corrected,

9      is true and correct.

10

11      DATED this          day of.                    ,

12    2025, at                          .

13

14

15                  _____

16                  HOD LIPSON, Ph.D.

17

18

19

20

21

22

23

24

25

                                        Page 186

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | Case No. 4:23-cv-03918-YGR |
| Plaintiff, | Assigned to the Hon. Yvonne Gonzalez Rogers |
| vs. | **DEPOSITION ERRATA OF DR. HOD LIPSON** |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | |
| Defendants. | |

## <u>DEPOSITION ERRATA SHEET</u>

Name of Deponent:    Hod Lipson

Deposition Date:    March 12, 2025

| Page | Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 48 | 25 | excepted | accepted | Transcription error |
| 56 | 23 | Archive | arXiv | Transcription error |
| 76 | 23 | accept | except | Transcription error |
| 119 | 12 | count | account | Transcription error |
| 136 | 21 | 2000-- | Two thou-- | Transcription error |
| 147 | 23 | publically | publicly | Transcription error |
| 165 | 18 | Clik | CLIP | Transcription error |
| 165 | 20 | LOMs | LLMs | Transcription error |
| 175 | 2 | the invention the social media | the invention of social media | Transcription error |

## <u>ACKNOWLEDGEMENT OF DEPONENT</u>

I, Hod Lipson, do hereby certify that I have read or concluded that no changes are necessary to the foregoing pages 1 through 187 of the March 12, 2025 Transcript, herein propounded, except for the corrections, changes in form or substance, if any, noted in this Errata Sheet.

Dated: April 24, 2025

_____
Hod Lipson

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    STATE OF CALIFORNIA       )

2                              (    ss.

3    COUNTY OF LOS ANGELES     )

4

5         I, RENEE HARRIS, do hereby certify that I

6    am a licensed Certified Shorthand Reporter, duly

7    qualified and certified as such by the State of

8    California;

9         That prior to being examined, the witness

10   named in the foregoing deposition was by me duly

11   sworn to testify to tell the truth, the whole

12   truth, and nothing but the truth;

13        That the said deposition was by me

14   recorded stenographically;

15        And the foregoing pages constitute a full,

16   true, complete and correct record of the testimony

17   given by the said witness;

18        That I am a disinterested person, not

19   being in any way interested in the outcome of said

20   action, or connected with, nor related to any of

21   the parties in said action, or to their respective

22   counsel, in any manner whatsoever.

23

24                  Renee Harris, CSR, CCR, RPR
                    CA CSR No. 14168,
25                  NJ CCR No. 30XI00241200
```

Page 187

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    BREEANA BREWER, ESQ.

2    bbrewer@willenken.com

3                                        March 25, 2025

4    RE: Openai, Inc  v. Open Artificial Intelligence, Inc

5    3/12/2025, Hod Lipson , Ph.D., (#7235109).

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20       Contact Veritext when the sealed original is required.

21   __ Waiving the CA Code of Civil Procedure per Stipulation of

22       Counsel - Original transcript to be released for signature

23       as determined at the deposition.

24   __ Signature Waived - Reading & Signature was waived at the

25       time of the deposition.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    _x_ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127