# EXHIBIT 9

**Brewer Declaration ISO Defendants' Opposition to Plaintiff's Motion for Summary Judgment**

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4    OPENAI, INC., a Delaware
      corporation,
 5                   Plaintiff,
              vs.
 6    OPEN ARTIFICIAL INTELLIGENCE,
      INC., a Delaware corporation;    No. 4:23-cv-03918-YGR
 7    and GUY RAVINE, an individual,
                   Defendants.
 8    _____/
      OPEN ARTIFICIAL INTELLIGENCE,
 9    INC., a Delaware corporation;
      and GUY RAVINE, an individual,
10        Counterclaimants,
              vs.
11    OPENAI, INC., a Delaware
      corporation; SAMUEL ALTMAN, an
12    individual; and GREGORY
      BROCKMAN, an individual,
13        Counterclaim-Defendants.
      _____/
14    AND RELATED COUNTERCLAIMS.
      _____/
15
16                  -- CONFIDENTIAL --
17      -- ATTORNEYS' EYES ONLY PORTION PAGES 139 - 143 --
18
19     VIDEO-RECORDED DEPOSITION OF YEDAM RACHEL PARK
20                Remote Zoom Proceedings
21               San Francisco, California
22               Saturday, December 7, 2024
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 256                    Job No. 7055677
```

Page 1

```
 1                 UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3                       OAKLAND DIVISION
 4
    OPENAI, INC., a Delaware
 5  corporation,
                     Plaintiff,
 6           vs.
    OPEN ARTIFICIAL INTELLIGENCE,
 7  INC., a Delaware corporation;    No. 4:23-cv-03918-YGR
    and GUY RAVINE, an individual,
 8                Defendants.
    _____/
 9  OPEN ARTIFICIAL INTELLIGENCE,
    INC., a Delaware corporation;
10  and GUY RAVINE, an individual,
         Counterclaimants,
11           vs.
    OPENAI, INC., a Delaware
12  corporation; SAMUEL ALTMAN, an
    individual; and GREGORY
13  BROCKMAN, an individual,
         Counterclaim-Defendants.
14  _____/
    AND RELATED COUNTERCLAIMS.
15  _____/
16                    -- CONFIDENTIAL --
17     -- ATTORNEYS' EYES ONLY PORTION PAGES 139 - 143 --
18
19      Video-recorded deposition of YEDAM RACHEL PARK,
20  taken on behalf of Defendants and Counterclaimants,
21  Remote Zoom Proceedings from San Francisco, California,
22  beginning at 10:15 a.m. Pacific Standard Time and ending
23  at 6:48 p.m. Pacific Standard Time, on Saturday, December
24  7, 2024, before Leslie Rockwood Rosas, RPR, Certified
25  Shorthand Reporter No. 3462.
```

                                                    Page  2

```
 1    APPEARANCES:

 2

 3    FOR OPENAI, INC.:

 4         QUINN EMANUEL URQUHART & SULLIVAN LLP

 5         BY: DYLAN SCHER, ESQ.

 6         295 5th Avenue

 7         New York, New York 10016

 8         (212) 849-7000

 9         dylanscher@quinnemanuel.com

10

11    FOR OPEN ARTIFICIAL INTELLIGENCE, INC., and GUY RAVINE:

12         HALEY GUILIANO LLP

13         BY: JOSHUA MASUR, ESQ.

14         111 North Market Street, Suite 900

15         San Jose, California 95113

16         (669) 213-1056

17         joshua.masur@hglaw.com

18             -and-

19         ARLENBACH LEGAL

20         BY: SPENCER GUSICK, ESQ.

21         315 Montgomery Street, Suite 1000

22         San Francisco, California 94104

23         (415) 994-7996

24         sg@arlenbach.com

25
```

                                              Page  3

1    APPEARANCES (Continued):

2

3    FOR THE WITNESS:

4        CONRAD METLITZKY KANE LLP

5        BY: NATALIE CHA, ESQ.

6            WARREN METLITZKY, ESQ.

7        217 Leidesdorff Street

8        San Francisco, California 94111

9        (415) 469-1717

10        ncha@conmetkane.com

11        wmetlitzky@conradmetlitzky.com

12

13    Also Present:

14        Soseh Kevorkian, Videographer

15

16

17

18

19

20

21

22

23

24

25

Page 4

CONFIDENTIAL

```
 1                      I N D E X

 2

 3

 4   SATURDAY, DECEMBER 7, 2024

 5

 6   WITNESS                              EXAMINATION

 7   YEDAM RACHEL PARK

 8

 9       BY MR. MASUR                     12, 241, 249

10       BY MR. SCHER                        145, 243

11

12

13      -- ATTORNEYS' EYES ONLY PORTION PAGES 139 - 143 --

14

15   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

16

17                      Page        Line

18                      157          17

19                      159           1

20                      162           7

21                      168          18

22                      171          22

23                      175           2

24                      175          13

25

                                              Page 5
```

CONFIDENTIAL

1      San Francisco, California; Saturday, December 7, 2024

2                    10:15 A.M.

3

4                    PROCEEDINGS

5           THE VIDEOGRAPHER:  Good morning.  We are going      10:15:45

6      on the record at 10:15 a.m. on December 7th, 2024.

7           Please note this deposition is being conducted

8      virtually.  Quality of recording depends on the quality

9      of the camera and internet connection of participants.

10     What is seen from the witness and heard on screen is what      10:16:15

11     will be recorded.

12          This is Media Unit 1 of the video-recorded

13     deposition of Yedam Park, taken by counsel for Defendant

14     and Counterclaimants, in the matter of OpenAI,

15     Incorporated versus Open Artificial Intelligence,      10:16:32

16     Incorporated, et al., and related counterclaims, filed in

17     the United States District Court, for the Northern

18     District of California, Case Number 4:23-cv-03918-YGR.

19          My name is Soseh Kevorkian, representing

20     Veritext, and I'm the videographer.  Our court reporter      10:16:57

21     is Leslie Rosas, also from the firm Veritext.

22          At this time would counsel and all present

23     please state their appearances and affiliations for the

24     record, and we will begin with the noticing attorney.

25          MR. MASUR:  Joshua Masur of the law firm Haley      10:17:12

                                                Page 10

1    Guiliano LLP on behalf of the defendants and

2    counterclaimants.

3            MR. SCHER:  This is Dylan Scher of Quinn Emanuel

4    Urquhart & Sullivan on behalf of Plaintiff OpenAI, Inc.

5            MS. CHA:  Natalie Cha from the firm Conrad          10:17:29

6    Metlitzky Kane on behalf of the witness, Yedam Park.

7            MR. MASUR:  And also to be clear, I believe we

8    also have someone else on the line -- two other people on

9    the line.

10            MR. METLITZKY:  Yeah.  Warren Metlitzky from          10:17:47

11    Conrad Metlitzky Kane, also for the witness.

12            MR. GUSICK:  And this is Spencer Gusick.  I am

13    the outside general counsel for Defendant and

14    Counterclaimant, and I am with Arlenbach Legal.

15            THE VIDEOGRAPHER:  Thanks so much.          10:18:01

16            Leslie, whenever you're ready.

17            THE REPORTER:  Thank you.

18            Ms. Park, if you would raise your right hand,

19    please.

20            Thank you.

21            You do solemnly state and affirm that you will

22    tell the truth, the whole truth and nothing but the

23    truth?

24            THE WITNESS:  Yes.

25            THE REPORTER:  Thank you.          10:18:16

                                                        Page 11

CONFIDENTIAL

```
 1            You may proceed, Counsel.

 2            MR. MASUR:  Thank you.

 3

 4                      EXAMINATION

 5   BY MR. MASUR:                                    10:18:22

 6       Q.  And thank you, Ms. Park.  We obviously really

 7   appreciate your -- your -- well, we appreciate you coming

 8   and testifying today, particularly giving up a weekend

 9   day.  It's never a pleasant thing to do, so we will try

10   to be as efficient as we can.                    10:18:35

11            I just wanted to start with some basic

12   introductory questions that I'm sure your counsel's

13   already gone over with you.

14            But if you could just state your full name and

15   your address for the record.                     10:18:47

16       A.  Yes.  It's -- my full name is Yedam Park.  My

17   address is 390 First Street, San Francisco, California

18   94105.

19       Q.  And, Ms. Park, have you ever had your deposition

20   taken before?                                    10:19:05

21       A.  Well, I don't know what deposition means, per

22   se.  But if it's the one with Jason Wilson, yes.  I've --

23   yeah, I don't really know.

24       Q.  Okay.  So that's probably a good opportunity to

25   clarify.  So when we say "deposition," we're talking      10:19:21
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          Where did you grow up?

2      A.  I grew up in Seoul, South Korea mostly.

3      Q.  Okay.  And when did you move to the US?

4      A.  I moved back and forth, but most recently for

5  college.                                              10:33:33

6      Q.  And when did you start college?

7      A.  2014.

8      Q.  And where did you go to college?

9      A.  University of Southern California.

10     Q.  And that was from 2014 until when?          10:33:44

11     A.  2018.

12     Q.  And what was your degree at -- can I call it

13  USC?

14     A.  Yes.

15     Q.  What degree -- strike that.                 10:33:56

16          Did you graduate from USC?

17     A.  Yes.

18     Q.  And what degree did you receive?

19     A.  Bachelor of Arts.

20     Q.  In what major?                              10:34:07

21     A.  Under school of cinematic arts, media arts.

22          (Reporter clarification.)

23          THE WITNESS:  School of cinematic arts.  The

24  major was media arts.

25     Q.  BY MR. MASUR:  And you graduated, then, in the   10:34:27

                                                        Page 25

1    spring of 2018?

2         A.  Yes.  May of 2018.

3         Q.  Okay.  And did you start working in a related

4    area to cinematic arts or media arts or -- and by

5    "related," I include design.  Did you start doing that          10:34:47

6    before you graduated from college?

7         A.  Before -- yes.  I interned at animation studios.

8         Q.  Which animation studios?

9         A.  DreamWorks Animation, Cartoon Network and Warner

10   Brothers Animation.                                             10:35:06

11        Q.  And when was the first of those, if you recall?

12        A.  DreamWorks Animation was January to August of

13   2016.

14        Q.  Okay.  And then you interned -- when was --

15   where was the next one that you interned at?                    10:35:19

16        A.  The next one was Warner Brothers Animation.

17        Q.  And that was from when to when?

18        A.  Summer of 2017, May to August.

19        Q.  And then the third?

20        A.  Cartoon Network was, I think, January to            10:35:35

21   May 2018.

22        Q.  Okay.  So, again, until about when you graduated

23   from college?

24        A.  Yes.

25        Q.  And then since college -- strike that.               10:35:48

                                                            Page 26

CONFIDENTIAL

1    you remember?

2         A.  It was graphic designer.

3         Q.  Okay.  And you were employed there from roughly

4    April '19 -- sorry.  Did you start working there in

5    roughly April 2019?                                    10:37:17

6         A.  Yes.  April or May, I don't quite recall

7    exactly, until August 2020.

8         Q.  Okay.  And to be clear, in August 2020, that was

9    when you -- what job did you take in 20 -- in

10   August 2020?                                           10:37:41

11        A.  Working with Guy at Video Inc.

12        Q.  And by "Guy," do you mean Guy Ravine?

13        A.  Yes.

14        Q.  Okay.  Thanks.

15            And then you no longer work with Mr. Ravine or   10:37:51

16   any of his companies; correct?

17        A.  Correct.

18        Q.  And when did you stop working with them?

19        A.  January 2024.

20        Q.  And what was -- sorry.  Strike that.            10:38:08

21            You're -- in January 2024, did you take a

22   different job?

23        A.  No.

24        Q.  So you took some time off?

25        A.  Yes.                                            10:38:20

                                                      Page 28

1       Q.  And what is your -- what was your next job

2   after -- after stopping your -- after stopping working

3   with Mr. Ravine and his company?

4       A.  I did woodworking and sold some woodworking

5   pieces, and then after that I started working as a          10:38:36

6   contractor at Meta.

7       Q.  And when did you start working as a contractor

8   at Meta?

9       A.  May 2024.

10      Q.  And is that still your role today?                   10:38:51

11      A.  Yes.

12      Q.  And as a contractor at Meta, broadly speaking,

13  what -- what are your job responsibilities -- or what are

14  your responsibilities?

15      A.  I'm a product designer in the augmented reality      10:39:04

16  space.

17      Q.  And has that been true since you started

18  contracting with Meta in May 2024?

19      A.  Yes.

20      Q.  And then -- and I'm sorry because I -- strike        10:39:20

21  that.

22          I tried to find, and wasn't successful at

23  finding, a LinkedIn profile for you to be able to speed

24  this process up.  Do you have currently a LinkedIn

25  profile?                                                     10:39:39

                                                        Page 29

1      Q.  Yeah.  Sorry.  It's the last page.  It's

2   PARK-0063.  It's actually page 9 of the document, and

3   specifically of Exhibit 107.

4      A.  Oh, yes.  Yes.

5      Q.  Okay.  And so this was -- was this your          10:52:06

6   employment agreement with Video Inc.?

7      A.  Yes.

8      Q.  And what was Video Inc. -- or is Video Inc.?

9      A.  Video Inc. is a -- what's an easy way to say

10  this -- video platform, a dashboard, that provides      10:52:26

11  services to companies.  Yeah, that's all I can share.

12      Q.  So you were talking about Video Inc. as

13  Video.io.  Is that what you mean there?

14      A.  Yes.

15      Q.  Okay.  But the company Video Inc., do you have   10:52:45

16  any knowledge of it other than that it's a company --

17  well, strike that.

18          Is it your understanding that Video Inc. is a

19  company that is owned or controlled by Mr. Ravine?

20      A.  Yes.                                              10:53:02

21      Q.  Okay.  Thanks.

22          And this was your employment agreement effective

23  August 30th, I believe it was, of 2020?

24      A.  Yes.

25      Q.  And so you started working for Mr. Ravine        10:53:18

                                                        Page 38

1      Q.  Yeah, is the bottom of the second page.

2      A.  Yes.  Yes.

3      Q.  And do you recognize this document?

4      A.  Yes.

5      Q.  What is this document?                         10:58:27

6      A.  It's a W-2 from Guy or Video Inc.

7      Q.  And this is a 2022 W-2?

8      A.  Yes.

9      Q.  So for --

10         MS. CHA:  I believe it's a -- sorry to          10:58:43

11     interrupt, Counsel.  It's 2020.

12         MR. MASUR:  I'm sorry.  You're right.  It is

13     2020.

14     Q.  It is a 2020 W-2.  So for the portion of 2020 --

15     for your compensation for the portion of 2020 during   10:58:56

16     which you were working with Mr. Ravine; is that correct?

17     A.  Yes.

18     Q.  Okay.  And then I'm going to introduce, this

19     time putting a stamp on it, an exhibit -- Exhibit 109.

20         (Exhibit 109, REVINE0025509 - 510, marked for    10:59:12

21         identification electronically by counsel.)

22         MR. MASUR:  And I'll represent that this bears

23     Production Numbers RAVINE0025507 and 25508 (sic), unless

24     my notes are wrong.

25     Q.  And do you see that, Ms. Park?                 10:59:48

Page 42

1     A.   Yes.

2     Q.   And do you recognize this exhibit?

3     A.   Yes.

4     Q.   And what is this exhibit?

5     A.   W-2 for 2021.                                    10:59:58

6     Q.   And this shows -- I just pulled up the wrong one

7   of the -- sorry.   Strike that.

8          And Exhibit 109, on the second page of it, shows

9   your W-2 compensation for 2021 as $2,500; is that

10  correct?                                                11:00:28

11    A.   Yes.   I don't recall.

12    Q.   You don't recall?   Sorry?

13    A.   Yes.   I do -- yes.

14    Q.   Okay.   And then I am going to introduce --

15  sorry.   I am laughing at my dog.                       11:00:56

16         I'm going to introduce now as Exhibit 110 a

17  document bearing Production Number RAVINE0025479.

18         (Exhibit 110, RAVINE0025479, marked for

19         identification electronically by counsel.)

20    Q.   BY MR. MASUR:   And do you see that document?    11:01:03

21    A.   Yes.

22    Q.   And do you recognize this document?

23    A.   Yes.

24    Q.   And what is this document?

25    A.   A 1099.                                          11:01:43

Page 43

```
1          Q.  So is it fair to say that at some point in 2021

2     you changed how you were being compensated for your work

3     with Mr. Ravine from being a W-2 to a 1099?

4          A.  Yes.

5          Q.  And do you recall why that change happened?        11:02:01

6          A.  No, I don't recall.

7          Q.  Do you recall whether you requested it or --

8          A.  I did not request that.

9               MR. MASUR:  Okay.  And then -- let's see.  Let

10    me -- hopefully we can speed this up by doing two in a      11:02:27

11    row.

12               (Exhibit 111, RAVINE0025485, marked for

13               identification electronically by counsel.)

14               MR. MASUR:  Apparently not.

15               Okay.  I'm introducing Exhibits 111 and very     11:02:55

16    shortly 112.

17               (Exhibit 112, RAVINE0025489, marked for

18               identification electronically by counsel.)

19          Q.  BY MR. MASUR:  And, Ms. Park, can you see

20    Exhibits 111 and 112 now in Exhibit Share?                  11:03:22

21          A.  Yes.

22               MR. MASUR:  And for the record, Exhibit 111

23    is -- it bears Production Number RAVINE0025485, and

24    Exhibit 112 bears Production Number RAVINE0025489.

25          Q.  And do you recognize these two documents?         11:03:46
```

Page 44

1        A.   Yes.

2        Q.   And these are for your compensation for

3   working -- the work that you did with Mr. Ravine during

4   2022 and 2023 respectively?

5        A.   2022 and 2000 --                                11:04:03

6        Q.   I'll represent that -- it's a little bit small,

7   but it says, "For calendar year 2023," at the top of

8   Exhibit 112.

9        A.   Yes.

10       Q.   Okay.  And did you receive any compensation in   11:04:19

11   2024 from Mr. Ravine?

12       A.   I must have for January.

13       Q.   Okay.  But obviously you don't have a 1099 yet,

14   because it's not yet 2025?

15       A.   Correct.                                         11:04:38

16       Q.   Okay.  This is probably -- we've been going --

17   we haven't quite been on the record for almost an hour,

18   but we've been sitting here for almost an hour.  Is this

19   a time that you'd want to take a break?

20       A.   Yes.                                             11:04:54

21          MR. MASUR:  Okay.  In that case, let's go off

22   the record.

23          THE VIDEOGRAPHER:  We're going off the record at

24   11:04 a.m.

25          (Recess.)                                          11:05:04

                                                        Page 45

1        Q.  Yeah.

2        A.  Yes.

3        Q.  Do you have any recollection of when the first

4    discussion you might have had with Mr. Ravine would have

5    been about -- sorry -- about artificial intelligence?    11:24:16

6        A.  I don't recall the first time, but in general he

7    was very into it, so probably in the beginning times.

8        Q.  So starting from shortly after or perhaps even

9    while you were interviewing and discussing whether to

10   join him?                                                 11:24:37

11       A.  I don't think during interview.

12       Q.  Okay.  But shortly after you started working

13   with him?

14       A.  I don't recall exactly what -- shortly or not,

15   yeah.                                                     11:24:48

16       Q.  Is it fair to say sometime before the end of

17   2020?

18       A.  I don't recall if it was during 2020 or anything

19   then, but I can see him bringing it up.

20       Q.  So it was -- it was a frequent topic of          11:25:04

21   conversation for him?

22       A.  Yes.

23       Q.  I believe you testified that it was something

24   that he was into.  What did you mean by that?

25       A.  I just meant he was passionate about artificial  11:25:23

                                                              Page 51

1    intelligence.

2         Q.   Would you say he was -- strike that.

3              Do you recall whether any of the work he was

4    doing related to artificial intelligence?

5         A.   Could you repeat the question?                11:25:40

6         Q.   Yeah.

7              Do you remember whether any of the work that

8    Mr. Ravine was working on was related to artificial

9    intelligence?

10        A.   Recently or which time?                       11:25:52

11        Q.   That's a good point.  So let's start with

12   recently.

13             Do you recall whether any of the work that he

14   was doing was related to artificial intelligence?

15        A.   Yes.                                          11:26:07

16        Q.   And I believe you testified you weren't sure

17   exactly when you first discussed artificial intelligence

18   with him.

19        A.   Correct.

20        Q.   But was it in the context of him doing work that   11:26:16

21   had something to do with artificial intelligence?

22        A.   I don't recall what the context was when he

23   first brought up artificial intelligence.

24        Q.   Let me ask it, perhaps, a better way.

25             Do you recall whether -- do you recall any    11:26:33

Page 52

CONFIDENTIAL

```
 1    frequently being involved with work that related to

 2    artificial intelligence technologies?

 3            MR. SCHER:  Object to form.

 4        Q.  BY MR. MASUR:  You can still answer even though

 5    there's an objection.                               11:28:20

 6        A.  Oh, I can answer?

 7        Q.  Yeah.  If you can answer, then you can.  Would

 8    you like to have the question read back?

 9        A.  Yes, please.

10            MR. MASUR:  Ms. Court Reporter, if you wouldn't  11:28:30

11    mind -- would you mind reading back that question?

12            THE REPORTER:  No problem.

13            MR. MASUR:  Thanks.

14            (The record was read by the reporter

15            as follows:

16            "QUESTION:  Over the course of that period, the

17            period that you were working with Mr. Ravine, do

18            you recall him as frequently being involved with

19            work that related to artificial intelligence

20            technologies?")                             11:28:56

21            THE WITNESS:  Yes.

22        Q.  BY MR. MASUR:  Okay.  Is it fair to say it was a

23    more or less constant focus of his work?

24            MR. SCHER:  Object to form.

25            THE WITNESS:  Do I respond?                 11:29:08
```

Page 54

1     Q.  BY MR. MASUR:  Yes.  You can -- anytime that

2     you -- that there's an objection but no instruction not

3     to answer, you can respond.

4          A.  Oh, sorry.  Could you repeat the question again?

5          Q.  Yeah.  And then this time I'll ask it hopefully     11:29:23

6     better.  I'm going to stop promising better, because I

7     don't seem to be meeting that promise.

8               Over the course of your work with Mr. Ravine, do

9     you remember work with artificial intelligence

10    technologies being a constant theme of his work?          11:29:40

11              MR. SCHER:  Object to form.

12              THE WITNESS:  Yes.

13         Q.  BY MR. MASUR:  Do you recall what you first

14    worked on with Mr. Ravine?

15         A.  First ever project?                               11:29:59

16         Q.  Yes.

17         A.  I think it was, like, a TikTok-like video

18    application.

19         Q.  Do you recall what that was called?

20         A.  No, I don't recall.                               11:30:15

21         Q.  Okay.  Actually, I may be going slightly out of

22    sequence here, because I don't know the date of -- of

23    this particular document, but maybe this is a good

24    opportunity to get it.

25              Let's see.  There we go.  I had to find it.       11:30:40

Page 55

```
 1              MR. MASUR:  Sorry.  I'm trying to skip ones that

 2    we don't need to look at.

 3              Okay.  And I'm going to mark as Exhibit 126 a

 4    document bearing Production Numbers PARK-00167 -- sorry,

 5    166 and 167.                                        12:12:35

 6         Q.  And if you can just let me know when you see

 7    that.

 8              (Exhibit 126, PARK-00166 - 67, marked for

 9              identification electronically by counsel.)

10         Q.  BY MR. MASUR:  And did that exhibit come up and   12:13:01

11    you're just reviewing it, Ms. Park?

12         A.  Yes.  Just reading.

13         Q.  Okay.  Just making sure.

14         A.  Sorry.  Was there a question?

15         Q.  Yeah, I just wanted -- first of all, I wanted to  12:13:15

16    make sure that you could actually see it, and then it

17    sounds like you were reviewing it to see whether you

18    recognized it?

19         A.  Yes, I recognize it.

20         Q.  Okay.  And does that refresh your recollection    12:13:26

21    about whether Mr. Ravine and you were working with

22    Nextdoor at the time?

23         A.  Yes.  Yes.

24         Q.  Okay.  And does it refresh your recollection at

25    all about what the goal was of that app?             12:13:43
```

Page 79

1      A.   Yes.   The goal was to have a partnership with

2  Nextdoor to improve their video quality and their

3  experience for uploading video content live streaming on

4  their app.

5          MR. MASUR:  And then I'm going to try to get to          12:14:10

6  a convenient stopping place, and then I figure we'll

7  probably all want to break for lunch in the near future.

8      Q.  Is -- is that a fair assumption?

9      A.  Yes.

10     Q.  Okay.  Great.                                           12:14:25

11         And I'm going to stamp and introduce as

12  Exhibit 127 a document bearing Production Numbers

13  PARK-00015 to 16.

14         (Exhibit 127, PARK-00015 - 16, marked for

15         identification electronically by counsel.)          12:15:30

16     Q.  BY MR. MASUR:  And are you able to see that

17  exhibit?

18     A.  Yes.

19     Q.  And do you recognize this exhibit?

20     A.  I do.                                                    12:15:36

21     Q.  And what is this exhibit?

22     A.  It's a Firebase App Distribution for an app

23  called Idol.

24     Q.  And do you recall what Idol was or is?

25     A.  I don't recall.                                          12:15:51

Page 80

1    top of the page of 8/18/22.

2            Do you see that?

3      A.  Oh, yes.

4      Q.  So obviously it predated August of '22?

5      A.  Yes.                                    13:19:47

6      Q.  Does -- does that help you at all recall

7    anything more about when you would have created the

8    "Rachel est, Testing," portion of that site?

9      A.  I think 2022 is a fair timeline.

10     Q.  Possibly.  So 20 -- at least in -- well, strike    13:20:07

11   that.

12             Sometime in 2022, before August 18th?

13     A.  Yes.

14     Q.  Possibly sometime in 2021?

15     A.  Yes.                                    13:20:19

16     Q.  Any possibility it was sometime in 2020?

17     A.  I can't say for sure.

18     Q.  Okay.  I think you mentioned a little bit ago

19   something that you called Boom?

20     A.  Yes.                                    13:20:56

21     Q.  What is Boom?

22     A.  Boom is an instantaneous video messaging app

23   that I was working on the majority of the time I worked

24   for Guy.

25     Q.  And when you say "the majority of the time," do    13:21:08

                                                    Page 97

1    you mean the majority of the amount of time that you

2    dedicated to it, or the majority of the, roughly,

3    three-and-a-half years that you worked there?

4        A.   The -- sorry.  What's the difference of the two?

5        Q.   Oh, I guess what -- so -- so you -- let me give        13:21:27

6    as a hypothetical, which I know will be -- I'm giving

7    Mr. Scher an opportunity to object as an improper

8    hypothetical.

9            You could have worked on this starting from the

10   day you got there till -- that you started working with    13:21:45

11   Mr. Ravine until the day you stopped, but you did not

12   spend more than 30 minutes a week on it or --

13           MR. SCHER:  Objection.

14       Q.   BY MR. MASUR:  -- you could have, you know, by

15   contrast -- because that would be over the entirety of      13:21:59

16   the period but not -- not necessarily -- so that would be

17   a majority of the time period that you were working -- in

18   fact, the entirety of the time period that you were

19   working with Mr. Ravine but not a majority of your time

20   that you spent there.                                        13:22:20

21           MR. SCHER:  Object to form.

22           MR. MASUR:  Yeah, it's not a question.  I'm

23   just -- so I'm just trying to, kind of, give a context

24   for it.

25       Q.   Put another way:  Do you have any recollection       13:22:30

                                                         Page 98

1  of roughly when you started working on Boom?

2      A.  I think that first idea came about early to

3  mid-2021.

4      Q.  Okay.

5      A.  And I don't recall if it was called Boom at the    13:22:48

6  time.  It might have been a version of Boom.  And then

7  until I stopped working for Guy, I worked on Boom.

8      Q.  Okay.  Do you recall any other names that Boom

9  had?

10      A.  I don't recall off the top of my head.    13:23:16

11      Q.  Would the name Woahhh!, with three "H"s, remind

12  you?

13      A.  No.  That was a different design.

14      Q.  Oh, okay.

15          What was Woahhh?  W-O-A-H-H-H, exclamation    13:23:29

16  point, I believe?

17      A.  Yes.  That was an image generation design idea.

18  Yeah, so, like, text-to-image.

19      Q.  Oh, so a -- an image generation -- strike that.

20          So do you mean an AI imaging generation tool?    13:23:54

21      A.  Yes.

22          MR. SCHER:  Object to form.

23      Q.  BY MR. MASUR:  Okay.  But that was separate from

24  Boom?

25      A.  Yes.    13:24:04

Page 99

```
1   that.

2         If I call this Ava, does -- does that make sense

3   to you?  Do you understand what I'm referring to?

4       A.  Yes.

5       Q.  What was your role in the development and          13:52:11

6   creation of Ava?

7       A.  My role was to design it using Figma, the

8   experience -- the UI/UX of it.

9       Q.  And was this the first artificial

10  intelligence-related -- strike that.                       13:52:34

11         Would you consider this to be an artificial

12  intelligence-related project?

13      A.  Yes.

14      Q.  And would you consider this to be the first

15  artificial intelligence-related project that you worked    13:52:44

16  on with Guy Ravine?

17      A.  I don't recall if there was something prior.

18      Q.  So you don't recall prior ones?

19      A.  I don't recall which came first.

20      Q.  Which came first, Ava or what?                     13:53:03

21      A.  The image generation.

22      Q.  Okay.  And your role -- sorry.  You already

23  testified what your role was.

24         Do you recall having any impressions of Ava when

25  you first saw it?                                          13:53:24
```

Page 116

```
 1              MR. SCHER:  Objection to form.

 2              THE WITNESS:  I designed it, so do you mean,

 3      like, the implementation of it?

 4         Q.  BY MR. MASUR:  I -- I should have been clearer.

 5              I wasn't talking about the visuals.  I was          13:53:38

 6      talking about the technology.

 7         A.  Oh, it was very cool.

 8         Q.  Very cool how?

 9         A.  At the time, there weren't a really great voice

10      assistant yet that I'd really experienced.  And          13:53:56

11      speech-to-text was really well done, and so I was very

12      impressed.

13         Q.  And when you say "speech-to-text was really well

14      done," you mean in Ava, not in the prior -- not in prior

15      or other -- strike that.          13:54:14

16              Let me make sure I'm quoting you accurately.

17              When you say that the speech-to-text was really

18      well down, you're comparing that to prior voice

19      assistants that you had experienced; correct?

20              MR. SCHER:  Objection to form.          13:54:40

21              THE WITNESS:  I haven't experienced a lot of

22      voice-to-speech, so my -- from my limited experiences, it

23      was impressive.

24         Q.  BY MR. MASUR:  And you started working on Ava by

25      mid-2023, you testified; correct?          13:55:04
```

                                                    Page 117

1          Do you know whether the corporation Open

2    Artificial Intelligence, Inc. had a previous name?

3        A.  No.  I don't know.

4        Q.  Okay.  That's all I've got.  Thanks.  And thank

5    you very much for your time.                          18:48:12

6        A.  Thank you for your time, too.

7          MS. CHA:  Before we go off the record,

8    Ms. Rosas, can we reserve the right to review the

9    transcript on the record?

10          THE REPORTER:  Thank you, Counsel.            18:48:27

11          MS. CHA:  Thank you.

12          THE VIDEOGRAPHER:  Okay.  So we are going off.

13    It's 6:48 p.m., and this concludes today's testimony

14    given by Yedam Park.  The total number of media units

15    used was ten and will be retained by Veritext.        18:48:41

16          (Time Noted:  6:48 p.m.)

17                    --oOo--

18

19

20

21

22

23

24

25

Page 251

CONFIDENTIAL

1        I declare under the penalty of perjury under the

2   laws of the State of California that the foregoing is

3   true and correct.

4        Executed on _____, 2024, at

5   _____, _____.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        JOB NO. 7055677

25

Page 252

CONFIDENTIAL

```
1   STATE OF CALIFORNIA     ) ss:

2   COUNTY OF MARIN         )

3

4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5   hereby certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9        That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16       I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20       IN WITNESS WHEREOF, I have subscribed my name

21  this 19th day of December, 2024.

22

23

24

25  LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 253

1    Natalie Cha

2    ncha@conmetkane.com

3                                    December 19, 2024

4    RE: Openai, Inc  v. Open Artificial Intelligence, Inc

5    12/7/2024, Yedam Rachel Park, (#7055677).

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   _X_ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20       Contact Veritext when the sealed original is required.

21   __ Waiving the CA Code of Civil Procedure per Stipulation of

22       Counsel - Original transcript to be released for signature

23       as determined at the deposition.

24   __ Signature Waived - Reading & Signature was waived at the

25       time of the deposition.

                                              Page 254

CONFIDENTIAL

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, notating the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1    Openai, Inc  v. Open Artificial Intelligence, Inc

2    Yedam Rachel Park (#7055677)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24      (Yedam Rachel Park)                    Date

25
```

Page 256