Jason H. Wilson (Bar No. 140269)
jwilson@willenken.com
Ashley L. Kirk (Bar No. 291012)
akirk@willenken.com
David S. Harris (Bar No. 255557)
dharris@willenken.com
Breeanna N. Brewer (Bar No. 312269)
bbrewer@willenken.com
Michelle K. Millard (Bar No. 298245)
mmillard@willenken.com
WILLENKEN LLP
707 Wilshire Blvd., Suite 4100
Los Angeles, California 90017
Telephone: (213) 955-9240

Joshua M. Masur (Bar No. 203510)
joshua.masur@hglaw.com
HALEY GUILIANO LLP
111 North Market Street, Suite 900
San Jose, California 95113
Telephone: (669) 213-1056

Attorneys for Defendants and Counterclaimants
OPEN ARTIFICIAL INTELLIGENCE, INC.
and GUY RAVINE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>Defendants.<br>_____<br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>Counterclaimants,<br><br>v.<br><br>OPENAI, INC., a Delaware corporation; SAMUEL ALTMAN, an individual; and GREGORY BROCKMAN, an individual,<br><br>Counterclaim-Defendants. | Case No.: 4:23-cv-03918-YGR<br><br>Assigned to the Hon. Yvonne Gonzalez Rogers<br><br>**DECLARATION OF LUKE TENERY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    June 17, 2025<br>Time:    2:00 p.m.<br>Ctrm:    1 – 4th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>DECLARATION OF LUKE TENERY.</u>**

I, Luke Tenery, declare as follows:

1.      I am currently a partner and the global practice leader for cybersecurity at StoneTurn Group, LLP ("StoneTurn"), a global professional services firm, where I regularly provide computer forensics support for legal matters and litigation.  I submit this declaration in support of Defendants Open Artificial Intelligence, Inc. and Guy Ravine's ("Defendants") Opposition to Plaintiff OpenAI, Inc.'s ("Plaintiff") Motion for Summary Judgment against Defendants (the "Motion"). I make this declaration based on my personal knowledge, education, training, and experience, as well as my review of relevant literature and case-specific materials. If called as a witness, I could and would testify competently to my opinions expressed below and the basis and reasons for them.

2.      Defendants' counsel retained me as a computer forensics expert. I was specifically asked to investigate Open Artificial Intelligence, Inc, (Open AI) and Guy Ravine's (Defendant) usage of the Open.ai webpage from April 2015 through March 1, 2024; investigate Defendants' usage of subdomains of Open.ai from April 2015 through March 1, 2024, including identifying the number of unique users for the webpages Open.ai, hub.Open.ai, beta.Open.ai, and decentralized.Open.ai, and for the products Evolved Collaboration Tool, Wikineering, the Initial Collaboration Tool, Decentralized, Hub, Ava, and Boom; and confirm the dates of usage for the software products Open Artificial Intelligence developed, including Evolved Collaboration Tool, Wikineering, and Initial Collaboration Tool.

3.      After my investigation, I concluded the following: (1) The Open.ai domain name was in continuous use from April 2015 to March 2024, and users from the United States visited this webpage and subdomains of this webpage during this period; (2) the Open AI mark was in use on various products associated with Defendants at least as early as October 2015; (3) there was a surge in visits to the domain Open.ai after the release of ChatGPT on November 30, 2022. A chart showing cumulative use from all sources is below:

1036887.2

| Date Ranges (Cumulative) | Open.AI Interactions | Open.AI Users | Open.AI US Users | Estimated Email Signups | Evolve Interactions | Evolve Users | Evolve US Users | Google Analytics |
|---|---|---|---|---|---|---|---|---|
| Before 12/11/2015 | 2,575 | 393 | 41 | 149 | - | - | - | - |
| 31-Dec-15 | 7,183 | 1,074 | 228 | 408 | - | - | - | - |
| 27-Apr-16 | 17,003 | 2,576 | 515 | 978 | - | - | - | - |
| 31-Dec-16 | 70,887 | 9,977 | 2,276 | 3788 | - | - | - | - |
| 31-Dec-17 | 120,002 | 16,406 | 3,940 | 6229 | 592 | 71 | 36 | - |
| 31-Dec-18 | 120,162 | 16,502 | 3,980 | - | 592 | 71 | 36 | - |
| 31-Dec-19 | 120,887 | 16,859 | 4,095 | - | 732 | 76 | 37 | - |
| 31-Dec-20 | 120,887 | 16,859 | 4,095 | - | 2,222 | 304 | 96 | - |
| 31-Dec-21 | 120,887 | 16,859 | 4,095 | - | 4,071 | 713 | 204 | - |
| 1-Jun-22 | 120,923 | 16,861 | 4,096 | - | 6,191 | 1,042 | 300 | - |
| 28-Sep-22 | 120,923 | 16,861 | 4,096 | - | 15,978 | 2,392 | 746 | - |
| 30-Nov-22 | 120,923 | 16,861 | 4,096 | - | 26,548 | 4,826 | 1,127 | 7,168 |
| 31-Dec-22 | 120,923 | 16,861 | 4,096 | - | 41,347 | 8,237 | 1,855 | 169,468 |
| 31-Dec-23 | 120,923 | 16,861 | 4,096 | - | 76,996 | 15,747 | 3,193 | 2,666,405 |
| End of data (Mar 23 2024) | 1,877,983 | 127,857 | 28,806 | - | 77,075 | 15,753 | 3,195 | 3,094,415 |

4.     Attached hereto as **Exhibit 1** is a true and correct copy of a report that I submitted in this action on January 30, 2025. My opinions expressed therein are provided within a reasonable degree of certainty within my field of computer forensics. The methodologies on which I have relied are commonly used by experts in my field and in litigation. My methodologies are also consistent with the scientific method and related reasoning as commonly used in the computer forensics profession. My opinions expressed are based upon my consideration of widely accepted theories and concepts and best practices in computer forensics and e-discovery and are further informed by information I reviewed in this matter, my expertise, and my experience.

5.     Plaintiff submitted an opening report from James Nielson, Ph.D., attached hereto as **Exhibit 4** (Nielson Opening Report).

6.     Attached hereto as **Exhibit 2** is a true and correct copy of a rebuttal report that I submitted in this action on February 20, 2025, rebutting the Nielson Opening Report.

7.     My rebuttal opinion further concluded that:

a.     Dr. Nielson either intentionally or unintentionally misinterprets evidence to support

1036887.2

his conclusions that Defendants' tools were inoperable and had no users. Dr. Nielson's conclusions contradict the forensic evidence, documentary evidence, and witness testimony, which all support my opinion that that Defendants' tools were operable and in use in the United States.

b.  Dr. Nielson misstates or misunderstands the methodology I used to arrive at my user counts. In fact, it is clear from his report that he did not review many of the forensic files produced in this case, or my scripts, to arrive at his conclusions regarding my methodology.

c.  Dr. Nielson inaccurately claims that the user counts are an overestimate of the users of Defendants' websites and projects and does not set forth any sort of appropriate methodology or analysis that support his conclusion that my user counts were an overestimate. My conclusions regarding use of the Defendants' domains are the result of sound analytical processes. Moreover, the data I collected and analyzed is known to be only a subset of Defendants' total historical data from its servers. For this reason, it is my opinion that the count of user interactions derived from my analysis for Defendants' 'open.ai,' 'wikineering.org,' 'beta.open.ai,' 'hub.open.ai,' and 'decentralized.open.ai' domains represent a lower bound of users of those websites.

d.  The archive data Dr. Nielson relies on to formulate his opinion contradicts the forensic evidence in this case. While third-party archives can be a useful tool in troubleshooting and fault analysis of websites, because of the incompleteness of archive records and the known problems with archive storage methods, any inferences about such websites using such archive data should be confirmed with forensic data taken from the website's host servers. As such, on the occasion forensic data from a website's host server conflicts with third-party archive data, the forensic data from the host server is a more reliable source of data and information about a website and its usage.

e.    Nothing in the Nielson Report changes or alters any of my opinions set forth in my Opening Report.

8.    I also submitted as Supplemental Report.  A true and correct copy of my Supplemental Report is attached as **Exhibit 3.**

9.    Plaintiff also submitted a rebuttal report to my opening report from James Nielson, Ph.D., which is attached as **Exhibit 5**  (Nielson Rebuttal Report).  I have reviewed that report, as well as the deposition testimony of Dr. Nielson, and the opinions expressed therein do not alter or affect my opinions from my opening or rebuttal reports.

10.    After the Deposition of Dr. Nielson, I reviewed his deposition transcript, excerpts of that transcript are attached hereto as **Exhibit 6** (Nielson Dep.).  Based upon this testimony, I reviewed the Declaration of Dr. Nielson submitted in support of the Plaintiff's Motion for Preliminary Injunction, attached hereto as **Exhibit 7** (Nielson Decl.) and the Declaration of Aaron Perahia submitted in support of Plaintiff's Motion for Preliminary Injunction, attached hereto as **Exhibit 8** (Perahia Decl.), respectively.

11.    In addition, I understand that Plaintiff raised the issue of the location associated with users in this case. This issue was not raised in any of the filings in this case I reviewed, nor was it raised in Dr. Nielson's various reports and Declaration.  In my initial report, I geolocated users based upon IP address to determine where those users were in the United States.  **Ex. 1** at ¶¶39, 42**.**  I reanalyzed some of my initial data in this case to further define the geolocation associated with Defendants' users.[1]  A true and correct copy of the scripts I ran to conduct this geolocation analysis is attached hereto as **Exhibit 9.**  A true and correct copy of the output of the script, and a map identifying the location associated with users is attached as **Exhibit 10.**

**Dr. Nielson's Opening Report was Technically Inaccurate and Unscientific**

12.    Dr. Nielson's analysis in his initial declaration and his opening report appear to rely on the work of Plaintiff's attorney, Aaron Perahia, rather than proper computer forensics methodology. *See,* e.g., Ex. 4 (Nielson Opening Rpt.) at ¶¶61, 62, 68, chart; Ex. 7 (Nielson

---

[1] StoneTurn used the IP2Location LITE database for IP geolocation (https://lite.ip2location.com).

1036887.2

Decl.) at ¶¶57, 58, 62, Chart; *compare* Ex. 8 (Perahia Decl.) at ¶¶12-14. Specifically, Dr. Nielson largely adopts Mr. Perahia's analysis of the Wayback machine data, without ever acknowledging whether forensic evidence from Defendants' servers confirm those conclusions, or whether they show that Defendants' websites were available to the public. *See,* e.g., Ex. 4 (Nielson Opening Rpt.) at ¶¶61, 62, chart; Ex. 7 (Nielson Decl.) at ¶¶57, 58, chart; *compare* Ex. 8 (Perahia Decl.) at ¶¶12-14. Moreover, Dr. Nielson never qualifies any of his conclusions based upon the well-known limitations of the Wayback machine for showing historical website usage, including the Wayback Machine's well-known failure to adequately store a website's subdomains, which is where Defendants claim their Open AI mark was used. Ex. 2 at ¶¶ 100-102.

13.     In parts of his Declaration, Dr. Nielson cites to the work of Mr. Perahia directly, namely, to conclude that Hub was copied and was unavailable. Ex. 7 (Nielson Decl.). at ¶62; *see also with citation omitted* Ex. 4 (Nielson Opening Rpt.) at ¶68. I found no notes or work product from Mr. Perahia in Dr. Nielson's reliance materials for me to adequately whether Dr. Nielson's reliance on Mr. Perahia's declaration was appropriate methodology to conclude that Hub was unavailable. Despite his clear reliance on an attorney declaration in reaching his conclusions, Dr. Nielson stated in his deposition that his analysis was done by him, he relied on no others in reaching his conclusions, and he chose all dates on the Wayback Machine for his analysis. Ex. 6 (Nielson Dep.), 51:7-52:5; 91:5-19.

14.     Finally, in his opening report, Dr. Nielson makes several statements regarding my estimate of users, without adequate support, and with a clear misunderstanding of the data that was produced and available for his review. For example, he states that my estimation of users is a 400% over-estimation, without citing any scripts or analysis he used to reach this conclusion. Ex. 2 at ¶¶ 11, 29, 30, 51. And, he implies that the data I analyzed was manipulated, which I found to be highly unlikely. Ex. 2 at ¶¶ 13-14.

**Dr. Nielson's Rebuttal Opinions Do Not Affect My Opinion**

15.     Dr. Nielson opines that my conclusions in my Opening Report, that Open AI Mark was in use on Defendants' products and that Defendants' various domain names has user

traffic, is flawed because 1) my data collection methodology was not in accordance with data collection standards appropriate for incident responses; 2) I did not properly filter data to remove infrequent users or bots; and 3) I manipulated data. However, it is apparent from Dr. Nielson's report that he does not understand data collection procedures in litigation matters, nor did he understand the types of data that were supplied to him in discovery. Moreover, in selecting his alternative method for filtering users, he never explains why infrequent users are inadequate for trademark purposes. For example, a customer that eats at a restaurant once is still a customer – Dr. Nielson's methodology would exclude them.

**I Collected Data from Defendants' Using the Electronic Discovery Reference Manual Protocol and Analyzed the Data Using Forensics Best Practices.**

16.    In his Rebuttal Report, Dr. Nielson opines that I should have used protocols such as NIST SP 800-86, titled "Guide to Integrating Forensic Techniques into Incident Response." Ex. 5 (Nielson Rebuttal Rpt.) at ¶7. However, this standard sets forth data collection techniques that are used to collect data from computers and networks that are hosting live content during a cybersecurity incident, where data could change over time, and data could be lost. This case, and collection, did not concern live data. All the files I collected were static as Defendants' website had been ordered by the Court to be disabled. Thus, NIST SP 800-86 is an inappropriate guideline to use in this case. Moreover, it is troublesome that Dr. Nielson misunderstood, or misrepresented, such a basic fact about Defendants' data in his Rebuttal Report.

17.    As set forth in my reports, Defendants engaged me to conduct a forensic analysis of web servers that were hosting the domain open.ai and the various subdomains, beta.open.ai, decentralized.open.ai and hub.open.ai. after an injunction from the Court required Defendants to remove their web content. Therefore, all services were no longer publicly accessible at the time I was engaged. Moreover, some of the data was from backed-up copies of servers no longer in use. *See* e.g., Ex. 1 at ¶20; Ex. 2 at ¶¶52, 56. Accordingly, we used the protocol set forth in the Electronic Discovery Reference Manual ("EDRM") for our data collection, which is appropriate for collecting archived records, and not NIST SP 800-86 a methodology more appropriate for

DECLARATION OF LUKE TENERY. ISO DEFENDANTS' OPP. TO PLAINTIFF'S MSJ

1  systems under cybersecurity investigation. *See* e.g., Ex. 1 at ¶18; Ex. 3 at ¶6.  Dr. Nielson stated

2  in his deposition that he had no reason to question the methodology of the EDRM.  Ex. 6

3  (Nielson Dep.) at 105:17-106:9.

4      18.    Dr. Nielson acknowledged he has never produced documents or logs with a bates

5  stamp, which was required by my team in this action so that Dr. Nielson could run his analysis.

6  Ex. 6 (Nielson Dep.) at 86:5-8.  In addition, he seemed unfamiliar with the types of documents

7  and formats that could be produced and readable to attorneys and experts in discovery matters.

8  Ex. 6 (Nielson Dep.) at 86:15-87:16. Dr. Nielson's lack of expertise and knowledge in this area

9  further highlights the deficiencies in his critique of my collection methodology.

10      19.    Moreover, my review of Dr. Nielson's deposition testimony raises doubts as to

11  whether he understood the nature of the data that was produced in this case.  For example, Dr.

12  Nielson believed that Defendant's web servers relevant in this action were still available online –

13  they are not. Ex. 6 (Nielson Dep.) at 109:19-25.   It is also apparent from Dr. Nielson's rebuttal

14  report and deposition that he did not understand the data that was produced and available to him

15  for analysis.  For example, Dr. Nielson claims in his rebuttal report users navigating to the

16  open.ai domain from Google should not be counted as users.  Specifically, he criticizes our code

17  string "count 'http://google.com?search=open.ai'", which identifies users navigating to the

18  open.ai domain from a Google search, as an interaction with Defendants' domain.  Ex. 5

19  (Nielson Rebuttal Rpt.) at ¶41.  However, this should count as an interaction.  In each instance, it

20  indicates that a user is navigating from a Google search to the open.ai domain, and Google

21  searching is a primary mechanism that people use to locate a company on the internet.  In my

22  experience, very few people locate a webpage through direct entry of a URL into a navigation

23  bar, including customers that repeatedly visit a site.

24      20.    Moreover, he appears to acknowledge that Defendants data could be incomplete,

25  but states that it could be from my collection, namely he states, "apparent gaps in the logs may

26  reflect incomplete collection rather than platform inactivity."  Ex. 5 (Nielson Rebuttal Rpt.) at

27  ¶3.  This is contrary to the Defendants' archived data, which clearly indicates that Defendants'

28

1036887.2

1    web servers rotated logs frequently, and that data was collected and produced from archived

2    copies of physical servers that were almost a decade old.  At no point in his reports does Dr.

3    Nielson acknowledge that the websites are a decade old, that logs were often routinely deleted,

4    or that old data is notoriously incomplete.  Instead, he uses the archived data to criticize my

5    methodology, often without a basis for doing do.

6        21.    Finally, in his deposition, when asked about the age of the data produced, Dr.

7    Nielson stated that he could not answer the question because he was still analyzing Defendants'

8    log data, which had been produced to him months before he delivered his report. Ex. 6 (Nielson

9    Dep.) at 110:7-23; 111:5-13. In fact, the only data that we produced after Dr. Nielson's Rebuttal

10   Report was an interim output file that is created by one of our scripts for analysis by another

11   script.  Dr. Nielson admitted in his deposition that his scripts produced similar interim files, and

12   he never produced those files to our team.  Ex. 6 (Nielson Dep.) at 151:2-18.

**My Forensic Analysis is Consistent with both Defendants' and Third-Party Testimony**

15       22.    Moreover, my review of Dr. Nielson's report raises doubts as to whether he

16   adequately reviewed third-party testimony in this case, despite his report indicating he reviewed

17   these materials.  Ex. 4 (Nielson Opening Rpt.) at Exhibit B.  My understanding is that the

18   forensic data in my report is supported by Defendants' testimony, third-party testimony, and the

19   testimony of Plaintiff's corporate representative, all of whom saw the Defendants' websites in

20   use. *See, e.g.,* Ex. 2 at ¶¶16, 18, 26, 27.  Dr. Nielson never explains or acknowledges the

21   inconsistencies in his Initial Report, or Rebuttal Reports, with this testimony.

**Geographical Filter of the Web Logs Show the Use of the Open AI Mark Through-Out**
**the United States**

24       23.    My understanding is that Plaintiff made the argument in their Summary

25   Judgement Motion that there was no evidence that Defendants' users identified in my report

26   were in any particular area of the United States.  In my Opening Report, I used a geolocation

27   filter to analyze Defendants' logs to determine the approximate location associated with IP

28   addresses visiting the Defendants' domain and subdomains.  Ex. 1 at ¶¶39, 42.

24.     I re-ran the log data collected from Defendants' servers for the period from 2015-2017 using this geolocation data to further define the location associated with Defendants' users. Ex. 8.   The results of this filter show that Defendants' users were dispersed through-out the United States. Ex. 9.   A map of Defendants' users is shown below:



I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on April 30, 2025, at Chicago, Illinois.

Luke Tenery

DECLARATION OF LUKE TENERY. ISO DEFENDANTS' OPP. TO PLAINTIFF'S MSJ

1036887.2