# EXHIBIT 12

**Brewer Declaration ISO Defendants' Opposition to Plaintiff's Motion for Summary Judgment**

HIGHLY CONFIDENTIAL

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                   OAKLAND DIVISION
4
5      _____
                                       )
6      OPENAI, INC., a Delaware        )
       corporation,                    )
7                                      )
            Plaintiff,                 )
8                                      )  Case No.
       vs.                             )  4:23-cv-03918-YGR
9                                      )
       OPEN ARTIFICIAL INTELLIGENCE,   )
10     INC., a Delaware corporation;   )
       and GUY RAVINE, an individual,  )
11                                     )
            Defendants.                )
12     _____)
                                       )
13     AND RELATED COUNTERCLAIMS.      )
       _____)
14
15                 HIGHLY CONFIDENTIAL
16       VIDEOTAPED DEPOSITION OF SAMUEL ALTMAN
17            San Francisco, California
18          Thursday, December 12, 2024
19                   Volume I
20
21     Reported by:
       CATHERINE A. NOLASCO, RMR, CRR, BS
22     CSR No. 8239
23     Job No. 7055684
24
25     PAGES 1 - 110

                                        Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
 5    _____
                                     )
 6    OPENAI, INC., a Delaware       )
      corporation,                   )
 7                                   )
            Plaintiff,               )
 8                                   )  Case No.
      vs.                            )  4:23-cv-03918-YGR
 9                                   )
      OPEN ARTIFICIAL INTELLIGENCE,  )
10    INC., a Delaware corporation;  )
      and GUY RAVINE, an individual, )
11                                   )
            Defendants.              )
12    _____)
                                     )
13    OPEN ARTIFICIAL INTELLIGENCE,  )
      INC., a Delaware corporation;  )
14    and GUY RAVINE, an individual, )
                                     )
15          Counterclaimants,        )
                                     )
16    vs.                            )
                                     )
17    OPENAI, INC., a Delaware       )
      corporation, SAMUEL ALTMAN, an )
18    individual; and GREGORY        )
      BROCKMAN, an individual,       )
19                                   )
            Counterclaim-Defendants. )
20    _____)
                                     )
21    AND RELATED COUNTERCLAIMS.     )
      _____)
22
23            Videotaped deposition of SAMUEL ALTMAN,
24    Volume I, taken on behalf of Defendants and
25    Counterclaimants, with the Witness appearing at
```

Page 2

HIGHLY CONFIDENTIAL

1    GIBSON DUNN & CRUTCHER, LLP, One Embarcadero Center,

2    Suite 2600, San Francisco, California, beginning at

3    9:03 a.m. and ending at 11:58 a.m., on Thursday,

4    December 12, 2024, before CATHERINE A. NOLASCO,

5    Certified Shorthand Reporter No. 8239.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1      APPEARANCES:
 2
 3      For OpenAI, Inc., Samuel Altman, and Gregory
        Brockman:
 4
             GIBSON DUNN & CRUTCHER, LLP
 5           BY:  ORIN SNYDER
                  LEFTERI J. CHRISTOS
 6           Attorneys at Law
             200 Park Avenue
 7           New York, New York  10166
             212.351.4000
 8           osnyder@gibsondunn.com
             lchristos@gibsondunn.com
 9
             BY:  ROSEMARIE T. RING
10           Attorney at Law
             One Embarcadero Center, Suite 2600
11           San Francisco, California  94111-3715
             415.393.8200
12           rring@gibsondunn.com
13
14      For OpenAI, Inc.:
15           QUINN EMANUEL URQUHART & SULLIVAN, LLP
             BY:  MARGRET M. CARUSO (appearing remotely)
16           Attorney at Law
             555 Twin Dolphin Drive, Fifth Floor
17           Redwood Shores, California  94065-2139
             650.801.5000
18           margretcaruso@quinnemanuel.com
19           BY:  AARON H. PERAHIA
             Attorneys at Law
20           865 South Figueroa Street, Tenth Floor
             Los Angeles, California  90017
21           213.443.3146
             213.443.3100 Fax
22           aaronperahia@quinnemanuel.com
23
24
25      //
```

Page  4

```
 1    APPEARANCES (Continued):
 2
 3    For Open Artificial Intelligence, Inc. and Guy
      Ravine:
 4
          WILLENKEN LLP
 5        BY:  JASON H. WILSON
          Attorney at Law
 6        707 Wilshire Boulevard, Suite 4100
          Los Angeles, California  90017
 7        213.955.9240
          213.955.9250 Fax
 8        jwilson@willenken.com
 9        HALEY GUILIANO
          BY:  JOSHUA M. MASUR
10        Attorney at Law
          111 North Market Street, Suite 900
11        San Jose, California  95113
          669.213.1050
12        669.500.7375 Fax
          joshua.masur@hglaw.com
13
          ARLENBACH LEGAL
14        BY:  SPENCER GUSICK
          Attorney at Law
15        315 Montgomery Street, Suite 1000
          San Francisco, California  94104
16        415.994.7996
          sg@arlenbach.com
17
18
19    ALSO PRESENT:
20    RENNY HWANG, Deputy General Counsel, OpenAI, Inc.
21    KEIGO PAINTER, Videographer, Veritext
22
23
24
25
```

                                             Page 5

HIGHLY CONFIDENTIAL

```
 1                          INDEX

 2     WITNESS                              EXAMINATION

 3     SAMUEL ALTMAN

       Volume I

 4                      BY MR. WILSON              13

 5

 6

 7                        EXHIBITS

 8     NUMBER              DESCRIPTION            PAGES

 9     Exhibit 179 Email series dated 10/8/2015,      20

10               "Subject:  Re: ycr branding"; Bates

11               OPENAI-RAV-00014280

12

13     Exhibit 180 Email series, "Subject:  Re: follow up   21

14               from call"; Bates OPENAI-RAV-00014210

15               - OPENAI-RAV-00014213

16

17     Exhibit 181 Email dated 11/24/2015, "Subject:    26

18               chat w/ ilya re: cogito"; Bates

19               OPENAI-RAV-00014237 -

20               OPENAI-RAV-00014238

21

22     Exhibit 182 Email series entitled "updates"; Bates   28

23               OPENAI_RAV-00003612 -

24               OPENAI-RAV-00003705

25     //
```

Page 6

HIGHLY CONFIDENTIAL

```
 1              EXHIBITS (Continued)

 2    NUMBER              DESCRIPTION              PAGES

 3    Exhibit 183 Email series, "Subject:  Re: updates";   41

 4                Bates OPENAI-RAV-00014205 -

 5                OPENAI-RAV-00014209

 6

 7    Exhibit 184 Email series, "Subject:  RE: updates";   43

 8                Bates OPENAI-RAV-00014201 -

 9                OPENAI-RAV-00014204

10

11    Exhibit 185 Email series, "Subject:  Fwd: @ycai";   49

12                Bates OPENAI-RAV-00014220 -

13                OPENAI-RAV-00014225

14

15    Exhibit 186 Email series, "Subject:  Re: Is this   51

16                group related to YC?"; Bates

17                OPENAI-RAV-00014254 -

18                OPENAI-RAV-00014255

19

20    Exhibit 187 Email series, "Subject:  Fwd:   53

21                question"; Bates OPENAI-RAV-00014285 -

22                OPENAI-RAV-00014286

23

24

25    //
```

Page 7

```
 1                    EXHIBITS (Continued)

 2     NUMBER                 DESCRIPTION                PAGES

 3     Exhibit 188 Email series, "Subject:  Re:           55

 4                 question"; Bates OPENAI-RAV-00014281 -

 5                 OPENAI-RAV-00014283

 6

 7     Exhibit 189 Email series, "Subject:  Re: updates";  58

 8                 Bates OPENAI-RAV-00014234 -

 9                 OPENAI-RAV-00014236

10

11     Exhibit 190 Email dated 12/11/2015, "Subject:       59

12                 Open.AI collective engineering AI

13                 initiative + OpenAI?"; Bates

14                 RAVINE0000006

15

16     Exhibit 191 Email series, "Subject:  Re: Open.AI    65

17                 collective engineering AI initiative +

18                 OpenAI?"; Bates OPENAI_RAV-00001422 -

19                 OPENAI_RAV-00001423

20

21     Exhibit 192 Email dated 12/17/2015, "Subject:       69

22                 Open.AI Followup"; Bates

23                 OPENAI-RAV-00014200

24

25     //

                                                     Page  8
```

```
 1                     EXHIBITS (Continued)

 2    NUMBER                DESCRIPTION                  PAGES

 3    Exhibit 193 Email series, "Subject:  Re: Open.AI     71

 4                Follow up"; Bates OPENAI-RAV-00014287

 5

 6    Exhibit 194 Email series dated 12/17/2015,           78

 7                "Subject:  Re: Open.AI Followup";

 8                Bates OPENAI-RAV-00014199

 9

10    Exhibit 195 Email series, "Subject:  Re:"; Bates     83

11                OPENAI_RAV-00001429 -

12                OPENAI_RAV-00001430

13

14    Exhibit 196 Email series, "Subject:  Re: Jeff        97

15                Arnold requests you to e-sign the

16                Trademark/Service Mark Application,

17                Principal Register"; Bates

18                OPENAI_RAV-00017867 -

19                OPENAI_RAV-00017868

20

21    Exhibit 197 Email series dated Mar 1, 2017,         101

22                entitled "Re: G Ravine"; Bates

23                OPENAI_RAV-00017869

24

25    //
```

Page 9

```
1            INSTRUCTIONS NOT TO ANSWER

2                                                   PAGES

3            "Q.  At this juncture, in December        34
             2015, how involved was Mr. Musk?  Did
4            he --you just talk to him once in a
             while?"

5

             "Q.  Do you recall if -- after the       46
6            name was selected, whether a lot of
             effort -- expense was made to
7            publicize the name in December of
             2015?"

8

             "Q.  Do you recall how much money was     47
9            spent to promote the name 'OpenAI' in
             December 2015?"

10

             "Q.  Do you have a methodology to         81
11           value domain names?"

12           "Q.  Was a discussion with in-house       82
             counsel the only reason why you
13           reached out to Mr. Ravine?"

14           "Q.  And just so the record's clear,      98
             at the initial naming of the company
15           in December 2015, about what
             percentage of your time were you
16           spending on the entity that became
             known as OpenAI?"

17

18                      ---o0o---

19

20

21

22

23

24

25

                                            Page 10
```

HIGHLY CONFIDENTIAL

```
 1    San Francisco, California; Thursday, December 12, 2024

 2                    9:03 a.m.

 3

 4            THE VIDEOGRAPHER:  Good morning.  We're

 5    going on the record at 9:03 a.m. on December 12th,     09:02:26

 6    2024.

 7            Please note that the microphones are

 8    sensitive and may pick up whispering and private

 9    conversations.

10            Please mute your phone at this time.          09:02:37

11            Audio and video recording will continue to

12    take place, unless all parties agree to go off the

13    record.

14            This is Media Unit 1 of the video-recorded

15    deposition of Samuel Altman, taken by the counsel     09:02:47

16    for the Defendants in the matter of OpenAI, Inc.,

17    versus Open Artificial Intelligence, Inc., et al.,

18    filed in the United States District Court, Northern

19    District of California, Oakland Division, Case No.

20    4:23-cv-03918-YGR.                                    09:03:02

21            The location of the deposition is One

22    Embarcadero Center, Suite 2600, San Francisco,

23    California 94111.

24            My name is Keigo Painter, representing

25    Veritext.  I'm the videographer.                      09:03:18
```

Page 11

| | | |
|---|---|---|
| 1 | The court reporter is Catherine Nolasco, | 09:03:20 |
| 2 | from the firm Veritext. | |
| 3 | I am not related to any party in this | |
| 4 | action, nor financially interested in the outcome. | |
| 5 | If you have any objection to the | 09:03:27 |
| 6 | proceeding, please state them at the time of your | |
| 7 | appearance. | |
| 8 | Counsel and all present, including | |
| 9 | remotely, will now state their appearances and | |
| 10 | affiliations for the record, beginning with the | 09:03:33 |
| 11 | noticing attorney. | |
| 12 | MR. WILSON:  Jason Wilson, of Willenken | |
| 13 | LLP, on behalf of the Defendants and | |
| 14 | Counterclaimants. | |
| 15 | MR. MASUR:  Joshua Masur, Haley Guiliano | 09:03:46 |
| 16 | LLP, also on behalf of the Defendants and | |
| 17 | Counterclaimants. | |
| 18 | MR. GUSICK:  Spencer Gusick, of Arlenbach | |
| 19 | Legal, outside general counsel for Defendant and | |
| 20 | Counterclaimant. | 09:03:59 |
| 21 | MR. SNYDER:  Okay.  Orin Snyder, Rose | |
| 22 | Ring, Lefteri Christos, from Gibson, Dunn.  We have | |
| 23 | Aaron Perahia, P-e-r-a-h-i-a, and Margret Caruso | |
| 24 | from Quinn Emanuel, and then Renny Hwang, the deputy | |
| 25 | general counsel of OpenAI, for all Defendants [sic]. | 09:04:20 |

Page 12

1           THE VIDEOGRAPHER:  Okay.  Will the court        09:04:25

2    reporter please swear the witness.

3           MS. CARUSO:  Just one moment, please.

4    Sorry.

5           To clarify, Margret Caruso is appearing        09:04:29

6    remotely, and we are appearing on behalf of

7    Plaintiff, OpenAI, Inc., for Quinn Emanuel.

8           MR. SNYDER:  Plaintiff, of course.  We are

9    the Plaintiff.

10          THE VIDEOGRAPHER:  Okay.  Will the court        09:04:42

11   reporter please swear in the witness, and then

12   counsel may proceed.

13                   SAMUEL ALTMAN,

14   having been administered an oath, was examined and

15   testified as follows:                                 09:04:55

16                    EXAMINATION

17   BY MR. WILSON:

18       Q   Mr. Altman, have you had your deposition

19   taken before?

20       A   No.  This is my first time.                   09:04:59

21       Q   I love the surprise.

22       A   It's a great honor.

23       Q   So I'll -- I'll -- I'll tell you a little

24   bit about deposition.

25          You understand that you're being sworn          09:05:08

Page 13

HIGHLY CONFIDENTIAL

```
 1              You may answer.                          09:33:43

 2              THE WITNESS:  It is a factor in the name

 3    that would have -- we would have relied on very

 4    competent experts to help us make the right

 5    decision.                                          09:34:01

 6              MR. WILSON:  All right.  Thank you.

 7         Q    Okay.  The next email that we're going to

 8    look at is Thursday, December 3rd, at -- 2015, at

 9    11:18 a.m., and it's from Mr. Musk to Mr. Brockman,

10    and you're CC'd.                                   09:34:24

11              Do you see that email?

12         A    Yes.

13         Q    And then do you see, at the bottom of

14    Mr. Musk's email, he says:  "We could call this

15    Open AI Institute."                                09:34:36

16              Do you see that?

17         A    Yes.

18         Q    Do you recall if that's the first time you

19    heard the name "OpenAI"?

20         A    I don't recall.                          09:34:48

21         Q    Do you recall if anyone else, other than

22    Mr. Musk, mentioned the name "OpenAI" to you?

23         A    I don't recall.

24         Q    Is it possible that someone else, other

25    than Mr. Musk, could have mentioned the name       09:35:01
```

Page 32

1    "OpenAI" before?                                    09:35:03

2        A    I believe --

3            MR. SNYDER:  Object- -- objection.  Calls

4    for speculation:  "Is it possible."

5    BY MR. WILSON:                                      09:35:10

6        Q    Do you have any recollection that someone

7    else, other than Mr. Musk --

8        A    I have no recollection of the name before

9    this email.

10       Q    Okay.  After receiving this email from      09:35:19

11   Mr. Musk, did you -- did you ever have a

12   conversation with him as to how he came up with the

13   name?

14       A    I don't believe so.

15       Q    Do you recall if Mr. Brockman ever          09:35:36

16   informed you -- let me rephrase that question.  I

17   apologize.  It's awkward.

18           Did you ever learn from any source as to

19   how Mr. Musk came up with that name?

20       A    I don't believe so.                         09:35:54

21       Q    Okay.  How active was Mr. Musk in the

22   naming of the venture?

23           MR. SNYDER:  Objection.  Form.

24           You may answer.

25           THE WITNESS:  Involved, but I'm not sure     09:36:27

Page 33

```
 1    launched, but I'm not testifying here.                10:31:17

 2         A    It's the night of?

 3              MS. RING:  The night.

 4              THE WITNESS:  Okay.  All right.

 5    BY MR. WILSON:                                        10:31:24

 6         Q    Are you familiar with the terms that

 7    Mr. Ravine is using in this email?

 8              MR. SNYDER:  Objection to form as to which

 9    terms there.

10              MR. WILSON:  Well, let me -- let me go      10:31:35

11    through it a little bit --

12              MR. SNYDER:  There's dozens of them.

13              MR. WILSON:  Let me go through it a little

14    bit more particularized.

15              That was a good objection by your counsel.  10:31:43

16         Q    In the first paragraph, Mr. Ravine writes

17    to you that he wanted to work collectively to

18    engineer deep learning algorithms.

19              Do you see that?

20         A    Yes.                                        10:32:04

21         Q    Do you have an understanding about what

22    the term "deep learning algorithms" means?

23              MR. SNYDER:  Are you asking him, just for

24    clarification, does he have an understanding today?

25              MR. WILSON:  I'll -- I'll -- that's a good  10:32:15
```

Page 60

```
 1    clarification.                                        10:32:17

 2         Q    Did you have an understanding at that

 3    time, when you read the email, what "deep learning

 4    algorithms" meant?

 5         A    I know what it means to me.  I think other  10:32:24

 6    people use these things -- these terms somewhat

 7    differently.  I think, like -- you know,

 8    "collectively engineer deep learning algorithms,"

 9    I'm not sure what someone means by that, but, yeah,

10    like, I think I know what "deep learning algorithms"  10:32:37

11    are, to me.

12         Q    And for -- so we have a clear record, what

13    does "deep learning algorithms" mean to you?

14         A    The algorithms that we develop to do deep

15    learning, yeah.                                       10:32:52

16         Q    And is that a common concept in artificial

17    intelligence?

18         A    Today, yes.  At the time, I think it was

19    much more open-ended.

20         Q    What do you mean by the term "open-ended"?  10:33:10

21              MR. SNYDER:  Excuse me.  I'm going to

22    now -- it's an interesting discussion, but it is

23    beyond the scope of anything remotely --

24              MR. WILSON:  Well --

25              MR. SNYDER:  -- connected -- excuse me --   10:33:20
```

Page 61

```
 1      A    Yes.                                         10:38:40

 2      Q    Do you know who that is?

 3      A    I do.

 4      Q    Who is it?

 5      A    He is a -- he works at Alphabet or Google.   10:38:43

 6      Q    And then it -- it refers to Richard

 7   Schooler [phonetic]?

 8      A    That guy is -- he runs an AI startup.  I

 9   think it's called U.AI or U.com.

10      Q    At the time or now?                          10:38:57

11      A    Now.  I don't know what he did at the

12   time.

13      Q    Okay.  And Mr. Brockman apparently agrees

14   to an in-person conversation with Mr. Ravine.

15           Do you know if that conversation happened?   10:39:15

16      A    I believe it did.

17      Q    Do you have any recollection -- did

18   Mr. Brockman, afterwards, tell you anything about

19   that conversation?

20      A    I don't recall.  I -- I think he -- I        10:39:23

21   think he -- I think he said, like, it wasn't that --

22   that was not an obvious thing to collaborate on or

23   something like that.

24      Q    Did he convey to you any impressions about

25   Mr. Ravine?                                          10:39:38
```

Page 66

HIGHLY CONFIDENTIAL

```
 1    meeting with you.                                    10:44:01

 2           Did you ever have a follow-up meeting with

 3    Mr. Ravine?

 4       A    I don't believe we did.

 5       Q    You see, at the bottom, he has his email     10:44:13

 6    address at guy@open.ai?

 7           Do you see that?

 8       A    I do.

 9       Q    Do you recall if anyone was asked to

10    search to see if he owned that domain name?           10:44:24

11       A    I don't recall.

12       Q    He makes a reference to "AI algorithms."

13           Do -- does that term have meaning to you,

14    at the time you read this email?

15       A    I know what an AI algorithm is, but I        10:44:47

16    don't -- it would not have jumped out at me as an

17    important part of this email.

18       Q    And what does "AI algorithm" mean to you?

19       A    Like, a technique for instructing a

20    computer to -- like, a -- a -- it can mean a lot of  10:45:08

21    things, but I -- I guess the simplest definition

22    would be a program that learns the distribution of

23    data to produce an AI system.

24       Q    All right.  Thank you.

25           Are AI algorithms relevant to artificial      10:45:34
```

Page 70

```
 1    intelligence?                                          10:45:37

 2              MR. SNYDER:  Objection to form.

 3              You may answer, if you can.

 4              THE WITNESS:  Yes.

 5    BY MR. WILSON:                                         10:45:45

 6        Q    In what way?

 7              MS. RING:  This is definitely beyond the

 8    scope.  We're not even talking about the

 9    communication anymore.

10              MR. WILSON:  No.  There's a term mentioned   10:45:53

11    in the communication.

12              MS. RING:  But you're not asking what

13    he -- if he understood this term in the

14    communication.  You're just asking something very

15    general.                                               10:46:01

16              MR. WILSON:  All right.  I'll move on.

17              The next exhibit is Exhibit 193, and it's

18    OPENAI-RAVINE -- no -- excuse me -- OPENAI-RAV- at

19    00014287.  And it's an email from Greg Brockman to

20    Sam Altman.                                            10:46:37

21              (Exhibit 193 was marked for

22              identification by the court reporter.)

23              THE WITNESS:  Okay.

24    BY MR. WILSON:

25        Q    Okay.  So do you see on -- in an email        10:47:15
```

Page 71

```
 1    sentence of the email?                              11:04:17

 2        A    Sure.

 3            (As read):  "OpenAI is working on building

 4    out our domain portfolio - would you be open to us

 5    acquiring the openai." -- "open.ai domain name and    11:04:25

 6    related IP rights from you?"

 7        Q    Do you have an understanding of what the

 8    term "related IP rights" means?

 9        A    I believe, in this case, it may -- it

10    meant his pending and unused trademark registration.  11:04:38

11            We're not -- try to be nice to people.

12    Like, you know, we're not -- we're trying to be

13    respectful.

14        Q    All right.  And then, on -- Mr. Ravine

15    responded, I guess, later on the 19th.               11:05:07

16            Do you recall receiving that response?

17        A    I do.

18        Q    Did you read his response?

19        A    I did.

20        Q    And what did -- did you draw any           11:05:34

21    impressions from Mr. Ravine's response?

22        A    My recollection is that him anchoring on

23    $11 million for the domain was, like, a very deep

24    misunderstanding of what a dot-ai name would be,

25    relative to a dot-com, and there was no trademark.   11:05:50
```

                                                    Page 85

```
 1            So, you know, that was -- my response was      11:05:54

 2    like, "Oh, this" -- my mental response was like,

 3    "This is fairly ridiculous."

 4        Q    Did you ever tell him that?

 5        A    No.                                          11:06:05

 6        Q    Why not?

 7        A    Well, I responded, trying to move in a

 8    more productive direction and see if there was a

 9    collaboration.  And then he didn't respond for a

10    while.  Responded.  Said, "I'll get back in touch."    11:06:16

11            Given that he was doing something very

12    important, with working to get his Russian team and

13    their families out into safety, it felt certainly

14    inappropriate to me to push on that and follow up,

15    so I didn't.                                          11:06:30

16        Q    Do you recall if, after this email, you

17    told him in any way that he misvalued his mark --

18    his domain -- his domain name and his purported

19    trademark rights?

20        A    We agree there's no mark, right?  There's    11:06:46

21    a registration of a domain name.

22        Q    I didn't say that.  Let me rephrase my

23    question, please.

24            Did you ever tell Mr. Ravine that you

25    viewed his response as ridiculous at any point in     11:07:08
```

Page 86

HIGHLY CONFIDENTIAL

```
 1    time?                                           11:07:11
 2         A    I don't believe I did.  He did -- he
 3    stopped following up.  I would have gotten to a
 4    price negotiation, maybe, at some point.
 5         Q    Did you --                            11:07:21
 6         A    That's hard to start when -- you know, if
 7    I think it's, like, a hundred thousand dollars and
 8    he says 11 million, that's probably like a, you know
 9    what, we don't really need this name -- domain name
10    that much.                                      11:07:31
11         Q    Did you ever send him a cease and desist
12    letter?
13         A    I'm not aware.
14              Did we?
15              MR. SNYDER:  Just answer.              11:07:43
16              THE WITNESS:  I don't recall.
17    BY MR. WILSON:
18         Q    Do you know if you provided him any
19    warning that you were going to sue him over the
20    name?                                           11:07:58
21         A    I would need to ask counsel.  I don't
22    recall from memory.
23         Q    Do you know if anyone else at Plaintiff
24    had negotiations with Mr. Ravine over the domain
25    name?                                           11:08:20
```

Page 87

1      A    Not that I'm aware of.                          11:08:21

2      Q    Did you have -- did you develop any

3  impression of Mr. Ravine from his response of

4  February 19th, 2022?

5      A    Other than that I thought trying to anchor      11:08:54

6  at 11 million for a dot-ai domain name was quite

7  silly, not -- nothing else that I remember.

8           Sir, with -- with respect, I get -- I run

9  a very complicated company.  I don't sit and form

10  mental models of everybody that sends me an email.      11:09:13

11      Q    And I understand that, Mr. Altman, but

12  this is a particular situation where you did reach

13  out --

14      A    Yeah --

15      Q    -- and initiate the conversation.             11:09:23

16      A    -- among many, many, many others.

17      Q    That's fair to say, isn't it?

18      A    Yeah.

19      Q    Did you ever -- he apparently made the

20  assertion that the ultimate value of the domain and    11:09:34

21  the brand are substantial.

22           Do you see that?  It's in the first

23  para- -- paragraph of his response.

24      A    Does he mean that about Tesla or OpenAI?

25      Q    I -- I think he's inferring that that's       11:09:51

Page 88

```
 1    other than your understanding from counsel, you          11:31:31

 2    have -- you had no belief as to what Mr. Ravine's IP

 3    rights were at the time?

 4           MR. SNYDER:  Objection.  Lacks foundation.

 5    To the extent you're mis- -- you're characterizing       11:31:46

 6    his testimony misstates his testimony, but you may

 7    answer.

 8           THE WITNESS:  I have no recollection

 9    outside of counsel preparing this email for me.

10    BY MR. WILSON:                                           11:32:07

11       Q   Did you personally do any investigation of

12    how Mr. Ravine used "OpenAI" before -- at any point

13    in time before this letter went to Mr. Ravine?

14       A   Nothing that I recall, other than what

15    we've talked about so far.                               11:32:35

16       Q   Other than -- and I want to exclude from

17    your answer any information that you've learned from

18    counsel.

19           Do you recall, at any point in time before

20    you sent this email in 2022, getting any information    11:32:53

21    from any source about Mr. Ravine's use of "OpenAI"?

22       A   Not that I recall, other than what we've

23    talked about so far.

24       Q   Okay.  And I think -- and if I -- and if I

25    misstate what you said, I apologize, but I think, at     11:33:19
```

Page 93

HIGHLY CONFIDENTIAL

```
 1    of.                                              11:34:57

 2              But you want to be respectful of them, so

 3    I'm sure that's not what he was hoping for.

 4        Q    Your -- I think you said repeatedly

 5    throughout this deposition that you're a high-level   11:35:15

 6    executive, right?

 7        A    Yes.

 8        Q    And it's not your job to investigate every

 9    detail, right?

10        A    Correct.                                 11:35:23

11        Q    Is it possible that your information that

12    Mr. Ravine has no use is wrong?

13              MR. SNYDER:  Objection.  Calls for

14    speculation.

15              You may answer.                         11:35:34

16              THE WITNESS:  There could, of course, be

17    things that I am not aware of that -- and you're

18    welcome to tell me what they are, and I can comment

19    on them.

20    BY MR. WILSON:                                    11:35:44

21        Q    But it's not your job to get into the

22    details of Mr. Ravine's use; isn't that right?

23        A    That seems reasonable.

24        Q    And you have to rely upon whatever

25    information that's given to you, as an executive --  11:36:00
```

Page 95

| | | |
|---|---|---|
| 1 | A    Correct. | 11:36:04 |
| 2 | Q    -- right? | |
| 3 | And has there ever been a time that the | |
| 4 | information that has been given to you, as an | |
| 5 | executive, has been incorrect? | 11:36:10 |
| 6 | A    Of course there have been times for that. | |
| 7 | Q    And with respect to whether or not | |
| 8 | Mr. Ravine has a -- trademark rights, you wouldn't | |
| 9 | be shocked if I told you that my client respectfully | |
| 10 | disagrees and does believe that he has enforceable | 11:36:40 |
| 11 | trademark rights? | |
| 12 | A    For what use? | |
| 13 | Q    What? | |
| 14 | A    For what use? | |
| 15 | Q    I'm -- I'm not here -- I'm not here to | 11:36:46 |
| 16 | answer your questions. | |
| 17 | A    I need a -- I need a complete question, | |
| 18 | like ... | |
| 19 | Q    Your understanding of what trademark | |
| 20 | rights Mr. Ravine has, again, given your position as | 11:37:04 |
| 21 | an executive, is dependent upon the advice you | |
| 22 | receive; isn't that right? | |
| 23 | MR. SNYDER:  Objection.  Objection.  Lacks | |
| 24 | foundation.  Misstates the facts. | |
| 25 | And you may answer. | 11:37:14 |

Page 96

HIGHLY CONFIDENTIAL

```
 1          MR. WILSON:  How it's within the scope.    11:40:39

 2   I'm just trying to judge how much -- it's an

 3   indication to me -- or one can draw an inference as

 4   to how much time he was involved in OpenAI, and that

 5   may be indicative of how involved he was in the      11:40:51

 6   naming.

 7          MR. SNYDER:  He's already answered direct

 8   questions about his involvement, and so I'm going to

 9   object and say it's outside the scope because his

10   time commitment to the venture at large is           11:41:01

11   irrelevant and -- and beyond the scope.

12          So thank you for the assist.

13   BY MR. WILSON:

14      Q    So you're following your counsel's --

15          MR. SNYDER:  Yeah.                            11:41:16

16   BY MR. WILSON:

17      Q    -- instruction not to answer?

18      A    I am.

19      Q    Have you ever had any regrets of choosing

20   the name "OpenAI"?                                   11:41:26

21          MR. SNYDER:  Objection to form.

22          Just give me a moment.

23          MS. RING:  That's outside of the scope.

24          MR. SNYDER:  Yeah.

25          MR. WILSON:  No.  I think any internal        11:41:37
```

Page 99

```
 1    discussions of deliberations regarding whether to          11:41:38

 2    use, abandon, or change the "OpenAI" --

 3              MR. SNYDER:  I'm going to let him answer

 4    it.

 5              MS. RING:  Ask that question.                     11:41:48

 6              MR. SNYDER:  Let him answer it.

 7              MS. RING:  Yeah.

 8              MR. SNYDER:  Do you have any regrets?

 9              THE WITNESS:  I have, but never -- never

10    with anything to do with your client or this matter        11:41:52

11    in any way.  It's four syllables.  If I knew we were

12    going to become a consumer brand, I would have

13    picked a shorter name to say, but not for any

14    reasons related to anything we're discussing here.

15    BY MR. WILSON:                                             11:42:07

16        Q    So when you went on a podcast with Lex

17    Feldman --

18              MR. SNYDER:  Fridman.

19    BY MR. WILSON:

20        Q    -- Fridman, and if an oracle could back --        11:42:23

21    go back in time, you were relating to the fact that

22    OpenAI is not consumer --

23        A    It's not a great consumer brand, but we

24    didn't think we were going to be a consumer company.

25              MR. WILSON:  All right.  Thank you.               11:42:39
```

Page 100

HIGHLY CONFIDENTIAL

1     THE VIDEOGRAPHER:  We're off the record at  11:57:54

2  11:58 p. -- a.m., and this concludes today's

3  testimony given by Samuel Altman.  The total number

4  of media units used was five and will be retained by

5  Veritext.              11:58:05

6     (TIME NOTED:  11:58 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 105

1          I, SAMUEL ALTMAN, do hereby declare under

2    penalty of perjury that I have read the foregoing

3    transcript; that I have made any corrections as

4    appear noted, in ink, initialed by me, or attached

5    hereto; that my testimony as contained herein, as

6    corrected, is true and correct.

7          EXECUTED this _____ day of _____,

8    2024, at _____, _____.
              (City)                    (State)

9

10                    _____

                          SAMUEL ALTMAN

11                          VOLUME I

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 106

HIGHLY CONFIDENTIAL

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby

3   certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were administered an oath; that

8   a record of the proceedings was made by me using

9   machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing is a true

11  record of the testimony given.

12       Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [ X ] was [  ] was not requested.

16       I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney or any party to this

19  action.

20       IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  Dated:  December 24, 2024

23

24                    *Catherine A. Nolasco*

                 Catherine A. Nolasco, RMR, CRR, BS

25               CSR No. 8239

                                        Page 107

HIGHLY CONFIDENTIAL

1  Orin Snyder, Esq.

2  osnyder@gibsondunn.com

3                                      December 24, 2024

4  RE: Openai, Inc v. Open Artificial Intelligence, Inc

5  12/12/2024, Samuel Altman, Vol. I (Job No. 7055684)

6  The above-referenced transcript has been

7  completed by Veritext Legal Solutions and

8  review of the transcript is being handled as follows:

9  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10     to schedule a time to review the original transcript at

11     a Veritext office.

12  __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13     Transcript - The witness should review the transcript and

14     make any necessary corrections on the errata pages included

15     below, noting the page and line number of the corrections.

16     The witness should then sign and date the errata and penalty

17     of perjury pages and return the completed pages to all

18     appearing counsel within the period of time determined at

19     the deposition or provided by the Code of Civil Procedure.

20     Contact Veritext when the sealed original is required.

21  __ Waiving the CA Code of Civil Procedure per Stipulation of

22     Counsel - Original transcript to be released for signature

23     as determined at the deposition.

24  __ Signature Waived - Reading & Signature was waived at the

25     time of the deposition.

                                              Page 108

HIGHLY CONFIDENTIAL

1    _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2        Transcript - The witness should review the transcript and

3        make any necessary corrections on the errata pages included

4        below, notating the page and line number of the corrections.

5        The witness should then sign and date the errata and penalty

6        of perjury pages and return the completed pages to all

7        appearing counsel within the period of time determined at

8        the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10       requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page 109

```
 1   Openai, Inc v. Open Artificial Intelligence, Inc.

 2   Samuel Altman, Vol. I (Job No. 7055684)

 3                 E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24       (Samuel Altman, Vol. I)             Date

25
```

Page 110