QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
295 Fifth Avenue
New York, NY 10016
Telephone:    (212) 849-7000

*Attorneys for OpenAI, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>    Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 4:23-cv-03918-YGR<br><br>Assigned to the Hon. Yvonne Gonzalez Rogers<br><br>**PLAINTIFF OPENAI, INC.'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      June 17, 2025<br>Time:     2:00 p.m.<br>Place:    Courtroom 1 (4th Fl.)<br>           1301 Clay St.<br>           Oakland, CA 94612 |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION...................................................................................................................6

ARGUMENT ........................................................................................................................6

I.     DEFENDANTS IDENTIFY NO TRIABLE ISSUE CONCERNING THE PARTIES' TRADEMARK INFRINGEMENT CLAIMS ........................................................6

    A.     Defendants Identify No Facts That Would Support A Finding That Plaintiff Does Not Have Senior Protectable Trademark Rights. ......................................................7

    B.     Defendants Fail To Identify Evidence Of Having Senior Trademark Rights. .........10

II.    DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON CANCELLATION .....................13

III.   DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON OTHER REASONS THEIR TRADEMARK INFRINGEMENT CLAIMS FAIL, INCLUDING LACHES..................15

IV.    DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON THEIR DAMAGES CLAIM .....18

V.     DEFENDANTS' EFFORTS TO MANUFACTURE FACTUAL DISPUTES FAIL FOR EVIDENTIARY REASONS..............................................................................19

CONCLUSION ...................................................................................................................20

1

# **TABLE OF AUTHORITIES**

2

## **Cases**

3

*Active Sports Lifestyle USA LLC v. Old Navy, LLC,*
4       2013 WL 11239385 (C.D. Cal. Nov. 21, 2013) ................................................................18

5
*Adidas America, Inc. v. Payless Shoesource, Inc.,*
6       2008 WL 4279812 (D. Or. Sep. 12, 2008) .......................................................................18

7
*Bafford v. Travelers Casualty Insurance Company of America,*
        2012 WL 5465851 (E.D. Cal. Nov. 8, 2012) ...................................................................19
8
*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
9       174 F.3d 1036 (9th Cir. 1999) ..........................................................................11, 14, 15

10
*California Cooler, Inc. v. Loretto Winer, Ltd.,*
        774 F.2d 1451 (9th Cir. 1985) ...........................................................................................12
11

12
*Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc.,*
        2021 WL 3630225 (9th Cir. Aug. 17, 2021) ....................................................................10
13
*Grupo Gigante SA De CV v. Dallo & Co., Inc.,*
14       391 F.3d 1088 (9th Cir. 2004) .............................................................................................7

15
*Gucci America, Inc. v. Guess?, Inc.*
16       858 F. Supp. 2d 250 (S.D.N.Y. 2012) ..............................................................................18
        868 F. Supp. 2d 207 (S.D.N.Y. 2012) ..............................................................................18
17
*Hanginout, Inc. v. Google, Inc.,*
18       54 F. Supp. 3d 1109 (S.D. Cal. 2014) ..............................................................................11

19
*Harman International Industries, Inc. v. Jem Accessories, Inc.,*
        668 F. Supp. 3d 1025 (C.D. Cal. 2023), *aff'd,*
20       2024 WL 4750497 (9th Cir. Nov. 12, 2024) ....................................................................16

21
*JIPC Management, Inc. v. Incredible Pizza Co.,*
22       2009 WL 10671438 (C.D. Cal. June 24, 2009) ................................................................16

23
*Jurado v. Eleven-Fifty Corp.,*
        813 F.2d 1406 (9th Cir. 1987) ...........................................................................................19
24
*Kifle v. YouTube LLC,*
25       2022 WL 326613 (N.D. Cal. Feb. 3, 2022) ......................................................................12

26
*Kopets v. Kajajian,*
27       2023 WL 4145433 (9th Cir. June 23, 2023) .....................................................................10

28
*Kournikova v. General Media Communications Inc.,*
        278 F. Supp. 2d 1111 (C.D. Cal. 2003) ..............................................................................9

*La Terra Fina USA, LLC v. Reser's Fine Foods, Inc.*
2024 WL 1973468 (N.D. Cal. May 3, 2024) .................................................................12

*Lahoti v. VeriCheck, Inc.*,
586 F.3d 1190 (9th Cir. 2009) ....................................................................................12

*Look Cycle International v. Kunshan Qiyue Outdoor Sports Goods Co.*,
2024 WL 3739358 (T.T.A.B. Aug. 9, 2024) ................................................................14

*Luke v. Family Care & Urgent Medical Clinics*,
323 F. App'x 496 (9th Cir. 2009) ...............................................................................20

*Machine Head v. Dewey Global Holdings Inc.*,
2001 WL 1747180 (N.D. Cal. Dec. 13, 2001) .............................................................15

*Mike's Novelties, Inc. v. PIV Enterprises, Inc.*,
2024 WL 457120 (E.D. Cal. Feb. 6, 2024) .................................................................11

*Open Sea Distribution Corp. v. Artemis Distribution, LLC*,
692 F.Supp.3d 1151 (M.D. Fla. 2023) ........................................................................18

*P & P Imports LLC v. Johnson Enterprises, LLC*,
46 F.4th 953 (9th Cir. 2022) ....................................................................................8, 9

*Playboy Enterprises, Inc. v. Baccarat Clothing Co.*,
692 F.2d 1272 (9th Cir. 1982) ...................................................................................18

*QS Wholesale, Inc. v. World Marketing, Inc.*,
2013 WL 1953719 (C.D. Cal. 2013) ...........................................................................18

*Reinsdorf v. Skechers U.S.A.*,
922 F. Supp. 2d 866 (C.D. Cal. 2013) ..........................................................................9

*Sands, Taylor & Wood v. Quaker Oats Co.*,
34 F.3d 1340 (7th Cir. 1994) ....................................................................................18

*Seal Shield LLC v. Otter Products LLC*,
2014 WL 11350295 (S.D. Cal. Nov. 3, 2014) .............................................................11

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
2013 WL 4528539 (N.D. Cal. Aug. 23, 2013) .............................................................11

*TIBCO Software Inc. v. GatherSmart LLC*,
2021 WL 4477902 (N.D. Cal. Mar. 5, 2021) ..............................................................10

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*,
465 F.3d 1102 (9th Cir. 2006) ...................................................................................16

*Twit, LLC v. Twitter Inc.*,
2018 WL 2431474 (N.D. Cal. May 30, 2018) .............................................................17

*West Coast Corvettes, Inc. v. MV Marketing, Inc.*,
    2012 WL 12882014 (C.D. Cal. Dec. 13, 2012) ..........................................................................10

*Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*,
    2010 WL 11520159 (C.D. Cal. Sept. 20, 2010) ...........................................................................9

**<u>Statutes</u>**

15 U.S.C. § 1057 .............................................................................................................................11

15 U.S.C. § 1127 .............................................................................................................................14

18 U.S.C. § 1001 .............................................................................................................................13

**<u>Other Authorities</u>**

4 McCarthy on Trademarks and Unfair Competition § 26:13 (5th ed. 2025) .................................11

5 McCarthy on Trademarks and Unfair Competition § 32:190 (5th ed. 2025) ................................9

## INTRODUCTION

Defendants' Opposition fails to identify any basis to deny Plaintiff's motion.

**First,** as to their affirmative claims, Defendants fail to identify evidence of senior continuous use, market penetration, or secondary meaning—each of which is required for enforceable rights.

**Second,** as to Plaintiff's cancellation claims, the evidence remains undisputed that Defendants represented to the PTO their first use in commerce of the name "Open AI" was in March 2015, but the "specimen" they submitted to show that use in September 2016, was created one day earlier; it did not reflect use in commerce as of September 2016—much less 2015. Defendants' current excuse—that they simply gave the PTO what it wanted—is a confession, not a defense.

**Third,** as to laches, Defendants fail to dispute the evidence they were aware of confusion more than five years before their secret letters of protest to the PTO, and seven years before filing their counterclaims. Even if the four-year delay period for a presumption of laches did not apply, Defendants do not even attempt to dispute the *E-Systems* factors establishing laches.

**Fourth,** Defendants claim no damages other than a lost reasonable royalty, but do not dispute that they had no licensing history, and they cite no case awarding royalties on a trademark claim where there was no prior licensing history between, or by, the parties for the mark, or a similar one.

**Finally,** Defendants fail to rebut Plaintiff's showing of secondary meaning in "OpenAI." Defendants' position that the term "OpenAI" was understood as merely descriptive among Plaintiff's users and likely users is supported by no documentary evidence—just speculation, conjecture, and mischaracterizations of the law. Ravine's declaration even acknowledges that researchers associated "OpenAI" exclusively with Plaintiff as early as 2017. Defendants' opposition largely rests on an irrelevant proposition: whether the general population—including those who did not use or intend to use ChatGPT—could identify OpenAI as the company that offers ChatGPT. This is neither the correct universe nor the correct legal inquiry for determining secondary meaning.

Accordingly, Plaintiff's summary judgment motion should be granted in full.

## ARGUMENT

## I.    DEFENDANTS IDENTIFY NO TRIABLE ISSUE CONCERNING THE PARTIES' TRADEMARK INFRINGEMENT CLAIMS

1

**A.**    <u>**Defendants Identify No Facts That Would Support A Finding That Plaintiff**</u>

2

<u>**Does Not Have Senior Protectable Trademark Rights.**</u>

3

Nothing in the Opposition detracts from the finding that Plaintiff's "OpenAI" trademark is

4

"one of the most recognized in the artificial intelligence industry, if not the world" (Dkt. 63 at 16

5

(PI Order)). Although they assert that the mark lacks secondary meaning (Opp. 9-13), Defendants

6

neither distinguish Plaintiff's authority nor offer any evidence creating a genuine issue of fact on

7

the secondary meaning factors, including years of continuous use, actual confusion, extensive

8

unsolicited media coverage, user statistics, sponsorship of events, and attendance at industry events.

9

*Compare* Mot. 18 & n.1 *with* Opp. 9-13; *see also* Ninth Circuit Model Civil Jury Instruction § 15.11;

10

Section V; Scher Decl., Exs. S-T.

11

Secondary meaning exists when "the primary significance of a mark is to identify *the source*

12

*of the product* rather than the product itself," as Defendants acknowledge. Opp. 10 (quoting *Grupo*

13

*Gigante SA De CV v. Dallo & Co*., *Inc.*, 391 F.3d 1088, 1095-96 (9th Cir. 2004)) (emphasis added).

14

"OpenAI" is understood as the source of products and services rather than as a description of them.

15

Mot. 15-19.[1] Defendants offer zero evidence—zero—of anyone *ever* using the "OpenAI" mark in

16

a descriptive manner or to refer to any entity other than Plaintiff—except due to Defendants'

17

confusing uses, which *buttress* Plaintiff's showing of secondary meaning. *See* Ravine Decl. ¶¶ 57-

18

61; S/RUF 51; Perahia Ex. 2 at 3-4, Exs. 40-42, 48-49; Scher Decl., Exs. L-M; *see also* Mot. 19.

19

Defendants purport to dispute the evidence establishing Plaintiff's continuous use,

20

marketing, and unsolicited media coverage, but they cite no evidence to the contrary. *See, e.g.,* RUF

21

2, 4-7, 10, 17, 20, 76. Instead, their position rests on the claim that some uses of Plaintiff's mark

22

were not "prominently" displayed. *Id*.; Opp. 1-2, 4, 6-8, 10-13, 20-21; Defendants' Additional Facts

23

("DAF") 110. Defendants cite no case supporting their position that font size and placement of the

24

displayed mark is relevant to determining secondary meaning. What matters is that the mark was

25

*used* in these contexts, which it indisputably was—contrary to Defendants' mischaracterizations of

26

27

---

[1]  *See also* SUF 1-7, 9, 14-16, 18; Brockman Decl. ¶¶ 3-5, 8, 12-46 & Exs. B, F, H, J, M; Dyett Decl.

28

¶¶ 10-28 & Exs. E, P; Korovesis Decl. ¶ 4; Lipson Decl., Ex. A, ¶¶ 22, 38, 44, 51; Perahia Decl. ¶¶ 27, 88-90 & Exs. 26, 86-88.

1  evidence.  *See id.*; Mot. 19; Scher Decl. ¶¶ 20-23, Exs. S-T (disproving Defendants'
2  characterizations that mark was not displayed), Plaintiff's Response to DAF, filed herewith,
3  ("RAF"), 110, 113.

4          Defendants criticize Plaintiff's lack of traditional paid advertising, suggesting there can be
5  no secondary meaning unless Plaintiff marketed its AI technology and research like grocery store
6  commodities.  Opp. 11.  But as they concede, Plaintiff's products were nonetheless "undoubtedly
7  … popular."  Opp. 12.  The AI researchers who were Plaintiff's primary target users before April
8  2020 saw the "OpenAI" mark on product announcement blogs, on the GitHub platform that made
9  Plaintiff's products available, and on research papers.  *See* S/RUF 3, 9; *e.g.*, Brockman Decl., Ex. B
10 at 6, 11, 16, 23, 64, 72, 78, 81, 83, 87, 98; Scher Decl. ¶¶ 20-21, Ex. S.  That was enough for them
11 to understand "OpenAI" to be an indicator of source—not a description of products—even without
12 television or newspaper ads.  *See id.*; Lipson Decl., Ex A ¶¶ 3, 22-38, 51 & pp. 33-42.

13         Defendants attempt to undermine this association by analogizing Plaintiff's sale of ChatGPT
14 to Hormel's sale of peanut butter, suggesting that unless consumers who have heard of the Skippy
15 peanut butter brand know it is made by Hormel, the HORMEL mark would not have secondary
16 meaning.  Opp. 10. That is incorrect.  The test of secondary meaning is whether Hormel consumers
17 identify the "Hormel" name with a *single source* of products, as opposed to believing it is a term
18 used to *describe products generally*.  *See P & P Imports LLC v. Johnson Enters., LLC*, 46 F.4th
19 953, 960 (9th Cir. 2022) (secondary meaning "requir[es] association with only a single—even
20 anonymous—source").  They do not need to be able to identify Hormel as the source of dozens of
21 products, or name any of those products.  Likewise, Defendants' argument that ████████████
22 ████████████████████████████████████████████████████████████████
23 ████████████████████████—particularly as to the secondary meaning of "OpenAI"
24 among AI researchers in January 2017.

25         Defendants' other argument ████████████████████████████████████
26 ████████████████████████████████████████████████████████████████
27 ███████████████████████████████████  The irrelevant question is
28 unaided brand awareness—i.e., what AI products, tools, and companies come to mind?  *See id.*  As

discussed above, secondary meaning assesses relevant consumers' association of a mark with a single source, *not* the unaided ability to call to mind the mark. *See P & P Imports*, 46 F.4th at 960.

To the extent brand awareness (i.e., recognition) is relevant to secondary meaning, it is only relevant in relation to the proper universe—i.e. actual consumers of the mark holder's goods and services. *See Westside Shepherd Rescue of Los Angeles, Inc. v. Pollock*, 2010 WL 11520159, at *4 (C.D. Cal. Sept. 20, 2010) ("factors considered in determining whether a descriptive mark has achieved secondary meaning include: (1) whether actual purchasers of the product ... associate the trademark with the producer") (quotations omitted). ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See, e.g., Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 877 (C.D. Cal. 2013) (excluding survey with improper universe where "Sketchers' customer base is disproportionately female, [but expert] surveyed an even number of men and women aged sixteen to twenty-four"); *Kournikova v. Gen. Media Commc'ns Inc.*, 278 F. Supp. 2d 1111, 1125 (C.D. Cal. 2003) (excluding overinclusive survey that "failed to reach the appropriate and reasonable consumer"); *see also* Brewer Ex. 16 (Steckel Report) at 13-19, ¶¶ 25-36. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ *E.g.,* 5 McCarthy on Trademarks and Unfair Competition § 32:190 (5th ed. 2025) ("Generally, figures over 50% are regarded as clearly sufficient. However, figures of 46%, 48%, 39% and 37 percent have also been found sufficient.").

In sum, the evidence Defendants rely on (Opp. 10-13) fails to create a dispute of material

fact concerning secondary meaning—i.e., "consumer's association of the mark with a particular source." *W. Coast Corvettes, Inc. v. MV Mktg., Inc.*, 2012 WL 12882014, at *6 (C.D. Cal. Dec. 13, 2012) (granting summary judgment) (Mot. 19).  Plaintiff has senior rights irrespective of whether the appropriate base for secondary meaning is deemed to be AI researchers, among whom "OpenAI" acquired secondary meaning by January 2017, or lay users of generative AI products before Defendants' introduction of an image generator using "Open AI" in November 2022.  *See Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 2021 WL 3630225, at *1 (9th Cir. Aug. 17, 2021) (affirming that "mark attained secondary meaning prior to the alleged infringement") (Mot. 24); Mot. 25; Ravine Decl. ¶¶ 39, 45.  Because Defendants concede confusion (*e.g.*, Opp. 13), Plaintiff is entitled to summary judgment on its trademark infringement claims.

### B.  Defendants Fail To Identify Evidence Of Having Senior Trademark Rights.

Defendants cite no evidence that could substantiate a verdict that they had senior trademark rights.  Tellingly, the evidence they rely on to argue they had any "Open AI" business at all before 2022 comes mainly from a hired forensic expert; there is no evidence of third-party articles, discussion on social media, YouTube videos, or even customer service inquiries or complaints— aside from those resulting from confusion with Plaintiff.  RUF 24, 40, 41, 51, 53, 54.  Their evidence is not sufficient to establish continuous use in bona fide commerce senior to Plaintiff's use, much less market penetration or distinctiveness.

***First,*** Defendants ignore the requirement that to establish senior rights, their use must be continuous from the first bona fide use.  *E.g.*, *Kopets v. Kajajian*, 2023 WL 4145433, at *1 (9th Cir. June 23, 2023) ("plaintiff's use of the mark [must be] continuous and not interrupted") (quotations omitted) (Mot. 21); *compare* Mot. 20-21 *with* Opp. 13-15.  Even if Defendants had made a bona fide use in commerce before Plaintiff released OpenAI Gym in spring of 2016 (SUF 3), that could not create a material dispute of fact because of their conceded lack of use of "Open AI" in commerce between February 2016 and the start of September 2016.[2]

---

[2]  RUF 31 and 32 identify no public "use" other than the "announcement coming soon" website— which was not a use in commerce, as the Trademark Examiner found, and as Defendants concede. Perahia Decl., Ex. 72 at 13; Ravine Decl. ¶ 19; *see also* S/RUF 24-26; *see* Dkt. 100 ¶ 125; Perahia Decl., Ex. 10 at 160:21-161:1l (initiative never launched); Mot. 20 (citing *TIBCO* and *Brookfield*).

**Second,** Defendants point to no evidence at all of market penetration; they simply argue that market penetration is not required.  Opp. 15-17.

The market penetration requirement flows from established law that marks not registered on the Principal Register do not get the benefit of the "right of priority, nationwide in effect" as of the application date.  15 U.S.C. § 1057(c).  Accordingly, the user of an "unregistered trademark is entitled to assert its trademark rights only in geographical areas in which it has legally sufficient market penetration," *Mike's Novelties, Inc. v. PIV Enters., Inc.*, 2024 WL 457120, at *9 (E.D. Cal. Feb. 6, 2024) (citations omitted) (Mot. 22)—i.e., those markets in which it can show "an association among consumers between the mark and the mark's owner."  *Brookfield Commc'ns Inc.,* 174 F.3d at 1051; *see also* Mot. 22-23 (citing cases, including *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1122 (S.D. Cal. 2014)); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 2013 WL 4528539, at *3, 11 (N.D. Cal. Aug. 23, 2013) (Mot. 18 n.1).  Although the Ninth Circuit did not use the phrase "market penetration" in *Brookfield,* it confirmed that a senior user's right to exclude junior users is limited to those "in the same industry *and market* or within the senior user's natural zone of expansion."  174 F.3d at 1047 (emphasis added). Thus, "[i]n the absence of federal registration, both parties have the right to expand into unoccupied territory and establish exclusive rights by being first in that territory."  4 McCarthy on Trademarks and Unfair Competition § 26:13 (5th ed. 2025).

Defendants' argument that market penetration is not necessary (Opp. 15-17) would upend this fundamental tenet of trademark law.  The sole in-circuit decision they cite that declines to apply the market penetration test does not address the underlying rationale of requiring market penetration, the consequences of granting nationwide priority based on a single use in commerce, or any of the authority cited in Plaintiff's Motion.  *Seal Shield LLC v. Otter Products LLC*, 2014 WL 11350295, at *7 (S.D. Cal. Nov. 3, 2014) (finding plaintiff's sales sufficient to establish priority of use, but granting summary judgment to defendant on cancellation claim because plaintiff failed to establish secondary meaning in descriptive mark LIFEPROOF).  This decision, which conflicts with the decisions of the Northern, Eastern, Central, and Southern Districts cited in Plaintiff's Motion (at 18, 22), does not excuse Defendants' failure to offer any evidence of market penetration.

**Third**, Defendants fail to cite any evidence that could support a finding of secondary

meaning in their mark.  Opp. 17-19 & n.5.  They argue they do not need to, even though, as they concede, multiple PTO trademark examiners found "Open AI" descriptive.  Mot. 23, S/RUF 46; *Kifle v. YouTube LLC*, 2022 WL 326613, at *5 (N.D. Cal. Feb. 3, 2022) ("In analyzing whether a mark is descriptive or suggestive, deference to the PTO's classification decision is sensible because the PTO has special expertise that we lack on this fact-intensive issue.") (quotations omitted).  The only legal authority they cite (Opp. 18) does not help them; it merely rejected the argument that "registrant is, by virtue of the supplemental registration, barred from establishing *secondary meaning* in subsequent litigation."  *California Cooler, Inc. v. Loretto Winer, Ltd.*, 774 F.2d 1451, 1454 (9th Cir. 1985) (emphasis added).  It did *not* find the registrant's mark was suggestive, but affirmed the finding that the registrant had shown sufficient evidence of secondary meaning.  *Id.* at 1455.  Defendants have identified no such evidence.  *Cf.* Opp. 19 n.5 (citing no evidence).

Defendants' only remaining argument to defeat summary judgment on "Open AI"'s lack of distinctiveness is to assert that fact issues exist as to whether it is suggestive.  Opp. 17-19.  They do not.  The relevant question for descriptiveness is not whether a dictionary definition exists that Defendants' goods and services do *not* meet (*id.* at 17-18), but "whether someone who knows what [Defendants'] goods and services are will understand the mark to convey information about them."  Mot. 24 (quoting authority Defendants make no effort to distinguish); *see also Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1201 (9th Cir. 2009) (to assess descriptiveness, "the mark must be examined in the industry context rather than in the abstract").  In this case, the answer to this question comes from Ravine, who indisputably used the words "open" and "AI" in describing Defendants' goods and services in statements to this Court, and from Defendants' allegation that they are "a literally open AI company."  Dkt. 100 (Counterclaims) ¶ 189; Mot. 24; SUF 45.  Defendants fail to identify any evidence casting doubt on the authenticity of that evidence.  RUF 45.  Indeed, Defendants' linguist provides evidence of "open" referring to a collaborative forum, such as "open discussion" and an "open forum for questions."  Leonard Decl., Ex. 1 (part 2) at 16 (ln. 107), 20 (ln. 471).

Because Defendants fail to identify any facts from which a reasonable juror could conclude they have established senior, valid rights in a distinctive mark, Plaintiff is entitled to summary judgment on all of Defendants' counterclaims.

## II.    DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON CANCELLATION

Defendants have cited no case that declined to cancel a registration in the face of the undisputed facts here: submission of a specimen to show use in commerce, claimed to have occurred months earlier, that was wholly created by the applicant's agent on the eve of its submission.  *See* Opp. 19-20; RUF 58-63.

Defendants' Opposition has served only to confirm the facts set forth in SUF 58-61 that establish Defendants' fraudulent submission to the PTO.  Ravine filed his trademark application on December 11, 2015. Perahia Decl., Ex. 72 at 2, 5.  He wrote and signed the application, which contained an explicit warning that false statements were punishable under 18 U.S.C. § 1001.  Perahia Decl., Ex. 72 at 3-5, Ex. 10 (Ravine Tr.) at 76:11-77:3; *see also* Scher Decl., Ex. D (Ravine Tr.) at 82:20-83:5.  Ravine stated the purported trademark was used in commerce "at least as early as 3/25/2015."  Perahia Decl., Ex. 72 at 3.  To support this use in commerce representation, Ravine submitted a specimen he described as "Website for Open AI," which he claimed "shows the mark as used on or in connection with the goods/services in application."  *Id.* at 3-4.  On its face, the website specimen did not reflect use in commerce, saying: "Announcement Will be Made Soon."  *Id.* at 7.  The PTO issued a non-final Office Action refusing registration in part: "because the specimen does not show the applied for mark in use in commerce."  *Id.* at 12-13; *see also* Ravine Decl. ¶ 19 (acknowledging specimen was "improper").

Defendants' fraud occurred in their September 2016 Response to Office Action. *See* SUF 33-34, 62-63.  Ravine signed the Response on September 27, 2016.  Perahia Decl., Ex. 72 at 33-35.  The Section 1001 warning appears again, on the same page as his signature.  *Id.* at 35.  Ravine's substitute specimen was from a webpage with the URL "hub.open.ai."  *Id.* at 37.  Again, Ravine represented that the first use of the mark was "at least as early as 3/25/2015," *and* that the specimen was in use at least as of "the filing date of the application."  *Id.* at 33.  In fact, however, Ravine admits that Hub was not publicly available until September 2016; it did not even exist in March *or* December 2015.  *E.g.,* Ravine Decl. ¶¶ 25, 26, 28.  The specimen reflected posts that were created the day before the specimen was submitted and contained content copied from a third-party website by a person Ravine paid to do so; nothing about the specimen reflected legitimate use in commerce

1  in 2016, let alone 2015. *See id.* ¶ 26; Gaer Decl. ¶ 15; Perahia Decl., Ex. 13 (Gaer Tr.) at 172:9-11,

2  212:3-215:11, 215:20-216:7, 216:11-18, 224:22-225:6; 226:2-10.

3      Defendants' efforts to defend this fraud only make matters worse—far worse.  First, they

4  argue the Hub specimen appearing to show use by third parties—i.e., use in commerce—was not

5  "false" because it showed a tool "that was online and available for use by the public."  Opp. 19.  But

6  the mere fact that a webpage *existed* in September 2016 does not show it was *used in commerce* in

7  2015, as Ravine represented; to qualify as a use in commerce there must be bona fide third-party

8  transactions involving goods or services.  *E.g.,* 15 U.S.C. § 1127 (use in commerce does not occur

9  until services using the mark are "rendered in commerce"); *Brookfield*, 174 F.3d at 1051-52 (quoting

10  same and reversing finding that intent to use registered website in commerce was sufficient to

11  establish required use); Perahia Decl., Ex. 33 (2015 USPTO Publication) at 22-23 (even "advertising

12  goods or services, without … the services [being] actually provided, is not use in commerce").  After

13  all this time, Defendants have still offered zero evidence of any such bona fide third-party Hub

14  transactions as of September 27, 2016—much less on March 25, 2015; the absence of evidence of

15  such use explains—not excuses—why the false specimen was submitted.  *E.g.,* RUF 31, 33-34.

16      Defendants' second "defense" is even worse and more revealing: they contend that Ravine

17  did not *intend* to deceive the PTO because "he was merely trying to meet the USPTO's

18  requirements."  Opp at 20.  Perhaps—just as defendants in many securities (or other) fraud cases

19  are "merely" trying to satisfy the government's requirements.  Judge Corley's decision in *La Terra*

20  *Fina USA, LLC v. Reser's Fine Foods, Inc.* (Opp. 19-20) does not provide a shield for such frauds;

21  it held only that a recklessness standard did not apply to create a duty on the applicant to investigate

22  "conflicting rights of another user."  2024 WL 1973468, at *3 (N.D. Cal. May 3, 2024).  Neither *La*

23  *Terra* nor any other case permits fabricated specimens like Ravine's to be submitted with impunity.

24  *See, e.g.*, *Look Cycle Int'l v. Kunshan Qiyue Outdoor Sports Goods Co.*, 2024 WL 3739358, at *14

25  (T.T.A.B. Aug. 9, 2024) (Mot. 25-26).  Finally, there is no "typical practice" of submitting to the

26  PTO specimens consisting of an online tool that did not *exist* in any form at the time of the claimed

27  use, as Defendants suggest.  Opp. 19, RUF 62; *cf.* Brewer Decl., Ex. 7 (McCurry Tr.) at 71:8-21

28  (Plaintiff's specimen was of a product known to be in existence as of first use date, even if exact

content on webpage reflected updated information).

Thus, Defendants' Opposition papers serve only to confirm that no case countenances their indisputably knowing falsehood to the PTO, entitling Plaintiff to summary judgment on its cancellation claims. *See* Mot. 25-28.

## III. DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON OTHER REASONS THEIR TRADEMARK INFRINGEMENT CLAIMS FAIL, INCLUDING LACHES

*First,* Defendants fail to defeat Plaintiff's alternative claim to senior rights as an intervening user in the market segment of generative AI, as opposed to whatever category Defendants claim for their earlier uses. *Compare* Mot. 28-29 *with* Opp. 20-21; *see also, e.g.*, *Brookfield*, 174 F.3d at 1051 (explaining ability of intervening junior user to acquire senior rights in a different product line). They argue that generative AI is not a distinct market segment and that there are "disputed issues of fact as to who first used the mark in commerce in connection with an online consumer application based on AI technology." Opp. 21. But Ravine's declaration belies that. He describes beginning to "conduct[] research into the development of generative AI products" as different from what he had done before, and states that "[g]enerative AI is a subset of AI algorithms, the development of which was always the purpose of my company." Ravine Dec. ¶ 39. But, purpose or not, Defendants never actually *released* any AI algorithms using the "Open AI" mark, or products built on AI technology before November 2022. *See* S/RUF 50; Ravine Decl. ¶¶ 22-25, 30, 35 (pre-November 2022 activities), ¶¶ 40-50 (generative AI products branded with "Open AI" released in November 2022 and May 2023); *see also* Perahia Decl., Ex. 72 at 88.

Never having previously offered products incorporating AI algorithms using the "Open AI" mark (*see* RUF 50), Defendants' "expansion" to offering generative AI tools like an image generator and chatbot was not within the scope of any trademark rights they may have possessed in April 2022 when Plaintiff launched its DALL·E 2 image generator—much less its earlier generative AI products. *See* Mot. 29. Defendants cite no authority to the contrary. *See* Opp. 21; *see also Mach. Head v. Dewey Glob. Holdings Inc.*, 2001 WL 1747180, at *5, 13 (N.D. Cal. Dec. 13, 2001) (expansion was "not natural") (Mot. 29).

*Second,* Defendants fail to identify any facts that could defeat laches.

Defendants concede that the laches period begins to run "when the trademark holder knew or should have known about likely consumer confusion between itself and the other party." Opp. 21-22 (quotations omitted). Contrary to Defendants' current position, Ravine expressly told this Court that he filed his trademark application in December *2015* because he believed Plaintiff was committing "infringement." *See* Perahia Decl., Ex. 22 (2024 Ravine Decl.) ¶ 12; *see also* Section V. And Defendants fail to dispute Plaintiff's evidence that Ravine knew of *actual* confusion by 2016.[3] Indeed, Ravine's declaration in connection with this motion *admits* he was aware of confusion no later than 2017. Ravine Decl. ¶¶ 58-59. He states that he was so concerned about it that Defendants took steps to mitigate it, including launching tools on subdomains to minimize confusion—which he did with hub.open.ai in September *2016*—and one of his agents actually redirected open.ai traffic to Plaintiff's website starting in early 2017. *Id.* ¶¶ 28, 53-54, 58-59; *see also* RUF 51. Defendants' unsupported, unsworn *ipse dixit* assertion that they "had no reason to suspect" confusion until 2022 (Opp. 22) cannot create a genuine factual dispute. *See* Section V. Accordingly, the laches presumption applies.[4]

Defendants illogically argue laches would bar Plaintiff's claim if it bars Defendants' claims. Opp. 21, 22. That is neither relevant to this motion nor correct. Each party's respective knowledge and respective uses must be separately analyzed. For example, Defendants point to *no* evidence that

---

[3]  *See* S/RUF 51; Perahia Decl., Ex. 12 (Ravine Tr.) at 42:13-15 ("back in 20 – 2016, even there was confusion"), Ex. 48 (Ravine responding to email by confused sender), Ex. 49 (same); Scher Exs. L-M (same); Perahia Decl, Ex. 2 at 3-4 (Rog 6) ("In the years following Plaintiff's launch of OpenAI in December 2015, Defendant has regularly received communications from consumers who believe they are interacting with Plaintiff or Plaintiff's website rather than with Defendant's website.").

[4]  The laches presumption would apply even if the filing of Plaintiff's claims tolled the laches period, as Defendants suggest, without citation. Opp. 23 n.6. But it did not. *See Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1037 (C.D. Cal. 2023) (considering if defendant "took longer than four years to file its counterclaims in this action" to "assess whether any presumption of laches exists"), *aff'd*, 2024 WL 4750497 (9th Cir. Nov. 12, 2024); *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1108-09 (9th Cir. 2006) ("Because the analogous state limitations period had long expired prior to Creamery's filing [of its counterclaim] in 2002, there is a presumption favoring Smoker's laches defense."). Nor did Defendants' secret letters of protest to PTO, which they first submitted in December 2022, toll it. McCurry Decl. (Dkt. 229) ¶¶ 7-8. Defendants' sole citation for this argument, *JIPC Management, Inc. v. Incredible Pizza Co.*, 2009 WL 10671438, at *10 n.64 (C.D. Cal. June 24, 2009) (Opp. 23), concerns the initiation of a TTAB cancellation proceeding—not a private letter to the PTO.

1   Plaintiff was aware Defendants were even using "Open AI" in commerce before 2022, much less

2   causing confusion by doing it.[5]   Defendants' attempt to apply the progressive encroachment

3   exception of *Tillamook*, 465 F.3d at 1110, likewise fails.  To the extent Defendants argue OpenAI's

4   release of DALL·E 2 (in April 2022)—i.e., a "generative AI product[] for use by everyday people,

5   rather than researchers or engineers" (Ravine Decl. ¶ 39)—was entry into a "new market" (Opp.

6   22), that was a market in which Defendants indisputably did not use "Open AI" branding until

7   November 2022.  *Id.* ¶¶ 39-50.

8       Finally, Defendants attempt to justify their delay by arguing a new theory of agreed

9   concurrent use.  *See* Opp. 22; 23, RUF 51, 72, 75.  This eleventh-hour invention cannot overcome

10  Defendants' prior admissions.  *See* Section V.  They specifically pled that after meeting with

11  Brockman, Ravine "stopped pursuing the OpenAI initiative" (Dkt. 100 ¶ 125) and that

12  "Counterclaimants do not now and have never sponsored or approved or authorized Counterclaim-

13  Defendants' use of the Open AI Mark" (Dkt. 138 ¶ 144).  *See also* Perahia Decl., Ex. 10 (Ravine

14  Tr.) at 197:5-11 ("I also didn't give him permission to [use the name OpenAI]."); Scher Decl., Ex.

15  D (Ravine Tr.) at 190:19-193:11, 194:12-198:2; n.5, *supra*.  This is not a concurrent use agreement.

16  *See, e.g.*, *Twit, LLC v. Twitter Inc.*, 2018 WL 2431474, at *2-4 (N.D. Cal. May 30, 2018) (dismissing

17  claim based on alleged "coexistence agreement").  Even if there were a tolled "concurrent use"

18  period, or the laches presumption did not apply, Defendants make no effort to rebut Plaintiff's

19  showing of the *E-Systems* factors; they do not even mention the word "prejudice" in their brief.

20

21  ─────────────────────────

22  [5]   *See* RUF 26, 107; Perahia Decl., Ex. 5 at 4 (RFA No. 2), Ex. 10 (Ravine Tr.) at 185:23-186:10,
    Ex. 15 (Altman Tr.) at 75:12-76:2 ("as far as I can recall, Mr. Ravine didn't do anything with this

23  project or the name for the intervening many years."); Brewer Decl., Ex 11 (Brockman Tr.) at 87:12-
    19 (open.ai appeared to show "same thing that had been there before"); S/RUF 49 (discussing

24  OpenAI's 2016 application (Serial No. 87,178,985), which was abandoned in 2017 for failure to
    respond to an Office Action); Brewer Decl., Ex. 19 at 6-7 (Jan. 2017 office action citing Defendants'

25  "pending application"); McCurry Decl. ¶¶ 4-5, Exs. B-E (Defendants' specimen copied from
    GitHub); Perahia Decl. ¶¶ 84-85, Exs. 83-84 (similar).  To the contrary, the record shows OpenAI

26  did *not* believe Defendants were using any "Open AI" or "open.ai" mark in commerce in between
    2015 and 2022.  *See id.*; Brewer Decl., Ex. 58 (Brockman email) ("[Ravine] had been trying to make

27  open.ai into a thing.  May be willing to give up on open.ai []now though."); Perahia Decl., Ex. 8
    (Brockman Tr.) at 68:13-20 (discussing meeting with Ravine), Ex. 39 (Ravine 2015 email);

28  McCurry Decl. ¶ 6, Ex. F (Ravine LinkedIn listing "OpenAI" from only "2014-2015").

1    *Compare* Mot. 29-33 *with* Opp. 21-23.  Nor did they attempt to distinguish any of the precedent

2    Plaintiff cited granting summary judgment on laches.  *Compare* Opp. 23 *with* Mot. 29-33.

## IV.    DEFENDANTS IDENTIFY NO TRIABLE ISSUE ON THEIR DAMAGES CLAIM

4           Defendants offer no evidence they ever licensed their mark or even negotiated to license it,

5    they cite no authority awarding a trademark reasonable royalty under circumstances like these, and

6    they disregard all of Plaintiff's authority forbidding one.  *Compare* Opp. 23-25 *with* Mot. 33-34.

7    Unlike here, in all the cases Defendants cite (Opp. 23-25), there was some pre-litigation licensing

8    history or negotiations.[6]  To the extent those courts *also* considered non-party licenses, *id.* they

9    were "agreements in the same industry as the products at issue."  Opp. 24.  In contrast, Dr. Goedde

10   did not rely upon a single license related to AI technology (or anything like it), but rather on

11   agreements involving a hodgepodge of licensors that included the AARP, the Financial Times, CBS

12   Broadcasting, KPMG Peat Marwick, the North Dakota Farm Bureau, Western Union, AT&T

13   Wireless, Brink's Network, Chengdu Time Share Technology Information Co., Telecom Italia, and

14   Virgin Enterprises.  *See* Perahia Ex. 54 (Goedde Report) at 29-35 (Schedule 3) (Licensor column).[7]

---

[6]  *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982) (plaintiff had a standard 5% royalty rate); *Active Sports Lifestyle USA LLC v. Old Navy, LLC*, 2013 WL 11239385, at *16 (C.D. Cal. Nov. 21, 2013) (defendant had established methodology for valuing licensed-in trademarks); *QS Wholesale, Inc. v. World Marketing, Inc.*, 2013 WL 1953719, at * 5 (C.D. Cal. 2013) (parties discussed prices over two years of negotiations); *adidas America, Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812, at *12 (D. Or. Sep. 12, 2008) (reasonable royalty was "consistent with royalties between adidas or Payless with third parties"); *see also Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340, 1342, 1344-45 (7th Cir. 1994) (citing trademark owner's licensing history and trademark valuation); *Open Sea Distribution Corp. v. Artemis Distribution, LLC*, 692 F.Supp.3d 1151, 1169 (M.D. Fla. 2023) (parties had entered an exclusive distributorship agreement and negotiated a prior trademark licensing agreement).  And although the court in *Gucci America, Inc. v. Guess?, Inc.*, denied a motion in limine (before a bench trial) to exclude a reasonable royalty opinion in the absence of a "license agreement involving the trademarks at issue," 858 F. Supp. 2d 250, 253, 255-56 (S.D.N.Y. 2012), following the bench trial, the court found the opinion was "highly speculative, and entitled to no weight," even though it was based in part on Guess's licensing agreements with third parties.  868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012).

[7]  Defendants assert these license agreements were "in the same industry as the parties in this case, i.e., providers of business/commercial services" (Opp. 25), but this "industry" is so broad as to be meaningless.  Defendants' expert testified there was no "type of commercial service a company might provide that" he would have excluded from consideration, and he rejected the notion that the licenses he considered needed to be "comparable" to the hypothetical license.  Scher Decl., Ex. H 117:16-118:22, 144:19-22 (Q "[does] the use of the word 'comparable' … have any meaning to you in this context? A. Not really."); *see also id.* 116:19-23, 131:7-14, 133:14-22, 134:9-22.

1   This purely speculative royalty is insufficient to raise a genuine issue of fact.  *See* Mot. 33-34.

2        Defendants have not even attempted to offer evidence of damages other than Dr. Goedde's

3   purported royalty analysis.  *See* Scher Decl., Ex. K.  Accordingly, summary adjudication should be

4   awarded to Plaintiff on Defendants' damages.

5   **V.   DEFENDANTS' EFFORTS TO MANUFACTURE FACTUAL DISPUTES FAIL**

6   **FOR EVIDENTIARY REASONS**

7        So many of Defendants' attempts to dispute facts are improper, unsupported, or otherwise

8   procedurally deficient, that it would be impossible to address all of them here.  *See* Local Rule 7-

9   3(c).  Some of the problems are evident upon review of Scher Ex. S, which identifies numerous

10  factual misstatements that are apparent from the face of the documents relied on by Brewer Exhibit

11  14.  Likewise, Plaintiff's Responses to Defendants' Additional Facts identifies numerous immaterial

12  and/or unsupported "facts."  Other defects are apparent on their face, such as claiming to dispute

13  facts without citing any evidence whatsoever that would demonstrate a dispute (*e.g.*, RUF 8) or

14  asserting "legal conclusions masquerading as facts," *Bafford v. Travelers Cas. Ins. Co. of Am.*, 2012

15  WL 5465851, at *8 (E.D. Cal. Nov. 8, 2012), (*e.g.,* DAF 112, 114-115).  If the Court would find it

16  helpful, Plaintiff would provide a comprehensive itemization of objections if so ordered by the

17  Court.  Set forth below is a limited sampling of Defendants' improper and objectionable efforts to

18  create fact disputes.

19       ***Defendants contradict their prior deposition testimony, declarations, and other***

20  ***representations to this Court***.  *See Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406, 1410 (9th Cir.

21  1987).  For example, they do this on the facts related to descriptiveness of "Open AI," as well as

22  laches, including knowledge of infringement and their new "concurrent use" theory.[8]

23  _____

24  [8]   ***Descriptiveness:***  *Compare* RUF 45 ("Defendants' Open AI mark is … not descriptive") *with*,
    *e.g.*, Dkt. 100 ¶ 189 ("a literally open AI company"); Dkt. 138 ¶ 35 ("When people heard the words

25  'Open AI,' they understood what the organization was about and felt a powerful desire to be a part
    of it.").  ***Start of Confusion***:  *Compare* Ravine Decl. ¶ 64 (cited in RUF 75) (confusion began in

26  2022) *with*, *e.g.*, Perahia Decl., Ex. 12 at 42:13-15 ("People started – well, you know, back in 20 –
    2016, even there was confusion."), Perahia Decl., Ex. 22 ¶ 12 (believed Plaintiff was committing

27  "infringement" in 2015).  ***Concurrent Use:*** *Compare* Ravine Decl. ¶ 20 (cited in RUF 51, 71, 72,
    75) (claiming concurrent use agreement) *with*, *e.g.*, Dkt. 138 ¶ 144 ("Counterclaimants do not now

28  and have never sponsored or approved or authorized Counterclaim-Defendants' use of the Open AI

1    ***Defendants submit new, untimely expert declarations that go beyond their original reports***

2    to "impermissibly attempt[] to fix the weakness" that were "identified by [a] summary judgment

3    motion." *Luke v. Fam. Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009)

4    (excluding declarations); *see* Leonard Decl. ¶¶ 7-13 (responding to rebuttal report); Tenery Decl.

5    ¶¶ 11-24 (similar); Chiagouris Decl. ¶¶ 6-34 (similar).

6        ***Defendants mischaracterize evidence.***  In addition to the evidence addressed by Scher

7    Exhibit S, other examples abound, including Defendants' misleading references to "third-party

8    witnesses" (Opp. 14; RUF 26); *see also* RUF 35; DAF 85, 93 (similar).  Each of these purported

9    third-party witnesses worked for or with Ravine or invested in his companies and/or this litigation.[9]

10                                       **CONCLUSION**

11        Summary judgment should be entered in Plaintiff's favor on all claims and counterclaims.

12

13   _____

14   Mark."), Perahia Decl., Ex. 10 at 197:5- 11 ("I also didn't give him permission to [use the name OpenAI]."), *and* Dkt. 100 ¶ 125 ("Relying on [Brockman's 2015] assurances Ravine stopped pursuing the OpenAI initiative").

15   [9]    ***Belkin, Gaer, and Iavarone:***  *See* Belkin Decl. ¶¶ 3-6 ("worked with" and was "hired" by

16   Ravine); Gaer Decl. ¶ 3 (began working for Ravine in "May 2014" and "generally worked for him 40 hours per week"); Iavarone Decl. ¶ 3 ("[Ravine] hired me in June of 2020"); Scher Decl., Ex. D

17   (Ravine Tr.) 10:19-11:22 (Ravine referring to Gaer and Iavarone as employees). ***McMurray:*** McMurray Decl. ¶ 3 ("we worked on a number of different projects over the next decade"); Scher

18   Decl., Ex. D (Ravine Tr.) 55:4-17 (Ravine referring to McMurray as a ▮▮▮▮); *see also id.*, Ex. J (not disclosing McMurry in initial disclosures). ***Reynolds (Investor):*** Scher Decl., Ex. D (Ravine

19   Tr.) 55:4-22 (Ravine referring to Reynolds as a "▮▮▮▮[]"); Ex. G (Reynolds Tr.) 64:9-13 (Reynolds

20   confirming she is "an investor in another one of his companies" and "his friend"), 74:7-76:1 ($450,000 investment in Ravine's company, "We Communicate," which became "Video Inc."),

21   134:18-136:10 (hosting Ravine for holidays and birthday parties, and claiming he has been to her home "probably more than 50" times); 139:2-8 (in 2024, "we checked in with each other once a

22   month or something").  Financial documents submitted by Defendants reflect that companies she invested in were funded through Defendants' alleged activities. *E.g.*, Gaer Decl., Ex. 1 at 3, 6 (payments

23   from "WE COMMUNICATE INC ATTN D REYNOLDS C/O GUY RAVINE"); Gaer Ex. 2 at 2-19 (invoices from 2016-2017 to We Communicate and from 2022 to Video Inc.); Iavarone Ex. 1 at

24   2, 7-21, 23-43, 45-46, 48 (various invoices to Video Inc.); Scher Decl., Ex. A (listing invoices from We Communicate and Video Inc. submitted by Defendants). ***Gruber (Investor):*** Dkt. 177

25   (Discovery Order) ("Gruber invested in defendant Open Artificial Intelligence, Inc., and is funding

26   the company's litigation"); Scher Decl., Ex. D (Ravine Tr.) 48:18-49:4, 53:3-10 (listing Gruber as litigation funder and admitting they discussed it in 2023), Ex. N (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮), Ex. O (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. P (email and attachment regarding "▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

28

DATED: May 14, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By          /s/ Margret M. Caruso
          Margret M. Caruso
      Attorneys for OpenAI, Inc.